QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice forthcoming*)
alexspiro@quinnemanuel.com
Maaren A. Shah (*pro hac vice forthcoming*)
maarenshah@quinnemanuel.com
Samuel Nitze (*pro hac vice forthcoming*)
samuelnitze@quinnemanuel.com
Scott Hartman (*pro hac vice forthcoming*)
scotthartman@quinnemanuel.com
Dominic Pody (*pro hac vice forthcoming*)
dominicpody@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen S. Messinger (CA Bar No. 329983)
kathleenmessinger@quinnemanuel.com
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> DEEL, INC., a Delaware corporation, and DOES 1 – 100, <br><br> Defendants. | Case No. 3:25-CV-2576 <br><br> **COMPLAINT** <br><br> 1. **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c);** <br><br> 2. **CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d);** <br><br> 3. **MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836,** *et seq.***;** |

4. **MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA UNIFORM TRADE SECRETS ACT, CIVIL CODE, § 3426, *et seq.*;**

5. **TORTIOUS INTERFERENCE WITH CONTRACT;**

6. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**

7. **UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, *et seq.***

**JURY TRIAL DEMANDED**

Judge
Courtroom:
Hearing Date:
Hearing Time:

People Center, Inc. d/b/a Rippling ("Rippling") brings this action against Deel, Inc. ("Deel") and unnamed Does, and alleges as follows:

## **INTRODUCTION**

1. This case exposes a calculated and unlawful corporate espionage scheme, orchestrated by Deel, a global, multi-billion-dollar technology company. In a brazen act of corporate theft, Deel cultivated a spy to systematically steal its competitor's most sensitive business information and trade secrets. This was not an isolated act of misconduct—it was a deliberate attack, perpetrated for over four months, designed to steal and weaponize critical competitive data, including a competitor's sales leads, sales pipeline, and its entire playbook for pitching prospective clients. These stolen goods appear intended to be deployed across the Deel organization to gain an unfair market advantage, including by:

- Deel's Sales and Marketing functions to target the competitor's leads and pipeline;

- Deel's Customer Retention function to leverage stolen pricing proposals to lock in customers;

- Deel's Recruiting function to exploit the competitor's internal phone directory to attempt to poach key personnel; and

- Deel's Communications and PR functions to combat and distort negative press cycles.

Most shockingly, these espionage efforts appear to have been directed by the highest levels of Deel's leadership, including, upon information and belief, Philippe Bouaziz – Deel's Board Chair, Chief Financial Officer, and the father of the CEO – or those closest to him.

2. This industrial espionage scheme came to light very recently, when Rippling discovered that its competitor Deel had cultivated a spy within Rippling's employee base and commenced an internal investigation.

3. That investigation revealed that Deel's spy used Rippling systems to spy on Deel's own customers, who were discussing a switch away from Deel. The spy searched the term "deel" in Rippling's systems on average 23 times a day over a four-month period, which allowed the spy to comprehensively capture every detail of Rippling's sales pipeline competing with Deel, including proposed pricing, details of sales meetings and conversations between Rippling and prospective

customers evaluating a switch away from Deel, and training materials for Rippling's sales organization on how to compete against Deel.

4.    For example, on just **one single day**—February 21, 2025—Deel's spy conducted searches that revealed 728 new companies requesting a demo of Rippling's products; 282 in-depth notes from Rippling account executives on companies that were new prospects in its sales pipeline; and thorough information about 26 new deals with existing customers or prospective clients who were evaluating switching to Rippling directly from Deel. And that is just one single day. These activities were repeated nearly every single day, for over four months.

5.    Astoundingly, this hijacking of Rippling's most prized data appears to have been orchestrated by Deel's senior leadership. The smoking gun came earlier this month, when Rippling set forth a test, or what is known by security professionals as a "honeypot." Rippling knew that Deel was most likely to activate its spy if faced with potentially damaging press, and indeed, that is how the spy originally revealed himself. So, to confirm Deel's involvement, Rippling's General Counsel sent a legal letter to Deel's senior leadership identifying a recently established Slack channel called "d-defectors," in which (the letter implied) Rippling employees were discussing information that Deel would find embarrassing if made public. In reality, the "d-defectors" channel was not used by Rippling employees and contained no discussions at all. It had never been searched for or accessed by the spy, would not have come up in any of the spy's previous searches, and the spy had no legitimate reason to access the channel. Crucially, this legal letter was only sent to three recipients, all associated with Deel: Deel's Chairman, Chief Financial Officer, and General Counsel (Philippe Bouaziz), Deel's Head of U.S. Legal (Spiros Komis), and Deel's outside counsel. Neither the letter nor the #d-defectors channel was known to anyone outside of Rippling's investigative team and the Deel recipients. Yet, just hours after Rippling sent the letter to Deel's executives and counsel, Deel's spy searched for and accessed the #d-defectors channel—proving beyond any doubt that Deel's top leadership, or someone acting on their behalf, had fed the information on the #d-defectors channel to Deel's spy inside Rippling.

6.    Armed now with proof that Deel was directing the spy (in addition to all of Rippling's existing forensic evidence, covering months of espionage activities), on Wednesday, March 12,

2025, Rippling dutifully sought and obtained a court order from the High Court in Ireland, the country in which the spy resides, to ensure the preservation of any incriminating information on the spy's mobile phone. This court order contained what is known in Ireland as a "penal endorsement," meaning that a party who fails to comply with the order may be imprisoned for their noncompliance. Last Friday (March 14, 2025), at Rippling's offices in Dublin, a court-appointed independent solicitor served Deel's spy with the court order to preserve his mobile phone.

7.      Faced with a choice between providing his cell phone for examination pursuant to a lawful court order or going to jail for not complying, the spy chose the latter. In fact, Deel's spy lied to the court-appointed solicitor about the location of his phone, and then locked himself in a bathroom—seemingly in order to delete evidence from his phone—all while the independent solicitor repeatedly warned him not to delete materials from his device and that his non-compliance was breaching a court order with penal endorsement. The spy responded: "I'm willing to take that risk." He then fled the premises.

8.      Due to the wanton conduct by Deel's spy last Friday, Rippling now swiftly brings this action against Deel to stop Deel's theft and misuse of its confidential and proprietary information, to prevent Deel from further harming Rippling through its unlawful competition, and to obtain compensation for the significant harm to Rippling that Deel has caused through its serial violations of the law.

## THE PARTIES

9.      Plaintiff People Center Inc. d/b/a Rippling is a Delaware corporation with its principal place of business in San Francisco, California. Rippling is a successful, late-stage software company that offers a global workforce management platform to enable businesses to manage core internal workflows—including human resources, IT, and finance—through a unified suite of cloud-based applications that are built on a single software platform. Rippling's customers are business enterprises ranging from small businesses to larger, enterprise-level customers. Since its founding in 2016, Rippling has been a leader in this space, now serving tens of thousands of customers around the world.

10.     Defendant Deel Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under 18 U.S.C. § 1962 and 18 U.S.C. § 1836.

12.     This Court has supplemental jurisdiction over Rippling's state law claims under 28 U.S.C. § 1367 because Rippling's state law claims are so closely related to its federal claims that they form part of the same case of controversy under Article III of the United States Constitution.

13.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391 because Deel resides in the Northern District of California and a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

## DIVISIONAL ASSIGNMENT

14.     A substantial part of the events and omissions which gave rise to the claims asserted took place in San Francisco, California.  Thus, pursuant to Civil L.R. 3-2(c) and (e), this action should be assigned to the San Francisco Division of this District.

## FACTUAL ALLEGATIONS

## I.    GENERAL BACKGROUND

15.     Rippling offers a global, all-in-one solution that allows its customers to hire, pay, and manage their global workforce.  Since its founding in 2016, Rippling has been a leader in this space, developing over 20 best-in-class, technology-first solutions, now used by tens of thousands of customers around the world.  Due to the breadth of Rippling's platform, Rippling has competitors in every market segment in which it operates.

16.     Deel was founded in 2019 as a global contractor management platform, and has, since that time, expanded to offer other global workforce management products.  Deel was also a customer of certain Rippling products until early 2023.  Rippling launched its global suite of products in late 2022, and Deel responded by planning competitive product announcements, bringing the two companies into direct competition.  In an email dated November 16, 2022, Rippling

1  informed Deel that it would not be renewing Deel's contract due the increasing competitive nature

2  of both Rippling and Deel's product offerings, and specifically noted: "We're concerned that your

3  access and use of our systems will inform your own efforts in this regard, and would prefer that we

4  each compete on the merits of our own innovations."

5

6  From: **Sarah Hartman** <sarah@rippling.com>
   Date: Wed, Nov 16, 2022, 12:06
   Subject: Deel and Rippling

7  To: <phb@deel.com>, <alex@deel.com>

8  Deel team,

9  Congrats on Deel's rapid growth. There's clearly a huge market for global employee management products, and it looks like both Deel and Rippling have discovered that opportunity. That means that, in some cases, we're going after the same customers with similar products, and that has put us in a difficult position around your use of the Rippling platform.

10 As you've surely recognized, the only path to success is by building a comprehensive HR and payroll system. We're concerned that your access and use of our systems will inform your own efforts in this regard, and would prefer that we each compete on the merits of our own innovations.

11

12 To that end, we'd like to terminate our commercial relationship at the end of your current agreement, which expires on February 28, 2023. We don't offer month-to-month extensions on our agreements, but this is an unusual case given that we're requesting that you find another provider. If necessary, we can work to find a mutually agreeable timeline beyond February.

13

14 We hope that this advance notice ensures you have the opportunity to transition gracefully to another provider. We understand the importance of ensuring continuity of payroll, benefits, and systems access for the 1,400+ people you support with Rippling. Let us know if you need any recommendations on other providers; we're committed to doing whatever's possible on our end to make this a very smooth transition for your team.

15

16 Thank you for being a Rippling customer to this point, and we wish you all the best in this exciting new market.

17 Yours,
   Sarah Hartman

18

19         17.    Rippling's termination notice to Deel turned out to be prescient.  Today, Rippling and

20 Deel often compete directly against each other for customers looking for global workforce

21 management solutions, a subset of Rippling's product offerings.  Terminating the Deel customer

22 relationship was an important step taken by Rippling to protect its confidential information.

23         18.    Rippling expends an enormous amount of time and money developing its products,

24 sales approach, and customer engagement strategy.  This information is valuable to Rippling

25 precisely because it is not available to its competitors.  As part of its regular business practices,

26 therefore, Rippling stringently protects its confidential, commercially sensitive business information

27 from disclosure and misuse in the highly competitive landscape in which it operates.

28

## II.    RIPPLING'S SALES AND MARKETING TRADE SECRETS AND CONFIDENTIAL BUSINESS INFORMATION

19.    Over the course of several years and through substantial efforts and financial investment, Rippling has developed, compiled, and maintained a wealth of sales- and marketing-related trade secrets and confidential business information (hereinafter referred to as "Rippling's Sales and Marketing Trade Secrets") that it uses to acquire customers, service the needs of those customers, and achieve and maintain a competitive edge over other global workforce management companies, including Deel.  This information was developed through direct interactions between Rippling representatives and current and potential Rippling customers and is not known to the general public.  Because this information is known only to Rippling, it provides Rippling with a competitive advantage over its competitors, allowing it to fine tune its marketing message to appeal to potential customers and to adapt its products to serve customer needs.  This information is likewise valuable to Rippling's competitors, who could obtain market share, and therefore economic value, by mimicking Rippling's message and product features, or by calibrating their own sales, marketing, and customer retention strategies to more directly combat those employed by Rippling.

20.    Rippling's Sales and Marketing Trade Secrets include the following:

21.    ***Rippling's Sales Leads.***  To identify potential prospective customers, Rippling spends millions of dollars each year on marketing, with the sole goal of identifying companies that are open to hearing about Rippling's products ("Rippling's Sales Leads").  Rippling identifies sales leads by tracking responses to targeted advertisements, LinkedIn posts, Google AdSense inventory, and a variety of other marketing efforts.

22.    The Sales Leads generated by these efforts are tremendously valuable in and of themselves—indeed, that is why Rippling spends so much money procuring them.  In Rippling's market, identifying potential customers in the first instance is the most difficult (and expensive) part of the revenue generation cycle.  A single outbound lead is the work product of hours of outbound phone calls made by one of Rippling's sales development representatives.  It is, in essence, a eureka moment:  the right person, with a business challenge that Rippling solves, at the exact point in their business lifecycle to consider Rippling.  Moreover, because the leads are the product of the work of

Rippling's sales team and are not made public, they provide Rippling with a competitive advantage over its competitors in identifying these potential customers. If a Rippling competitor were to have access to the end result of these efforts without needing to spend the considerable sums and hours Rippling does, the competitor could profit substantially by pursuing Rippling's Sales Leads without expending the effort to generate them. The value of the leads to Rippling would, in turn, diminish.

23. ***Rippling's Sales (Prospective Client) Pipeline.*** Once Rippling has identified prospective customers to be targeted, Rippling's salesforce is responsible for persuading them to become Rippling customers. To do so, Rippling's salesforce follows a step-by-step process developed through extensive efforts and experience that is unique to Rippling ("Rippling's Sales Pipeline"). Rippling's Sales Pipeline is best illustrated as a funnel, with customers getting closer and closer to signing a deal with Rippling as they process from the top of the funnel to the bottom.

24. A prospect flowing through Rippling's Sales Pipeline goes through the following stages, each of which reflects Rippling's extensive research into the ideal method of converting a Sales Lead into a Rippling customer:

    a. **Stage 1.** A Rippling sales development representative ("SDR") assigns the prospect to a Rippling salesperson, who in turn engages in pre-call research about the prospective customer.

    b. **Stage 2.** The salesperson works with the prospective customer to identify the prospect's business challenges, learn why the prospect is interested in learning more about Rippling (particularly if the prospect is currently a customer of a direct competitor), and discusses how Rippling can solve those business challenges.

    c. **Stage 3.** The salesperson conducts product demonstrations for the prospect, showing how Rippling's products can solve the prospective customer's unique business challenges.

    d. **Stage 4.** Depending on the feedback from the customer, the salesperson may further tailor Rippling's solution(s) to the customer's current issues and conduct additional demonstrations to validate those solution(s).

e.  **Stage 5.**  The salesperson and the prospective customer align on pricing—which is unique to each individual customer (*i.e.*, Rippling's pricing is dynamic and reflects individual customer needs)—and other contract terms.

25.  Represented visually, Rippling's Sales Pipeline generally looks like the below:



26.  Each stage of the Sales Pipeline requires significant effort and resources by Rippling and its salesforce.  Moreover, and importantly, each stage is vigorously documented.  This documentation includes: (1) who the prospective customer is, where they are located, who the contact person is, and the size of the company; (2) the customer's business challenges, or what the customer is looking for; (3) Rippling's customized and tailored solution to that customer's problems and needs; and (4) the offering price point and contractual terms.  Additionally, each call with a prospect is transcribed in real-time and stored in a centralized database, allowing for subsequent review of each and every call with a prospect.

27.  The information generated through Rippling's Sales Pipeline assists the company in quickly and efficiently turning a prospective customer into an actual customer.  Rippling employees

who are soliciting a prospective customer or who are interested in learning about that prospective customer can search this information to understand the prospect's needs and desires, and company engineers can use it to determine why customers choose Rippling's products (and why some prospects do not) in order to sharpen Rippling's products and to design even better solutions for the next prospect down the line.

28.    In many cases, Rippling is soliciting a prospective customer who is an active customer of a competitor's product. Through the Sales Pipeline process, Rippling employees learn what these prospects' business challenges are with their existing solution, and why the prospect is interested in exploring a replacement solution. For obvious reasons, in the hands of a competitor this information would provide a real competitive advantage in their efforts to retain their customer.

29.    ***Rippling's Competitive Intelligence Cards.***  In tandem with the expense, time, and resources devoted to identifying prospective customers, Rippling has also developed competitive "battlecards" that it uses to train its salespeople for pitches to prospective Rippling customers that are currently working with a competitor, or who are considering Rippling along with one or more of its competitors, in order to effectively explain Rippling's advantages over those competitors ("Rippling's Competitive Intelligence Cards"). Rippling maintains Competitive Intelligence Cards for competitors in each of its product verticals, totaling over 80 such cards, including one for Deel.

30.    The Competitive Intelligence Cards reflect thousands of hours of work by Rippling, including the review of call transcripts and notes with current and prospective customers that mention or pertain to Rippling's competitors. During that process, Rippling learns several things, including: (1) what that customer does not like about the competitor; (2) what that customer is looking for that the competitor does not offer; and (3) what that customer does like about the competitor. By carefully and thoroughly analyzing the information produced through Rippling's thousands of hours of calls with prospective and current customers, Rippling determines how to effectively pitch a customer that is either already a customer of one of its competitors or is considering Rippling alongside one or more competitors. Rippling then simplifies that data into slides showcasing the advantages of Rippling's products over deficiencies in its competitors' products.

31.    For example, from the review of thousands of pages of customer call transcripts, Rippling might believe that a top complaint prospective customers have about Deel is ineffective support, with responses taking multiple days.  Armed with that information, Rippling might then effectively train its salesforce to focus on highlighting Rippling support, and in particular Rippling's online publication of real-time support status data.

32.    In effect, these Competitive Intelligence Cards represent Rippling's entire playbook for competing against its peers.  The Competitive Intelligence Cards position Rippling to compete against, among others, Deel in the best possible manner, and train Rippling's sales force on what to say to effectively, both offensively and defensively, counter Deel.  The Cards are also iterative in nature, or a "living document," in the sense that, as Rippling learns new information about its competitor, the slides are tweaked and fine-tuned to address those changes.

33.    Rippling's Competitive Intelligence Cards are valuable to Rippling in significant part because their contents are not known to Rippling's competitors.  A competitor who gained access to Rippling's slides about it could attempt to, for example, build out a functionality Rippling has identified as superior in its products vis-à-vis the competitor's products or calibrate its marketing message to rebut or muddy the arguments made by Rippling.

34.    ***Rippling's Implementation and Customer Support Strategies.***  Once a contract is executed with a customer, Rippling's salesforce hands off the customer to its implementation team to tailor and customize Rippling's products to the customer's unique needs, and then to its account management and support teams to ensure continued satisfaction and utility with the Rippling platform ("Rippling's Implementation and Customer Support Strategies").  Simultaneously, Rippling deploys a team of Rippling employees to identify and address any challenges the customer may have during or after the implementation process.

35.    In order to efficiently and quickly address any challenges its clients may be facing, Rippling has created various Slack channels so that Rippling team members can promptly address concerns.  For example, Rippling has an "exec-escalations" channel, which contains information about customers with significant issues that require involvement of Rippling's executive leadership team.  This information is used to understand customer business challenges and provide quick

resolutions, with visibility at the highest levels of the company.  This, in turn, allows Rippling to quickly and comprehensively address these issues, and effectively demonstrate its commitment to customer experience.

36.     However, in the hands of a competitor, knowledge of new Rippling customers who are encountering challenges would be valuable, as such new customers might be more willing to switch from Rippling's products to the competitor's products than the majority of Rippling's (satisfied) customers would be.  Accordingly, and for obvious reasons, Rippling's internal list of customers in the implementation phase or with support tickets is highly secret, and the disclosure thereof would negatively affect Rippling's business in numerous ways.

37.     ***Rippling's Client List and Churn Risk List***.  Finally, Rippling also maintains a list of its customers along with important non-public information about each customer and its relationship to Rippling, such as pricing data and the individualized discounts to Rippling's list price applied for that customer, customer business analysis (such as potential business growth plans, budgetary constraints, or potential product use-cases), information on the customer's systems and other technologies, and information on the customer's relationships with other vendors in Rippling's verticals (and the customer's level of interest in purchasing additional Rippling products to replace those vendors) ("Rippling's Customer List").  Relatedly, Rippling maintains a list of current Rippling customers that are at-risk for leaving Rippling (i.e., customers at risk of "churn") ("Rippling's Churn Risk List").  For the latter, Rippling maintains a dedicated Slack channel that identifies "churn" risks and assigns a probability likelihood of that particular customer leaving Rippling or considering leaving Rippling; using this information, Rippling can attempt to resolve those customers' concerns and improve their experience so that they stay.

*   *   *

38.     The Sales and Marketing Trade Secrets described above were compiled, developed, and created by Rippling over time through substantial efforts and expense, and are not known to the public.  Moreover, their value to Rippling derives in significant part from the fact that they are known only to the company.  Disclosure of this information to the public or to Rippling's competitors would allow those competitors to target their products and marketing to potential

customers without expending the time, energy, and money that Rippling has expended in identifying those prospective customers and developing the information about the prospective customers' needs and desires.

39.     For example, as mentioned above, Rippling (and its competitors) expend massive amounts of money to market to prospective customers, all with the intent of identifying prospective customers that are willing to have a conversation with one of the company's salespeople about the company's products.  The identities of its customers and their desires, complaints, and interests are valuable to Rippling, in part, because they are not publicly known.  Rippling can achieve a sales advantage over its competitors by using this information to target its sales pitches and product design.

40.     Likewise, if a competitor were to obtain Rippling's Sales Pipeline, notes, transcripts, and Churn Risk List, the competitor could exploit this information without undertaking the arduous and incredibly expensive marketing and intelligence effort which Rippling used to generate the information.  The competitor would immediately have a treasure trove of high-intent prospective customers at its fingertips at no cost to itself.  And that would be true even if the competitor only had access to Rippling's Sales Leads.  Couple that with the fact that the competitor could also know the prospective customer's business challenges, Rippling's solutions to those concerns, and the price point at which the Rippling would be offering those solutions, the competitor would be positioned to target, pitch, and win the customer on the back of Rippling's considerable work.

41.     Due to the fast-paced and global nature of Rippling's business and target market, it is imperative that Rippling employees can exchange information quickly and efficiently to expeditiously close deals with prospective customers or identify and resolve issues a current customer is facing and deploy a solution as fast as possible.  To achieve this, Rippling stores its Sales and Marketing Trade Secrets in centralized databases accessible to all of its employees, including databases hosted by Salesforce, Slack, and Google.  Rippling's use of these databases for storage is not uncommon for a modern technology company of its size.

42.     Given that their value lies in part in their secrecy, Rippling has taken considerable steps to maintain the confidentiality of its Sales and Marketing Trade Secrets.  These efforts include

requiring all of Rippling's employees to sign a Confidentiality and Intellectual Property Rights Assignment Agreement ("CIPRAA") as a condition of employment and requiring that such employees sign Rippling's Global Employee Handbook, which includes Rippling's Code of Conduct.  The CIPRAA, Employee Handbook, and Code of Conduct make clear that each Rippling employee is required to keep Rippling's information confidential and to utilize the information and technology provided by Rippling only for an appropriate, work-related purpose.

43.    In addition, the tools Rippling utilizes to facilitate its global work are also restricted to employee-only access and require various authentication methods.  For example, for an individual to be able to access and utilize Rippling's Slack function, Rippling must add that person as an active Slack user.  Rippling only provides such credentials to active employees and certain contractors that are providing services to Rippling for a particular purpose.  Moreover, Rippling's practice is for employees to only access public Slack channels within the Rippling universe that pertain specifically to their job function.

44.    Moreover, while Rippling permits its employees to remotely access Rippling's company systems, networks, or applications, in accordance with Rippling's Bring Your Own Device ("BYOD") Policy, that remote access is also heavily restricted.  For example, in order to access an application such as Slack from their mobile device, the Rippling employee must use a device meeting certain security requirements (such as having a strong password, automatic locking of the device upon a number of failed login attempts, and the latest security patches and updates installed). The employee must use their Rippling login credentials and, where required by the system, is subject to a multi-factor authentication process or is required to use a token for access.

## III.    RIPPLING HIRES DEEL'S EVENTUAL SPY

45.    On June 20, 2023, an affiliate of Rippling hired Deel's spy ("D.S."), because of his experience in global payroll, into a management role at Rippling as its Global Payroll Compliance Manager. D.S.'s responsibilities in that role included hiring payroll specialists, country launches, and setting up payroll processing and operations for approximately 15 countries in which Rippling offers global payroll services.  D.S.'s daily responsibilities included managing a team of Global Payroll Operations Specialists to ensure timely and accurate performance of local payroll activities

for customers, as well as resolving payroll-related customer escalations related to the countries within his job scope.  As a result of his employment in this role—and pursuant to several contracts he signed in connection therewith, detailed below—D.S. was granted access to: Rippling's secure internal electronic messaging application, Slack (the "Slack Platform"); Rippling's Salesforce database (the "Salesforce Database"), which contained confidential information about current and prospective customers; Rippling's secure Google Drive repository ("Rippling's Google Drive"); and Rippling's internal human resources system, which contains information such as names, addresses, and personal cell phone numbers for Rippling employees (the "Rippling HR Platform").  The Slack Platform, the Salesforce Database, Rippling's Google Drive, and Rippling HR Platform are confidential. Moreover, not all Rippling employees have access to all files stored on these platforms; rather, they must be granted permissions to access specific file.  As described above, that restriction is enforced through industry standard authentication protocols.

46.     As a formal matter, Rippling Ireland Limited ("Rippling Ireland"), a wholly owned subsidiary of Rippling, hired D.S. for the purpose of providing services to Rippling.  Indeed, when D.S. was offered his position, he was specifically informed that Rippling was "delighted to make you an offer to join the People Center, Inc. [Rippling] team" and that, because he was not a resident of a country where Rippling has a legal entity, his "employment will be structured using an Employer of Record service, provided through our international employment partner Rippling Ireland Limited ('Rippling')."  Moreover, while D.S. was technically an employee of Rippling Ireland, his employment offer letter made clear that he was employed by Rippling Ireland to "provid[e] services to [Rippling's Ireland's] client, People Center, Inc. [Rippling]." Rippling Ireland is the employer of record for any member of Rippling's internal workforce physically located outside of the United States.  D.S. is domiciled in Ireland; however, the overlap between his Irish domicile and Rippling Ireland's domicile is a coincidence.

47.     As Rippling's agent and manager, D.S. owed fiduciary duties to Rippling.  Therefore, as a matter of common law agency principles, D.S. owed a duty of loyalty to Rippling and was obligated not to use or communicate information confidentially given to him or acquired during the course of his employment in violation of his duties as an agent, in competition with or to the injury

of Rippling, or for his own benefit or the benefit of another in a transaction not related to his employment.

48.     D.S.'s duties of loyalty, trust, and confidence to Rippling and its affiliates were further established and defined by the agreements that he signed in connection with his employment.

49.     **_First_**, through his Contract of Employment, D.S. agreed not to "use or disclose or make available to anyone else, during or after [his] employment, any Confidential Information," except as necessary in connection with his employment.  "Confidential Information," in turn, was defined to include:

> [A]ll proprietary or confidential information regarding the Company... or relating to the Company Group's operations or business and not generally known outside of the Company Group, which you obtain from the Company or its directors, officers, employees, agents, suppliers or customers or otherwise by virtue of your employment with the Company including, without limitation, the following types of information or material: corporate information, including... marketing information, including sales, investment and product plans, strategies, methods, customers, customer lists and information, prospects and market research data; [...] and personnel information, including personnel lists, resumes, personnel data, organizational structure and performance evaluations.

50.     D.S.'s Contract of Employment also obligated him "to comply with [Rippling Ireland's] and [Rippling's] rules, regulations and policies (the 'Policies')."  Those policies included Rippling's Code of Conduct, which prohibited employees from "disclos[ing] or reveal[ing] confidential information within or outside of Rippling without proper authorization or purpose."

51.     **_Second_**, when he began working at Rippling, D.S. acknowledged and agreed in writing that his employment was contingent upon his agreement to certain terms (the "Employment Acceptance Agreement").  Among those terms was a prohibition on "engag[ing] in any employment, occupation, consulting, or other business activity directly related to the business in which [Rippling] is now involved or becomes involved during the term of [his] relationship with [Rippling]" and a prohibition on "engag[ing] in any other activities that conflict with [his] obligations to [Rippling]."

52.     **_Third_**, D.S. executed Rippling's CIPRAA with Rippling directly.  Through the CIPRAA, D.S. agreed to "keep and hold all . . . business, technical and financial information

developed, learned or obtained in connection with [his employment] (collectively 'Proprietary Information') in strict confidence and trust." D.S. further agreed not to "disclose any Proprietary Information without first receiving [Rippling's] express written direction or consent."

53.    The confidentiality and nondisclosure elements of D.S.'s Contract of Employment, the Employment Acceptance Agreement, and the CIPRAA (collectively, "D.S.'s Nondisclosure Obligations") were and remain critical to Rippling, given the competitively sensitive information D.S. had access to during his employment and the considerable risk of competitive harm likely to result from dissemination of that information to Rippling's competitors, including Deel.

## IV.    DEEL'S SPY BEGINS STEALING RIPPLING'S TRADE SECRETS AND CONFIDENTIAL BUSINESS INFORMATION

54.    As noted above, by virtue of their employment, Rippling employees enjoy access to Rippling Slack channels to aid in their business activities. Moreover, Rippling utilizes various additional software programs in conjunction with Slack, such as Gong, which transcribes telephone calls with customers and prospective customers. These transcripts are then "pushed" to Slack for authorized users to view and query.

55.    In part to ensure that the confidential information in Rippling's Slack channels is used only for authorized purposes, Rippling employees' Slack activity is "logged," meaning every time a user views a document through Slack, accesses a Slack channel, sends a message, or conducts searches on Slack, that activity (and the associated user) is recorded in a log file.

56.    Rippling's Slack logs show that D.S. began searching and accessing Rippling's Slack channels at an unprecedented rate beginning in or around early November 2024.  Notably, D.S. searched the term "deel" approximately 23 times per day:



57.    The below illustrative example demonstrates why a search for "deel" is powerful and alarming.  Namely, this example search shows that "deel" is mentioned in discussions concerning certain Rippling sales leads as well in a discussion related to a potential customer for Rippling's Professional Employer Organization ("PEO") product:



58.    Also notably, D.S. frequently accessed various channels in "preview" mode—allowing him to see the contents of the channels without "joining" them.  Although it is more common for Slack users to join a channel to review its contents, joining a channel generates an automated message to the members of the channel identifying the new user who has joined.  On information and belief, D.S. chose to review the channels in question in preview mode to avoid alerting the channels' members that he had accessed them.

59.    The log-generated chart below shows that, between August and October 2024, D.S. rarely previewed any Slack channels, consistent with typical employee behavior.  Moreover, on the rare occasions in which he did so, D.S. previewed the channels no more than four times in any given month, and did so for channels like "#ppl-dogs," a channel dedicated to Rippling employees sharing pictures of their dogs:

| Aug 2024 | | Sep 2024 | | Oct 2024 | |
|---|---|---|---|---|---|
| Channel | Views | Channel | Views | Channel | Views |
| oasis-ytd-import | 4 | [redacted] | 2 | [redacted] | 2 |
| ppl-dogs | 3 | poland | 1 | churn_updates | 1 |
| payments | 1 | hub | 1 | | |
| incident-response | 1 | | | | |

60.    However, beginning in November 2024, D.S. beginning previewing channels at a rate orders of magnitude greater than he had before—both in terms of the number of channels previewed, and in the number of times he previewed each of those channels:

| Nov 2024 | | Dec 2024 | | Jan 2025 | | Feb 2025 | |
|---|---|---|---|---|---|---|---|
| Channel | Views | Channel | Views | Channel | Views | Channel | Views |
| deal-desk-sales | 113 | gong-stream-deel-compete | 104 | deal-desk-sales | 164 | [redacted]-peo | 71 |
| am-sales-updates | 85 | gong-stream-deel-compete | 98 | gong-stream-deel-compete | 105 | im-gong-calls | 54 |
| gong-stream-deel-compete | 73 | im-gong-calls | 63 | im-gong-calls | 88 | deal-desk-sales | 53 |
| sdr-segment-drift | 53 | deel-gongstream | 47 | am-sales-updates | 75 | gong-stream-deel-compete | 51 |
| deel-gongstream | 36 | peo-quote-updates | 41 | notifications | 57 | emea-global-only-ob-notifications | 28 |
| global-apac-sdr-qualification | 32 | emea-sales-global-core | 40 | sdr-segment-drift | 42 | payroll-ukraine-russia | 21 |
| rattle-mops-testing | 26 | client-[redacted]-eor | 37 | peo-quote-updates | 39 | client-[redacted]-peo | 21 |
| foundgold-global-nls | 24 | mops-inbound-request-alerts | 30 | exec-escalations | 38 | am-sales-updates | 17 |
| emea-global-routing | 24 | deal-room-[redacted] | 25 | foundgold-global-nls | 38 | sales | 17 |
| ind-sdr-ae-opps | 24 | am-sales-updates | 24 | prospect-[redacted] | 37 | emea-sc-requests | 16 |
| comms-competitor-news | 22 | global-sc-requests | 20 | deel-gongstream | 36 | global-sc-requests | 16 |
| notifications | 21 | uki-s1-routing | 16 | bernie-wow | 35 | exec-escalations | 15 |
| sales-alerts | 18 | competitive-deal-insights | 15 | emea-sales-global-core | 31 | competitive-deal-insights | 12 |
| delighted-nps | 18 | foundgold-global-nls | 15 | client-[redacted] | 30 | namedaccount-[redacted] | 12 |
| uki-s1-routing | 17 | hr-sc-requests | 13 | uki-s1-routing | 26 | peo-quote-updates | 12 |
| sales-wins | 14 | delighted-nps | 13 | emea-global-routing | 25 | [redacted]-strategy | 11 |
| notifications | 14 | sdr-segment-drift | 12 | rattle-mops-testing | 24 | coaching | 11 |
| proj-deel-remote-compete | 13 | im_churn_updates | 11 | competitive-deal-insights | 22 | content-posting-hq | 11 |
| emea-sc-requests | 12 | peo-prospect-[redacted] | 11 | delighted-nps | 20 | mops-inbound-request-alerts | 10 |
| page-load-alerts | 12 | apac-forecast-updates | 10 | comms-competitor-news | 18 | foundgold-global-nls | 10 |
| ask-data-deletion | 11 | emea-global-routing | 9 | sdr-creating-referral-partner-optys | 17 | test-escalations-catch-all | 10 |
| aus-apac-background-checks-vevo | 11 | mm-global-high-intent-notifications | 9 | emea-sc-requests | 17 | sdr-segment-drift | 10 |
| emea-global-outbound-pods | 11 | competitor-marketing-in-the-wild | 9 | client-[redacted]-peo | 9 | mm-global-high-intent-notifications | 10 |
| in-product-cross-sell | 10 | mid-market-wins | 8 | client-[redacted] | 8 | am-ts-missedopportunities | 9 |
| hr-sc-requests | 10 | escalation-[redacted] | 8 | hr-sc-requests | 14 | gong-stream-justworks | 9 |

61.    A chart of D.S.'s Slack-channel-previewing activity represented graphically tells the same story.  The blue in the chart represents the number of times that D.S. previewed a public channel.  A spike in previewing activity begins in November 2024 and continues thereafter:



62.    D.S.'s Slack activity beginning in November 2024 was not merely a departure from his own prior activities.  As shown below, D.S. previewed Slack at orders of magnitude more than his peer Rippling employees as well; in this chart, red bars indicate D.S.'s channel previews over time, while three of his peers are represented with other colors (barely noticeable by comparison):



63.     The channels D.S. previewed during this period have no connection to his payroll operations job responsibilities.   What they do relate to, however, are all aspects of Rippling's business development, sales, and customer retention strategies—the most sensitive of the Company's Sales and Marketing Trade Secrets and confidential business information—with a particular emphasis on a single competitor, Deel.  Leaving no doubt about the ultimate beneficiary of the brazen espionage scheme, D.S. viewed channels related specifically to Rippling's competitive intelligence concerning Deel over 450 times during the course of the scheme.

64.     Indeed, D.S.'s top 10 channel previews since November 2024 are all sales-related channels, completely unrelated to D.S.'s role in payroll operations:

| | A | B | ◄ ► | F | G | H | I |
|---|---|---|---|---|---|---|---|
| 1 | Channel name | Total count of events | | 2025-02 | 2025-01 | 2024-12 | 2024-11 |
| 2 | deal-desk-sales | 428 | | 53 | 164 | 98 | 113 |
| 3 | gong-stream-deel-compete | 333 | | 51 | 105 | 104 | 73 |
| 4 | im-gong-calls | 209 | | 54 | 88 | 63 | 4 |
| 5 | am-sales-updates | 200 | | 17 | 75 | 23 | 85 |
| 6 | deel-gongstream | 123 | | 4 | 36 | 47 | 36 |
| 7 | sdr-segment-drift | 117 | | 10 | 42 | 12 | 53 |
| 8 | peo-quote-updates | 101 | | 12 | 39 | 41 | 9 |
| 9 | emea-global-only-ob-notifications | 99 | | 28 | 57 | 0 | 14 |
| 10 | foundgold-global-nls | 88 | | 10 | 38 | 15 | 25 |

65.     Guided by "Deel" as his primary search term, D.S. surreptitiously accessed Rippling Slack channels replete with its Sales and Marketing Trade Secrets and proprietary and confidential information.  The channels accessed by D.S. contain highly sensitive and confidential information about existing customers and prospective customers, including details such as the customer's name, contact information, revenue at issue, the current issues or problems the customer is facing, and details of sales and relationship conversations between Rippling and its customers or prospective customers.  All of these are details that a competitor, such as Deel, could exploit to convince such customers to purchase their products rather than Rippling products.

66.     To illustrate a few examples of the Sales and Marketing Trade Secrets and confidential information within Rippling's Slack channels, D.S. viewed the following slack channels:

- #[redacted]-global-nis: a channel that has only a single member — its creator, Rippling's Senior Vice President of International Sales.  This individual made the

channel to pull in and collate summaries of sales calls with promising prospective customers for Rippling's global products. Several recent entries on the channel describe specific prospective customers currently using Deel and other solutions, but who are interested in Rippling to address specific concerns or objectives. D.S. has viewed the channel 88 times since November 2024.

- #mops-inbound-request-alerts: a channel that records every inbound sales request and contact information for every prospective Rippling customer. Inbound sales requests are prospective customers who contact Rippling to initiate a sales discussion after having viewed Rippling's Marketing or promotional materials. On one day in February alone, there were over 700 notifications posted in the channel. D.S. has viewed this channel 56 times since November 2024.

- #deal-desk-sales: a channel that includes an automated alert for each sales quote, which includes the name of the customer, the net revenue attributable to the potential sale, the discount to the product's sticker price applied, the associated sales representative, the date the transaction closed, and a link to the customer account in Rippling's Salesforce software. Through this channel, D.S. had access to every client name and sales quote dating back to September 10, 2024. D.S. has viewed this channel over 400 times since November 2024.

- "mm-global-high-intent-notifications": a channel containing an automated feed of every prospective mid-market customer that books a demo with Rippling, along with key details about the customer, including their total domestic and international employee and contractor headcount, existing payroll provider, Rippling products they are most interested in exploring, and a summary of challenges they have faced with prior HR enterprise software. D.S. has visited the channel over 40 times since November 2024, exclusively from his personal mobile phone.

  ○ As an example, D.S. accessed this channel 16 times on March 12, 2025. On that single day, the channel captured 65 distinct mid-market prospects seeking to demo Rippling products, along with their entity profile details and HR software objectives. A competitor stealing these details would know exactly where to direct its outbound sales efforts, without having to deploy any of their own resources towards marketing or researching those prospects.

- "PEO-Dealroom": a channel used for the sole purpose of requesting that a member of the sales team put together quotes for prospective customers of Rippling's PEO product and who have reached the price-negotiation stage of Rippling's Sales Pipeline. Knowledge of prospective customers seeking PEO quotes from Rippling and the quotes under discussion internally would enable a competitor to insert itself into every Rippling PEO contract negotiation, without having to spend the marketing budget or sales team resources to source or cultivate those prospects. On February 19, 2025, a single day during the scheme, D.S. viewed this channel 8 times.

67.     In total, Slack logs of D.S.'s activity establish that he secretly viewed and downloaded information from Rippling Slack channels dedicated to prospective clients over 1,300

times between November 2024 and March 2025.  Rippling's forensic investigation has uncovered several examples of how D.S. plundered these prospective customer Sales and Marketing Trade Secrets in a pattern demonstrating an intent to misappropriate them for Deel's commercial benefit. For example:

- On March 11, 2025, a new Slack channel was created to discuss a company ("Prospect A") that was already using Rippling for certain products but was not using Rippling's HRIS product.  A single message was posted, noting that this Prospect A was "exploring options to transition their 90+ international employees from Deel/Personio to a new HRIS platform and are evaluating Rippling."

- By the very next day, March 12, 2025, D.S. had found and previewed this channel three times, guided by his cornerstone search term, "deel".

- The Rippling sales team then used the channel to discuss confidential sales strategies to compete for the potential opportunity, including how to address specific pricing structure requests from Prospect A and Prospect A's implementation objectives. Little did the team know, there was a spy within Rippling viewing this information with the apparent intention of sharing it with Deel.



68.    D.S. and Deel deployed this same methodology repeatedly throughout the scheme. As another example:

- On February 19, 2025, D.S. searched "deel" 27 times on Slack.

- Reacting to one of the search results, D.S. navigated to a mention of Deel in a channel focused on a particular prospective customer who was considering both Rippling and Deel ("Prospect B").

- D.S. previewed the channel, which included details for a call scheduled with Prospect B the next day and communications in which Prospect B relayed to Rippling specific concerns with the products and services offered by Deel. The channel also contained the Rippling sales team's internal pitch strategy discussion, including confidential details about how Rippling planned to highlight certain advantages of its products to address the prospect's pain points with Deel's offerings.

- D.S. downloaded to his mobile phone two communications from the channel.

- On February 20, 2025, the day of the scheduled call between Rippling and Prospect B, D.S. previewed the Prospect B-related channel sixty-six (66) times.

- Later that day, Prospect B abruptly canceled the scheduled call with Rippling in which Rippling was going to deliver its proposal—and explained that they were doing so because they had decided to select Deel for the product they were interested in, even though Rippling believes that customer would have been better served by Rippling.

69.     D.S. also misappropriated details about Rippling's confidential customer retention strategies. In violation of his duties to Rippling, and to improperly benefit Deel, D.S. viewed or downloaded information about Rippling's existing customers on more than 600 occasions between November 2024 and March 2025, and targeted Slack channels related to customer experience and "churn" risks over 100 times, presumably for identification of vulnerable customer information for Deel to exploit.

70.     For example, D.S. accessed the following channels containing highly confidential information about Rippling's customer retention strategies:

- #smbrenewaldeck-test: a channel with an automated feed of notes regarding existing Rippling customers who are approaching their renewal date. D.S. viewed this channel 23 times between November 2024 and March 2025. On March 4, 2025, in particular, D.S. previewed the channel 8 times. On that day alone, the channel highlighted 10 customers approaching renewal.

- #in-product-cross-sell: a channel with an automated feed of existing customers who have expressed interest in additional Rippling products. D.S. accessed this channel 13 times. On January 22, 2025, a day when D.S. viewed the channel, the channel captured 14 different cross-sell opportunities.

- #exec-escalations: as described above, a channel recording customer support escalations that may warrant leadership attention. The channel captures details about

customer experiences that could be used by a competitor to identify Rippling customers vulnerable to being recruited to a new provider.  D.S. previewed this channel 65 times.

71.    D.S. also viewed and downloaded Rippling's Competitive Intelligence Card for Deel. This document is a 31-page slide deck that outlines Rippling's competitive strategy vis-a-vis Deel, product-by-product.  As described in further detail above, Rippling uses this document and others like it to train its sales team how to sell against competitors (in this case, Deel) in competitive sales situations.  Rippling's Competitive Intelligence Card for Deel represents extensive, confidential work by Rippling's sales, marketing, operations, and other teams to develop an effective strategy to engage with customers and explain the unique value of Rippling's software platform as compared to Deel.  Notably, D.S. did not download any of the other eighty (80) Rippling Competitive Intelligence Cards—that is, the cards associated with Rippling competitors other than Deel.

72.    Throughout the scheme, D.S.'s Slack searches frequently followed a distinctive and unusual pattern: he searched for a channel on his personal iPhone, then, moments later, searched for the same channel on his company-issued computer, and then (and only then) did he download a file from that channel.  On information and belief, D.S. followed this pattern so that most of his searches would occur on his personal device, on which he was less susceptible to detection, and so that he could reserve the use of his work computer for downloading information that he had determined was worthy of misappropriating.

73.    For example, on January 28, 2025, D.S. searched the "deal-desk-sales" Slack channel from his phone 21 times.  On that day, 140 unique customer sales deals were detailed in the channel. Shortly after one of his visits to the channel that day from his mobile phone, D.S. then accessed the channel from his work laptop and subsequently downloaded certain files returned by his search.

74.    Due the staggering scope of the corporate espionage scheme described in this section—involving over 6,000 queries through Rippling's Slack channels, where, as described above, a single channel ("mm-global-high-intent-notifications", or "deal-desk-sales"), may contain dozens or even hundreds of distinct customer or prospect opportunities—the commercial harm Rippling has already experienced is likely to persist well beyond today.  Indeed, each single instance of espionage may cause months of future harm, as Rippling has already seen.  For example:

- On December 19, 2024, D.S. searched Rippling's Slack for "deel" 33 times;

- Among other previews, on this day D.S. viewed the channel "Gong-Stream-Deel-Compete" 13 times;

- The channel, an automated feed of sales calls with customers evaluating Rippling and Deel products in tandem, included mention of an existing Deel customer considering moving to Rippling to address "compliance and payroll challenges as the company has grown" ("Prospect C") and Rippling's pitch strategy, noting the products that appeared to resonate most with the prospect; and

- The prospect ultimately signed with Deel.

75.    In short, on information and belief, on behalf of and for the benefit of Deel, D.S. stole information on Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Slideshow on Deel, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List—and he did so repeatedly, for months on end, in a manner likely to harm Rippling for many months or even years to come.

76.    On information and belief, D.S.'s activities beginning in November 2024 were directed by, at the behest of, and for the benefit of, Deel. D.S. painstakingly, methodically, and repeatedly hunted through Rippling's Slack channels, using the term "deel" to identify confidential information about Rippling's prospective and existing customers that could be stolen and exploited to Deel's advantage.  Deel's role as D.S.'s puppetmaster is evident by D.S.'s "deel"-driven search pattern and has been made even more clear through the results of Rippling's forensic investigation after learning of a leaker in their midst, as detailed *infra*.

## V.    ON INFORMATION AND BELIEF, DEEL INDUCED THE THEFT OF RIPPLING EMPLOYEE CONTACT INFORMATION

77.    In addition to misappropriating Rippling's Sales and Marketing Trade Secrets, Deel appears to have induced its spy to misappropriate contact information for Rippling employees of his own team, the Global Payroll Operations Team.

78.    Between January 29 and February 17, 2025, at least seventeen (17) members of Rippling's Global Payroll Operations Team were contacted about similar jobs at Deel and at least ten reported receiving offers from Deel.  Several of the team members reported that these offers were made without any substantive interview, and only after direct unsolicited contact from Deel's

Chief Operating Officer, Dan Westgarth.  Some of these team members were contacted directly via WhatsApp, a messaging application that requires knowledge of a person's mobile phone number to send a message.

79.     In one telling case shown below, on January 23, 2025, Mr. Westgarth messaged a member of Rippling's Global Payroll Operations Team on LinkedIn, presumably because he did not have this individual's phone number.  Four days later, on January 27, 2025, D.S. visited this individual's page in Rippling's internal personnel directory, which contains employees' personal phone numbers.  Later that same day, Mr. Westgarth messaged the team member on WhatsApp:




Case No. 3:25-CV-2576
COMPLAINT

80.     Rippling's internal personnel directory is viewable only by active Rippling employees, and only upon logging into their Rippling account using their unique username, password, and other authenticating credentials.

81.     The profile logs that capture when a Rippling employee is viewing a particular employee profile on the Rippling HR Platform line up with Deel's attempted poaching activities described above.   Once again, Rippling investigated D.S.'s activity around the time Rippling employees were contacted by Deel representatives, and once again, Rippling learned that D.S. had accessed and viewed the profiles of several of the Rippling employees who were contacted by Deel.

82.     Some of the Rippling employees who received unsolicited contact from Deel expressed concern about this contact because they did not know how Deel had access to their personal data.  Some of the contacted employees had not updated their public profiles on sites like LinkedIn, so Deel could not readily determine from public sources their current position in Rippling or even (for some of them) that they worked at Rippling at all.  Some of the employees also noted that their phone numbers were de-listed.  As a result of these employee concerns, Rippling opened a security investigation into the matter in early February 2025, but did not identify an internal source at that time.  After conducting additional forensics in February and March 2025, Rippling believes that D.S. likely provided contact information on some or all of these individuals to Deel.

## VI.    RIPPLING DISCOVERS D.S.'S THEFT OF RIPPLING'S SALES AND MARKETING TRADE SECRETS AT DEEL'S BEHEST

83.     On February 18, 2025, an investigative reporter at *The Information* contacted Rippling about a forthcoming article concerning Deel's Russia-related sanctions activity, noting he had "been working on a story on Deel for the past few weeks" that "started as an exercise to look into the veracity of that lawsuit I previously reported on."  This reporter was referring to his January 9, 2025, article entitled "Deel Accused of Money Laundering, Sanctions Failures in Lawsuit," which reported on *Damian v. Deel Inc.*, No. 25-cv-20017 (S.D. Fla. Jan. 3, 2025).

84.     The reporter's email listed eleven assertions regarding supposed issues at Rippling relating to payments into Russia and other sanctioned jurisdictions.  Each individual assertion was followed by internal Rippling Slack messages—thirteen messages in total—that supposedly

supported or related to the assertion (the "Shared Slack Messages").  As Rippling explained to the reporter, these assertions did not hold water—to be clear, Rippling has never transmitted a payment to a sanctioned country, individual, entity or bank, including Russia—but the fact that internal Rippling Slack messages (which are only available to Rippling employees) were in the possession of someone other than a Rippling employee caused Rippling to immediately open a security investigation.

85.     An analysis of the Shared Slack Messages revealed that these messages came from thirteen different channels in Rippling's Slack workspace, and that the messages all contained certain searchable keywords ("Russia," "Belarus," "Iran," "Syria," and/or "Sanctions").  Rippling's investigators proceeded to review Slack log files.  Upon review, Rippling learned that a single account associated with a single Rippling employee—D.S.—had searched for specific, targeted, and highly unusual names and keywords that corresponded with the Shared Slack Messages.  Rippling further learned from the various Slack logs that the searches were tied to specific internet protocol (IP) addresses associated with D.S.'s location in Ireland, strongly suggesting that it was D.S. himself (rather than someone with D.S.'s login credentials impersonating him) conducting these searches.

86.     Rippling' forensic research revealed that D.S. had specifically conducted targeted keyword searches on each of the eleven points raised by *The Information*'s reporter in and around the time Rippling was contacted by that reporter, including:

a.  D.S. first searched the term "Russia" on February 12, 2025.  From that date until February 27, 2025, D.S. searched the term "Russia" 157 times, an average of almost 9 times per day.

b.  D.S. first searched the term "Belarus" on February 13, 2025.  From that date until February 27, 2025, D.S. searched the term "Belarus" 39 times, an average of almost 4 times per day.

c.  D.S. first searched the term "OFAC" (i.e., U.S. Office of Foreign Assets Control, a regulator responsible for sanctions controls) on February 17, 2025.  From that date until February 27, 2025, D.S. searched the term "OFAC" 42 times, an average of over 5 times per day.

d.  D.S. first searched the term "sanctioned" on February 13, 2025.  From that date until February 27, 2025, D.S. searched variations of that term (including using that term in combination with other terms like "payment") a total of 31 times.

e.  D.S. first searched the terms "Michael Roddan" or "Roddan" (the reporter's name) as well as "the information" (the reporter's outlet) on February 21, 2025.  Over the following six days, up until the publication of *The Information*'s article, D.S. searched the reporter's name 15 times and his outlet's name 31 times.

87.     Based on the timing of the reporter's investigation, Rippling's forensic analysis team identified D.S. as the source of the Shared Slack Messages referenced in the reporter's February 18, 2025, email.  On information and belief, D.S. conducted these searches to assist Deel's communications team, led by Elisabeth Diana, Deel's Vice President of Communications, in an effort to reframe an upcoming story about Deel's sanctions issues into one about a Deel-versus-Rippling rivalry.

## VII.   RIPPLING ESTABLISHES A CLEAR CONNECTION BETWEEN DEEL'S SPY AND DEEL

88.     Collectively, D.S.'s activities documented above suggest strongly that D.S. has acted at the behest of Deel since at least November 2024.  However, three additional activities by D.S. make the connection certain: (1) D.S. meeting with Deel in December 2024; (2) D.S. searching for "Tinybird" without any lawful reason to know a company by that name existed; and, most tellingly, (3) D.S. searching for and accessing a Slack channel ("#d-defectors") which established a clear link between D.S. and Deel.

89.     ***December 2024 Meeting Between D.S. and Deel***.  While D.S. was logged into his Rippling work browser on December 9, 2024, he reviewed an email to himself indicating that he had a scheduled meeting with Deel that afternoon—approximately one month after his pattern of suspicious activity began.  D.S.'s browser history also reveals that, on that same day, he searched for an email thread with "alex@deel.com" (Deel's CEO), which produced an email presumably from Deel's CEO to D.S., titled in part "Intro" with "Olivier."  "Olivier" likely refers to Olivier Elbaz, Deel's Head of Global Expansion and a Senior Advisor at Sarona Ventures, a venture capital fund started by the Bouaziz family and early investor in Deel.  On information and belief, based upon the browser history described above, on December 9, 2024, D.S. met, either electronically or in-person, with one or both of Alex Bouaziz (Deel's CEO) and/or Elbaz.

90.    ***Tinybird***.  On February 27, 2025, when *The Information* published the article for which its reporter sought comment from Rippling, Rippling learned two important things for the first time: (1) that Tinybird, a startup discussed in the article, is Deel's customer, and (2) that Tinybird reportedly made payments to sanctioned Russian banks using the Deel platform; specifically, "Tinybird [] followed instructions currently hosted on the website of a sanctioned Russian bank that guided companies on how to skirt sanctions rules by using Deel."  Prior to the publication of this article, no one at Rippling—including D.S.—had any work-related reason to know about any connection between Tinybird and Deel, let alone search that name through Rippling's Slack archives.

91.    Nevertheless, Rippling's investigation revealed that D.S. had searched for "tinybird" 20 times between February 19 and February 20—over a week before *The Information*'s article was published—and also ran other search terms related to *The Information*'s then-upcoming story:



The timing of these searches coincides with the reporter's investigation into Deel.

92.    On information and belief, D.S. most likely knew to search for "tinybird" because he was instructed to search for that term by Deel, presumably after the reporter indicated to Deel's communications team led by VP of Communications Elisabeth Diana that Tinybird was a focus of his reporting.

93.    ***#d-defectors***.  Upon learning of the "Tinybird" searches, Rippling strongly suspected that Deel was directing D.S.'s actions.  But to ensure its suspicions were correct, Rippling conceived

of a test (known in the security world as a "honeypot") that would leave no doubt, utilizing Rippling's understanding that Deel activated its spy when it perceived potential reputational damage (as it had with "tinybird").

94.    The evening of March 3, 2025, Rippling's General Counsel sent a letter to three individuals: (1) Philippe Bouaziz, Deel's Board Chair, Chief Financial Officer, General Counsel, and father of Deel's CEO, (2) Spiros Komis, Deel's Head of US Legal, and (3) an employment attorney at Deel's outside law firm.

95.    Rippling's letter included a screenshot of a Slack message from its Chief Revenue Officer Matt Plank, referencing a "#d-defectors" Slack channel along with three points, which were all believed to be true but redacted for dramatic effect.  The screenshot and reference to #d-defectors was intended to indicate to Deel that Rippling had a Slack channel for ex-Deel employees now employed by Rippling where they shared embarrassing information about Deel and that the channel contained information which would cause negative press attention if revealed.  Rippling believed this would be extremely interesting to Deel:

96.     In truth, the renamed #d-defectors channel did not exist until March 3, 2025 (or early morning March 4, 2025, Irish Time (UTC)).   Rather than being a gathering place for ex-Deel employees, the channel was set up as part of a ruse designed to confirm that Deel was instructing D.S. to search for specific information in Rippling's Slack.

97.     Deel—through D.S.—took the bait.   Within hours of Rippling sending the letter referencing the #d-defectors channel—again, a channel that existed only as bait for Deel, and one which D.S. could not have known existed absent a connection between himself and Deel—D.S. ran the following searches in Slack:

| 230 | 2025-03-04 | matt plank |
| 231 | 2025-03-04 | matt plank |
| 232 | 2025-03-04 | matt plank |
| 233 | 2025-03-04 | matt plank |
| 234 | 2025-03-04 | matt plank |
| 235 | 2025-03-04 | matt plank |
| 236 | 2025-03-04 | matt plank |
| 237 | 2025-03-04 | matt plank |
| 238 | 2025-03-04 | matt plank |
| 239 | 2025-03-04 | d defector |
| 240 | 2025-03-04 | d defector |
| 241 | 2025-03-04 | d defector |
| 242 | 2025-03-04 | d defector |
| 243 | 2025-03-04 | d defector |
| 244 | 2025-03-04 | defector |
| 245 | 2025-03-04 | defector |
| 246 | 2025-03-04 | defector |
| 247 | 2025-03-04 | defector |
| 248 | 2025-03-04 | defector |

98.     D.S. also accessed the #d-defectors channel five times that same day.

99.     For avoidance of doubt, before March 3, 2025, D.S. had never searched for the term "defectors" in Slack.   Further, and crucially, at the time the letter was sent to Deel, no one at Rippling (apart from the investigations team) had ever viewed the (new) #d-defectors channel.

100.     The results of Rippling's honeypot operation left no doubt:   Deel's senior leadership or those closest to them were directing D.S.'s actions, in furtherance of Deel's business interests and to harm Rippling and its customers.

**VIII.    RIPPLING CONFRONTS DEEL'S SPY WITH A COURT ORDER BUT THE SPY REFUSES TO COMPLY, ATTEMPTS TO DESTROY EVIDENCE, AND FLEES**

101.    After the successful honeypot operation, Rippling confronted its managerial employee D.S. about his activities.  Due to D.S.'s efforts to conceal his conduct, however, Rippling was concerned that any such confrontation would inevitably lead to D.S. and Deel erasing as much evidence of this conspiracy as possible.  Accordingly, last Wednesday, March 12, 2025, Rippling diligently sought and obtained an extraordinary form of relief—an order from the High Court in Ireland directing seizure and inspection of D.S.'s phone.

102.    The court order required that D.S. surrender his cell phone to an independent solicitor for preservation, pending an adversarial hearing to determine whether Rippling would be entitled to access the data on the phone.  The court order also included a penal endorsement, which typically all but assures compliance, as the penalty of non-compliance could lead to imprisonment.

103.    Served with the court order at Rippling's Dublin office, D.S. initially feigned compliance—before hiding in the bathroom and then fleeing the scene.

104.    The independent solicitor informed D.S. that he was an independent solicitor and did not work on behalf of Rippling, that D.S. was required to surrender his phone for forensic imaging pursuant to a court order, and that he had another phone available to D.S. to call a solicitor before any imaging would take place.  The independent solicitor also informed D.S. that the court order had been obtained due to concerns regarding the taking of Rippling confidential information to third parties.  Subsequent communications made clear that the concern involved Deel.

105.    D.S. initially told the independent solicitor that his cell phone was in a bag on another floor.  The solicitor offered to have an associate retrieve the bag, but D.S. insisted that he retrieve it himself.  The solicitor informed D.S. that if he was lying, he would be breaching the court order.  The solicitor accompanied D.S. downstairs and took possession of the bag, but, in fact, D.S. had lied.  The bag only contained a notebook.  It held no mobile device.  On information and belief, D.S.'s cell phone was on his person the entire time.

106.    After misdirecting the independent solicitor, D.S. then went into a bathroom, locking the door behind him and refusing to come out, despite the independent solicitor's repeated warnings

that these actions were in violation of the court order.  Rather than comply, D.S. was heard "doing something" on his phone by the independent solicitor, who also heard D.S. flush the toilet— suggesting that D.S. may have attempted to flush his phone down the toilet rather than provide it for inspection.  Later that day, Rippling had the plumbing of its Dublin offices inspected, but did not locate any mobile devices.

107.    While in the bathroom and continuing after leaving the bathroom, D.S. was again told repeatedly that he was required to provide the device or he would be in violation of a court order.  After D.S. left the bathroom, he was informed that taking another step forward rather than handing over the phone immediately would be an additional breach of the order. D.S. then replied: "I'm willing to take that risk."  D.S. then stormed out of the office and fled the scene.

## IX.    RIPPLING HAS INCURRED SIGNIFICANT HARM DUE TO DEEL'S SCHEME

108.    Through its misappropriation of Rippling's highly valuable pipeline of customer information, information on customer relationships, strategies for pitching prospective customers, and likely more, Deel has inflicted significant harm by depriving Rippling of the competitive advantage afforded by its exclusive use of that information.  Moreover, as shown above, at least one potential Rippling customer, and potentially many more, were diverted to Deel as a direct result of Deel's nefarious scheme; Rippling has therefore suffered lost profits because of the scheme as well.

109.    Separately and independently, Deel's intrusions into Rippling's systems have caused Rippling to suffer additional pecuniary harm in the form of costs incurred in investigating Deel's access to those systems and remediating those harms.  Such investigation and remediation costs include, *inter alia*: loss of employee time in responding to the intrusion; the cost of hiring an investigative firm to determine the extent and scope of the intrusion; the cost of hiring a separate cybersecurity vendor to identify how Deel was able to exploit Rippling's systems; and attorneys' fees.

1

**CLAIMS FOR RELIEF**

2

**FIRST CAUSE OF ACTION**

3

**(Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c))**

4    110.    Rippling re-alleges and incorporates by reference each and every allegation

5    contained in paragraphs 1 through 109 of this Complaint.

6    111.    From at least November 2024 and continuing up to and including the date of the

7    filing of this compliant, in the Northern District of California, and elsewhere, defendant Deel, and

8    others known and unknown, including but not limited to D.S. and Does 1-100, constituted an

9    "enterprise," as that term is defined in 18 U.S.C. § 1961(4); that is, a group of business entities and

10   individuals associated in fact, which was engaged in, and the activities of which affected, interstate

11   and foreign commerce (the "Enterprise").

12   112.    The Enterprise functioned as a continuing unit with discrete participants sharing the

13   same goal through unlawful means of developing competing products, generating profits, and

14   soliciting customers for Deel using Rippling's stolen Sales and Marketing Trade Secrets and

15   confidential business information.

16   113.    On information and belief, Deel's senior leadership acted as the leaders of the

17   Enterprise, with D.S. and Does 1-100 providing assistance.  These members of the Enterprise

18   communicated via electronic mail and/or other electronic means in furtherance of their common

19   scheme.  The Enterprise continues today.

20   114.    From at least November 2024 and continuing up to and including the date of the

21   filing of this compliant, in the Northern District of California, and elsewhere, defendant Deel, and

22   others known and unknown, including but not limited to D.S. and Does 1-100, being persons

23   employed by and associated with the Enterprise described above, did unlawfully, knowingly, and

24   intentionally conduct and participate, directly and indirectly, in the conduct, management, and

25   operation of the affairs of the Enterprise, which engaged in, and the activities of which affected

26   interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous

27   acts of racketeering indictable under 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to

28   commit the same) and 18 U.S.C. § 1832 (theft of trade secrets), in violation of 18 U.S.C. § 1962.

115.   On multiple occasions, defendant Deel, Inc., and others known and unknown, including but not limited to D.S. and Does 1-100, participated in the affairs of the Enterprise by engaging in acts of wire fraud and conspiracy to commit wire fraud, to further the Enterprise's objectives.  Specifically, in multiple instances, Deel conspired to defraud and defrauded Rippling by working with D.S. to misappropriate Rippling's confidential business information, using wires in interstate and foreign commerce, in violation of the duties of loyalty, trust and confidence that D.S. owed to Rippling, in violation of 18 U.S.C. §§ 1343 and 1349.

116.   Moreover, on multiple occasions, defendant Deel, and others known and unknown, including but not limited to D.S. and Does 1-100, participated in the affairs of the Enterprise by engaging in theft of Rippling's trade secrets, to further the Enterprise's objectives.

117.   Specifically, on multiple occasions, with intent to convert trade secrets, that were related to products and services used in or intended for use in interstate or foreign commerce, to their own economic benefit, and intending and knowing that the offense would, injure Rippling, defendant Deel, Inc., and others known and unknown, including but not limited to D.S. and Does 1-100, including agents and employees of Deel, knowingly

(1)   stole, or without authorization appropriated, took, carried away, and concealed, and by fraud, artifice, and deception obtained such information;

(2)  without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information; and

(3)  received, bought, and possessed such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization;

and attempted and conspired to do the same, all in violation of 18 U.S.C. § 1832.

118.   The enterprise engaged in numerous unlawful, overt, predicate acts to create an illegal pattern of racketeering, which included, but is not limited to, (1) each instance of misappropriation of Rippling's Sales and Marketing Trade Secrets, in violation of 18 U.S.C. § 1832; (2) each instance of embezzlement of confidential information (property) owned by Rippling, in violation of 18 U.S.C. §§ 1343 and 1349; (3) each use of the wires in furtherance of Deel's scheme;

and (3) each time Deel used Rippling's Sales and Marketing Trade Secrets to unlawfully and unfairly compete with Rippling. This pattern of racketeering has been ongoing since at least approximately November 2024 and continues to this day, thereby posing a threat of continued criminal activity. Indeed, Deel's predicate acts are so numerous and pervasive that they constitute an open-ended scheme and are part of the normal course of how Deel regularly conducts business.

119.    Each of the predicate acts perpetrated by Deel, D.S., and/or Does 1-100 in furtherance of the racketeering scheme was related to the others and was performed while participating in the conduct of the affairs of the enterprise identified above in violation of 18 U.S.C. § 1962(c).

120.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Rippling has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, advantageous business relationships (including customer and employee relationships) and profits.

## SECOND CAUSE OF ACTION

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

121.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 120 of this Complaint.

122.    Deel, D.S., and Does 1-100 qualify as "persons" under 18 U.S.C. § 1961(3).

123.    Deel engaged in violations of 18 U.S.C. § 1962(c), the predicate acts for which are set forth in Count I above and expressly incorporated herein.

124.    Deel has violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C.§ 1962(c), as set forth in Count I above, by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering, and by agreeing to the commission of multiple predicate acts.

125.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Rippling has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business

information, equipment, business opportunities, reputation, advantageous business relationships (including customer and employee relationships) and profits.

### THIRD CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq.***)**

126.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraph 1 through 125 of this Complaint.

127.    At all relevant times, Rippling owned and had the right to possess the Sales and Marketing Trade Secrets as described in Paragraphs 19-75.

128.    Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

129.    Rippling has taken efforts reasonable under the circumstances to maintain the secrecy of its Sales and Marketing Trade Secrets by allowing access to this information only to Rippling employees and storing its Sales and Marketing Trade Secrets in a secure location accessible only to Rippling employees.  In addition, as a condition of employment, Rippling requires all employees to sign a CIPRAA; each employee's employment agreement requires that such employees keep, *inter alia*, the Sales and Marketing Trade Secrets confidential; employees receive and sign a Global Handbook that includes a Code of Conduct setting forth expectations for an employee's use of Rippling's confidential information (including the Sales and Marketing Trade Secrets), including that such information not be used outside Rippling; and Rippling requires that employees follow an Acceptable Use Policy prohibiting employees from misusing Rippling's "resources and data assets," including the Sales and Marketing Trade Secrets.

130.    The Sales and Marketing Trade Secrets are not generally known or available to the public.

131.    Rippling spent tremendous time, effort, and resources developing and cultivating the Sales and Marketing Trade Secrets.

132.    The Sales and Marketing Trade Secrets are of substantial economic value to Rippling.  The Sales and Marketing Trade Secrets derive independent economic value from not being generally known to the public, to Rippling's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

133.    Deel's actions with respect to Rippling's Sales and Marketing Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Rippling of the benefits of Rippling's own substantial investment and efforts and steal the fruits of years of Rippling's labor.

134.    On information and belief, Deel's acts of misappropriation of Rippling's Sales and Marketing Trade Secrets include, but are not limited to:

a.    Knowingly receiving Rippling's Trade Secrets from D.S.; on information and belief, Deel knew or had reason to know that, at the time D.S. was disclosing or attempted to disclose Rippling's Sales and Marketing Trade Secrets, he was under a contractual duty to maintain the secrecy of Rippling's Sales and Marketing Trade Secrets and did not have the express or implied authority or consent to disclose Rippling's Sales and Marketing Trade Secrets to Deel.

b.    Utilizing Rippling's Sales and Marketing Trade Secrets and/or confidential information, including Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and/or Rippling's Churn Risk List to unfairly to compete against Rippling.

135.    On information and belief, Deel has gained, or will gain, substantial benefit from its misappropriation of Rippling's Sales and Marketing Trade Secrets, to Rippling's substantial detriment.

136.    On information and belief, Deel used the Sales and Marketing Trade Secrets D.S. disclosed to unfairly compete against Rippling in head-to-head sales battles and ultimately won certain of those sales battles as a result of knowing Rippling's "playbook."

137.    As a direct and proximate result of Deel's wrongful misappropriation of Rippling's confidential or proprietary information and Sales and Marketing Trade Secrets, Rippling has suffered actual damages in a sum to be set forth according to proof at trial.

138.    Rippling is informed and believes that Deel's conduct was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above.  Rippling is therefore entitled to recover from Deel exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C).

139.    Rippling is also entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## FOURTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*)

140.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 139 of this Complaint.

141.    At all relevant times, Rippling owned and had the right to possess the Sales and Marketing Trade Secrets as described in Paragraphs 19-75.

142.    Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List constitute trade secrets under the California Uniform Trade Secrets Act, California Civil Code § 3426, *et seq.*

143.    Rippling has taken efforts reasonable under the circumstances to maintain the secrecy of its Sales and Marketing Trade Secrets by allowing access to this information only to Rippling employees and storing its Sales and Marketing Trade Secrets in a secure location accessible only to Rippling employees.  In addition, as a condition of employment, Rippling requires all employees to sign a CIPRAA; each employee's employment agreement requires that such employees keep, *inter alia*, the Sales and Marketing Trade Secrets confidential; employees receive and sign a Global Handbook that includes a Code of Conduct setting forth expectations for an employee's use of Rippling's confidential information (including the Sales and Marketing Trade Secrets), including

that such information not be used outside Rippling; and Rippling requires that employees follow an Acceptable Use Policy prohibiting employees from misusing Rippling's "resources and data assets," including the Sales and Marketing Trade Secrets.

144.    The Sales and Marketing Trade Secrets are not generally known or available to the public.

145.    Rippling spent tremendous time, effort, and resources developing and cultivating the Sales and Marketing Trade Secrets.

146.    The Sales and Marketing Trade Secrets are of substantial economic value to Rippling.  The Sales and Marketing Trade Secrets derive independent economic value from not being generally known to the public, to Rippling's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

147.    Deel's actions with respect to Rippling's Sales and Marketing Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Rippling of the benefits of Rippling's own substantial investment and efforts and steal the fruits of years of Rippling's labor.

148.    On information and belief, Deel's acts of misappropriation of Rippling's Sales and Marketing Trade Secrets include, but are not limited to:

    a.  Knowingly receiving Rippling's Sales and Marketing Trade Secrets from D.S.; on information and belief, Deel knew or had reason to know that, at the time D.S. was disclosing or attempted to disclose Rippling's Sales and Marketing Trade Secrets, he was under a contractual duty to maintain the secrecy of Rippling's Sales and Marketing Trade Secrets and did not have the express or implied authority or consent to disclose Rippling's Sales and Marketing Trade Secrets to Deel.

    b.  Utilizing Rippling's Sales and Marketing Trade Secrets and/or confidential information, including Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List to unfairly to compete against Rippling.

149.    On information and belief, Deel has gained, or will gain, substantial benefit from its misappropriation of Rippling's Sales and Marketing Trade Secrets, to Rippling's substantial detriment.

150.    On information and belief, Deel used the Sales and Marketing Trade Secrets D.S. disclosed to unfairly compete against Rippling in head-to-head sales battles and ultimately won those sales battles as a result of knowing Rippling's "playbook."

151.    As a direct and proximate result of Deel's wrongful misappropriation of Rippling's confidential or proprietary information and Sales and Marketing Trade Secrets, Rippling has suffered actual damages in a sum to be set forth according to proof at trial.

152.    Rippling is informed and believes that Deel's conduct was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above.  Rippling is therefore entitled to recover from Deel exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by California Civil Code § 3426.3.

153.    Rippling is also entitled to an award of attorneys' fees pursuant to California Civil Code § 3426.4.

**FIFTH CAUSE OF ACTION**

**(Tortious Interference with Contract)**

154.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 153 of this Complaint.

155.    Rippling has a valid and enforceable confidentiality agreement, *viz*., the CIPRAA, with D.S. Deel knew or should have known of D.S.'s confidentiality agreement with Rippling.

156.    Deel willfully and intentionally interfered with this agreement, without privilege to do so, by aiding, abetting, and assisting D.S. in breaching his contractual obligations to Rippling, including, but not limited to, his obligations to not (1) disclose Rippling's confidential information; (2) solicit Rippling employees for Deel's gain; (3) engage in activity that is, will, or could constitute a conflict of interest; (4) improperly use Rippling's resources and data assets to aid a competitor in its unlawful and anti-competitive activities; and (5) use or disclose Rippling's confidential information for his own benefit or outside the scope of his employment with Rippling.

157.    Deel's misconduct was independently tortious and unlawful because it involved the conspiracy to recruit D.S. and have him work as a double agent for Rippling and Deel at the same time, and involved the misappropriation of Rippling's confidential information.  In addition, Deel intentionally induced D.S. to breach his obligations under his employment agreements in order to unfairly compete against Rippling and steal Rippling's existing clients and prospective client. D.S. did in fact breach the CIPRAA as a result of Deel's actions.

158.    As a direct and proximate cause of the above-alleged misconduct by Deel, Rippling suffered injuries, including, but not limited to, actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Rippling's employment relationships and customer relationships.  Because the tortious conduct of Deel was willful and malicious, Rippling seeks exemplary damages.

159.    This cause of action for tortious interference with D.S.'s contract is not based on the misappropriation of any Sales and Marketing Trade Secrets.  Rather, Rippling bases this cause of action on Deel's recruitment of and subsequent compensation to D.S. in order to further Deel's scheme to unlawfully and unfairly compete against Rippling by, among other things, inducing D.S. to breach his employment agreements with Rippling.

## SIXTH CAUSE OF ACTION

### (Aiding & Abetting Breach of Fiduciary Duty)

160.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 162 of this Complaint.

161.    As a manager at Rippling, D.S. owed fiduciary duties to Rippling.

162.    On information and belief, Deel knew D.S. owed Rippling fiduciary duties.

163.    At all times alleged herein, Deel was aware of D.S.'s conduct as alleged above, including that D.S. used his position at Rippling to steal confidential information to give to Deel and provided Rippling employee contact information to Deel.

164.    At all times alleged herein and on information and belief, Deel knew D.S.'s conduct constituted a breach of his fiduciary duties to Rippling.

165.    On information and belief, Deel knowingly gave substantial encouragement and assistance to D.S. so that he and Does 1-100 could accomplish the unlawful results alleged above.

166.    Deel's conduct in assisting these breaches of fiduciary duties was a substantial factor in causing the harm suffered by Rippling.

167.    Deel knowingly and substantially participated, aided, and abetted the above-alleged breaches of the fiduciary duties committed by D.S.

168.    Deel's acts, omissions, and misconduct has caused continuous, connected, ongoing and material harm to Rippling.

## EIGHTH CAUSE OF ACTION

**(Unfair Competition, California Business & Professions Code § 17200, *et seq.*)**

169.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 168 of this Complaint.

170.    Deel engaged in unfair competition, including unlawful, unfair, and fraudulent business activities.  Deel's unlawful, unfair, and/or fraudulent business activities included but are not limited to tortious interference with contract, aiding and abetting breach of fiduciary duties, violating RICO statutes, and violating 18 U.S.C. §§ 1343 and 1836.

171.    Deel's misconduct significantly threatens and/or harms competition.  Deel's actions are part of a deliberate scheme and plan to deprive Rippling of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Deel an unfair competitive advantage.

172.    As a proximate result of Deel's acts as alleged above, Rippling to date has suffered, and will continue to suffer, damages.  Thus, as a proximate result of Deel's wrongful acts, Rippling is entitled to restitution as provided for by California Business and Professions Code section 17200 *et seq.* and a constructive trust in which Deel, as constructive trustees, hold their income, profits, commissions, fees, revenues, or other funds, received as a result of their wrongful acts alleged herein, for Rippling's benefit.

173.    Deel's conduct was willful and malicious, oppressive, fraudulent, despicable, and in conscious disregard of the rights of Rippling, and the resulting harm to Rippling.  Deel acted with the intent to cause injury and to obtain an unfair competitive advantage over Rippling in the marketplace.  Therefore, Deel is liable for restitution and exemplary and/or punitive damages in an amount to be established according to proof at trial.

174.    The rights invoked herein petition for, implicate, invoke, and demand the enforcement of important rights affecting the public interest.  Furthermore, because the relief sought will provide a significant benefit to the general public at large, Rippling is entitled to an award of attorneys' fees incurred by undergoing the burden of seeking the private enforcement of statutes vindicating important public rights, including the right of the public to be free from unfair competition and violations of the California Business and Professions Code.

## PRAYER FOR RELIEF

Wherefore, Rippling respectfully requests that judgment be entered in its favor and against Deel and Does 1-100, jointly and severally, including:

1.    Awarding compensatory damages in an amount to be determined at trial;

2.    Awarding exemplary and/or punitive and/or treble damages in an amount to be determined at trial;

3.    Awarding interest at the maximum legal rate on all sums awarded;

4.    Awarding reasonable attorneys' fees as permitted by law;

5.    Awarding all costs of suit herein; and

6.    Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Rippling hereby demands a trial by jury as to all issues so triable in this case.

Dated: March 17, 2025                          Respectfully submitted,

                                               QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP


                                               By /s/ Kathleen S. Messinger

                                                   Attorneys for Plaintiff
                                                   People Center, Inc. d/b/a Rippling