QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Maaren A. Shah (*pro hac vice*)
maarenshah@quinnemanuel.com
Samuel Nitze (*pro hac vice*)
samuelnitze@quinnemanuel.com
Scott Hartman (*pro hac vice*)
scotthartman@quinnemanuel.com
Dominic Pody (*pro hac vice*)
dominicpody@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen S. Messinger (CA Bar No. 329983)
kathleenmessinger@quinnemanuel.com
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DEEL, INC., a Delaware corporation, and DOES 1 – 100,<br><br>Defendants. | Case No. 3:25-CV-2576-CRB<br><br>The Hon. Charles R. Breyer<br><br>**PLAINTIFF RIPPLING'S NOTICE OF PENDENCY OF OTHER ACTION OR PROCEEDING**<br><br>[Civil L.R. 3-13] |

Pursuant to Civil Local Rule 3-13, Plaintiff People Center, Inc. d/b/a Rippling ("Rippling") hereby gives notice of a related case, *Deel, Inc. v. People Center, Inc. d/b/a Rippling*, Case No. N25C-04-239 DJB, filed in the Superior Court of Delaware on April 25, 2024 (the "Delaware Action"). The Delaware Action was brought against Rippling—the plaintiff in this case—by Deel, Inc. ("Deel")—the defendant in this case—and is materially related to the same facts and subjects as those set forth in Rippling's Complaint (ECF No. 1) in this case.

The complaint in the Delaware Action, though replete with allegations wholly unrelated to the purported claims,[1] alleges defamation, trade libel, tortious interference with prospective economic advantage, civil conspiracy, and violation of the Delaware Deceptive Trade Practices Act. *See* Compl., N25C-04-239 DJB (Del. Super. Ct.) (Dkt. 1) ("DE Compl.") (attached hereto as Ex. A) at 60–72. The parties to this case and the Delaware Action are identical, and the underlying purported "facts" in Deel's Delaware Action substantially relate to the facts alleged in the current action. For example:

- The complaint in the Delaware Action repeatedly references the corporate espionage scheme and the corporate spy at the heart of this case. *See* DE Compl. ¶¶ 7–8, 14, 145, 149. Indeed, while Rippling took steps to avoid publicly naming D.S. (Deel's spy) in its Complaint, Deel's complaint in the Delaware Action deliberately revealed D.S.'s identity, in a public U.S. proceeding, as Keith O'Brien. *Id.* ¶ 7.

- Deel repeatedly references what it alleges are Rippling's "false espionage claims" (meaning, the facts underlying Rippling's Complaint in this action) while falsely asserting—without a shred of evidence—in the Delaware Action that it is instead Rippling who has been spying on Deel. *See id.* ¶¶ 14, 145, 149. Tellingly, Deel's Delaware complaint was filed within 20 minutes of Deel's two motions to dismiss and motion to strike all state causes of action in Rippling's Complaint in this action, a clear

---

[1] Deel's complaint in the Delaware Action expounds for pages on topics that bear no relevance to its purported clams against Rippling, including Rippling CEO Parker Conrad's tenure as the CEO of Zenefits, Conrad's academic career, and musings about whether a global payroll platform is possible without significant advances in quantum computing. *See* DE Compl. ¶¶ 4, 9, 35–37, 42, 141–42.

sign of the connectedness between the Delaware Action and this action.  *Compare* Ex. A *with* ECF Nos. 48–50.

- Indeed, several of the claims asserted in Deel's complaint in the Delaware Action have a strong nexus to this case and are premised on the allegation that Rippling has asserted "false espionage allegations against Deel" in this action.  While Deel claims that "Rippling's conduct vis-à-vis O'Brien is not the subject of" the Delaware Action (*id.* ¶ 8 n.1), much of the complaint in the Delaware Action is premised on circumstances involving O'Brien.  *See id.* ¶¶ 6–8, 77, 145.

In addition, many of Deel's allegations in the Delaware Action concern and relate to actions that took place *in California*, *not Delaware*.  For example:

- Deel specifically alleges that certain of the facts and events underlying its Delaware Action are what motivated Rippling to sue Deel in this case in this Court.  *See* DE Compl. ¶ 148 (claiming Rippling's Northern District of California suit was predicated on and proves the actions at-issue in Deel's Delaware Action).

- Deel claims Rippling engaged in a "shadow PR campaign" that caused *California* State Senator Steve Padilla and *California* Representative Adam Schiff to take action against Deel.  *Id.* ¶¶ 105–06.

- Deel also claims that in September 2024, Reverend Al Sharpton published a letter and newspaper op-ed relating to Rippling.  *Id.* ¶ 66.  That "newspaper op-ed" was published in the San Francisco Chronicle, a periodical published in San Francisco.  *See* Al Sharpton, Opinion, *San Francisco escapes the doom loop. Now is the time to reshape its economy*, S.F. Chron. (Sept. 5, 2024).

- Deel grounds certain of its Delaware claims on a "snake game" on Rippling's website that identifies misleading advertising by Deel.  *See* DE Compl. ¶¶ 128–29, 137.  The "snake game" was created by Rippling employees located in San Francisco, California, and its publication was authorized by Rippling employees located in San Francisco.  Moreover, contrary to Deel's allegation that Rippling did not respond to Deel's request to remove the game from Rippling's website because facts about Deel contained within

NOTICE OF PENDENCY OF OTHER ACTION OR PROCEEDING

the "snake game" were supposedly inaccurate (*id.* ¶¶ 136–37), in fact Rippling responded to Deel's request with a point-by-point rebuttal of Deel's allegations the following day—from Rippling's office in San Francisco. *See* Exhibit B at 1–5. Notably, Deel's request itself came from an individual whose email signature block contains a San Francisco address. *Id*. at 5–6. In short, the dispute over the "snake game"—a sizable portion of the allegations underpinning Deel's Delaware causes of action—took place entirely in San Francisco, not Delaware.

- Relatedly, Deel alleges that Rippling "launched a webpage that" purportedly "made misleading advertising claims regarding Deel's G2 scores." *See* DE Compl. ¶ 138. That webpage was also created by Rippling employees, many of whom are located in San Francisco.

Given the substantial overlap in the underlying facts in the Delaware Action and this action, the identical parties currently named in both actions, and the fact that the unnamed Does in the Delaware action are likely individuals involved in this action against Deel (making the relief sought in the Delaware Action inextricably tied to this action), Deel plainly knows that its allegations in Delaware are properly cast as counterclaims in this case. Yet Deel seeks to avoid subjecting its faulty claims to the scrutiny of this Court.

Indeed, while Rippling looks forward to continuing to press its legitimate claims and defeating Deel's legally meritless and factually baseless allegations in any forum, it bears note that Deel's Delaware Action—to the extent grounded in allegations arguably relevant to its claims rather than gratuitous *ad hominem* attacks designed for media impact—impermissibly purports to impose liability on Rippling for the exercise of certain individuals' free speech and petition rights. *See, e.g.*, DE Compl. ¶¶ 100–27. This suggests that the Delaware Action was filed by Deel in an alternative forum as part of a calculated and improper effort to avoid California's strong anti-SLAPP laws in favor of Delaware's much narrower laws on the same topic. *Compare* Cal. Civ. Proc. Code § 425.16 *with* 10 Del. C. § 8136, *et seq.* Deel's blatant forum shopping is particularly galling given Deel's attempt to avail itself of the same California anti-SLAPP statute in this action (*see* ECF No. 50) that it evidently sought to avoid by filing a SLAPP suit in Delaware.

Given the differences in anti-SLAPP statutes in the competing fora, there is a clear conflict between California and Delaware law that this Court is aptly prepared to resolve.  Moreover, judicial economy favors resolution of Deel's Delaware Action in California.  For instance, as raised above, Deel alleges in its Delaware Action that Rippling filed its Complaint in this action as a continuation of its purported bad acts against Deel.  As such, it is more efficient for this Court to resolve these allegations in tandem with resolving Rippling's allegations.

In short, the Delaware Action involves the same parties and subject matter that materially overlaps with the subject matter of this case.  Yet it was filed by Deel in its preferred alternative forum, at the same time as Deel's motions in this action, in an effort to avoid this Court's scrutiny of its meritless allegations under legal standards unfavorable to Deel.  At the same time, Deel seeks to take advantage of those same legal standards in a way that is internally inconsistent and violates first-filed principles and traditional prohibitions against forum shopping.


Dated: April 28, 2025                              Respectfully submitted,

                                                                QUINN EMANUEL URQUHART &
                                                                SULLIVAN, LLP



                                                   By /s/ Kathleen S. Messinger
                                                   _____

                                                        Attorneys for Plaintiff
                                                        People Center, Inc. d/b/a Rippling

# EXHIBIT A

EFiled:  Apr 24 2025 12:51PM EDT
Transaction ID 76139091
Case No. N25C-04-239 DJB

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEEL, INC., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N25C-04-_____ |
| | ) | |
| PEOPLE CENTER, INC. | ) | |
| D/B/A/RIPPLING, a Delaware | ) | |
| corporation; and DOES 1 – 100, | ) | |
| inclusive. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

OF COUNSEL:

Lance A. Etcheverry
(*pro hac vice* forthcoming)
Jack P. DiCanio
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Tel.: (650) 470-4500
lance.etcheverry@skadden.com
jack.dicanio@skadden.com

Jason D. Russell
(*pro hac vice* forthcoming)
Adam K. Lloyd
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067

Paul J. Lockwood (ID No. 3369)
Connor K. Judge (ID No. 7413)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
920 N. King St.
Wilmington, Delaware 19801
Tel.: (302) 651-3000
paul.lockwood@skadden.com
connor.judge@skadden.com

*Attorneys for Plaintiff Deel, Inc.*

Tel.: (213) 687-5000
jason.russell@skadden.com
adam.lloyd@skadden.com

DATED:  April 24, 2025

Plaintiff Deel, Inc. ("Deel") brings this action against Defendants People Center, Inc. d/b/a Rippling ("Rippling"), and unnamed Does 1-100 (the "Does," and collectively with Rippling, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     Deel is the leading workforce solutions company in the world, providing human resources, payroll, compliance, and other back-office software solutions to over 35,000 customers in more than 150 countries. Deel has imagined and built a truly borderless global workplace, using its software to connect employers with millions of highly skilled people around the world to give them access to remote employment opportunities that would not otherwise be available.

2.     Deel's dedication and care for its clients and their workforce is at the heart of everything it does, and Deel is fortunate enough to count some of the biggest and best companies in the world as its clients.

3.     While Deel is laser-focused on helping its customers succeed, it is now apparent that Deel's competitors' primary focus is Deel. One competitor in particular—Rippling—has been so wholly consumed by its obsession with Deel that it is willing to do *anything* to try to catch up to or destroy Deel, even if that means engaging in unethical or unlawful business practices.

4.     Like Deel, Rippling offers human resources and payroll services. But that is where the similarities end. Haunted by his previous failures, and now fueled

by suffocating jealousy at his inability to fairly compete with Deel in the marketplace, Rippling's co-founder and CEO, Parker Conrad—who was investigated and penalized by the SEC, and exiled from his own former company, Zenefits, for flouting the law—has fallen back on his old playbook: cheating.

5.     On information and belief, what began as mere annoyances from a competitor far in Deel's rearview mirror has grown exponentially in recent years to a vast and desperate conspiracy that comprises three primary components:

**(1)** a coordinated and illegal years-long shadow campaign to smear and tarnish Deel's stellar reputation through secret alliances with powerful lobbyists and a lawyer-turned-serial-instigator who has repeatedly made false and frivolous claims against Deel, all while concealing his longstanding relationship with Rippling;

**(2)** relentless and obsessive efforts to unlawfully solicit and access Deel's confidential information—using private investigators, direct outreach to Deel's employees, and clandestine surveillance—to gain illicitly that which it cannot obtain through legitimate competition; and

**(3)** rampant unlawful and anticompetitive conduct, driven by Conrad's trademark disregard for internal processes, controls, and compliance, which allows Rippling to bolster a facade of success and market products and services that it claims comply with the law when Rippling

itself does not, allowing Rippling to unfairly steal market share from its law-abiding competitors like Deel.

6.    As just one example of Rippling's casual yet appalling lawlessness, on information and belief, whistleblowers have expressed concern that Rippling was not remitting its customers' payroll tax and social benefits dollars to local taxation authorities as required, **but instead was categorizing and reporting these funds as *its own earnings***. On information and belief, not only does Rippling steal these funds from its clients, but also from its own employees by using a similar scheme. Another whistleblower maintains that Rippling facilitates the evasion of international sanctions in jurisdictions such as Russian, Belarus, Iran, and Syria. On information and belief, at least one of these whistleblowers has raised their concerns with the relevant authorities to discuss a potential investigation of Rippling.

7.    Rippling is well aware of the existence of these whistleblowers, and for at least one in particular—Keith O'Brien—Rippling used heavy-handed tactics to terrorize him and intimidate him into silence, which eventually caused him to have such a massive psychological breakdown that he nearly ended his own life and sought hospitalization.

8.    It is obvious that O'Brien's contemporaneous emails from when Rippling was traumatizing him tell the true story of why Rippling was trying to "destroy" him: because he "reported the illegal sanctioned payments to Russia" and

3

"with the Central Bank of Ireland via the whistle-blower helpline." Rippling then "pressured [him] to say things that are not true . . . to damage Deel" and "coerc[ed] him to say that [he] shared data [with Deel]" with threats and bribes, and told him that there "is a pathway forward for [him]." That "pathway" was taking money from Rippling in exchange for Rippling ending its relentless harassment. Taking that "pathway," O'Brien then filed an affidavit in Ireland—plainly under extreme duress—which is replete with falsehoods and grossly distorts the nature of O'Brien's interactions with Deel, with whom he was seeking employment precisely to escape the abusive and lawless culture prevalent at Rippling.[1]

9.      In retrospect, perhaps Rippling's anticompetitive and unfair conduct should not be that surprising to Deel. As noted above and detailed herein, Rippling's co-founder, Parker Conrad—who, on information and belief, is closely connected to convicted fraudster Sam Bankman-Fried and his disgraced companies, FTX and Alameda Research—has a long history of cutting corners when he could not advance

---

[1] Although Rippling's conduct vis-à-vis O'Brien is not the subject of this action, which is based on Rippling's unfair competition with and defamation of Deel (Rippling initiated proceedings in Ireland against O'Brien and Deel, attesting that "Ireland is clearly the jurisdiction most closely connected with the wrongs the subject matter of these proceedings"), Deel would be remiss in failing to note how Rippling reacts when confronted with a potential whistleblower who threatens to expose the company as smoke and mirrors. Deel will demonstrate in the Irish courts that Rippling's allegations about "spies" are nothing more than the latest in a series of ginned-up "wrongs" all designed to support a false narrative against Deel.

through legitimate means. Conrad was forced to resign from his last company, Zenefits, where the SEC determined he had made materially false and misleading statements to investors, and that he had personally created a computer script to circumvent California's insurance licensing requirements. Upon Conrad's forced expulsion from his own company, his former employees literally had "celebrations" and cried "tears of relief." The CEO who replaced Conrad reported on Conrad's culture of "***bullying and pressuring employees to cut corners and do the wrong thing***."

10.    And it clearly appears that broken culture of non-compliance has continued at Rippling, which Conrad started just two months after his forced resignation from Zenefits. Because Conrad ported over a significant number of his loyalists at Zenefits to the C-suite at Rippling, Rippling's workplace culture has been described as "hostile," "dog-eat-dog," and "subject to [] tempers, cliques, and seemingly erratic management decisions." Former Rippling employees have decried the "sad and toxic reality of Rippling leadership openly possessing and using recreational drugs . . . with subordinates during or after Rippling events." Indeed, at least one witness has reported that Rippling's leadership pressured female subordinates to snort cocaine at company events. And Rippling's attitude toward former employees is described as one of "vindictiveness and exclusion."

11.     Indeed, for one to understand why Rippling's shocking and lawless corporate culture even exists at all, one must understand the persona and folly of the man who runs it—Parker Conrad. As detailed herein, Conrad has injected his infamous history of "doing the wrong thing" into nearly everything that Rippling does. To understand Conrad is to understand Rippling. On information and belief, he exercises such pervasive control over all aspects of Rippling's corporate decision-making on matters both large and small that it is impossible to separate his direct influence over all the Rippling misconduct alleged in this Complaint.

12.     On information and belief, Conrad has never apologized or admitted wrongdoing for his actions at Zenefits. Evidencing that he learned nothing from his Zenefits failure, he has instead blamed others, including the venture capital firm Andreessen Horowitz, for pushing him out of the company despite his obvious and well-documented illegal conduct and gross mismanagement. It is now apparent that Conrad has made it his life's goal to exact misguided and petty revenge on those connected with Andreessen, including Deel, in which Andreessen owns a 20% share. Indeed, on information and belief, Conrad's fixation with Deel has resulted in the creation of entire groups at Rippling whose sole job is to copy Deel's products, pursue Deel partners and clients, and monitor Rippling's own employees' internal communications and Slack messages in an effort to guard against their departure for better opportunities at Deel.

13.     As such, not content with its own internal illegality and toxicity, starting in late 2022, Rippling launched a multi-faceted secret campaign to defame Deel and bring down what it rightly recognized as the dominant player in Rippling's field. On information and belief, Rippling has planted false and misleading claims about Deel in the press and with regulators across the country. To hide its tracks, Rippling works with Thomas Grady, a Rippling investor and lawyer who has maligned Deel to its employees, investors, and customers, including by falsely claiming that Deel is "under Congressional investigation." On information and belief, Rippling then worked with Grady, public relations consultants, and lobbyists to amplify and cite these false claims as the basis for further investigation of Deel—creating its own ouroboros news cycle with the intent to disrupt Deel's relationships with regulators, partners, customers, investors, and employees. And Rippling is succeeding in that unlawful endeavor.

14.     Rippling has not stopped at false and misleading claims. It has also solicited Deel employees to pass on to Rippling confidential commercially sensitive information about Deel. And incredibly—given Rippling's recent "spying" allegations—Deel has information to believe that Rippling's strange obsession with Deel had led *Rippling to place an insider at Deel*, essentially allowing it to eavesdrop on Deel's internal communications without Deel's permission.

*      *      *

15.    Deel takes no pleasure in filing this action, but Rippling has left Deel with no choice. Deel has had enough. It will no longer tolerate Rippling's unlawful, anticompetitive, and defamatory conduct, which has harmed Deel by hundreds of millions of dollars in terms of lost business opportunities, disrupted relationships with this current and prospective clients and investors, and in terms of the ill-gotten gains that Rippling could achieve not on its own merit, but only by breaking the law.

## THE PARTIES

16.    Deel, Inc. is a Delaware corporation with its current principal place of business in San Francisco, California. Deel is the leading global HR and workforce management software platform.

17.    Defendant People Center, Inc., d/b/a Rippling, is a Delaware corporation with a principal place of business in San Francisco, California.

18.    Deel does not know the true names and capacities of defendants sued in this Complaint as Doe 1 through Doe 100, inclusive (collectively, the "Does"), and therefore sues these defendants by fictitious names. Deel will amend this Complaint to allege the true names and capacities of the Does, inclusive, when ascertained. Deel is informed and believes, and on that basis alleges, that each of the defendants named herein as Doe 1 through Doe 100, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Deel's claims pursuant to 10 *Del. C.* § 541 and Article IV, Section 7 of the Delaware Constitution. The amount in controversy exceeds $75,000.

20.     The Court has general personal jurisdiction over Rippling because Rippling is incorporated in Delaware.

## FACTUAL ALLEGATIONS

## I.     DEEL IS THE LEADING WORKFORCE SOLUTIONS COMPANY IN THE WORLD

21.     Deel is an integrated human resources platform designed to simplify global payroll, compliance, and workforce management across over 150 countries, serving more than 35,000 clients, including major Fortune 500 companies. Deel's culture, innovation, and compliance practices have earned it numerous accolades, including a place on Forbes' Best Startup Employers list for multiple consecutive years, recognition as a Forbes Cloud 100 company and on the CNBC Disrupter 50 list, and ranking first in the Bay Area and fifth nationally on the Deloitte Fast 500.

22.     Alex Bouaziz and Shuo Wang founded Deel in 2019. They met while completing their graduate degrees at MIT. Both had started businesses before Deel, and had experienced first-hand the difficulty of making payroll payments across jurisdictions.

23.     Drawing on their international backgrounds, Alex and Shuo recognized a major inefficiency in the global talent market: the back-office complexities of local taxes, regulations, and payroll requirements prevented professionals from working for companies across national boundaries, and those companies missed out on exceptional talent. These hurdles limited both company growth and opportunities for skilled workers worldwide. Deel solved this problem by creating turnkey infrastructure that allows companies to hire and pay talent worldwide.

24.     In 2019, Deel was selected to join the highly selective Y Combinator, a San Francisco-based startup accelerator known for helping some of the world's most successful businesses.

25.     From its first product launch, Deel's primary focus was compliance. That was the major pain point it was fixing for its customers. The company worked with labor attorneys worldwide to create a product that enabled companies to hire international independent contractors in compliance with local labor laws. Deel has never lost sight of that compliance focus, even as it has grown: it now has over 2,000 in-house experts globally across payroll, legal, mobility, immigration, human resources, and compliance, offering country- and region-specific expertise to help Deel's customers address regulatory and compliance issues.

26.     From its initial payroll product, Deel has rapidly developed multiple best-in-class products, giving its customers an all-in-one HR and payroll solution. In

2020, Deel created entities in various nations that would serve as the Employer of Record ("EOR") for companies' international employees and contractors. By 2022, Deel had expanded its EOR offering to more than 100 countries. By working with Deel's EOR entities, companies can hire talented employees and contractors around the world, in full compliance with local regulations. For example, one of Deel's clients, a California-based company with a predominantly Latin America-based workforce, had an administrative team of more than twenty people and incurred tens of thousands of dollars in monthly expenses to manage its payroll and HR functions across several countries before it hired Deel to provide EOR, payroll, and HR functions. Deel's ability to streamline these processes—and its integration with the customer's accounting and communication tools—allowed the customer to significantly reduce its administrative time, cut tens of thousands of dollars in monthly costs, and hire hundreds more employees to expand its business.

27.    In addition to its rapid development of best-in-class products, Deel stood out because it had a global focus. Typically, US startups develop a domestic customer base first, then expand slowly to the rest of the world. Deel, however, drew from its founders' experiences and marketed to international companies from the beginning, only later entering into the US market.

28.    Deel quickly saw a marked increase in demand from an unexpected source. In 2020, the COVID-19 pandemic led to a sudden influx of new customers

in need of a simple solution to manage a remote, global workforce. Changing work habits in the wake of the pandemic opened the door for many companies to expand their hiring horizons. Deel was ready.

29.    Major investors saw Deel's potential. In May 2020, Deel secured a $14 million series A funding round and added 400 new customers. By September 2020, it had grown threefold. By April 2021, after raising $156 million in a series C funding round, Deel had reached "unicorn" status, with a valuation of $1.25 billion. Its revenue grew twentyfold, with over 1,800 customers. A year later, in May 2022, Deel raised $50 million, valuing the company at $12 billion.

30.    From the beginning, Deel's focus has always been on its customers, not its competitors. In Deel's first six months, Alex (who was then based in Europe), served as frontline support for Deel's customers, personally answering questions and fixing problems at all times of the day. Alex was even known to pause executive meetings to immediately troubleshoot for clients. Unsurprisingly, Deel became known for its lightning-fast customer service in addition to its unique product offering, and its customer base grew quickly.

31.    Even today, Deel's customer retention is far above market standards—a key differentiator and revenue driver. Deel has a "net revenue retention" rate of 126%, meaning that existing Deel customers, in aggregate, expand the services they purchase from Deel far higher than those who choose to leave Deel. Deel also

continues to gain new customers, including from competitors due to its superior platform and customer service. That is a significant achievement in this highly competitive industry, where customers regularly share competitors' quotes with Deel (and vice versa) in an effort to get the best price.

32.    Deel has sustained this extraordinary growth without sacrificing its culture. It is known as a stellar employer, ranked as one of the top 100 companies to work for in 2025 by Glassdoor. With over 6,000 employees worldwide, Deel has remained true to its roots and is now the largest fully remote global company in the world.

## II.    PARKER CONRAD'S RESUME OF FAILURE AND DEMONSTRATED TRACK RECORD OF LAWLESSNESS SET THE FOUNDATION FOR RIPPLING'S CORPORATE CULTURE OF UNLAWFUL AND UNFAIR BUSINESS PRACTICES

33.    As previously noted and discussed in more detail below, Rippling's co-founder Conrad gained notoriety as a con man after being forced out of his previous company, Zenefits, where he presided over a culture in which employees were "pressur[ed] and bull[ied] to cut corners and do the wrong thing."[2]

34.    But Zenefits was not the first time Conrad cut corners. And as his tenure at Rippling has shown, it was certainly not his last. Indeed, Conrad has failed at

---

[2]*Zenefits Was the Perfect Startup. Then It Self-Disrupted*, https://www.bloomberg.com/features/2016-zenefits (hereafter "*Zenefits Self-Disruption*").

nearly everything he has attempted on his own merit. Perhaps this explains why Conrad will now go to extreme—and as it turns out, unlawful—lengths to satisfy his desperate need to have Rippling not turn out to be yet another personal and career disappointment.

35.    Conrad grew up on New York City's Upper East Side, where he earned "mediocre" grades at an expensive and prestigious all-boys preparatory school. Despite his mediocrity, Conrad was then admitted to Harvard University.

36.    Predictably, Conrad then failed out of Harvard, which he described as an "incredibly humiliating and shocking experience"—because he apparently did not attend any classes "for like a year."[3] Despite Conrad's forced leave of absence from Harvard, he was eventually readmitted, once again showcasing his privilege.[4]

37.    After finally bumbling to graduation, Conrad and a former college roommate he used to day trade with in the dorms, Mike Sha, founded a company called SigFig (originally Wikinvest). Conrad helped start SigFig by unethically

---

[3] *How a series of humiliating events led to one of the fastest-growing startups EVER*, https://www.businessinsider.com/the-incredible-story-of-zenefits-founder-parker-conrad-2015-2 (hereafter "*Humiliating Events*").

[4] Notably, one of Conrad's college mentees during his time working at the *Harvard Crimson* newspaper is now the Editor-in-Chief of the online publication *The Information*, which has provided significant coverage of Rippling's recently instigated disputes with Deel. Deel believes that discovery in this matter will show a significant amount of misinformation provided to *The Information* by Rippling and its agents to propagate stories designed to damage Deel.

living for free in housing in the notoriously high-priced Bay Area that was reserved for senior citizens over 65 years old. He later described his displacement of seniors to be "funny."

38.    SigFig failed to catch on with Conrad in a leadership role. When Conrad had the reins as "co-CEO," the company was "constantly just two or three months away from not being able to make payroll" and "constantly pivot[ing]."[5] This led to the deterioration of Sha and Conrad's relationship over time, and Sha eventually forced Conrad out of the company after only a year, marking at least the second time Conrad was forced out from one his own chosen endeavors.

39.    The very same day he was fired from SigFig, Conrad incorporated Zenefits. Conrad apparently came up with the idea for Zenefits based on his experience at SigFig. Conrad self-identifies as a "shitty engineer," and so—showing his nature—decided to solve his admitted shortcomings by reportedly raiding his former employer and hiring SigFig's top engineer, among "a bunch of others."[6]

40.    Conrad launched Zenefits in 2013 to purportedly "disrupt" the health insurance industry for start-ups and small businesses. But Conrad's "disruption" of the insurance industry did not depend on technical wizardry or deep business insight. Instead, he cheated.

---

[5] *See Humiliating Events*.

[6] *See id.*

41.    To make Zenefits unfairly competitive, Conrad simply disregarded insurance licensing requirements, which safeguard the industry and its customers, including the employees of Zenefit's customers. The company marketed insurance in states where it was not licensed.

42.    Worse, Conrad developed software that allowed his staff to circumvent insurance licensing requirements, as the U.S. Securities and Exchange Commission ("SEC") would later determine. Zenefits employees used Conrad's cheat-code software to "systemically cheat" throughout his tenure as CEO. The California Department of Insurance stated at the time of its own investigation that, "as far as a company doing what Zenefits has done, I don't know that we have seen this before." Following these revelations, a spokesperson for Anthem Blue Cross described what Conrad was overseeing and doing as "really illegal."

43.    Conrad's previous self-imposed humiliations and knowledge that he had created a house of cards and was deeply in over his head at Zenefits likely explains why press reports at the time described him as "petrified, his days a series of white-knuckled attempts to escape the clutches of sudden, inadvertent failure."[7]

44.    Given that Conrad had built a key component of Zenefits on an illegal charade, reports of other troubling misconduct and the farcical workplace culture

---

[7] https://www.nytimes.com/2014/09/21/business/zenefits-leader-is-rattling-an-industry-so-why-is-he-stressed-out.html (hereafter *Conrad Stressed Out*).

cultivated by Conrad are unsurprising. Under Conrad's leadership, Zenefits had misclassified its own workers, underpaying account executives and salespeople by millions. Employees complained that Conrad had operated the company like a *Wolf-of-Wall-Street*-esque frat house. *The Wall Street Journal* reported on company-wide emails that reminded employees to not "smoke, drink, eat, or have sex" in company stairwells after "[c]igarettes, plastic cups filled with beer, and several used condoms were found" there.[8] Zenefits had beer kegs in the office, employees were reportedly taking shots of hard liquor in the office during the workday, and Conrad himself would get drunk and wrestle his coworkers to the floor.[9] Indeed, once Conrad left, Zenefits's new CEO had to ban drinking alcohol at the office to try to clean up Conrad's deeply unserious corporate culture.

45.    Despite Conrad's gnawing fears of yet another personal and professional failure, he clearly has difficulty recognizing its root cause: himself. His inability to effectively manage Zenefits caused it to be constantly "bouncing from one terrifying near-catastrophe to the next," in his own words.[10]

---

[8]  https://www.wsj.com/articles/zenefits-once-told-employees-no-sex-in-stairwells-1456183097.

[9] *See Zenefits Self-Disruption*.

[10] *See Conrad Stressed Out.*

46.    But Conrad's fears came true when the SEC and other regulators eventually took notice of what he was doing (and not doing) at Zenefits, and initiated investigations. In response to these investigations, Conrad experienced his *third* forced removal. Indeed, due to Conrad's malfeasance, multiple states threatened not only to shut Zenefits down entirely, but to seek prosecution and incarceration of Conrad personally, unless he resigned his post as CEO.

47.    Conrad resigned soon thereafter.

48.    Zenefits' new CEO, David Sacks, explained that "**many of our internal processes, controls, and actions around compliance have been inadequate, and some decisions have just been plain wrong . . . [a]s a result, Parker [Conrad] has resigned.**"[11]

49.    Following Conrad's forced departure, Zenefits understandably took pains to distance itself from Conrad's disdain for the law, stating that Zenefits was "now focused on developing business practices that will ensure compliance with all regulatory requirements, and making certain that the company operates with integrity as its number-one value."[12]

---

[11]    https://www.reuters.com/article/technology/zenefits-ceo-parker-conrad-resigns-amid-startup-turmoil-idUSKCN0VI02B/.

[12]    https://www.wsj.com/articles/zenefits-once-told-employees-no-sex-in-stairwells-1456183097.

50.    Indeed, in what sounds like a bad joke but in reality is a perfect microcosm of Conrad's leadership style, Zenefits reportedly decided to change its previous company motto under Conrad from "***Ready. Fire. Aim.***" to "***Operate With Integrity***" after his exit.[13]

51.    The *New York Times* reported that, when Conrad's forced resignation was announced, "there were celebrations and tears of relief at the San Francisco headquarters of Zenefits."[14]

52.    Following Conrad's resignation, in October 2017, the SEC found that Conrad made "materially false and misleading statements and omissions to investors" and imposed "cease-and-desist" proceedings.[15] The SEC noted that Zenefits had racked up $11 million in state regulatory fines. In its order, the SEC fined Zenefits approximately $1 million, over half of which Conrad was required to pay directly. Notably, just months before the Zenefits scandal came to light, Conrad cashed out $10 million in stock.[16]

53.    After Zenefits's scandals caused by Conrad came to light, **its valuation dropped 56%, to $2 billion, and the company laid off 45% of its workforce**.

---

[13] *See Zenefits Self-Disruption*.

[14] https://www.nytimes.com/2016/02/18/technology/zenefits-scandal-highlights-perils-of-hypergrowth-at-start-ups.html.

[15] https://www.sec.gov/files/litigation/admin/2017/33-10429.pdf.

[16] https://www.businessinsider.com/parker-conrad-launches-a-new-startup-2017-3.

## III.   CONRAD FOUNDS AND RUNS RIPPLING BY IMPORTING THE SAME DISDAIN FOR COMPLIANCE THAT GOT HIM EXILED FROM HIS OWN PREVIOUS STARTUP, ZENEFITS

54.    Conrad founded Rippling in Delaware just two months after being kicked out of his former company and leaving it in financial ruin.

55.    Conrad jump-started Rippling by inviting over a contingent of his old Zenefits crew into senior positions at Rippling, including the former Director of Engineering at Zenefits, Zenefits' former SVP of Customer Experience, and Zenefits's former Chief Revenue Officer. This overlap was no accident. Rippling was Conrad's attempt to rebuild his Zenefits enterprise—it apparently uses the same "map" as Zenefits, and Conrad is transparent that he wants to show the world that "Rippling was the company that Zenefits would have become" under his continued stewardship.

56.    Conrad's co-founder at Rippling, Prasanna Sankaranarayanan, also known as Prasanna Sankar ("Sankar"), was one of Conrad's loyalists at Zenefits, and joined Conrad as Rippling's CTO. Rippling's co-founder is reportedly currently on the run from authorities in India, following deeply disturbing revelations levied

by his wife in court proceedings that Sankar repeatedly sexually and physically abused her, and has now absconded with their nine-year-old son.[17]



(Conrad, right, sitting with accused fugitive and Rippling co-founder Sankar, left)

57.    To date, Conrad has not commented publicly on his co-founder's legal troubles or his alleged heinous conduct, and a Rippling spokesperson has sought to distance the company from Sankar.

58.    Sankar was integral to Rippling's founding due to Conrad's own ongoing legal troubles with the SEC. In March 2017, while the SEC investigation into Zenefits was still pending, Conrad declared publicly that Rippling had "no plans

---

[17]    https://sfstandard.com/2025/04/04/rippling-prasanna-sankar-wife-viral-custody-battle/ (reporting that Sankar allegedly "punched" his wife "in the chest twice" when she refused to sign a financial settlement without consulting an attorney, among other things).

to enter the insurance business."[18] But that was false. In August 2017 (only five months later), a company called "Waveling Insurances Services" was incorporated in Florida. Waveling would go on to become Rippling's Florida insurance subsidiary, but neither Rippling nor Conrad's name appears on the Articles of Incorporation. Instead, in an attempt to avoid scrutiny, the company was incorporated by attorney Thomas Grady ("Grady"), and the only officer named was Rippling's co-founder, Sankar.

59.    As discussed in more detail below, Grady is a Florida lawyer, former politician, and donor to candidates such as former Florida Congressman Matt Gaetz. He served as the Chairman of the Florida State Board of Education during the state's restriction of books in public school libraries and implementation of the controversial "Don't Say Gay" law, among other things. The *Tampa Bay Times* has reported on Grady's "history of questionable spending," noting that he was named as the "costliest flyer" to taxpayers of all Florida lawmakers during his brief stint a state legislator. He also reportedly lost an opportunity to be the permanent CEO of Florida's insurer of last resort (Citizens Property Insurance) after he drew attention for his "unconscionable" spending habits on the ratepayers' dime in *just two months* as its interim leader, which included nearly $10,000 for Ritz-Carlton hotel rooms,

---

[18] https://www.ft.com/content/f8d06016-0914-11e7-97d1-5e720a26771b

first-class airplane travel, limousines, and a three-night trip to Bermuda.[19] Grady is a significant investor in Rippling. On information and belief, as detailed below, Rippling uses Grady as a "fixer" for much of Rippling's misconduct, which includes planting false stories in the press, ginning up frivolous regulatory issues for Deel, and incorporating entities for Rippling so that insurance regulators do not connect these entities with Conrad's troubled past.

60.     The personnel and circumstances surrounding Rippling's founding are not the only things questionable about what appears to be Conrad's latest Potemkin business.

61.     In contrast to Deel's compliance-focused culture, Conrad imported the same broken culture and unstable foundation at Rippling that plagued his tenure at Zenefits. When asked whether he "did [things] different[ly at Rippling] . . . from an actual governance perspective [than he did at Zenefits]," Conrad admitted, "not much."

62.     Indeed, former Rippling employees have stated that although Rippling purportedly wants to "distance itself from the reputation and legacy of Zenefits, given Parker's history," Rippling's "conduct and culture seem to be sending Rippling inevitably down the same dangerous path."

---

[19]    https://www.tampabay.com/news/business/banking/citizens-property-insurance-interim-president-chalks-up-almost-10000-in/1236203/.

63.    On information and belief, that is because as long as Conrad is at Rippling, it will always just be Zenefits 2.0—advertising and selling legal compliance products to its customers while it is fundamentally incapable of following the law itself.

64.    Public reporting suggests that, just like Zenefits, Rippling is plagued by inadequate training, micromanagement, an abusive "hunger games"-style work culture, and an ethos of obsessive resentment towards competitors and former employees. Former employees of Rippling have described Rippling's workplace as "toxic" where employees are "subject to [] tempers, cliques, and seemingly erratic management decisions" that are "immoral if not illegal."

65.    Troublingly for a company ostensibly focused on human resources "solutions," former employees have complained that "Rippling has terminated employees who were on or returning from a protected leave of absence, such as parental, pregnancy, or medical leaves," and the company "has a long history of intentionally terminating employees prior to their vesting of stock (so as to deny them their hard earned shares)." In fact, on information and belief, Rippling has a common practice of terminating its employees just prior to their one-year anniversary date so as to avoid the vesting of any Rippling shares. In this way, on information and belief, Rippling sucks as much as it can as quickly as it can out of its successful new hires, hoarding the fruits of their labor and hard work all to itself.

66.     Indeed, in a September 2024 letter and newspaper op-ed calling for Rippling's state tax credits to be canceled, Reverand Al Sharpton claimed that he had been informed that Rippling routinely discriminates against minorities and women, and that Conrad sacrifices his own workers' physical and mental health to pad his bottom line. Former U.S. Congresswoman for Conrad's own former home district in New York, Carolyn Maloney, raised similar concerns with the New York governor and Attorney General, among others. Representative Maloney alleged that Rippling "systemically terminates employees who use legally protected leaves of absence," including "parental, pregnancy, and medical leaves," which she referred to as "par for the course" for Rippling's "CEO Parker Conrad, who previously led the scandal-plagued startup Zenefits."

67.     And, as at Zenefits, former Rippling employees report "a sad and toxic reality of Rippling leadership openly possessing and using recreational drugs . . . with subordinates during or after Rippling events." Concerningly, at least one former Rippling employee said that they have personally witnessed female subordinates pressured to consume cocaine with their superiors at Rippling company events.

68.     In recent years, Rippling has taken extraordinary measures to punish Rippling employees who left Rippling for better positions with Rippling's competitors and to intimidate current employees from doing the same. For example, on information and belief, the company regularly demands to see current employees

"private text messages with former employees," and routinely has its attorneys send its own employees "boilerplate letters with baseless accusations intended to scare" them. On information and belief, Rippling has instituted Orwellian surveillance of its own employees and obsessively monitors their internal communications, including on Slack, for the apparently mutinous crime of merely discussing wanting to leave Rippling for a better opportunity at a competitor.

69.    In April 2023, Rippling announced a $590 million tender offer for current employees, former employees, and investors. Rippling, as a private company, does not have shares of stock that can be freely sold. But the tender offer permitted current and former employees to sell up to 25% of their vested equity options in Rippling, providing a rare opportunity for employees to obtain cash for their equity in Rippling.

70.    But there was one catch. Former employees who Rippling deemed to be working for "competitors," including Deel, were categorically excluded from participating in the tender offer—a move violative of multiple state laws banning retaliatory action and employee non-compete agreements. By excluding former employees who had gone to competitors like Deel with better performance and better workplace cultures, Rippling sent a message: employees who leave Rippling to work at competitors would be punished, and Rippling was not going to let the law stand in its way. On information and belief, Rippling's actions in connection with the

tender offer were specifically aimed at targeting Deel employees. As someone familiar with the tender offer explained "[e]veryone who has options is eligible, even former employees. Except if you went to Deel[,] then you're screwed."

71.     The broken culture Conrad carried with him from Zenefits to Rippling was not limited to punitive measures against its own employees, discriminatory acts, and drug use. Several former Rippling personnel and others with knowledge have described total lack of internal compliance at Rippling that has led to rampant and unchecked deceptive and fraudulent business practices that has employees scrambling for an exit. On information and belief, at least one former employee has claimed that Rippling's entire product is "held together by duct tape," and that many critical and required processes either do not work at all, or are held together by overworked engineers. In sum, on information and belief, Rippling is nothing more than another Conrad scam.

72.     For example, on information and belief, sources have reported that Rippling's platform is not only not tax-compliant, but that Rippling abuses tax laws to inflate its bottom line.

73.     On information and belief, Rippling was not remitting and does not remit its customers' payroll tax dollars and social contributions to local taxation and other relevant authorities as required, but *instead was categorizing and reporting these funds as Rippling's own earnings*. On information and belief, Rippling has

engaged in this practice in at least two to three different countries, and may have taken efforts to dupe and/or take advantage of the regulators in those countries, which may explain why Rippling has not been caught—yet.

74.    Deel is unaware of a single country where not remitting these payroll taxes or benefits payments to the appropriate authorities would not be considered a fraudulent criminal act.

75.    Evidencing this egregious, and what appears to be highly illegal practice, on information and belief, Rippling intentionally refuses to provide its clients any data on Rippling's tax remittance activity, because it knows that would expose its scheme.

76.    Even more shocking is that Rippling is not only doing this to its clients, but **also to its *own employees***, on information and belief. On information and belief, here's how Rippling's scheme to defraud its own employees works: Sources report that first, Rippling would systemically inflate the tax withholding on an employee's paycheck. Then, on information and belief, instead of remitting the entire inflated amount to the local government, Rippling would instead ***pocket the extra*** that it stole from its own employee. To be clear, that is theft.

77.    And Rippling's conduct here is intentional—on information and belief, at least one whistleblower has raised these concerns with Rippling's senior management, and been rebuffed.

78.    Apart from using its own clients' tax dollars for its own personal gain, on information and belief, Rippling also apparently exploits its clients by locking them into long-term contracts under false pretenses, and then overcharges by nickel-and-diming them with countless scores of hidden and undisclosed fees, according to complaints from other clients. Some have claimed that Rippling even charges hidden fees to correct Rippling's own payroll errors. Another claimed that Rippling charges its clients for functionality that is broken or unavailable on Rippling's end. On information and belief, Rippling not only refuses to refund its clients' money, but instead tries to string them along with false promises of improved functionality that will be "coming soon," even though Rippling represented that it was already in place when the customer paid for the service.

79.    On information and belief, this scheme to routinely and fraudulently overcharge clients is no accident—sources close to Rippling's leadership have claimed that Rippling desired to set in motion a plan to make an additional $30 million from Rippling's clients "**without them knowing**."

80.    Worse still, on information and belief, other sources have asserted that ***Rippling has a practice of misappropriating and covertly scraping intellectual property from its own software partners and vendors*, in which it steals their information and builds its own competing products and services**. To borrow a phrase, this is "par for the course" for Conrad, given his history instating similar

fraudulent practices at Zenefits and lashing out when he inevitably gets caught. In fact, Zenefits and Conrad were actually sued by payroll company ADP, LLC for allegedly integrating Zenefits' own platform with ADP's in an unauthorized manner and then using automated scraping technology to steal ADP's client payroll information. After ADP blocked Zenefits' activity, Zenefits then allegedly "commenced a manipulative and malicious public relations campaign, ignoring its own conduct, to defame ADP and drive away ADP's clients."[20] As Deel describes below, this conduct is worryingly similar to what Rippling has done to Deel here. ADP sued Conrad and Zenefits for, among other things, defamation, intentional interference with economic relations, and unfair competition. ADP and Zenefits settled this dispute approximately five months after it was filed.

81.    In this vein, on information and belief, Rippling misappropriated the trade secrets, confidential information, and/or intellectual property of Blue Marble, a global payroll provider with payroll engines in foreign countries. On information and belief, it did so by luring Blue Marble to believe it wanted to partner with it to provide international payroll services to Rippling customers. However, on information and belief, after studying Blue Marble's product, platform, and even source code, Rippling elected not to move forward with its partnership but rather

---

[20] *See ADP, LLC v. YourPeople, Inc. et al.*, Case No. 3:15-cv-02560-VC (N.D. Cal. June 9, 2015).

recreate a substantially similar product based on its knowledge of Blue Marble's confidential information. Upon information and belief, Rippling did so even after executing a non-disclosure agreement, which it did as a pretext to gain their trust.

82.     As another specific example, upon information and belief, Rippling misappropriated the trade secrets, confidential information, and/or intellectual property of Trinet, the company which acquired Conrad's predecessor entity, Zenefits, after Conrad was thrown out. On information and belief, Rippling did so by having Trinet believe Rippling wanted to partner with it to provide US PEO services. On information and belief, after learning about Trinet's products, insurers, payroll and tax products and processes, and a host of other information, it declined to proceed with Trinet (although Trinet was eager to partner with Rippling), and opted to mirror Trinet products and services instead. On information and belief, it also lured Trinet PEO leaders to join Rippling and induced them to breach their contractual covenants owed to Trinet.

83.     Further, on information and belief, Rippling engaged in similar conduct during its partnership with a company called Brex, which provided certain expense management functionality for Rippling's customers. On information and belief, this partnership ended after Rippling decide to use its knowledge of Brex's product to create its own product that mirrored Brex's for the purpose of unfairly competing with Brex.

84.     Yet another example of Rippling's lawlessness is Rippling's persistent failure to comply with international sanctions restrictions, and its willingness to go to any lengths to cover up its behavior and divert public attention elsewhere. The United States and other Western countries have implemented a set of targeted sanctions against specific parties and specific sectors of the Russian economy, with the goal of pressuring the Russian government to cease its aggression towards Ukraine. Because of this sanctions regime, it is unlawful for U.S. companies to pay sanctioned Russia-based employees or contractors, and it is also unlawful for any payments to pass through sanctioned Russian banks.

85.     But of course, none of that stops someone like Conrad.

86.     To the contrary, facilitating payroll services for customers seeking to employ Russian nationals represented a valuable market for Rippling. As recently as July 2024—*years* after Russian sanctions laws had been in force—Rippling published a blog post titled "How to pay international contractors in Russia," which encouraged potential customers to use Rippling if they wanted to send money to

Russian contractors, despite the "difficult landscape" created by international

sanctions:

# How to pay international contractors in Russia

PUBLISHED          AUTHOR

Jul 30, 2024        The Rippling Team

87.    Rippling provided detailed "guidance . . . [to] better understand how to

hire and pay contractors in Russia as a global business," despite the understated fact

that "paying contractors in Russia is challenging in the current political climate."

The post included steps on how to "[d]etermine the best way to pay . . . contractors

in Russia," and provided "possible payment methods," including "Rippling's global

payroll services [which] still support contractors in Russia," with some exceptions.[21]

88.    This information was still available on Rippling's website through

October 2024. But Rippling's transactions with Russia eventually drew unwanted

scrutiny, and ultimately caused it to scramble to cover its tracks and delete the above

information from its website, with the media reporting on internal Rippling messages

---

[21]https://web.archive.org/web/20240912112609/https://www.rippling.com/blog/ho
w-to-pay-contractors-in-russia.

reflecting that "Russia stuff" needed to be removed from Rippling's website "ASAP," despite sanctions having been in place for *years*.

89.    Indeed, a Rippling spokesperson even went so far as to claim that "Rippling has never transmitted payments to any sanctioned country, entity, individual or bank." But that is demonstrably false.

90.    On information and belief, in March 2024, Rippling attempted to transmit payments to a Moscow-based contractor with an account at a sanctioned bank. Rippling's third-party payment processor caught and froze these payments before they could be processed.[22] On information and belief, Rippling's processor also froze other payments attempted to be sent by Rippling to sanctioned Russian banks. Rippling claimed that it had failed to properly maintain its compliance systems to prevent such payments from occurring, and claimed that its senior leadership would fix the "technical glitch."

91.    However, its own public statements encouraging its clients to continue transmitting money to Russia following these incidents and continued flouting of the Russian sanctions regime shows that its proffered excuse of blaming its own incompetence was misleading at best. On information and belief, Rippling continued

---

[22]  https://www.theinformation.com/articles/the-bitter-fintech-feud-that-stretches-from-silicon-valley-to-moscow.

violating sanctions laws because it knew it could make money by doing so because its competitors, like Deel, would follow the law.

92.    Indeed, on information and belief, Rippling continued facilitating payments to sanctioned Russian banks at least *two dozen times* through at *least* December 2024. For example, on information and belief, in September 2024, following Rippling's purported "fix" of its internal sanctions compliance failures, Rippling's third-party processor was once again forced to block Rippling payments to a sanctioned Russian bank. And in December, it happened yet again, on information and belief, despite Rippling claiming that this "should NOT have been possible." And Deel believes that discovery in this matter is likely to yield significantly more illegal payments made by Rippling, along with other evidence of Rippling's unlawful, unfair, and fraudulent business practices.

93.    Whether Rippling's persistent violation of international sanctions law was intentional or merely incompetent is beside the point. Under either scenario, Rippling's illegal payments were allowing it to compete with its law-abiding competitors like Deel unfairly, on information and belief.

94.    In light of Rippling's seemingly limitless tolerance for risk exposure due to its unlawful conduct and Conrad's menagerie of questionable associations, it also bears noting that Conrad is close with fellow disgraced founder and convicted felon Sam Bankman-Fried, who is currently serving a 25-year federal prison

sentence for fraud and money laundering. In fact, on information and belief, Rippling received millions of dollars from Bankman-Fried's now-bankrupt companies, FTX and Alameda Research, for providing unspecified payroll and tax services to their employees. On information and belief, legal filings in Bankman-Fried's criminal trial and FTX's bankruptcy proceedings reveal that there may have been employee misclassification issues at Alameda Research at the time that Rippling was responsible for its human resources and payroll management, and Rippling had to file corrected tax forms with regulators. FTX's bankruptcy filings also listed Rippling as "critical" to its business. And just days before Bankman-Fried's arrest in the Bahamas in 2023, Conrad insinuated on X.com that "the deck is stacked" against Bankman-Fried, just as it is "against all defendants in federal criminal proceedings."

95.    Perhaps all of this miasma emanating from Conrad and Rippling helps explain why there has been nothing short of a senior leadership exodus from Rippling in recent years of those closest to Conrad—likely because they can see that Conrad's poor decision-making is yet again going to drive his company into the ground. On information and belief, at least ten high-level senior employees have left the company since June 2023, which includes Rippling's Chief Compliance Officer, VP of Product Marketing, Human Resources Director, Head of Global Real Estate and Workplace, Director of Engineering, Chief Marketing Officer, and VP of

Communications. In fact, former employees have indicated that Rippling's lack of organization and internal compliance processes are even now deteriorating the company's client-facing product.

96.    Other Rippling employees have predicted an eventual "big tech article expose of this company," including detailing "how terrible employees are treated" and its complete lack of internal controls.

97.    Indeed, on information and belief, Rippling's employees are so desperate to escape Conrad's latest iteration of illegality and chaos masquerading as a legitimate business that they are even turning down Rippling's offers of $100,000 bonuses to stay "due to the toxic culture that permeates from top down leadership."

## IV.    UNABLE TO FAIRLY COMPETE WITH DEEL, RIPPLING ORCHESTRATES AN OBSESSIVE, ANTICOMPETITIVE, AND DEFAMATORY SABOTAGE CAMPAIGN DESIGNED TO HARM DEEL

98.    Deel has been harmed by unfair competition due to Rippling's blatant disregard for the law governing (i) how it treats employees, (ii) how it advertises its products and services to customers, (iii) how it reports its income, (iv) protection fo intellectual property and confidential business information, and (v) its compliance with international sanctions laws, as detailed above. Conrad and Rippling's culture of cutting corners provides an illegal and unfair business advantage to Rippling because following the law is more expensive than simply ignoring it.

99.    Rippling has also harmed Deel by coordinating "a manipulative and malicious public relations campaign, ignoring its own conduct, to defame" and malign Deel—just as Conrad did at Zenefits with another competitor, ADP, causing ADP to bring legal claims against Conrad and Zenefits that they were ultimately forced to settle.[23] Unfortunately, misleading and bad-faith attacks against its competitors appear to be yet another tool in Conrad's garbage bag of dirty tricks.

**A.    Rippling Launches A Shadow PR And Regulatory Blitzkrieg Against Deel Based On Lies And Misrepresentations, Using Grady As An Intermediary**

100.    Unable to actually compete with Deel on product and service and losing market share by the day, on information and belief, Rippling—at Conrad's direction—initiated a multi-pronged sabotage smear campaign against Deel designed to falsely disparage Deel in the press and to regulators, as well as its partners, customers, investors, and employees. On information and belief, Rippling's playbook is clear in retrospect: it would plant false information, either with the press or a government official. Then, it would cite that false story or report as a basis for further investigation, creating its own press cycle about Deel. It would then rinse and repeat that strategy all over the country, including in Delaware.

---

[23]    *See ADP, LLC v. YourPeople, Inc. et al.*, Case No. 3:15-cv-02560-VC (N.D. Cal. June 9, 2015).

101.   On information and belief, Rippling was careful to cover its tracks, launching these attacks on Deel on multiple fronts—without disclosing to anyone that Rippling was ultimately behind each one. To accomplish this, on information and belief, Rippling would use its "fixer" Grady as an intermediary to do so.

102.   For example, on information and belief, at Rippling's direction, one of Grady's associates filed a letter in January 2023 with the Florida Department of Business & Professional Regulation ("DBPR") alleging that Deel was engaging in "consumer fraud and deception" because it was not able to obtain a license as a professional employer organization ("PEO") there. Deel was able to quickly and favorably resolve these allegations with the DBPR, and was granted a PEO license in Florida following that conversation. Deel would later learn that it was Rippling who was behind this officious and underhanded attack.

103.   Next, on information and belief, on March 20, 2023, Rippling and Grady placed a misleading hit-piece about Deel with *Business Insider*, which insinuated that Deel misclassified many of its employees—including U.S. employees—as independent contractors.[24] This hit-piece was replete with sensational and patently false claims, including that "at least half of its thousands-strong workforce"—including workers in the United States—were independent

---

[24]  https://www.businessinsider.com/inside-hr-startup-deel-culture-employment-regulatory-2023-2.

contractors. The story even absurdly alleged that Deel's CEO, Alex Bouaziz, was classified as an independent contractor—a claim that was demonstrably false.

104.   On information and belief, Rippling utilized lobbyists to amplify these false claims about Deel to lawmakers. Lobbyist filings show that Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") conducted lobbying at the federal level on behalf of Rippling on "[i]ssues related to employee misclassification" beginning in April 2023, shortly after the publication of the *Business Insider* article. On information and belief, Rippling paid Akin Gump approximately $80,000 for its lobbying services since April 2023. From July to September 2023, Akin Gump's federal lobbying for Rippling shifted to "[e]ducating Members of the House and Senate on issues related to developments in the human resources technology sector."

105.   From the start, Rippling's shadow PR campaign had its intended effect. In July 2023, California State Senator Steve Padilla wrote a letter to the Secretary of the California Labor and Workforce Development Agency, urging an investigation into Deel for alleged employee misclassification. Padilla's letter exclusively cited the *Business Insider* stories. *Business Insider* then authored additional articles based on Padilla's letter, creating a feedback loop based on a false narrative that was ultimately designed by Rippling, and perpetuated by Grady, on information and belief.

106.   On July 26, 2023, then-California Representative Adam Schiff, wrote a similar letter to the Acting U.S. Secretary of Labor Julie Su, also urging an investigation into Deel. Like the Padilla, letter, the Schiff letter cited recent "troubling reporting" as the basis for its concerns about Deel. The Schiff letter triggered even more press reports noting that lawmakers were calling for an investigation into Deel, which further amplified Rippling's chicken-or-egg media loop.

107.   Deel was forced to divert energy from fairly competing with Rippling to responding to these false claims. Of course, no investigation was ever launched, either by the U.S. Department of Labor, the California Labor and Workforce Development Agency, or by Congress, because these claims were patently false. Indeed, then-Representative Schiff later walked back his statements seeking investigations of Deel, stating that Deel had "clear[ed] up" his concerns after Deel explained that independent contractors and vendors comprised less than 1% of Deel's U.S. workforce (amounting to about 30 people), and that these contractors made    about    $134,000    per    year    on    average.    *See*

https://www.deel.com/blog/thefacts/.[25] Deel was clearly not what Rippling was claiming.

108.    At the same time Rippling was executing its shadow PR campaign against Deel related to employee misclassification, on information and belief, it also launched a regulatory blitzkrieg in multiple states against Deel following its early test balloon in Florida. As Deel would later learn, Rippling used its Florida fixer, Grady, to instigate these baseless attacks, on information and belief.

109.    On information and belief, Grady lobbied, both directly and indirectly through third parties, regulators in multiple states, including Delaware, to investigate Deel for operating as an unlicensed money transmitter, writing letters replete with knowingly false information about Deel. On information and belief, Grady then amplified these false claims to Deel's employees, customers, and investors in order to damage Deel's business. On information and belief, Grady took all of these actions at the direction of, and as an agent for, Rippling.

110.    On August 2, 2023, Grady wrote a letter to Florida regulators falsely alleging that "[Deel's business is] unlicensed, unregulated, uninsured, unsupervised, and unlawful . . . ." In the letter, Grady purported to be investigating Deel's

---

[25] https://www.forbes.com/sites/phoebeliu/2024/05/30/how-this-chinese-immigrant-became-one-of-americas-most-successful-self-made-women/?sh=661270e55afd.

activities on behalf of his law firm's clients and relied on his status as a former state official—but he neglected to mention that he was a large and early investor in Rippling.

111.   On information and belief, Grady then sent similar letters and made calls to other regulators in other states, falsely asserting that Deel was perpetrating consumer fraud, and that Deel was an unlicensed money transmitter. He also falsely alleged that Deel lacked adequate anti-money laundering policies, and asserted that Deel might be "under investigation by other states already"—omitting that he was the driving force behind these investigations and again failing to disclose that he was an investor in Rippling. Indeed, Deel has learned through talking to these state regulators and FOIA requests that Grady would represent himself as a former banking commissioner from Florida, and make the pretextual claim that he was calling out of his purported concerns for the citizens of the regulators' respective states.

112.   At the same time, like Rippling had done with the bogus misclassification allegations, on information and belief, Grady facilitated the placement of stories with the press that parroted the knowingly false allegations he circulated to regulators—effectively creating a self-sustaining perpetual motion machine in the media to continuously breathe life into Rippling and Grady's conjured narrative.

113.   For example, in October 2023, *Florida Politics* published a story that claimed Deel was "under investigation" for, among other things, operating as an unlicensed payment processor in Florida. The story also falsely claims that "Rep. Adam Schiff ha[d] uncovered evidence that Deel's tenuous grasp of employment law also applies to its own workers and has urged the Department of Labor to investigate." The story does not mention that then-Rep. Schiff had effectively publicly retracted his calls for an investigation related to Deel.

114.   Of course, the star and exclusive source for the story was Grady, whose association with Rippling was omitted from the article, and who was described only as a "former Commissioner of the Florida Office of Financial Regulation [who was] investigating proprietary trading scams and their payment processors." Notably, the story was withdrawn by *Florida Politics* after it realized the allegations were baseless.

115.   Indeed, nearly every state regulator contacted by Grady ultimately rejected his sham claims. However, one state, Minnesota, requested that Deel pay $12,000 to enter a "no contest" consent order, which Deel happily agreed to do in order to put any questions to rest. However, FOIA requests reveal that Grady then facilitated the circulation of the Minnesota order to regulators from all 50 states, including Delaware, which resulted in the creation of banking commission office thread where states which had even already approved Deel's operations were

encouraged and influenced to view Deel negatively and skeptically. On information and belief, Grady, at Rippling's direction, traded on his reputation as a former Florida banking officer, not disclosing that he was in fact a Rippling investor simply out to destroy a competitor. These acts effectively caused reputational damage to Deel in Delaware along with every state in the country, and Deel is still dealing with the fallout.

116.   Grady and Rippling did not stop with state regulators. They also spent $40,000 to file a complaint with the Better Business Bureau's National Advertising Division ("NAD"), alleging, among other things, that Deel was engaging in false or misleading comparative advertising when it claimed in advertising materials that customers could save up to $20,000 a year by switching from Rippling to Deel. Although Deel was forced to spend a significant sum on attorneys' fees to defend itself from Rippling's frivolous allegations, Rippling's stunt ultimately backfired: after an investigation, the NAD confirmed that Deel's comparative advertising on this point was not misleading.

117.   Undeterred, on information and belief, Rippling and Grady continued their sham regulatory attack against Deel.

118.   On June 29, 2024, Grady emailed an additional "complaint" to Florida regulators seeking to block Deel's application for a money transmitter license. This complaint was laden with numerous false allegations. Grady purported that he

"represent[ed] clients impacted by Deel's activities" and that he had been "unable to confirm Deel's licenses. . . ." He also stated that he had "discovered" that Deel had applied for money transmission licenses through an affiliated company "DPayments," insinuating that Deel was concealing its relationship with DPayments, even though he well knew that Deel had never tried to hide its affiliation with DPayments. Grady also stated that he was "alarmed by Deel's ongoing business activities in Russia," falsely implying that Deel was engaging in improper payments to Russia. There was absolutely no merit to these claims, as Grady well knew. Grady's attempt to focus on Deel's compliance with Russia sanctions is, on information and belief, part of Rippling's strategy to divert attention from its own evasion of Russia-related sanctions orders.

119.   Grady also falsely asserted that "California and the U.S. Congress are investigating claims of misclassification made by former Deel employees," something that Grady knew was untrue. Indeed, almost a year prior, then-Representative Schiff had effectively publicly walked back his requests for an investigation into Deel.

120.   On information and belief, at the time he was communicating with them regarding Deel, neither Grady nor Rippling ever revealed to regulators in Florida, or any other state, that he was an investor of Rippling and thus had a direct financial interest in harming Deel, or that he was coordinating these regulatory attacks against

Deel at the behest of Rippling. Instead, Grady cynically traded off his reputation as a former Florida regulator to benefit Rippling and his own investment. And, on information and belief, to the extent Grady was actually acting in a legal capacity on Rippling's behalf in those various states, he may have been engaged in the unlicensed practice of law all over the country.

121.   Finally, evidencing Rippling and Grady's sabotage smear campaign is a meritless class action lawsuit filed on January 3, 2025, in the U.S. District Court for the Southern District of Florida.

122.   Specifically, Grady filed a lawsuit on behalf of Melanie Damian, the court-appointed receiver of victims of consumer fraud committed by an alleged fraudster, Brent Seaman, and various LLCs that he managed. This consumer fraud has nothing to do with Deel, and Deel was not mentioned in the SEC's July 27, 2023 complaint against Seaman.

123.   On information and belief, Grady did not disclose his connections to, and his investment in, Rippling to his clients in the *Damian* lawsuit. Indeed, Grady has not denied that he hid his connection to Rippling from his clients in the lawsuit, commentating in the press only that such a claim was a "predictable response" by Deel.

124.   The *Damian* lawsuit regurgitates the same false allegations that Rippling and Grady spread throughout 2023 and 2024, including the sensational and

patently false claims that Deel engaged in "unlicensed money transmission and money laundering around the world." It apes these false allegations even though they have absolutely nothing to do with the alleged Seaman fraud, which itself has nothing to do Deel. To be clear, Deel is not basing any liability on Grady and Rippling's perpetuation of the *Damian* lawsuit, but using their orchestration of it only to further evidence their smear campaign against Deel.

125.    Unfortunately, although Deel has expended significant resources trying to defend itself against Rippling and Grady's sham whack-a-mole press and regulatory onslaught, Rippling's false smear campaign has accomplished its real purpose: damaging Deel's commercial reputation and relationships with its current and prospective customers, partners, investors, and employees. As a direct—and directly cited—result of the negative news cycles created and amplified by Rippling and its agents, partners have pulled out of co-sponsored industry events, at least one fintech company has closed financing opportunities for Deel employees, and several potential customers who were close to signing contracts with Deel opted to back out.

126.    For example, one prospective customer, Prospect #1, explained to Deel in September 2023 that it decided not to work with Deel because "[t]he . . . concerns with misclassifying your own employees does not inspire trust that you can properly classify ours," which created a "confidence issue." Another, Prospect #2, decided not to work with Deel in July-August 2023 because "that article [about alleged

employee misclassification] . . . seriously . . . has a negative impact on your reputation." Others, including Prospect #3 and Prospect #4, declined for similar reasons.

127. And the ripple effects from Rippling's misconduct continue to persist. In September 2024, another potential client that was evaluating Deel, Prospect #5, cited the stale *Business Insider* article regarding the purported misclassification issues planted by Rippling, which Prospect #5 stated "was the determining factor" in their decision to choose another vendor besides Deel.

## B.  **Rippling's False Advertising Statements**

128. And Grady's smear campaign was just one piece of the puzzle. Since Rippling was unable to actually compete with Deel in the market, it also resorted to deceitful ad campaigns.

129. As one of many examples, Rippling launched a juvenile and insecure advertisement in which Rippling referred to Deel's superior products as "snake oil," and was accompanied by a bizarre "snake game" that purported to reveal facts about Deel's services when it was played. In reality, the game and the ad campaign—which

are available to this day on Rippling's website at https://www.rippling.com/snake-game—relied on seven false and misleading statements about Deel:



130.    This advertisement is replete with misrepresentations. For example:

131.    Rippling misrepresents that "[n]ot even managers can have customized permissions settings on Deel." This statement is not true. Deel has a highly customizable and advanced permissions architecture allowing for the very thing that Rippling states is not possible.

132.   Rippling misrepresents Deel's platform is "[l]imited to 3 automated actions only; send email, send slack message, create task." This statement is not true. Deel provides a multitude of automated features and functions beyond those that Rippling claims Deel is limited to, including for example, jira tasks, webhooks, and integrations from Deel's app store which opens up dozens, if not hundreds, of API automations.

133.   Rippling misrepresents that Deel's platform is "[c]ustomizable but no ability to share one-time reports." This statement is not true. All reports can be saved and shared.

134.   Rippling misrepresents that Deel "[r]elies on many third parties to support solutions like Contractor Management, Ben Admin, Background Checks, PEO, and more." This statement is inaccurate. Deel does not use third parties for contractor management, and Deel's PEO solution is currently through a legal joint venture owned by Deel, Deel PEO US, LLC. Separately, Rippling also provides certain similar ancillary services offered to customers by third parties through a partnership portal, including, for example, access to WeWork. Rippling's advertisement implies that Rippling is providing its customers with Rippling-owned commercial real estate and Rippling-conducted background checks, which is not true.

135.   Rippling's statement regarding onboarding is also inaccurate. Any worker can be onboarded to the Deel platform in minutes.

136.   Finally, Rippling references payroll compliance issues, but does not describe what they are. Deel asked Rippling to substantiate or remove this claim, and Rippling refused.

137.   Indeed, on December 4, 2024, Deel reached out to Rippling directly, explained the falsity of each of the statements in the "snake oil" advertisement, and asked them to correct or remove the statements. Rippling ignored Deel's request, and the "snake oil" advertisement remains unchanged live on Rippling's website to this very day, showing that Rippling's misstatements are willful.

138.   Similarly, Rippling also launched a webpage that made misleading advertising claims regarding Deel's G2 scores—metrics for ranking business software products based on user reviews and other data—as compared to Rippling. As shown below, Rippling's advertising claims made many other false and misleading claims regarding its own and Deel's functionality, which are still available online at https://www.rippling.com/paid-compare-deel:

# Complete functionality matters

| CAPABILITIES | RIPPLING | deel. |
|---|:---:|:---:|
| Automatically syncs updates across all modules | ✓ | ✗ |
| Talent Management & Applicant Tracking | ✓ | ✗ |
| In-house PEO | ✓ | ✗ |
| Payroll capabilities built, not acquired | ✓ | ✗ |
| Locally compliant employment agreements with CIPRAA-grade IP protection | ✓ | ✗ |
| Automated compliance alerts, resolution recommendations, and prioritization stamps | ✓ | ✗ |
| Auto-connect to product specialist for customer support | ✓ | ✗ |

## Consolidate your domestic and global workforce on one platform

Rippling offers a true global all-in-one solution allowing you to hire, pay, and manage your entire global workforce in one place. Since Deel was originally built to be a contractor payments solution, it's disjointed and clunky to get things done. You need a global solution designed from day one to save you time.

| FEATURES | RIPPLING | deel. |
|---|:---:|:---:|
| Custom reporting for both domestic and global payroll | ✓ | ✗ |
| Everything you need for global HR: HRIS, performance management, recruiting, learning management, scheduling, and much more | ✓ | ✗ |
| Roles and permissions customizable by country | ✓ | ✗ |

## Automate more of your work across and simplify global HR, IT, and finance

Unlike Deel, Rippling's platform tracks and acts on compliance regulations to give you peace of mind. Rippling has out-of-the-box compliance policies based on locale to minimize human errors, and even will send you alerts when a potential issue, like a minimum wage violation, is detected.

| FEATURES | RIPPLING | deel. |
|---|:---:|:---:|
| Hundreds of possible automated workflows across HR, IT, and finance | ✓ | ✗ |
| Single source of employee data: no silos | ✓ | ✗ |
| 600+ available integrations | ✓ | ✗ |

53

139.   The statements in these advertisements regarding Rippling's capabilities vis-à-vis deal are also false and misleading.

140.   Furthermore, on information and belief, Rippling has also been making the false claim to prospective customers and the market generally that it was building fifty to one hundred of its own payroll engines to process payroll on a global scale, in order to divert sales from its competitors like Deel.

141.   By way of background, building any kind of payroll engine is an extremely difficult task, and some of the more established companies still use the same historic mainframe they have always used to process payroll, and build their own manufacturing plants to make the parts to keep it running. Alternatively, smaller local companies have their own engines just for local payroll processing.

142.   To date, however, on information and belief no one has been able to build a large-scale payroll engine to process payroll on a global scale. Indeed, these likely cannot actually be built without significant advances in quantum computing.

143.   However, Rippling never lets facts get in the way of a good scam. On information and belief, Rippling has been falsely representing to its current and prospective customers that Rippling is running its payroll services on its own platform. On information and belief, Rippling is instead misleading its customers and the market. In this way, Rippling disparages Deel's services and business by representing that they are inferior to the services offered by Rippling, because Deel

uses local payroll engines, while Rippling supposedly was building and using its own global engine. But these representations were false, and have harmed Deel in the form of diverted sales and tarnished its commercial reputation.

## V.    RIPPLING USES UNDERHANDED MEANS TO OBTAIN CONFIDENTIAL INTERNAL INFORMATION TO HARM DEEL

144.    In addition to Rippling's internal disregard for law and the malicious defamation scheme deployed against Deel described above, on information and belief, Conrad has also resorted to yet another of his tired tricks to harm Deel that he relies upon when he cannot fairly compete: using underhanded and unlawful means to solicit and obtain confidential internal information. As described below, on information and belief, this includes, but is not limited to, the use of Grady and private investigators to obtain confidential information they believed could be damaging to Deel under false pretenses.

145.    Unless one is aware that Conrad and Rippling's assertions of misconduct against their competitors are nearly always projection and/or confessions, it is tempting to see the irony of Rippling's attempted pilfering of Deel's confidential information, given Rippling's recent false espionage allegations against Deel. As noted, on information and belief, while those allegations are not at issue, they are meant to distract from the very serious and concerning issue of Rippling's own egregious and abusive intimidation of those who want to blow the whistle on Rippling's illegal conduct.

146.   In 2024, on information and belief, while Grady and Rippling were carrying out their sham regulatory bombardment of Deel, Grady—at the behest of Rippling—copied the same, false talking points in direct solicitations to key Deel stakeholders, including Deel investors and personnel who have regular contacts with Delaware and/or transact substantial business with the state. These brazen solicitations led with the assertion—which Grady knew was false—that Deel was under "congressional investigation." The solicitations also contained a hodge-podge of Grady and Rippling's knowingly false attacks on Deel, including that Deel was purportedly an unlicensed money transmitter and that Deel misclassified Deel employees as independent contractors. Grady mirrored the same false statements on a public page titled "Deel Truth" hosted on his law firm's website. Grady even set up an email address—advertised on his website and in the private solicitations—for Deel employees to provide confidential information about Deel.

147.   Rippling has also deployed professional private investigators to obtain confidential Deel information under false pretenses. Also in 2024, private investigators from Nardello & Co. ("Nardello") went to the home of the co-founder of Arival Bank to obtain information about prior commercial discussions between it and Deel. The Nardello investigator advised that she was engaged by a "large U.S. client." On information and belief, Rippling had engaged Nardello to obtain private

information about Deel's discussions or transactions with Arival Bank to obtain new fuel for its dark PR campaign and Grady's sham regulatory attacks.

148.   If any doubt persisted that Rippling was behind Grady and Nardello's coordinated inquisition, it was dispelled immediately upon Rippling's filing of its lawsuit against Deel in the Northern District of California. In March 2025, within days of Rippling's filing of that action, Nardello directly contacted current Deel employees on behalf of Rippling, overtly seeking confidential information on Deel. Each of these employees solicited by Nardello was subject to a standard employee confidentiality agreement as part of their employment at Deel, and owed common law fiduciary duties to maintain the confidentiality of internal Deel information. Rippling has also now employed on its own behalf the exact same information-gathering scheme it conducted through Grady's law firm—publicly soliciting any information about "suspicious activity by Deel" on its website, including an email address on its own internet domain (deel.tips@rippling.com), inviting all comers to submit to Rippling any information it could use to harm Deel. Each of these tactics by Rippling and its allies was deliberately and knowingly intended to obtain confidential Deel information from Deel employees in violation of their contractual and fiduciary confidentiality obligations.

149.   In fact, and ironically given the implausible Deel espionage tale Rippling has spun to the press, **Deel has been investigating for many months that**

it is **_Rippling_ that has a spy inside Deel**. Indeed, Deel has reason to believe that Rippling has already unlawfully acquired Deel's confidential information. On April 15, 2025, a media outlet asked Deel to comment on an upcoming story that it was writing based on grossly mischaracterized discussions from a recent confidential Deel board of directors meeting, which purported to include an (inaccurate) disclosure of attorney-client privileged information. There is no way this outlet would be privy to this information, albeit inaccurate, without a source at Deel. Given the similarities between the outlet's description of its unpublished story and a letter that Deel received from Rippling's litigation counsel that same day, Deel strongly suspects, and alleges on information and belief, that Rippling is the one engaging in "corporate espionage."

*       *       *

150.   In short, on information and belief, it appears that Conrad's corner-cutting "business" ethos has ensured that almost nothing about Rippling's business can be considered to be fair competition or a lawful practice. Which is by design. Smoke and mirrors rule the day at Rippling, just as they did during Conrad's tenure at Zenefits. Conrad's own former employees confirm that his obsession with and willingness to go to any lengths to destroy his competitors is driven by his deep-seated insecurity, which is justified by his own long history of "humiliating" failure.

151.   On information and belief, Conrad knows he cannot win a fair fight with his competitors, so he does the only thing he knows how to do: he cheats.

152.   He cheats by creating a culture of fear, intimidation, surveillance, retribution and abuse at Rippling to try to prevent his employees from exercising their rights to leave to work for better jobs at competitors.

153.   He cheats by thumbing his nose at compliance and process, despite purporting to sell those same things to his customers.

154.   He cheats by stealing his own customer's and employee's payroll taxes and benefit dollars, and reporting them as Rippling's income to defraud his investors.

155.   He cheats by falsely advertising Rippling's products, functionality, and costs.

156.   He cheats by disparaging his competitor's products with lies and misleading advertising statements.

157.   He cheats by stealing confidential data from his own vendors and partners to create competing products.

158.   He cheats by flouting international sanctions regulations.

159.   He cheats by engaging in malignant and defamatory public relations smear campaigns replete with false information to sabotage his competitors by making false statements to the press and regulators.

160.   And he cheats by illicitly obtaining and using his competitor's confidential information for the purpose of harming them.

161.   Given Conrad's stewardship of Rippling and the collision course with potential liability he has once again created, it will not be surprising if Conrad's employees are once again soon "celebrati[ng]" and crying "tears of relief" following this cheater's *fourth* forced removal from one of his own ventures.

## FIRST CAUSE OF ACTION
**(VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT ("DTPA"), 6 *DEL. C.* § 2531, *ET SEQ.*)**

162.   Deel re-alleges and incorporates by reference each and every allegation contained above.

163.   The DTPA prohibits unreasonable interference with the promotion and conduct of another person's business through the disparagement of the goods, services, or business of another by false or misleading representations of fact committed in the course of a business, vocation, or occupation.

164.   The DTPA also prohibits representations that one's goods or services have approval, characteristics, uses, or benefits that they do not have.

165.   As detailed herein, Defendants Rippling and Does 1-100—and each of them—in the course of their business, vocation, or occupation, have engaged in deceptive trade practices within the meaning of 6 *Del. C.* § 2532(a) (i) by making false and misleading statements of fact about Deel's goods, services, and business

in advertising campaigns designed to disparage and damage Deel, and by spreading false information about Deel to the press, government officials, and other third parties, including, but not limited to, Deel's employees, contractors, investors, and current and potential customers; and separately by (ii) making representations that Rippling's business, goods, and services are compliant with applicable law and will assist its customers with their compliance with applicable law, when in fact Rippling, its platform, and services routinely violate applicable laws, and that Rippling's business, goods and services have approval, characteristics, uses, and benefits that they do not have.

166.    Specifically, Defendants' deceptive trade practices have violated at least 6 *Del. C.* § 2532(a)(8)'s express prohibition against "[d]isparag[ing] the goods, services, or business of another by false or misleading representation of fact," and 6 *Del. C.* § 2532(a)(5)'s express prohibition against representing that one's own "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have."

167.    Defendants' disparaging statements and deceptive representations of legal compliance were intended and understood as assertions of fact, and not as opinion.

168.   The third parties who read and heard Defendants' false disparaging statements about Deel reasonably understood that they were being made about Deel's goods, services, or business, since Defendants would expressly mention Deel by name. The third parties who read and heard Defendants' false representations as to Rippling's own compliance with the law reasonably understood that they were being made about Rippling.

169.   As a direct and proximate result of Defendants' deceptive trade practices, Deel has incurred hundreds of millions of dollars in harm from damages to Deel's commercial reputation, as well as damages to Deel's relationships with regulators, partners, current customers, prospective customers, investors, employees, and contractors. Deel has also incurred significant costs and expenses to defend itself against Defendants' false and relentless smear campaign. These harms caused to Deel by the Defendants' deceptive trade practices are ongoing to this day.

170.   For example, as detailed above, partners have pulled out of co-sponsored industry events, fintech companies have closed funding opportunities for Deel employees, and at least five potential customers expressly told Deel that they would not continue their existing negotiations to use Deel's services as a direct result of the false and malicious misrepresentations that Defendants had made about Deel. Deel has identified these lost potential customers anonymously at this time, but they are identifiable individual lost potential customers, and their decisions not to proceed

with Deel in light of Defendants' false statements are supported by documentary evidence.

171.   As a consequence of Defendants' sprawling deceptive trade practices, Deel is entitled to legal remedies against Defendants, including, but not limited to, treble damages and attorneys' fees pursuant to 6 *Del. C.* § 2533(b) and (c).

172.   On information and belief, Defendants knew or should have known that their conduct was of a nature prohibited by the DTPA, and thus their violations of the DTPA were willful pursuant to 6 *Del. C.* § 2533(e).

## SECOND CAUSE OF ACTION
### (DEFAMATION)

173.   Deel re-alleges and incorporates by reference each and every allegation contained above.

174.   As described above, Defendants, and each of them, willfully, without justification and without privilege, caused to be published or publicly communicated false and/or misleading statements of fact about Deel to third persons other than Deel. As detailed herein, this includes, among other things, by making false and misleading statements of fact about Deel's goods, services, and business in advertising campaigns designed to disparage and damage Deel, and by spreading false information about Deel to the press, government officials, and other third parties.

175.   On information and belief, Defendants' defamatory statements were intended and understood as assertions of fact about Deel, and not as opinion.

176.   Defendants' statements regarding Deel were *per se* defamatory because they were made to malign Deel's trade, business, or profession.

177.   The third parties who read and heard Defendants' defamatory statements reasonably understood that the statements were being made about Deel, and understood the statements' defamatory character, as the statements exposed Deel to disgrace and tended to injure Deel in its profession, trade, business and reputation, and to discourage others from associating or dealing with Deel.

178.   On information and belief, Defendants made these statements with knowledge of their falsity, and knew that they would injure Deel's business by decreasing its ability to compete with Rippling and continue to retain and attract current and potential customers, employees, and investors. Alternatively, Defendants failed to use reasonable care to determine the truth or falsity of the statements.

179.   As an actual and proximate result of Defendants' statements, Deel has incurred hundreds of millions of dollars in harm from damages to Deel's commercial reputation, as well as damages to Deel's relationships with regulators, partners, current customers, prospective customers, investors, employees, and contractors. Deel has also incurred significant costs and expenses to defend itself against

Defendants' false and relentless smear campaign. These harms caused to Deel by the Defendants' defamatory statements are ongoing to this day.

180. For example, as detailed above, partners have pulled out of co-sponsored industry events, fintech companies have closed funding opportunities for Deel employees, and at least five potential customers have discontinued negotiations with Deel as a direct result of the false and malicious misrepresentations that Defendants had made about Deel. Deel has identified these lost potential customers anonymously at this time, but they are identifiable individual lost potential customers, and their decisions not to proceed with Deel in light of Defendants' false statements are supported by documentary evidence.

181. Defendants' conduct as alleged herein was intentional, willful, wanton, and malicious, and undertaken for the purpose of injuring or causing injury to Deel. Deel is therefore entitled to punitive and exemplary damages against Defendants.

## THIRD CAUSE OF ACTION
### (TRADE LIBEL)

182. Deel re-alleges and incorporates by reference each and every allegation contained above.

183. As described above, Defendants, and each of them, willfully, without justification and without privilege, caused to be published or publicly communicated false and/or misleading statements of fact about Deel's business to third persons other than Deel. As detailed herein, this includes, among other things, by making

false and misleading statements of fact about Deel's goods, services, and business in advertising campaigns designed to disparage and damage Deel's business, and by spreading false information about Deel to the press, government officials, and other third parties.

184.   On information and belief, Defendants' defamatory statements were intended and understood as assertions of fact about Deel, and not as opinion.

185.   Defendants' statements regarding Deel were *per se* defamatory because they were made to malign Deel's trade, business, or profession. However, to the extent the Court finds they were not defamatory, they still constitute trade libel because they were false statements about Deel's business.

186.   The third parties who read and heard Defendants' false statements reasonably understood that the statements were being made about Deel, and understood the statements' false character, as the statements exposed Deel to disgrace and tended to injure Deel in its profession, trade, business and reputation, and to discourage others from associating or dealing with Deel.

187.   On information and belief, Defendants made these statements with knowledge of their falsity, and knew that they would injure Deel's business by decreasing its ability to compete with Rippling and continue to retain and attract current and potential customers, employees, and investors. Alternatively,

Defendants failed to use reasonable care to determine the truth or falsity of the statements.

188.  As an actual and proximate result of Defendants' statements, Deel has incurred hundreds of millions of dollars in harm from damages to Deel's commercial reputation, as well as damages to Deel's relationships with regulators, partners, current customers, prospective customers, investors, employees, and contractors. Deel has also incurred significant costs and expenses to defend itself against Defendants' false and relentless smear campaign. These harms caused to Deel by the Defendants' false statements regarding Deel's business are ongoing to this day.

189.  For example, as detailed above, partners have pulled out of co-sponsored industry events, fintech companies have closed funding opportunities for Deel employees, and at least five potential customers have discontinued negotiations with Deel as a direct result of the false and malicious misrepresentations that Defendants had made about Deel. Deel has identified these lost potential customers anonymously at this time, but they are identifiable individual lost potential customers, and their decisions not to proceed with Deel in light of Defendants' false statements are supported by documentary evidence.

190.  Defendants' conduct as alleged herein was intentional, willful, wanton, and malicious, and undertaken for the purpose of injuring or causing injury to Deel. Deel is therefore entitled to punitive and exemplary damages against Defendants.

## FOURTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

191.   Deel re-alleges and incorporates by reference each and every allegation contained above.

192.   At the time of Defendants' misconduct, Deel was engaged in a number of actual and prospective business relationships with its current and potential customers.

193.   Defendants were aware of the existence of these relationships, and intentionally interfered with those relationships by making false and misleading statements of fact about Deel's goods, services, and business in advertising campaigns designed to disparage and damage Deel, and by spreading false information about Deel to the press, government officials, and other third parties.

194.   Defendants' efforts to publicize those knowingly misleading and false statements, particularly by facilitating the dissemination of and coordinating to plant false statements of fact about Deel in the press and with regulators, as well as misrepresenting their intentions and identities to regulators, constitute the employment of wrongful means for the purpose of harming Deel.

195.   Through this wrongful conduct, Defendants have interfered with Deel's existing and prospective business relationships potential customers.

196. As detailed above, at least five potential customers expressly told Deel that they would not continue their existing negotiations to use Deel's services as a direct result of the false and malicious misrepresentations that Defendants had made about Deel. Deel has identified these lost potential customers anonymously at this time, but they are identifiable individual lost potential customers, and their decisions not to proceed with Deel in light of Defendants' false statements are supported by documentary evidence.

197. As a direct result of Defendants' misconduct, Deel has suffered damages, including, but not limited to, the loss of revenue from these foregone business opportunities with the prospective customers identified herein, and continues to be damaged as a result of Defendants' misconduct to this day, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (CIVIL CONSPIRACY)

198. Deel re-alleges and incorporates by reference each and every allegation contained above.

199. On information and belief, Defendants confederated or combined to commit, and did commit, the following unlawful acts in furtherance of the conspiracy: (1) engaging in unfair competition against Deel by misrepresenting the nature, quality, and characteristics of Rippling's own business, products, and services, (2) disparaging and defaming Deel and its goods, services, and business,

and (3) accessing, using, disclosing, and otherwise misappropriating Deel's confidential business information for the purpose of harming Deel, all as detailed herein.

200. As a direct and proximate result of Defendants' conspiracy, Deel has incurred hundreds of millions of dollars in harm from damages to Deel's commercial reputation, as well as damages to Deel's relationships with regulators, partners, current customers, prospective customers, investors, employees, and contractors. Deel has also incurred significant costs and expenses to defend itself against Defendants' false and relentless smear campaign. These harms caused to Deel by the Defendants' conspiracy are ongoing to this day.

201. For example, as detailed above, partners have pulled out of co-sponsored industry events, fintech companies have closed funding opportunities for Deel employees, and at least five potential customers expressly told Deel that they would not continue their existing negotiations to use Deel's services as a direct result of the false and malicious misrepresentations that Defendants had made about Deel. Deel has identified these lost potential customers anonymously at this time, but they are identifiable individual lost potential customers, and their decisions not to proceed with Deel in light of Defendants' false statements are supported by documentary evidence.

202.  Deel is therefore entitled to legal remedies against Defendants, including damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Deel prays that this Court enter judgment in its favor and enter an order, including, but not limited to, the following:

1.     Awarding general and special damages in favor of Deel jointly and severally against each of Rippling and Does 1-100 in an amount to be determined at trial;

2.     Awarding punitive and exemplary damages in favor of Deel jointly and severally against each of Rippling and Does 1-100 in an amount to be determined at trial;

3.     Awarding Deel its attorneys' fees and costs incurred in this action, to the extent allowed by law, jointly and severally against each of Rippling and Does 1-100;

4.     Awarding Deel pre- and post-judgment interest as to each of the above to the extent allowed by law; and

5.     Granting such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR A JURY TRIAL

Deel hereby demands a trial by jury on all issues so triable.

*/s/ Paul J. Lockwood*

Paul J. Lockwood (ID No. 3369)
Connor K. Judge (ID No. 7413)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
920 N. King St.
Wilmington, Delaware 19801
Tel.: (302) 651-3000
paul.lockwood@skadden.com
connor.judge@skadden.com

*Attorneys for Plaintiff Deel, Inc.*

OF COUNSEL:

Lance A. Etcheverry
(*pro hac vice* forthcoming)
Jack P. DiCanio
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Tel.: (650) 470-4500
lance.etcheverry@skadden.com
jack.dicanio@skadden.com

Jason D. Russell
(*pro hac vice* forthcoming)
Adam K. Lloyd
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Tel.: (213) 687-5000
jason.russell@skadden.com
adam.lloyd@skadden.com

DATED: April 24, 2025

# EXHIBIT B

 **RIPPLING**                                    **Chris Campbell <ccampbell@rippling.com>**

---

## Fwd: Deel Snake Game Hosted by Rippling

**Chris Campbell** <ccampbell@rippling.com>                              Thu, Dec 5, 2024 at 5:06 PM
To: spiros.komis@deel.com
Bcc: Vanessa Wu <vanessa@rippling.com>

Hi Spiros,

It's great to hear that Deel is committed to accurate and fair advertising. Rippling is too, which is why we asked Deel repeatedly – both in emails/letters as well as formal proceedings like the National Advertising Division (NAD) lawsuit that Rippling filed against Deel – to ensure that Deel's advertising and product comparisons are accurate. Unfortunately, Deel has shown very little interest in engaging.

For example, despite NAD ruling against Deel on a dozen of its advertising claims a few months ago, Deel's product comparison website still has a number of false statements about Rippling's products. Deel says, e.g., that "Rippling's contractor payments are limited to wire transfers and a hefty $20 fee per transaction." That's wrong. Most contractors using Rippling are paid in local currency (which is not done by wire and has no wire fee); domestic payments are also not typically paid by wire and have no wire fee. Deel's statement also leaves the impression that Deel doesn't charge fees for contractor payments, which is untrue. Other examples include Deel's statement that Deel has "HR Slack plugins" and Rippling does not (Rippling's HR suite is fully integrated with Slack) and that Deel has "Career development, including career frameworks" and Rippling does not (Rippling has a Performance Management product entirely focused on career development/frameworks). Please let me know if Deel is willing to correct or remove these misstatements.

The Snake Game, while tongue-in-cheek, is also intended to combat the overblown, exaggerated, and misleading claims that Deel makes about its own products – and provides corrective statements drawing directly from Deel's own materials. The entire point is to ensure that consumers receive accurate information and are not misled. To address the specific items you raised:

**Deel's Marketing Claim:** "Customize access levels depending on what data you want each person or team to be able to see."

**Reality:** "Not even managers can have customized permissions settings on Deel."

**Support**: Deel's Help Desk, which states:

| Can the permissions for managers be customized? | – |
|---|---|

Currently, the permissions are limited and cannot be customized for the manager role. However, we are working on enabling customizable permissions in future updates.

**Deel's Marketing Claim:** "Automate anything for your workflow."

**Reality:** "Limited to 3 automated actions only; send email, send slack message, create task."

**Support**: Deel's Help Desk, which states:

✅ Step 3 - Add action event

The action event will happen after the 'trigger' occurs.

Select the action event from the dropdown menu, which can include:

- Sending an email
- Sending a Slack message to a public channel
- Sending a Slack message to a private channel
- Create a task and assign it to someone else (it will be visible on the assignee's home page)

The client can also narrow the action event even further by selecting a filter and choosing your conditions.

Using the filter tool, specific automation for workers can be created based on location, worker type, department, and more.

Clients can also add delays, allowing them to send a series of tasks and emails over a chosen period.

**Deel's Marketing Claim:** "Customize reports to make them more digestible for stakeholders and analyze spending in specific areas, like social security, 401k, pensions, and more."

**Reality:** "Customizable but no ability to share one-time reports."

**Support**: Deel's Help Desk, which states:

## Frequently Asked Questions

| Can a One-time Report be shared with others? | – |
| --- | --- |

No, a One-time report cannot be shared with others through the platform. The option to share a report will be available only if the report type is set to "**save to dashboard**".

**Deel's Marketing Claim:** "No third-parties are involved in handling sensitive employee information."

**Reality:** "Relies on many third parties to support solutions like Contractor Management, Ben Admin, Background Checks, PEO, and more."

**Support**: Deel's Help Desk, which states (here, here, here, and here):

# How does Deel Wallet work?

Contractors with US tax residency **and** who reside in the US will receive an account created through Deel partner *Alviere,* the service provider for Deel Wallet. Deel Wallet can be accessed via Deel account by navigating to the home page.

# How To Request A Health Insurance Quote As An Independent Contractor

Deel partners with health insurers who understand remote working, both in your country and internationally.

We have exclusive discounts that make it safer than ever to work with remote teams.

Learn more about health insurance for remote workers in our Deel blog post.

Requesting a quote from our health insurance partners can be done in just a few clicks.

# How to Run a Background Check on Deel

Deel has partnered with Certn to offer fast and accurate Background Checks to companies.

# How To Offer 401(k) Through Deel PEO

This article explains how PEO clients can elect to offer 401(k) through Deel PEO to their PEO employees.

Deel PEO provides 401(k) through our partner Slavic401k.

**Deel's Marketing Claim:** "Onboard new hires in minutes through our platform."

**Reality:** "Onboarding new hires can take several days to process and approve in countries like Brazil and China and more."

**Support**: Deel's Help Desk, which points out that various aspects of onboarding will take at least "3 business days" (China) or require a mandatory medical exam (Brazil):

Deel's onboarding process will get you set-up and working in a few quick steps.

Watch your inbox for our welcome email. It will include instructions on signing up to Deel and other information to help you get started.

1. **Set up your account** with your unique onboarding link.
2. **Provide your additional information**. We need to verify your identity and details so **you can sign your employment agreement**. Please make sure you provide your actual **residential address** and **phone number.** Deel requires this information to deliver your employment agreement to your address.
3. You will be required to upload the required documents under the Compliance Documents section of the Deel platform. **Download and print** the document "Employee Registration Form". Complete the document with the required details and sign it. You will need to send this document to Deel's office via post.
4. Once you have completed your Deel profile and uploaded the required compliance document, we will upload your employment agreement on the Deel platform and send you **two physical copies of your employment agreement to your address** via courier.
   **Please note:** Deel will dispatch the employment agreement within 3 business days following your receipt of the online version on the platform. Based on your province and the courier, it can take a couple of more days.
5. Once you receive the two copies of your employment agreement, please **sign them in wet-ink** (by hand) and **upload a scanned copy of your signed employment agreement to the Compliance Documents section** of the Deel platform, under "Scan copy of your signed Employment Agreement".
6. Please **send one copy of your signed employment agreement and your Employee Registration Form to Deel's office** via post at the following address:

   Martin Zhou 上海市徐汇区肇嘉浜路825号尚秀商务楼1号楼5A室 Room 5A, Suite 1, Shang Xiu Business Tower, No. 825, Zhaojiabang Road, Xuhui District, Shanghai 200032, PRC. Tel: (86.21) 62812366 x 8023

   Any costs associated with postage can be submitted as an expense on the Deel platform for reimbursement.
7. **Review our FAQs**. Check out the **Help & Feedback** section on the platform to find Frequently Asked Questions and Answers about payslips, taxes, benefits, and more.

## Additional documents required once you have signed up on Deel:

- Employee New Hire Form
- Medical Exam Results (you will be notified once it is scheduled)

Reach out to us if you have any questions regarding your onboarding.

**Deel's Marketing Claim:** "We take on all of the responsibility to make sure you're compliant with local laws."

**Reality:** "Users report they run into payroll compliance issues across TrustRadius and G2."

**Support**: Various user reviews on TrustRadius and G2, including but not limited to here, here, here, here, here, and here.

Rippling's request – implied in the Snake Game, but explicit here – is that Deel stop making exaggerated and misleading marketing claims to consumers. This has been a standing request for over a year, first made formally in my November 17, 2023 letter to Philippe Bouaziz.

To be clear, we are very much in favor of lowering the temperature and avoiding unnecessary legal cycles. The very best way to do that is for Deel to take a hard look at its own practices and ensure that it is operating fairly and compliantly, particularly with respect to its advertising. Rippling has always been committed to those goals, and remains so.

I'm happy to discuss live on a phone call; just let me know.

Regards,

Chris Campbell
Deputy General Counsel | Rippling.com

From: **Spiros Komis** <spiros.komis@deel.com>
Date: Wed, Dec 4, 2024 at 6:33AM
Subject: Deel Snake Game Hosted by Rippling
To: Vanessa Wu <vanessa@rippling.com>

Hi Vanessa,

I hope this note finds you well and that you enjoyed a nice Thanksgiving holiday.

As you can imagine, Rippling's newly launched "Snake Game" targeting Deel made its way to me because of a series of inaccurate statements and misrepresentations. I look forward to working with you to help ensure both of our clients provide accurate and fair comparative marketing. As a reminder, I welcome you to reach out to me if you ever believe that any representation made by Deel concerning Rippling is untrue or inaccurate.

To start, your site's introductory statement that Deel's "customers pay the price for gaps beneath the surface" is an overly broad and unsubstantiated misrepresentation. What price are customers paying and what gaps exist beneath the surface? Who are the customers who have paid this price?

Moving on to your chart, many of the points are simply not true:

1. Rippling's misrepresentation: "Not even managers can have customized permissions settings on Deel." This statement is not true. Deel has a highly customizable and advanced permissions architecture allowing for the very thing that Rippling states is not possible.

2. Rippling's misrepresentation: "Limited to 3 automated actions only; send email, send slack message, create task." This statement is not true. Deel provides a multitude of automated features and functions beyond those that Rippling claims Deel is limited to, including for example, jira tasks, webhooks, and integrations from our app store which opens up dozens if not hundreds of API automations.

3. Rippling's misrepresentation: "Customizable but no ability to share one-time reports." This statement is not true. All reports can be saved and shared.

4. Rippling's misrepresentation: "Relies on many third parties to support solutions like Contractor Management, Ben Admin, Background Checks, PEO, and more." This statement is inaccurate. Deel does not use third parties for contractor management, and our PEO solution is currently through a legal joint venture owned by Deel, Deel PEO US, LLC. Separately, Rippling also provides certain similar ancillary services offered to customers by third parties through a partnership portal, including for example, access to WeWork. Hats off to Rippling if it is providing its customers with Rippling-owned commercial real estate and Rippling conducted background checks.

5. Rippling's statement regarding onboarding is also inaccurate. Any worker can be onboarded to the Deel Platform in minutes.

6. Finally, Rippling references payroll compliance issues: what are these payroll compliance issues? Please let me know so that I can address them. If Rippling is not aware of a particular payroll compliance issue caused by the Deel platform, we ask that you modify or remove this statement.

Vanessa--I was personally hoping for a reset of our commercial relationship in the New Year, but it appears Rippling doesn't share the same goal. It doesn't have to be this way. If ever you have concerns about anything Deel is representing concerning Rippling, you have an open line to me and my commitment to address it promptly. I would appreciate the same courtesy.

Please remove or modify your Snake Game accordingly, and let me know if you have any questions or need further assurances as to any of the representations I have made.

Thank you,

--
**Spiros D. Komis**
spiros.komis@deel.com
(202) 631-5845 (US)



deel.com
650 2nd Street, San Francisco, CA 94107