1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   Alex Spiro (*pro hac vice*)
2  alexspiro@quinnemanuel.com
   Maaren A. Shah (*pro hac vice*)
3  maarenshah@quinnemanuel.com
   Samuel Nitze (*pro hac vice*)
4  samuelnitze@quinnemanuel.com
   Scott Hartman (*pro hac vice*)
5  scotthartman@quinnemanuel.com
   Dominic Pody (*pro hac vice*)
6  dominicpody@quinnemanuel.com
   295 5th Avenue, 9th Floor
7  New York, NY 10016
   Telephone: (212) 849-7000
8  Facsimile: (212) 849-7100

9  Joseph Sarles (CA Bar No. 254750)
   josephsarles@quinnemanuel.com
10 Kathleen S. Messinger (CA Bar No. 329983)
   kathleenmessinger@quinnemanuel.com
11 865 S Figueroa St., 10th Floor
   Los Angeles, CA 90017
12 Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

13

14              **IN THE UNITED STATES DISTRICT COURT**
15           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
16
17 PEOPLE CENTER, INC. D/B/A RIPPLING, a          Case No. 3:25-CV-2576 (CRB)
   Delaware corporation,
                                                  **FIRST AMENDED COMPLAINT**
18              Plaintiff,
                                                  1.  **VIOLATION OF THE**
19         vs.                                        **RACKETEER INFLUENCED AND**
                                                      **CORRUPT ORGANIZATIONS**
20                                                    **ACT ("RICO"), 18 U.S.C. § 1962(c);**
   DEEL, INC., a Delaware corporation,
21 ALEXANDRE ("ALEX") BOUAZIZ, an                  2.  **CONSPIRACY TO VIOLATE**
   individual, PHILIPPE BOUAZIZ, an                    **RICO, 18 U.S.C. § 1962(d);**
22 individual, DANIEL JOHN ("DAN")
   WESTGARTH, an individual, and DOES 1–          3.  **MISAPPROPRIATION OF TRADE**
23 100,                                               **SECRETS UNDER DEFEND**
                                                      **TRADE SECRETS ACT, 18 U.S.C.**
24              Defendants.                           **§ 1836, *et seq.*;**

25



**4. TORTIOUS INTERFERENCE WITH CONTRACT;**

**5. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**

**6. UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, *et seq*.**

**JURY TRIAL DEMANDED**

Judge: Hon. Charles R. Breyer
Courtroom: 6

People Center, Inc. d/b/a Rippling ("Rippling" or the "Company") brings this action against Deel, Inc. ("Deel"), Alexandre Bouaziz, Philippe Bouaziz, Daniel Westgarth, and unnamed Does 1–100.

## INTRODUCTION

1.      This case is about a criminal syndicate that operated from the shadows of a multibillion-dollar technology company—Deel.  At its helm are CEO Alex Bouaziz and his father Philippe Bouaziz, who directed a racketeering enterprise that steals and repurposes the hard-earned work of its victims to unlawfully fuel Deel's growth (the "Bouaziz Racketeering Enterprise").  This enterprise encompasses several senior Deel executives, collaborative outsiders, and carefully groomed, disaffected employees turned corporate spies from rival firms.  To date, at least four distinct corporate victims have been identified—each targeted, infiltrated, and compromised to serve the aims of the Bouaziz Racketeering Enterprise.

2.      The top-down, centrally orchestrated structure of this criminal operation came to light only after Rippling filed its initial complaint on March 17, 2025.  Shortly thereafter, one of the Bouazizes' operatives—a paid-for spy embedded within Rippling—came forward and confessed.[1]  In a sworn affidavit filed before the High Court of Ireland on April 2, 2025, the spy, then-Rippling employee Keith O'Brien, confirmed Rippling's worst suspicions, which were already supported by extensive forensic evidence and a controlled honeypot test—evidence strong enough to obtain an emergency court order requiring preservation of the spy's device.[2]  But the spy's confession revealed

---

[1]  *See* Sworn Affidavit of Keith O'Brien, attached as Exhibit 1.

[2]  Rippling Ireland Ltd., Rippling's Irish subsidiary, dutifully obtained an emergency preservation order from the High Court of Ireland on March 12, 2025 to require the spy to turn over his devices to an independent solicitor for forensic imaging.  The order carried a "penal endorsement," meaning non-compliance has a likely risk of imprisonment in the Irish legal system.  Rippling Ireland obtained this form of extraordinary relief due to extensive forensic analysis from its security team, which showed that a mid-level payroll operations manager in Rippling's Dublin office had been using his internal systems access to gather sensitive data relevant to Deel.  For example, forensic

far more than Rippling initially knew—most critically, that it was CEO Alex Bouaziz who personally recruited the spy, directed the near-daily theft of trade secrets and confidential information from his competitor, arranged payments with his father, Philippe Bouaziz and a third-party handler known only as "The Watchman," and orchestrated a cover up when the scheme began to unravel.

3.      Alex Bouaziz directed the spy's actions using disappearing Telegram messages—advising what to search for, what to steal, and even dictating Slack messages to "mess" with Rippling.  He and his father Philippe Bouaziz coordinated payments with "The Watchman" via fiat and cryptocurrencies.  The spy's transaction receipts show that "The Watchman" routed the initial payment through the Revolut account of Alba Basha, wife of Deel COO Dan Westgarth, and then shifted future payments to Ethereum, at Philippe's direction, in order to leave "no trace."  The payment chain was also managed using a crude system of codewords to further obscure the money trail.  When payment was due, the spy would send a photo of a wristwatch.  And then Philippe would authorize with phrases like "the buyer is happy" or "send that watch to London."

4.      What the spy delivered to Alex Bouaziz and Deel was worth far more than a Rolex. He handed over Rippling's most sensitive and valuable documents and information:  internal product roadmaps, launch strategies, country-by-country pricing models, sales forecasts, customer lists, recruitment targets, and go-to-market tactics.

---

records revealed that the spy searched the term "deel" in Rippling's systems on average 23 times a day for months—enabling the spy to capture almost all details of Rippling's sales pipeline competing with Deel, proposed pricing, details of sales meetings and conversations, and training materials.  In addition, Rippling conducted a controlled test—known by security professionals as a "honeypot," which confirmed that Deel's leadership or its closest associates actively directed the spy. But when the court-appointed solicitor sought to enforce the order on March 14, 2025, the spy locked himself in a company bathroom and fled the premises, telling the solicitor, "*I'm willing to take that risk*"—referring to jail time.  For a complete timeline of the events in this matter, please see Exhibit 2.

5.    And this information wasn't merely stolen—it was weaponized in real-time by Deel's CEO.  In one jarring example, on the same day a Rippling sales representative met with a prospective client, that prospect received an unprompted WhatsApp message from "alex from deel" (Alex Bouaziz), stating that he "[h]eard" they were "using a few other products than deel" and suggesting they speak.  "That scared TSO of me," the prospect later wrote, and then asked his Rippling contact:

> On Deel intelligence:  I am just curious to know how they [Deel] would know [that the prospect was considering Rippling] in real time.  I haven't posted anything on LinkedIn nor went out asking for quotes.  Do you have a perspective on that?

Rippling did not "have a perspective" on Deel's seemingly real-time intelligence then.  It does now.  This was not competitive intelligence—this was theft directed by Alex Bouaziz who was stealing Rippling's confidential information and brazenly exploiting it like parts in a high-tech chop shop.

6.    The impact of Deel's theft was immediate, real, and deeply damaging.  Alex Bouaziz and his co-conspirators used this stolen information to gain unfair competitive advantage across every dimension of Deel's business, including:

- **Sales & Marketing**, to identify Rippling prospects and undercut live deals;

- **Customer Retention**, to weaponize pricing proposals and retain accounts;

- **Recruiting**, to poach key personnel identified through internal directories;

- **Product**, to inform and accelerate Deel's product roadmap; and

- **PR & Communications**, to preempt and distort public narratives.

This systematic theft not only deprived Rippling of the fruits of its labor and monetary investments, but also enabled the Bouaziz Racketeering Enterprise to profit from misappropriated customers, stolen R&D, and an illicit head start with products and markets it did not develop.

7.    And then, when Rippling closed in by obtaining an emergency court order from the High Court of Ireland authorizing the seizure and preservation of the spy's devices (an extraordinary

remedy), Alex Bouaziz and his inner circle only doubled down on their misconduct.  Alex enlisted senior legal operatives at Deel, David Mieli and Asif Malik, who instructed the spy to destroy evidence and lie.  They assured the spy that Alex would "sort all this out."  The spy was told by the lawyers to purchase a burner phone and set up a new account on Telegram, a private instant messaging platform; to destroy his existing phone (which he did, with an axe); to lie to regulators, court officials, and lawyers about fictitious sanctioned Russian payments;[3] and to take "a holiday" or relocate his family to Dubai.

8.    Meanwhile, Alex Bouaziz and COO Dan Westgarth scrambled to erase all remaining digital traces connecting them to the spy.  After the initial complaint was filed, Alex Bouaziz renamed a three-way WhatsApp group chat with Dan Westgarth and the spy from "Keith <> Dan" to "V", and then both Alex and Dan abruptly left the group.  This evidence tampering notably occurred while litigation holds were in effect.  Then, Alex Bouaziz virtually disappeared from social media for two months—only to return recently, tweeting casually about PSG (Paris Saint-Germain Football Club), as if nothing had happened.

9.    Given the brazenness of the conduct and Philippe Bouaziz's boasting of having "spies at other companies," it is unsurprising that other corporate victims have emerged.  Underscoring the Bouaziz Racketeering Enterprise's broader fixation beyond Rippling, additional forensic analysis revealed that the spy also searched Rippling's Slack—an internal company communication tool, enabling employees to communicate through group channels or direct messages—to find information targeting nine Deel competitors over 300 times by running the following search terms:  "Papaya," "Velocity Global," "Remote," "G-P" (Globalization Partners),

---

[3]    Despite Deel's continued false statements to the media, unlike Deel, Rippling has never transmitted sanctioned payments to Russia.  Indeed, the spy only made a sanctions-related complaint when instructed to falsely do so by Deel's senior counsel after being served with the Irish court order.  The spy later confessed that he "knew this [complaint] was false," but that making it "seemed like a way out of the situation."

"Omnipresent," "Oyster," "Boundless," "Payzaar," and "Remofirst."    Meanwhile, Deel whistleblowers have reported that competitor hires were celebrated at Deel All-Hands meetings for the information they brought with them.  No wonder then that several parties—including major Deel competitors and a startup accelerator—have uncovered eerily similar conduct by Deel or its associates to obtain their confidential information and trade secrets.  With multiple investigations ongoing, Rippling expects the full extent of the Bouaziz Racketeering Enterprise will soon be revealed.

10.    Rippling now brings this First Amended Complaint under the federal RICO statute, the Defend Trade Secrets Act, and California state law to put an end to Deel's criminally misguided approach to competition and seek redress for the serious and ongoing harm it has suffered.  The evidence already shows that the Bouaziz Racketeering Enterprise operates with precision, premeditation, and remarkable brazenness—led by Deel CEO Alex Bouaziz, coordinated by his father, Deel Board Chair, CFO, and former General Counsel Philippe Bouaziz, and supported by a close-knit group of criminal associates inside and outside of Deel, including COO Dan Westgarth and senior legal personnel.

11.    Deel has attempted to spin this dispute as a tech rivalry gone bad.  But tech rivals don't bribe employees to spy.  They don't launder payments through crypto and family members.  They don't coach witnesses to lie under oath.  When they are caught, they don't destroy evidence and take refuge in non-extradition territories like Dubai.  And they certainly don't replicate these schemes repeatedly across an industry.

12.    Enough is enough.  Rippling brings this case to stop the Bouaziz Racketeering Enterprise from continuing its campaign of theft, coercion, and deception, and to recover for the extensive damages it has suffered as a result of the systematic theft of Rippling's trade secrets.

Rippling also aims to deliver a clear message to Alex Bouaziz and the associates of the Bouaziz Racketeering Enterprise: stealing trade secrets is not a business strategy—it's a crime.

## THE PARTIES AND THE RACKETEERING ENTERPRISE

### Plaintiff Rippling

13.    ***Rippling.***  Plaintiff People Center, Inc. d/b/a Rippling is a Delaware corporation with its principal place of business in San Francisco, California.  Rippling is a successful, late-stage software company that offers a global workforce management platform to enable businesses to manage core internal workflows—including human resources, IT, and finance—through a unified suite of cloud-based applications that are built on a single software platform.  Rippling's customers are business enterprises ranging from small businesses to larger, enterprise-level customers.  Since its founding in 2016, Rippling has been a leader in this space, now serving tens of thousands of customers around the world.

### The Bouaziz Racketeering Enterprise

14.    The Bouaziz Racketeering Enterprise is directed by Alex Bouaziz and his father Philippe Bouaziz, who together coordinate the criminal activities of a loosely organized association-in-fact.  The members of the enterprise consist of Alex and Philippe themselves, Deel and certain of its employees, closely aligned (but not Deel-employed) individuals and entities, and, most importantly, a network of current and recently departed employees of Deel's competitors who serve as industrial spies.  The Enterprise operates across multiple jurisdictions including the United States, Israel, France, United Kingdom, Italy, Ireland, and the United Arab Emirates (Dubai), with Alex and Philippe directing coordinated activities among members who maintain independent residences, employment relationships, and business operations across these locations.

15.    The Bouaziz Racketeering Enterprise exists for the purpose of enriching Deel, its principles, and their spies, by systematically misappropriating and exploiting trade secrets and

confidential business information belonging to Deel's competitors.  Through Alex and Philippe's direction and coordination, the Bouaziz Racketeering Enterprise's spies steal competitively sensitive information through multiple different channels and feed that information to the enterprise in exchange for compensation in the form of cash payments or the promise of future employment. These criminal acts are facilitated by the other members of the Bouaziz Racketeering Enterprise, including other Deel employees and closely aligned but unaffiliated individuals and entities.  The enterprise's members operate under Alex and Philippe's unified direction to accomplish systematic competitive intelligence theft that Deel could not achieve through its corporate structure alone.

**Defendant Members of the Bouaziz Racketeering Enterprise**

16.    ***Deel***.  Defendant Deel, Inc. is a Delaware corporation with its principal place of business at 425 First Street #1502, San Francisco, California.[4]  While the company markets itself as having been founded in 2019, Deel's origins are murky.  Deel's founders publicly list four different dates for Deel's start:  August 2018 (Ofer Simon), November 2018 (Philippe Bouaziz), January 2019 (Shuo Wang), and May 2019 (Alex Bouaziz).[5]  Meanwhile, Deel's SEC filings all identify "Lifeslice, Inc." as one of Deel's "Previous Names"[6]—online databases suggest that Lifeslice, Inc.

---

[4]   Despite all of its SEC reports, current and historical corporate filings, current Terms of Service, and current Privacy Policy listing this address, Deel now argues in a recent Motion for Forum Non Conveniens that this is just a "mailing address."  *See, e.g.*, Deel, Inc., Form D (Dec. 27, 2024), https://www.sec.gov/Archives/edgar/data/1813695/000181369524000002/xslFormDX01/primary_doc.xml.

[5]   Further complicating the history, in 2018, the same trio of co-founders (Alex, Wang, and Simon) also formed "SciDex," a now-defunct cryptocurrency startup with unsavory reviews, and public evidence suggests that SciDex is a Deel predecessor as well.

[6]   *See, e.g.*, *supra*, note 4.

was founded in 2016[7]—while Deel's earliest-dated SEC filing, from 2020, likewise represents that Deel, Inc. was founded in 2017.[8]

17.     ***Alex Bouaziz***.  Defendant Alexandre "Alex" Bouaziz, an individual, has been the Director and Chief Executive Officer of Defendant Deel, Inc. at all relevant times herein.  Deel's most recent SEC filing (dated December 27, 2024) identifies Alex as having a San Francisco, California address.[9]  On information and belief, Alex is also a resident of Tel Aviv, Israel, and Paris, France, and visits Dubai, United Arab Emirates.  Alongside his father, he is a Founder and Venture Partner at Sarona Ventures, an Israeli venture capital firm invested in Deel, touted to be "Sarona Venture's top portfolio star!"[10]  On information and belief, Alex also benefits financially from Deel's business via Sarona Ventures' investment.  Alex also previously co-founded LifeSlice and SciDex, both of which appear to be part of the same corporate entity as Deel.

18.     ***Philippe Bouaziz***.  Defendant Philippe Bouaziz, an individual, has been the Board Chair, Chief Financial Officer, and Whistleblowing Contact of Defendant Deel, Inc. at all relevant times herein.  Philippe has also held himself out as General Counsel to Deel, until recently, despite possessing no cognizable legal background, law license, or law degree.[11]  Deel's most recent SEC

---

[7]  *See Lifeslice Company Profile*, Tracxn, https://tracxn.com/d/companies/lifeslice/__GjXjqzmRbHNQbh2dKHaxICtuE9NJ7VnjLpv7GJg9PvY (last updated May 30, 2025).

[8]  Deel, Inc., Form D (June 2, 2020), https://www.sec.gov/Archives/edgar/data/1813695/000181369520000001/xslFormDX01/primary_doc.xml.

[9]  *See* Deel, Inc., Form D (Dec. 27, 2024), https://www.sec.gov/Archives/edgar/data/1813695/000181369524000002/xslFormDX01/primary_doc.xml.

[10]  Sarona Ventures (@SaronaPartners), X, (July 18, 2024, 6:28PM), https://x.com/SaronaPartners/status/1813928730974380541.

[11]  *See* Samuel Dahan & Philippe Bouaziz, *The State of Global Work Law: A Call for New Policy Infrastructure*, Queen's Univ. Legal Rsch. Paper (June 23, 2023) (Philippe Bouaziz describing himself as "Chief Financial Officer ***and General Counsel***, Deel Inc.") (emphasis added), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4484981.

filing (dated December 27, 2024) identifies Philippe as having a San Francisco, California address.[12] On information and belief, Philippe is also a resident of Tel Aviv, Israel; Paris, France; New York, New York; and Dubai, United Arab Emirates.  He is the Founding Managing Partner and Chairman of Sarona Ventures (an early Deel investor) alongside his son Alex Bouaziz, a founder of Bouaziz & Partners (listed as a Deel Whistleblowing Contact, until May 2025) and, on information and belief, was previously a board member at SciDex.  On information and belief, Philippe also benefits financially from Deel's business via Sarona Ventures' investment and Bouaziz & Partners' consulting relationship.

19.    ***Daniel Westgarth***.  Defendant Daniel ("Dan") Westgarth, an individual, has been the Chief Operating Officer of Defendant Deel, Inc. at all relevant times herein.  On information and belief, Dan Westgarth is a resident of New York, New York; London, United Kingdom; and Dubai, United Arab Emirates.

### **Non-Party Members of the Bouaziz Racketeering Enterprise**

20.    ***Alba Basha***.  Non-party Alba Basha, an individual, has been the wife of Defendant Dan Westgarth at all relevant times herein.  On information and belief, Basha is a resident of London, United Kingdom and Dubai, United Arab Emirates.  Basha is not an employee of Deel.  On information and belief, Basha was employed as a cryptocurrency compliance specialist at the investment platform company Robinhood Markets, Inc., in and before March 2025 but has since separated from that company.

21.    ***Andrea David Mieli***.  Non-party Andrea David Mieli, an individual, has been an attorney at Deel since February 2021, and appears to have been their first legal counsel.  Mieli publicly lists himself as an independent contractor for Deel, bearing the title "Global Senior Director

---

[12]  *See, e.g., id.*

of Legal." On information and belief, Mieli is a resident of Rome, Italy, and is the longest-tenured attorney currently employed at Deel.

22.    **Asif Malik**. Non-party Asif Malik, an individual, is an attorney at Deel, employed as Deel's "Legal Director – Fintech, Regulatory, and Licensing (Global)" since July 2024. Malik was appointed as UK Director of Deel's newly-acquired payment subsidiary Atlantic Money Ltd. in February 2025, where he is listed as a resident of Newcastle, United Kingdom. However, by April 2025, when process servers in a separate proceeding attended this address, a woman responded that Malik had gone to Dubai, and a Deel spokesperson later stated that Malik was currently residing in Dubai, United Arab Emirates.

23.    **Spiros Komis**. Non-party Spiros Komis, an individual, is an attorney at Deel, employed as Deel's "Head of US Legal." He began working in that capacity in May 2023. On information and belief, Komis is a resident of Saint Petersburg, Florida and Fairfax, Virginia.

24.    **Keith O'Brien**. Non-party Keith O'Brien, an individual, is a resident of Dublin, Ireland. Between June 2023 and March 2025, O'Brien was Rippling's Global Payroll Compliance Manager.[13] In or around November 2024, O'Brien was personally recruited by Alex Bouaziz and

---

[13]    As a formal matter, Rippling Ireland Limited ("Rippling Ireland"), a wholly owned subsidiary of Rippling, was O'Brien's employer, but from the beginning he understood that he was joining "the People Center, Inc. [*i.e.*, Rippling] team" and that his responsibilities, including his fiduciary duty of loyalty, ran to Rippling. O'Brien's duties of loyalty, trust, and confidence to Rippling and its affiliates were further established and defined by the agreements that he signed in connection with his employment.

These agreements included: (1) a Confidentiality and Intellectual Property Rights Assignment Agreement ("CIPRAA") between Rippling and O'Brien, through which O'Brien agreed not to "disclose any Proprietary Information without first receiving [Rippling's] express written direction or consent"; (2) a Contract of Employment, through which O'Brien agreed not to "use or disclose or make available to anyone else, during or after [his] employment, any Confidential Information" (except as necessary in connection with his employment); and (3) an Employment Acceptance Agreement, prohibiting O'Brien from "engag[ing] in any employment, occupation, consulting, or other business activity directly related to the business in which [Rippling] is now involved or becomes involved during the term of [his] relationship with [Rippling]" and from "engag[ing] in any other activities that conflict with [his] obligations to [Rippling]." Proprietary Information was

his father Philippe Bouaziz to spy on and steal from Rippling for the benefit of the Bouaziz Racketeering Enterprise.  O'Brien has since confessed his role in this espionage scheme.

25.     ***LiquiFi***.  Non-party LiquiFi, Inc. ("LiquiFi") is a Delaware corporation with its principal place of business in San Francisco, California.  LiquiFi is a digital cryptocurrency management company which partnered with Deel in September 2024 to offer a global crypto-based tax and payroll services.  Deel CEO Alex Bouaziz reportedly sought to "crush Toku," its competitor, via this partnership.

26.     ***Benjamin Snipes***.  Non-party Benjamin Snipes, an individual, is an attorney.  He was General Counsel at LiquiFi, and, prior to that role, was the Head of Legal at WorkCo, Inc. d/b/a Toku.  On information and belief, Snipes is a resident of New Jersey and was in touch with Deel after joining LiquiFi.

27.     ***Conspirator-1***.  Non-party Conspirator-1 was a Director of National Accounts at Rippling before joining Deel as a Director of Partnerships in January 2024.  At all relevant times, Conspirator-1 was a resident of California.  He was discovered to have downloaded sensitive information, including company product roadmaps and financial projects before his termination from Rippling, and later, against Rippling's objections, used a forensics firm hired and paid for by Deel's lawyers to delete records of this activity.

28.     ***Conspirator-2***.  Non-party Conspirator-2 was a Senior Manager of PEO Solutions Consultants at Rippling before joining Deel as a Director of PEO Solutions Consulting in February 2024.  Conspirator-2 is a resident of California.  Conspirator-2 was in communication with several Deel executives as early as summer 2023, and, on information and belief, unlawfully solicited

---

broadly defined to include "all . . . business, technical and financial information [O'Brien] developed, learned or obtained in connection with [his] employment." Confidential Information was broadly defined to include among other things "[a]ll proprietary or confidential information regarding [Rippling] . . . or relating to [Rippling's] operations or business."

several former Rippling employees and documents after joining Deel, including by asking for sensitive information about Rippling and openly boasting about this activity to Deel employees, including Deel CEO Alex Bouaziz.

29. ***Conspirator-3***.  Non-party Conspirator-3 was an employee of Victim-3 (defined below) until early 2022.  On information and belief, at the behest of Alex Bouaziz and in violation of Conspirator-3's duty of loyalty to Victim-3, Conspirator-3 provided the Bouaziz Racketeering Enterprise with Victim-3's "CRM" (*i.e.*, its trade secret customer database, containing confidential and valuable nonpublic information about customers compiled by Victim-3, the value of which laid in its secret and nonpublic nature).

30. ***Conspirator-4***.  Non-party Conspirator-4 was an employee of Victim-3 (defined below) until approximately summer 2023.  On information and belief, at the behest of Alex Bouaziz and Conspirator-3, and in violation of Conspirator-4's duty of loyalty to Victim-3, Conspirator-4 provided the Bouaziz Racketeering Enterprise with Victim-3's "CRM" (*i.e.*, its trade secret customer database, containing confidential and valuable nonpublic information about customers compiled by Victim-3, the value of which laid in its secret and nonpublic nature).

31. ***Conspirator-5***.  Non-party Conspirator-5 is an individual known to O'Brien as the "Watchman."  On behalf of the Bouaziz Racketeering Enterprise, Conspirator-5 made or directed fiat and cryptocurrency payments to O'Brien in exchange for O'Brien's providing Rippling trade secret information to the Enterprise.

32. ***Does 1–100***.  Non-parties Does 1–100 are as yet unknown individuals who facilitated the activities of the Bouaziz Racketeering Enterprise.  They include, but are not limited to, participants in the "network of spies" that Philippe Bouaziz has boasted of maintaining at competitor corporations, whose participation is necessary to carry out the Enterprise's systematic theft of trade secrets and confidential business information.

**Other Victims of the Bouaziz Racketeering Enterprise**

33.    ***Victim-2 (Toku)***.  WorkCo, Inc. d/b/a Toku ("Toku") is a Delaware corporation with its principal place of business in Delaware.  Toku is a cryptocurrency-based tax and payroll compliance company, which filed a suit against its competitor LiquiFi in December 2024, alleging misappropriation of trade secrets and then filed a preliminary injunction in April 2025, alleging Deel CEO Alex Bouaziz's participation in the overall scheme and desire to "crush Toku."

34.    ***Victim-3 (Start-Up Accelerator)***.  Victim-3 is a startup accelerator that previously partnered with Deel.

35.    ***Victims-4+ (Major EOR Competitors)***.    Victims 4+ are one or more major competitors of Deel in the EOR ("Employer of Record") market other than Rippling.

## JURISDICTION AND VENUE

36.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under 18 U.S.C. § 1962 and 18 U.S.C. § 1836.

37.    This Court has supplemental jurisdiction over Rippling's state law claims under 28 U.S.C. § 1367 because Rippling's state law claims are so closely related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

38.    Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391 because Deel resides in the Northern District of California and a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

## DIVISIONAL ASSIGNMENT

39.    A substantial part of the events and omissions which gave rise to the claims asserted took place in San Francisco, California.  Thus, pursuant to Civil L.R. 3-2(c) and (e), this action should be assigned to the San Francisco Division of this District.

# FACTUAL ALLEGATIONS

## I.     EARLY SIGNS OF THE BOUAZIZES' SCHEME VIA DEEL

40.     Rippling pioneered the concept of an all-in-one solution for workforce management across HR, IT, and finance.  Since its founding in 2016, Rippling has set the standard for modern business infrastructure—building over 20 deeply integrated, technology-first products that power everything from payroll and benefits to device management and corporate cards.  Today, tens of thousands of customers around the world rely on Rippling to manage their global workforce. Because of the platform's breadth and depth, Rippling has competitors in every market segment in which it operates.

41.     In 2022, Rippling extended this all-in-one solution concept globally by developing a comprehensive suite of global workforce management products designed to enable its customers to hire, pay, and manage their global workforce.  These offerings included Global Employer of Record ("EOR"), Global Contractor, and Global HRIS Services—representing a major expansion of Rippling's platform.  Rippling also simultaneously launched Global Payroll or "the world's first native global payroll system."[14]

42.     At the time, Deel was a Rippling customer and offered only Global EOR and Global Contractor services.  Deel remained a Rippling customer until early 2023.

### Rippling Launches Global Products, and Deel Head of Sales Responds:
### "I play dirty and will not lose"

43.     As Rippling prepared to go to market with its global products, Deel's Head of Sales, Chris Lee, got wind of these global expansion plans and sent a disturbing LinkedIn message to Rippling's first global account executive.  In that message dated September 12, 2022, Lee warned that he compiled "*pages of insights*" on Rippling gathered from Deel sales representatives posing

---

[14]     Tomer Schwartz, et al., *Introducing Rippling Global*, Rippling Blog (Oct. 20, 2022), https://www.rippling.com/blog/introducing-rippling-global.

as job applicants, and declared, "*I'm ruthless*."  And then, foreshadowing a broader pattern or improper and unethical conduct by Deel, Lee threatened:  "*I play dirty and I will not lose.*"[15]

44.    Concerned that Deel, still a Rippling customer at the time, had access to Rippling's platform and Rippling's now-competitive products, Rippling made the decision to end the customer relationship.  On November 16, 2022, Rippling informed Deel that it would not renew Deel's contract due the increasingly competitive nature of both Rippling's and Deel's product offerings. The email specifically noted:  "***We're concerned that your access and use of our systems will inform your own efforts in this regard, and would prefer that we each compete on the merits of our own innovations.***"

---------- Forwarded message ----------
From: ▇▇▇▇▇▇▇ @rippling.com>
Date: Wednesday, November 16 2022 at 22:06 GMT+2
Subject: Deel and Rippling
To: <phb@deel.com>, <alex@deel.com>

Deel team,

Congrats on Deel's rapid growth. There's clearly a huge market for global employee management products, and it looks like both Deel and Rippling have discovered that opportunity. That means that, in some cases, we're going after the same customers with similar products, and that has put us in a difficult position around your use of the Rippling platform.

As you've surely recognized, the only path to success is by building a comprehensive HR and payroll system. We're concerned that your access and use of our systems will inform your own efforts in this regard, and would prefer that we each compete on the merits of our own innovations.

To that end, we'd like to terminate our commercial relationship at the end of your current agreement, which expires on February 28, 2023. We don't offer month-to-month extensions on our agreements, but this is an unusual case given that we're requesting that you find another provider. If necessary, we can work to find a mutually agreeable timeline beyond February.

We hope that this advance notice ensures you have the opportunity to transition gracefully to another provider. We understand the importance of ensuring continuity of payroll, benefits, and systems access for the 1,400+ people you support with Rippling. Let us know if you need any recommendations on other providers; we're committed to doing whatever's possible on our end to make this a very smooth transition for your team.

Thank you for being a Rippling customer to this point, and we wish you all the best in this exciting new market.

Yours,

▇▇▇▇▇▇▇

45.    Rippling's termination notice to Deel proved to be prescient.  Today, Rippling and Deel compete head-to-head for customers looking for global workforce management solutions.

---

[15]    *See* Exhibit 3.  Lee's fixation on Rippling is further evidenced by an April 2024 LinkedIn message Lee sent to the VP of Sales at Multiplier, another Deel competitor.  In the message, Lee threatened the VP, writing "I'll demolish your small sales team by hiring all your reps at exorbitant comp if you try poaching any of my reps."  Exhibit 4.  To back up his threat, Lee further wrote, "[y]ou can ask my friends at Rippling.  I've hired 8 of their top sales people and they've been able to hire 1 mid-performing rep.  That's my fair warning – take it or leave."  *Id.*

Terminating the Deel customer relationship was an important and necessary step taken by Rippling to protect its confidential information from misuse by a now-direct competitor.[16]

**Deel Develops Fixation with Rippling Talent**

46.    Since the breakup, Deel has demonstrated a sustained and targeted interest in recruiting Rippling personnel.  Standing alone, this does not seem unusual—Rippling has great people.  But in light of recent revelations, Deel's recruitment tactics  now appear, at least in part, to have served as a mechanism for misappropriating trade secrets and confidential business information.

47.    These tactics included, but were not limited to: (a) offering significantly more compensation for employees who join from competitors; (b) fast-tracked hiring processes, including offers without interviews; (c) hiring of departing employees who had downloaded significant amounts of confidential information from their prior employer; and (d) refusal to identify or return this material.  These poaching efforts (mostly unsuccessful, but notable in breadth) became so prevalent that within Rippling's team, it is commonly remarked—only half in jest—that all Rippling employees have a standing offer to join Deel.

---

[16]   Though not the subject of this lawsuit, Rippling notes that it has repeatedly encountered troubling conduct by Deel and its affiliates since terminating its customer relationship, and has reported such conduct, where appropriate. Rippling's message to Deel has been simple and consistent:  comply with the law and compete fairly.  Deel, by contrast, has refused.  It continued offering EOR services in Russia into 2025 despite U.S. sanctions, was advertised as a partner of and, per public records, banks with sanctioned Russian bank T-Bank, and has misclassified its global personnel—including reportedly its own CEO.  Deel has also launched regulated services like payroll and PEO without proper licensure.  When scrutiny arises, deflection often follows.  In one instance, Deel leaked a false acquisition bid of its competitor Papaya Global the same week one of its large payout clients (a simulated prop trading firm) was charged with fraud by the CFTC.  And in response to a confirmed investigation by Singapore's Ministry of Manpower, Deel CEO Alex Bouaziz brushed it off:  "We have investigations all the time across all the countries."  *See* Kenrick Cai, *$12 Billion HR Startup Deel Changed Global Hiring. Now It Wants To Change Regulators' Minds*, Forbes (Dec. 4, 2023),    https://www.forbes.com/sites/kenrickcai/2023/12/04/12-billion-hr-startup-deel-changed-global-hiring-now-it-wants-to-change-regulators-minds/?sh=124f39d2599b.

**Two Illustrative Examples of Deel's Recruiting Practices Being a Means to Access Rippling's Confidential and Proprietary Information**

48.    Two personnel incidents illustrate how Deel's recruiting practices served as a conduit for obtaining confidential and proprietary information.

49.    First, in January 2024, Deel hired Rippling's former Director of National Accounts (Conspirator-1) as Deel's new Director of Partnerships, shortly after his termination from Rippling for performance.  During a routine security review, Rippling discovered that, in the late evening hours before his termination in December 2023, Conspirator-1 had downloaded a cache of highly sensitive trade secret documents, including product roadmaps and critical operational playbooks. When Rippling demanded that Conspirator-1 return this information to Rippling (as his contracts with Rippling required) and informed Deel of these concerns, Deel's attorneys and Conspirator-1 refused to take action.  Further investigation revealed that the volume of documents taken was even greater than initially believed.  Deel's attorneys then suddenly informed Rippling that a third-party forensic investigator was hired to delete the documents rather than return them to Rippling, as required.  On information and belief, Deel is funding Conspirator-1's legal defense counsel, who represents Deel in separate matters.

50.    Second, in February 2024, Deel hired a senior manager from Rippling's PEO team (Conspirator-2) as Deel's new Director of PEO Solutions Consulting.  On information and belief, at least eight months prior, in July 2023, Deel attempted to recruit Conspirator-2 to lead the development of its new PEO offering.  At the time, because Conspirator-2 was a key individual on Rippling's PEO team, Rippling offered him a retention package, which he accepted.  On information and belief, Deel and Conspirator-2 remained in contact despite Conspirator-2 remaining at Rippling. By early 2024, Deel returned with a new offer, one that was lucrative enough to prompt Conspirator-2 to turn down a second retention bonus from Rippling.  According to Deel whistleblowers, Conspirator-2 improperly retained confidential Rippling documents concerning Rippling's PEO

offering after leaving Rippling for Deel.  On information and belief, Conspirator-2 did so in anticipation of payment from the Bouaziz Racketeering Enterprise once he joined Deel and provided the misappropriated documents to his new bosses when he arrived.  Former Deel employees have told Rippling that, upon joining Deel, Conspirator-2 shared the misappropriated confidential Rippling PEO materials with Deel executives, including Alex Bouaziz.

51.    Moreover, Conspirator-2 went so far as to text one of his former colleagues to "do [him] a solid" and send him additional Rippling documents.



*Text Messages on April 16–18, 2024 Between Conspirator-2 and Rippling Employee*

On information and belief, Conspirator-2 engaged in this behavior with the express intent of benefiting Deel at Rippling's expense.

### A Broader Pattern of Deception and Competitive Misconduct

52.    Deel's misconduct has not been limited to employee poaching for information. Former Deel employees describe a company with virtually no internal controls around competitor information.  Rather, these former employees report that they were "positively encouraged" to bring information from prior employers to Deel, and that Deel's leadership would instruct sales teams to create fake email accounts through Gmail or Outlook, mimicking legitimate company domains to circumvent firewalls blocking known Deel traffic, to explore competitor products while

masquerading as prospective customers—practices that are all expressly prohibited in Rippling's policies and training.

53.    Meanwhile, even if Deel employees encountered illicit conduct, per Deel's public Whistleblowing Policy, they were instructed to contact "phb@deel.com" (the email address for Board Chair and CFO Philippe Bouaziz) or his consulting company Bouaziz & Partners."[17]

54.    For Deel, lack of controls appears to be an intentional feature, not a bug.[18]

55.    Taken together with the conduct at issue in this action, these practices reflect a deliberate pattern and practice by Deel to shortcut innovation through the misappropriation of the time, capital, and intellectual investments of its competitors.

## II.    DEEL'S CEO CULTIVATES AND PAYS FOR A SPY TO STEAL RIPPLING TRADE SECRETS

56.    Deel's illicit tactics reached a shocking crescendo in 2024.  CEO Alex Bouaziz personally recruited, directed, and paid a Rippling employee to operate as a corporate spy—feeding Deel a steady stream of confidential trade secrets from inside the company.  The contours of this covert operation are known due to extensive forensic analysis, contemporaneous documentary evidence, and a sworn affidavit from the spy himself.[19]

---

[17]  *See Whistleblower Policy*, Deel, Inc., *available at* http://web.archive.org/web/20250421013709/https://www.deel.com/legal/whistleblower-policy/ (effective Oct. 28, 2024) (archived Apr. 21, 2025).

[18]  By contrast, Rippling has put in place robust and overlapping controls to ensure that competitor confidential information does not enter Rippling when new employees come over from a competitor. Specifically, Rippling employees sign agreements that state they will not bring any third-party confidential information to Rippling, including that of any former employer.  Beyond contractual controls, Rippling also employs several administrative and technical controls to ensure that its new hires are well versed on their continuing obligations to their prior employers, including policies, training, and restrictions on its referral bonus program.

[19]  *See* Exhibit 1 (Sworn Affidavit of Keith O'Brien).

**How Deel CEO Alex Bouaziz Recruited the Spy**

57.    In or around March 2024, Alex Bouaziz commented on a LinkedIn post by Keith O'Brien, then a mid-level payroll compliance manager at Rippling, requesting to connect.  Around the same time, O'Brien applied for a payroll product compliance role at Deel, but was not offered the position.  Following the application process, Alex and O'Brien exchanged messages to discuss the interview feedback.  The pair continued to exchange occasional messages.

58.    A few months later, in or around August or September 2024, O'Brien told Alex that he had launched a new payroll consulting company called Global Payroll Geeks.  Alex referred O'Brien to Deel COO Dan Westgarth to explore a service provider arrangement.  O'Brien also mentioned to Alex that he was considering leaving Rippling to focus on his payroll consulting business full-time.  Alex suggested that they speak by phone.

59.    During that call, Alex Bouaziz told O'Brien that he "had an idea."  Rather than leave Rippling, O'Brien should remain at the company and serve as a "spy" for Deel—in Alex's own words, just like "James Bond," in exchange for monetary reward.  After some quick thought, O'Brien agreed to the spying arrangement.  Alex then initiated a three-way phone call with O'Brien and his father, Philippe Bouaziz, to discuss the logistics.

**Deel CEO Establishes Protected Communication and**
**Payment Channels for the Spying Scheme**

60.    Recognizing the risk of open phone lines, Alex moved the conversation to Telegram.[20]  Telegram lets users send "Secret Chats" using end-to-end encryption.[21]  This means: "Telegram has no way of seeing what's discussed in Secret Chat conversations, . . . [u]sers also

---

[20]  *How Telegram Became a Playground for Criminals,* N.Y. Times (Sept. 7, 2024), https://www.nytimes.com/2024/09/07/technology/telegram-crime-terrorism.html.

[21]  *See Telegram Privacy Policy*, Telegram, https://telegram.org/privacy (last accessed June 4, 2025); *see also* Secret Chats, *Telegram FAQ*, Telegram, https://telegram.org/faq#secret-chats (last accessed June 4, 2025).

can't forward these messages, and they can self-destruct—making it even harder for third parties to intercept their contents."[22]  With Philippe present, Alex outlined the spying arrangement:  O'Brien would provide insights into "Rippling's 'way[] of doing things,'" including corporate strategy, customer insights, and "other interesting [Rippling] company information."   In exchange, Alex agreed to pay O'Brien approximately €5,000 a month around the 6th of each month.

61.    Communications were to be strictly limited to Telegram, with messages configured to auto-delete after 24 hours.  Alex instructed O'Brien to only relay Rippling's confidential information to him via a private Telegram.  Alex told O'Brien that payments would be arranged in a separate Telegram channel with Philippe and a third individual referred to as "the Watchman," who had the initials "A.D."  A.D.'s real identity is not yet known.

62.    Philippe then instructed O'Brien on particular terminology to use to discuss payments.  When it was time for O'Brien to request payment, O'Brien would send a picture of a watch to the payment chat.  At times, Philippe would reply, "the buyer is happy," which O'Brien understood to mean that Alex, the "buyer" of Rippling's confidential information, was happy with the information provided.  Other times, O'Brien would tell Alex that payment was late, and Alex would tell him to "ping Watchman" or say he would "sort it."

63.    Because O'Brien understood that what Deel was asking him to do was "wrong," O'Brien requested that the spying engagement be papered with a consulting agreement, so that O'Brien would have a "seemingly innocent explanation for the additional income" he was receiving for spying on Deel's behalf.  Alex refused such agreement because, according to O'Brien, Alex did not want a documentary record of his relations with O'Brien.

---

[22]    Sam Sabin, *How Telegram Became a Destination for Criminals*, Axios (Aug. 27, 2024), https://www.axios.com/2024/08/27/telegram-pavel-durov-encryption-hackers-criminals.

64.    O'Brien began receiving compensation for his spying activities in November 2024, when he received a bank transfer of $6,000 from an "A.B." via Revolut, a British financial technology company that specializes in online payments.  Documentary evidence from Revolut establishes that "A.B." was Alba Basha, *the wife of Deel COO Dan Westgarth*:[23]



---

[23]  Rippling is in the process of seeking "Know Your Customer" information from Revolut about this account to confirm Alba Basha's identity.

65. Philippe wanted there to be "no trace," so he informed O'Brien that all subsequent payments would be made in cryptocurrency. After the first payment, Deel began to pay O'Brien using the Ethereum cryptocurrency and continued making such payments until March 13, 2025— just one day before Rippling obtained an order from the Irish High Court requiring O'Brien to turn over his personal devices for imaging and preservation. An example of one such transaction is below.



66. O'Brien would then immediately convert those payments to fiat currency to his personal bank account:[24]



_____

[24] A textual representation of these transactions is attached hereto as Exhibit 5.

**How the Spying Scheme Operated**

67.     Alex managed the spy and his theft closely.  He communicated with O'Brien multiple times each workday through written or voice notes, always via Telegram.  At Alex's direction, O'Brien accessed secure, centralized databases that are accessible only to Rippling employees, including databases hosted by Salesforce, Slack, and Google.[25]  These Rippling databases, and the data stored therein, are all located in the United States.  As such, each and every instance of O'Brien accessing these databases (each instance of which occurred from Ireland) necessarily required O'Brien to utilize international wires.

68.     Deel unlawfully accessed and exploited those databases for its own ends.  Alex directed O'Brien to conduct searches on behalf of Deel in Rippling's Slack instance on a near daily basis, and O'Brien also searched within Rippling's Salesforce and Google Drive repositories for content requested by Alex.  Alex messaged O'Brien several times a day on Telegram, and often messaged him on Monday mornings ("hey boss, good weekend??"), prodding him to resume his

---

[25]  Rippling's use of these databases for storage is common for a modern technology company of its size, but understanding the risks posed thereby, Rippling safeguards its confidential information through both contractual and technological means.  All Rippling employees are contractually obligated to keep Rippling's information confidential and to utilize the information and technology provided by Rippling only for an appropriate, work-related purpose.  Rippling also specifically trains its employees to keep all sales, lead, and pricing information strictly confidential.  Among other industry-standard technological safeguards, Rippling also only grants access to its systems to authorized users who pass initial and periodic biometric checks designed to block unauthorized access to Rippling's information repositories.  In addition, Rippling comprehensively logs all system activity for ongoing security monitoring.  For example, all Slack activity is "logged" such that every time a user views a document through Slack, accesses a Slack channel, sends a message, or conducts searches on Slack, that activity (and the associated user and related digital details) is recorded in a log file. Finally, remote access to Rippling's systems is tightly controlled; for example, to access Rippling Slack channels from a mobile device, Rippling employees must use a device meeting certain security requirements (such as having a strong password, automatic locking of the device upon a number of failed login attempts, and the latest security patches and updates installed).  Employees must also use their Rippling login credentials and, where required by the system, are subject to multi-factor authentication or token-controlled access.

theft at the start of a new workweek.  O'Brien transmitted all of the confidential information he stole from Rippling directly to Alex, for his use at Deel.

69.     Throughout the scheme, Alex consistently focused O'Brien's thefts on Rippling's most valuable corporate work product:

- **Corporate Strategy Trade Secrets** (*e.g.*, product expansion plans, core payroll initiatives); and

- **Sales and Marketing Trade Secrets** (*e.g.*, customer data, pipeline intelligence, messaging).

> 18.     Alex was particularly interested in Rippling's strategies around global payroll and expansion efforts, as well as reviewing specific sales, marketing information, and customer details. Alex would give me direction for what terms to search on Rippling's Slack system in order to yield the information he wanted.  Alex would frequently message me and say "hi boss!" or "hey boss, can you search for…" to start a conversation.  Alex would frequently message me on Mondays with "hey boss, good weekend??"

The reason for Alex's focus on Rippling's most treasured Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets is obvious:  Through his stealing, Deel gained an unfair head start, saved countless hours and dollars in research and development of market priorities, and identified prospects and customers interested in competitive services, without the significant expenditures Rippling incurred.  Alex directed O'Brien to this content by suggesting specific search terms for O'Brien to use when secretly combing through Rippling's internal data repositories.

70.     Early on, O'Brien would transmit information to Alex via screenshots (static images), but Alex soon asked O'Brien to adjust his approach, coaching him on how to take screen recordings (*i.e.*, videos of the information visible on O'Brien's phone as he scrolled through Rippling's Slack), allowing O'Brien to capture—and Deel to receive—more of Rippling's

information in each transmission.  Thereafter, O'Brien sent as many as six screen recordings of stolen information per day.  Because O'Brien did not always obey Alex's deletion rule, some of these screen recordings and other information were backed up to O'Brien's Apple iCloud account and have now been obtained by Rippling's forensics firm.

71.     Alex used emojis and catchphrases to signal his degree of satisfaction with the Rippling secrets O'Brien had stolen and transmitted.  When he was pleased with information O'Brien sent him, Alex would often respond with a "heart" emoji.  When Alex found the stolen information to be particularly valuable, he often responded to O'Brien with the word "beast."

> 25.  Sometimes Alex would react enthusiastically about information I sent to him, saying things like, "this channel is beast" or "these are badass."  I understood this to mean that what I sent him was really good and I should keep sending him similar information. Sometimes Alex would say that certain information was a "headache," which I took to mean that he did not find it valuable.

72.     By December 2024, O'Brien again expressed to Alex that he planned to leave Rippling, but Alex directed O'Brien to stay on.  Alex said O'Brien should contact COO Dan who would "see to it that [his] consulting company Global Payroll Geeks[] would get money from Deel," and on January 9, 2025, Alex created a three-way WhatsApp group with Dan and O'Brien called "Keith <> Dan."  Alex also promised to make Global Payroll Geeks a preferred partner of Deel if the stealing continued for a little while longer.

**Theft and Use of Rippling's Trade Secrets Throughout the Deel Organization**

73.     Though its investigation of the Bouaziz Racketeering Enterprise remains ongoing, Rippling has already forensically identified, and confirmed with O'Brien's cooperation, substantial evidence of Alex Bouaziz's theft of Rippling trade secrets on Deel's behalf.  Through this brazen

scheme, Alex directed O'Brien to exfiltrate reams of Rippling's most confidential internal documents which Deel has exploited to illegally benefit Deel's business operations, in particular, in the following ways:

- **Rippling's Sales & Marketing Trade Secrets**:  stolen and used by Deel to shortcut customer acquisition spend and steal Rippling's customers, prospects, and pipeline in support its own growth;

- **Rippling's Corporate Strategy Trade Secrets**, including:

    ○ **(a) Rippling's Product Strategy** – stolen and used by Deel to facilitate the development of its own product roadmap;

    ○ **(b) Customer Retention Strategy** – stolen and used by Deel to gain an unfair economic pricing advantage and retain accounts;

    ○ **(c) Recruiting strategy** – Deel has relied on stolen and confidential Rippling talent data to thwart Rippling's continued success and to support its own key business development efforts; and

    ○ **(d) PR & Communications** – Deel has relied on stolen Rippling trade secrets and confidential information to advance its own PR and Communications agenda, and inflict reputational damage on Rippling.

*Rippling Sales and Marketing Trade Secrets Stolen by Alex Bouaziz*

74.    O'Brien's sworn confession and substantial forensic evidence has confirmed that Alex ordered O'Brien to steal information about Rippling's competitive sales and marketing strategies, and Rippling's prospects and customers at all stages of the sales pipeline.  Prompted by instructions from Alex sent via Telegram, O'Brien accessed Rippling's Sales and Marketing Trade Secrets extensively, on a near-daily basis, by previewing sales and marketing related channels in Rippling's Slack instance and sending screen-recordings back to Alex via Telegram to maximize the amount of content shared.  One such screen-recording of Rippling's internal Slack systems inadvertently captured by O'Brien's iCloud backup is ***six minutes and thirty-one seconds*** long.

75.     Rippling's Slack logs[26] powerfully demonstrate the unprecedented rate with which O'Brien combed through Rippling's sales and marketing Slack channels, accessing channels in "preview" mode to steal for Alex Bouaziz and benefit Deel.[27]  Beginning in November 2024, O'Brien searched the term "deel" in Rippling's Slack instance approximately 23 times per day.



Using "deel" as his anchoring search term, O'Brien relentlessly and secretly accessed 114 different sales and marketing focused Rippling Slack channels to procure information for Deel regarding Rippling's (a) sales leads and pipeline; and (b) competitive sales strategies.  The sales and marketing channels stolen from most frequently are listed here:

---

[26]   In part to ensure that confidential information in Rippling's Slack channels is used only for authorized purposes, Rippling employees' Slack activity is "logged", meaning every time a user views a document through Slack, accesses a Slack channel, sends a message, or conducts searches on Slack, that activity (and the associated user) is recorded in a log file.

[27]   Although it is more common for Slack users to join a channel to review its contents or participate in a discussion, O'Brien consistently accessed channels in "preview" mode, allowing him to see the contents of the channels without joining them.  O'Brien chose to review the channels in preview mode to avoid alerting the channels' members that he had accessed them.

| Channel name | Total count of events |
|---|---|
| deal-desk-sales | 428 |
| gong-stream-deel-compete | 333 |
| im-gong-calls | 209 |
| am-sales-updates | 200 |
| deel-gongstream | 123 |
| sdr-segment-drift | 117 |
| peo-quote-updates | 101 |
| emea-global-only-ob-notifications | 99 |
| foundgold-global-nls | 88 |
| emea-sales-global-core | 76 |
| emea-global-routing | 65 |
| uki-s1-routing | 58 |
| competitive-deal-insights | 57 |
| mops-inbound-request-alerts | 56 |
| rattle-mops-testing | 56 |
| global-sc-requests | 52 |
| comms-competitor-news | 51 |
| mm-global-high-intent-notifications | 46 |
| emea-sc-requests | 46 |
| hr-sc-requests | 40 |
| global-apac-sdr-qualification | 32 |
| sales | 27 |
| ind-sdr-ae-opps | 24 |
| gong-xero-mentions | 21 |
| sales-alerts | 21 |
| apac-forecast-updates | 21 |
| peo-forecast-updates | 15 |
| emea-global-outbound-pods | 17 |

*Theft and Use of Rippling's Sales Leads and Pipeline for Deel*

76.     To identify potential prospective customers, Rippling spends millions of dollars each year on marketing, with the sole goal of identifying companies that are open to hearing about Rippling's products ("Rippling's Sales Leads").   Rippling identifies sales leads by tracking responses to targeted advertisements, LinkedIn posts, Google AdSense inventory, and a variety of other marketing efforts. The sales leads generated by these efforts are tremendously valuable—indeed, that is why Rippling spends so much money procuring them.   In Rippling's market, identifying potential customers, who happen to be seeking a solution to a challenge that Rippling is poised to solve, is the most difficult (and expensive) part of the revenue generation cycle, with each lead requiring hours of outbound phone calls by one of Rippling's sales development representatives.   Rippling's sales leads, which are not made public, provide Rippling with a competitive advantage over its competitors with respect to potential customers.   By stealing

Rippling's leads—without having to expend the time and money to develop leads itself—Alex Bouaziz in effect stole value from Rippling, harnessing Rippling's work for Deel's benefit while in turn diminishing the value of the leads to Rippling.

77.    Once Rippling has identified prospective customers to be targeted as Sales Leads, Rippling's salesforce is responsible for persuading them to become Rippling customers.  To do so, Rippling's salesforce follows Rippling's unique step-by-step process to gather information and ultimately convert a prospect into a paying customer (this process and the information gathered during that process, "Rippling's Sales Pipeline").  Each stage of the pipeline requires significant effort and resources by Rippling and its salesforce, and each stage is vigorously documented.  This documentation includes:  (1) who the prospective customer is, where they are located, who the contact person is, and the size of the company; (2) the customer's business challenges, or what the customer is looking for; (3) Rippling's customized solution to that customer's needs; and (4) the offering price point and contractual terms.  Additionally, each call with a prospect is transcribed in real-time and stored in a centralized database, allowing for subsequent review of each and every call with a prospect.  For obvious reasons, in the hands of a competitor like Deel, such information provides a substantial competitive advantage, allowing Deel to more effectively tailor its pitch to a prospective customer or, in the case of a Deel customer, maximize its chances of retaining the customer through better service.

78.    In total, Slack logs of O'Brien's activity establish that he secretly viewed and downloaded information from Rippling Slack channels dedicated to prospective clients over 1,300 times between November 2024 and March 2025.  Two of the channels that O'Brien spied on the most during Deel's spying scheme reflect Bouaziz's efforts to target Rippling's sales prospects and pipeline:

- **#deal-desk-sales**:  a channel that provides an automated feed describing in detail each new sales quote generated by the Rippling Sales organization.  The summary

of each sales quote recorded in the channel includes details of any discounts applied, anticipated transaction timing, and certain details about the customer.  Through this channel, O'Brien had access to the details of every client sales quote dating back to September 2024.  O'Brien accessed the channel over 400 times since the start of the spying scheme.

- **#[redacted]-global-nls**:  a channel that has only a single member—its creator—Rippling's Senior Vice President of International Sales, who created the channel to capture summaries of all sales calls with promising prospective customers for Rippling's global products.  Several recent entries on the channel describe specific prospective customers currently using Deel and other solutions, but who are interested in Rippling to address specific concerns or objectives.  O'Brien viewed the channel 88 times since the start of the spying scheme.

79.    The harm to Rippling from Deel's theft of its Sales Leads and Sales Pipeline trade secrets is not hypothetical.   Indeed, in November 2024—the month the scheme began—Alex Bouaziz used the stolen information to attempt to poach a Rippling prospective customer.

80.    ***On the same day*** that a current Rippling prospect ("Prospect A") had a conversation with a Rippling account executive, Prospect A received a message from "alex from deel" (Alex Bouaziz), stating that he "***heard***" that Prospect A was "using a few products other than Deel" and suggesting that they speak:



81.    Prospect A told Rippling in a contemporaneous email that the timing was suspicious:



82.    And then Prospect A questioned how Deel "would know [about their discussions with Rippling] in real time," because they had not publicly referenced consideration of Rippling or initiated a formal vendor search:

> On Wed, Nov 20, 2024 at 8:34 AM ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ wrote:
>
>> Great, will be in touch as soon as I have visibility.
>>
>> On the airpods, thanks.
>>
>> On Deel intelligence: I am just curious to know how they would know it in
>> real time. I haven't posted anything on LinkedIn nor went out asking for
>> quotes. Do you have a perspective on that?
>>

83.    But it was only after Rippling filed its complaint in this action that Prospect A (and Rippling) realized that this timing was in fact not a coincidence at all, but a result of Deel's spying scheme:

FIRST AMENDED COMPLAINT

1



2

3

4

5

6    84.    Evidence now confirms exactly how Deel knew about Prospect A's business

7    discussions with Rippling in real time.  Review of O'Brien's Slack logs confirms that he secretly

8    previewed details of Rippling's confidential pricing strategy discussions about Prospect A.

9    Specifically, O'Brien "previewed" Rippling's #deal-desk-sales Slack channel several times on

10   November 6, 2024, the same day Alex Bouaziz contacted Prospect A via WhatsApp.  On November

11   5, #deal-desk-sales referenced over 100 distinct sales leads with a description of Rippling's

12   proposed pricing strategy for each, including a reference on November 5, 2024, to Prospect A:

13

14

15

16

17

18

19

20

21   85.    Rippling continues to identify examples of Deel's salesforce using the fruits of

22   Alex's spying scheme to expand their customer base at Rippling's expense.  As a sample, Rippling

23   has learned:

24        ● Prospect B:

25

○ On December 19, 2024, after searching "deel" in Rippling's Slack 33 times, O'Brien previewed the channel "Gong-Stream-Deel-Compete" 13 times.

○ The channel, an automated feed of sales calls with customers evaluating Rippling and Deel products in tandem, included mention of an existing Deel customer considering moving to Rippling to address compliance and payroll challenges as the company has grown ("Prospect B") and Rippling's pitch strategy, noting the products that appeared to resonate most with the prospect.

○ Armed with the benefit of these stolen insights into Rippling's sales strategy, the prospect ultimately signed with Deel.

● Prospect C:

○ On February 19, 2025, after searching for "deel" 27 times in Rippling's Slack instance, O'Brien navigated to a mention of Deel in a channel focused on a particular prospective customer who was considering both Rippling and Deel ("Prospect C").

○ O'Brien previewed the channel, which included details for a call scheduled with Prospect C the next day and communications in which Prospect C relayed to Rippling specific concerns with Deel's products and services. The channel also contained the Rippling sales team's internal pitch strategy discussion, including confidential details about how Rippling planned to highlight certain advantages of its products to address the prospect's pain points with Deel's offerings.

○ O'Brien downloaded to his mobile phone two communications from the Slack channel.

○ On February 20, 2025, the day of Rippling's scheduled call with Prospect C, O'Brien previewed the Prospect-C related channel 66 times.

○ Later that day, Prospect C abruptly canceled the scheduled call with Rippling, explaining that they had decided to select Deel for the product they were interested in, despite Rippling's optimized solutions in light of their prior-referenced pain points with Deel's offerings.

○ Through his cooperation, O'Brien has since confirmed that he stole Rippling's confidential strategy discussions regarding Prospect C and sent them to Alex Bouaziz.

● Customer A:

○ After Rippling filed its initial complaint in this action, Customer A reached out to Rippling and reported that in October 2024, shortly after moving of its employees from Deel's PEO services to Rippling, Customer A received an unsolicited email from Deel referencing "word on the street is that you are looking at signing with one of our competitors." Customer A reported feeling confused by the outreach at the time, but in the wake of Rippling's complaint

against Deel, expressed concern that their communications with Rippling appeared to have been stolen and distributed to Deel's staff:



86.    Given the extensive nature of Deel's espionage scheme, Rippling anticipates that it will identify countless more examples of Rippling customers and prospects preyed upon by Deel using Rippling's stolen intelligence.

### *Rippling's Competitive Intelligence Cards*

87.    Alex also instructed O'Brien to steal documents and information concerning Rippling's competitive sales strategy.  Operating in a highly competitive HR software-as-a-service field, Rippling has developed and maintains evolving competitive "battlecards" that it uses to train its salespeople on how to position and pitch Rippling products in relation to competitor offerings, by highlighting Rippling's advantages over other products or features ("Rippling's Competitive Intelligence Cards").  Rippling maintains Competitive Intelligence Cards for competitors in each of its product verticals, totaling over 80 such cards, including one for Deel.  Rippling has generated the Competitive Intelligence Cards through thousands of hours of work by Rippling analysts, deep-

diving call transcripts and notes with current and prospective customers describing favorable and unfavorable attributes of competitor offerings and then strategizing how best to highlight Rippling's solutions amidst that playing field. The resulting Competitive Intelligence Cards are depicted on slides steeped with data and talking points showcasing the advantages of Rippling's products over those of its competitors.

88.    In effect, these Competitive Intelligence Cards represent Rippling's playbook for competing against its peers. Deel's theft of Rippling's Competitive Intelligence Cards, particularly the card for Deel itself, weaponizes Deel to calibrate its marketing in a manner designed to eliminate or undercut Rippling's own selling points, and to tailor its corporate development and product strategy to close the gaps and pain points driving customers to choose Rippling over Deel. Deel's CEO Alex Bouaziz has expressed his appreciation of the value of these Rippling trade secrets. O'Brien has recounted that CEO Alex was unable to hide his enthusiasm, responding immediately with a heart emoji after O'Brien sent him a screen recording of each of the 31 pages of Rippling's Competitive Intelligence presentation deck capturing its competitive strategy against Deel.

### *Deel's Theft and Use of Rippling's Corporate Strategy Trade Secrets*

89.    From the very beginning of the scheme, Alex made his priority clear—he wanted O'Brien to provide him with details about Rippling's "ways of doing things" including corporate strategy and customer insights. During the course of the scheme, acting in response to near-daily instructions from Alex, O'Brien accessed such strategy and insights in at least 27 different Rippling Slack channels, more than 250 times. Rippling C-level and other senior executives use these channels. These channels range from providing leadership visibility into favorable and unfavorable customer experiences with Rippling products, to global expansion plans and products under development. For example, the Slack channel "gtm-france" is a dedicated channel among cross-functional stakeholders collaborating on strategy and efforts for Rippling's entry into France as a

payroll and global benefits provider; and the "data-growth-exec-updates" channel highlights new data-related product features.

| Channel name | Total count of events |
|---|---|
| exec-escalations | 54 |
| delighted-nps | 54 |
| proj-deel-remote-compete | 15 |
| imchurnupdates | 11 |
| proj-3p-payroll-custom-app | 11 |
| g2-positive-reviews | 10 |
| brokerpartner-bitwarden | 10 |
| test-escalations-catch-all | 10 |
| cmt-in-product-reviews | 9 |
| gtm-france | 7 |
| jpmc-ofac | 7 |
| highest-priority-customer-tasks-sla | 7 |
| client-top-quadrant-eor | 6 |
| incident-20241010-missed-internal | 6 |
| france-product-readiness | 6 |
| brokerpartner-fairmarkit | 6 |
| g2-negative-reviews | 6 |
| peo-wc-risk-review-updates | 5 |
| payments-exec-updates | 4 |
| data-growth-exec-updates | 4 |
| smart-pensions-build | 4 |
| customer-insights-stream | 3 |
| proj-win-back-the-base | 3 |
| proj-knowledge-base-research | 3 |
| platform-ai-layer | 3 |
| launches-hris | 3 |
| | **267** |

90.    In addition to Corporate Strategy Trade Secrets exfiltrated via Rippling's Slack instance, O'Brien's sworn affidavit and subsequent cooperation have confirmed that he also ran searches in Rippling's Google Drive file repository and Rippling's internal systems to identify confidential materials of interest to Bouaziz.

*Deel's Targeted Theft of Rippling's French Native Payroll Strategy*

91.    O'Brien recounted that Alex Bouaziz was particularly focused on Rippling's native payroll offering, and in particular, its native French payroll platform. After Rippling launched its native global payroll software platform in October 2022, Deel repeatedly and falsely advertised that Rippling did not have global payroll software because "it was impossible," or because, as Deel recently alleged in a legal filing, it would require "significant advances in quantum computing," a

1  claim so preposterous that Bloomberg columnist Matt Levine felt compelled to satirically

2  comment.[28]

3      92.     Whereas Deel's payroll solutions are either white-labeled tools offered in partnership

4  with various vendors, or payroll software which Deel obtained through acquisition of smaller payroll

5  providers, collectively presenting operational complexity to operate in tandem, Rippling's payroll

6  platforms in US, Canada, UK, Ireland, Australia, New Zealand, Singapore, and France (among

7  others) were custom built in-house by Rippling engineers and operate on a single underlying engine.

8  With this structure, Rippling's global native payroll solution digitally streamlines the complexity of

9  worldwide workforce payments, coordinating the administration of different tax regimes and

10  payment in different currencies which through Rippling are all achieved in a single pay run, with

11  taxes and net pay calculated in milliseconds.

12      93.     In contrast, Deel's payroll solution operates on separate underlying systems by

13  country. This patchwork system historically was not built by Deel—Deel purchased licenses to

14  third-party payroll systems, country by country. With this cobbled-together structure, the same tax

15  calculation achieved in milliseconds across multiple countries on Rippling's global payroll engine,

16  requires multiple days for Deel's payroll tool to calculate, as payroll operations teams load the data

17  into each third party payroll system to simulate the payroll run and then export the net pay amounts

18  and taxes back to Deel, on a country by country basis.  Not only is operating global payroll

19  materially less efficient on Deel's platform, Deel's patchwork architecture is a shaky foundation on

20  which to build user-facing products, because the capabilities of each of the systems are different,

21  requiring Deel to attempt makeshift integration by reducing the whole platform to align with the

22  "lowest common denominator" of all of the systems. In other words, a tool is only as good as its

23  _____

24  [28]  Matt Levine, Opinion, *Argentex Got Some Margin Calls*, Bloomberg: Money Stuff (Apr. 28,
    2025), https://www.bloomberg.com/opinion/newsletters/2025-04-28/argentex-got-some-margin-

25  calls.

weakest integrated system. This Achilles heel also inherently limits Deel's ability to build new features, without the ability to support those features in all underlying systems.

94. It was this key competitive advantage of Rippling over Deel (as between Rippling's self-built native global payroll program and Deel's third-party-acquired piecemeal solution) that Alex Bouaziz sought when directing O'Brien to steal details on Rippling's "way of doing things." O'Brien has confirmed that Bouaziz repeatedly asked him to steal and send recordings of Rippling's Slack channels related to payroll and tax operations, including regarding Rippling's French payroll product. These stolen details contain insights on exactly how Rippling was able to support former Deel customers on Rippling's native payroll engine, that Deel was unable to satisfactorily support themselves. Alex Bouaziz asked O'Brien to return to these Slack channels because of the value to Deel's CEO in seeing on-the-ground examples of the advantages of Rippling's architecture and approach, which are winning with customers.

95. Alex Bouaziz was particularly interested in Rippling's native French payroll solution, which was a notably challenging feat, given the intricacies of French payroll regulations. Bouaziz, recognizing O'Brien's extensive knowledge of Rippling's global payroll offerings by virtue of his then-role as Rippling's global payroll operations manager, peppered O'Brien with questions seeking insight on how Rippling's French payroll product was performing, including:

- What issues Rippling or its customers were experiencing with the French payroll product;

- Contact information for Rippling's French Payroll product leaders and French payroll operations specialists; and

- Rippling's reaction to Deel's acquisition of Safeguard Global, a company offering a native French payroll tool.

96. O'Brien has confirmed that he disclosed confidential insights on these topics to Deel's CEO, revealing:

- Screen recordings from Rippling's payroll and tax operations Slack channel revealing details of certain issues Rippling was working to resolve with its French payroll product;

- Names and contact information for key product and payroll operations talent;

- Internal discussions about Rippling's management of the Customer B account; and

- Feedback from Rippling's internal Slack discussion of competitor news commenting on Deel's announced acquisition of Safeguard Global.

97.     Deel's CEO made quick use of the stolen details of Rippling's French payroll program.  Bouaziz told O'Brien that Deel was focused on hiring French payroll specialists as a top priority.  Thus, on information and belief, he shared the product and payroll operations talent details with his COO, Dan Westgarth, who circumvented Deel's talent acquisition team to make direct contact with the potential candidates to inquire about their willingness to join Deel.   One of Rippling's payroll specialists described the strangeness of the encounter with Westgarth, referencing his role at Rippling without the individual mentioning that fact.  The Rippling payroll specialist also spoke with Deel's Chief Financial Officer for Europe, who discussed Deel's pending project to "create a native [French payroll] solution":

**Rippling payroll specialist**
To sum up :
- Dan mentioned that he knew I worked at Rippling, although I deliberately hid it from him at first.
- He then asked me who my manager was, which struck me as strange and inappropriate. Obviously, I refused to give this information.
- I also spoke to the CFO Europe, who is a French expert accountant and the founder's cousin. He informed me that he wanted to create a native solution and that this was already under development. He didn't try to test my technical expertise.

98.     Alex Bouaziz sought to steal confidential information about Rippling's strategy, and, in this particular example, he sought to learn how Rippling developed and maintained a successful native French payroll product, which had prompted one of Deel's former customers to switch to Rippling based on Rippling's superior product offering.  Capitalizing on the stolen knowledge that Rippling's native French payroll offering was earning Rippling a competitive advantage, Deel sought to regain ground, embarking on a marketing campaign through its largest investor to

1    emphasize the native payroll solutions Deel offered through acquisitions, not built internally, like

2    Rippling.[29]

3                    *Product Strategy Trade Secrets Stolen by Deel*

4        99.    O'Brien has confirmed that he stole Rippling's product roadmap and Global EOR

5    expansion roadmap and sent them to Alex Bouaziz, evoking instant excitement from Bouaziz, who

6    responded "beast!"[30]    These stolen roadmaps are among Rippling's most valuable internal assets,

7    reflecting the expertise and efforts of large swaths of employees working cross-functionally to

8    identify and operationalize the company's key strategic priorities and offerings.    For example, a

9    product roadmap from February 2025, which O'Brien sent to Alex Bouaziz, revealed feature sets

10    and go-to-market timing information for dozens of product initiatives that Rippling planned for its

11    2025 fiscal year.    Similarly, the Global EOR expansion roadmap[31] that O'Brien confessed he sent

12

13    [29]  Deel's largest investor, Andreessen Horowitz (also known as a16z), published a blog post titled,
     "Deconstructing Deel: How a Startup Became the OS for Global Work," praising several aspects of
14    Deel's business model, including Deel's use of acquisitions to acquire global native payroll
     offerings, lauding how "these acquisitions have paid off.    The acquisition of PayGroup in 2022 and
15    PaySpace in 2024, for example, enabled Deel to expand its owned infrastructure, including native
     payroll engines in more than 100 countries."    Anish Acharya & Justin Kahl, *Deconstructing Deel:*
16    *How a Startup Became the OS for Global Work*, a16z (March. 10, 2024),
     https://a16z.com/deconstructing-deel/. The day after Andreessen's complimentary blog post, on
17    March 11, 2025, Deel announced the acquisition of Safeguard Global's payroll division.

18    [30]  Rippling's product roadmap represents the culmination of strategic decisions developed over the
     course of a three-month planning process on what product developments Rippling plans to prioritize
19    for an upcoming quarter or year.    To develop the Product Roadmap, Rippling's Product team, in
     close partnership with Rippling's R&D, Engineering, Legal/Compliance, Security, Risk, and
20    Marketing, and Executive teams (up to and including Rippling's CEO), conduct a review of
     extensive data sets from across the company—from Sales, to Technical Account Management, to
21    Implementation, to Solutions Consultants, to Support, to Escalations—in a highly data-driven
     approach to determining customer wants and pain points.    Rippling's product roadmap plans are
22    also heavily influenced by Rippling's substantial R&D expenditures, far exceeding peer SaaS
     companies of its size and stage, to identify opportunities to further innovate and integrate workforce
     management software solutions.

23    [31]  The Global EOR Roadmap is the product of hours upon hours of intensive cross-functional work
24    across Rippling teams, including Rippling's Risk, Finance, Business Development, Compliance,
     and Legal departments.    The product of the tireless work of these teams is an exhaustive document
25    that has tremendous value.    Accordingly, the harm Rippling suffered from its theft is immense.

to Bouaziz at least three times, records comprehensive data on new geographic markets Rippling plans to enter, including launch date, scope of planned product offerings, and country-specific operational details.

100.     Deel's theft of these and other Corporate Strategy Trade Secrets simply repeated its tried-and-true unlawful growth strategy—why do it yourself, when you can steal it from your competitor?  Alex Bouaziz commandeered O'Brien to steal Rippling's key corporate, product, and global development plans.  And the theft of these prized internal assets has deprived Rippling of the value of its hard-fought efforts, instead diverting these efforts for Deel's own benefit.  Alex's reaction, "beast!", upon his receipt of this stolen information, makes clear that he fully understands the value of what he wrongfully obtained.  He knows that the roadmaps, plans and insights will spell out for Deel which product offerings Rippling believes are in highest demand among its customers, the approximate time and complexity they will take to design, build and launch, and how Rippling plans to position them to the market.  Armed with this information, Deel is competing with Rippling using Rippling's own proprietary trade secret information.

101.     As a noted tech investor recognized in *The Week Startups Podcast*, for software-as-a-service (SaaS) start-up companies like Rippling and Deel, getting your hands on a competitor's product roadmap is the most valuable discovery imaginable:

- Alex Wilhem (Journalist):  "Jason, in terms of the crown jewels, if you are a reporter, the crown jewels is getting someone's income statement, right?  But if you are a competing SaaS provider, this is what you want."

- Jason Calacanis (Seed Investor):   "The product roadmap [if stolen] is extremely damaging . . . .  Some of it might be obvious but it would give you the ability to front-run announcements and then it would give you the ability to say to investors or to your team or to your customers, in other words, your constituents, 'Look, we released these three features. Rippling is just a fast follower, they copy us.'  So you could really damage [Rippling CEO's reputation] and Rippling's reputation in this case by making them look like a fast-follower, when in fact, you are."[32]

---

[32]   Jason Calacanis & Alex Wilhem, This Week in Startups, *Spycraft in SaaS, Rabbit's Comeback, and Startup Pitch Madness* at 11:36–12:53 (Apr. 2, 2025), *available at*

102. Having illegally obtained Rippling's product roadmap, Deel instantly acquired for its own benefit, the value of Rippling's industry-leading R&D expenditures[33] and months of cross-functional efforts to analyze data points compiled from across the company identifying product pain points, gaps, and opportunity areas, along with anticipated time and resources needed to build and deploy a prioritized ranking of new features in a compliant, integrated and user-friendly manner. Similarly, armed with Rippling's Global EOR Roadmap, Deel (unlawfully) put itself in position to secure significant competitive advantages, including a chance to beat Rippling to certain markets; to lure away prospective customers by referencing countries not included in Rippling's roadmap or shortlisted for upcoming launches; and to flag differences in vendor strategy as part of competitive pitch efforts. None of this information would have been available to Deel but-for its spying scheme. The harm to Rippling by Deel's calculated theft of these most valuable corporate assets will likely continue for years to come, woven into all aspects of Deel's product, expansion, and sales strategy efforts like laundered money folded into purported legitimate businesses.

### *Rippling's Customer Retention Strategy Trade Secrets Stolen by Deel*

103. Another example of Rippling's "way of doing things" that Bouaziz focused his espionage scheme on is Rippling's carefully developed set of internal protocols for customer retention, focusing on implementation, support, and retention efforts used to oversee and support its existing customers. These strategies include:

- Rippling's implementation team specializes in tailoring and customizing Rippling's products to each customer's unique profile and needs;

- Rippling's account management and support teams retain a host of non-public customer data and a full dossier of customer communications to ensure continued satisfaction with Rippling's products and services, all retained and used to identify

---

https://www.youtube.com/watch?v=llqXieL5nMQ.

[33] *Rippling CFO Adam Swiecicki Discusses Leadership and Sustaining Growth on the Run the Numbers Podcast*, Rippling (Apr. 2, 2024), https://www.rippling.com/blog/cfo-adam-swiecicki-run-the-numbers.

potential customers who may be at risk of non-renewal (known as "churn risks"); and

- Rippling's complaints and escalation teams lead the resolution of any challenges a Rippling customer may experience.

Each of these workstreams are carried out through various Slack channels uniting the appropriate combination of Rippling teams to attend to customer needs using and reflecting an evolving set of internal playbooks and protocols that are continuously refreshed and optimized.

104.    O'Brien misappropriated for Deel's benefit details about Rippling's confidential customer retention strategies by viewing or downloading information about Rippling's existing customers on more than 600 occasions between November 2024 and March 2025, and targeting Slack channels related to customer experience and "churn" risks over 100 times.  Directed by near-daily instruction from Alex, these surgical efforts no doubt represent attempts to identify vulnerable customer information for Deel to exploit.  Example Slack channels from which O'Brien captured information for Deel include:

- **#smbrenewaldeck-test**:  a channel regarding existing Rippling customers approaching their renewal date.  O'Brien secretly previewed this channel 23 times between November 2024 and March 2024.  On March 4, 2025 in particular, O'Brien viewed the channel 8 times. On that day alone, the channel highlighted 10 customers approaching renewal.

- **#in-product-cross-sell**: a channel regarding existing customers who have expressed interest in additional Rippling products.  O'Brien accessed this channel 13 times.  On January 22, 2024, a day when O'Brien viewed the channel, it captured 14 different cross-sell opportunities.

- **#exec-escalations**:  a channel for Rippling discussion of customers whose issues have garnered visibility among Rippling's leadership, used to triage challenges and provide quick resolutions, with visibility and direction from the highest levels of the company.  O'Brien previewed this channel 65 times.

105.    In addition, O'Brien has admitted to providing Alex targeted customer lists from confidential reports to which he only had access by virtue of his global payroll compliance role.  Indeed, O'Brien's iCloud data has yielded forensic evidence of multiple wish lists of Rippling

customers that Alex identified by name and instructed O'Brien to target in Rippling's confidential records and platforms.

106. In the hands of a competitor like Deel, information about Rippling customers who are encountering challenges, and Rippling's proprietary resolution and retention strategies, are highly valuable and could be used to poach those customers and thwart Rippling's attempts to maintain customer loyalty. In total, Rippling has identified that O'Brien secretly accessed over 50 different Slack channels dedicated to specific Rippling customers, each chronicling Rippling's relationship maintenance and retention strategies. Again, Alex Bouaziz's targeting of this information via his spy was no accident. From the start of his spying scheme, Bouaziz instructed O'Brien to focus on gathering  Rippling's "customer insights" precisely for these reasons—to attempt to grow Deel's customer base by luring away Rippling's hard-earned customers through stolen trade secrets created at the hands of countless Rippling employees.

107. Rippling has already uncovered examples of Deel's use of these stolen Rippling assets to pursue Rippling's "churn risks." For example, on November 8, 2024, O'Brien stole and sent to Bouaziz information stolen from Rippling's Slack dedicated to discussions concerning a then-current Rippling customer based in San Francisco who was considering churning to Deel ("Customer B"). The stolen information included details about Rippling's pricing strategy and Customer B's internal deadline to decide between Rippling and Deel that Customer B had communicated to Rippling. But one day before that internal deadline, Customer B elected to churn to Deel.

### *Deel's Recruiting Campaign Born Out of Stolen Rippling Confidential Data*

108. In addition to misappropriating Corporate Strategy Trade Secrets and Rippling's Sales and Marketing Trade Secrets, O'Brien admitted that Alex induced him to misappropriate contact information for specialized and high-performing Rippling employees, allowing Deel to

exploit internal Rippling information for its own recruitment efforts.  Bouaziz's fixation on Rippling's key talent was another, poorly-disguised, strategy to misappropriate even further Rippling trade secrets and confidential information.

109.    Acting on Bouaziz's instructions, O'Brien stole contact information for high-performing Rippling employees from across the company, including members of his Global Payroll Operations team and Rippling's Product team.  Bouaziz and Westgarth immediately activated this information to begin aggressively soliciting the referenced Rippling personnel via LinkedIn and, when provided mobile phone numbers, WhatsApp.

110.    Indeed, between January 29 and February 17, 2025, at least 17 members of Rippling's Global Payroll Operations Team and at least 4 Global Product and Operations leads were solicited directly by Deel executives and at least ten reported receiving job offers.  Several team members reported that these offers were made without any substantive interview, and only after repeated, unsolicited contact from Deel's COO Dan Westgarth.  Some of these team members were contacted directly via WhatsApp, a messaging application that requires knowledge of a person's mobile phone number to send a message—and many of these numbers were provided by O'Brien at Alex's request.

111.    Westgarth personally cold-called nearly all members of Rippling's payroll operations team, bombarding them with messages on WhatsApp, LinkedIn and phone calls, referencing an awareness of their role at Rippling absent any publication of those details, and offering them specialized roles at Deel without conducting any formal or technical interview.  In one instance, Westgarth even went so far as to offer a role at Deel to a Rippling employee without anyone from Deel ever meeting the person, let alone interviewing them:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



*Outreach to a Single Rippling Employee on January 23 and January 27, 2025*

17

18    112.    Notably, former Deel employees have informed Rippling that it is widely-known at

19    Deel that Deel deliberately recruits talent from competitors with the expectation that they bring

20    confidential materials from their prior employers to Deel.  Indeed, a former Deel employee recalls

21    Westgarth, a key architect of Deel's poaching employees to steal competitor confidential

22    information pipeline, presenting a Rippling confidential sales strategy document internally at Deel.

23

24

25

*Deel's Use of Stolen Rippling Trade Secrets to Fuel Deel's PR & Communications Agenda*

113.    Deel also used its spy to exploit internal confidential Rippling information of value for Deel to further its own competitive, dishonest press strategy—but this effort backfired on Deel, and led to the exposure of its use of the spy.

114.    On February 18, 2025, an investigative reporter at *The Information* contacted Rippling about a forthcoming article concerning Deel's Russia-related sanctions activity, noting he had "been working on a story on Deel for the past few weeks" that "started as an exercise to look into the veracity of that lawsuit I previously reported on."  This reporter was referring to his January 9, 2025, article entitled "Deel Accused of Money Laundering, Sanctions Failures in Lawsuit," which reported on *Damian v. Deel Inc.*, No. 25-cv-20017 (S.D. Fla. Jan. 3, 2025).

115.    The reporter's email then asked Rippling to comment on a series of false assertions about Rippling's sanctions compliance program, with each assertion referencing an internal Rippling Slack message—13 messages in total—that supposedly supported or related to the assertion (the "Shared Slack Messages").  As Rippling explained to the reporter, these assertions were baseless—to be clear, Rippling has never transmitted a payment to a sanctioned country, individual, entity, or bank, including Russia.  In fact, Rippling responded to the reporter by providing the full context of each of the Shared Slack Messages, which demonstrated the falsity of the assertions levied in reliance on cherry-picked fragments intentionally offered to distort their true meaning.  But the fact that internal Rippling Slack messages (which are only available to Rippling employees) were in the possession of someone other than a Rippling employee caused Rippling to immediately open a security investigation.

116.    An analysis of the Shared Slack Messages revealed that these messages came from thirteen different channels in Rippling's Slack workspace, and that the messages all contained certain searchable keywords ("Russia," "Belarus," "Iran," "Syria," and/or "Sanctions").  By

reviewing Slack log files, Rippling's investigators identified a single Rippling employee account— O'Brien's—whose specific, targeted, and highly unusual search terms corresponded with the Shared Slack Messages.  Further, the timing of O'Brien's search activity aligned with the timing of the reporter's investigation.  Accordingly, Rippling's forensic analysis team identified O'Brien as the source of the Shared Slack Messages referenced in the reporter's February 18, 2025 email.

117.    O'Brien has since confirmed that Alex Bouaziz directed him to conduct these searches, and that (contrary to Deel's suggestions) he had no contact with the reporter Michael Roddan (a fact that Mr. Roddan has likewise confirmed in subsequent reporting[34]).  On information and belief, Alex did so to assist Deel's communications team, led by Elisabeth Diana, Deel's then-Vice President of Communications, in an effort to reframe an upcoming story about Deel's sanctions issues into one about a Deel-versus-Rippling rivalry.

118.    In fact, it was Deel's activation of O'Brien for communications-related purposes that allowed Rippling to make a clear and undeniable link between O'Brien and Deel while the scheme was still ongoing.

119.    The evening of March 3, 2025, Rippling's General Counsel sent a letter to three individuals:  (1) Philippe Bouaziz, Deel's Board Chair, Chief Financial Officer, General Counsel, and father of Deel's CEO; (2) Spiros Komis, Deel's Head of US Legal; and (3) an employment attorney at Deel's outside law firm.

120.    Rippling's letter included a screenshot of a Slack message from its Chief Revenue Officer Matt Plank, referencing a "#d-defectors" Slack channel along with three points, which were all believed to be true but redacted for dramatic effect.  The screenshot and reference to #d-defectors

---

[34]  Michael Roddan, *Inside the Nasty Feud Between Deel and Rippling That Became a Spy Drama*, The Information (Mar. 20, 2025), https://www.theinformation.com/articles/inside-nasty-feud-deel-rippling-became-spy-drama ("Until this week [*i.e.*, after Rippling filed its initial Complaint], I didn't know Keith O'Brien existed").

was intended to indicate to Deel that Rippling had a Slack channel for ex-Deel employees now employed by Rippling where they shared embarrassing information about Deel and that the channel contained information which would cause negative press attention if revealed.[35]  Rippling believed this would be extremely interesting to Deel:



121.    In truth, the renamed #d-defectors channel did not exist until March 3, 2025 (or early morning March 4, 2025, Irish Time (UTC)).  Rather than being a gathering place for ex-Deel

[35]  Rippling expected that this bait would be effective because it was grounded in truth:  Rippling had learned that while Deel had been canceling equity for former employees that subsequently joined Rippling, Deel would reverse course once those former employees sent legal letters explaining that Deel's actions violated applicable laws.

employees, the channel was set up as part of a ruse designed to confirm that Deel was instructing O'Brien to search for specific information in Rippling's Slack.

122.    Deel—through O'Brien—took the bait.  Within hours of Rippling sending the letter referencing the #d-defectors channel—again, a channel that existed only as bait for Deel, and one which O'Brien could not have known existed absent a connection between himself and Deel—O'Brien ran the following searches in Slack:

| 230 | 2025-03-04 | matt plank |
| 231 | 2025-03-04 | matt plank |
| 232 | 2025-03-04 | matt plank |
| 233 | 2025-03-04 | matt plank |
| 234 | 2025-03-04 | matt plank |
| 235 | 2025-03-04 | matt plank |
| 236 | 2025-03-04 | matt plank |
| 237 | 2025-03-04 | matt plank |
| 238 | 2025-03-04 | matt plank |
| 239 | 2025-03-04 | d defector |
| 240 | 2025-03-04 | d defector |
| 241 | 2025-03-04 | d defector |
| 242 | 2025-03-04 | d defector |
| 243 | 2025-03-04 | d defector |
| 244 | 2025-03-04 | defector |
| 245 | 2025-03-04 | defector |
| 246 | 2025-03-04 | defector |
| 247 | 2025-03-04 | defector |
| 248 | 2025-03-04 | defector |

123.    O'Brien also accessed the #d-defectors channel five times that same day.

124.    For avoidance of doubt, before March 3, 2025, O'Brien had never searched for the term "defector" in Slack.  Further, and crucially, at the time the letter was sent to Deel, no one at Rippling (apart from the investigations team) had ever viewed the (new) #d-defectors channel. Moreover, simply searching "deel" would not have directed O'Brien to the #d-defectors channel because (1) the #d-defectors channel name did not include the term "deel"; (2) the #d-defectors channel itself was empty; and (3) the message from Matt Plank screenshotted above was in a private channel, inaccessible to O'Brien and his searches.  In short, **_only if O'Brien was acting at the direction of Deel's leadership_** could O'Brien have known to run the searches above.

125.    O'Brien has since admitted that he ran these searches shortly after Alex Bouaziz requested that he do so.  Apparently realizing what he had done, shortly thereafter, Alex sent O'Brien panicked messages stating that if O'Brien had not yet run the searches, he should not do so, because Rippling's letter could be a "trap."  But it was too late.  Alex's reaction?  "oh shit."

> **#d-Defectors**
>
> 27.    At the end of February 2025, Alex told me to search Rippling's Slack system for the channel "#d-defectors."  I ran the search immediately and began to look at the results.  Within minutes, Alex messaged me again and told me not to run the search because he believed it was a "trap." I told Alex that by the time I got his message, I had already done the search and he said "oh shit."  I told him that the "#d-defectors" channel had Matt Plank, Rippling's Chief Revenue Officer, in the channel.  I told him I was frightened, but he just said, "don't worry."  Thereafter, he continued to press me to pass him information from Rippling.

126.    Nevertheless, Rippling's forensic investigation (and, eventually, O'Brien) confirm that even after they were caught in Rippling's honeypot, Alex, through O'Brien, continued mining Rippling's Slack channels for Rippling's trade secrets.

127.    As Rippling has confirmed through layers of corroborating evidence, including forensic data, the spy's sworn confession, WhatsApp chat logs, wire transfer payment records, and a well-laid honeypot—Deel's CEO and several key executives planned, directed, and executed the corporate espionage scheme detailed above.  And they did so for an obvious and simple reason: Rippling's information was extremely valuable to Deel and the Bouaziz Racketeering Enterprise.  It not only saved Deel a significant amount of time and money, but also gave Deel an unlawful head start in launching or developing competing products.  Indeed, the fruits of Deel's theft and exploitation of Rippling's trade secrets were embedded throughout the Deel organization.  From corporate strategy to sales and marketing to HR and recruiting to communications and PR, nearly

every aspect of Deel's business has benefitted from information stolen from Rippling, and where Deel benefitted, so did Alex and Philippe personally via their investment vehicles

128.    While the full impact of Deel's theft of Rippling's trade secrets is not yet known (or known to Rippling, which continues to investigate the harms caused), the record is already alarming. In fact, on March 10, 2025—as Rippling was in the process of preparing to confront O'Brien—Deel's largest outside investor, a16z, published a blog post entitled "Deconstructing Deel: How a Startup Became the OS for Global Work."[36]  The content of the blog—compiled from extensive interviews with Deel's C-Suite and product leadership—indicates that Deel has already begun integrating aspects of Rippling's Corporate Strategy Trade Secrets into its organization, as the post outlines future strategies Deel intends to pursue that mirror those in the documents containing Rippling Corporate Strategy Trade Secrets stolen by O'Brien.

129.    Due to the staggering scope of the corporate espionage scheme here—involving stolen product roadmaps, competitive battlecards and over 6,000 queries through Rippling's Slack channels, where any particular search may return dozens or even hundreds of distinct customer or prospect opportunities—the commercial harm Rippling has already experienced is likely to persist for many months or even years to come.

## III.    ONCE DEEL'S SPY IS CAUGHT, DEEL ATTEMPTS AN ELABORATE COVER UP, OBSTRUCTION OF JUSTICE, AND DEFLECTION CAMPAIGN

### The Cover Up: Destroy, Delete, Deflect

130.    After the successful honeypot operation, Rippling prepared to confront O'Brien about his activities.  Due to O'Brien's efforts to conceal his conduct, Rippling feared that any such confrontation would result in the destruction of key evidence.  Accordingly, on March 12, 2025,

---

[36]  *See Deconstructing Deel: How a Startup Became the OS for Global Work*, a16z (Mar. 10, 2025), https://a16z.com/deconstructing-deel/.

1    Rippling diligently sought and obtained an emergency form of relief—an order from the High Court

2    in Ireland authorizing the seizure and preservation of O'Brien's devices, with penal endorsement.

3        131.    However, when the court-appointed independent solicitor served him with the court

4    order at Rippling's Dublin office on March 14, 2025, O'Brien lied about his phone's whereabouts,

5    hid in the bathroom to delete evidence, and then fled the scene, stating "I'm willing to take that risk"

6    in response to warnings about the likelihood of jail time for violating the order.

7        132.    Immediately after fleeing, O'Brien contacted Deel CEO Alex Bouaziz, messaging

8    him on LinkedIn with a simple "hey."  Alex soon thereafter called O'Brien via WhatsApp.

> 30.    I walked around for a while, and then logged onto LinkedIn on my phone browser and messaged
> Alex, "hey."  He then called me from a Romanian phone number and not his usual +33 number.
> I am not sure whether the call came through his phone or WhatsApp.  I know that it came from
> a Romanian number, as the call came up with the international prefix which was identified as
> "ROM".  The call came within three to five minutes of me sending the message.  I know that it
> was Alex, as I had pinged him via LinkedIn and I recognised his voice. I told him what happened.
> I told him I got served with a High Court order and that I was in serious trouble.  I told him that
> Rippling was saying I had taken their data.  He said everything was going to be okay and that
> someone would get in touch straight away.  Afterwards, he messaged me on LinkedIn saying
> something like, "hey Keith, thanks for the chat, make sure you apply for that job."  I believe Alex
> sent this message as a cover, to make it look like our conversation had been about a job
> application rather than their scheme to steal Rippling's information.

19        133.    Following their call, O'Brien was then contacted by an individual identifying himself

20    only as "David."  O'Brien later recognized this voice as belonging to Defendant Andrea David

21    Mieli, Deel's Global Senior Director of Legal.  Mieli advised O'Brien to reach back out on a new

22    Telegram ID, which O'Brien understood to mean that he should procure a new "burner" phone.

23    Once O'Brien reached out to Mieli on a "burner" phone, Mieli created a Telegram chat and added

a third person:  Defendant Asif Malik, one of Deel's senior in-house attorneys.  Deel's lawyers told

O'Brien to "stick to the programme" of misrepresentation, evidence destruction, and evasion.

> 32. I tried to talk to David, but he interjected and told me to call him back via Telegram.  He said not to install Telegram again on my old phone, but to go get a "new Telegram number".  I understood this meant I should buy a new phone (a burner phone) and install Telegram on the new phone. David also gave me a number to call him back on from my new telegram account. I did what he told me to do.  Once I had Telegram again, I got into contact with "David," and he added Asif Malik, one of Deel's senior in-house lawyers to a three-way chat.  We had a few phone calls that day.  Asif, Deel's in-house lawyer, said he was speaking in a "personal capacity" and that Rippling "have nothing."  They suggested flying my family and me to Dubai that night, saying "we all need a holiday."  I understood they were suggesting that my family and I flee Ireland permanently and that Deel would put me up in Dubai.  They kept saying that Rippling was being very aggressive and improper, and that they didn't have anything on me.  They said I should "tell them nothing" and that I should "stick with the programme," meaning I should lie and keep quiet.  Deel's lawyer Asif said, "don't worry, PSG is going to sort all this out."  I understood him to be referring to Alex when he said "PSG" because Alex and I frequently talked about football (soccer) and PSG was Alex's team.

134.    From March 15, 2025 to March 25, 2025, O'Brien spoke with Malik **every day**.

Mieli also contacted O'Brien, to offer "reassurance and general comfort."  Malik assured O'Brien

that "[t]he guys at the top have your back[.]"  O'Brien understood this to mean that Alex and

Philippe Bouaziz would take care of O'Brien if he refused to "cooperate against Deel."  Malik

reiterated that Deel would move O'Brien and his family to Dubai and would "figure out a

mechanism to cover [O'Brien's] legal costs," presumably associated with the Irish proceedings

against O'Brien and any subsequent legal proceedings initiated by Rippling as a result of Deel's

spying scheme.  O'Brien understood the "mechanism" through which Deel would "cover" his "legal

costs" was that O'Brien would become a consultant for Deel and that the consulting business would

be very successful once he was back up and running.  Malik and Mieli made overtures to O'Brien

that if he "kept quiet and stuck with the plan," Deel would ensure he was "legally protected" and "financially rewarded."

135.    On March 15, Malik instructed O'Brien to destroy his old phone (the one used to facilitate Deel's spy scheme), by "breaking it up and throwing it in the [Dublin] canal." That same day, Malik requested to see the High Court order requiring O'Brien to turn over his devices, and O'Brien obliged, sending the order to Malik over Telegram.

136.    The following day, March 16, O'Brien heeded Malik's instruction and destroyed his phone with an axe before throwing the remains down the drain of his mother-in-law's house. The same day, O'Brien spoke with Malik, expressing concerns about what he had done and guilt for his wrongful actions. Suddenly feigning ignorance, Malik purported to not "know" what O'Brien had done, expressed that he did not want to know what O'Brien had done, and represented that he was speaking to O'Brien only in his "personal capacity," perhaps understanding that (at best) he was unknowingly participating in a cover-up and at worst knowingly engaging in the same.

137.    On the evening of March 16, Malik spoke with O'Brien's wife for approximately 45 minutes to an hour, reassuring her and purportedly "corroborating" the story Deel had fabricated for O'Brien.

138.    On March 17, Rippling filed its initial Complaint, and it became publicly known that Rippling alleged that Deel had cultivated a spy (O'Brien) to steal its confidential information and trade secrets. Deel immediately issued a statement that attempted to "shift the narrative" that Rippling was attempting to deflect after being accused of transmitting sanctioned Russian payments (in reality, Rippling had not been so accused, and has never transmitted a sanctioned payment). Meanwhile, Deel's in-house lawyers conditioned Deel's continued support of O'Brien on him making false statements that "Rippling facilitated sanctioned 'Russian payments'" which Deel hoped would "shift [] the narrative" and make their media statements valid after-the-fact. Deel's

conditions required O'Brien to make these types of statements to the Central Bank of Ireland, the High Court, and even Deel's own Irish counsel.

139.    Indeed, on March 18, at Malik's instruction, O'Brien made a false report to the Central Bank of Ireland about Rippling's purported "Russian payments."  O'Brien has since admitted that he knew these allegations and statements were false.  In fact, O'Brien never made any type of "whistleblower" complaint before he was caught spying for Deel, nor does he have any knowledge of any sanctions-violating payments made by Rippling.  Rather, *he made these false statements solely at Deel's express instruction, in support of Deel's effort to cover up their illicit spying campaign*.

140.    The next day, on March 19, O'Brien was due in court in Ireland to explain his non-compliance with the court order, and at Deel's instruction (through Malik), O'Brien falsely stated in the Irish court proceedings (though not under oath) that he believed the matter had to do with "Russian payments."  O'Brien later admitted—under oath—that he did not believe those statements when he made them, but rather had made the statements at Deel's "encourage[ment]."

141.    The judge in O'Brien's Irish case, Justice Sanfey, explained to O'Brien that he had been provided a copy of the order and that its stated purpose was to preserve his phone.  He then asked if O'Brien was prepared to turn his phone over.  In response, O'Brien admitted that he had "destroyed" his phone, which prompted Justice Sanfey to note, "*I think that Mr. O'Brien is in a very serious situation*" and deliver the following stern warning to O'Brien:

> *I think you do need to face up to the situation.*
>
> *And I think you need legal advice in doing that. But, as of now, it has certainly appeared to me that you have breached the Orders of this Court and, as such, there is at least the possibility that you are in contempt of court. And I don't want to say any more than that until you get a chance to consider your position - hopefully in conjunction with lawyers. [...]*
>
> *Now you're not going to be able to bring [the] phone back if you have destroyed it. But it is up to you to undo the damage that you have done by breaching the Court Order, and the*

1

2

*attitude of this Court will be influenced by the degree to which you undertake actions which will have the effect of remedying the breach of the Court Order. [...]*

*I am trying to speak very carefully but I hope you understand me, Mr. O'Brien?*

142.    Caught red handed, Deel CEO Alex and COO Dan worked to erase all digital traces of contact with O'Brien.  On March 20, O'Brien noticed that Alex (the "+33" number below) had renamed the three-way WhatsApp group chat between himself, O'Brien, and Defendant Westgarth from "Keith <> Dan" to "V" and left the group.  Three days later, on March 23, Defendant Westgarth left the group chat.

  

143.    On March 21, Malik told O'Brien that Deel's Irish solicitors would be emailing him at his Global Payroll Geeks address, as it had to be at an email address known to Deel.  As a result, between 10 and 11am UTC, O'Brien called and messaged one of his Global Payroll Geeks cofounders, frantically seeking to regain access to this email account:

144.    Like clockwork, later that afternoon at 3:11pm UTC, Deel's now-former Irish counsel, A&L Goodbody, sent an email to Rippling's Irish solicitors, Matheson, and, shockingly, copied O'Brien's Global Payroll Geeks email.

145.    At the time, Rippling wondered why Deel's Irish counsel was corresponding with Rippling's employee, the alleged spy, and could discern no legitimate basis.  Rippling now knows that this was part of Deel's larger ploy to use its Irish solicitors A&L Goodbody in furtherance of this scheme to "make contact" with O'Brien in a way that *appeared* legitimate.  Malik told O'Brien to use this email thread to tell A&L Goodbody that he was a whistleblower and being harassed by Rippling and needed help.  At Malik's instruction and drafting assistance, O'Brien responded to the March 21 A&L Goodbody email, removing Rippling's counsel and telling A&L Goodbody that he was being harassed by Rippling for reporting supposed "illegal Russian payments."  Yet again, O'Brien later admitted under oath that he knew the information contained in his response email was false.  In response, A&L Goodbody (as instructed by Deel) recommended Irish law firms that O'Brien could contact, including Fenecas Law.

146.    Around March 22, O'Brien noticed that his Deel contacts on Telegram (Malik and Mieli) had "hid" their contact identities from him—a Telegram feature that enables the hidden user to contact the other person.  The result was Malik and Mieli could contact O'Brien, but he had no way of contacting them once the messages disappeared from their chats.

147.    These developments began to take their toll on O'Brien.  He had a call with Malik, expressing in a heated fashion his frustration with the situation, and in a show of good faith, Malik turned his Telegram ID ("SPDLW") back on, and O'Brien wrote it down.



148.    Increasingly feeling abandoned by Deel, on March 25, O'Brien contacted and retained a law firm (Fenecas Law) that Deel itself had recommended to O'Brien. The same day, O'Brien spoke with Malik and told him about his new Irish counsel. Malik instructed O'Brien to "stick to the programme" and warned O'Brien that he should "look after [himself] and [his] family." That was the last time O'Brien spoke to Malik. That evening, O'Brien told his Irish counsel about Deel's spy scheme. O'Brien then decided to meet with the independent solicitor the next day (March 26, 2025) and attempt to comply with the High Court Order.

149.    The next day, March 26, O'Brien—with his own Irish counsel, Fenecas, at his side—met first with the court-designated independent solicitor and then with Rippling's Irish counsel. O'Brien provided his personal devices to the independent solicitor for imaging, and decided to come clean. In a last-ditch effort to protect their scheme, Malik contacted O'Brien's wife *during this meeting in which O'Brien was beginning to come clean*. She advised him that she was not able to speak.

150.    O'Brien was due back in court on March 31 to face Justice Sanfey. In the two hours leading up to this court hearing, Malik, who was not aware that O'Brien had confessed, attempted to contact O'Brien twice by way of his burner phone. By this point, O'Brien's burner phone was in the possession of and being actively monitored by an independent forensic investigator. The forensic investigator recorded the two calls from Malik to O'Brien's burner phone at the time they occurred:

FIRST AMENDED COMPLAINT



151.    Malik's Telegram ID was still on, which meant that his Telegram ID could also be linked to his mobile phone, if known:




152.    Malik then took the intentional step of manually deleting the electronic record of both calls by midday—even though, consistent with Deel's pattern of erasing records, the calls were already set to delete after 24 hours.  Malik's act of manual deletion was also observed and recorded by the forensic investigator.

153.    O'Brien ultimately decided to come clean because he knew what he was doing "was wrong" and he was "getting sick concealing this lie."[37]  Ultimately, O'Brien came to the conclusion that he was "***harming myself and my family to protect Deel***."

---

[37] For Deel, every accusation is a confession.  To set the record straight, below are three such false accusations (or confessions in disguise) recently advanced by or on behalf of Deel and likely at the behest of the Bouaziz Racketeering Enterprise:

(1) Deel's lawyers and spokespersons falsely claim that the spy Keith O'Brien confessed "under extreme duress," when in reality, the only duress O'Brien described was manufactured by operatives of the Bouaziz Racketeering Enterprise.  To be clear, O'Brien voluntarily came forward to confess while represented by his own legal counsel—counsel who had, notably, been recommended to him by Deel's then-Irish solicitors A&L Goodbody.  As shown herein, the fact that O'Brien (then a Rippling employee) was in communication with Deel's outside counsel (who have since severed ties with Deel) is itself indicative of foul play.

(2) Deel has also falsely asserted to the media that the spy remains on Rippling's payroll.  That too is untrue.  In fact, it was senior legal counsel associated with the Enterprise who attempted to secure the spy's continued loyalty through promises of future payment. By contrast, O'Brien's cooperation with Rippling has been formally documented in a Cooperation Agreement entered into on March 27, 2025, and has been transparently disclosed to the High Court of Ireland. Specifically, Rippling provided the High Court with a copy of the agreement and publicly described the agreement as one "whereby Mr. O'Brien agreed to cooperate with the Plaintiffs [Rippling] in any litigation worldwide in connection with the wrongdoing . . . . Under that agreement, Plaintiffs agreed to contribute toward O'Brien's costs of these proceedings and to pay his reasonable out of pocket and legal expenses in connection with the cooperation to be provided under that agreement."

(3) Deel has now resorted to baseless straw-grasping—announcing claims to great fanfare with no supporting evidence and under the protection of "litigation privilege" via a sham Delaware complaint that was not even served on Rippling.  Only after getting widespread media coverage of these allegations—including allegations that Rippling had a spy within a Deel board meeting, an accusation that appears to stem from Deel Board member Anish Archaya's steadfast approval of the Bouaziz Racketeering Enterprise—did Deel silently drop its most salacious baseless allegations (such as the allegation of a boardroom spy) in an amended filing a few weeks later.  *See* Cory Weinberg and  Michael Roddan, *Andreessen Horowitz Comes to Deel's Defense in Spy Battle*, The Information (Apr. 26, 2025), https://www.theinformation.com/articles/andreessen-horowitz-comes-deels-defense-spy-battle.

> 50.    I decided to cooperate after I got a text from a friend on March 25, 2025 saying, "the truth will set you free." I was also driving with a family member to meet my solicitors and she told me that if I had done something wrong that I should "just tell the truth." I was having bad thoughts at the time; it was a horrible time for me. I was getting sick concealing this lie. I realised that I was harming myself and my family to protect Deel. I was concerned, and I am still concerned, about how wealthy and powerful Alex and Philippe are, but I know that what I was doing was wrong. After I spoke with my solicitors at Fenecas Law, I started to feel a sense of relief. I want to do what I can to start making amends and righting these wrongs.

154.    Deel and its officers' reactions to Rippling's complaint leave no doubt about their guilt, bad faith, and disregard for the law.  Rather than acknowledge the mounting body of forensic evidence, sworn testimony, and corroborating documentation, Alex Bouaziz and his associates have instead engaged in an extensive cover-up effort—one marked by evasion, distraction, and reputational sabotage.

155.    For example, once it became clear that Malik's role in the scheme would be exposed, he fled to Dubai—the very place he had proposed relocating O'Brien.[38]  Around the same time, Alex and Philippe Bouaziz turned up in Dubai.  Though Deel publicly claimed Alex was there to celebrate Passover, Deel has been evasive about even the country of their primary residence.  Both his and Philippe's whereabouts remain unknown as of the filing of this First Amended Complaint.  Meanwhile, Andrea David Mieli, another co-conspirator, appears to have similarly gone to ground and is presently unreachable.

156.    These are not the actions of an organization or individuals acting in good faith and who have behaved lawfully and have nothing to hide.

---

[38]  Charles Rollet, *Deel's CEO is now in Dubai, complicating Rippling's lawsuit*, TechCrunch (Apr. 15, 2025), https://techcrunch.com/2025/04/15/deels-ceo-is-now-in-dubai-complicating-ripplings-lawsuit/

**The Cover Up (Part 2): Business as Usual—Buy Loyalty, Gaslight, and Flood the Zone**

157.    Unchastened, Deel has gone on with business as usual: obfuscating, distracting, and otherwise flooding the zone.  First, Deel told to the media that Rippling's initial complaint was retribution for "accusations about Russian payments"—even as it was coercing its spy to submit false, after-in-time false complaints to the Central Bank of Ireland, court officials, and legal professionals.

158.    Then, as Deel affiliates caught wind that Rippling was in the midst of a long-planned financing round, they sought, through one of Deel's high-profile investors, to sabotage Rippling's Series G financing round.  Around April 23, 2025, just two days before the financing was scheduled to close, a "tier 1" investor "in a position to know [about Deel's planned response to Rippling's complaint]," contacted a "very senior" partner at Rippling's Series G investor.  That person claimed Deel would soon be "hitting back" with "material information" against Rippling in this litigation and urged the investor to delay until Deel's response came out, which effectively stalled the financing.  Days later, despite an obligation to file counterclaims in this California litigation, Deel and its counsel filed a plainly frivolous complaint in Delaware (not California) on April 25, 2025.  That filing conspicuously attempts to avoid California by asserting, implausibly, that California is not its headquarters (despite being the address listed on all corporate records, its Terms of Services, its Privacy Policy, and now as of last month, its Whistleblowing Policy).  The Delaware action appears to serve no legitimate purpose other than to manufacture the appearance of "litigation privilege" as a pretext to inject knowingly false and disparaging allegations about Rippling and its CEO into the public domain, which Deel did with great fanfare.  After garnering widespread media coverage, Deel silently dropped its most salacious allegations in an Amended Complaint a few weeks later. Perhaps most tellingly, neither of Deel's Delaware complaints nor its related filings denied the core of Rippling's allegations:  that Alex Bouaziz personally recruited and directed

O'Brien to steal Rippling's most sensitive trade secrets, to be used for Deel's benefit and to Rippling's detriment.

159.    And now, Deel continues as if nothing is amiss.  After two months of silence, Alex Bouaziz is back on LinkedIn and X.com (formerly Twitter), touting PSG results to "flood the zone." Meanwhile, Deel has purchased full-page ads in Irish media and the Dublin airport, seemingly operating under the belief that "no press is bad press," and that reputational damage is just another expense to pay off.  And despite evidence sufficient to obtain an emergency order with the High Court of Ireland and a sworn affidavit from the spy, Deel's Board—which includes Bouaziz himself and is chaired by his father, Philippe Bouaziz—has reportedly turned a blind eye, with a revolving door of resigning lawyers and communications experts, but no apparent steps to investigate. Instead, in April 2025, Deel suddenly announced the hiring of a new General Counsel and a new Chief Compliance Officer, who reports directly to the same Board comprised of the very individuals implicated in the misconduct. Ironically, as of April 2025, the new CCO's LinkedIn profile states: "I also serve as a strategic advisor to the CEO and General Counsel, helping drive a culture of compliance and ethical business practices."[39]  It remains unclear how such an arrangement—where those responsible for the misconduct run the Board—is supposed to restore integrity or accountability.  As Fintech Biz Weekly writer Jason Mikula wryly noted:  "Godspeed, sir.[40]

IV.    SINCE THE COMPLAINT WAS FILED, RIPPLING HAS LEARNED ABOUT ADDITIONAL VICTIMS OF THE BOUAZIZ RACKETEERING ENTERPRISE

160.    In the days and weeks following the filing of Rippling's complaint on March 17, 2025, it became increasingly clear that Rippling was not Deel's only victim.  Deel's misconduct is

---

[39]    Anthony Luis Rodriguez, LinkedIn, https://www.linkedin.com/in/arod052971/ (last accessed June 4, 2025).

[40]    Jason Mikula (@mikulaja), X (May 1, 2025, 3:38PM), http://x.com/mikulaja/status/1918072551055802824.

1   not limited to a single scheme, a single rogue employee, or even a single target.  Rather, the pattern

2   that has emerged reflects a coordinated and deeply embedded business strategy—one that prioritizes

3   aggressive, unlawful tactics over fair competition.

4       161.    Trade secret theft and industrial espionage are not outliers in Deel's approach—they

5   are, by all accounts, features of its operating model.  Indeed, Deel's own C-level executives appear

6   desensitized to the seriousness of this conduct, with reports of Philippe Bouaziz openly bragging

7   about maintaining "spies at other companies."[41]

8       162.    As uncovered in Rippling's ongoing investigation, Deel whistleblowers report that

9   Deel leadership routinely encouraged new hires to bring confidential and proprietary materials from

10   prior employers for Deel's benefit.  This practice was so prevalent, in fact, that it was common

11   knowledge that the employees that Deel hired from competitors shared information and sales

12   documents that those employees took from their prior employers.  At company-wide "all-hands"

13   meetings, Deel executives reportedly announced new hires from competitors and referenced the

14   sensitive documents and intelligence they provided—treating stolen information as a form of

15   celebrated internal achievement.  Given these practices, Deel's competitors have reported seeing

16   Deel in possession of, and using, their confidential internal documents, including by contacting then-

17   current Deel customers moments after Deel's competitors reached out—just like in Rippling's case.

18   Competitors also reported that Deel's leadership had information about the competitors' customers,

19   including specific information about issues those customers had with the competitors' products, and

20   that they had seen Deel attempting to poach employees *en masse* using confidential information that

21   it acquired from the competitors' current and former employees.

22

23

24   [41]  Michael Roddan and Cory Weinberg, *How Deel's Combative Father-Son Duo Sparked a Spy Scandal*, The Information (Apr. 4, 2025), https://www.theinformation.com/articles/deels-combative-father-son-duo-sparked-spy-scandal.

25

163.    It is little surprise, then, that since this case was filed, several parties—including major EOR competitors, a startup accelerator, and even a seemingly unrelated third party (a competitor of a Deel partner)—have uncovered eerily similar conduct by Deel or its associates to obtain their confidential information and trade secrets.[42]  For example:

164.    ***Toku (Victim-2)***.  A crypto currency-based payroll and equity management platform, Toku, uncovered evidence that one of Deel's partners (LiquiFi), with Deel's knowledge and active support, encouragement, and involvement, hired Toku's former general counsel Benjamin Snipes knowing that he misappropriated Toku's trade secrets, and then proceeded to disseminate and use those trade secrets across the LiquiFi/Deel enterprise to compete with Toku.

165.    Toku already had an open lawsuit against LiquiFi from December 2024 to enforce its rights, and on information and belief, Toku connected the dots that Deel was likely involved after the filing of this action.  Indeed, last month, Toku revealed in public legal filings that it had uncovered evidence that Alex Bouaziz wanted to "crush Toku" and would ask why Toku was "not out of the picture."  His malicious targeting of Toku went so far that he "want[ed] to kill Toku more than see lots of revenue."  In aid of that effort, LiquiFi hired Toku's former general counsel, telling Alex Bouaziz and the Deel executive team that because Toku's "General Counsel is now [LiquiFi's] General Counsel," it "ha[d] every insight into how to kill" Toku, as Alex Bouaziz had demanded. Shortly afterwards, and despite being unable to do so for months, LiquiFi and Deel then rolled out an integrated, working product that mirrored Toku's, reaping the ill-gotten benefits of yet another unlawful raid against a competitor.

166.    ***Victim-3***.  Shortly after Rippling's initial Complaint, Victim-3, a start-up accelerator, informed Rippling that Deel had stolen the start-up accelerator's "CRM" (*i.e.*, its trade secret

---

[42] Evidence substantiating the below will be brought forward once formal subpoenas are issued in this matter.

1    customer database, containing confidential and valuable nonpublic information about customers

2    compiled by Victim-3, the value of which laid in its secret and nonpublic nature).  This start-up

3    accelerator had entered into an exclusivity arrangement with Deel, where, under the arrangement,

4    Deel contractually bound the start-up accelerator to require its start-up customers to partner with

5    Deel to manage their contractor payroll needs.  During the course of the partnership, across 2022

6    and 2023, Deel poached two employees to join Deel, and soon after their departures, this start-up

7    accelerator learned that these two employees had each stolen the accelerator's CRM and brought it

8    to Deel to support their efforts to drive business development at Deel, working in close partnership

9    with Alex and Philippe Bouaziz.  When this start-up accelerator confronted its former employees

10   about the theft, the former employees both cited generous compensation offers from Deel, nearly

11   tripling their prior salaries, in order to bring the accelerator's confidential start-up partnership and

12   CRM data to Deel.  When this start-up accelerator confronted Deel, Deel challenged the accelerator

13   to try to sue to enforce its rights, referencing that Deel had a large legal budget and would vigorously

14   oppose any legal claims about the incident.

15        167.   ***Victim 4+, other major EOR competitor(s)***.  Underscoring the Bouaziz Racketeering

16   Enterprise's broader fixation beyond Rippling, forensic analysis revealed that the enterprise's spy

17   had searched Rippling's Slack to find confidential information targeting 9 Deel separate competitors

18   over 300 times, including "Papaya," "Velocity Global," "Remote," "G-P" (Globalization Partners),

19   "Omnipresent," "Oyster," "Boundless," "Payzaar," and "Remofirst."  In fact, searches for one

20   competitor, "Oyster," represented approximately half of O'Brien's Slack searches (150 in total) in

21   the months following the spy's recruitment by Alex Bouaziz.

22        168.   Unsurprisingly, other EOR competitors have uncovered unsavory activity at the

23   hands of Deel.  Indeed, following the release of O'Brien's sworn affidavit, the CEO of Papaya,

24

25

another one of Deel's major EOR competitors, publicly stated that "this is not a one-off incident"[43] and that Alex Bouaziz had "ask[ed] the family member of a Papaya co-founder to pass on information about" Papaya.[44]

169.    In short, given the lawlessness of Bouaziz Racketeering Enterprise and its approach to "business" from its C-Suite, Rippling is not left with any doubt that its misconduct is currently ongoing and will continue until its corrupt enterprise is dismantled.

**CLAIMS FOR RELIEF**
**FIRST CAUSE OF ACTION**

**(Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c))**
(Against Defendants Deel, Alex Bouaziz, and Philippe Bouaziz)

170.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 169 of this First Amended Complaint.

171.    From at least early 2022 and continuing up to and including the date of the filing of this First Amended Complaint, in the Northern District of California, and elsewhere, defendants Deel, Alex, Philippe, Westgarth,  and others known and unknown, including but not limited to Alba Basha, Malik, Mieli, O'Brien, LiquiFi, Snipes, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, Conspirator-5, and Does 1–100, constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4); that is, a group of business entities and individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce (previously defined as the "Bouaziz Racketeering Enterprise").

---

[43]  Eynat Guez (@EynatGuez), X (Apr. 2, 2025, 8:32AM), https://x.com/EynatGuez/status/1907456212045590567.

[44]  Michael Roddan and Cory Weinberg, *How Deel's Combative Father-Son Duo Sparked a Spy Scandal*, The Information (Apr. 4, 2025), https://www.theinformation.com/articles/deels-combative-father-son-duo-sparked-spy-scandal.

172.    The Bouaziz Racketeering Enterprise functioned as a continuing unit with discrete participants sharing the same goal through unlawful means of developing competing products, generating profits, and soliciting customers for Deel using Rippling's stolen Corporate Strategy Trade Secrets, Sales and Marketing Trade Secrets, and confidential business information.

173.    On information and belief, Alex Bouaziz and Philippe Bouaziz acted as the ringleaders of the Bouaziz Racketeering Enterprise, with Deel, Westgarth, O'Brien, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, Conspirator-5, Basha, Malik, Mieli, LiquiFi, and Does 1–100 providing assistance.  These members of the Bouaziz Racketeering Enterprise communicated via electronic mail and/or other electronic means in furtherance of their common scheme.  The Bouaziz Racketeering Enterprise continues today.

174.    From at least early 2022 and continuing up to and including the date of the filing of this First Amended Complaint, in the Northern District of California, and elsewhere, defendants Deel, Alex Bouaziz, and Philippe Bouaziz, being persons employed by and associated with the Bouaziz Racketeering Enterprise described above, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Bouaziz Racketeering Enterprise, which engaged in, and the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity consisting of multiple acts of racketeering indictable under 18 U.S.C. §§ 1343, 1346 and 1349 (wire fraud and conspiracy to commit the same), 18 U.S.C. § 1803(a) (obstruction of justice),  and 18 U.S.C. § 1832 (theft of trade secrets), in violation of 18 U.S.C. § 1962.

175.    Defendants Deel, Alex Bouaziz, and Philippe Bouaziz participated in the affairs of the Bouaziz Racketeering Enterprise by engaging in acts of wire fraud and conspiracy to commit wire fraud, to further the Bouaziz Racketeering Enterprise's objectives.  Specifically, in multiple instances, Deel, Alex Bouaziz, and Philippe Bouaziz conspired to defraud and defrauded Rippling

and other Deel competitors by working with employees of Deel's competitors, including O'Brien, to fraudulently misappropriate those competitors' confidential business information, using wires in interstate and foreign commerce, in violation of the duties of loyalty, trust and confidence that those employees owed to their employers, in violation of 18 U.S.C. §§ 1343 and 1349.  Moreover, in multiple instances, Deel, Alex Bouaziz, and Philippe Bouaziz conspired to defraud and defrauded Rippling and other Deel competitors by working with employees of Deel's competitors, including O'Brien, to deprive those competitors of their intangible right to their employees' honest services, using wires in interstate and foreign commerce, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.

176.    Examples of the predicate acts of wire fraud include, but are not limited to, the following:

- On multiple occasions, Defendants Alex Bouaziz, Philippe Bouaziz, and others known and unknown, including but not limited to O'Brien, used wire communications originating outside of the United States that were directed to Rippling's servers in the United States, including Slack queries and queries to other Rippling databases hosted in the United States, to engage in a scheme to defraud Rippling by communicating and receiving Rippling's stolen Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets, including specific documents containing trade secret information.  *Supra* ¶¶ 60–107.

- Defendants Alex Bouaziz and Philippe Bouaziz used wires in interstate and foreign commerce, including a Revolut transfer that, on information and belief, transited through the United States banking system, to bribe O'Brien to deprive Rippling of its intangible right to O'Brien's honest services and to

steal Rippling's trade secrets in violation of the duty of trust and loyalty he owed to Rippling. *Supra* ¶¶ 60–107.

177. Moreover, on multiple occasions, defendants Deel, Alex Bouaziz, and Philippe Bouaziz participated in the affairs of the Bouaziz Racketeering Enterprise by engaging in theft of trade secrets, to further the Bouaziz Racketeering Enterprise's objectives.

178. Specifically, on multiple occasions, with intent to convert trade secrets that were related to products and services used in or intended for use in interstate or foreign commerce to their own economic benefit, and intending and knowing that the offense would injure the entity from whom the trade secrets were misappropriated, defendants Alex Bouaziz, Philippe Bouaziz, and Deel, knowingly:

(1) stole, or without authorization appropriated, took, carried away, and concealed, and by fraud, artifice, and deception obtained such information;

(2) without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information; and

(3) received, bought, and possessed such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization; and

(4) attempted and conspired to do the same, all in violation of 18 U.S.C. § 1832.

179. Examples of the predicate acts of trade secrets theft include, but are not limited to, the following:

- From November 2024 to March 2025, on multiple occasions, defendants Alex Bouaziz, Philippe Bouaziz, Deel, and others known and unknown, directed O'Brien to take and transmit, without authorization, Rippling's

Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets. *Supra* ¶¶ 73–107.

- From November 2024 to March 2025, on multiple occasions, defendants Alex Bouaziz, Philippe Bouaziz, Deel, and others known and unknown, knowingly received and possessed Rippling trade secrets stolen by O'Brien knowing that O'Brien had taken the trade secrets without authorization. *Supra* ¶¶ 73–107.

- From at least January 2024 through today, defendants Alex Bouaziz and Deel, and others known and unknown, knowingly received and possessed Rippling trade secrets stolen by Conspirator-1 knowing that Conspirator-1 had taken the trade secrets without authorization. *Supra* ¶¶ 27, 49.

- From at least February 2024 through today, defendants Alex Bouaziz and Deel, and others known and unknown, knowingly received and possessed Rippling trade secrets stolen by Conspirator-2 knowing that Conspirator-2 had taken the trade secrets without authorization. *Supra* ¶¶ 28, 50–51.

- From at least February 2024 through today, defendants Alex Bouaziz and Deel, and others known and unknown, knowingly received and possessed Toku (Victim-2) trade secrets stolen by Snipes knowing that Snipes had taken the trade secrets without authorization. *Supra* ¶¶ 26, 164–165.

- From approximately early 2022 through today, defendants Alex Bouaziz and Deel, and others known and unknown, knowingly received and possessed Victim-3 trade secrets stolen by Conspirator-3 and Conspirator-4 knowing that Conspirator-3 and Conspirator-4 had taken the trade secrets without authorization. *Supra* ¶¶ 29–30, 166.

180.    Additionally, following the filing of this action, on multiple occasions, Alex Bouaziz and Deel, through Alex Bouaziz, Meli, and others known and unknown, corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice, in violation of 18 U.S.C. § 1503(a), though, among other things, engaging in acts of document destruction, attempts to improperly influence witnesses, and interfering with Rippling's efforts to raise funds.

181.    Defendants' predicate acts are so numerous and pervasive that they constitute an open-ended scheme and are part of the normal course of how the Bouaziz Racketeering Enterprise and the defendants regularly conduct business.  In light of that fact, and given Philippe's claim that he maintains a network of spies at competitor companies, there is every reason to believe that the commission of the predicate acts remains ongoing.  Indeed, were it not for the fact that Rippling caught O'Brien in the act and confronted him, O'Brien's spying activity on behalf of the Bouaziz Racketeering Enterprise would likely have continued indefinitely.

182.    Each of the predicate acts perpetrated by Deel, Alex Bouaziz, and Philippe Bouaziz, in furtherance of the racketeering scheme was related to the others and was performed while participating in the conduct of the affairs of the Bouaziz Racketeering Enterprise in violation of 18 U.S.C. § 1962(c).

183.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Rippling has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, advantageous business relationships (including customer and employee relationships) and profits.

## SECOND CAUSE OF ACTION

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))
### (Against All Defendants)

184.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 183 of this First Amended Complaint.

185.    Alex Bouaziz, Philippe Bouaziz, Westgarth, Basha, Malik, Mieli, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, Conspirator-5, O'Brien, Deel, and Does 1–100 qualify as "persons" under 18 U.S.C. § 1961(3).

186.    Alex Bouaziz, Philippe Bouaziz, and Deel engaged in violations of 18 U.S.C. § 1962(c), the predicate acts for which are set forth in Count I above and expressly incorporated herein.

187.    Alex Bouaziz, Philippe Bouaziz, Westgarth, and Deel have violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C.§ 1962(c), as set forth in Count I above, by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering, and by agreeing to the commission of multiple predicate acts.

188.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Rippling has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, advantageous business relationships (including customer and employee relationships) and profits.

## THIRD CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)**
**(Against Deel)**

189.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraph 1 through 188 of this First Amended Complaint.

190.    At all relevant times, Rippling owned and had the right to possess the stolen trade secrets, including the Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets as described in Paragraphs 73–107.

191.    As set forth above, Deel improperly acquired, retained, and/or used confidential and proprietary information of Rippling constituting trade secrets as defined by 18 U.S.C. § 1839(3), including without limitation the Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets as described in Paragraphs 73–107.

192.    Rippling has taken efforts reasonable under the circumstances to maintain the secrecy of its Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets by limiting access to this information to Rippling employees and storing its Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets on secure, password protected databases that are accessible only to Rippling employees who pass initial and periodic biometric checks.  As a condition of employment, Rippling  also requires all employees to sign a CIPRAA; each employee's employment agreement requires that such employees keep, *inter alia*, the Sales and Marketing Trade Secrets confidential; employees receive and sign a Global Handbook that includes a Code of Conduct setting forth expectations for an employee's use of Rippling's confidential information (including the Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets), including that such information not be used outside Rippling; and Rippling requires that employees follow an Acceptable Use Policy prohibiting employees from misusing Rippling's "resources and data assets," including the Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets.

193.    Rippling spent tremendous time, effort, and resources developing and cultivating the stolen trade secrets.  Rippling's trade secrets are not generally known or available to the public, and derive independent economic value from not being generally known to the public, to Rippling's

competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

194.    Deel's actions with respect to Rippling's trade secrets, as alleged above, were a deliberate scheme and plan to deprive Rippling of the benefits of Rippling's own substantial investment and efforts and steal the fruits of years of Rippling's labor.

195.    Deel's acts of misappropriation of Rippling's trade secrets include, but are not limited to:

a. Acquiring Rippling's trade secrets through improper means, including by obtaining Rippling's trade secrets from O'Brien by cultivating him as a "James Bond" spy, communicating with him using ephemeral messaging, and paying him in cryptocurrency in exchange for Rippling proprietary information that O'Brien had no authority to share with Deel;

b. Using and disclosing these improperly acquired trade secrets, including to target Rippling's prospects and existing customers and to leverage its ill-gotten knowledge of Rippling's business plans, product plans, and roadmaps.

196.    Deel's improper acquisition and use of Rippling's trade secrets, actual or threatened, violates the Defend Trade Secrets Act.

197.    As a direct and proximate result of Deel's wrongful misappropriation of Rippling's trade secrets, Rippling has suffered actual damages, and will continue to suffer actual damages in a sum to be set forth according to proof at trial.    Additionally, as a proximate result of its misappropriation of Rippling's trade secrets, Deel has been unjustly enriched.

198.    As the direct and proximate result of Defendants' conduct, Rippling has suffered irreparable injury and is entitled to permanent injunctive relief.

199.    As described herein, Deel's conduct was, and is, malicious, fraudulent, deliberate, and willful.  Rippling is therefore entitled to recover from Deel exemplary damages as permitted by 18 U.S.C. § 1836(b)(3)(C), and entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

### FOURTH CAUSE OF ACTION

**(Tortious Interference with Contract)**
**(Against Deel)**

200.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 199 of this First Amended Complaint.

201.    Rippling has a valid and enforceable confidentiality agreement, *viz.*, the CIPRAA, with O'Brien, and Deel knew or should have known of O'Brien's confidentiality agreement with Rippling.

202.    Deel willfully and intentionally interfered with this agreement, without privilege to do so, by aiding, abetting, and assisting O'Brien in breaching his contractual obligations to Rippling, including, but not limited to, his obligations to not (1) disclose Rippling's confidential information; (2) solicit Rippling employees for Deel's gain; (3) engage in activity that is, will, or could constitute a conflict of interest; (4) improperly use Rippling's resources and data assets to aid a competitor in its unlawful and anti-competitive activities; and (5) use or disclose Rippling's confidential information for his own benefit or outside the scope of his employment with Rippling.

203.    Deel's misconduct was independently tortious and unlawful because it involved the conspiracy to recruit O'Brien and have him work as a double agent for Rippling and Deel at the same time, and involved the misappropriation of Rippling's confidential information.  In addition, Deel intentionally induced O'Brien to breach his obligations under his employment agreements in order to unfairly compete against Rippling and steal Rippling's existing clients and prospective client.  O'Brien did in fact breach the CIPRAA as a result of Deel's actions.

204.    As a direct and proximate cause of the above-alleged misconduct by Deel, Rippling suffered injuries, including, but not limited to, actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Rippling's employment relationships and customer relationships. Because the tortious conduct of Deel was willful and malicious, Rippling seeks exemplary damages.

205.    This cause of action for tortious interference with O'Brien's contract is not based on the misappropriation of any Sales and Marketing Trade Secrets. Rather, Rippling bases this cause of action on Deel's recruitment of and subsequent compensation to O'Brien in order to further Deel's scheme to unlawfully and unfairly compete against Rippling by, among other things, inducing O'Brien to breach his employment agreements with Rippling.

### FIFTH CAUSE OF ACTION

**(Aiding & Abetting Breach of Fiduciary Duty)**
**(Against Deel)**

206.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 205 of this First Amended Complaint.

207.    As a manager at Rippling, O'Brien owed fiduciary duties to Rippling.

208.    On information and belief, Deel knew O'Brien owed Rippling fiduciary duties.

209.    At all times alleged herein, Deel was aware of O'Brien's conduct as alleged above, including that O'Brien used his position at Rippling to steal confidential information to give to Deel and provided Rippling employee contact information to Deel.

210.    At all times alleged herein and on information and belief, Deel knew O'Brien's conduct constituted a breach of his fiduciary duties to Rippling.

211.    On information and belief, Deel knowingly gave substantial encouragement and assistance to O'Brien so that he and Does 1–100 could accomplish the unlawful results alleged above.

212.    Deel's conduct in assisting these breaches of fiduciary duties was a substantial factor in causing the harm suffered by Rippling.

213.    Deel knowingly and substantially participated, aided, and abetted the above-alleged breaches of the fiduciary duties committed by O'Brien.

214.    Deel's acts, omissions, and misconduct has caused continuous, connected, ongoing and material harm to Rippling.

## SIXTH CAUSE OF ACTION

**(Unfair Competition, California Business & Professions Code § 17200, *et seq.*)**
**(Against Deel)**

215.    Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 214 of this First Amended Complaint.

216.    Deel engaged in unfair competition, including unlawful, unfair, and fraudulent business activities.  Deel's unlawful, unfair, and/or fraudulent business activities included but are not limited to tortious interference with contract, aiding and abetting breach of fiduciary duties, violating RICO statutes, and violating 18 U.S.C. §§ 1343 and 1836.

217.    Deel's misconduct significantly threatens and/or harms competition.  Deel's actions are part of a deliberate scheme and plan to deprive Rippling of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Deel an unfair competitive advantage.

218.    As a proximate result of Deel's acts as alleged above, Rippling to date has suffered, and will continue to suffer, damages.  Thus, as a proximate result of Deel's wrongful acts, Rippling is entitled to restitution as provided for by California Business and Professions Code section 17200 *et seq.* and a constructive trust in which Deel, as constructive trustees, hold their income, profits, commissions, fees, revenues, or other funds, received as a result of their wrongful acts alleged herein, for Rippling's benefit.

219.    Deel's conduct was willful and malicious, oppressive, fraudulent, despicable, and in conscious disregard of the rights of Rippling, and the resulting harm to Rippling.  Deel acted with the intent to cause injury and to obtain an unfair competitive advantage over Rippling in the marketplace.  Therefore, Deel is liable for restitution and exemplary and/or punitive damages in an amount to be established according to proof at trial.

220.    The rights invoked herein petition for, implicate, invoke, and demand the enforcement of important rights affecting the public interest.  Furthermore, because the relief sought will provide a significant benefit to the general public at large, Rippling is entitled to an award of attorneys' fees incurred by undergoing the burden of seeking the private enforcement of statutes vindicating important public rights, including the right of the public to be free from unfair competition and violations of the California Business and Professions Code.

## PRAYER FOR RELIEF

Wherefore, Rippling respectfully requests that judgment be entered in its favor and against Defendants, jointly and severally, including:

221.    Permanent injunctive relief prohibiting any further wrongful possession, disclosure, and/or misuse of Rippling's Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets, and preventing Defendants from profiting or benefiting from their wrongful conduct;

222.    Awarding compensatory damages in an amount to be determined at trial;

223.    Awarding exemplary and/or punitive and/or treble damages in an amount to be determined at trial;

224.    Awarding interest at the maximum legal rate on all sums awarded;

225.    Awarding reasonable attorneys' fees as permitted by law;

226.    Awarding all costs of suit herein; and

227.    Awarding such other and further relief as the Court deems just and proper.

1

## JURY DEMAND

2          Plaintiff Rippling hereby demands a trial by jury as to all issues so triable in this case.

3

4   Dated: June 5, 2025                        Respectfully submitted,

5                                              **QUINN EMANUEL URQUHART &**
                                               **SULLIVAN, LLP**
6

7                                              By */s/ Joseph Sarles*
                                               _____

8                                              Alex Spiro (*pro hac vice*)
                                               Maaren A. Shah (*pro hac vice*)
9                                              Samuel Nitze (*pro hac vice*)
                                               Scott Hartman (*pro hac vice*)
10                                             Dominic Pody (*pro hac vice*)
                                               295 5th Avenue, 9th Floor
11                                             New York, NY 10016
                                               Telephone: (212) 849-7000
12                                             Facsimile: (212) 849-7100
                                               alexspiro@quinnemanuel.com
13                                             maarenshah@quinnemanuel.com
                                               samuelnitze@quinnemanuel.com
14                                             scotthartman@quinnemanuel.com
                                               dominicpody@quinnemanuel.com
15
                                               Joseph Sarles (CA Bar No. 254750)
16                                             Kathleen S. Messinger (CA Bar No. 329983)
                                               865 S Figueroa St., 10th Floor
17                                             Los Angeles, CA 90017
                                               Telephone: (213) 443-3000
18                                             Facsimile: (213) 443-3100
                                               josephsarles@quinnemanuel.com
19                                             kathleenmessinger@quinnemanuel.com

20                                             *Attorneys for Plaintiff*
                                               *People Center, Inc. d/b/a Rippling*
21

22

23

24

25

FIRST AMENDED COMPLAINT