1    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
     Alex Spiro (*pro hac vice forthcoming*)
2    alexspiro@quinnemanuel.com
     Maaren A. Shah (*pro hac vice forthcoming*)
3    maarenshah@quinnemanuel.com
     Samuel Nitze (*pro hac vice forthcoming*)
4    samuelnitze@quinnemanuel.com
     Scott Hartman (*pro hac vice forthcoming*)
5    scotthartman@quinnemanuel.com
     Dominic Pody (*pro hac vice forthcoming*)
6    dominicpody@quinnemanuel.com
     295 5th Avenue, 9th Floor
7    New York, NY 10016
     Telephone: (212) 849-7000
8    Facsimile: (212) 849-7100

9    ~~QUINN EMANUEL URQUHART & SULLIVAN, LLP~~
     Joseph Sarles (CA Bar No. 254750)
10   josephsarles@quinnemanuel.com
     Kathleen S. Messinger (CA Bar No. 329983)
11   kathleenmessinger@quinnemanuel.com
     865 S Figueroa St., 10th Floor
12   Los Angeles, CA 90017
     Telephone: (213) 443-3000
13   Facsimile: (213) 443-3100

14

15            **IN THE UNITED STATES DISTRICT COURT**
         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16               **SAN FRANCISCO DIVISION**

17   PEOPLE CENTER, INC. D/B/A RIPPLING, a   |   Case No. 3:25-CV-2576 (CRB)
     Delaware corporation,

18                        **FIRST AMENDED COMPLAINT**

19             Plaintiff,
                     1. **VIOLATION OF THE**
                           **RACKETEER INFLUENCED AND**
20           vs.                          **CORRUPT ORGANIZATIONS**
                           **ACT ("RICO"), 18 U.S.C. § 1962(c);**
21   DEEL, INC., a Delaware corporation,
     ALEXANDRE ("ALEX") BOUAZIZ, an     |   2. **CONSPIRACY TO VIOLATE**
22   individual, PHILIPPE BOUAZIZ, an       |       **RICO, 18 U.S.C. § 1962(d);**
     individual, DANIEL JOHN ("DAN")
     WESTGARTH, an individual, and DOES ~~1–1001~~–100,   |   3. **MISAPPROPRIATION OF TRADE**
                           **SECRETS UNDER DEFEND**
                           **TRADE SECRETS ACT, 18 U.S.C.**

Defendants.

§ 1836, *et seq.*;

~~4. MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA UNIFORM TRADE SECRETS ACT, CIVIL CODE, § 3426, *et seq.*;~~

**4.** ~~5.~~ **TORTIOUS INTERFERENCE WITH CONTRACT;**

**5.** ~~6.~~ **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**

**6.** ~~7.~~ **UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200,** *et seq.*

**JURY TRIAL DEMANDED**

Judge: Hon. Charles R. Breyer
Courtroom: 6
~~Hearing Date:~~
~~Hearing Time:~~

1    People Center, Inc. d/b/a Rippling ("Rippling") or the "Company") brings this action

2    against Deel, Inc. ("Deel") and, Alexandre Bouaziz, Philippe Bouaziz, Daniel Westgarth, and

3    unnamed Does, and alleges as follows: 1–100.

4                                        **<u>INTRODUCTION</u>**

5    1.    This case exposes a calculated and unlawful corporate espionage scheme,

6    orchestrated by Deel, a global, multi-billion-dollaris about a criminal syndicate that operated from

7    the shadows of a multibillion-dollar technology company. In a brazen act of corporate theft, Deel

8    cultivated a spy to systematically steal its competitor's most sensitive business information and

9    trade secrets. This was not an isolated act of misconduct—it was a deliberate attack, perpetrated

10   for over four months, designed to steal and weaponize critical competitive data, including a

11   competitor's sales leads, sales pipeline, and its entire playbook for pitching prospective clients.

12   These stolen goods appear intended to be deployed across the Deel organization to gain an unfair

13   market advantage, including by: —Deel. At its helm are CEO Alex Bouaziz and his father

14   Philippe Bouaziz, who directed a racketeering enterprise that steals and repurposes the

15   hard-earned work of its victims to unlawfully fuel Deel's growth (the "Bouaziz Racketeering

16   Enterprise"). This enterprise encompasses several senior Deel executives, collaborative outsiders,

17   and carefully groomed, disaffected employees turned corporate spies from rival firms. To date, at

18   least four distinct corporate victims have been identified—each targeted, infiltrated, and

19   compromised to serve the aims of the Bouaziz Racketeering Enterprise.

20   2.    The top-down, centrally orchestrated structure of this criminal operation came to

21   light only after Rippling filed its initial complaint on March 17, 2025. Shortly thereafter, one of

22   the Bouazizes' operatives—a paid-for spy embedded within Rippling—came forward and

1  confessed.[1]  In a sworn affidavit filed before the High Court of Ireland on April 2, 2025, the spy,

2  then-Rippling employee Keith O'Brien, confirmed Rippling's worst suspicions, which were

3  already supported by extensive forensic evidence and a controlled honeypot test—evidence strong

4  enough to obtain an emergency court order requiring preservation of the spy's device.[2]  But the

5  spy's confession revealed far more than Rippling initially knew—most critically, that it was CEO

6  Alex Bouaziz who personally recruited the spy, directed the near-daily theft of trade secrets and

7  confidential information from his competitor, arranged payments with his father, Philippe Bouaziz

8  and a third-party handler known only as "The Watchman," and orchestrated a cover up when the

9  scheme began to unravel.

10        3.     Alex Bouaziz directed the spy's actions using disappearing Telegram

11  messages—advising what to search for, what to steal, and even dictating Slack messages to

12  "mess" with Rippling.  He and his father Philippe Bouaziz coordinated payments with "The

13  Watchman" via fiat and cryptocurrencies.  The spy's transaction receipts show that "The

14  Watchman" routed the initial payment through the Revolut account of Alba Basha, wife of Deel

15

16  _____

[1]  *See* Sworn Affidavit of Keith O'Brien, attached as Exhibit 1.

[2]  Rippling Ireland Ltd., Rippling's Irish subsidiary, dutifully obtained an emergency preservation order from the High Court of Ireland on March 12, 2025 to require the spy to turn over his devices to an independent solicitor for forensic imaging.  The order carried a "penal endorsement," meaning non-compliance has a likely risk of imprisonment in the Irish legal system.  Rippling Ireland obtained this form of extraordinary relief due to extensive forensic analysis its security team, which showed that a mid-level payroll operations manager in Rippling's Dublin office had been using his internal systems access to gather sensitive data relevant to Deel.  For example, forensic records revealed that the spy searched the term "deel" in Rippling's systems on average 23 times a day for months—enabling the spy to capture almost all details of Rippling's sales pipeline competing with Deel, proposed pricing, details of sales meetings and conversations, and training materials.  In addition, Rippling conducted a controlled test—known by security professionals as a "honeypot," which confirmed that Deel's leadership or its closest associates actively directed the spy. But when the court-appointed solicitor sought to enforce the order on March 14, 2025, the spy locked himself in a company bathroom and fled the premises, telling the solicitor, "*I'm willing to take that risk*"—referring to jail time.  For a complete timeline of the events in this matter, please see Exhibit 2.

1    COO Dan Westgarth, and then shifted future payments to Ethereum, at Philippe's direction, in

2    order to leave "no trace." The payment chain was also managed using a crude system of

3    codewords to further obscure the money trail. When payment was due, the spy would send a

4    photo of a wristwatch. And then Philippe would authorize with phrases like "the buyer is happy"

5    or "send that watch to London."

6        4.    What the spy delivered to Alex Bouaziz and Deel was worth far more than a Rolex.

7    He handed over Rippling's most sensitive and valuable documents and information: internal

8    product roadmaps, launch strategies, country-by-country pricing models, sales forecasts, customer

9    lists, recruitment targets, and go-to-market tactics.

10       5.    And this information wasn't merely stolen—it was weaponized in real-time by

11   Deel's CEO. In one jarring example, on the same day a Rippling sales representative met with a

12   prospective client, that prospect received an unprompted WhatsApp message from "alex from

13   deel" (Alex Bouaziz), stating that he "[h]eard" they were "using a few other products than deel"

14   and suggesting they speak. "That scared TSO of me," the prospect later wrote, and then asked his

15   Rippling contact:

16   *On Deel intelligence: I am just curious to know how they [Deel] would know [that the*
*prospect was considering Rippling] in real time. I haven't posted anything on LinkedIn*

17   *nor went out asking for quotes. Do you have a perspective on that?*

18   Rippling did not "have a perspective" on Deel's seemingly real-time intelligence then. It does

19   now. This was not competitive intelligence—this was theft directed by Alex Bouaziz who was

20   stealing Rippling's confidential information and brazenly exploiting it like parts in a high-tech

21   chop shop.

22       6.    The impact of Deel's theft was immediate, real, and deeply damaging. Alex

Bouaziz and his co-conspirators used this stolen information to gain unfair competitive advantage

across every dimension of Deel's business, including:

1    ● ~~Deel's~~ **Sales** ~~and~~**& Marketing** ~~functions to target the competitor's leads and~~

2    ~~pipeline~~, to identify Rippling prospects and undercut live deals;

     ● ~~Deel's~~ **Customer Retention** ~~function to leverage stolen~~, to weaponize pricing

3    proposals ~~to lock in customers~~and retain accounts;

4    ● ~~Deel's~~ **Recruiting** ~~function to exploit the competitor's internal phone directory to~~

     ~~attempt~~, to poach key personnel identified through internal directories; ~~and~~

5
     ● **Product**, to inform and accelerate Deel's product roadmap; and

6
     ● ~~Deel's~~**PR & Communications** ~~and PR functions~~, to ~~combat~~preempt and distort

7    ~~negative press cycles~~public narratives.

8    This systematic theft not only deprived Rippling of the fruits of its labor and monetary

9    investments, but also enabled the Bouaziz Racketeering Enterprise to profit from misappropriated

10   customers, stolen R&D, and an illicit head start with products and markets it did not develop.

11        7.    And then, when Rippling closed in by obtaining an emergency court order from the

12   High Court of Ireland authorizing the seizure and preservation of the spy's devices (an

13   extraordinary remedy), Alex Bouaziz and his inner circle only doubled down on their misconduct.

14   Alex enlisted senior legal operatives at Deel, David Mieli and Asif Malik, who instructed the spy

15   to destroy evidence and lie.  They assured the spy that Alex would "sort all this out."  The spy was

16   told by the lawyers to purchase a burner phone and set up a new account on Telegram, a private

17   instant messaging platform; to destroy his existing phone (which he did, with an axe); to lie to

18   regulators, court officials, and lawyers about fictitious sanctioned Russian payments;[3] and to take

19   "a holiday" or relocate his family to Dubai.

20

21

22

   ---
   [3]    Despite Deel's continued false statements to the media, unlike Deel, Rippling has never
   transmitted sanctioned payments to Russia.  Indeed, the spy only made a sanctions-related
   complaint when instructed to falsely do so by Deel's senior counsel after being served with the
   Irish court order.  The spy later confessed that he "knew this [complaint] was false," but that
   making it "seemed like a way out of the situation."

1        8.      Meanwhile, Alex Bouaziz and COO Dan Westgarth scrambled to erase all

2 remaining digital traces connecting them to the spy. After the initial complaint was filed, Alex

3 Bouaziz renamed a three-way WhatsApp group chat with Dan Westgarth and the spy from "Keith

4 <> Dan" to "V", and then both Alex and Dan abruptly left the group. This evidence tampering

5 notably occurred while litigation holds were in effect. Then, Alex Bouaziz virtually disappeared

6 from social media for two months—only to return recently, tweeting casually about PSG (Paris

7 Saint-Germain Football Club), as if nothing had happened.

8        9.      Given the brazenness of the conduct and Philippe Bouaziz's boasting of having

9 "spies at other companies," it is unsurprising that other corporate victims have emerged.

10 Underscoring the Bouaziz Racketeering Enterprise's broader fixation beyond Rippling, additional

11 forensic analysis revealed that the spy also searched Rippling's Slack—an internal company

12 communication tool, enabling employees to communicate through group channels or direct

13 messages—to find information targeting nine Deel competitors over 300 times by running the

14 following search terms: "Papaya," "Velocity Global," "Remote," "G-P" (Globalization Partners),

15 "Omnipresent," "Oyster," "Boundless," "Payzaar," and "Remofirst." Meanwhile, Deel

16 whistleblowers have reported that competitor hires were celebrated at Deel All-Hands meetings

17 for the information they brought with them. No wonder then that several parties—including major

18 Deel competitors and a startup accelerator—have uncovered eerily similar conduct by Deel or its

19 associates to obtain their confidential information and trade secrets. With multiple investigations

20 ongoing, Rippling expects the full extent of the Bouaziz Racketeering Enterprise will soon be

21 revealed.

22       10.    Rippling now brings this First Amended Complaint under the federal RICO statute,

the Defend Trade Secrets Act, and California state law to put an end to Deel's criminally

misguided approach to competition and seek redress for the serious and ongoing harm it has

1  suffered.  The evidence already shows that the Bouaziz Racketeering Enterprise operates with

2  precision, premeditation, and remarkable brazenness—led by Deel CEO Alex Bouaziz,

3  coordinated by his father, Deel Board Chair, CFO, and former General Counsel Philippe Bouaziz,

4  and supported by a close-knit group of criminal associates inside and outside of Deel, including

5  COO Dan Westgarth and senior legal personnel.

6      11.    Deel has attempted to spin this dispute as a tech rivalry gone bad.  But tech rivals

7  don't bribe employees to spy.  They don't launder payments through crypto and family members.

8  They don't coach witnesses to lie under oath.  When they are caught, they don't destroy evidence

9  and take refuge in non-extradition territories like Dubai.  And they certainly don't replicate these

10  schemes repeatedly across an industry.

11      12.    Enough is enough.  Rippling brings this case to stop the Bouaziz Racketeering

12  Enterprise from continuing its campaign of theft, coercion, and deception, and to recover for the

13  extensive damages it has suffered as a result of the systematic theft of Rippling's trade secrets.

14  Rippling also aims to deliver a clear message to Alex Bouaziz and the associates of the Bouaziz

15  Racketeering Enterprise:  stealing trade secrets is not a business strategy—it's a crime.

16      Most shockingly, these espionage efforts appear to have been directed by the

17  highest levels of Deel's leadership, including, upon information and belief,

18  Philippe Bouaziz—Deel's Board Chair, Chief Financial Officer, and the father of

19  the CEO—or those closest to him.

20      2.  This industrial espionage scheme came to light very recently, when

21  Rippling discovered that its competitor Deel had cultivated a spy within Rippling's

   employee base and commenced an internal investigation.

22      3.  That investigation revealed that Deel's spy used Rippling systems to spy

   on Deel's own customers, who were discussing a switch away from Deel.  The spy

   searched the term "deel" in Rippling's systems on average 23 times a day over a

four-month period, which allowed the spy to comprehensively capture every detail of Rippling's sales pipeline competing with Deel, including proposed pricing, details of sales meetings and conversations between Rippling and prospective customers evaluating a switch away from Deel, and training materials for Rippling's sales organization on how to compete against Deel.

4. For example, on just *one single day* February 21, 2025 Deel's spy conducted searches that revealed 728 new companies requesting a demo of Rippling's products; 282 in-depth notes from Rippling account executives on companies that were new prospects in its sales pipeline; and thorough information about 26 new deals with existing customers or prospective clients who were evaluating switching to Rippling directly from Deel. And that is just one single day. These activities were repeated nearly every single day, for over four months.

5. Astoundingly, this hijacking of Rippling's most prized data appears to have been orchestrated by Deel's senior leadership. The smoking gun came earlier this month, when Rippling set forth a test, or what is known by security professionals as a "honeypot." Rippling knew that Deel was most likely to activate its spy if faced with potentially damaging press, and indeed, that is how the spy originally revealed himself. So, to confirm Deel's involvement, Rippling's General Counsel sent a legal letter to Deel's senior leadership identifying a recently established Slack channel called "d-defectors," in which (the letter implied) Rippling employees were discussing information that Deel would find embarrassing if made public. In reality, the "d-defectors" channel was not used by Rippling employees and contained no discussions at all. It had never been searched for or accessed by the spy, would not have come up in any of the spy's previous searches, and the spy had no legitimate reason to access the channel. Crucially, this legal letter was only sent to three recipients, all associated with Deel: Deel's Chairman, Chief Financial Officer, and General Counsel (Philippe

Bouaziz), Deel's Head of U.S. Legal (Spiros Komis), and Deel's outside counsel. Neither the letter nor the #d-defectors channel was known to anyone outside of Rippling's investigative team and the Deel recipients. Yet, just hours after Rippling sent the letter to Deel's executives and counsel, Deel's spy searched for and accessed the #d-defectors channel—proving beyond any doubt that Deel's top leadership, or someone acting on their behalf, had fed the information on the #d-defectors channel to Deel's spy inside Rippling.

6. Armed now with proof that Deel was directing the spy (in addition to all of Rippling's existing forensic evidence, covering months of espionage activities), on Wednesday, March 12, 2025, Rippling dutifully sought and obtained a court order from the High Court in Ireland, the country in which the spy resides, to ensure the preservation of any incriminating information on the spy's mobile phone. This court order contained what is known in Ireland as a "penal endorsement," meaning that a party who fails to comply with the order may be imprisoned for their noncompliance. Last Friday (March 14, 2025), at Rippling's offices in Dublin, a court-appointed independent solicitor served Deel's spy with the court order to preserve his mobile phone.

7. Faced with a choice between providing his cell phone for examination pursuant to a lawful court order or going to jail for not complying, the spy chose the latter. In fact, Deel's spy lied to the court-appointed solicitor about the location of his phone, and then locked himself in a bathroom—seemingly in order to delete evidence from his phone—all while the independent solicitor repeatedly warned him not to delete materials from his device and that his non-compliance was breaching a court order with penal endorsement. The spy responded: "I'm willing to take that risk." He then fled the premises.

8. Due to the wanton conduct by Deel's spy last Friday, Rippling now swiftly brings this action against Deel to stop Deel's theft and misuse of its confidential

~~and proprietary information, to prevent Deel from further harming Rippling through its unlawful competition, and to obtain compensation for the significant harm to Rippling that Deel has caused through its serial violations of the law.~~

## THE PARTIES AND THE RACKETEERING ENTERPRISE

### Plaintiff Rippling

13.    ~~9.~~ ***Rippling.***  Plaintiff People Center, Inc. d/b/a Rippling is a Delaware corporation with its principal place of business in San Francisco, California.  Rippling is a successful, late-stage software company that offers a global workforce management platform to enable businesses to manage core internal workflows—including human resources, IT, and finance—through a unified suite of cloud-based applications that are built on a single software platform.  Rippling's customers are business enterprises ranging from small businesses to larger, enterprise-level customers.  Since its founding in 2016, Rippling has been a leader in this space, now serving tens of thousands of customers around the world.

~~10. Defendant Deel Inc. is a Delaware corporation with its principal place of business in San Francisco, California.~~

### The Bouaziz Racketeering Enterprise

14.    The Bouaziz Racketeering Enterprise is directed by Alex Bouaziz and his father Philippe Bouaziz, who together coordinate the criminal activities of a loosely organized association-in-fact.  The members of the enterprise consist of Alex and Philippe themselves, Deel and certain of its employees, closely aligned (but not Deel-employed) individuals and entities, and, most importantly, a network of current and recently departed employees of Deel's competitors who serve as industrial spies.  The Enterprise operates across multiple jurisdictions including the United States, Israel, France, United Kingdom, Italy, Ireland, and the United Arab Emirates

1  (Dubai), with Alex and Philippe directing coordinated activities among members who maintain

2  independent residences, employment relationships, and business operations across these locations.

3      15.    The Bouaziz Racketeering Enterprise exists for the purpose of enriching Deel, its

4  principles, and their spies, by systematically misappropriating and exploiting trade secrets and

5  confidential business information belonging to Deel's competitors.  Through Alex and Philippe's

6  direction and coordination, the Bouaziz Racketeering Enterprise's spies steal competitively

7  sensitive information through multiple different channels and feed that information to the

8  enterprise in exchange for compensation in the form of cash payments or the promise of future

9  employment.    These criminal acts are facilitated by the other members of the Bouaziz

10  Racketeering Enterprise, including other Deel employees and closely aligned but unaffiliated

11  individuals and entities.  The enterprise's members operate under Alex and Philippe's unified

12  direction to accomplish systematic competitive intelligence theft that Deel could not achieve

13  through its corporate structure alone.

14          **Defendant Members of the Bouaziz Racketeering Enterprise**

15      16.    ***Deel***.  Defendant Deel, Inc. is a Delaware corporation with its principal place of

16  business at 425 First Street #1502, San Francisco, California.[4]  While the company markets itself

17  as having been founded in 2019, Deel's origins are murky.  Deel's founders publicly list four

18  different dates for Deel's start:  August 2018 (Ofer Simon), November 2018 (Philippe Bouaziz),

19  January 2019 (Shuo Wang), and May 2019 (Alex Bouaziz).[5]  Meanwhile, Deel's SEC filings all

20

21  [4]  Despite all of its SEC reports, current and historical corporate filings, current Terms of Service,
    and current Privacy Policy listing this address, Deel now argues in a recent Motion for Forum Non
22  Conveniens that this is just a "mailing address."  *See, e.g.*, Deel, Inc., Form D (Dec. 27, 2024),
    https://www.sec.gov/Archives/edgar/data/1813695/000181369524000002/xslFormDX01/primary
    _doc.xml.

    [5]  Further complicating the history, in 2018, the same trio of co-founders (Alex, Wang, and
    Simon) also formed "SciDex," a now-defunct cryptocurrency startup with unsavory reviews, and

FIRST AMENDED COMPLAINT

1    identify "Lifeslice, Inc." as one of Deel's "Previous Names"[6]—online databases suggest that

2    Lifeslice, Inc. was founded in 2016[7]—while Deel's earliest-dated SEC filing, from 2020, likewise

3    represents that Deel, Inc. was founded in 2017.[8]

4        17.    ***Alex Bouaziz***.  Defendant Alexandre "Alex" Bouaziz, an individual, has been the

5    Director and Chief Executive Officer of Defendant Deel, Inc. at all relevant times herein.  Deel's

6    most recent SEC filing (dated December 27, 2024) identifies Alex as having a San Francisco,

7    California address.[9]  On information and belief, Alex is also a resident of Tel Aviv, Israel, and

8    Paris, France, and visits Dubai, United Arab Emirates.  Alongside his father, he is a Founder and

9    Venture Partner at Sarona Ventures, an Israeli venture capital firm invested in Deel, touted to be

10   "Sarona Venture's top portfolio star!"[10]  On information and belief, Alex also benefits financially

11   from Deel's business via Sarona Ventures' investment.  Alex also previously co-founded LifeSlice

12   and SciDex, both of which appear to be part of the same corporate entity as Deel.

13       18.    ***Philippe Bouaziz***.  Defendant Philippe Bouaziz, an individual, has been the Board

14   Chair, Chief Financial Officer, and Whistleblowing Contact of Defendant Deel, Inc. at all relevant

15

16

17   Simon) also formed "SciDex," a now-defunct cryptocurrency startup with unsavory reviews, and
     public evidence suggests that SciDex is a Deel predecessor as well.

18   [6]  *See, e.g.*, *supra*, note 4.

19   [7]  *See Lifeslice Company Profile*, Tracxn,
     https://tracxn.com/d/companies/lifeslice/__GjXjqzmRbHNQbh2dKHaxICtuE9NJ7VnjLpv7GJg9P
20   vY (last updated May 30, 2025).

21   [8]  Deel, Inc., Form D (June 2, 2020),
     https://www.sec.gov/Archives/edgar/data/1813695/000181369520000001/xslFormDX01/primary
     _doc.xml.
22   [9]  *See* Deel, Inc., Form D (Dec. 27, 2024),
     https://www.sec.gov/Archives/edgar/data/1813695/000181369524000002/xslFormDX01/primary
     _doc.xml.

     [10]  Sarona Ventures (@SaronaPartners), X, (July 18, 2024, 6:28PM),
     https://x.com/SaronaPartners/status/1813928730974380541.

1    times herein.  Philippe has also held himself out as General Counsel to Deel, until recently, despite

2    possessing no cognizable legal background, law license, or law degree.[11]  Deel's most recent SEC

3    filing (dated December 27, 2024) identifies Philippe as having a San Francisco, California

4    address.[12]  On information and belief, Philippe is also a resident of Tel Aviv, Israel; Paris, France;

5    New York, New York; and Dubai, United Arab Emirates.  He is the Founding Managing Partner

6    and Chairman of Sarona Ventures (an early Deel investor) alongside his son Alex Bouaziz, a

7    founder of Bouaziz & Partners (listed as a Deel Whistleblowing Contact, until May 2025) and, on

8    information and belief, was previously a board member at SciDex.  On information and belief,

9    Philippe also benefits financially from Deel's business via Sarona Ventures' investment and

10   Bouaziz & Partners' consulting relationship.

11        19.    ***Daniel Westgarth***.  Defendant Daniel ("Dan") Westgarth, an individual, has been

12   the Chief Operating Officer of Defendant Deel, Inc. at all relevant times herein.  On information

13   and belief, Dan Westgarth is a resident of New York, New York; London, United Kingdom; and

14   Dubai, United Arab Emirates.

15        **Non-Party Members of the Bouaziz Racketeering Enterprise**

16        20.    ***Alba Basha***.  Non-party Alba Basha, an individual, has been the wife of Defendant

17   Dan Westgarth at all relevant times herein.  On information and belief, Basha is a resident of

18   London, United Kingdom and Dubai, United Arab Emirates.  Basha is not an employee of Deel.

19   On information and belief, Basha was employed as a cryptocurrency compliance specialist at the

20

21

22

---

[11]  *See* Samuel Dahan & Philippe Bouaziz, *The State of Global Work Law: A Call for New Policy Infrastructure*, Queen's Univ. Legal Rsch. Paper (June 23, 2023) (Philippe Bouaziz describing himself as "Chief Financial Officer ***and General Counsel***, Deel Inc.") (emphasis added), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4484981.

[12]  *See, e.g., id.*

1    investment platform company Robinhood Markets, Inc., in and before March 2025 but has since

2    separated from that company.

3    21.    ***Andrea David Mieli***.  Non-party Andrea David Mieli, an individual, has been an

4    attorney at Deel since February 2021, and appears to have been their first legal counsel.  Mieli

5    publicly lists himself as an independent contractor for Deel, bearing the title "Global Senior

6    Director of Legal."  On information and belief, Mieli is a resident of Rome, Italy, and is the

7    longest-tenured attorney currently employed at Deel.

8    22.    ***Asif Malik***.  Non-party Asif Malik, an individual, is an attorney at Deel, employed

9    as Deel's "Legal Director – Fintech, Regulatory, and Licensing (Global)" since July 2024.  Malik

10   was appointed as UK Director of Deel's newly-acquired payment subsidiary Atlantic Money Ltd.

11   in February 2025, where he is listed as a resident of Newcastle, United Kingdom.  However, by

12   April 2025, when process servers in a separate proceeding attended this address, a woman

13   responded that Malik had gone to Dubai, and a Deel spokesperson later stated that Malik was

14   currently residing in Dubai, United Arab Emirates.

15   23.    ***Spiros Komis***.  Non-party Spiros Komis, an individual, is an attorney at Deel,

16   employed as Deel's "Head of US Legal."  He began working in that capacity in May 2023.  On

17   information and belief, Komis is a resident of Saint Petersburg, Florida and Fairfax, Virginia.

18   24.    ***Keith O'Brien***.  Non-party Keith O'Brien, an individual, is a resident of Dublin,

19   Ireland.  Between June 2023 and March 2025, O'Brien was Rippling's Global Payroll Compliance

20   Manager.[13]  In or around November 2024, O'Brien was personally recruited by Alex Bouaziz and

21

22   [13]   As a formal matter, Rippling Ireland Limited ("Rippling Ireland"), a wholly owned subsidiary
     of Rippling, was O'Brien's employer, but from the beginning he understood that he was joining
     "the People Center, Inc. [*i.e.*, Rippling] team" and that his responsibilities, including his fiduciary
     duty of loyalty, ran to Rippling.  O'Brien's duties of loyalty, trust, and confidence to Rippling and
     its affiliates were further established and defined by the agreements that he signed in connection
     with his employment.

FIRST AMENDED COMPLAINT

1    his father Philippe Bouaziz to spy on and steal from Rippling for the benefit of the Bouaziz

2    Racketeering Enterprise.  O'Brien has since confessed his role in this espionage scheme.

3        25.    *LiquiFi*.  Non-party LiquiFi, Inc. ("LiquiFi") is a Delaware corporation with its

4    principal place of business in San Francisco, California.  LiquiFi is a digital cryptocurrency

5    management company which partnered with Deel in September 2024 to offer a global

6    crypto-based tax and payroll services.  Deel CEO Alex Bouaziz reportedly sought to "crush

7    Toku," its competitor, via this partnership.

8        26.    *Benjamin Snipes*.  Non-party Benjamin Snipes, an individual, is an attorney.  He

9    was General Counsel at LiquiFi, and, prior to that role, was the Head of Legal at WorkCo, Inc.

10   d/b/a Toku.  On information and belief, Snipes is a resident of New Jersey and was in touch with

11   Deel after joining LiquiFi.

12       27.    *Conspirator-1*.  Non-party Conspirator-1 was a Director of National Accounts at

13   Rippling before joining Deel as a Director of Partnerships in January 2024.  At all relevant times,

14   Conspirator-1 was a resident of California.  He was discovered to have downloaded sensitive

15   information, including company product roadmaps and financial projects before his termination

16

17

18   These agreements included:  (1) a Confidentiality and Intellectual Property Rights Assignment
     Agreement ("CIPRAA") between Rippling and O'Brien, through which O'Brien agreed not to

19   "disclose any Proprietary Information without first receiving [Rippling's] express written direction
     or consent"; (2) a Contract of Employment, through which O'Brien agreed not to "use or disclose

20   or make available to anyone else, during or after [his] employment, any Confidential Information"
     (except as necessary in connection with his employment); and (3) an Employment Acceptance

21   Agreement, prohibiting O'Brien from "engag[ing] in any employment, occupation, consulting, or
     other business activity directly related to the business in which [Rippling] is now involved or

22   becomes involved during the term of [his] relationship with [Rippling]" and from "engag[ing] in
     any other activities that conflict with [his] obligations to [Rippling]."  Proprietary Information was
     broadly defined to include "all . . . business, technical and financial information [O'Brien]
     developed, learned or obtained in connection with [his] employment." Confidential Information
     was broadly defined to include among other things "[a]ll proprietary or confidential information
     regarding [Rippling] . . . or relating to [Rippling's] operations or business."

1    from Rippling, and later, against Rippling's objections, used a forensics firm hired and paid for by

2    Deel's lawyers to delete records of this activity.

3        28.    ***Conspirator-2***.  Non-party Conspirator-2 was a Senior Manager of PEO Solutions

4    Consultants at Rippling before joining Deel as a Director of PEO Solutions Consulting in

5    February 2024.  Conspirator-2 is a resident of California.  Conspirator-2 was in communication

6    with several Deel executives as early as summer 2023, and, on information and belief, unlawfully

7    solicited several former Rippling employees and documents after joining Deel, including by

8    asking for sensitive information about Rippling and openly boasting about this activity to Deel

9    employees, including Deel CEO Alex Bouaziz.

10        29.    ***Conspirator-3***.  Non-party Conspirator-3 was an employee of Victim-3 (defined

11    below) until early 2022.  On information and belief, at the behest of Alex Bouaziz and in violation

12    of Conspirator-3's duty of loyalty to Victim-3, Conspirator-3 provided the Bouaziz Racketeering

13    Enterprise with Victim-3's "CRM" (*i.e.*, its trade secret customer database, containing confidential

14    and valuable nonpublic information about customers compiled by Victim-3, the value of which

15    laid in its secret and nonpublic nature).

16        30.    ***Conspirator-4***.  Non-party Conspirator-4 was an employee of Victim-3 (defined

17    below) until approximately summer 2023.  On information and belief, at the behest of Alex

18    Bouaziz and Conspirator-3, and in violation of Conspirator-4's duty of loyalty to Victim-3,

19    Conspirator-4 provided the Bouaziz Racketeering Enterprise with Victim-3's "CRM" (*i.e.*, its

20    trade secret customer database, containing confidential and valuable nonpublic information about

21    customers compiled by Victim-3, the value of which laid in its secret and nonpublic nature).

22        31.    ***Conspirator-5***.  Non-party Conspirator-5 is an individual known to O'Brien as the

      "Watchman."  On behalf of the Bouaziz Racketeering Enterprise, Conspirator-5 made or directed

1  fiat and cryptocurrency payments to O'Brien in exchange for O'Brien's providing Rippling trade

2  secret information to the Enterprise.

3      32.    *Does 1–100*.    Non-parties Does 1–100 are as yet unknown individuals who

4  facilitated the activities of the Bouaziz Racketeering Enterprise.  They include, but are not limited

5  to, participants in the "network of spies" that Philippe Bouaziz has boasted of maintaining at

6  competitor corporations, whose participation is necessary to carry out the Enterprise's systematic

7  theft of trade secrets and confidential business information.

8                    **Other Victims of the Bouaziz Racketeering Enterprise**

9      33.    *Victim-2 (Toku)*.  WorkCo, Inc. d/b/a Toku ("Toku") is a Delaware corporation

10  with its principal place of business in Delaware.  Toku is a cryptocurrency-based tax and payroll

11  compliance company, which filed a suit against its competitor LiquiFi in December 2024, alleging

12  misappropriation of trade secrets and then filed a preliminary injunction in April 2025, alleging

13  Deel CEO Alex Bouaziz's participation in the overall scheme and desire to "crush Toku."

14      34.    *Victim-3 (Start-Up Accelerator)*.  Victim-3 is a startup accelerator that previously

15  partnered with Deel.

16      35.    *Victims-4+ (Major EOR Competitors)*.    Victims 4+ are one or more major

17  competitors of Deel in the EOR ("Employer of Record") market other than Rippling.

18                            **JURISDICTION AND VENUE**

19      36.    ~~11.~~ This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

20  § 1331, as it arises under 18 U.S.C. § 1962 and 18 U.S.C. § 1836.

21      37.    ~~12.~~ This Court has supplemental jurisdiction over Rippling's state law claims under

22  28 U.S.C. § 1367 because Rippling's state law claims are so closely related to its federal claims

1    that they form part of the same case ~~of~~or controversy under Article III of the United States

2    Constitution.

3        38.    ~~13.~~ Venue is proper in the United States District Court for the Northern District of

4    California pursuant to 28 U.S.C. § 1391 because Deel resides in the Northern District of California

5    and a substantial part of the events and omissions giving rise to the claims asserted occurred in

6    this District.

**DIVISIONAL ASSIGNMENT**

8        39.    ~~14.~~ A substantial part of the events and omissions which gave rise to the claims

9    asserted took place in San Francisco, California.  Thus, pursuant to Civil L.R. 3-2(c) and (e), this

10   action should be assigned to the San Francisco Division of this District.

**FACTUAL ALLEGATIONS**

12   I.    ~~GENERAL BACKGROUND~~EARLY SIGNS OF THE BOUAZIZES' SCHEME VIA
         DEEL

13

14       40.    ~~15.~~ Rippling ~~offers a global,~~pioneered the concept of an all-in-one solution ~~that~~

15   ~~allows its customers to hire, pay, and manage their global workforce~~for workforce management

     across HR, IT, and finance.  Since its founding in 2016, Rippling has ~~been a leader in this space,~~

16   ~~developing over 20 best-in-class~~set the standard for modern business infrastructure—building over

17   20 deeply integrated, technology-first ~~solutions, now used by~~products that power everything from

18   payroll and benefits to device management and corporate cards.  Today, tens of thousands of

19   customers around the world. ~~Due to the~~ rely on Rippling to manage their global workforce.

20   Because of the platform's breadth ~~of Rippling's platform~~and depth, Rippling has competitors in

21   every market segment in which it operates.

22       41.    In 2022, Rippling extended this all-in-one solution concept globally by developing

     a comprehensive suite of global workforce management products designed to enable its customers

1  to hire, pay, and manage their global workforce.  These offerings included Global Employer of

2  Record ("EOR"), Global Contractor, and Global HRIS Services—representing a major expansion

3  of Rippling's platform.  Rippling also simultaneously launched Global Payroll or "the world's first

4  native global payroll system."[14]

5      42.    At the time, Deel was a Rippling customer and offered only Global EOR and

6  Global Contractor services.  Deel remained a Rippling customer until early 2023.

**Rippling Launches Global Products, and Deel Head of Sales Responds:**
**"I play dirty and will not lose"**

8      43.    As Rippling prepared to go to market with its global products, Deel's Head of

9  Sales, Chris Lee, got wind of these global expansion plans and sent a disturbing LinkedIn message

10  to Rippling's first global account executive.  In that message dated September 12, 2022, Lee

11  warned that he compiled "*pages of insights*" on Rippling gathered from Deel sales representatives

12  posing as job applicants, and declared, "*I'm ruthless*."  And then, foreshadowing a broader pattern

13  or improper and unethical conduct by Deel, Lee threatened:  "*I play dirty and I will not lose*."[15]

14      44.    16. Deel was founded in 2019 as a global contractor management platform, and

15  has, since that time, expanded to offer other global workforce management products.  Deel was

16  also a customer of certain Rippling products until early 2023.  Rippling launched its global suite of

17  products in late 2022, and Deel responded by planning competitive product announcements,

18  bringing the two companies into direct competition.  In an email dated Concerned that Deel, still a

19

20

21  [14]    Tomer Schwartz, et al., *Introducing Rippling Global*, Rippling Blog (Oct. 20, 2022), https://www.rippling.com/blog/introducing-rippling-global.

22  [15]    *See* Exhibit 3.  Lee's fixation on Rippling is further evidenced by an April 2024 LinkedIn message Lee sent to the VP of Sales at Multiplier, another Deel competitor.  In the message, Lee threatened the VP, writing "I'll demolish your small sales team by hiring all your reps at exorbitant comp if you try poaching any of my reps."  Exhibit 4.  To back up his threat, Lee further wrote, "[y]ou can ask my friends at Rippling.  I've hired 8 of their top sales people and they've been able to hire 1 mid-performing rep.  That's my fair warning – take it or leave."  *Id.*

1  Rippling customer at the time, had access to Rippling's platform and Rippling's now-competitive

2  products, Rippling made the decision to end the customer relationship.  On November 16, 2022,

3  Rippling informed Deel that it would not ~~be renewing~~renew Deel's contract due the

4  ~~increasing~~increasingly competitive nature of both ~~Rippling~~Rippling's and Deel's product

5  offerings~~, and~~.  The email specifically noted:  "***We're concerned that your access and use of our***

6  ***systems will inform your own efforts in this regard, and would prefer that we each compete on***

7  ***the merits of our own innovations.***"



From: **Sarah Hartman** <sarah@rippling.com>
Date: Wed, Nov 16, 2022, 12:06
Subject: Deel and Rippling
To: <phb@deel.com>, <alex@deel.com>

Deel team,

Congrats on Deel's rapid growth. There's clearly a huge market for global employee management products, and it looks like both Deel and Rippling have discovered that opportunity. That means that, in some cases, we're going after the same customers with similar products, and that has put us in a difficult position around your use of the Rippling platform.

As you've surely recognized, the only path to success is by building a comprehensive HR and payroll system. We're concerned that your access and use of our systems will inform your own efforts in this regard, and would prefer that we each compete on the merits of our own innovations.

To that end, we'd like to terminate our commercial relationship at the end of your current agreement, which expires on February 28, 2023. We don't offer month-to-month extensions on our agreements, but this is an unusual case given that we're requesting that you find another provider. If necessary, we can work to find a mutually agreeable timeline beyond February.

We hope that this advance notice ensures you have the opportunity to transition gracefully to another provider. We understand the importance of ensuring continuity of payroll, benefits, and systems access for the 1,400+ people you support with Rippling. Let us know if you need any recommendations on other providers; we're committed to doing whatever's possible on our end to make this a very smooth transition for your team.

Thank you for being a Rippling customer to this point, and we wish you all the best in this exciting new market.

Yours,
Sarah Hartman

18  for global workforce management solutions~~, a subset of Rippling's product offerings~~.

20  Terminating the Deel customer relationship was an important and necessary step taken by

21  Rippling to protect its confidential information~~.~~ from misuse by a now-direct competitor.[16]

---

[16]     Though not the subject of this lawsuit, Rippling notes that it has repeatedly encountered troubling conduct by Deel and its affiliates since terminating its customer relationship, and has reported such conduct, where appropriate.  Rippling's message to Deel has been simple and

1   18. Rippling expends an enormous amount of time and money developing its

2   products, sales approach, and customer engagement strategy.  This information is

3   valuable to Rippling precisely because it is not available to its competitors.  As part

4   of its regular business practices, therefore, Rippling stringently protects its

5   confidential, commercially sensitive business information from disclosure and

6   misuse in the highly competitive landscape in which it operates.

**Deel Develops Fixation with Rippling Talent**

7       46.     Since the breakup, Deel has demonstrated a sustained and targeted interest in

8   recruiting Rippling personnel.  Standing alone, this does not seem unusual—Rippling has great

9   people.  But in light of recent revelations, Deel's recruitment tactics  now appear, at least in part,

10  to have served as a mechanism for misappropriating trade secrets and confidential business

11  information.

12      47.     These tactics included, but were not limited to: (a) offering significantly more

13  compensation for employees who join from competitors; (b) fast-tracked hiring processes,

14  including offers without interviews; (c) hiring of departing employees who had downloaded

15  significant amounts of confidential information from their prior employer; and (d) refusal to

16  identify or return this material.  These poaching efforts (mostly unsuccessful, but notable in

17

18

19  consistent:  comply with the law and compete fairly.  Deel, by contrast, has refused.  It continued
    offering EOR services in Russia into 2025 despite U.S. sanctions, was advertised as a partner of
    and, per public records, banks with sanctioned Russian bank T-Bank, and has misclassified its

20  global personnel—including reportedly its own CEO.  Deel has also launched regulated services
    like payroll and PEO without proper licensure.  When scrutiny arises, deflection often follows.  In

21  one instance, Deel leaked a false acquisition bid of its competitor Papaya Global the same week
    one of its large payout clients (a simulated prop trading firm) was charged with fraud by the

22  CFTC.  And in response to a confirmed investigation by Singapore's Ministry of Manpower, Deel
    CEO Alex Bouaziz brushed it off:  "We have investigations all the time across all the countries."
    *See* Kenrick Cai, *$12 Billion HR Startup Deel Changed Global Hiring. Now It Wants To Change
    Regulators'        Minds*,        Forbes        (Dec.        4,        2023),
    https://www.forbes.com/sites/kenrickcai/2023/12/04/12-billion-hr-startup-deel-changed-global-hir
    ing-now-it-wants-to-change-regulators-minds/?sh=124f39d2599b.

1   breadth) became so prevalent that within Rippling's team, it is commonly remarked—only half in

2   jest—that all Rippling employees have a standing offer to join Deel.

3   **Two Illustrative Examples of Deel's Recruiting Practices Being a Means to Access Rippling's Confidential and Proprietary Information**

4        48.    Two personnel incidents illustrate how Deel's recruiting practices served as a

5   conduit for obtaining confidential and proprietary information.

6        49.    First, in January 2024, Deel hired Rippling's former Director of National Accounts

7   (Conspirator-1) as Deel's new Director of Partnerships, shortly after his termination from Rippling

8   for performance.  During a routine security review, Rippling discovered that, in the late evening

9   hours before his termination in December 2023, Conspirator-1 had downloaded a cache of highly

10  sensitive trade secret documents, including product roadmaps and critical operational playbooks.

11  When Rippling demanded that Conspirator-1 return this information to Rippling (as his contracts

12  with Rippling required) and informed Deel of these concerns, Deel's attorneys and Conspirator-1

13  refused to take action.  Further investigation revealed that the volume of documents taken was

14  even greater than initially believed.  Deel's attorneys then suddenly informed Rippling that a

15  third-party forensic investigator was hired to delete the documents rather than return them to

16  Rippling, as required.  On information and belief, Deel is funding Conspirator-1's legal defense

17  counsel, who represents Deel in separate matters.

18        50.    Second, in February 2024, Deel hired a senior manager from Rippling's PEO team

19  (Conspirator-2) as Deel's new Director of PEO Solutions Consulting.  On information and belief,

20  at least eight months prior, in July 2023, Deel attempted to recruit Conspirator-2 to lead the

21  development of its new PEO offering.  At the time, because Conspirator-2 was a key individual on

22  Rippling's PEO team, Rippling offered him a retention package, which he accepted.  On

    information and belief, Deel and Conspirator-2 remained in contact despite Conspirator-2

1    remaining at Rippling.  By early 2024, Deel returned with a new offer, one that was lucrative

2    enough to prompt Conspirator-2 to turn down a second retention bonus from Rippling.  According

3    to Deel whistleblowers, Conspirator-2 improperly retained confidential Rippling documents

4    concerning Rippling's PEO offering after leaving Rippling for Deel.  On information and belief,

5    Conspirator-2 did so in anticipation of payment from the Bouaziz Racketeering Enterprise once he

6    joined Deel and provided the misappropriated documents to his new bosses when he arrived.

7    Former Deel employees have told Rippling that, upon joining Deel, Conspirator-2 shared the

8    misappropriated confidential Rippling PEO materials with Deel executives, including Alex

9    Bouaziz.

10        51.    Moreover, Conspirator-2 went so far as to text one of his former colleagues to "do

11    [him] a solid" and send him additional Rippling documents.



12

13    Tuesday • 2:58 PM

14    Hey can you do me a solid and shoot me over the
      national and tri state benefit guides?

15    Tuesday • 11:11 PM

16    lol guess not?

17    Yesterday • 6:52 PM

18    C'mon. You know that's not going to happen 🤷

19

20    *Text Messages on April 16–18, 2024 Between Conspirator-2 and Rippling Employee*

21    On information and belief, Conspirator-2 engaged in this behavior with the express intent of

22    benefiting Deel at Rippling's expense.

**A Broader Pattern of Deception and Competitive Misconduct**

52.     Deel's misconduct has not been limited to employee poaching for information. Former Deel employees describe a company with virtually no internal controls around competitor information.  Rather, these former employees report that they were "positively encouraged" to bring information from prior employers to Deel, and that Deel's leadership would instruct sales teams to create fake email accounts through Gmail or Outlook, mimicking legitimate company domains to circumvent firewalls blocking known Deel traffic, to explore competitor products while masquerading as prospective customers—practices that are all expressly prohibited in Rippling's policies and training.

53.     Meanwhile, even if Deel employees encountered illicit conduct, per Deel's public Whistleblowing Policy, they were instructed to contact "phb@deel.com" (the email address for Board Chair and CFO Philippe Bouaziz) or his consulting company Bouaziz & Partners."[17]

54.     For Deel, lack of controls appears to be an intentional feature, not a bug.[18]

55.     Taken together with the conduct at issue in this action, these practices reflect a deliberate pattern and practice by Deel to shortcut innovation through the misappropriation of the time, capital, and intellectual investments of its competitors.

II.    **DEEL'S CEO CULTIVATES AND PAYS FOR A SPY TO STEAL RIPPLING TRADE SECRETS**

---

[17]  *See Whistleblower Policy*, Deel, Inc., *available at* http://web.archive.org/web/20250421013709/https://www.deel.com/legal/whistleblower-policy/ (effective Oct. 28, 2024) (archived Apr. 21, 2025).

[18]  By contrast, Rippling has put in place robust and overlapping controls to ensure that competitor confidential information does not enter Rippling when new employees come over from a competitor.  Specifically, Rippling employees sign agreements that state they will not bring any third-party confidential information to Rippling, including that of any former employer.  Beyond contractual controls, Rippling also employs several administrative and technical controls to ensure that its new hires are well versed on their continuing obligations to their prior employers, including policies, training, and restrictions on its referral bonus program.

56.     Deel's illicit tactics reached a shocking crescendo in 2024.  CEO Alex Bouaziz personally recruited, directed, and paid a Rippling employee to operate as a corporate spy—feeding Deel a steady stream of confidential trade secrets from inside the company.  The contours of this covert operation are known due to extensive forensic analysis, contemporaneous documentary evidence, and a sworn affidavit from the spy himself.[19]

**How Deel CEO Alex Bouaziz Recruited the Spy**

57.     In or around March 2024, Alex Bouaziz commented on a LinkedIn post by Keith O'Brien, then a mid-level payroll compliance manager at Rippling, requesting to connect.  Around the same time, O'Brien applied for a payroll product compliance role at Deel, but was not offered the position.  Following the application process, Alex and O'Brien exchanged messages to discuss the interview feedback.  The pair continued to exchange occasional messages.

58.     A few months later, in or around August or September 2024, O'Brien told Alex that he had launched a new payroll consulting company called Global Payroll Geeks.  Alex referred O'Brien to Deel COO Dan Westgarth to explore a service provider arrangement.  O'Brien also mentioned to Alex that he was considering leaving Rippling to focus on his payroll consulting business full-time.  Alex suggested that they speak by phone.

59.     During that call, Alex Bouaziz told O'Brien that he "had an idea."  Rather than leave Rippling, O'Brien should remain at the company and serve as a "spy" for Deel—in Alex's own words, just like "James Bond," in exchange for monetary reward.  After some quick thought, O'Brien agreed to the spying arrangement.  Alex then initiated a three-way phone call with O'Brien and his father, Philippe Bouaziz, to discuss the logistics.

**Deel CEO Establishes Protected Communication and
Payment Channels for the Spying Scheme**

---

[19]  *See* Exhibit 1 (Sworn Affidavit of Keith O'Brien).

60.    Recognizing the risk of open phone lines, Alex moved the conversation to Telegram.[20]  Telegram lets users send "Secret Chats" using end-to-end encryption.[21]  This means: "Telegram has no way of seeing what's discussed in Secret Chat conversations, . . . [u]sers also can't forward these messages, and they can self-destruct—making it even harder for third parties to intercept their contents."[22]  With Philippe present, Alex outlined the spying arrangement: O'Brien would provide insights into "Rippling's 'way[] of doing things,'" including corporate strategy, customer insights, and "other interesting [Rippling] company information."  In exchange, Alex agreed to pay O'Brien approximately €5,000 a month around the 6th of each month.

61.    Communications were to be strictly limited to Telegram, with messages configured to auto-delete after 24 hours.  Alex instructed O'Brien to only relay Rippling's confidential information to him via a private Telegram.  Alex told O'Brien that payments would be arranged in a separate Telegram channel with Philippe and a third individual referred to as "the Watchman," who had the initials "A.D."  A.D.'s real identity is not yet known.

62.    Philippe then instructed O'Brien on particular terminology to use to discuss payments.  When it was time for O'Brien to request payment, O'Brien would send a picture of a watch to the payment chat.  At times, Philippe would reply, "the buyer is happy," which O'Brien understood to mean that Alex, the "buyer" of Rippling's confidential information, was happy with the information provided.  Other times, O'Brien would tell Alex that payment was late, and Alex would tell him to "ping Watchman" or say he would "sort it."

---

[20]  *How Telegram Became a Playground for Criminals,* N.Y. Times (Sept. 7, 2024), https://www.nytimes.com/2024/09/07/technology/telegram-crime-terrorism.html.

[21]  *See Telegram Privacy Policy*, Telegram, https://telegram.org/privacy (last accessed June 4, 2025); *see also* Secret Chats, *Telegram FAQ*, Telegram, https://telegram.org/faq#secret-chats (last accessed June 4, 2025).

[22]  Sam Sabin, *How Telegram Became a Destination for Criminals*, Axios (Aug. 27, 2024), https://www.axios.com/2024/08/27/telegram-pavel-durov-encryption-hackers-criminals.

63.     Because O'Brien understood that what Deel was asking him to do was "wrong," O'Brien requested that the spying engagement be papered with a consulting agreement, so that O'Brien would have a "seemingly innocent explanation for the additional income" he was receiving for spying on Deel's behalf.  Alex refused such agreement because, according to O'Brien, Alex did not want a documentary record of his relations with O'Brien.

64.     O'Brien began receiving compensation for his spying activities in November 2024, when he received a bank transfer of $6,000 from an "A.B." via Revolut, a British financial technology company that specializes in online payments.  Documentary evidence from Revolut establishes that "A.B." was Alba Basha, *the wife of Deel COO Dan Westgarth*:[23]

---

[23]    Rippling is in the process of seeking "Know Your Customer" information from Revolut about this account to confirm Alba Basha's identity.

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20      65.     Philippe wanted there to be "no trace," so he informed O'Brien that all subsequent

21  payments would be made in cryptocurrency.  After the first payment, Deel began to pay O'Brien

22  using the Ethereum cryptocurrency and continued making such payments until March 13,

    2025—just one day before Rippling obtained an order from the Irish High Court requiring O'Brien

1  to turn over his personal devices for imaging and preservation. An example of one such

2  transaction is below.



11  66.     O'Brien would then immediately convert those payments to fiat currency to his

12  personal bank account:[24]



[24]  A textual representation of these transactions is attached hereto as Exhibit 5.

-28-                                    Case No. 3:25-CV-2576

FIRST AMENDED COMPLAINT



**How the Spying Scheme Operated**

1      67.    Alex managed the spy and his theft closely.  He communicated with O'Brien

2    multiple times each workday through written or voice notes, always via Telegram.  At Alex's

3    direction, O'Brien accessed secure, centralized databases that are accessible only to Rippling

4    employees, including databases hosted by Salesforce, Slack, and Google.[25]   These Rippling

5    databases, and the data stored therein, are all located in the United States.  As such, each and every

6    instance of O'Brien accessing these databases (each instance of which occurred from Ireland)

7    necessarily required O'Brien to utilize international wires.

8      68.    Deel unlawfully accessed and exploited those databases for its own ends.  Alex

9    directed O'Brien to conduct searches on behalf of Deel in Rippling's Slack instance on a near

10   daily basis, and O'Brien also searched within Rippling's Salesforce and Google Drive repositories

11   for content requested by Alex.  Alex messaged O'Brien several times a day on Telegram, and

12   often messaged him on Monday mornings ("hey boss, good weekend??"), prodding him to resume

13

14

15

16   [25]  Rippling's use of these databases for storage is common for a modern technology company of
     its size, but understanding the risks posed thereby, Rippling safeguards its confidential
     information through both contractual and technological means.  All Rippling employees are
17   contractually obligated to keep Rippling's information confidential and to utilize the information
     and technology provided by Rippling only for an appropriate, work-related purpose.  Rippling also
18   specifically trains its employees to keep all sales, lead, and pricing information strictly
     confidential.  Among other industry-standard technological safeguards, Rippling also only grants
19   access to its systems to authorized users who pass initial and periodic biometric checks designed
     to block unauthorized access to Rippling's information repositories.  In addition, Rippling
20   comprehensively logs all system activity for ongoing security monitoring.  For example, all Slack
     activity is "logged" such that every time a user views a document through Slack, accesses a Slack
21   channel, sends a message, or conducts searches on Slack, that activity (and the associated user and
     related digital details) is recorded in a log file. Finally, remote access to Rippling's systems is
22   tightly controlled; for example, to access Rippling Slack channels from a mobile device, Rippling
     employees must use a device meeting certain security requirements (such as having a strong
     password, automatic locking of the device upon a number of failed login attempts, and the latest
     security patches and updates installed).  Employees must also use their Rippling login credentials
     and, where required by the system, are subject to multi-factor authentication or token-controlled
     access.

1    his theft at the start of a new workweek.  O'Brien transmitted all of the confidential information he

2    stole from Rippling directly to Alex, for his use at Deel.

3        69.    Throughout the scheme, Alex consistently focused O'Brien's thefts on Rippling's

4    most valuable corporate work product:

5    ●    **Corporate Strategy Trade Secrets** (*e.g.*, product expansion plans, core payroll

6         initiatives); and

7    ●    **Sales and Marketing Trade Secrets** (*e.g.*, customer data, pipeline intelligence,

8         messaging).

9

10

11       18.   Alex was particularly interested in Rippling's strategies around global payroll and expansion
             efforts, as well as reviewing specific sales, marketing information, and customer details. Alex
12           would give me direction for what terms to search on Rippling's Slack system in order to yield
             the information he wanted.  Alex would frequently message me and say "hi boss!" or "hey boss,
13           can you search for…" to start a conversation.  Alex would frequently message me on Mondays
             with "hey boss, good weekend??"

14

15

16

17   The reason for Alex's focus on Rippling's most treasured Corporate Strategy Trade Secrets and

18   Sales and Marketing Trade Secrets is obvious:  Through his stealing, Deel gained an unfair head

19   start, saved countless hours and dollars in research and development of market priorities, and

20   identified prospects and customers interested in competitive services, without the significant

21   expenditures Rippling incurred.  Alex directed O'Brien to this content by suggesting specific

22   search terms for O'Brien to use when secretly combing through Rippling's internal data

     repositories.

70.    Early on, O'Brien would transmit information to Alex via screenshots (static images), but Alex soon asked O'Brien to adjust his approach, coaching him on how to take screen recordings (*i.e.*, videos of the information visible on O'Brien's phone as he scrolled through Rippling's Slack), allowing O'Brien to capture—and Deel to receive—more of Rippling's information in each transmission.  Thereafter, O'Brien sent as many as six screen recordings of stolen information per day.  Because O'Brien did not always obey Alex's deletion rule, some of these screen recordings and other information were backed up to O'Brien's Apple iCloud account and have now been obtained by Rippling's forensics firm.

71.    Alex used emojis and catchphrases to signal his degree of satisfaction with the Rippling secrets O'Brien had stolen and transmitted.  When he was pleased with information O'Brien sent him, Alex would often respond with a "heart" emoji.  When Alex found the stolen information to be particularly valuable, he often responded to O'Brien with the word "beast."

25.    Sometimes Alex would react enthusiastically about information I sent to him, saying things like, "this channel is beast" or "these are badass."  I understood this to mean that what I sent him was really good and I should keep sending him similar information. Sometimes Alex would say that certain information was a "headache," which I took to mean that he did not find it valuable.

72.    By December 2024, O'Brien again expressed to Alex that he planned to leave Rippling, but Alex directed O'Brien to stay on.  Alex said O'Brien should contact COO Dan who would "see to it that [his] consulting company Global Payroll Geeks[] would get money from Deel," and on January 9, 2025, Alex created a three-way WhatsApp group with Dan and O'Brien

1    called "Keith <> Dan."  Alex also promised to make Global Payroll Geeks a preferred partner of

2    Deel if the stealing continued for a little while longer.

3                   **Theft and Use of Rippling's Trade Secrets Throughout the Deel Organization**

4         73.    Though its investigation of the Bouaziz Racketeering Enterprise remains ongoing,

5    Rippling has already forensically identified, and confirmed with O'Brien's cooperation,

6    substantial evidence of Alex Bouaziz's theft of Rippling trade secrets on Deel's behalf.  Through

7    this brazen scheme, Alex directed O'Brien to exfiltrate reams of Rippling's most confidential

8    internal documents which Deel has exploited to illegally benefit Deel's business operations, in

9    particular, in the following ways:

10   • **Rippling's Sales & Marketing Trade Secrets**:  stolen and used by Deel to
     shortcut customer acquisition spend and steal Rippling's customers, prospects, and
11   pipeline in support its own growth;

12   • **Rippling's Corporate Strategy Trade Secrets**, including:

13        ○ **(a) Rippling's Product Strategy** – stolen and used by Deel to facilitate the
          development of its own product roadmap;

14        ○ **(b) Customer Retention Strategy** – stolen and used by Deel to gain an
          unfair economic pricing advantage and retain accounts;

15        ○ **(c) Recruiting strategy** – Deel has relied on stolen and confidential
16        Rippling talent data to thwart Rippling's continued success and to support
          its own key business development efforts; and

17        ○ **(d) PR & Communications** – Deel has relied on stolen Rippling trade
18        secrets and confidential information to advance its own PR and
          Communications agenda, and inflict reputational damage on Rippling.

19   ~~II. RIPPLING'S~~*Rippling* Sales and Marketing Trade Secrets ~~AND CONFIDENTIAL~~

20   ~~BUSINESS INFORMATION~~*Stolen by Alex Bouaziz*

21

22        ~~19.  Over the course of several years and through substantial efforts and~~
     ~~financial investment, Rippling has developed, compiled, and maintained a wealth~~
     ~~of sales- and marketing-related~~ ~~trade secrets and confidential business information~~
     ~~(hereinafter referred to as "Rippling's Sales and Marketing Trade Secrets") that it~~

1  uses to acquire customers, service the needs of those customers, and achieve and

2  maintain a competitive edge over other global workforce management companies,

3  including Deel. This information was developed through direct interactions

4  between Rippling representatives and current and potential Rippling customers and

5  is not known to the general public. Because this information is known only to

6  Rippling, it provides Rippling with a competitive advantage over its competitors,

7  allowing it to fine tune its marketing message to appeal to potential customers and

8  to adapt its products to serve customer needs. This information is likewise

9  valuable to Rippling's competitors, who could obtain market share, and therefore

10  economic value, by mimicking Rippling's message and product features, or by

11  calibrating their own sales, marketing, and customer retention strategies to more

    directly combat those employed by Rippling.

12      74.    O'Brien's sworn confession and substantial forensic evidence has confirmed that

13  Alex ordered O'Brien to steal information about Rippling's competitive sales and marketing

14  strategies, and Rippling's prospects and customers at all stages of the sales pipeline. Prompted by

15  instructions from Alex sent via Telegram, O'Brien accessed Rippling's Sales and Marketing Trade

16  Secrets extensively, on a near-daily basis, by previewing sales and marketing related channels in

17  Rippling's Slack instance and sending screen-recordings back to Alex via Telegram to maximize

18  the amount of content shared. One such screen-recording of Rippling's internal Slack systems

19  inadvertently captured by O'Brien's iCloud backup is ***six minutes and thirty-one seconds*** long.

20      75.    Rippling's Slack logs[26] powerfully demonstrate the unprecedented rate with which

21  O'Brien combed through Rippling's sales and marketing Slack channels, accessing channels in

22

---

[26]   In part to ensure that confidential information in Rippling's Slack channels is used only for authorized purposes, Rippling employees' Slack activity is "logged", meaning every time a user views a document through Slack, accesses a Slack channel, sends a message, or conducts searches on Slack, that activity (and the associated user) is recorded in a log file.

1   "preview" mode to steal for Alex Bouaziz and benefit Deel.[27]   Beginning in November 2024,

2   O'Brien searched the term "deel" in Rippling's Slack instance approximately 23 times per day.



10  Using "deel" as his anchoring search term, O'Brien relentlessly and secretly accessed 114

11  different sales and marketing focused Rippling Slack channels to procure information for Deel

12  regarding Rippling's (a) sales leads and pipeline; and (b) competitive sales strategies.   The sales

13  and marketing channels stolen from most frequently are listed here:

14

15

16

17

18

19

20

21

22

[27]   Although it is more common for Slack users to join a channel to review its contents or participate in a discussion, O'Brien consistently accessed channels in "preview" mode, allowing him to see the contents of the channels without joining them.   O'Brien chose to review the channels in preview mode to avoid alerting the channels' members that he had accessed them.

| Channel name | Total count of events |
| --- | --- |
| deal-desk-sales | 428 |
| gong-stream-deel-compete | 333 |
| im-gong-calls | 209 |
| am-sales-updates | 200 |
| deel-gongstream | 123 |
| sdr-segment-drift | 117 |
| peo-quote-updates | 101 |
| emea-global-only-ob-notifications | 99 |
| foundgold-global-nls | 88 |
| emea-sales-global-core | 76 |
| emea-global-routing | 65 |
| uki-s1-routing | 58 |
| competitive-deal-insights | 57 |
| mops-inbound-request-alerts | 56 |
| rattle-mops-testing | 56 |
| global-sc-requests | 52 |
| comms-competitor-news | 51 |
| mm-global-high-intent-notifications | 46 |
| emea-sc-requests | 46 |
| hr-sc-requests | 40 |
| global-apac-sdr-qualification | 32 |
| sales | 27 |
| ind-sdr-ae-opps | 24 |
| gong-xero-mentions | 21 |
| sales-alerts | 21 |
| apac-forecast-updates | 21 |
| peo-forecast-updates | 15 |
| emea-global-outbound-pods | 17 |

20. *Theft and Use of* Rippling's Sales ~~and Marketing Trade Secrets include the following:~~*Leads and Pipeline for Deel*

76.     21. ***Rippling's Sales Leads.*** To identify potential prospective customers, Rippling spends millions of dollars each year on marketing, with the sole goal of identifying companies that are open to hearing about Rippling's products ("Rippling's Sales Leads").  Rippling identifies sales leads by tracking responses to targeted advertisements, LinkedIn posts, Google AdSense inventory, and a variety of other marketing efforts.

~~22.~~ The ~~Sales Leads~~sales leads generated by these efforts are tremendously valuable ~~in and of themselves~~ —indeed, that is why Rippling spends so much money procuring them.  In Rippling's market, identifying potential customers~~in the first instance~~, who happen to be seeking a solution to a challenge that Rippling is poised to solve, is the most difficult (and expensive) part of the revenue generation cycle.  ~~A single outbound~~, with each lead ~~is the work product of~~requiring

-36-                                              Case No. 3:25-CV-2576

1   hours of outbound phone calls ~~made~~ by one of Rippling's sales development representatives. ~~It is,~~

2   ~~in essence, a eureka moment: the right person, with a business challenge that Rippling solves, at~~

3   ~~the exact point in their business lifecycle to consider Rippling. Moreover, because the leads are~~

4   ~~the product of the work of~~ Rippling's sales ~~team and~~ leads, which are not made public, ~~they~~

5   provide Rippling with a competitive advantage over its competitors ~~in identifying these~~ with

6   respect to potential customers. ~~If a Rippling competitor were to have access to the end result of~~

7   ~~these efforts without needing to spend the considerable sums and hours Rippling does, the~~

8   ~~competitor could profit substantially by pursuing Rippling's Sales Leads without expending the~~

9   ~~effort to generate them. The~~ By stealing Rippling's leads—without having to expend the time and

10  money to develop leads itself—Alex Bouaziz in effect stole value from Rippling, harnessing

11  Rippling's work for Deel's benefit while in turn diminishing the value of the leads to Rippling

12  ~~would, in turn, diminish~~.

13      77.    ~~23. *Rippling's Sales (Prospective Client) Pipeline.*~~ Once Rippling has identified

14  prospective customers to be targeted as Sales Leads, Rippling's salesforce is responsible for

15  persuading them to become Rippling customers.    To do so, Rippling's salesforce follows

16  ~~a~~ Rippling's unique step-by-step process ~~developed through extensive efforts and experience that~~

17  ~~is unique to Rippling (~~ to gather information and ultimately convert a prospect into a paying

18  customer (this process and the information gathered during that process, "Rippling's Sales

19  Pipeline"). ~~Rippling's Sales Pipeline is best illustrated as a funnel, with customers getting closer~~

    ~~and closer to signing a deal with Rippling as they process from the top of the funnel to the bottom.~~

20      ~~24. A prospect flowing through Rippling's Sales Pipeline goes through the~~

21  ~~following stages, each of which reflects Rippling's extensive research into the ideal~~

22  ~~method of converting a Sales Lead into~~ a ~~Rippling customer:~~

a. **Stage 1.** A Rippling sales development representative ("SDR") assigns the prospect to a Rippling salesperson, who in turn engages in pre-call research about the prospective customer.

b. **Stage 2.** The salesperson works with the prospective customer to identify the prospect's business challenges, learn why the prospect is interested in learning more about Rippling (particularly if the prospect is currently a customer of a direct competitor), and discusses how Rippling can solve those business challenges.

c. **Stage 3.** The salesperson conducts product demonstrations for the prospect, showing how Rippling's products can solve the prospective customer's unique business challenges.

d. **Stage 4.** Depending on the feedback from the customer, the salesperson may further tailor Rippling's solution(s) to the customer's current issues and conduct additional demonstrations to validate those solution(s).

e. **Stage 5.** The salesperson and the prospective customer align on pricing — which is unique to each individual customer (*i.e.*, Rippling's pricing is dynamic and reflects individual customer needs) — and other contract terms.

25. Represented visually, Rippling's Sales Pipeline generally looks like the below:

26. Each stage of the Sales Pipeline requires Rippling and its sales team to document. This documentation includes who the contact person is, what the

1  customer is looking for; (3) Rippling's customized ~~and tailored~~ solution to that customer's

2  ~~problems and~~ needs; and (4) the offering price point and contractual terms.  Additionally, each call

3  with a prospect is transcribed in real-time and stored in a centralized database, allowing for

4  subsequent review of each and every call with a prospect.  For obvious reasons, in the hands of a

5  competitor like Deel, such information provides a substantial competitive advantage, allowing

6  Deel to more effectively tailor its pitch to a prospective customer or, in the case of a Deel

7  customer, maximize its chances of retaining the customer through better service.

8

   ~~27.  The information generated through Rippling's Sales Pipeline assists the~~

9  ~~company in quickly and efficiently turning a prospective customer into an actual~~

10 ~~customer.  Rippling employees who are soliciting a prospective customer or who~~

11 ~~are interested in learning about that prospective customer can search this~~

12 ~~information to understand the prospect's needs and desires, and company engineers~~

13 ~~can use it to determine why customers choose Rippling's products (and why some~~

   ~~prospects do not) in order to sharpen Rippling's products and to design even better~~

14 ~~solutions for the next prospect down the line.~~

15     78.    In total, Slack logs of O'Brien's activity establish that he secretly viewed and

16 downloaded information from Rippling Slack channels dedicated to prospective clients over 1,300

17 times between November 2024 and March 2025.  Two of the channels that O'Brien spied on the

18 most during Deel's spying scheme reflect Bouaziz's efforts to target Rippling's sales prospects

19 and pipeline:

20     •  **#deal-desk-sales**:  a channel that provides an automated feed describing in detail
        each new sales quote generated by the Rippling Sales organization.  The summary

21      of each sales quote recorded in the channel includes details of any discounts
        applied, anticipated transaction timing, and certain details about the customer.

22      Through this channel, O'Brien had access to the details of every client sales quote
        dating back to September 2024.  O'Brien accessed the channel over 400 times since
        the start of the spying scheme.

     •  **#[redacted]-global-nls**:  a channel that has only a single member—its
        creator—Rippling's Senior Vice President of International Sales, who created the

channel to capture summaries of all sales calls with promising prospective customers for Rippling's global products. Several recent entries on the channel describe specific prospective customers currently using Deel and other solutions, but who are interested in Rippling to address specific concerns or objectives. O'Brien viewed the channel 88 times since the start of the spying scheme.

79.    The harm to Rippling from Deel's theft of its Sales Leads and Sales Pipeline trade secrets is not hypothetical. Indeed, in November 2024—the month the scheme began—Alex Bouaziz used the stolen information to attempt to poach a Rippling prospective customer.

80.    **On the same day** that a current Rippling prospect ("Prospect A") had a conversation with a Rippling account executive, Prospect A received a message from "alex from deel" (Alex Bouaziz), stating that he "*heard*" that Prospect A was "using a few products other than Deel" and suggesting that they speak:



81.    Prospect A told Rippling in a contemporaneous email that the timing was suspicious:



82.    And then Prospect A questioned how Deel "would know [about their discussions with Rippling] in real time," because they had not publicly referenced consideration of Rippling or initiated a formal vendor search:

> On Wed, Nov 20, 2024 at 8:34 AM                      wrote:
>
>> Great, will be in touch as soon as I have visibility.
>>
>> On the airpods, thanks.
>>
>> On Deel intelligence: I am just curious to know how they would know it in
>> real time. I haven't posted anything on LinkedIn nor went out asking for
>> quotes. Do you have a perspective on that?
>>

83.    But it was only after Rippling filed its complaint in this action that Prospect A (and Rippling) realized that this timing was in fact not a coincidence at all, but a result of Deel's spying scheme:



~~28. In many cases, Rippling is soliciting a prospective customer who is an active customer of a competitor's product. Through the Sales Pipeline process, Rippling employees learn what these prospects' business challenges are with their existing solution, and why the prospect is interested in exploring a replacement solution.~~ For obvious reasons, in the hands of a competitor this information would provide a real competitive advantage in their efforts to retain their customer.

84.     Evidence now confirms exactly how Deel knew about Prospect A's business discussions with Rippling in real time. Review of O'Brien's Slack logs confirms that he secretly previewed details of Rippling's confidential pricing strategy discussions about Prospect A. Specifically, O'Brien "previewed" Rippling's #deal-desk-sales Slack channel several times on November 6, 2024, the same day Alex Bouaziz contacted Prospect A via WhatsApp. On November 5, #deal-desk-sales referenced over 100 distinct sales leads with a description of Rippling's proposed pricing strategy for each, including a reference on November 5, 2024, to Prospect A:



85.    Rippling continues to identify examples of Deel's salesforce using the fruits of Alex's spying scheme to expand their customer base at Rippling's expense.  As a sample, Rippling has learned:

- Prospect B:
  - On December 19, 2024, after searching "deel" in Rippling's Slack 33 times, O'Brien previewed the channel "Gong-Stream-Deel-Compete" 13 times.

  - The channel, an automated feed of sales calls with customers evaluating Rippling and Deel products in tandem, included mention of an existing Deel customer considering moving to Rippling to address compliance and payroll challenges as the company has grown ("Prospect B") and Rippling's pitch strategy, noting the products that appeared to resonate most with the prospect.

  - Armed with the benefit of these stolen insights into Rippling's sales strategy, the prospect ultimately signed with Deel.

- Prospect C:
  - On February 19, 2025, after searching for "deel" 27 times in Rippling's Slack instance, O'Brien navigated to a mention of Deel in a channel focused on a particular prospective customer who was considering both Rippling and Deel ("Prospect C").

  - O'Brien previewed the channel, which included details for a call scheduled with Prospect C the next day and communications in which Prospect C relayed to Rippling specific concerns with Deel's products and services. The channel also contained the Rippling sales team's internal pitch strategy discussion, including confidential details about how Rippling planned to highlight certain advantages of its products to address the prospect's pain points with Deel's offerings.

  - O'Brien downloaded to his mobile phone two communications from the Slack channel.

  - On February 20, 2025, the day of Rippling's scheduled call with Prospect C, O'Brien previewed the Prospect-C related channel 66 times.

  - Later that day, Prospect C abruptly canceled the scheduled call with Rippling, explaining that they had decided to select Deel for the product they were interested in, despite Rippling's optimized solutions in light of their prior-referenced pain points with Deel's offerings.

1    ○ ≡ Through his cooperation, O'Brien has since confirmed that he stole Rippling's confidential strategy discussions regarding Prospect C and sent

2    them to Alex Bouaziz.

3    ● ≡ Customer A:

4    ○ ≡ After Rippling filed its initial complaint in this action, Customer A reached

5    out to Rippling and reported that in October 2024, shortly after moving of its employees from Deel's PEO services to Rippling, Customer A received

6    an unsolicited email from Deel referencing "word on the street is that you are looking at signing with one of our competitors."  Customer A reported

7    feeling confused by the outreach at the time, but in the wake of Rippling's complaint against Deel, expressed concern that their communications with

8    Rippling appeared to have been stolen and distributed to Deel's staff:



20    86.    Given the extensive nature of Deel's espionage scheme, Rippling anticipates that it

21    will identify countless more examples of Rippling customers and prospects preyed upon by Deel

22    using Rippling's stolen intelligence.

29.*Rippling's Competitive Intelligence Cards*

87. . In tandem with the expense, time, and resources devoted to identifying prospective customers Alex also instructed O'Brien to steal documents and information concerning Rippling's competitive sales strategy. Operating in a highly competitive HR software-as-a-service field, Rippling has also developed and maintains evolving competitive "battlecards" that it uses to train its salespeople for pitches to prospective Rippling customers that are currently working with a competitor, or who are considering Rippling along with one or more of its competitors, in order to effectively explain on how to position and pitch Rippling products in relation to competitor offerings, by highlighting Rippling's advantages over those competitors other products or features ("Rippling's Competitive Intelligence Cards"). Rippling maintains Competitive Intelligence Cards for competitors in each of its product verticals, totaling over 80 such cards, including one for Deel.

30. Rippling has generated the The Competitive Intelligence Cards reflect through thousands of hours of work by Rippling, including the review of analysts, deep-diving call transcripts and notes with current and prospective customers that mention or pertain to Rippling's competitors. During that process, Rippling learns several things, including: (1) what that customer does not like about the competitor; (2) what that customer is looking for that the competitor does not offer; and (3) what that customer does like about the competitor. By carefully and thoroughly analyzing the information produced through Rippling's thousands of hours of calls with prospective and current customers, Rippling determines how to effectively pitch a customer that is either already a customer of one of its competitors or is considering Rippling alongside one or more competitors. Rippling then simplifies that data into slides describing favorable and unfavorable attributes of competitor offerings and then strategizing how best to highlight Rippling's solutions amidst that playing field. The resulting Competitive Intelligence Cards are depicted on slides steeped with data and talking points showcasing the advantages of Rippling's products over deficiencies in those of its competitors' products.

1   ~~31. For example, from the review of thousands of pages of customer call~~
2   ~~transcripts, Rippling might believe that a top complaint prospective customers have~~
3   ~~about Deel is ineffective support, with responses taking multiple days. Armed with~~
4   ~~that information, Rippling might then effectively train its salesforce to focus on~~
5   ~~highlighting Rippling support,~~ and in particular ~~Rippling's online publication of~~
6   ~~real-time support status data.~~

    88.   ~~32.~~ In effect, these Competitive Intelligence Cards represent Rippling's ~~entire~~
7   playbook for competing against its peers. ~~The~~<u>Deel's theft of Rippling's</u> Competitive Intelligence
8   Cards ~~position Rippling to compete against, among others,~~ Deel in the ~~best possible manner, and~~
9   ~~train Rippling's sales force on what to say to effectively, both offensively and defensively, counter~~
10  ~~Deel. The Cards are also iterative in nature, or a "living document," in the sense that, as Rippling~~
11  ~~learns new information about its competitor, the slides are tweaked and fine-tuned to address those~~
12  ~~changes. ,~~ <u>particularly the card for Deel itself, weaponizes Deel to calibrate its marketing in a</u>
13  <u>manner designed to eliminate or undercut Rippling's own selling points, and to tailor its corporate</u>
14  <u>development and product strategy to close the gaps and pain points driving customers to choose</u>
15  <u>Rippling over Deel. Deel's CEO Alex Bouaziz has expressed his appreciation of the value of</u>
16  <u>these Rippling trade secrets. O'Brien has recounted that CEO Alex was unable to hide his</u>
17  <u>enthusiasm, responding immediately with a heart emoji after O'Brien sent him a screen recording</u>
18  <u>of each of the 31 pages of Rippling's Competitive Intelligence presentation deck capturing its</u>
19  <u>competitive strategy against Deel.</u>

20  *<u>Deel's Theft and Use of Rippling's Corporate Strategy Trade Secrets</u>*

21  89.   <u>From the very beginning of the scheme, Alex made his priority clear—he wanted</u>
22  <u>O'Brien to provide him with details about Rippling's "ways of doing things" including corporate</u>
    <u>strategy and customer insights. During the course of the scheme, acting in response to near-daily</u>

---

1  instructions from Alex, O'Brien accessed such strategy and insights in at least 27 different

2  Rippling Slack channels, more than 250 times. Rippling C-level and other senior executives use

3  these channels. These channels range from providing leadership visibility into favorable and

4  unfavorable customer experiences with Rippling products, to global expansion plans and products

5  under development. For example, the Slack channel "gtm-france" is a dedicated channel among

6  cross-functional stakeholders collaborating on strategy efforts for Rippling's entry into France

7  as a payroll and global benefits provider; and the "data-growth-exec-updates" channel highlights

8  new data-related product features.

9

| Channel name | Total count of events |
| --- | --- |
| exec-escalations | 54 |
| delighted-nps | 54 |
| proj-deel-remote-compete | 15 |
| imchurnupdates | 11 |
| proj-3p-payroll-custom-app | 11 |
| g2-positive-reviews | 10 |
| brokerpartner-bitwarden | 10 |
| test-escalations-catch-all | 10 |
| cmt-in-product-reviews | 9 |
| gtm-france | 7 |
| jpmc-ofac | 7 |
| highest-priority-customer-tasks-sla | 7 |
| client-top-quadrant-eor | 6 |
| incident-20241010-missed-internal | 6 |
| france-product-readiness | 6 |
| brokerpartner-fairmarkit | 6 |
| g2-negative-reviews | 6 |
| peo-wc-risk-review-updates | 5 |
| payments-exec-updates | 4 |
| data-growth-exec-updates | 4 |
| smart-pensions-build | 4 |
| customer-insights-stream | 3 |
| proj-win-back-the-base | 3 |
| proj-knowledge-base-research | 3 |
| platform-ai-layer | 3 |
| launches-hris | 3 |
| | **267** |

21      90.      In addition to Corporate Strategy Trade Secrets exfiltrated via Rippling's Slack

22  instance, O'Brien's sworn affidavit and subsequent cooperation have confirmed that he also ran

searches in Rippling's Google Drive file repository and Rippling's internal systems to identify

confidential materials of interest to Bouaziz.

1              *Deel's Targeted Theft of Rippling's French Native Payroll Strategy*

2              91.      O'Brien recounted that Alex Bouaziz was particularly focused on Rippling's native

3    payroll offering, and in particular, its native French payroll platform.  After Rippling launched its

4    native global payroll software platform in October 2022, Deel repeatedly and falsely advertised

5    that Rippling did not have global payroll software because "it was impossible," or because, as

6    Deel recently alleged in a legal filing, it would require "significant advances in quantum

7    computing," a claim so preposterous that Bloomberg columnist Matt Levine felt compelled to

8    satirically comment.[28]

9              92.      Whereas Deel's payroll solutions are either white-labeled tools offered in

10   partnership with various vendors, or payroll software which Deel obtained through acquisition of

11   smaller payroll providers, collectively presenting operational complexity to operate in tandem,

12   Rippling's payroll platforms in US, Canada, UK, Ireland, Australia, New Zealand, Singapore, and

13   France (among others) were custom built in-house by Rippling engineers and operate on a single

14   underlying engine.  With this structure, Rippling's global native payroll solution digitally

15   streamlines the complexity of worldwide workforce payments, coordinating the administration of

16   different tax regimes and payment in different currencies which through Rippling are all achieved

17   in a single pay run, with taxes and net pay calculated in milliseconds.

18             93.      In contrast, Deel's payroll solution operates on separate underlying systems by

19   country. This patchwork system historically was not built by Deel—Deel purchased licenses to

20   third-party payroll systems, country by country. With this cobbled-together structure, the same tax

21   calculation achieved in milliseconds across multiple countries on Rippling's global payroll engine,

22

---

[28]  Matt Levine, Opinion, *Argentex Got Some Margin Calls*, Bloomberg: Money Stuff (Apr. 28, 2025),
https://www.bloomberg.com/opinion/newsletters/2025-04-28/argentex-got-some-margin-calls.

1    requires multiple days for Deel's payroll tool to calculate, as payroll operations teams load the

2    data into each third party payroll system to simulate the payroll run and then export the net pay

3    amounts and taxes back to Deel, on a country by country basis.  Not only is operating global

4    payroll materially less efficient on Deel's platform, Deel's patchwork architecture is a shaky

5    foundation on which to build user-facing products, because the capabilities of each of the systems

6    are different, requiring Deel to attempt makeshift integration by reducing the whole platform to

7    align with the "lowest common denominator" of all of the systems. In other words, a tool is only

8    as good as its weakest integrated system.  This Achilles heel also inherently limits Deel's ability to

9    build new features, without the ability to support those features in all underlying systems.

10       94.    It was this key competitive advantage of Rippling over Deel (as between Rippling's

11   self-built native global payroll program and Deel's third-party-acquired piecemeal solution) that

12   Alex Bouaziz sought when directing O'Brien to steal details on Rippling's "way of doing things."

13   O'Brien has confirmed that Bouaziz repeatedly asked him to steal and send recordings of

14   Rippling's Slack channels related to payroll and tax operations, including regarding Rippling's

15   French payroll product.  These stolen details contain insights on exactly how Rippling was able to

16   support former Deel customers on Rippling's native payroll engine, that Deel was unable to

17   satisfactorily support themselves.  Alex Bouaziz asked O'Brien to return to these Slack channels

18   because of the value to Deel's CEO in seeing on-the-ground examples of the advantages of

19   Rippling's architecture and approach, which are winning with customers.

20       95.    Alex Bouaziz was particularly interested in Rippling's native French payroll

21   solution, which was a notably challenging feat, given the intricacies of French payroll regulations.

22   Bouaziz, recognizing O'Brien's extensive knowledge of Rippling's global payroll offerings by

     virtue of his then-role as Rippling's global payroll operations manager, peppered O'Brien with

     questions seeking insight on how Rippling's French payroll product was performing, including:

1   ■   ● What issues Rippling or its customers were experiencing with the French payroll
2   product;

    ■   ● Contact information for Rippling's French Payroll product leaders and French
3   payroll operations specialists; and

4   ■   ● Rippling's reaction to Deel's acquisition of Safeguard Global, a company offering a
    native French payroll tool.

5   96.   O'Brien has confirmed that he disclosed confidential insights on these topics to

6   Deel's CEO, revealing:

7   ■   ● Screen recordings from Rippling's payroll and tax operations Slack channel
    revealing details of certain issues Rippling was working to resolve with its French
8   payroll product;

9   ■   ● Names and contact information for key product and payroll operations talent;

10  ■   ● Internal discussions about Rippling's management of the Customer B account; and

    ■   ● Feedback from Rippling's internal Slack discussion of competitor news
11  commenting on Deel's announced acquisition of Safeguard Global.

12  97.   Deel's CEO made quick use of the stolen details of Rippling's French payroll

13  program. Bouaziz told O'Brien that Deel was focused on hiring French payroll specialists as a top

14  priority. Thus, on information and belief, he shared the product and payroll operations talent

15  details with his COO, Dan Westgarth, who circumvented Deel's talent acquisition team to make

16  direct contact with the potential candidates to inquire about their willingness to join Deel. One of

17  Rippling's payroll specialists described the strangeness of the encounter with Westgarth,

18  referencing his role at Rippling without the individual mentioning that fact. The Rippling payroll

19  specialist also spoke with Deel's Chief Financial Officer for Europe, who discussed Deel's

20  pending project to "create a native [French payroll] solution":

21  

    **Rippling payroll specialist**
    To sum up :
22  ● Dan mentioned that he knew I worked at Rippling, although I deliberately hid it from him at first.
    ● He then asked me who my manager was, which struck me as strange and inappropriate. Obviously, I refused to give this information.
    ● I also spoke to the CFO Europe, who is a French expert accountant and the founder's cousin. He informed me that he wanted to create a native solution and that this was already under development. He didn't try to test my technical expertise.

1

     98.     Alex Bouaziz sought to steal confidential information about Rippling's strategy,

2  and, in this particular example, he sought to learn how Rippling developed and maintained a

3  successful native French payroll product, which had prompted one of Deel's former customers to

4  switch to Rippling based on Rippling's superior product offering.  Capitalizing on the stolen

5  knowledge that Rippling's native French payroll offering was earning Rippling a competitive

6  advantage, Deel sought to regain ground, embarking on a marketing campaign through its largest

7  investor to emphasize the native payroll solutions Deel offered through acquisitions, not built

8  internally, like Rippling.[29]

9

                         *Product Strategy Trade Secrets Stolen by Deel*

10

     99.     O'Brien has confirmed that he stole Rippling's product roadmap and Global EOR

11  expansion roadmap and sent them to Alex Bouaziz, evoking instant excitement from Bouaziz,

12  who responded "beast!"[30]  These stolen roadmaps are among Rippling's most valuable internal

13

14  —————————————

15  [29]  Deel's largest investor, Andreessen Horowitz (also known as a16z), published a blog post
     titled, "Deconstructing Deel: How a Startup Became the OS for Global Work," praising several
16  aspects of Deel's business model, including Deel's use of acquisitions to acquire global native
     payroll offerings, lauding how "these acquisitions have paid off.  The acquisition of PayGroup in
17  2022 and PaySpace in 2024, for example, enabled Deel to expand its owned infrastructure,
     including native payroll engines in more than 100 countries."  Anish Acharya & Justin Kahl,
18  *Deconstructing Deel: How a Startup Became the OS for Global Work*, a16z (March. 10, 2024),
     https://a16z.com/deconstructing-deel/. The day after Andreessen's complimentary blog post, on
19  March 11, 2025, Deel announced the acquisition of Safeguard Global's payroll division.

     [30]  Rippling's product roadmap represents the culmination of strategic decisions developed over
20  the course of a three-month planning process on what product developments Rippling plans to
     prioritize for an upcoming quarter or year.  To develop the Product Roadmap, Rippling's Product
21  team, in close partnership with Rippling's R&D, Engineering, Legal/Compliance, Security, Risk,
     and Marketing, and Executive teams (up to and including Rippling's CEO), conduct a review of
22  extensive data sets from across the company—from Sales, to Technical Account Management, to
     Implementation, to Solutions Consultants, to Support, to Escalations—in a highly data-driven
     approach to determining customer wants and pain points.  Rippling's product roadmap plans are
     also heavily influenced by Rippling's substantial R&D expenditures, far exceeding peer SaaS
     companies of its size and stage, to identify opportunities to further innovate and integrate
     workforce management software solutions.

1  assets, reflecting the expertise and efforts of large swaths of employees working cross-functionally

2  to identify and operationalize the company's key strategic priorities and offerings.  For example, a

3  product roadmap from February 2025, which O'Brien sent to Alex Bouaziz, revealed feature sets

4  and go-to-market timing information for dozens of product initiatives that Rippling planned for its

5  2025 fiscal year.  Similarly, the Global EOR expansion roadmap[31] that O'Brien confessed he sent

6  to Bouaziz at least three times, records comprehensive data on new geographic markets Rippling

7  plans to enter, including launch date, scope of planned product offerings, and country-specific

8  operational details.

9        100.    Deel's theft of these and other Corporate Strategy Trade Secrets simply repeated its

10  tried-and-true unlawful growth strategy—why do it yourself, when you can steal it from your

11  competitor?  Alex Bouaziz commandeered O'Brien to steal Rippling's key corporate, product, and

12  global development plans.  And the theft of these prized internal assets has deprived Rippling of

13  the value of its hard-fought efforts, instead diverting these efforts for Deel's own benefit.  Alex's

14  reaction, "beast!", upon his receipt of this stolen information, makes clear that he fully

15  understands the value of what he wrongfully obtained.  He knows that the roadmaps, plans and

16  insights will spell out for Deel which product offerings Rippling believes are in highest demand

17  among its customers, the approximate time and complexity they will take to design, build and

18  launch, and how Rippling plans to position them to the market.  Armed with this information,

19  Deel is competing with Rippling using Rippling's own proprietary trade secret information.

20

21

22

---

[31]   The Global EOR Roadmap is the product of hours upon hours of intensive cross-functional work across Rippling teams, including Rippling's Risk, Finance, Business Development, Compliance, and Legal departments.  The product of the tireless work of these teams is an exhaustive document that has tremendous value.  Accordingly, the harm Rippling suffered from its theft is immense.

101.   As a noted tech investor recognized in *The Week Startups Podcast*, for software-as-a-service (SaaS) start-up companies like Rippling and Deel, getting your hands on a competitor's product roadmap is the most valuable discovery imaginable:

- Alex Wilhem (Journalist): "Jason, in terms of the crown jewels, if you are a reporter, the crown jewels is getting someone's income statement, right?  But if you are a competing SaaS provider, this is what you want."

33. Rippling's Competitive Intelligence Cards are valuable to Rippling in significant part because their contents are not known to Rippling's competitors.  A competitor who gained access to Rippling's slides about it could attempt to, for example, build out a functionality Rippling has identified as superior in its products vis-à-vis the competitor's products or calibrate its marketing message to rebut or muddy the arguments made by Rippling.

34. ***Rippling's Implementation and Customer Support Strategies.***  Once a contract is executed with a customer, Rippling's salesforce hands off the customer to its implementation team to tailor and customize Rippling's products to the customer's unique needs, and then to its account management and support teams to ensure continued satisfaction and utility with the Rippling platform ("Rippling's Implementation and Customer Support Strategies").  Simultaneously, Rippling deploys a team of Rippling employees to identify and address any challenges the customer may have during or after the implementation process.

35. In order to efficiently and quickly address any challenges its clients may be facing, Rippling has created various Slack channels so that Rippling team members can promptly address concerns.  For example, Rippling has an "exec-escalations" channel, which contains information about customers with significant issues that require involvement of Rippling's executive leadership team.  This information is used to understand customer business challenges and provide quick resolutions, with visibility at the highest levels of the company.  This, in turn,

1  allows Rippling to quickly and comprehensively address these issues, and

2  effectively demonstrate its commitment to customer experience.

3  36. However, in the hands of a competitor, knowledge of new Rippling

4  customers who are encountering challenges would be valuable, as such new

5  customers might be more willing to switch from Rippling's products to the

6  competitor's products than the majority of Rippling's (satisfied) customers would

7  be. Accordingly, and for obvious reasons, Rippling's internal list of customers in

   the implementation phase or with support tickets is highly secret, and the disclosure

8  thereof would negatively affect Rippling's business in numerous ways.

9  37. ***Rippling's Client List and Churn Risk List.*** Finally, Rippling also

10  maintains a list of its customers along with important non-public information about

11  each customer and its relationship to Rippling, such as pricing data and the

12  individualized discounts to Rippling's list price applied for that customer, customer

   business analysis (such as potential business growth plans, budgetary constraints,

13  or potential product use-cases), information on the customer's systems and other

14  technologies, and information on the customer's relationships with other vendors in

15  Rippling's verticals (and the customer's level of interest in purchasing additional

16  Rippling products to replace those vendors) ("Rippling's Customer List").

17  Relatedly, Rippling maintains a list of current Rippling customers that are at-risk

18  for leaving Rippling (i.e., customers at risk of "churn") ("Rippling's Churn Risk

19  List"). For the latter, Rippling maintains a dedicated Slack channel that identifies

   "churn" risks and assigns a probability likelihood of that particular customer

20  leaving Rippling or considering leaving Rippling; using this information, Rippling

21  can attempt to resolve those customers' concerns and improve their experience so

22  that they stay.

*  *  *

38. The Sales and Marketing Trade Secrets described above were compiled, developed, and created by Rippling over time through substantial efforts and expense, and are not known to the public. Moreover, their value to Rippling derives in significant part from the fact that they are known only to the company. Disclosure of this information to the public or to Rippling's competitors would allow those competitors to target their products and marketing to potential customers without expending the time, energy, and money that Rippling has expended in identifying those prospective customers and developing the information about the prospective customers' needs and desires.

39. For example, as mentioned above, Rippling (and its competitors) expend massive amounts of money to market to prospective customers, all with the intent of identifying prospective customers that are willing to have a conversation with one of the company's salespeople about the company's products. The identities of its customers and their desires, complaints, and interests are valuable to Rippling, in part, because they are not publicly known. Rippling can achieve a sales advantage over its competitors by using this information to target its sales pitches and product design.

40. Likewise, if a competitor were to obtain Rippling's Sales Pipeline, notes, transcripts, and Churn Risk List, the competitor could exploit this information without undertaking the arduous and incredibly expensive marketing and intelligence effort which Rippling used to generate the information. The competitor would immediately have a treasure trove of high-intent prospective customers at its fingertips at no cost to itself. And that would be true even if the competitor only had access to Rippling's Sales Leads. Couple that with the fact that the competitor could also know the prospective customer's business challenges, Rippling's solutions to those concerns, and the price point at which the

1   Rippling would be offering those solutions, the competitor would be positioned to

2   target, pitch, and win the customer on the back of Rippling's considerable work.

3       41. Due to the fast-paced and global nature of Rippling's business and target

4   market, it is imperative that Rippling employees can exchange information quickly

5   and efficiently to expeditiously close deals with prospective customers or identify

6   and resolve issues a current customer is facing and deploy a solution as fast as

7   possible.  To achieve this, Rippling stores its Sales and Marketing Trade Secrets in

8   centralized databases accessible to all of its employees, including databases hosted

9   by Salesforce, Slack, and Google.  Rippling's use of these databases for storage is

    not uncommon for a modern technology company of its size.

10      42. Given that their value lies in part in their secrecy, Rippling has taken

11  considerable steps to maintain the confidentiality of its Sales and Marketing Trade

12  Secrets.  These efforts include requiring all of Rippling's employees to sign a

13  Confidentiality and Intellectual Property Rights Assignment Agreement

14  ("CIPRAA") as a condition of employment and requiring that such employees sign

15  Rippling's Global Employee Handbook, which includes Rippling's Code of

16  Conduct.  The CIPRAA, Employee Handbook, and Code of Conduct make clear

17  that each Rippling employee is required to keep Rippling's information

18  confidential and to utilize the information and technology provided by Rippling

    only for an appropriate, work-related purpose.

19      43. In addition, the tools Rippling utilizes to facilitate its global work are also

20  restricted to employee-only access and require various authentication methods.  For

21  example, for an individual to be able to access and utilize Rippling's Slack

22  function, Rippling must add that person as an active Slack user.  Rippling only

    provides such credentials to active employees and certain contractors that are

    providing services to Rippling for a particular purpose.  Moreover, Rippling's

1    practice is for employees to only access public Slack channels within the Rippling

2    universe that pertain specifically to their job function.

3        44. Moreover, while Rippling permits its employees to remotely access

4    Rippling's company systems, networks, or applications, in accordance with

5    Rippling's Bring Your Own Device ("BYOD") Policy, that remote access is also

6    heavily restricted.  For example, in order to access an application such as Slack

7    from their mobile device, the Rippling employee must use a device meeting certain

8    security requirements (such as having a strong password, automatic locking of the

9    device upon a number of failed login attempts, and the latest security patches and

10   updates installed).  The employee must use their Rippling login credentials and,

11   where required by the system, is subject to a multi-factor authentication process or

12   is required to use a token for access.

13

14

15

16

17

18

19

20

21

22

1    ~~III. RIPPLING HIRES DEEL'S EVENTUAL SPY~~

2    ~~45. On June 20, 2023, an affiliate of Rippling hired Deel's spy ("D.S."),~~

3    ~~because of his experience in global payroll, into a management role at Rippling as~~

4    ~~its Global Payroll Compliance Manager. D.S.'s responsibilities in that role included~~

5    ~~hiring payroll specialists, country launches, and setting up payroll processing and~~

6    ~~operations for approximately 15 countries in which Rippling offers global payroll~~

7    ~~services. D.S.'s daily responsibilities included managing a team of Global Payroll~~

     ~~Operations Specialists to ensure timely and accurate performance of local payroll~~

8    ~~activities for customers, as well as resolving payroll-related customer escalations~~

9    ~~related to the countries within his job scope. As a result of his employment in this~~

10   ~~role—and pursuant to several contracts he signed in connection therewith, detailed~~

11   ~~below—D.S. was granted access to: Rippling's secure internal electronic~~

12   ~~messaging application, Slack (the "Slack Platform"); Rippling's Salesforce~~

13   ~~database (the "Salesforce Database"), which contained confidential information~~

14   ~~about current and prospective customers; Rippling's secure Google Drive~~

     ~~repository ("Rippling's Google Drive"); and Rippling's internal human resources~~

15   ~~system, which contains information such as names, addresses, and personal cell~~

16   ~~phone numbers for Rippling employees (the "Rippling HR Platform"). The Slack~~

17   ~~Platform, the Salesforce Database, Rippling's Google Drive, and Rippling HR~~

18   ~~Platform are confidential. Moreover, not all Rippling employees have access to all~~

19   ~~files stored on these platforms; rather, they must be granted permissions to access~~

20   ~~specific file. As described above, that restriction is enforced through industry~~

     ~~standard authentication protocols.~~

21
     ~~46. As a formal matter, Rippling Ireland Limited ("Rippling Ireland"), a~~

22   ~~wholly owned subsidiary of Rippling, hired D.S. for the purpose of providing~~

     ~~services to Rippling. Indeed, when D.S. was offered his position, he was~~

     ~~specifically informed that Rippling was "delighted to make you an offer to join the~~

1   People Center, Inc. [Rippling] team" and that, because he was not a resident of a
2   country where Rippling has a legal entity, his "employment will be structured using
3   an Employer of Record service, provided through our international employment
4   partner Rippling Ireland Limited ('Rippling')." Moreover, while D.S. was
5   technically an employee of Rippling Ireland, his employment offer letter made
6   clear that he was employed by Rippling Ireland to "provid[e] services to
7   [Rippling's Ireland's] client, People Center, Inc. [Rippling]." Rippling Ireland is
8   the employer of record for any member of Rippling's internal workforce physically
9   located outside of the United States. D.S. is domiciled in Ireland; however, the
10  overlap between his Irish domicile and Rippling Ireland's domicile is a
    coincidence.

11  47. As Rippling's agent and manager, D.S. owed fiduciary duties to Rippling.
12  Therefore, as a matter of common law agency principles, D.S. owed a duty of
13  loyalty to Rippling and was obligated not to use or communicate information
14  confidentially given to him or acquired during the course of his employment in
15  violation of his duties as an agent, in competition with or to the injury of Rippling,
16  or for his own benefit or the benefit of another in a transaction not related to his
    employment.

17  48. D.S.'s duties of loyalty, trust, and confidence to Rippling and its affiliates
18  were further established and defined by the agreements that he signed in
19  connection with his employment.

20  49. *First*, through his Contract of Employment, D.S. agreed not to "use or
    disclose or make available to anyone else, during or after [his] employment, any
21  Confidential Information," except as necessary in connection with his employment.
22  "Confidential Information," in turn, was defined to include:

> [A]ll proprietary or confidential information regarding the
> Company... or relating to the Company Group's operations or
> business and not generally known outside of the Company Group,
> which you obtain from the Company or its directors, officers,

1    employees, agents, suppliers or customers or otherwise by virtue of
     your employment with the Company including, without limitation,
2    the following types of information or material: corporate
     information, including... marketing information, including sales,
3    investment and product plans, strategies, methods, customers,
     customer lists and information, prospects and market research data;
4    [...] and personnel information, including personnel lists, resumes,
     personnel data, organizational structure and performance
5    evaluations.

6    50. D.S.'s Contract of Employment also obligated him "to comply with

7    [Rippling Ireland's] and [Rippling's] rules, regulations and policies (the

8    'Policies')."  Those policies included Rippling's Code of Conduct, which

9    prohibited employees from "disclos[ing] or reveal[ing] confidential information

10   within or outside of Rippling without proper authorization or purpose."

11   51. *Second*, when he began working at Rippling, D.S. acknowledged and

12   agreed in writing that his employment was contingent upon his agreement to

13   certain terms (the "Employment Acceptance Agreement").  Among those terms was

14   a prohibition on "engag[ing] in any employment, occupation, consulting, or other

15   business activity directly related to the business in which [Rippling] is now

16   involved or becomes involved during the term of [his] relationship with [Rippling]"

17   and a prohibition on "engag[ing] in any other activities that conflict with [his]

18   obligations to [Rippling]."

19   52. *Third*, D.S. executed Rippling's CIPRAA with Rippling directly.

20   Through the CIPRAA, D.S. agreed to "keep and hold all . . . business, technical and

21   financial information developed, learned or obtained in connection with [his

22   employment] (collectively 'Proprietary Information') in strict confidence and

     trust."  D.S. further agreed not to "disclose any Proprietary Information without

     first receiving [Rippling's] express written direction or consent."

53. The confidentiality and nondisclosure elements of D.S.'s Contract of Employment, the Employment Acceptance Agreement, and the CIPRAA (collectively, "D.S.'s Nondisclosure Obligations") were and remain critical to Rippling, given the competitively sensitive information D.S. had access to during his employment and the considerable risk of competitive harm likely to result from dissemination of that information to Rippling's competitors, including Deel.

**IV.  DEEL'S SPY BEGINS STEALING RIPPLING'S TRADE SECRETS AND CONFIDENTIAL BUSINESS INFORMATION**

54. As noted above, by virtue of their employment, Rippling employees enjoy access to Rippling Slack channels to aid in their business activities.  Moreover, Rippling utilizes various additional software programs in conjunction with Slack, such as Gong, which transcribes telephone calls with customers and prospective customers.  These transcripts are then "pushed" to Slack for authorized users to view and query.

55. In part to ensure that the confidential information in Rippling's Slack channels is used only for authorized purposes, Rippling employees' Slack activity is "logged," meaning every time a user views a document through Slack, accesses a Slack channel, sends a message, or conducts searches on Slack, that activity (and the associated user) is recorded in a log file.

56. Rippling's Slack logs show that D.S. began searching and accessing Rippling's Slack channels at an unprecedented rate beginning in or around early



1    November 2024.  Notably, D.S. searched the term "deel" approximately 23 times
2    per day:

3

57. The below illustrative example demonstrates why a search for "deel" is powerful and
alarming.  Namely, this example search shows that "deel" is mentioned in discussions concerning
certain Rippling sales leads as well in a discussion related to a potential customer for Rippling's
Professional Employer Organization ("PEO") product:

7

58. Also notably, D.S. frequently accessed various channels in "preview"
mode—allowing him to see the contents of the channels without "joining" them.
Although it is more common for Slack users to join a channel to review its
contents, joining a channel generates an automated message to the members of the
channel identifying the new user who has joined.  On information and belief, D.S.



chose to review the channels in question in preview mode to avoid alerting the channels' members that he had accessed them.

59. The log-generated chart below shows that, between August and October 2024, D.S. rarely previewed any Slack channels, consistent with typical employee behavior.  Moreover, on the rare occasions in which he did so, D.S. previewed the channels no more than four times in any given month, and did so for channels like "#ppl-dogs," a channel dedicated to Rippling employees sharing pictures of their dogs:

| Aug 2024 | | Sep 2024 | | Oct 2024 | |
|---|---|---|---|---|---|
| Channel | Views | Channel | Views | Channel | Views |
| oasis-ytd-import | 4 | [redacted] | 2 | [redacted] | 2 |
| ppl-dogs | 3 | poland | 1 | churn_updates | 1 |
| payments | 1 | hub | 1 | | |
| incident-response | 1 | | | | |

extremely ... ability to front-run announcements and then it would give you the ability to say to investors or to your team or to your customers, in other words, your constituents, 'Look, we released these three features. Rippling is just a fast follower, they copy us.'  So you could really damage [Rippling CEO's reputation] and Rippling's reputation in this case by making them look like a fast-follower, when in fact, you are."[32]

102.  Having illegally obtained Rippling's product roadmap, Deel instantly acquired for its own benefit, the value of Rippling's industry-leading R&D expenditures[33] and months of cross-functional efforts to analyze data points compiled from across the company identifying product pain points, gaps, and opportunity areas, along with anticipated time and resources needed to build and deploy a prioritized ranking of new features in a compliant, integrated and user-friendly manner.  Similarly, armed with Rippling's Global EOR Roadmap, Deel (unlawfully) put itself in position to secure significant competitive advantages, including a chance to beat Rippling to certain markets; to lure away prospective customers by referencing countries not

[32] Jason Calacanis & Alex Wilhem, This Week in Startups, *Spycraft in SaaS, Rabbit's Comeback, and Startup Pitch Madness* at 11:36–12:53 (Apr. 2, 2025), *available at* https://www.youtube.com/watch?v=llqXieL5nMQ.

[33]  *Rippling CFO Adam Swiecicki Discusses Leadership and Sustaining Growth on the Run the Numbers Podcast,* Rippling (Apr. 2, 2024), https://www.rippling.com/blog/cfo-adam-swiecicki-run-the-numbers.

1 included in Rippling's roadmap or shortlisted for upcoming launches; and to flag differences in

2 vendor strategy as part of competitive pitch efforts.  None of this information would have been

3 available to Deel but-for its spying scheme.  The harm to Rippling by Deel's calculated theft of

4 these most valuable corporate assets will likely continue for years to come, woven into all aspects

5 of Deel's product, expansion, and sales strategy efforts like laundered money folded into purported

6 legitimate businesses.

7 *Rippling's Customer Retention Strategy Trade Secrets Stolen by Deel*

8 ~~60.  However, beginning in November 2024, D.S. beginning previewing~~

9 ~~channels at a rate orders of magnitude greater than he had before—both in terms of~~

10 ~~the number of channels previewed, and in the number of times he previewed each~~

11 of th...

| Nov 2024 | | Dec 2024 | | Jan 2025 | | Feb 2025 | |
|---|---|---|---|---|---|---|---|
| Channel | Views | Channel | Views | Channel | Views | Channel | Views |
| deal-desk-sales | 113 | gong-stream-deel-compete | 104 | deal-desk-sales | 164 | [redacted]-peo | 71 |
| am-sales-updates | 85 | deal-desk-sales | 98 | gong-stream-deel-compete | 105 | im-gong-calls | 54 |
| gong-stream-deel-compete | 73 | im-gong-calls | 63 | im-gong-calls | 88 | deal-desk-sales | 53 |
| sdr-segment-drift | 53 | deal-gongstream | 47 | am-sales-updates | 75 | gong-stream-deel-compete | 51 |
| deel-gongstream | 36 | peo-quote-updates | 41 | notifications | 57 | emea-global-only-ob-notifications | 28 |
| global-apac-sdr-qualification | 32 | emea-sales-global-core | 40 | sdr-segment-drift | 42 | payroll-ukraine-russia | 21 |
| rattle-mops-testing | 26 | client-[redacted]-eor | 27 | peo-quote-updates | 39 | client-[redacted]-peo | 21 |
| global-apac-sdr-qualification | 25 | mops-inbound-request-alerts | 30 | exec-escalations | 38 | am-sales-updates | 17 |
| emea-global-routing | 24 | deal-room-[redacted] | 23 | foundgold-global-nls | 38 | sales | 17 |
| snd-sdr-ae-opps | 24 | am-sales-updates | 23 | prospect-[redacted] | 37 | emea-sc-requests | 16 |
| comms-competitor-news | 22 | global-sc-requests | 22 | deel-gongstream | 36 | global-sc-requests | 16 |
| notifications | 21 | uki-s1-routing | 15 | bernie-wow | 35 | exec-escalations | 15 |
| sales-alerts | 18 | competitive-deal-insights | 15 | emea-sales-global-core | 31 | competitive-deal-insights | 14 |
| delighted-nps | 18 | foundgold-global-nls | 15 | client-[redacted] | 30 | namedaccount-[redacted] | 12 |
| uki-s1-routing | 17 | hr-sc-requests | 13 | uki-s1-routing | 26 | peo-quote-updates | 11 |
| sales-wins | 14 | sdr-segment-drift | 13 | emea-global-routing | 25 | [redacted]-strategy | 11 |
| notifications | 14 | rattle-mops-testing | 13 | coaching | 24 | coaching | 11 |
| proj-deel-remote-compete | 13 | im_churn_updates | 11 | competitive-deal-insights | 22 | content-posting-hq | 11 |
| emea-sc-requests | 13 | peo-prospect-[redacted] | 11 | delighted-nps | 20 | mops-inbound-request-alerts | 10 |
| page-load-alerts | 12 | apac-forecast-updates | 10 | comms-competitor-news | 18 | foundgold-global-nls | 10 |
| task-data-deletion | 12 | emea-global-routing | 10 | sdr-creating-referral-partner-optys | 17 | test-escalations-catch-all | 10 |
| aus-apac-background-checks-revo | 12 | mm-global-high-intent-notifications | 9 | emea-sc-requests | 17 | sdr-segment-drift | 10 |
| | | competitor-marketing-in-the-wild | 10 | | | mm-global-high-intent-notifications | 10 |
| emea-global-outbound-pods | 11 | client-[redacted]-peo | 9 | foundgold-global-nls | 17 | |
| in-product-cross-sell | 10 | mid-market-wins | 9 | client-[redacted] | 16 | am-ts-missedopportunities | 9 |
| hr-sc-requests | 10 | escalation-[redacted] | 8 | hr-sc-requests | 14 | gong-stream-justworks | 9 |

...espio... ...mer

...reten... ...port

...its ex...

...ing's

...blic

...nued

...ntify

...s'');

...es a

20 Rippling customer may experience.

21 Each of these workstreams are carried out through various Slack channels uniting the appropriate

22 combination of Rippling teams to attend to customer needs using and reflecting an evolving set of

internal playbooks and protocols that are continuously refreshed and optimized.

1

2    ~~61.  A  chart  of  D.S.'s  Slack  channel  previewing  activity  represented~~

3    ~~graphically tells the same story.  The blue in the chart represents the number of~~



4

5

6

7

8

9

10

11

12

13   ~~times that D.S. previewed a public channel.  A spike in previewing activity begins~~

14   ~~in November 2024 and continues thereafter:~~

15   ~~62. D.S.'s  Slack  activity  beginning  in  November  2024  was  not  merely  a~~

16   ~~departure from his own prior activities.  As shown below, D.S. previewed Slack at~~

17   ~~orders of magnitude more than his peer Rippling employees as well; in this chart,~~

18   ~~red bars indicate D.S.'s channel previews over time, while three of his peers are~~
     ~~represented with other colors (barely noticeable by comparison):~~

19   ~~63. The channels D.S. previewed during this period have no connection to his~~

20   ~~payroll operations job responsibilities.  What they do relate to, however, are all~~

21   ~~aspects of  Rippling's  business  development,  sales,  and  customer  retention~~

22   ~~strategies — the most sensitive of the Company's Sales and Marketing Trade Secrets~~
     ~~and  confidential  business  information — with  a  particular  emphasis  on  a  single~~
     ~~competitor, Deel.  Leaving no doubt about the ultimate beneficiary of the brazen~~
     ~~espionage  scheme,  D.S.  viewed  channels  related  specifically  to  Rippling's~~

FIRST AMENDED COMPLAINT

competitive intelligence concerning Deel over 450 times during the course of the scheme.

64. Indeed, D.S.'s top 10 channel previews since November 2024 are all sales related channels, completely unrelated to D.S.'s role in payroll operations:

| Channel name | Total count of events | 2025-02 | 2025-01 | 2024-12 | 2024-11 |
|---|---|---|---|---|---|
| deal-desk-sales | 428 | 53 | 164 | 98 | 113 |
| gong-stream-deel-compete | 333 | 51 | 105 | 104 | 73 |
| im-gong-calls | 209 | 54 | 88 | 63 | 4 |
| am-sales-updates | 200 | 17 | 75 | 23 | 85 |
| deel-gongstream | 123 | 4 | 36 | 47 | 36 |
| sdr-segment-drift | 117 | 10 | 42 | 12 | 53 |
| peo-quote-updates | 101 | 12 | 39 | 41 | 9 |
| emea-global-only-ob-notifications | 99 | 28 | 57 | 0 | 14 |
| foundgold-global-nls | 88 | 10 | 38 | 15 | 25 |

65. Guided by "Deel" as his primary search term, D.S. surreptitiously accessed Rippling Slack channels replete with its Sales and Marketing Trade Secrets and proprietary and confidential information. The channels accessed by D.S. contain highly sensitive and confidential information about existing customers and prospective customers, including details such as the customer's name, contact information, revenue at issue, the current issues or problems the customer is facing, and details of sales and relationship conversations between Rippling and its customers or prospective customers. All of these are details that a competitor, such as Deel, could exploit to convince such customers to purchase their products rather than Rippling products.

66. To illustrate a few examples of the Sales and Marketing Trade Secrets and confidential information within Rippling's Slack channels, D.S. viewed the following slack channels:

- #[redacted]-global-nls: a channel that has only a single member — its creator, Rippling's Senior Vice President of International Sales. This individual made the channel to pull in and collate summaries of sales calls with promising prospective customers for Rippling's global products. Several recent entries on the channel describe specific prospective customers currently using Deel and other solutions, but who are interested in Rippling to address specific concerns or objectives. D.S. has viewed the channel 88 times since November 2024.

- #mops-inbound-request-alerts: a channel that records every inbound sales request and contact information for every prospective Rippling customer. Inbound sales requests are prospective customers who contact Rippling to initiate a sales discussion after having viewed Rippling's Marketing or promotional materials. On

one day in February alone, there were over 700 notifications posted in the channel. D.S. has viewed this channel 56 times since November 2024.

- #deal-desk-sales: a channel that includes an automated alert for each sales quote, which includes the name of the customer, the net revenue attributable to the potential sale, the discount to the product's sticker price applied, the associated sales representative, the date the transaction closed, and a link to the customer account in Rippling's Salesforce software. Through this channel, D.S. had access to every client name and sales quote dating back to September 10, 2024. D.S. has viewed this channel over 400 times since November 2024.

- "mm-global-high-intent-notifications": a channel containing an automated feed of every prospective mid-market customer that books a demo with Rippling, along with key details about the customer, including their total domestic and international employee and contractor headcount, existing payroll provider, Rippling products they are most interested in exploring, and a summary of challenges they have faced with prior HR enterprise software. D.S. has visited the channel over 40 times since November 2024, exclusively from his personal mobile phone.

    ○ As an example, D.S. accessed this channel 16 times on March 12, 2025. On that single day, the channel captured 65 distinct mid-market prospects seeking to demo Rippling products, along with their entity profile details and HR software objectives. A competitor stealing these details would know exactly where to direct its outbound sales efforts, without having to deploy any of their own resources towards marketing or researching those prospects.

- "PEO-Dealroom": a channel used for the sole purpose of requesting that a member of the sales team put together quotes for prospective customers of Rippling's PEO product and who have reached the price-negotiation stage of Rippling's Sales Pipeline. Knowledge of prospective customers seeking PEO quotes from Rippling and the quotes under discussion internally would enable a competitor to insert itself into every Rippling PEO contract negotiation, without having to spend the marketing budget or sales team resources to source or cultivate those prospects. On February 19, 2025, a single day during the scheme, D.S. viewed this channel 8 times.

67. In total, Slack logs of D.S.'s activity establish that he secretly viewed and downloaded information from Rippling Slack channels dedicated to prospective clients over 1,300 times between November 2024 and March 2025. Rippling's forensic investigation has uncovered several examples of how D.S. plundered these prospective customer Sales and Marketing Trade Secrets in a pattern demonstrating an intent to misappropriate them for Deel's commercial benefit. For example:

1   ● On March 11, 2025, a new Slack channel was created to discuss a company
        ("Prospect A") that was already using Rippling for certain products but was not
2       using Rippling's HRIS product. A single message was posted, noting that this
        Prospect A was "exploring options to transition their 90+ international employees
3       from Deel/Personio to a new HRIS platform and are evaluating Rippling."

4   ● By the very next day, March 12, 2025, D.S. had found and previewed this channel
        three times, guided by his cornerstone search term, "deel".

5   ● The Rippling sales team then used the channel to discuss confidential sales strategies
6       to compete for the potential opportunity, including how to address specific pricing
        structure requests from Prospect A and Prospect A's implementation objectives.
7       Little did the team know, there was a spy within Rippling viewing this information
        with the apparent intention of sharing it with Deel.



68. D.S. and Deel deployed this same methodology repeatedly throughout the scheme. As
another example:

    ● On February 19, 2025, D.S. searched "deel" 27 times on Slack.

    ● Reacting to one of the search results, D.S. navigated to a mention of Deel in a
        channel focused on a particular prospective customer who was considering both
        Rippling and Deel ("Prospect B").

    ● D.S. previewed the channel, which included details for a call scheduled with
        Prospect B the next day and communications in which Prospect B relayed to

1    ~~Rippling specific concerns with the products and services offered by Deel. The
2    channel also contained the Rippling sales team's internal pitch strategy discussion,
     including confidential details about how Rippling planned to highlight certain
3    advantages of its products to address the prospect's pain points with Deel's
     offerings.~~

4    ● ~~D.S. downloaded to his mobile phone two communications from the channel.~~

5    ● ~~On February 20, 2025, the day of the scheduled call between Rippling and Prospect
     B, D.S. previewed the Prospect B-related channel sixty-six (66) times.~~

6    ● ~~Later that day, Prospect B abruptly canceled the scheduled call with Rippling in
7    which Rippling was going to deliver its proposal  and explained that they were
     doing so because they had decided to select Deel for the product they were
8    interested in, even though Rippling believes that customer would have been better
     served by Rippling.~~

9    104.  ~~69. D.S. also~~O'Brien misappropriated for Deel's benefit details about Rippling's

10   confidential customer retention strategies. ~~In violation of his duties to Rippling, and to improperly

11   benefit Deel, D.S. viewed or downloaded~~ by viewing or downloading information about

12   Rippling's existing customers on more than 600 occasions between November 2024 and March

13   2025, and ~~targeted~~targeting Slack channels related to customer experience and "churn" risks over

14   100 times, ~~presumably for identification of~~  Directed by near-daily instruction from Alex, these

15   surgical efforts no doubt represent attempts to identify vulnerable customer information for Deel

16   to exploit.  Example Slack channels from which O'Brien captured information for Deel include:

17

18   ~~70. For example, D.S. accessed the following channels containing highly
     confidential information about Rippling's customer retention strategies:~~

19   ● **#smbrenewaldeck-test**:  a channel ~~with an automated feed of notes~~ regarding
     existing Rippling customers ~~who are~~ approaching their renewal date. ~~D.S. viewed~~
20   O'Brien secretly previewed this channel 23 times between November 2024 and
     March ~~2025~~2024.  On March 4, 2025~~,~~ in particular, ~~D.S. previewed~~O'Brien
21   viewed the channel 8 times. On that day alone, the channel highlighted 10
     customers approaching renewal.

22   ● **#in-product-cross-sell**:  a channel ~~with an automated feed of~~regarding existing
     customers who have expressed interest in additional Rippling products.
     ~~D.S.~~O'Brien accessed this channel 13 times.  On January 22, ~~2025~~2024, a day

1    when ~~D.S.~~O'Brien viewed the channel, ~~the channel~~it captured 14 different cross-sell opportunities.

2    ● **#exec-escalations**: ~~as described above, a channel recording customer support escalations that may warrant leadership attention. The channel captures details about customer experiences that could be used by a competitor to identify Rippling customers vulnerable to being recruited to a new provider. D.S.~~ a channel for Rippling discussion of customers whose issues have garnered visibility among Rippling's leadership, used to triage challenges and provide quick resolutions, with visibility and direction from the highest levels of the company. O'Brien previewed this channel 65 times.

105.    In addition, O'Brien has admitted to providing Alex targeted customer lists from confidential reports to which he only had access by virtue of his global payroll compliance role. Indeed, O'Brien's iCloud data has yielded forensic evidence of multiple wish lists of Rippling customers that Alex identified by name and instructed O'Brien to target in Rippling's confidential records and platforms.

106.    In the hands of a competitor like Deel, information about Rippling customers who are encountering challenges, and Rippling's proprietary resolution and retention strategies, are highly valuable and could be used to poach those customers and thwart Rippling's attempts to maintain customer loyalty. In total, Rippling has identified that O'Brien secretly accessed over 50 different Slack channels dedicated to specific Rippling customers, each chronicling Rippling's relationship maintenance and retention strategies. Again, Alex Bouaziz's targeting of this information via his spy was no accident. From the start of his spying scheme, Bouaziz instructed O'Brien to focus on gathering Rippling's "customer insights" precisely for these reasons—to attempt to grow Deel's customer base by luring away Rippling's hard-earned customers through stolen trade secrets created at the hands of countless Rippling employees.

107.    Rippling has already uncovered examples of Deel's use of these stolen Rippling assets to pursue Rippling's "churn risks." For example, on November 8, 2024, O'Brien stole and sent to Bouaziz information stolen from Rippling's Slack dedicated to discussions concerning a

1    then-current Rippling customer based in San Francisco who was considering churning to Deel

2    ("Customer B").  The stolen information included details about Rippling's pricing strategy and

3    Customer B's internal deadline to decide between Rippling and Deel that Customer B had

4    communicated to Rippling.  But one day before that internal deadline, Customer B elected to

5    churn to Deel.

6              *Deel's Recruiting Campaign Born Out of Stolen Rippling Confidential Data*

7         71.  D.S. also viewed and downloaded Rippling's Competitive Intelligence

8    Card for Deel.  This document is a 31-page slide deck that outlines Rippling's

9    competitive strategy vis-a-vis Deel, product-by-product.  As described in further

10   detail above, Rippling uses this document and others like it to train its sales team

11   how to sell against competitors (in this case, Deel) in competitive sales situations.

12   Rippling's Competitive Intelligence Card for Deel represents extensive,

13   confidential work by Rippling's sales, marketing, operations, and other teams to

14   develop an effective strategy to engage with customers and explain the unique

15   value of Rippling's software platform as compared to Deel.  Notably, D.S. did not

16   download any of the other eighty (80) Rippling Competitive Intelligence

17   Cards—that is, the cards associated with Rippling competitors other than Deel.

18        72.  Throughout the scheme, D.S.'s Slack searches frequently followed a

19   distinctive and unusual pattern: he searched for a channel on his personal iPhone,

20   then, moments later, searched for the same channel on his company-issued

21   computer, and then (and only then) did he download a file from that channel.  On

22   information and belief, D.S. followed this pattern so that most of his searches

     would occur on his personal device, on which he was less susceptible to detection,

     and so that he could reserve the use of his work computer for downloading

     information that he had determined was worthy of misappropriating.

73. For example, on January 28, 2025, D.S. searched the "deal-desk-sales" Slack channel from his phone 21 times.  On that day, 140 unique customer sales deals were detailed in the channel.  Shortly after one of his visits to the channel that day from his mobile phone, D.S. then accessed the channel from his work laptop and subsequently downloaded certain files returned by his search.

74. Due the staggering scope of the corporate espionage scheme described in this section  involving over 6,000 queries through Rippling's Slack channels, where, as described above, a single channel ("mm-global-high-intent-notifications", or "deal-desk-sales"), may contain dozens or even hundreds of distinct customer or prospect opportunities  the commercial harm Rippling has already experienced is likely to persist well beyond today. Indeed, each single instance of espionage may cause months of future harm, as Rippling has already seen.  For example:

● On December 19, 2024, D.S. searched Rippling's Slack for "deel" 33 times;

● Among other previews, on this day D.S. viewed the channel "Gong-Stream-Deel-Compete" 13 times;

● The channel, an automated feed of sales calls with customers evaluating Rippling and Deel products in tandem, included mention of an existing Deel customer considering moving to Rippling to address "compliance and payroll challenges as the company has grown" ("Prospect C") and Rippling's pitch strategy, noting the products that appeared to resonate most with the prospect; and

● The prospect ultimately signed with Deel.

75. In short, on information and belief, on behalf of and for the benefit of Deel, D.S. stole information on Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Slideshow on Deel, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List  and he did so repeatedly, for months on end, in a manner likely to harm Rippling for many months or even years to come.

76. On information and belief, D.S.'s activities beginning in November 2024 were directed by, at the behest of, and for the benefit of, Deel. D.S. painstakingly, methodically, and repeatedly hunted through Rippling's Slack channels, using the term "deel" to identify confidential information about Rippling's prospective and existing customers that could be stolen and exploited to Deel's advantage. Deel's role as D.S.'s puppetmaster is evident by D.S.'s "deel"-driven search pattern and has been made even more clear through the results of Rippling's forensic investigation after learning of a leaker in their midst, as detailed *infra*.

V. ON INFORMATION AND BELIEF, DEEL INDUCED THE THEFT OF RIPPLING EMPLOYEE CONTACT INFORMATION

108.    77. In addition to misappropriating Corporate Strategy Trade Secrets and Rippling's Sales and Marketing Trade Secrets, Deel appears to haveO'Brien admitted that Alex induced its spyhim to misappropriate contact information for specialized and high-performing Rippling employees of his own team, the Global Payroll Operations Team., allowing Deel to exploit internal Rippling information for its own recruitment efforts. Bouaziz's fixation on Rippling's key talent was another, poorly-disguised, strategy to misappropriate even further Rippling trade secrets and confidential information.

109.    Acting on Bouaziz's instructions, O'Brien stole contact information for high-performing Rippling employees from across the company, including members of his Global Payroll Operations team and Rippling's Product team. Bouaziz and Westgarth immediately activated this information to begin aggressively soliciting the referenced Rippling personnel via LinkedIn and, when provided mobile phone numbers, WhatsApp.

110.    78. BetweenIndeed, between January 29 and February 17, 2025, at least seventeen (17) members of Rippling's Global Payroll Operations Team were contacted about similar jobs atand at least 4 Global Product and Operations leads were solicited directly by Deel executives

1    and at least ten reported receiving job offers ~~from Deel~~.  Several ~~of the~~ team members reported

2    that these offers were made without any substantive interview, and only after ~~direct~~repeated,

3    unsolicited contact from Deel's ~~Chief Operating Officer,~~COO Dan Westgarth.  Some of these

4    team members were contacted directly via WhatsApp, a messaging application that requires

5    knowledge of a person's mobile phone number to send a message—and many of these numbers

6    were provided by O'Brien at Alex's request.

7

        ~~79.  In one telling case shown below, on January 23, 2025, Mr. Westgarth~~

8

9

10

11

12

13                                              

14

15

16

17

18

19

20

21

22

~~messaged a member of Rippling's Global Payroll Operations Team on LinkedIn,~~

~~presumably because he did not have this individual's phone number.  Four days~~

later, on January 27, 2025, D.S. visited this individual's page in Rippling's internal personnel directory, which contains employees' personal phone numbers. Later that same day, Mr. Westgarth messaged the team member on WhatsApp:

    111.   Westgarth personally cold-called nearly all members of Rippling's payroll operations team, bombarding them with messages on WhatsApp, LinkedIn and phone calls, referencing an awareness of their role at Rippling absent any publication of those details, and offering them specialized roles at Deel without conducting any formal or technical interview. In one instance, Westgarth even went so far as to offer a role at Deel to a Rippling employee without anyone from Deel ever meeting the person, let alone interviewing them:



80.  Rippling's internal personnel directory is viewable only by active Rippling employees, and only upon logging into their Rippling account using their unique username, password, and other authenticating credentials.

81. The profile logs that capture when a Rippling employee is viewing a particular employee profile on the Rippling HR Platform line up with Deel's attempted poaching activities described above.  Once again, Rippling investigated D.S.'s activity around the time Rippling employees were contacted by Deel representatives, and once again, Rippling learned that D.S. had accessed and

viewed the profiles of several of the Rippling employees who were contacted by Deel.

82.  Some of the Rippling employees who received unsolicited contact from Deel expressed concern about this contact because they did not know how Deel had access to their personal data.  Some of the contacted employees had not updated their public profiles on sites like LinkedIn, so Deel could not readily determine from public sources their current position in Rippling or even (for some of them) that they worked at Rippling at all.  Some of the employees also noted that their phone numbers were de-listed.  As a result of these employee concerns, Rippling opened a security investigation into the matter in early February 2025, but did not identify an internal source at that time.  After conducting additional forensics in February and March 2025, Rippling believes that D.S. likely provided contact information on some or all of these individuals to Deel.

**VI. RIPPLING DISCOVERS D.S.'S THEFT OF RIPPLING'S SALES AND MARKETING TRADE SECRETS AT DEEL'S BEHEST**

*Outreach to a Single Rippling Employee on January 23 and January 27, 2025*

112.    Notably, former Deel employees have informed Rippling that it is widely-known at Deel that Deel deliberately recruits talent from competitors with the expectation that they bring confidential materials from their prior employers to Deel.  Indeed, a former Deel employee recalls Westgarth, a key architect of Deel's poaching employees to steal competitor confidential information pipeline, presenting a Rippling confidential sales strategy document internally at Deel.

*Deel's Use of Stolen Rippling Trade Secrets to Fuel Deel's PR & Communications Agenda*

113.    Deel also used its spy to exploit internal confidential Rippling information of value for Deel to further its own competitive, dishonest press strategy—but this effort backfired on Deel, and led to the exposure of its use of the spy.

1    114. 83. On February 18, 2025, an investigative reporter at *The Information* contacted

2    Rippling about a forthcoming article concerning Deel's Russia-related sanctions activity, noting

3    he had "been working on a story on Deel for the past few weeks" that "started as an exercise to

4    look into the veracity of that lawsuit I previously reported on."  This reporter was referring to his

5    January 9, 2025, article entitled "Deel Accused of Money Laundering, Sanctions Failures in

6    Lawsuit," which reported on *Damian v. Deel Inc.*, No. 25-cv-20017 (S.D. Fla. Jan. 3, 2025).

7    115. 84. The reporter's email listed eleven assertions regarding supposed issues at

8    Rippling relating to payments into Russia and other sanctioned jurisdictions.  Each individual

9    assertion was followed by then asked Rippling to comment on a series of false assertions about

10   Rippling's sanctions compliance program, with each assertion referencing an internal Rippling

11   Slack messages—thirteen message—13 messages in total—that supposedly supported or related to

12   the assertion (the "Shared Slack Messages").  As Rippling explained to the reporter, these

13   assertions did not hold water were baseless—to be clear, Rippling has never transmitted a payment

14   to a sanctioned country, individual, entity, or bank, including Russia—but.  In fact, Rippling

15   responded to the reporter by providing the full context of each of the Shared Slack Messages,

16   which demonstrated the falsity of the assertions levied in reliance on cherry-picked fragments

17   intentionally offered to distort their true meaning.  But the fact that internal Rippling Slack

18   messages (which are only available to Rippling employees) were in the possession of someone

19   other than a Rippling employee caused Rippling to immediately open a security investigation.

20   116. 85. An analysis of the Shared Slack Messages revealed that these messages came

21   from thirteen different channels in Rippling's Slack workspace, and that the messages all

22   contained certain searchable keywords ("Russia," "Belarus," "Iran," "Syria," and/or "Sanctions").

     Rippling's investigators proceeded to review By reviewing Slack log files.  Upon review, Rippling

     learned that a single account associated with, Rippling's investigators identified a single Rippling

employee  D.S. had searched for account—O'Brien's—whose specific, targeted, and highly
unusual names and keywords thatsearch terms corresponded with the Shared Slack Messages.
Rippling further learned from the various Slack logs that the searches were tied to specific internet
protocol (IP) addresses associated with D.S.'s location in Ireland, strongly suggesting that it was
D.S. himself (rather than someone with D.S.'s login credentials impersonating him) conducting
these searches.

86.  Further, the timing of O'Brien's search activity aligned with Rippling' forensic
research revealed that D.S. had specifically conducted targeted keyword searches on each of the
eleven points raised by *The Information*'s reporter in and around the time Rippling was contacted
by that reporter, including:

> a. D.S. first searched the term "Russia" on February 12, 2025.  From that date
> until February 27, 2025, D.S. searched the term "Russia" 157 times, an
> average of almost 9 times per day.

> b. D.S. first searched the term "Belarus" on February 13, 2025.  From that date
> until February 27, 2025, D.S. searched the term "Belarus" 39 times, an
> average of almost 4 times per day.

> c. D.S. first searched the term "OFAC" (i.e., U.S. Office of Foreign Assets
> Control, a regulator responsible for sanctions controls) on February 17,
> 2025.  From that date until February 27, 2025, D.S. searched the term
> "OFAC" 42 times, an average of over 5 times per day.

> d. D.S. first searched the term "sanctioned" on February 13, 2025.  From that
> date until February 27, 2025, D.S. searched variations of that term
> (including using that term in combination with other terms like "payment")
> a total of 31 times.

> e. D.S. first searched the terms "Michael Roddan" or "Roddan" (the reporter's
> name) as well as "the information" (the reporter's outlet) on February 21,
> 2025.  Over the following six days, up until the publication of *The
> Information*'s article, D.S. searched the reporter's name 15 times and his
> outlet's name 31 times.

87. Based on the timing of the reporter's investigation.  Accordingly, Rippling's forensic analysis
team identified D.S.O'Brien as the source of the Shared Slack Messages referenced in the
reporter's February 18, 2025, email.

1    117.    O'Brien has since confirmed that Alex Bouaziz directed him to conduct these

2    searches, and that (contrary to Deel's suggestions) he had no contact with the reporter Michael

3    Roddan (a fact that Mr. Roddan has likewise confirmed in subsequent reporting[34]).    On

4    information and belief, ~~D.S. conducted these searches~~Alex did so to assist Deel's communications

5    team, led by Elisabeth Diana, Deel's ~~Vice~~then-Vice President of Communications, in an effort to

6    reframe an upcoming story about Deel's sanctions issues into one about a Deel-versus-Rippling

7    rivalry.

8    ~~VII.  RIPPLING ESTABLISHES A CLEAR CONNECTION BETWEEN DEEL'S SPY
        AND DEEL~~

9

10    ~~88.  Collectively, D.S.'s activities documented above suggest strongly that~~

11    ~~D.S. has acted at the behest of Deel since at least November 2024.  However, three~~

12    ~~additional activities by D.S. make the connection certain: (1) D.S. meeting with~~

13    ~~Deel in December 2024; (2) D.S. searching for "Tinybird" without any lawful~~

14    ~~reason to know a company by that name existed; and, most tellingly, (3) D.S.~~

15    ~~searching for and accessing a Slack channel ("#d-defectors") which established a~~

16    ~~clear link between D.S. and Deel.~~

17    ~~89.  **December 2024 Meeting Between D.S. and Deel**.  While D.S. was logged~~

18    ~~into his Rippling work browser on December 9, 2024, he reviewed an email to~~

19    ~~himself indicating that he had a scheduled meeting with Deel that~~

20    ~~afternoon—approximately one month after his pattern of suspicious activity began.~~

21    ~~D.S.'s browser history also reveals that, on that same day, he searched for an email~~

22    ~~thread with "alex@deel.com" (Deel's CEO), which produced an email presumably~~

[34]    Michael Roddan, *Inside the Nasty Feud Between Deel and Rippling That Became a Spy
Drama*, The Information (Mar. 20, 2025),
https://www.theinformation.com/articles/inside-nasty-feud-deel-rippling-became-spy-drama
("Until this week [*i.e.*, after Rippling filed its initial Complaint], I didn't know Keith O'Brien
existed").

from Deel's CEO to D.S., titled in part "Intro" with "Olivier." "Olivier" likely refers to Olivier Elbaz, Deel's Head of Global Expansion and a Senior Advisor at Sarona Ventures, a venture capital fund started by the Bouaziz family and early investor in Deel. On information and belief, based upon the browser history described above, on December 9, 2024, D.S. met, either electronically or in-person, with one or both of Alex Bouaziz (Deel's CEO) and/or Elbaz.

90. ***Tinybird***. On February 27, 2025, when *The Information* published the article for which its reporter sought comment from Rippling, Rippling learned two important things for the first time: (1) that Tinybird, a startup discussed in the article, is Deel's customer, and (2) that Tinybird reportedly made payments to sanctioned Russian banks using the Deel platform; specifically, "Tinybird [] followed instructions currently hosted on the website of a sanctioned Russian bank that guided companies on how to skirt sanctions rules by using Deel." Prior to the publication of this article, no one at Rippling including D.S. had any work-related reason to know about any connection between Tinybird and Deel, let alone search that name through Rippling's Slack archives.

91. Nevertheless, Rippling's investigation revealed that D.S. had searched for "tinybird" 20 times between February 19 and February 20—over a week before *The Information*'s article was published—and also ran other search terms related to *The Information*'s then-upcoming story:



1    92. On information and belief, D.S. most likely knew to search for "tinybird"

2    because he was instructed to search for that term by Deel, presumably after the

3    reporter indicated to Deel's communications team led by VP of Communications

4    Elisabeth Diana that Tinybird was a focus of his reporting.

5    93. *#d-defectors*.    Upon learning of the "Tinybird" searches, Rippling

6    strongly suspected that Deel was directing D.S.'s actions.    But to ensure its

7    suspicions were correct, Rippling conceived of a test (known in the security world

8    as a "honeypot") that would leave no doubt, utilizing Rippling's understanding that

9    Deel activated its spy when it perceived potential reputational damage (as it had

10   with "tinybird").

11   119. 94. The evening of March 3, 2025, Rippling's General Counsel sent a letter to three

12   individuals:  (1) Philippe Bouaziz, Deel's Board Chair, Chief Financial Officer, General Counsel,

13   and father of Deel's CEO,; (2) Spiros Komis, Deel's Head of US Legal,; and (3) an employment

14   attorney at Deel's outside law firm.

15   120. 95. Rippling's letter included a screenshot of a Slack message from its Chief

16   Revenue Officer Matt Plank, referencing a "#d-defectors" Slack channel along with three points,

17   which were all believed to be true but redacted for dramatic effect.  The screenshot and reference

18   to #d-defectors was intended to indicate to Deel that Rippling had a Slack channel for ex-Deel

19   employees now employed by Rippling where they shared embarrassing information about Deel

20   and that the channel contained information which would cause negative press attention if

21   revealed.[35]



Dear Mr. Distelburger,

While I appreciate Deel's ongoing fascination with Rippling's hires and especially Deel defectors — ▓▓▓▓ and ▓▓▓▓ rest assured, Rippling does not want Deel's confidential information[1].

But since you wrote, I wanted to raise our concerns. For starters, as Deel is surely aware, ▓▓▓▓ no longer works here because of Deel. As Rippling's CRO Matt Plank recently learned:

Matt Plank    12:41 AM
Thursday, February 27th —
Just learned a few crazy things in the #d-defectors channel…😃
#2 and #3 seem like real wtf's

I know this isn't my area of expertise, but those two things seem like they're pretty illegal…or really bad if it became public for them?

• I learned the real reason ▓▓▓▓ left; Deel cancelled all of his vested equity b/c he joined Rippling — it was suddenly cancelled in Carta, which is how he found out. Csuite at Deel called him and basically said, "You chose Rippling, so you're not going to get any of your equity." And then gave it back when he resigned.

• Deel is actively ▓▓▓▓▓▓▓▓, and is knowingly processing ▓▓▓▓▓▓▓▓

• Someone apparently knows ▓▓▓▓ at Deel, and said they have thorough knowledge of some ▓▓▓▓▓▓▓▓ — for example ▓▓▓▓▓▓▓▓ They included a pretty damning screenshot along with it (sender, timestamps, etc.).

[1] Rippling respects the intellectual property rights of others and takes the requisite precautions and measures to ensure that Rippling competes on fair terms. We have no reason to believe that any Deel confidential information or lawful restrictive covenant will be compromised by these hires. Specifically, our employees sign agreements that state they will not bring any employer confidential information to Rippling, including that of any former employer. Beyond contractual controls, we employ several administrative and technical controls to ensure that our new hires are well versed on their continuing obligations to their prior employers, including policies, trainings, and restrictions on our referral bonus program. I trust that this addresses Deel's concerns with our existing and future hires from Deel.

[35] Rippling ▓▓▓▓▓▓▓▓  
had learned ▓▓▓▓▓▓▓▓  
joined Ri▓▓▓▓▓▓▓  
explaining ▓▓▓▓▓▓▓  

Rippling ▓▓▓▓  
sequently ▓▓▓  
al letters



121. 96. In truth, the renamed #d-defectors channel did not exist until March 3, 2025 (or early morning March 4, 2025, Irish Time (UTC)). Rather than being a gathering place for ex-Deel employees, the channel was set up as part of a ruse designed to confirm that Deel was instructing D.S. O'Brien to search for specific information in Rippling's Slack.

122. 97. Deel—through D.S. O'Brien—took the bait. Within hours of Rippling sending the letter referencing the #d-defectors channel—again, a channel that existed only as bait for Deel, and one which D.S. O'Brien could not have known existed absent a connection between himself and Deel—D.S. O'Brien ran the following searches in Slack:

| 230 | 2025-03-04 | matt plank |
|---|---|---|
| 231 | 2025-03-04 | matt plank |
| 232 | 2025-03-04 | matt plank |
| 233 | 2025-03-04 | matt plank |
| 234 | 2025-03-04 | matt plank |
| 235 | 2025-03-04 | matt plank |
| 236 | 2025-03-04 | matt plank |
| 237 | 2025-03-04 | matt plank |
| 238 | 2025-03-04 | matt plank |
| 239 | 2025-03-04 | d defector |
| 240 | 2025-03-04 | d defector |
| 241 | 2025-03-04 | d defector |
| 242 | 2025-03-04 | d defector |
| 243 | 2025-03-04 | d defector |
| 244 | 2025-03-04 | defector |
| 245 | 2025-03-04 | defector |
| 246 | 2025-03-04 | defector |

| 230 | 2025-03-04 | matt plank |
|---|---|---|
| 231 | 2025-03-04 | matt plank |
| 232 | 2025-03-04 | matt plank |
| 233 | 2025-03-04 | matt plank |
| 234 | 2025-03-04 | matt plank |
| 235 | 2025-03-04 | matt plank |
| 236 | 2025-03-04 | matt plank |
| 237 | 2025-03-04 | matt plank |
| 238 | 2025-03-04 | matt plank |
| 239 | 2025-03-04 | d defector |
| 240 | 2025-03-04 | d defector |
| 241 | 2025-03-04 | d defector |
| 242 | 2025-03-04 | d defector |
| 243 | 2025-03-04 | d defector |
| 244 | 2025-03-04 | defector |
| 245 | 2025-03-04 | defector |
| 246 | 2025-03-04 | defector |
| 247 | 2025-03-04 | defector |
| 248 | 2025-03-04 | defector |

123. 98. D.S.O _____ times that same day.

124. 99. For a _____ rien had never searched for the term "defectors d _____ e the letter was sent to Deel, no one at Rippl _____ ver viewed the (new) #d-defectors channel.  M _____ directed O'Brien to the #d-defectors channel be _____ clude the term "deel"; (2) the #d-defectors cha _____ att Plank screenshotted above was in a private channel, inaccessible to O'Brien and his searches.  In short, *only if O'Brien was acting at the direction of Deel's leadership* could O'Brien have known to run the searches above.

100. The results of Rippling's honeypot operation left no doubt:  Deel's senior leadership or those closest to them were directing D.S.'s actions, in furtherance of Deel's business interests and to harm Rippling and its customers.

1    125.    O'Brien has since admitted that he ran these searches shortly after Alex Bouaziz

2  requested that he do so.  Apparently realizing what he had done, shortly thereafter, Alex sent

3  O'Brien panicked messages stating that if O'Brien had not yet run the searches, he should not do

4  so, because Rippling's letter could be a "trap."  But it was too late.  Alex's reaction?  "oh shit."

5

6    **#d-Defectors**

7    27.    At the end of February 2025, Alex told me to search Rippling's Slack system for the channel
       "#d-defectors."  I ran the search immediately and began to look at the results.  Within minutes,

8     Alex messaged me again and told me not to run the search because he believed it was a "trap."
       I told Alex that by the time I got his message, I had already done the search and he said "oh

9     shit."  I told him that the "#d-defectors" channel had Matt Plank, Rippling's Chief Revenue
       Officer, in the channel.  I told him I was frightened, but he just said, "don't worry."  Thereafter,

10    he continued to press me to pass him information from Rippling.

11

12

13

14

15

16

17

18

19

20

21

22

126.    Nevertheless, Rippling's forensic investigation (and, eventually, O'Brien) confirm that even after they were caught in Rippling's honeypot, Alex, through O'Brien, continued mining Rippling's Slack channels for Rippling's trade secrets.

127.    As Rippling has confirmed through layers of corroborating evidence, including forensic data, the spy's sworn confession, WhatsApp chat logs, wire transfer payment records, and a well-laid honeypot—Deel's CEO and several key executives planned, directed, and executed the corporate espionage scheme detailed above.  And they did so for an obvious and simple reason: Rippling's information was extremely valuable to Deel and the Bouaziz Racketeering Enterprise. It not only saved Deel a significant amount of time and money, but also gave Deel an unlawful head start in launching or developing competing products.  Indeed, the fruits of Deel's theft and exploitation of Rippling's trade secrets were embedded throughout the Deel organization.  From corporate strategy to sales and marketing to HR and recruiting to communications and PR, nearly every aspect of Deel's business has benefitted from information stolen from Rippling, and where Deel benefitted, so did Alex and Philippe personally via their investment vehicles

128.    While the full impact of Deel's theft of Rippling's trade secrets is not yet known (or known to Rippling, which continues to investigate the harms caused), the record is already alarming.  In fact, on March 10, 2025—as Rippling was in the process of preparing to confront O'Brien—Deel's largest outside investor, a16z, published a blog post entitled "Deconstructing Deel: How a Startup Became the OS for Global Work."[36]  The content of the blog—compiled from extensive interviews with Deel's C-Suite and product leadership—indicates that Deel has already begun integrating aspects of Rippling's Corporate Strategy Trade Secrets into its

---

[36]    *See Deconstructing Deel: How a Startup Became the OS for Global Work*, a16z (Mar. 10, 2025), https://a16z.com/deconstructing-deel/.

1   organization, as the post outlines future strategies Deel intends to pursue that mirror those in the

2   documents containing Rippling Corporate Strategy Trade Secrets stolen by O'Brien.

3          129.    Due to the staggering scope of the corporate espionage scheme here—involving

4   stolen product roadmaps, competitive battlecards and over 6,000 queries through Rippling's Slack

5   channels, where any particular search may return dozens or even hundreds of distinct customer or

6   prospect opportunities—the commercial harm Rippling has already experienced is likely to persist

7   for many months or even years to come.

8   **III.**   ~~VIII. RIPPLING CONFRONTS~~ONCE DEEL'S SPY ~~WITH A COURT ORDER
    BUT THE SPY REFUSES TO COMPLY,~~IS CAUGHT, DEEL ATTEMPTS ~~TO
9   DESTROY EVIDENCE, AND FLEES~~AN ELABORATE COVER UP,
    OBSTRUCTION OF JUSTICE, AND DEFLECTION CAMPAIGN

10                    **The Cover Up: Destroy, Delete, Deflect**

11         130.    ~~101.~~ After the successful honeypot operation, Rippling ~~confronted its managerial

12   employee D.S.~~prepared to confront O'Brien about his activities. Due to ~~D.S.'s~~O'Brien's efforts to

13   conceal his conduct, ~~however,~~ Rippling ~~was concerned~~feared that any such confrontation would

14   ~~inevitably lead to D.S. and Deel erasing as much~~result in the destruction of key evidence ~~of this

15   conspiracy as possible.~~   Accordingly, ~~last Wednesday.~~on March 12, 2025, Rippling diligently

16   sought and obtained an ~~extraordinary~~emergency form of relief—an order from the High Court in

17   Ireland ~~directing~~authorizing the seizure and ~~inspection of D.S.'s phone~~preservation of O'Brien's

18   devices, with penal endorsement.

19

20         ~~102.   The court order required that D.S. surrender his cell phone to an

21   independent solicitor for preservation, pending an adversarial hearing to determine

22   whether Rippling would be entitled to access the data on the phone.   The court

     order also included a penal endorsement, which typically all but assures

     compliance, as the penalty of non-compliance could lead to imprisonment.~~

103. Served with the court order at Rippling's Dublin office, D.S. initially feigned compliance—before hiding in the bathroom and then fleeing the scene.

104. The independent solicitor informed D.S. that he was an independent solicitor and did not work on behalf of Rippling, that D.S. was required to surrender his phone for forensic imaging pursuant to a court order, and that he had another phone available to D.S. to call a solicitor before any imaging would take place. The independent solicitor also informed D.S. that the court order had been obtained due to concerns regarding the taking of Rippling confidential information to third parties. Subsequent communications made clear that the concern involved Deel.

105. D.S. initially told the independent solicitor that his cell phone was in a bag on another floor. The solicitor offered to have an associate retrieve the bag, but D.S. insisted that he retrieve it himself. The solicitor informed D.S. that if he was lying, he would be breaching the court order. The solicitor accompanied D.S. downstairs and took possession of the bag, but, in fact, D.S. had lied. The bag only contained a notebook. It held no mobile device. On information and belief, D.S.'s cell phone was on his person the entire time.

106. After misdirecting the independent solicitor, D.S. then went into a bathroom, locking the door behind him and refusing to come out, despite the independent solicitor's repeated warnings that these actions were in violation of the court order. Rather than comply, D.S. was heard "doing something" on his phone by the independent solicitor, who also heard D.S. flush the toilet—suggesting that D.S. may have attempted to flush his phone down the toilet rather than provide it for inspection. Later that day, Rippling had the plumbing of its Dublin offices inspected, but did not locate any mobile devices.

107. While in the bathroom and continuing after leaving the bathroom, D.S. was again told repeatedly that he was required to provide the device or he would be

-88-    Case No. 3:25-CV-2576

in violation of a court order. After D.S. left the bathroom, he was informed that taking another step forward rather than handing over the phone immediately would be an additional breach of the order. D.S. then replied: "I'm willing to take that risk." D.S. then stormed out of the office and fled the scene.

**IX. RIPPLING HAS INCURRED SIGNIFICANT HARM DUE TO DEEL'S SCHEME**

108. Through its misappropriation of Rippling's highly valuable pipeline of customer information, information on customer relationships, strategies for pitching prospective customers, and likely more, Deel has inflicted significant harm by depriving Rippling of the competitive advantage afforded by its exclusive use of that information. Moreover, as shown above, at least one potential Rippling customer, and potentially many more, were diverted to Deel as a direct result of Deel's nefarious scheme; Rippling has therefore suffered lost profits because of the scheme as well.

109. Separately and independently, Deel's intrusions into Rippling's systems have caused Rippling to suffer additional pecuniary harm in the form of costs incurred in investigating Deel's access to those systems and remediating those harms. Such investigation and remediation costs include, *inter alia*: loss of employee time in responding to the intrusion; the cost of hiring an investigative firm to determine the extent and scope of the intrusion; the cost of hiring a separate cybersecurity vendor to identify how Deel was able to exploit Rippling's systems; and attorneys' fees.

131. However, when the court-appointed independent solicitor served him with the court order at Rippling's Dublin office on March 14, 2025, O'Brien lied about his phone's whereabouts, hid in the bathroom to delete evidence, and then fled the scene, stating "I'm willing to take that risk" in response to warnings about the likelihood of jail time for violating the order.

132.    Immediately after fleeing, O'Brien contacted Deel CEO Alex Bouaziz, messaging him on LinkedIn with a simple "hey."  Alex soon thereafter called O'Brien via WhatsApp.

30.    I walked around for a while, and then logged onto LinkedIn on my phone browser and messaged Alex, "hey."  He then called me from a Romanian phone number and not his usual +33 number. I am not sure whether the call came through his phone or WhatsApp.  I know that it came from a Romanian number, as the call came up with the international prefix which was identified as "ROM".  The call came within three to five minutes of me sending the message.  I know that it was Alex, as I had pinged him via LinkedIn and I recognised his voice. I told him what happened. I told him I got served with a High Court order and that I was in serious trouble.  I told him Rippling was saying I had taken their data.  He said everything was going to be okay and that someone would get in touch straight away.  Afterwards, he messaged me on LinkedIn saying something like, "hey Keith, thanks for the chat, make sure you apply for that job." I believe Alex sent this message as a cover, to make it look like our conversation had been about a job application rather than their scheme to steal Rippling's information.

133.    Following their call, O'Brien was then contacted by an individual identifying himself only as "David."  O'Brien later recognized this voice as belonging to Defendant Andrea David Mieli, Deel's Global Senior Director of Legal.  Mieli advised O'Brien to reach back out on a new Telegram ID, which O'Brien understood to mean that he should procure a new "burner" phone.  Once O'Brien reached out to Mieli on a "burner" phone, Mieli created a Telegram chat and added a third person:  Defendant Asif Malik, one of Deel's senior in-house attorneys.  Deel's lawyers told O'Brien to "stick to the programme" of misrepresentation, evidence destruction, and evasion.

32. I tried to talk to David, but he interjected and told me to call him back via Telegram. He said not to install Telegram again on my old phone, but to go get a "new Telegram number". I understood this meant I should buy a new phone (a burner phone) and install Telegram on the new phone. David also gave me a number to call him back on from my new telegram account. I did what he told me to do. Once I had Telegram again, I got into contact with "David," and he added Asif Malik, one of Deel's senior in-house lawyers to a three-way chat. We had a few phone calls that day. Asif, Deel's in-house lawyer, said he was speaking in a "personal capacity" and that Rippling "have nothing." They suggested flying my family and me to Dubai that night, saying "we all need a holiday." I understood they were suggesting that my family and I flee Ireland permanently and that Deel would put me up in Dubai. They kept saying that Rippling was being very aggressive and improper, and that they didn't have anything on me. They said I should "tell them nothing" and that I should "stick with the programme," meaning I should lie and keep quiet. Deel's lawyer Asif said, "don't worry, PSG is going to sort all this out." I understood him to be referring to Alex when he said "PSG" because Alex and I frequently talked about football (soccer) and PSG was Alex's team.

134.    From March 15, 2025 to March 25, 2025, O'Brien spoke with Malik **every day**. Mieli also contacted O'Brien, to offer "reassurance and general comfort." Malik assured O'Brien that "[t]he guys at the top have your back[.]" O'Brien understood this to mean that Alex and Philippe Bouaziz would take care of O'Brien if he refused to "cooperate against Deel." Malik reiterated that Deel would move O'Brien and his family to Dubai and would "figure out a mechanism to cover [O'Brien's] legal costs," presumably associated with the Irish proceedings against O'Brien and any subsequent legal proceedings initiated by Rippling as a result of Deel's spying scheme. O'Brien understood the "mechanism" through which Deel would "cover" his "legal costs" was that O'Brien would become a consultant for Deel and that the consulting business would be very successful once he was back up and running. Malik and Mieli made overtures to O'Brien that if he "kept quiet and stuck with the plan," Deel would ensure he was "legally protected" and "financially rewarded."

1    135.    On March 15, Malik instructed O'Brien to destroy his old phone (the one used to

2 facilitate Deel's spy scheme), by "breaking it up and throwing it in the [Dublin] canal." That same

3 day, Malik requested to see the High Court order requiring O'Brien to turn over his devices, and

4 O'Brien obliged, sending the order to Malik over Telegram.

5    136.    The following day, March 16, O'Brien heeded Malik's instruction and destroyed

6 his phone with an axe before throwing the remains down the drain of his mother-in-law's house.

7 The same day, O'Brien spoke with Malik, expressing concerns about what he had done and guilt

8 for his wrongful actions. Suddenly feigning ignorance, Malik purported to not "know" what

9 O'Brien had done, expressed that he did not want to know what O'Brien had done, and

10 represented that he was speaking to O'Brien only in his "personal capacity," perhaps

11 understanding that (at best) he was unknowingly participating in a cover-up and at worst

12 knowingly engaging in the same.

13    137.    On the evening of March 16, Malik spoke with O'Brien's wife for approximately

14 45 minutes to an hour, reassuring her and purportedly "corroborating" the story Deel had

15 fabricated for O'Brien.

16    138.    On March 17, Rippling filed its initial Complaint, and it became publicly known

17 that Rippling alleged that Deel had cultivated a spy (O'Brien) to steal its confidential information

18 and trade secrets. Deel immediately issued a statement that attempted to "shift the narrative" that

19 Rippling was attempting to deflect after being accused of transmitting sanctioned Russian

20 payments (in reality, Rippling had not been so accused, and has never transmitted a sanctioned

21 payment). Meanwhile, Deel's in-house lawyers conditioned Deel's continued support of O'Brien

22 on him making false statements that "Rippling facilitated sanctioned 'Russian payments'" which

Deel hoped would "shift [] the narrative" and make their media statements valid after-the-fact.

1    Deel's conditions required O'Brien to make these types of statements to the Central Bank of

2    Ireland, the High Court, and even Deel's own Irish counsel.

3        139.    Indeed, on March 18, at Malik's instruction, O'Brien made a false report to the

4    Central Bank of Ireland about Rippling's purported "Russian payments."  O'Brien has since

5    admitted that he knew these allegations and statements were false.  In fact, O'Brien never made

6    any type of "whistleblower" complaint before he was caught spying for Deel, nor does he have any

7    knowledge of any sanctions-violating payments made by Rippling.  Rather, *he made these false*

8    *statements solely at Deel's express instruction, in support of Deel's effort to cover up their illicit*

9    *spying campaign*.

10        140.    The next day, on March 19, O'Brien was due in court in Ireland to explain his

11    non-compliance with the court order, and at Deel's instruction (through Malik), O'Brien falsely

12    stated in the Irish court proceedings (though not under oath) that he believed the matter had to do

13    with "Russian payments."  O'Brien later admitted—under oath—that he did not believe those

14    statements when he made them, but rather had made the statements at Deel's "encourage[ment]."

15        141.    The judge in O'Brien's Irish case, Justice Sanfey, explained to O'Brien that he had

16    been provided a copy of the order and that its stated purpose was to preserve his phone.  He then

17    asked if O'Brien was prepared to turn his phone over.  In response, O'Brien admitted that he had

18    "destroyed" his phone, which prompted Justice Sanfey to note, "*I think that Mr. O'Brien is in a*

19    *very serious situation*" and deliver the following stern warning to O'Brien:

20        *I think you do need to face up to the situation.*

21        *And I think you need legal advice in doing that. But, as of now, it has certainly appeared to*
         *me that you have breached the Orders of this Court and, as such, there is at least the*
22        *possibility that you are in contempt of court. And I don't want to say any more than that*
         *until you get a chance to consider your position - hopefully in conjunction with lawyers.*
         *[...]*

         *Now you're not going to be able to bring [the] phone back if you have destroyed it. But it*
         *is up to you to undo the damage that you have done by breaching the Court Order, and the*

-93-                                                Case No. 3:25-CV-2576

1  *attitude of this Court will be influenced by the degree to which you undertake actions*
   *which will have the effect of remedying the breach of the Court Order. [...]*

2  *I am trying to speak very carefully but I hope you understand me, Mr. O'Brien?*

3  142.   Caught red handed, Deel CEO Alex and COO Dan worked to erase all digital traces

4  of contact with O'Brien.  On March 20, O'Brien noticed that Alex (the "+33" number below) had

5  renamed the three-way WhatsApp group chat between himself, O'Brien, and Defendant Westgarth

6  from "Keith <> Dan" to "V" and left the group.   Three days later, on March 23, Defendant

7  Westgarth left the group chat.

8

9

10

11      

12

13

14

15

16

17

18  143.   On March 21, Malik told O'Brien that Deel's Irish solicitors would be emailing

19  him at his Global Payroll Geeks address, as it had to be at an email address known to Deel.  As a

20  result, between 10 and 11am UTC, O'Brien called and messaged one of his Global Payroll Geeks

21  cofounders, frantically seeking to regain access to this email account:

22

| | | |
|---|---|---|
| KO | Keith O'Brien <+353876606██> | 21/3/2025, 10:39 AM |
| | I need to access my emails | |
| SM | System Message <System Message> | 21/3/2025, 10:39 AM |
| | Missed video call from Norma Delgado Guevara (3468314██@s.whatsapp.net) | |
| SM | System Message <System Message> | 21/3/2025, 10:39 AM |
| | Outgoing call from Keith (353876604██@s.whatsapp.net owner) | |
| KO | Keith O'Brien <+353876606██> | 21/3/2025, 10:47 AM |
| | asdf2025ty@gmail.com | |
| SM | System Message <System Message> | 21/3/2025, 10:47 AM |
| | Outgoing call from Keith (353876604██@s.whatsapp.net owner) | |
| # | Norma Delgado Guevara <34683140██@s.whatsapp.net> | 21/3/2025, 10:52 AM |
| | When it asks for a code, use one of these | |
| # | Norma Delgado Guevara <34683140██@s.whatsapp.net> | 21/3/2025, 10:52 AM |
| | 82142800, 06983303, 71165306, 21624370, 77152336, 00187402, 90744534, 17837222, 12125251, 40460572 | |
| # | Norma Delgado Guevara <34683140██@s.whatsapp.net> | 21/3/2025, 10:52 AM |
| | See if it works | |
| KO | Keith O'Brien <+353876606██> | 21/3/2025, 10:53 AM |
| | Still asking for 2fa | |
| # | Norma Delgado Guevara <34683140██@s.whatsapp.net> | 21/3/2025, 10:53 AM |
| | Yes but put one of those codes | |
| # | Norma Delgado Guevara <34683140██@s.whatsapp.net> | 21/3/2025, 10:53 AM |
| | When it asks for a code | |
| KO | Keith O'Brien <+353876606██> | 21/3/2025, 11:01 AM |
| | Sorted | |
| KO | Keith O'Brien <+353876606██> | 21/3/2025, 11:01 AM |
| | Ty | |

144.    Like clockwork, later that afternoon at 3:11pm UTC, Deel's now-former Irish counsel, A&L Goodbody, sent an email to Rippling's Irish solicitors, Matheson, and, shockingly, copied O'Brien's Global Payroll Geeks email.

| | |
|---|---|
| From: | Kenan Furlong < > |
| Sent: | 21 March 2025 15:11 |
| To: | Murphy O'Connor, Julie; Reynolds, Karen |
| Cc: | keith@payrollgeeks.world; Nicholas Cole; Christina Moran; Christina Heffernan; Jane Kirby |
| Subject: | Rippling - Deel - Urgent - Private and Confidential |
| Attachments: | 20250320 Letter to Matheson (002).pdf; 2025.03.20 Preservation Letter to QE.pdf; 2025.03.18 Preservation Letter to QE.pdf |
| Importance: | High |

Dear Julie and Karen,

I attach a letter on behalf of Deel, Inc.

Please acknowledge receipt in due course.

Regards,

**Kenan Furlong (he/him) | Partner**
**A&L Goodbody LLP**

DDI:        | T:        | E:
                                                            www.algoodbody.com

145.    At the time, Rippling wondered why Deel's Irish counsel was corresponding with Rippling's employee, the alleged spy, and could discern no legitimate basis.  Rippling now knows that this was part of Deel's larger ploy to use its Irish solicitors A&L Goodbody in furtherance of this scheme to "make contact" with O'Brien in a way that *appeared* legitimate.  Malik told O'Brien to use this email thread to tell A&L Goodbody that he was a whistleblower and being harassed by Rippling and needed help.  At Malik's instruction and drafting assistance, O'Brien responded to the March 21 A&L Goodbody email, removing Rippling's counsel and telling A&L Goodbody that he was being harassed by Rippling for reporting supposed "illegal Russian payments."  Yet again, O'Brien later admitted under oath that he knew the information contained in his response email was false.  In response, A&L Goodbody (as instructed by Deel) recommended Irish law firms that O'Brien could contact, including Fenecas Law.

146.    Around March 22, O'Brien noticed that his Deel contacts on Telegram (Malik and Mieli) had "hid" their contact identities from him—a Telegram feature that enables the hidden user to contact the other person.  The result was Malik and Mieli could contact O'Brien, but he had no way of contacting them once the messages disappeared from their chats.

147.    These developments began to take their toll on O'Brien.  He had a call with Malik, expressing in a heated fashion his frustration with the situation, and in a show of good faith, Malik turned his Telegram ID ("SPDLW") back on, and O'Brien wrote it down.



148.    Increasingly feeling abandoned by Deel, on March 25, O'Brien contacted and retained a law firm (Fenecas Law) that Deel itself had recommended to O'Brien.  The same day, O'Brien spoke with Malik and told him about his new Irish counsel.  Malik instructed O'Brien to "stick to the programme" and warned O'Brien that he should "look after [himself] and [his] family."  That was the last time O'Brien spoke to Malik.  That evening, O'Brien told his Irish counsel about Deel's spy scheme.  O'Brien then decided to meet with the independent solicitor the next day (March 26, 2025) and attempt to comply with the High Court Order.

149.    The next day, March 26, O'Brien—with his own Irish counsel, Fenecas, at his side—met first with the court-designated independent solicitor and then with Rippling's Irish counsel.  O'Brien provided his personal devices to the independent solicitor for imaging, and decided to come clean.  In a last-ditch effort to protect their scheme, Malik contacted O'Brien's wife *during this meeting in which O'Brien was beginning to come clean*.  She advised him that she was not able to speak.

150.   O'Brien was due back in court on March 31 to face Justice Sanfey.  In the two hours leading up to this court hearing, Malik, who was not aware that O'Brien had confessed, attempted to contact O'Brien twice by way of his burner phone.  By this point, O'Brien's burner phone was in the possession of and being actively monitored by an independent forensic investigator.  The forensic investigator recorded the two calls from Malik to O'Brien's burner phone at the time they occurred:




 151.     Malik's Telegram ID was still on, which meant that his Telegram ID could also be linked to his mobile phone, if known:




152.    Malik then took the intentional step of manually deleting the electronic record of both calls by midday—even though, consistent with Deel's pattern of erasing records, the calls were already set to delete after 24 hours.  Malik's act of manual deletion was also observed and recorded by the forensic investigator.

1    153.    O'Brien ultimately decided to come clean because he knew what he was doing

2    "was wrong" and he was "getting sick concealing this lie."[37]    Ultimately, O'Brien came to the

3    conclusion that he was "*harming myself and my family to protect Deel*."

4

5

6

7

8

---

9    [37]    For Deel, every accusation is a confession.  To set the record straight, below are three such
false accusations (or confessions in disguise) recently advanced by or on behalf of Deel and likely
10    at the behest of the Bouaziz Racketeering Enterprise:

11    (1) Deel's lawyers and spokespersons falsely claim that the spy Keith O'Brien confessed "under
extreme duress," when in reality, the only duress O'Brien described was manufactured by
operatives of the Bouaziz Racketeering Enterprise.  To be clear, O'Brien voluntarily came forward
12    to confess while represented by his own legal counsel—counsel who had, notably, been
recommended to him by Deel's then-Irish solicitors A&L Goodbody.  As shown herein, the fact
13    that O'Brien (then a Rippling employee) was in communication with Deel's outside counsel (who
have since severed ties with Deel) is itself indicative of foul play.

14    (2) Deel has also falsely asserted to the media that the spy remains on Rippling's payroll.  That too
15    is untrue.  In fact, it was senior legal counsel associated with the Enterprise who attempted to
secure the spy's continued loyalty through promises of future payment. By contrast, O'Brien's
16    cooperation with Rippling has been formally documented in a Cooperation Agreement entered
into on March 27, 2025, and has been transparently disclosed to the High Court of Ireland.
17    Specifically, Rippling provided the High Court with a copy of the agreement and publicly
described the agreement as one "whereby Mr. O'Brien agreed to cooperate with the Plaintiffs
18    [Rippling] in any litigation worldwide in connection with the wrongdoing . . . .  Under that
agreement, Plaintiffs agreed to contribute toward O'Brien's costs of these proceedings and to pay
19    his reasonable out of pocket and legal expenses in connection with the cooperation to be provided
under that agreement."

20    (3) Deel has now resorted to baseless straw-grasping—announcing claims to great fanfare with no
supporting evidence and under the protection of "litigation privilege" via a sham Delaware
21    complaint that was not even served on Rippling.  Only after getting widespread media coverage of
these allegations—including allegations that Rippling had a spy within a Deel board meeting, an
22    accusation that appears to stem from Deel Board member Anish Archaya's steadfast approval of
the Bouaziz Racketeering Enterprise—did Deel silently drop its most salacious baseless
allegations (such as the allegation of a boardroom spy) in an amended filing a few weeks later.
*See* Cory Weinberg and Michael Roddan, *Andreessen Horowitz Comes to Deel's Defense in Spy
Battle*,    The    Information    (Apr.    26,    2025),
https://www.theinformation.com/articles/andreessen-horowitz-comes-deels-defense-spy-battle.

---

50.    I decided to cooperate after I got a text from a friend on March 25, 2025 saying, "the truth will set you free." I was also driving with a family member to meet my solicitors and she told me that if I had done something wrong that I should "just tell the truth." I was having bad thoughts at the time; it was a horrible time for me. I was getting sick concealing this lie. I realised that I was harming myself and my family to protect Deel. I was concerned, and I am still concerned, about how wealthy and powerful Alex and Philippe are, but I know that what I was doing was wrong. After I spoke with my solicitors at Fenecas Law, I started to feel a sense of relief. I want to do what I can to start making amends and righting these wrongs.

154.    Deel and its officers' reactions to Rippling's complaint leave no doubt about their guilt, bad faith, and disregard for the law. Rather than acknowledge the mounting body of forensic evidence, sworn testimony, and corroborating documentation, Alex Bouaziz and his associates have instead engaged in an extensive cover-up effort—one marked by evasion, distraction, and reputational sabotage.

155.    For example, once it became clear that Malik's role in the scheme would be exposed, he fled to Dubai—the very place he had proposed relocating O'Brien.[38] Around the same time, Alex and Philippe Bouaziz turned up in Dubai. Though Deel publicly claimed Alex was there to celebrate Passover, Deel has been evasive about even the country of their primary residence. Both his and Philippe's whereabouts remain unknown as of the filing of this First Amended Complaint. Meanwhile, Andrea David Mieli, another co-conspirator, appears to have similarly gone to ground and is presently unreachable.

156.    These are not the actions of an organization or individuals acting in good faith and who have behaved lawfully and have nothing to hide.

---

[38]    Charles Rollet, *Deel's CEO is now in Dubai, complicating Rippling's lawsuit*, TechCrunch (Apr. 15, 2025), https://techcrunch.com/2025/04/15/deels-ceo-is-now-in-dubai-complicating-ripplings-lawsuit/

1

**The Cover Up (Part 2): Business as Usual—Buy Loyalty, Gaslight, and Flood the Zone**

3      157.    Unchastened, Deel has gone on with business as usual: obfuscating, distracting, and otherwise flooding the zone.  First, Deel told to the media that Rippling's initial complaint was retribution for "accusations about Russian payments"—even as it was coercing its spy to submit false, after-in-time false complaints to the Central Bank of Ireland, court officials, and legal professionals.

8      158.    Then, as Deel affiliates caught wind that Rippling was in the midst of a long-planned financing round, they sought, through one of Deel's high-profile investors, to sabotage Rippling's Series G financing round.  Around April 23, 2025, just two days before the financing was scheduled to close, a "tier 1" investor "in a position to know [about Deel's planned response to Rippling's complaint]," contacted a "very senior" partner at Rippling's Series G investor.  That person claimed  Deel would soon be "hitting back" with "material information" against Rippling in this litigation and urged the investor to delay until Deel's response came out, which effectively stalled the financing.  Days later, despite an obligation to file counterclaims in this California litigation, Deel and its counsel filed a plainly frivolous complaint in Delaware (not California) on April 25, 2025.  That filing conspicuously attempts to avoid California by asserting, implausibly, that California is not its headquarters (despite being the address listed on all corporate records, its Terms of Services, its Privacy Policy, and now as of last month, its Whistleblowing Policy).  The Delaware action appears to serve no legitimate purpose other than to manufacture the appearance of "litigation privilege" as a pretext to inject knowingly false and disparaging allegations about Rippling and its CEO into the public domain, which Deel did with great fanfare.  After garnering widespread media coverage, Deel silently dropped its most salacious allegations in an Amended Complaint a few weeks later. Perhaps most tellingly, neither

FIRST AMENDED COMPLAINT

1  of Deel's Delaware complaints nor its related filings denied the core of Rippling's allegations:

2  that Alex Bouaziz personally recruited and directed O'Brien to steal Rippling's most sensitive

3  trade secrets, to be used for Deel's benefit and to Rippling's detriment.

4      159.    And now, Deel continues as if nothing is amiss.  After two months of silence, Alex

5  Bouaziz is back on LinkedIn and X.com (formerly Twitter), touting PSG results to "flood the

6  zone."  Meanwhile, Deel has purchased full-page ads in Irish media and the Dublin airport,

7  seemingly operating under the belief that "no press is bad press," and that reputational damage is

8  just another expense to pay off.  And despite evidence sufficient to obtain an emergency order

9  with the High Court of Ireland and a sworn affidavit from the spy, Deel's Board—which includes

10  Bouaziz himself and is chaired by his father, Philippe Bouaziz—has reportedly turned a blind eye,

11  with a revolving door of resigning lawyers and communications experts, but no apparent steps to

12  investigate. Instead, in April 2025, Deel suddenly announced the hiring of a new General Counsel

13  and a new Chief Compliance Officer, who reports directly to the same Board comprised of the

14  very individuals implicated in the misconduct. Ironically, as of April 2025, the new CCO's

15  LinkedIn profile states: "I also serve as a strategic advisor to the CEO and General Counsel,

16  helping drive a culture of compliance and ethical business practices."[39]  It remains unclear how

17  such an arrangement—where those responsible for the misconduct run the Board—is supposed to

18  restore integrity or accountability.  As Fintech Biz Weekly writer Jason Mikula wryly noted:

19  "Godspeed, sir.[40]

20

21

22

_____

[39]    Anthony Luis Rodriguez, LinkedIn, https://www.linkedin.com/in/arod052971/ (last accessed June 4, 2025).

[40]    Jason Mikula (@mikulaja), X (May 1, 2025, 3:38PM), http://x.com/mikulaja/status/1918072551055802824.

IV.    **SINCE THE COMPLAINT WAS FILED, RIPPLING HAS LEARNED ABOUT ADDITIONAL VICTIMS OF THE BOUAZIZ RACKETEERING ENTERPRISE**

160.    In the days and weeks following the filing of Rippling's complaint on March 17, 2025, it became increasingly clear that Rippling was not Deel's only victim.  Deel's misconduct is not limited to a single scheme, a single rogue employee, or even a single target.  Rather, the pattern that has emerged reflects a coordinated and deeply embedded business strategy—one that prioritizes aggressive, unlawful tactics over fair competition.

161.    Trade secret theft and industrial espionage are not outliers in Deel's approach—they are, by all accounts, features of its operating model.  Indeed, Deel's own C-level executives appear desensitized to the seriousness of this conduct, with reports of Philippe Bouaziz openly bragging about maintaining "spies at other companies."[41]

162.    As uncovered in Rippling's ongoing investigation, Deel whistleblowers report that Deel leadership routinely encouraged new hires to bring confidential and proprietary materials from prior employers for Deel's benefit.  This practice was so prevalent, in fact, that it was common knowledge that the employees that Deel hired from competitors shared information and sales documents that those employees took from their prior employers.  At company-wide "all-hands" meetings, Deel executives reportedly announced new hires from competitors and referenced the sensitive documents and intelligence they provided—treating stolen information as a form of celebrated internal achievement.  Given these practices, Deel's competitors have reported seeing Deel in possession of, and using, their confidential internal documents, including by contacting then-current Deel customers moments after Deel's competitors reached out—just like in Rippling's case.  Competitors also reported that Deel's leadership had information about

---

[41]  Michael Roddan and Cory Weinberg, *How Deel's Combative Father-Son Duo Sparked a Spy Scandal*, The Information (Apr. 4, 2025), https://www.theinformation.com/articles/deels-combative-father-son-duo-sparked-spy-scandal.

FIRST AMENDED COMPLAINT

1    the competitors' customers, including specific information about issues those customers had with

2    the competitors' products, and that they had seen Deel attempting to poach employees *en masse*

3    using confidential information that it acquired from the competitors' current and former

4    employees.

5        163.    It is little surprise, then, that since this case was filed, several parties—including

6    major EOR competitors, a startup accelerator, and even a seemingly unrelated third party (a

7    competitor of a Deel partner)—have uncovered eerily similar conduct by Deel or its associates to

8    obtain their confidential information and trade secrets.[42]  For example:

9        164.    ***Toku (Victim-2).***    A crypto currency-based payroll and equity management

10   platform, Toku, uncovered evidence that one of Deel's partners (LiquiFi), with Deel's knowledge

11   and active support, encouragement, and involvement, hired Toku's former general counsel

12   Benjamin Snipes knowing that he misappropriated Toku's trade secrets, and then proceeded to

13   disseminate and use those trade secrets across the LiquiFi/Deel enterprise to compete with Toku.

14       165.    Toku already had an open lawsuit against LiquiFi from December 2024 to enforce

15   its rights, and on information and belief, Toku connected the dots that Deel was likely involved

16   after the filing of this action.  Indeed, last month, Toku revealed in public legal filings that it had

17   uncovered evidence that Alex Bouaziz wanted to "crush Toku" and would ask why Toku was "not

18   out of the picture."  His malicious targeting of Toku went so far that he "want[ed] to kill Toku

19   more than see lots of revenue."  In aid of that effort, LiquiFi hired Toku's former general counsel,

20   telling Alex Bouaziz and the Deel executive team that because Toku's "General Counsel is now

21   [LiquiFi's] General Counsel," it "ha[d] every insight into how to kill" Toku, as Alex Bouaziz had

22   demanded.  Shortly afterwards, and despite being unable to do so for months, LiquiFi and Deel

---

[42] Evidence substantiating the below will be brought forward once formal subpoenas are issued in this matter.

FIRST AMENDED COMPLAINT

1    then rolled out an integrated, working product that mirrored Toku's, reaping the ill-gotten benefits

2    of yet another unlawful raid against a competitor.

3        166.    ***Victim-3.***    Shortly after Rippling's initial Complaint, Victim-3, a start-up

4    accelerator, informed Rippling that Deel had stolen the start-up accelerator's "CRM" (*i.e.*, its trade

5    secret customer database, containing confidential and valuable nonpublic information about

6    customers compiled by Victim-3, the value of which laid in its secret and nonpublic nature).  This

7    start-up accelerator had entered into an exclusivity arrangement with Deel, where, under the

8    arrangement, Deel contractually bound the start-up accelerator to require its start-up customers to

9    partner with Deel to manage their contractor payroll needs.  During the course of the partnership,

10   across 2022 and 2023, Deel poached two employees to join Deel, and soon after their departures,

11   this start-up accelerator learned that these two employees had each stolen the accelerator's CRM

12   and brought it to Deel to support their efforts to drive business development at Deel, working in

13   close partnership with Alex and Philippe Bouaziz.  When this start-up accelerator confronted its

14   former employees about the theft, the former employees both cited generous compensation offers

15   from Deel, nearly tripling their prior salaries, in order to bring the accelerator's confidential

16   start-up partnership and CRM data to Deel.  When this start-up accelerator confronted Deel, Deel

17   challenged the accelerator to try to sue to enforce its rights, referencing that Deel had a large legal

18   budget and would vigorously oppose any legal claims about the incident.

19       167.    ***Victim 4+, other major EOR competitor(s).***    Underscoring the Bouaziz

20   Racketeering Enterprise's broader fixation beyond Rippling, forensic analysis revealed that the

21   enterprise's spy had searched Rippling's Slack to find confidential information targeting 9 Deel

22   separate competitors over 300 times, including "Papaya," "Velocity Global," "Remote," "G-P"

     (Globalization Partners)," "Omnipresent," "Oyster," "Boundless," "Payzaar," and "Remofirst." In

-107-                                              Case No. 3:25-CV-2576

1    fact, searches for one competitor, "Oyster," represented approximately half of O'Brien's Slack

2    searches (150 in total) in the months following the spy's recruitment by Alex Bouaziz.

3        168.    Unsurprisingly, other EOR competitors have uncovered unsavory activity at the

4    hands of Deel.  Indeed, following the release of O'Brien's sworn affidavit, the CEO of Papaya,

5    another one of Deel's major EOR competitors, publicly stated that "this is not a one-off incident"[43]

6    and that Alex Bouaziz had "ask[ed] the family member of a Papaya co-founder to pass on

7    information about" Papaya.[44]

8        169.    In short, given the lawlessness of Bouaziz Racketeering Enterprise and its approach

9    to "business" from its C-Suite, Rippling is not left with any doubt that its misconduct is currently

10   ongoing and will continue until its corrupt enterprise is dismantled.

11                          **CLAIMS FOR RELIEF**
                          **FIRST CAUSE OF ACTION**
12

13   **(Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c))**
     **(Against Defendants Deel, Alex Bouaziz, and Philippe Bouaziz)**

14       170.    110. Rippling re-alleges and incorporates by reference each and every allegation

15   contained in paragraphs 1 through 109169 of this First Amended Complaint.

16       171.    111. From at least November 2024early 2022 and continuing up to and including

17   the date of the filing of this compliantFirst Amended Complaint, in the Northern District of

18   California, and elsewhere, defendantdefendants Deel, Alex, Philippe, Westgarth,  and others

19   known and unknown, including but not limited to D.S.Alba Basha, Malik, Mieli, O'Brien, LiquiFi,

20   Snipes, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, Conspirator-5, and Does

21

22   [43]  Eynat Guez (@EynatGuez), X (Apr. 2, 2025, 8:32AM),
     https://x.com/EynatGuez/status/1907456212045590567.

     [44]  Michael Roddan and Cory Weinberg, *How Deel's Combative Father-Son Duo Sparked a Spy Scandal*, The Information (Apr. 4, 2025),
     https://www.theinformation.com/articles/deels-combative-father-son-duo-sparked-spy-scandal.

1 ~~1–100~~1–100, constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4); that is, a

2 group of business entities and individuals associated in fact, which was engaged in, and the

3 activities of which affected, interstate and foreign commerce (~~the "~~previously defined as the

4 "Bouaziz Racketeering Enterprise").

5 172. ~~112.~~ The Bouaziz Racketeering Enterprise functioned as a continuing unit with

6 discrete participants sharing the same goal through unlawful means of developing competing

7 products, generating profits, and soliciting customers for Deel using Rippling's stolen Corporate

8 Strategy Trade Secrets, Sales and Marketing Trade Secrets, and confidential business information.

9 173. ~~113.~~ On information and belief, ~~Deel's senior leadership~~Alex Bouaziz and Philippe

10 Bouaziz acted as the ~~leaders~~ringleaders of the Bouaziz Racketeering Enterprise, with ~~D.S. and~~

11 ~~Does 1–100~~Deel, Westgarth, O'Brien, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4,

12 Conspirator-5, Basha, Malik, Mieli, LiquiFi, and Does 1–100 providing assistance. These

13 members of the Bouaziz Racketeering Enterprise communicated via electronic mail and/or other

14 electronic means in furtherance of their common scheme. The Bouaziz Racketeering Enterprise

15 continues today.

16 174. ~~114.~~ From at least ~~November 2024~~early 2022 and continuing up to and including

17 the date of the filing of this ~~compliant~~First Amended Complaint, in the Northern District of

18 California, and elsewhere, ~~defendant Deel, and others known and unknown, including but not~~

19 ~~limited to D.S. and Does 1–100~~defendants Deel, Alex Bouaziz, and Philippe Bouaziz, being

20 persons employed by and associated with the Bouaziz Racketeering Enterprise described above,

21 did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the

22 conduct, management, and operation of the affairs of the Bouaziz Racketeering Enterprise, which

engaged in, and the activities of which affected interstate and foreign commerce, through a pattern

of racketeering activity consisting of ~~numerous~~multiple acts of racketeering indictable under 18

1  U.S.C. §§ 1343, 1346 and 1349 (wire fraud and conspiracy to commit the same), 18 U.S.C. §

2  1803(a) (obstruction of justice),  and 18 U.S.C. § 1832 (theft of trade secrets), in violation of 18

3  U.S.C. § 1962.

4      175.  115. On multiple occasions,  defendant Deel, Inc., and others known and unknown,

5  including but not limited to  D.S. and Does 1-100, Defendants Deel, Alex Bouaziz, and Philippe

6  Bouaziz participated in the affairs of the Bouaziz Racketeering Enterprise by engaging in acts of

7  wire fraud and conspiracy to commit wire fraud, to further the Bouaziz Racketeering Enterprise's

8  objectives.   Specifically, in multiple instances, Deel, Alex Bouaziz, and Philippe Bouaziz

9  conspired to defraud and defrauded Rippling and other Deel competitors by working with D.S.

10  to employees of Deel's competitors, including O'Brien, to fraudulently misappropriate

11  Rippling's those competitors' confidential business information, using wires in interstate and

12  foreign commerce, in violation of the duties of loyalty, trust and confidence that D.S. those

13  employees owed to Rippling their employers, in violation of 18 U.S.C. §§ 1343 and 1349.

14  Moreover, in multiple instances, Deel, Alex Bouaziz, and Philippe Bouaziz conspired to defraud

15  and defrauded Rippling and other Deel competitors by working with employees of Deel's

16  competitors, including O'Brien, to deprive those competitors of their intangible right to their

17  employees' honest services, using wires in interstate and foreign commerce, in violation of 18

18  U.S.C. §§ 1343, 1346, and 1349.

19      176.   Examples of the predicate acts of wire fraud include, but are not limited to, the

20  following:

21      •  On multiple occasions, Defendants Alex Bouaziz, Philippe Bouaziz, and

22      others known and unknown, including but not limited to O'Brien, used wire

        communications originating outside of the United States that were directed

        to Rippling's servers in the United States, including Slack queries and

1      queries to other Rippling databases hosted in the United States, to engage in

2      a scheme to defraud Rippling by communicating and receiving Rippling's

3      stolen Corporate Strategy Trade Secrets and Sales and Marketing Trade

4      Secrets, including specific documents containing trade secret information.

5      *Supra* ¶¶ 60–107.

6      • Defendants Alex Bouaziz and Philippe Bouaziz used wires in interstate and

7      foreign commerce, including a Revolut transfer that, on information and

8      belief, transited through the United States banking system, to bribe O'Brien

9      to deprive Rippling of its intangible right to O'Brien's honest services and

10     to steal Rippling's trade secrets in violation of the duty of trust and loyalty

11     he owed to Rippling. *Supra* ¶¶ 60–107.

12     177.   116. Moreover, on multiple occasions, defendant Deel, and others known and

13     unknown, including but not limited to D.S. and Does 1-100, defendants Deel, Alex Bouaziz, and

14     Philippe Bouaziz participated in the affairs of the Bouaziz Racketeering Enterprise by engaging in

15     theft of Rippling's trade secrets, to further the Bouaziz Racketeering Enterprise's objectives.

16     178.   117. Specifically, on multiple occasions, with intent to convert trade secrets, that

17     were related to products and services used in or intended for use in interstate or foreign commerce,

18     to their own economic benefit, and intending and knowing that the offense would injure

19     Rippling, defendant Deel, Inc., and others known and unknown, including but not limited to D.S.

20     and Does 1-100, including agents and employees of the entity from whom the trade secrets were

21     misappropriated, defendants Alex Bouaziz, Philippe Bouaziz, and Deel, knowingly:

22              (1) stole, or without authorization appropriated, took, carried away, and

                concealed, and by fraud, artifice, and deception obtained such information;

(2) without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information; and

(3) received, bought, and possessed such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization; and

(4) attempted and conspired to do the same, all in violation of 18 U.S.C. § 1832.

118. The enterprise engaged in numerous unlawful, overt, predicate acts to create an illegal pattern of racketeering, which included, but is not limited to, (1) each instance of misappropriation of Rippling's Sales and Marketing Trade Secrets, in violation of 18 U.S.C. § 1832; (2) each instance of embezzlement of confidential information (property) owned by Rippling, in violation of 18 U.S.C. §§ 1343 and 1349; (3) each use of the wires in furtherance of Deel's scheme; and (3) each time Deel used Rippling's Sales and Marketing Trade Secrets to unlawfully and unfairly compete with Rippling. This pattern of racketeering has been ongoing since at least approximately November 2024 and continues to this day, thereby posing a threat of continued criminal activity. Indeed, Deel's predicate acts are so numerous and pervasive that they constitute an open-ended scheme and are part of the normal course of how Deel regularly conducts business.

179. Examples of the predicate acts of trade secrets theft include, but are not limited to, the following:

- From November 2024 to March 2025, on multiple occasions, defendants Alex Bouaziz, Philippe Bouaziz, Deel, and others known and unknown,

1   directed O'Brien to take and transmit, without authorization, Rippling's

2   Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets.

3   *Supra* ¶¶ 73–107.

4   • From November 2024 to March 2025, on multiple occasions, defendants

5   Alex Bouaziz, Philippe Bouaziz, Deel, and others known and unknown,

6   knowingly received and possessed Rippling trade secrets stolen by O'Brien

7   knowing that O'Brien had taken the trade secrets without authorization.

8   *Supra* ¶¶ 73–107.

9   • From at least January 2024 through today, defendants Alex Bouaziz and

10  Deel, and others known and unknown, knowingly received and possessed

11  Rippling trade secrets stolen by Conspirator-1 knowing that Conspirator-1

12  had taken the trade secrets without authorization. *Supra* ¶¶ 27, 49.

13  • From at least February 2024 through today, defendants Alex Bouaziz and

14  Deel, and others known and unknown, knowingly received and possessed

15  Rippling trade secrets stolen by Conspirator-2 knowing that Conspirator-2

16  had taken the trade secrets without authorization. *Supra* ¶¶ 28, 50–51.

17  • From at least February 2024 through today, defendants Alex Bouaziz and

18  Deel, and others known and unknown, knowingly received and possessed

19  Toku (Victim-2) trade secrets stolen by Snipes knowing that Snipes had

20  taken the trade secrets without authorization. *Supra* ¶¶ 26, 164–165.

21  • From approximately early 2022 through today, defendants Alex Bouaziz

22  and Deel, and others known and unknown, knowingly received and

    possessed Victim-3 trade secrets stolen by Conspirator-3 and Conspirator-4

1    knowing that Conspirator-3 and Conspirator-4 had taken the trade secrets

2    without authorization. *Supra* ¶¶ 29–30, 166.

3        180.    Additionally, following the filing of this action, on multiple occasions, Alex

4    Bouaziz and Deel, through Alex Bouaziz, Meli, and others known and unknown, corruptly

5    influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due

6    administration of justice, in violation of 18 U.S.C. § 1503(a), though, among other things,

7    engaging in acts of document destruction, attempts to improperly influence witnesses, and

8    interfering with Rippling's efforts to raise funds.

9        181.    Defendants' predicate acts are so numerous and pervasive that they constitute an

10    open-ended scheme and are part of the normal course of how the Bouaziz Racketeering Enterprise

11    and the defendants regularly conduct business.  In light of that fact, and given Philippe's claim that

12    he maintains a network of spies at competitor companies, there is every reason to believe that the

13    commission of the predicate acts remains ongoing.  Indeed, were it not for the fact that Rippling

14    caught O'Brien in the act and confronted him, O'Brien's spying activity on behalf of the Bouaziz

15    Racketeering Enterprise would likely have continued indefinitely.

16        182.    ~~119.~~ Each of the predicate acts perpetrated by Deel, ~~D.S.~~Alex Bouaziz, and ~~or Does~~

17    ~~1-100~~ Philippe Bouaziz, in furtherance of the racketeering scheme was related to the others and

18    was performed while participating in the conduct of the affairs of the ~~enterprise identified~~

19    ~~above~~Bouaziz Racketeering Enterprise in violation of 18 U.S.C. § 1962(c).

20        183.    ~~120.~~ As a direct and proximate result of the pattern of racketeering activity, by and

21    through each of the unlawful acts recited herein, Rippling has been injured in its business and

22    property, including, but not limited to, loss of trade secrets, drawings, intellectual property,

protected business information, equipment, business opportunities, reputation, advantageous

business relationships (including customer and employee relationships) and profits.

**SECOND CAUSE OF ACTION**

**(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))**
**(Against All Defendants)**

184. ~~121.~~ Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through ~~120~~183 of this First Amended Complaint.

185. ~~122.~~ Alex Bouaziz, Philippe Bouaziz, Westgarth, Basha, Malik, Mieli, Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, Conspirator-5, O'Brien, Deel, ~~D.S.,~~ and Does ~~1-100~~1–100 qualify as "persons" under 18 U.S.C. § 1961(3).

186. ~~123.~~ Alex Bouaziz, Philippe Bouaziz, and Deel engaged in violations of 18 U.S.C. § 1962(c), the predicate acts for which are set forth in Count I above and expressly incorporated herein.

187. ~~124. Deel has~~Alex Bouaziz, Philippe Bouaziz, Westgarth, and Deel have violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C.§ 1962(c), as set forth in Count I above, by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering, and by agreeing to the commission of multiple predicate acts.

188. ~~125.~~ As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Rippling has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, advantageous business relationships (including customer and employee relationships) and profits.

**THIRD CAUSE OF ACTION**

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)**

1                                   **(Against Deel)**

2      189.  126. Rippling re-alleges and incorporates by reference each and every allegation

3  contained in paragraph 1 through 125188 of this First Amended Complaint.

4      190.  127. At all relevant times, Rippling owned and had the right to possess the stolen

5  trade secrets, including the Corporate Strategy Trade Secrets and Sales and Marketing Trade

6  Secrets as described in Paragraphs 19-7573–107.

7      128.  Rippling's  Sales  Leads,  Rippling's  Sales  Pipeline,  Rippling's

8  Competitive Intelligence Cards, Rippling's Implementation and Customer Support

9  Strategies, Rippling's Customer List, and Rippling's Churn Risk List constitute

10 trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

     191.  As set forth above, Deel improperly acquired, retained, and/or used confidential

11 and proprietary information of Rippling constituting trade secrets as defined by 18 U.S.C. §

12 1839(3), including without limitation the Corporate Strategy Trade Secrets and Sales and

13 Marketing Trade Secrets as described in Paragraphs 73–107.

14     192.  129. Rippling has taken efforts reasonable under the circumstances to maintain the

15 secrecy of its Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets by

16 allowinglimiting access to this information only to Rippling employees and storing its Corporate

17 Strategy Trade Secrets and Sales and Marketing Trade Secrets in aon secure location, password

18 protected databases that are accessible only to Rippling employees. In addition, as who pass

19 initial and periodic biometric checks.  As a condition of employment, Rippling  also requires all

20 employees to sign a CIPRAA; each employee's employment agreement requires that such

21 employees keep, *inter alia*, the Sales and Marketing Trade Secrets confidential; employees receive

22 and sign a Global Handbook that includes a Code of Conduct setting forth expectations for an

   employee's use of Rippling's confidential information (including the Corporate Strategy Trade

1    Secrets and Sales and Marketing Trade Secrets), including that such information not be used

2    outside Rippling; and Rippling requires that employees follow an Acceptable Use Policy

3    prohibiting employees from misusing Rippling's "resources and data assets," including the

4    Corporate Strategy Trade Secrets and Sales and Marketing Trade Secrets.

5        130. The Sales and Marketing Trade Secrets are not generally known or

6    available to the public.

7        131. Rippling spent tremendous time, effort, and resources developing and

8    cultivating the Sales and Marketing Trade Secrets.

9        132. The Sales and Marketing Trade Secrets are of substantial economic

10   value to Rippling. The Sales and Marketing Trade Secrets derive independent

     economic value from not being generally known to the public, to Rippling's

11   competitors, or to other persons who can obtain economic value from the

12   disclosure or use of the information.

13       133. Deel's actions with respect to Rippling's Sales and Marketing Trade

14   Secrets, as alleged above, were a deliberate scheme and plan to deprive Rippling of

15   the benefits of Rippling's own substantial investment and efforts and steal the fruits

16   of years of Rippling's labor.

17       134. On information and belief, Deel's acts of misappropriation of Rippling's

     Sales and Marketing Trade Secrets include, but are not limited to:

18           a. Knowingly receiving Rippling's Trade Secrets from D.S.; on information and

19               belief, Deel knew or had reason to know that, at the time D.S. was

20               disclosing or attempted to disclose Rippling's Sales and Marketing Trade

21               Secrets, he was under a contractual duty to maintain the secrecy of

                 Rippling's Sales and Marketing Trade Secrets and did not have the express

22               or implied authority or consent to disclose Rippling's Sales and Marketing

                 Trade Secrets to Deel.

b. Utilizing Rippling's Sales and Marketing Trade Secrets and/or confidential information, including Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and/or Rippling's Churn Risk List to unfairly to compete against Rippling.

135. On information and belief, Deel has gained, or will gain, substantial benefit from its misappropriation of Rippling's Sales and Marketing Trade Secrets, to Rippling's substantial detriment.

136. On information and belief, Deel used the Sales and Marketing Trade Secrets D.S. disclosed to unfairly compete against Rippling in head-to-head sales battles and ultimately won certain of those sales battles as a result of knowing Rippling's "playbook."

137. As a direct and proximate result of Deel's wrongful misappropriation of Rippling's confidential or proprietary information and Sales and Marketing Trade Secrets, Rippling has suffered actual damages in a sum to be set forth according to proof at trial.

138. Rippling is informed and believes that Deel's conduct was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Rippling is therefore entitled to recover from Deel exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C).

139. Rippling is also entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

### FOURTH CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*)**

140. Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 139 of this Complaint.

141. At all relevant times, Rippling owned and had the right to possess the Sales and Marketing Trade Secrets as described in Paragraphs 19-75.

142. Rippling's Sales Leads, Rippling's Sales Pipeline, Rippling's Competitive Intelligence Cards, Rippling's Implementation and Customer Support Strategies, Rippling's Customer List, and Rippling's Churn Risk List constitute trade secrets under the California Uniform Trade Secrets Act, California Civil Code § 3426, *et seq.*

143. Rippling has taken efforts reasonable under the circumstances to maintain the secrecy of its Sales and Marketing Trade Secrets by allowing access to this information only to Rippling employees and storing its Sales and Marketing Trade Secrets in a secure location accessible only to Rippling employees. In addition, as a condition of employment, Rippling requires all employees to sign a CIPRAA; each employee's employment agreement requires that such employees keep, *inter alia*, the Sales and Marketing Trade Secrets confidential; employees receive and sign a Global Handbook that includes a Code of Conduct setting forth expectations for an employee's use of Rippling's confidential information (including the Sales and Marketing Trade Secrets), including that such information not be used outside Rippling; and Rippling requires that employees follow an Acceptable Use Policy prohibiting employees from misusing Rippling's "resources and data assets," including the Sales and Marketing Trade Secrets.

144. The Sales and Marketing Trade Secrets are not generally known or available to the public.

193. 145. Rippling spent tremendous time, effort, and resources developing and cultivating the Sales and Marketing Trade Secrets.

146. stolen trade secrets.  Rippling's trade secrets The Sales and Marketing Trade Secrets are of substantial economic value to Rippling.  The Sales and Marketing Trade Secrets are not generally known or available to the public, and derive independent economic value from not being generally known to the public, to Rippling's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

194. 147. Deel's actions with respect to Rippling's Sales and Marketing Trade Secretstrade secrets, as alleged above, were a deliberate scheme and plan to deprive Rippling of the benefits of Rippling's own substantial investment and efforts and steal the fruits of years of Rippling's labor.

195. 148. On information and belief, Deel's acts of misappropriation of Rippling's Sales and Marketing Trade Secretstrade secrets include, but are not limited to:

> a. Knowingly receivingAcquiring Rippling's Sales and Marketing Trade Secrets from D.S.; on information and belief, Deel knew or had reason to know that, at the time D.S. was disclosing or attempted to disclose Rippling's Sales and Marketing Trade Secrets, he was under a contractual duty to maintain the secrecy of Rippling's Sales and Marketing Trade Secrets and did not have the express or implied authority or consent to disclose Rippling's Sales and Marketing Trade Secrets to Deel.trade secrets through improper means, including by obtaining Rippling's trade secrets from O'Brien by cultivating him as a "James Bond" spy, communicating with him using ephemeral messaging, and paying him in cryptocurrency in

FIRST AMENDED COMPLAINT

1    exchange for Rippling proprietary information that O'Brien had no

2    authority to share with Deel;

3    b.  Using and disclosing these improperly acquired trade secrets, including to

4    target Rippling's prospects and existing customers and to leverage its

5    ill-gotten knowledge of Rippling's business plans, product plans, and

6    roadmaps.

7    196.  Deel's improper acquisition and use of Rippling's trade secrets, actual or

8    threatened, violates the Defend Trade Secrets Act.

9    b. Utilizing Rippling's Sales and Marketing Trade Secrets and/or

10   confidential information, including Rippling's Sales Leads,

11   Rippling's Sales Pipeline, Rippling's Competitive Intelligence

12   Cards, Rippling's Implementation and Customer Support

13   Strategies, Rippling's Customer List, and Rippling's Churn Risk

14   List to unfairly to compete against Rippling.

15   149. On information and belief, Deel has gained, or will gain, substantial

16   benefit from its misappropriation of Rippling's Sales and Marketing Trade Secrets,

     to Rippling's substantial detriment.

17   150. On information and belief, Deel used the Sales and Marketing Trade

18   Secrets D.S. disclosed to unfairly compete against Rippling in head-to-head sales

19   battles and ultimately won those sales battles as a result of knowing Rippling's

20   "playbook."

     197.  151. As a direct and proximate result of Deel's wrongful misappropriation of

21   Rippling's confidential or proprietary information and Sales and Marketing Trade Secrets trade

22   secrets, Rippling has suffered actual damages, and will continue to suffer actual damages in a sum

1   to be set forth according to proof at trial.  Additionally, as a proximate result of its

2   misappropriation of Rippling's trade secrets, Deel has been unjustly enriched.

3        198.   As the direct and proximate result of Defendants' conduct, Rippling has suffered

4   irreparable injury and is entitled to permanent injunctive relief.

5        199.   152.  Rippling is informed and believes that As described herein, Deel's conduct

6   was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described

7   above.  Rippling is therefore entitled to recover from Deel exemplary damages in an amount twice

8   the total of the damages recovered for actual loss as permitted by California Civil Code

9   § 3426.3 18 U.S.C. § 1836(b)(3)(C), and entitled to an award of attorneys' fees pursuant to 18

10  U.S.C. § 1836(b)(3)(D).

11       153.  Rippling is also entitled to an award of attorneys' fees pursuant to

12  California Civil Code § 3426.4.

13  **FIFTH CAUSE OF ACTION**
    **FOURTH CAUSE OF ACTION**

14

15  **(Tortious Interference with Contract)**
    **(Against Deel)**

16       200.   154.  Rippling re-alleges and incorporates by reference each and every allegation

17  contained in paragraphs 1 through 153 199 of this First Amended Complaint.

18       201.   155.  Rippling has a valid and enforceable confidentiality agreement, *viz.*, the

19  CIPRAA, with D.S. O'Brien, and Deel knew or should have known of D.S.'s O'Brien's

20  confidentiality agreement with Rippling.

21       202.   156.  Deel willfully and intentionally interfered with this agreement, without

22  privilege to do so, by aiding, abetting, and assisting D.S. O'Brien in breaching his contractual

    obligations to Rippling, including, but not limited to, his obligations to not (1) disclose Rippling's

1  confidential information; (2) solicit Rippling employees for Deel's gain; (3) engage in activity that

2  is, will, or could constitute a conflict of interest; (4) improperly use Rippling's resources and data

3  assets to aid a competitor in its unlawful and anti-competitive activities; and (5) use or disclose

4  Rippling's confidential information for his own benefit or outside the scope of his employment

5  with Rippling.

6      203.  ~~157.~~ Deel's misconduct was independently tortious and unlawful because it

7  involved the conspiracy to recruit ~~D.S.~~O'Brien and have him work as a double agent for Rippling

8  and Deel at the same time, and involved the misappropriation of Rippling's confidential

9  information.  In addition, Deel intentionally induced ~~D.S.~~O'Brien to breach his obligations under

10  his employment agreements in order to unfairly compete against Rippling and steal Rippling's

11  existing clients and prospective client. ~~D.S.~~ O'Brien did in fact breach the CIPRAA as a result of

12  Deel's actions.

13      204.  ~~158.~~ As a direct and proximate cause of the above-alleged misconduct by Deel,

14  Rippling suffered injuries, including, but not limited to, actual damages, direct damages, indirect

15  damages, incidental damages, consequential damages, special damages, lost profits, costs of

16  mitigation, and irreparable damage to Rippling's employment relationships and customer

17  relationships.  Because the tortious conduct of Deel was willful and malicious, Rippling seeks

18  exemplary damages.

19      205.  ~~159.~~ This cause of action for tortious interference with ~~D.S.'s~~O'Brien's contract is

20  not based on the misappropriation of any Sales and Marketing Trade Secrets.  Rather, Rippling

21  bases this cause of action on Deel's recruitment of and subsequent compensation to ~~D.S.~~O'Brien

22  in order to further Deel's scheme to unlawfully and unfairly compete against Rippling by, among

   other things, inducing ~~D.S.~~O'Brien to breach his employment agreements with Rippling.

**~~SIXTH~~FIFTH CAUSE OF ACTION**

**(Aiding & Abetting Breach of Fiduciary Duty)**

**(Against Deel)**

206.  160. Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 162205 of this First Amended Complaint.

207.  161. As a manager at Rippling, D.S.O'Brien owed fiduciary duties to Rippling.

208.  162. On information and belief, Deel knew D.S.O'Brien owed Rippling fiduciary duties.

209.  163. At all times alleged herein, Deel was aware of D.S.'sO'Brien's conduct as alleged above, including that D.S.O'Brien used his position at Rippling to steal confidential information to give to Deel and provided Rippling employee contact information to Deel.

210.  164. At all times alleged herein and on information and belief, Deel knew D.S.'sO'Brien's conduct constituted a breach of his fiduciary duties to Rippling.

211.  165. On information and belief, Deel knowingly gave substantial encouragement and assistance to D.S.O'Brien so that he and Does 1-1001–100 could accomplish the unlawful results alleged above.

212.  166. Deel's conduct in assisting these breaches of fiduciary duties was a substantial factor in causing the harm suffered by Rippling.

213.  167. Deel knowingly and substantially participated, aided, and abetted the above-alleged breaches of the fiduciary duties committed by D.SO'Brien.

214.  168. Deel's acts, omissions, and misconduct has caused continuous, connected, ongoing and material harm to Rippling.

**EIGHTHSIXTH CAUSE OF ACTION**

**(Unfair Competition, California Business & Professions Code § 17200, *et seq.*)**

**(Against Deel)**

215. 169. Rippling re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 168214 of this First Amended Complaint.

216. 170. Deel engaged in unfair competition, including unlawful, unfair, and fraudulent business activities. Deel's unlawful, unfair, and/or fraudulent business activities included but are not limited to tortious interference with contract, aiding and abetting breach of fiduciary duties, violating RICO statutes, and violating 18 U.S.C. §§ 1343 and 1836.

217. 171. Deel's misconduct significantly threatens and/or harms competition. Deel's actions are part of a deliberate scheme and plan to deprive Rippling of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Deel an unfair competitive advantage.

218. 172. As a proximate result of Deel's acts as alleged above, Rippling to date has suffered, and will continue to suffer, damages. Thus, as a proximate result of Deel's wrongful acts, Rippling is entitled to restitution as provided for by California Business and Professions Code section 17200 *et seq.* and a constructive trust in which Deel, as constructive trustees, hold their income, profits, commissions, fees, revenues, or other funds, received as a result of their wrongful acts alleged herein, for Rippling's benefit.

219. 173. Deel's conduct was willful and malicious, oppressive, fraudulent, despicable, and in conscious disregard of the rights of Rippling, and the resulting harm to Rippling. Deel acted with the intent to cause injury and to obtain an unfair competitive advantage over Rippling in the marketplace. Therefore, Deel is liable for restitution and exemplary and/or punitive damages in an amount to be established according to proof at trial.

220. 174. The rights invoked herein petition for, implicate, invoke, and demand the enforcement of important rights affecting the public interest. Furthermore, because the relief sought will provide a significant benefit to the general public at large, Rippling is entitled to an

1  award of attorneys' fees incurred by undergoing the burden of seeking the private enforcement of

2  statutes vindicating important public rights, including the right of the public to be free from unfair

3  competition and violations of the California Business and Professions Code.

4                                    **PRAYER FOR RELIEF**

5          Wherefore, Rippling respectfully requests that judgment be entered in its favor and against

6  ~~Deel and Does 1-100~~Defendants, jointly and severally, including:

7          221.    Permanent injunctive relief prohibiting any further wrongful possession, disclosure,

8  and/or misuse of Rippling's Corporate Strategy Trade Secrets and Sales and Marketing Trade

9  Secrets, and preventing Defendants from profiting or benefiting from their wrongful conduct;

10         222.    ~~1.~~Awarding compensatory damages in an amount to be determined at trial;

11         223.    ~~2.~~Awarding exemplary and/or punitive and/or treble damages in an amount to be

12  determined at trial;

13         224.    ~~3.~~Awarding interest at the maximum legal rate on all sums awarded;

14         225.    ~~4.~~Awarding reasonable attorneys' fees as permitted by law;

15         226.    ~~5.~~Awarding all costs of suit herein; and

16         227.    ~~6.~~Awarding such other and further relief as the Court deems just and proper.

17                                    **JURY DEMAND**

18         Plaintiff Rippling hereby demands a trial by jury as to all issues so triable in this case.

19  Dated: ~~March 17~~June 5, 2025                    Respectfully submitted,

20                                          **QUINN EMANUEL URQUHART &**
                                            **SULLIVAN, LLP**
21

22

FIRST AMENDED COMPLAINT

By */s/* ~~Kathleen S. Messinger~~*Joseph Sarles*

Alex Spiro (*pro hac vice*)
Maaren A. Shah (*pro hac vice*)
Samuel Nitze (*pro hac vice*)
Scott Hartman (*pro hac vice*)
Dominic Pody (*pro hac vice*)
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
maarenshah@quinnemanuel.com
samuelnitze@quinnemanuel.com
scotthartman@quinnemanuel.com
dominicpody@quinnemanuel.com

Joseph Sarles (CA Bar No. 254520)
Kathleen S. Messinger (CA Bar No. 329983)
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
josephsarles@quinnemanuel.com
kathleenmessinger@quinnemanuel.com

*Attorneys for Plaintiff*
*People Center, Inc. d/b/a Rippling*

Case No. 3:25-CV-2576
FIRST AMENDED COMPLAINT