# EXHIBIT 10

THE HIGH COURT

COMMERCIAL - INTELLECTUAL PROPERTY & TECHNOLOGY

Record No. 2025 / 1289P

Between:

PEOPLE CENTRE, INC. (D/B/A RIPLING) and

RIPPLING IRELAND LTD

Plaintiffs

-and-

KEITH O'BRIEN

Defendant

---

### AFFIDAVIT OF KEITH O'BRIEN

---

I, **KEITH O'BRIEN**, Defendant in the Proceedings, of 31 Ringfort Avenue, Balrothery County Dublin, K32 WY93, being aged eighteen years and upwards, **MAKE OATH** and say as follows:

1.  I began working at Rippling in July 2023 in global payroll and compliance. I worked in the Dublin office primarily, and occasionally worked from home.

2.  I beg to refer to a tabulated book of documents upon which I intend to rely (the "**Book of Exhibits**"), upon which marked with the letters and number "**KOB1**" I have signed my name prior to the swearing hereof.

3.  I interviewed with Deel in or around March 2024 for a senior director of payroll product compliance position I found on LinkedIn. I interviewed with Olivier Elbaz, Deel's Global Head of Expansion, but I did not receive an offer.

4.  Around that same time, I connected with Alex Bouaziz, Deel's founder and chief executive officer (CEO), over LinkedIn. I believe he had commented on one of my posts saying we should connect. When I didn't get the offer at Deel, I reached out to Alex and asked him for feedback.

1

He said I was an excellent candidate, but from the interview feedback, the presentation that I gave as part of my application was not good enough.

5.      In August or September 2024, while still working at Rippling, I started a company called Global Payroll Geeks to provide payroll consulting services to businesses. I told Alex Bouaziz about my new business, and he referred me to Dan Westgarth, the chief operating officer (COO) of Deel. We began discussions about Global Payroll Geeks becoming a service provider for Deel.

**I Begin Spying for Deel**

6.      In or around the end of September 2024, I let Alex Bouaziz know I was considering leaving Rippling to pursue full time consulting work. Alex suggested that we discuss my career considerations, and we spoke on a WhatsApp call shortly thereafter. That was my first phone call with Alex; previously we had exchanged the occasional message on LinkedIn or WhatsApp. I took the WhatsApp call with Alex from a meeting room at Rippling's Dublin office, while I was at work. Alex told me he "had an idea." He suggested that I remain at Rippling and become a "spy" for Deel, and I recall him specifically mentioning James Bond. I asked him what he meant. He said he would offer me a monetary reward if I agreed to spy on Rippling for Deel. I told him I would have to think about it.

7.      About thirty minutes later, I called Alex back over WhatsApp and told him that I was onboard with the plan. He turned that call into a three-way call between me, Alex, and his father, Philippe Bouaziz, who is Deel's chief financial officer (CFO). I had never spoken to Philippe before that call. Alex asked me if I was agreeing to his offer. Once I agreed, Alex said we should move the conversation to Telegram. Before September 2024, I did have a historical Telegram account which had been dormant for about a year and I then had to reinstall the app. I understood that Alex and Philippe wanted our future conversations to take place over Telegram so that we could engage in secret communications.

8.      Once we switched to Telegram, we discussed what my reward would be and how I would be paid. Alex and Philippe said I would be paid approximately 5000 euros per month for spying on Rippling for Deel, and that I would be paid around the 6th of each month. I wanted to be paid in fiat currency and asked that payments be made through Revolut, an online payments application.

9.      I understood what Alex was asking me to do was wrong, and I believe he knew it was wrong too. I asked Alex and Philippe to paper our arrangement with a consulting agreement, so that I would have a seemingly innocent explanation for the additional income I was receiving for spying on behalf of Deel. Alex refused to execute a consulting agreement. I understood that his refusal was due to the fact that he did not want a documentary record of our relationship.

10.     During this initial Telegram call, we also discussed what kind of confidential information Alex wanted me to take from Rippling.  In exchange for the monetary reward, Alex told me that I would need to provide him information regarding Rippling's "ways of doing things" which I understood to mean corporate strategy, customer insights and other interesting company information.

11.     During the initial call, Alex also gave me instructions on how to communicate with him. Alex said that going forward I would communicate with him via a Telegram channel containing only the two of us so that I could relay the Rippling confidential information. He said  that I would communicate with Philippe in a separate Telegram channel about payments.  I understood that the purpose of this separation was to distance Alex from the payments that I was receiving. All of the Telegram chats were set to automatically delete after 24 hours.  Alex told me to "be careful" and "clean up" which I understood to mean that I should take steps to ensure there was no evidence of the communications between us.

**The Payment Arrangement**

12.     I received my first payment in the beginning of November into my Revolut account from an account associated with an individual named "A.B." The payment was $6,000 USD.  A copy of the transfer record is at Tab 1 to the Book of Exhibits.  I did not know who A.B. was at the time. I have since learned that A.B. stands for Alba Basha, as denoted on the Revolut transaction receipt, and that Alba Basha is Dan Westgarth's wife. Dan is the COO of Deel.

13.     Soon after I received the initial payment, Philippe Bouaziz informed me that future payments would be made via cryptocurrency, as this method would leave "no trace."  From then on, I received transfers in Ethereum to my Blockchain.com currency wallet.  Because I was concerned about cryptocurrency fluctuation, I would then liquify the funds into fiat currency and place them into my AIB bank account.  A copy of my Blockchain.com account and transfer records from my Blockchain.com account to my AIB account are at Tabs 2 and 3 of the Book of Exhibits.

14.     In addition to Philippe and myself, the Telegram channel in which we discussed my payments included a third individual who Alex only referred to as "the Watchman." I don't know who the Watchman is.  I only know that his initials were "A.D." in the Telegram chat.  I did not have any conversations with A.D. on Telegram.   As discussed below, I subsequently spoke to an individual with the initials A.D. but I cannot say whether he and "the Watchman" were one and the same person.

15.     Philippe established payment terminology that I was expected to follow. When it was time for me to be paid, I would send a picture of a watch to the payment chat, and Philippe would say "send that watch to London."  Then he would say "the buyer is happy."  I understood this to

mean that Alex, the buyer of Rippling's confidential information, was happy with my services and the information I had sent him, and that I would be getting paid.

16.    I was supposed to be paid around the 6th of each month. Sometimes, the Watchman would chat me in a Telegram channel that did not include Philippe to tell me that a payment would be late or that I would only be receiving a portion of what I was owed and that I would receive the rest later.  Other times, I would tell Alex if my payment was late, and he would tell me to "ping Watchman" or that he would "sort it."

**The Stolen Rippling Information**

17.    Alex and I communicated multiple times a day every workday, and sometimes on the weekends. He was the only one I transferred information to.  Most of our communication was through written Telegram messages, but sometimes Alex and I would exchange voice notes through Telegram as well.

18.    Alex was particularly interested in Rippling's strategies around global payroll and expansion efforts, as well as reviewing specific sales, marketing information, and customer details. Alex would give me direction for what terms to search on Rippling's Slack system in order to yield the information he wanted.  Alex would frequently message me and say  "hi boss!" or "hey boss, can you search for…" to start a conversation.  Alex would frequently message me on Mondays with "hey boss, good weekend??"

19.    In order to find the confidential Rippling information for Deel, I would search through Rippling's Slack, Salesforce, and Google Drive.  At first, I would type in a search term on Slack, take a screenshot of the results on my phone and then send it to Alex via Telegram.  After a few weeks, Alex suggested I start making screen recordings in order to capture more information at once. I complied and sent the screen recordings to Alex via Telegram.  I sent many screen recordings to Alex, but the number would vary from day to day. A big day would have included around six screen recordings. Alex would also suggest variations of searches. For example, I remember he once asked me to search "tinybird," and then he suggested that I add a space and search for "tiny bird." Although I regularly deleted many of the screen recordings and screenshots in accordance with Alex's instructions to be careful, some of them were backed up without my knowledge to my iCloud account, including a  1 minute 34 second screen recording from December 17, 2024 and a 6 minute and 31 second screen recording from December 20, 2024. These screen recordings and a screenshot are exhibited at Tabs 4, 5 and 6 of the Book of Exhibits.

20.    Sometimes, I would send Alex information before he requested it.  I knew what he was looking for and if I saw something that I believed would be of interest to him, I would send it.  If I sent

4

something he liked, he would ask me to click into the same channel multiple times in order to find more content. Other times, Alex would ask me to send him some leads or to search for specific information, including outside sales and customer-specific information. He expressed particular interest in the Deel customers that had signed up to receive a demonstration of Rippling's products. If he would ask for something on Deel, I would record a particular Slack channel for him to view. He would also ask me to research and identify examples of Rippling's pain points. At one point, he asked me focused questions about Rippling's French products, including key features, painpoints, and even specifics around a French customer's implementation who had left Deel for Rippling's global payroll product. Another time, he asked me to look into Rippling's reaction when Deel announced its acquisition of a new company. I also recall a time when he gave me a list of customer names to search within Rippling. I believed that those were either Deel customers or companies that were actively considering Deel as a solution.

21.     Among the specific searches that I recall Alex asked me to run were searches for "tom brady," "iran," "sanctioned countries," and "tinybird." He also asked me for information on certain Rippling employees, and would ask me to send him the "superstars." I would provide him with their profiles and contact information. I understood that Alex wanted this information in order to recruit high performing employees from Rippling, and that Deel did reach out to many of my coworkers about working at Deel. I myself did not receive outreach or an offer to work at Deel. I believe Alex thought I was more valuable to Deel staying in Rippling.

22.     Alex and I communicated via Telegram on a near daily basis and often multiple times a day. Sometimes our chats would be personal and discuss sports. For example, I learned that he was a big fan of "PSG," which stands for Paris Saint-Germain F.C., the football (soccer) team of Paris. He also reached out to me multiple times a day to request information about Rippling. It seemed constant. If it had been a few hours since he heard from me, he would reach out. Sometimes I would be taking care of personal matters and not responsive to his messages, and he would reach out multiple times.

23.     I provided Alex with a lot of Rippling confidential information, including Rippling's product roadmap, which indicated where Rippling was currently providing services and where it sought to expand. I also passed on the Deel "battlecard," a document that instructed Rippling's salesforce on what arguments to make to potential customers about the superiority of Rippling products over Deel's. I also provided Alex with many of Rippling's sales leads.

24.     Sometimes Alex would ask me for Rippling's customers in a particular country for specific products. This is not information that was generally available to Rippling personnel, so I would provide Alex with this information by accessing a restricted report within the Rippling application, such as the Global Payroll "New Hire Report," which is a report that I had access to as a result of my role as a Global Payroll Compliance Manager. After I accessed this report, I would note

the customer names in a spreadsheet and send Alex a screenshot. Examples of these screenshots are exhibited at Tab 7 of the Book of Exhibits.

25.    Sometimes Alex would react enthusiastically about information I sent to him, saying things like, "this channel is beast" or "these are badass."  I understood this to mean that what I sent him was really good and I should keep sending him similar information. Sometimes Alex would say that certain information was a "headache," which I took to mean that he did not find it valuable.

26.    In December of 2024, I told Alex that I planned to leave Rippling. Alex said I should stay there and continue to spy for a few more months.  He said that I should contact Dan Westgarth, and that if I did stay on at Rippling for a few more months, Dan would see to it that my consulting company Global Payroll Geeks, would get money from Deel.  Alex promised to make Global Payroll Geeks a preferred partner of Deel after I told him I would stay at Rippling for a little while longer. In January of 2025, Alex Bouaziz created a WhatsApp group with Dan Westgarth and myself as participants and named this group "Keith <> Dan." I believe this group was formed to discuss this proposed Global Payroll Geeks partnership. A copy of the logs for this WhatsApp group is exhibited at Tab 8 of the Book of Exhibits.

**#d-Defectors**

27.    At the end of February 2025, Alex told me to search Rippling's Slack system for the channel "#d-defectors."  I ran the search immediately and began to look at the results.  Within minutes, Alex messaged me again and told me not to run the search because he believed it was a "trap." I told Alex that by the time I got his message, I had already done the search and he said "oh shit."  I told him that the "#d-defectors" channel had Matt Plank, Rippling's Chief Revenue Officer, in the channel.  I told him I was frightened, but he just said, "don't worry."  Thereafter, he continued to press me to pass him information from Rippling.

**Service of High Court Order and Subsequent Conversations with Deel**

28.    On Friday, March 14, 2025, I went into the Rippling office believing I was there to pick up a compliance award for one of my coworkers.  An independent solicitor served me with a court order requiring inspection of my devices.  The solicitor asked me where my devices were. Although I had my phone in my pocket, I lied.  I told the solicitor that both my phone and laptop were in a bag downstairs.  He followed me downstairs, where we retrieved my bag, which had my work laptop in it.

29.    Once we got back upstairs after retrieving my bag, it started to sink in just how serious this was. I panicked.  I went to the bathroom with my phone and performed a factory reset on it, erasing all of its contents, including all apps and contacts.  I flushed the toilet a couple of times.  When I came out, I just wanted to get out of there.  I started to walk out, but the solicitor tried to stop

me.  He warned me that this was serious, and there was a court order requiring my cooperation. I said, "I'll take that risk" and left.

30.    I walked around for a while, and then logged onto LinkedIn on my phone browser and messaged Alex, "hey."  He then called me from a Romanian phone number and not his usual +33 number. I am not sure whether the call came through his phone or WhatsApp.  I know that it came from a Romanian number, as the call came up with the international prefix which was identified as "ROM".  The call came within three to five minutes of me sending the message.  I know that it was Alex, as I had pinged him via LinkedIn and I recognised his voice. I told him what happened. I told him I got served with a High Court order and that I was in serious trouble.  I told him that Rippling was saying I had taken their data.  He said everything was going to be okay and that someone would get in touch straight away.  Afterwards, he messaged me on LinkedIn saying something like, "hey Keith, thanks for the chat, make sure you apply for that job." I believe Alex sent this message as a cover, to make it look like our conversation had been about a job application rather than their scheme to steal Rippling's information.

31.    I then got a call from someone named "David" and pronounced "DAH" - "VEED." within approximately the next hour.  I don't know who David is nor what his last name is, but I believe he is affiliated with Deel or its network.  I listened to a portion of a webinar conducted by Andrea David Mieli, who I understand from his LinkedIn profile is the Global Senior Director of Legal at Deel. I immediately recognised Mr Mieli's voice as the "David" that I spoke to on a few occasions via Telegram starting March 14, 2025.  A copy of his LinkedIn profile and this webinar are exhibited at Tabs 9 and 10 of the Book of Exhibits.

32.    I tried to talk to David, but he interjected and told me to call him back via Telegram.  He said not to install Telegram again on my old phone, but to go get a "new Telegram number".  I understood this meant I should buy a new phone (a burner phone) and install Telegram on the new phone. David also gave me a number to call him back on from my new telegram account. I did what he told me to do.  Once I had Telegram again, I got into contact with "David," and he added Asif Malik, one of Deel's senior in-house lawyers to a three-way chat.  We had a few phone calls that day.  Asif, Deel's in-house lawyer, said he was speaking in a "personal capacity" and that Rippling "have nothing."  They suggested flying my family and me to Dubai that night, saying "we all need a holiday."  I understood they were suggesting that my family and I flee Ireland permanently and that Deel would put me up in Dubai.  They kept saying that Rippling was being very aggressive and improper, and that they didn't have anything on me.  They said I should "tell them nothing" and that I should "stick with the programme," meaning I should lie and keep quiet.  Deel's lawyer Asif said, "don't worry, PSG is going to sort all this out."  I understood him to be referring to Alex when he said "PSG" because Alex and I frequently talked about football (soccer) and PSG was Alex's team.

7

33.    From March 15, 2025 to March 25, 2025, I spoke to Deel's lawyer, Asif, every day. I also received supportive calls from David, offering reassurance and general comfort. During these calls, Deel's lawyer Asif told me repeatedly, "The guys at the top have your back," and "This is going all the way to the top of the mountain." I understood him to mean that Alex and Philippe would take care of me if I refused to cooperate against Deel. Deel's lawyer Asif said they would move me and my family to Dubai, and would figure out a mechanism to cover my legal costs. I understood that I would become a consultant for Deel and would have my legal costs paid "through that mechanism" and that the consulting business would be very successful once I was back up and running. I understood that I would be legally protected and be financially rewarded if I kept quiet and stuck with the plan.

34.    Deel's lawyer Asif said that Deel's strategy to help me required that I make statements that Rippling facilitated sanctioned "Russian payments", and that "there's going to be a shift in the narrative". He specifically advised me on making such statements to the Central Bank of Ireland, the High Court, and Deel's Irish solicitors A&L Goodbody that I was being harassed because I was reporting illegal "Russian payments". I knew this was false. I have never made any such reports to anyone at Rippling, nor outside of Rippling, prior to Asif's instruction and I have no knowledge of any sanctioned payments made by Rippling. I went along with the plan initially. It seemed like a way out of the situation.

35.    On March 15, 2025, I spoke to Deel's lawyer, Asif. He told me to destroy my old phone by breaking it up and throwing it in the canal. By then, because I had performed a factory reset and deleted all of my apps and contacts, I no longer had contact details for Alex, and Deel's in-house lawyers Asif and David were my only point of contact at that time. I felt lost at sea and it was one of the darkest days of my life. Deel's lawyer Asif asked me on March 15 2025 to see a copy of the Court Order, and I sent him a copy over Telegram.

36.    On March 16, 2025, I smashed my old phone with an axe and put it down the drain at my mother-in-law's house, as Deel's lawyer Asif had advised. I also deleted my LinkedIn account around this time, I cannot be sure on what date precisely but I believe it was March 14 or 16. A copy of the "goodbye email" received from LinkedIn, dated March 17, 2025 is exhibited at Tab 11 of the Book of Exhibits. I spoke to Deel's lawyer Asif that Sunday and expressed concerns that what I had done and was doing was wrong. Deel's lawyer, Asif, told me he did not know what I had done and did not want to know, that he was only speaking in a personal capacity and told me to see a doctor. He said he hoped I was ok. I told him I was concerned about my wife and about my own state of mind. That evening, Deel's lawyer Asif spoke to my wife for 45 minutes to an hour on a Telegram call, reassuring her and corroborating what I had told her — that Rippling was lying and making this all up. My wife later expressed concerns to me about the call with Deel's lawyer Asif. She said that what he was saying did not add up, and she felt he was being pushy.

37.     On March 18, 2025, a few days after I was served with the High Court Order and at Deel lawyer Asif's instruction, I made a false report to the Central Bank of Ireland about "Russian payments" at Rippling.

38.     On March 19, 2025, I appeared in the High Court and admitted that I had destroyed my phone. I told the Court that I destroyed my phone on March 14, the same day that I was served with the High Court order, when in fact, I destroyed the phone on March 16, after receiving instructions from Deel's lawyer, Asif. I also said that I believed this matter had to do with "Russian payments," but I didn't believe that. Deel's lawyer Asif had encouraged me to say this. He had told me that "there's going to be a shift in the narrative."

39.     After the March 19, 2025 hearing, I felt that Deel's support and that of its in-house lawyers was beginning to pull away.

40.     On March 20, 2025, I noticed that Alex Bouaziz had renamed his previously-created "Keith <> Dan" WhatsApp group to "V," and left the group. When I noticed this, I wrote "hey" into the group. I then deleted this message. Later, on March 23, 2025, Dan Westgarth also left this WhatsApp group and thereby made me the administrator of the now empty group chat. A copy of the logs of this WhatsApp group along with a screenshot of both Alex and Dan leaving the WhatsApp group which are exhibited at Tab 12 of the Book of Exhibits,

41.     On  the morning of March 21, 2025, Deel's lawyer Asif told me that Deel's Irish solicitors would be emailing me at my 'keith@globalpayrollgeeks' address. He explained that Deel's Irish solicitors could only contact an email that Deel previously had access to. I was very frustrated by this because I did not have access to the account at that time.

42.     On March 21, 2025, at approximately 10 am, I had a WhatsApp chat with Norma Delgado, one of my colleagues at Global Payroll Geeks, in order to regain access to my 'keith@globalpayrollgeeks' email address, as Deel's in-house lawyer, Asif, informed me that I should expect an email message from A&L Goodbody's to that email address. A copy of this discussion is exhibited at Tab 13 of the Book of Exhibits.

43.     On March 21, 2025, in the afternoon, I was copied on an email at my 'keith@globalpayrollgeeks' email address from Deel's Irish solicitors A&L Goodbody to Rippling's solicitors at Matheson. I understood that A&L Goodbody could not represent me, as that would be a conflict.  Deel's in-house lawyer Asif instructed me to respond to this email directly to A&L Goodbody and advised me on what to write, including stating that (1) I was being harassed by Rippling for reporting illegal "Russian payments" and (2) I never shared any data with Deel.  I knew this was false. I sent this email to A&L Goodbody and understood that my email would put Deel's solicitors in a position to help me. A copy of email exchanges with A&L Goodbody, dated between 21 March and 24 March 2025 are exhibited at Tabs 14 to 17 of the Book of Exhibits.

44.    On around March 22, 2025, my Deel contacts hid their Telegram identities from me, so they could contact me, but I had no way of contacting them once the messages disappeared from our chats. I previously was able to see the Telegram IDs of Deel's in-house lawyers Asif Malik and Andrea David Mieli.  Around this time,  I had a call with Deel's lawyer Asif and expressed my frustration, with this development and the exchange got quite heated. Asif then turned on his Telegram ID after this call, and I wrote it down on a piece of paper. A copy of Deel lawyer Asif Malik's telegram ID is exhibited at Tab 18 of the Book of Exhibits.

45.    On March 24, 2025, around the time of one of the High Court Order hearings, I messaged the independent solicitor that I would comply with the High Court Order and meet with him later that day. After the court hearing, I messaged Mr. Coonan that I was unwell and would not be able to attend.  I later received a call from Ms. Karen Reynolds, one of Rippling's solicitors at Matheson, asking if I would meet with the independent solicitor the next day. I said that I was not sure and that I was doing this on my own. She asked if I had been talking to anyone else about this matter, like Deel, and I said, "that's a tough one," told her to contact me the next day, and hung up.  At the time, I was struggling with deciding what to do.  I needed legal advice.  I was mindful and possibly fearful of the people I was dealing with.

46.    On March 25, 2025, I contacted and instructed the solicitors at Fenecas Law. I also received another phone call from Ms. Reynolds, asking about my intentions for compliance with the High Court Order. In the evening of March 25, 2025, I had my last communication with Deel's lawyer Asif. I told him I had engaged a solicitor but did not say who.  I did not tell him what I had told my solicitor and I did not tell him I was planning on cooperating. He told me to "stick to the programme" and that I should "look after myself and my family." By the evening of March 25, 2025, I told my solicitors that I would meet with the independent solicitor the next day.

47.    On March 26, 2025, I met with my solicitors, the independent solicitor, and Rippling's solicitors. I handed over my devices for imaging. I understand that Deel's lawyer, Asif, contacted my wife via a private number while I was in this meeting, and she told him that she was not able to speak. A copy of her phone logs showing calls from a "private number" are exhibited at Tab 19 of the Book of Exhibits.

48.    On March 28, 2025, I met with Rippling's in-house and US legal team and agreed to an interview. I also expressed to my solicitors that I was fearful for my safety, given the power and wealth of the individuals involved. I requested and was provided with security.

49.    Also, on March 28, 2025, I turned over my "burner" phone to PWC's forensics team for on-going monitoring. I understand that Deel's lawyer Asif has subsequently attempted to contact me via Telegram two times in the two hours before my court hearing on March 31, 2025. I have reviewed those call logs and can confirm that the Telegram ID associated with those Telegram missed calls is associated with Deel's lawyer Asif.

50.     I decided to cooperate after I got a text from a friend on March 25, 2025 saying, "the truth will set you free." I was also driving with a family member to meet my solicitors and she told me that if I had done something wrong that I should "just tell the truth." I was having bad thoughts at the time; it was a horrible time for me. I was getting sick concealing this lie. I realised that I was harming myself and my family to protect Deel. I was concerned, and I am still concerned, about how wealthy and powerful Alex and Philippe are, but I know that what I was doing was wrong. After I spoke with my solicitors at Fenecas Law, I started to feel a sense of relief. I want to do what I can to start making amends and righting these wrongs.

**SWORN** by the said **KEITH O'BRIEN**

I,                              , hereby certify that I know the Deponent

[who is personally known to me]                                        EK

[who is identified to me by                                who is personally known to me and certifies their personal knowledge of the deponent]

[whose identity has been established to me before the taking of this affidavit by the production to me of a relevant document   within the meaning of Section 2 of the Statutory   Declaration   Act   1938   being   a driving licence and containing a photograph of the deponent]

_____

**SIGNATURE**

on    ~~March~~ 2025 at  70 Sir John Rogerson Quay
         , April

in the City ~~/ County~~ of Dublin before me a Practising Solicitor / ~~Commissioner for Oaths~~    EK

_____

**KEITH O'BRIEN**

**PRACTISING  SOLICITOR  / ~~COMMISSIONER  FOR OATHS~~**    Ek

Filed on the        day of April 2025 by Matheson LLP, 70 Sir John Rogerson's Quay, Dublin 2.

**THE HIGH COURT**

**COMMERCIAL - INTELLECTUAL PROPERTY & TECHNOLOGY**

**Record No 2025 / 1289 P**

**PEOPLE CENTER, INC. D/B/A RIPPLING**

**RIPPLING IRELAND LTD**

**Plaintiffs**

-and-

**KEITH O'BRIEN**

**Defendant**

---

**AFFIDAVIT OF KEITH O'BRIEN**

---

MATHESON LLP
70 Sir John Rogerson's Quay
Dublin 2
Ireland
DO2 R296
T: +353 1 232 2000
F: +353 1 232 3333
64282563.6

**THE HIGH COURT**

**COMMERCIAL - INTELLECTUAL PROPERTY & TECHNOLOGY**

**Record No. 2025 / 1289P**

**Between:**

**PEOPLE CENTRE, INC. (D/B/A RIPLING) and**

**RIPPLING IRELAND LTD**

**Plaintiffs**

**-and-**

**KEITH O'BRIEN**

**Defendant**

---

**AFFIDAVIT OF KEITH O'BRIEN**

---

This is exhibit "**KOB1**" referred to the grounding affidavit of Keith O'Brien sworn this 1 April 2025.

**KEITH O'BRIEN**

**PRACTISING SOLICITOR / ~~COMMISSIONER FOR OATHS~~** EK