**RE: *People Center, Inc. d/b/a Rippling v. Deel, Inc., et al.*, Case No.: 3:25-cv-02576-CRB**
    **Joint Letter re: Deel's Objections to Rippling's Interrogatories**

Dear Judge Cisneros:

This letter addresses the parties' disputes over Deel's responses to Rippling's First Set of Interrogatories. The parties met and conferred over Deel's initial responses on September 2, and Deel served amended responses on September 16. Rippling sent a deficiency letter on September 18 and sent its portion of this joint letter on September 30. The parties met and conferred via Zoom on October 3, and resolved what was previously Issue #1. Below, both parties present their final positions on the remaining disputes. On June 20, 2025, the parties' Initial Case Management Conference was canceled; thus, no deadlines have been set for (1) fact and expert discovery, (2) the last day to hear dispositive motions, or (3) pretrial conference or trial. ECF 69.

**Issue #2—Objection To Date Range (Nos. 1-9)**

Rippling's Position. Consistent with its pleaded allegations, Rippling seeks responsive information back to January 2022. *See* FAC ¶ 171 (Deel's wrongdoing began in "early 2022"). Deel, claiming burden of document review without substantiating that claim, seeks to limit its production to when O'Brien began spying in September 2024. But Rippling's allegations are broader than, and pre-date, O'Brien. Rippling alleges that, as "directed by" Deel's CEO and Chairman (FAC ¶ 14): Conspirator-1 joined Deel from Rippling in January 2024 (FAC ¶ 27); Conspirator-2 conspired with Deel by "summer 2023" (FAC ¶ 28); and Conspirator-3 and -4 stole customer information from Victim-3 in "early 2022" and "summer 2023" (FAC ¶¶ 29-30). By September 2022, Deel's Head of Sales bragged he would "play dirty" to compete with Rippling (FAC ¶43). Deel's other alleged misconduct likely began even earlier, like placing "spies at other companies" (FAC ¶ 161) and hiring "from competitors with the expectation that they bring confidential materials from their prior employers to Deel." FAC ¶ 112. Given the timing of those events that form the basis of Rippling's claims, Rippling's request for responsive information beginning in January 2022 is well founded. *See In re Dockers Roundtrip Airfare Promotion Sales Pracs. Litig.*, 2010 WL 11515318, at *5 (C.D. Cal. Aug. 1, 2010) (plaintiffs generally entitled to discovery for during, and even before, the period of the alleged wrongdoing). Rippling offered to accept responsive information beginning in September 2022, but Deel rejected that compromise.

Deel's Position. Rippling's proposed date range beginning in January 2022 is belied by its own requests (*see* Interrogatories 1-2, 7), and is disproportionate to the needs of the case, as it will require Deel to review large amounts of information untethered to Rippling's claims. Fed. R. Civ. Pro. 26(b)(1). Rippling's FAC is based on allegations that Deel has harmed Rippling by allegedly misappropriating Rippling's "Corporate Strategy Trade Secrets" and "Sales and Marketing Trade Secrets" through O'Brien's actions. *E.g.*, FAC ¶¶2-8, 67-73, 190-195. Rippling alleges O'Brien only agreed to "spy on and steal from Rippling" for Deel "[i]n or around the November 2024." *See* FAC ¶¶24; ECF 57-1 ¶ 6 (O'Brien's Irish affidavit).

Rippling's attempt to extend this date range into January 2022 is without merit, as Rippling does not allege any unlawful acts occurring in that period. *Dockers* is thus inapposite; there discovery of defendant's sales data prior to a misleading ad campaign could show "economic motivation for promising a round trip flight to consumers and [that] those promises caused Plaintiffs and members of the Class to act." 2010 WL 11515318, at *4; *see Om Recs., LLC v. OM Dev., SAS*, 2024 WL 4100870, at *4 (N.D. Cal. Sept. 6, 2024) (denying motion to compel and rejecting plaintiff's "argument about what the earlier starting point might yield [that] seems to rest on a speculative foundation rather than on a concrete basis"). Here, although Rippling does not even assert an injury or trade secret claim based on the alleged acts of unnamed "Conspirator-1" and "Conspirator-2," the earliest Rippling has alleged Deel "received and possessed Rippling trade secrets" from those two is "January 2024." *Id.* ¶¶27-28, 49-50. Rippling alleges Conspirator-2 shared "misappropriated confidential" Rippling material "upon joining Deel" in February 2024. *Id.* ¶50. And Rippling misrepresents the nature of the alleged September 2022 communication from Deel's Head of Sales to make it seem untoward, but Exhibit 3 cited by the FAC in support of Rippling's false assertion shows that *Rippling* had been "secretly meeting with [Deel's] sales reps" to "poach" them from Deel, and in that process, Rippling's "recruiter and others in the hiring process … divulged more info than they should to a competitive candidate." *See id.* ¶43 & Ex. 3. And, as set forth in Issue #6 below, Rippling cannot get discovery based on alleged harm to *others*.

Hon. Lisa J. Cisneros

For these reasons, although omitted from Rippling's position above, Deel offered at the October 3 meet-and-confer to begin the date range at January 1, 2024 as a compromise, but Rippling refused.

**Issue #3—Objection To The Term "Rippling Originated Information" (Nos. 1-2, 4-9)**

Rippling's Position. Deel objects that Rippling has not sufficiently defined "Rippling Originated Information." Deel waived this objection by not raising it in its initial June objections. Rather, in June, Deel **conceded** that the term referred to the trade secrets "alleged in Rippling's FAC." Ex. 2 at 5. Deel's timing exposes its gamesmanship. Deel asserted its new specificity objection only in September, **after** losing its bid to stay all discovery pending a ruling on its FNC motion. Ex. 1 at 5. Courts do not permit parties to sandbag serial objections in this way, because that causes the party seeking discovery to be "strung along indefinitely." *Safeco Ins. Co. of Am. v. Rawstrom*, 183 F.R.D. 668, 671 (C.D. Cal. 1998) (finding late objections waived). Seeking to avoid waiver, Deel points unavailingly to boilerplate June objections such as "vague and ambiguous." This fails. *See Ramirez v. Cnty. of Los Angeles*, 231 F.R.D. 407, 409 (C.D. Cal. 2005) (finding waiver and noting that "all grounds for objection must be stated with specificity"). Nor did Deel preserve this objection by contesting whether the alleged trade secrets were "legally protectible." Ex. 2 at 5. That is a **different issue** than specificity. Menell et al., *Trade Secret Case Management Judicial Guide*, 2023 WL 4687411, Ch. 4.2 (2023) ("whether an alleged trade secret has been sufficiently identified" is different from "whether the information qualifies as a trade secret"). Deel's request below for further briefing confirms what its serial objections already reveal: delay is the strategy.

Rippling's disclosure easily meets the applicable "pre-discovery test." *Auris Health, Inc. v. Noah Med. Corp.*, 2023 WL 5959427, at *5 (N.D. Cal. Sept. 12, 2023); *Phoenix Techs., Ltd. v. DeviceVM, Inc.*, 2010 WL 8590525, at *3 (N.D. Cal. Mar. 17, 2010) ("trade secret identification should be liberally construed and reasonable doubts about its sufficiency should be resolved in favor of allowing discovery to go forward"). Deel's statement that Rippling "does not know whether Deel even obtained any Rippling trade secrets" is absurd. Rippling's FAC explains that the asserted trade secrets are Rippling's corporate strategy plans, proprietary customer-specific information, and sales strategy plans. FAC ¶¶ 74-112. These are **paradigmatic** trade secrets.[1] Rippling also identified people who took trade secrets to Deel (*e.g.*, FAC ¶¶27-28) and hundreds of search terms and Slack channels that O'Brien used to steal information, following Deel's instructions. FAC ¶¶ 67-75; ECF 57-1 ¶¶ 17-26 (O'Brien's sworn corroboration). Rippling even gave a supplemental disclosure mapping its trade secrets onto its pleadings. *See* Appx. A.

As in *Auris*, it is unreasonable to require further specificity from Rippling. "[O]ther discovery tools," namely discovery from Deel, "are better suited to reveal which alleged trade secrets [defendant] has likely misappropriated" because "[t]hat information is in Defendants' possession." *Auris*, 2023 WL 5959427, at *5-6. This reasoning carries even more force here because Deel deliberately destroyed evidence. For example, Rippling's computer databases store information on tens of thousands of customers, and O'Brien sent "multiple screen recordings" of these databases **every day**. ECF 57-1 ¶19. But only two survive because Deel ordered O'Brien to delete them and to destroy the phone used to make them. *Id.* ¶¶ 19, 36. Deel cannot leverage its spoliation into tactical advantage by imposing impossible disclosure obligations on its victim.

Finally, *Auris* involved a public field (endoscopy), such that defendants could plausibly argue for more specificity to inform whether the alleged trade-secret improvements to an "endoscopy system" were actually "in the public literature" or "independently developed." *Id.* at *1, *4. Conversely here, there is no such justification because Rippling's customer-specific information

---

[1] *See Brocade Commc'n Sys. Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) ("[C]ustomer-related information including ... pricing guidelines ... and customers' business needs/preferences ... is routinely given trade secret protection."); *WHIC LLC v. NextGen Lab'ys, Inc.*, 341 F. Supp. 3d 1147, 1163 (D. Haw. 2018) (finding it likely that "customer data, history, needs and preferences" qualify as trade secrets); *H.Q. Milton, Inc. v. Webster*, 2017 WL 5625929, at *3 (N.D. Cal. Nov. 22, 2017) ("customer list and contact information, sales leads, customer interests, and [plaintiff's] proprietary pricing"); *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *3, (C.D. Cal. Nov. 22, 2013) ("a customer list qualifies as a trade secret").

Hon. Lisa J. Cisneros

and internal product plans are inherently proprietary. Deel's reference below to a "fishing expedition" is misplaced because Rippling seeks only **what Deel stole**, not Deel's original work.

<u>Deel's Position.</u> Deel requests to present full briefing on this important issue. "Despite the breadth of potential trade-secret protection, not all proprietary information qualifies for protection as a property interest under DTSA. To show that information is a trade secret, a plaintiff 'may not simply rely upon "catchall" phrases or identify categories of trade secrets.'" *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025). Instead, a plaintiff must identify its trade secrets with "sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Id.* "Discovery in a trade-secret case … requires an 'iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification,'" and "[r]equiring too much disclosure [from defendants] too early could encourage fishing expeditions." *Id.* at 1085, 1088.

Deel did not waive its objection that Rippling has not defined "Rippling Originated Information," which includes its alleged trade secrets, with the requisite specificity. On June 30, Deel objected to the definition of "Rippling Originated Information" because it was "vague and ambiguous," "requires Deel to reach a legal conclusion in order to determine what falls within the definition," and "causes the Interrogatories to seek information not relevant to the claims or defenses at issue in this action." Ex. 2 at 5 ¶6. As in Deel's Amended September 16 Objections, Deel's June 30 objections stated that Deel would construe "Rippling Originated Information" to mean the "Corporate Strategy Trade Secrets" and "Sales and Marketing Trade Secrets" alleged in the FAC, but that Deel did not agree that these allegations were sufficient to constitute "legally protectible trade secrets" under the law. *Id.*; *see, e.g.*, FAC ¶ 73 (generically defining categories of "trade secrets"). When the parties met-and-conferred to discuss those June 30 objections on September 2, Deel asked Rippling to specifically identify what it actually claimed to be its "Corporate Strategy Trade Secrets" and "Sales and Marketing Trade Secrets," so that Deel could attempt to respond to Rippling's discovery requests. On September 8, Rippling provided an amended definition that provided no further information on the generic categories of "trade secrets" alleged in the FAC. As a result, Deel served its Amended Objections on September 16, as Rippling's amendment still did not sufficiently identify what Rippling was claiming to be a "trade secret." Ex. 1 at 4-6 ¶¶6-7.

In any event, this Court has held identification is a *legal requirement* "prior to commencing discovery." *Auris*, 2023 WL 5959427, at *5. This is Rippling's "burden," as "[i]dentifying trade secrets with sufficient particularity is important because defendants need 'concrete identification' to prepare a rebuttal." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020). Thus, even if Rippling *had* provided a list of documents, "[i]t is inadequate … to 'cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information'" and "[l]ong lists of general areas of information … are not substitutes for particularized and concrete trade secrets." *Id.*; *see also Wilson Aerospace LLC v. Boeing Co. Inc.*, 2025 WL 2733893, at *3 (W.D. Wash. Sept. 25, 2025) (plaintiff's identification inadequate that "does not list the documentary sources for these trade secrets, leaving Defendant with only Plaintiff's word as to what those trade secrets are," and "merely repeats the categories of trade secrets set forth in the Complaint or otherwise summarize[s] the information allegedly provided to Defendant." (cleaned up)). But Rippling's "word" is the sole identification it asks Deel to accept.

Thus, like in *Auris*, the Court should find Rippling has not "satisfied [its] obligation, in the course of discovery, to identify the trade secrets" and order it "to precisely identify each alleged trade secret it contends is at issue in writing …, with precision and specificity, so that the actual contents of each alleged trade secret is divulged." *Auris*, 2023 WL 5959427, at *4-5; *accord Quintara*, 149 F.4th at 1091 (noting court "could have granted a protective order limiting discovery to whether [plaintiff] had identified its trade secrets with 'sufficient particularity' before permitting additional discovery" as "[r]efining trade secret identifications through discovery makes good sense").

Rippling's citation to *Auris* to absurdly claim that it should be allowed to wait for *Deel's* discovery before sufficiently defining its *own* trade secrets here overlooks that (1) *defendants* were the parties moving to compel an interrogatory response in *Auris*, and (2) the *Auris* plaintiffs had *already* initially identified "78 distinct trade secrets" in discovery, 2023 WL 5959427, at *5, which was

3

Hon. Lisa J. Cisneros

still legally inadequate and Rippling has not done here. Indeed, Rippling's shocking and incredible admission (which was even clearer in earlier drafts of this letter) that it cannot define its own trade secrets because it does not know whether Deel even obtained any Rippling trade secrets turns the law on its head, as Rippling alleges it "has already forensically identified, and confirmed with O'Brien's cooperation" Deel's supposed trade secret theft. *E.g.*, FAC ¶73; *Wilson*, 2025 WL 2733893, at *3 ("A plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'"). This gamesmanship is why courts require plaintiffs to sufficiently identify their trade secrets prior to seeking discovery on the same.

At a minimum, Rippling's purported inability and/or unwillingness to specifically define its trade secrets shows that these Interrogatories should not be answered at the outset of discovery, before any document review has taken place. *Auris*, 2023 WL 5959427, at *3; Fed. R. Civ. Pro. 33(d).

**Issue #4—Objection That The Interrogatories Are Compound (Nos. 1-3, 5-7, 9)**

Rippling's Position. Though it has answered none of them, Deel objects that Rippling's nine interrogatories actually count as 26. Its objections fail because none of Rippling's interrogatories "cover more than one primary subject." *Finjan, Inc. v. Qualys Inc.*, 2020 WL 4923964, at *1 (N.D. Cal. Aug. 21, 2020). Deel misrepresents Rippling's asks; for example, Interrogatory No. 2 does not ask Deel to prove that each item of Rippling Originated Information qualifies for trade secret protection, only to identify each stolen item specifically (*e.g.*, a disclosure that Deel stole "information about Rippling's customers" would not suffice). Generally, Deel misclassifies instructions on **what constitutes** a sufficient response with multiple requests. For example, Interrogatory No. 3 asks about Deel's efforts to steal information from employees of other companies; a sufficient response requires Deel to identify the Deel actor(s), the employee(s), and the information exchanged between them. Deel's other compound objections fare no better, as each Interrogatory targets a "single common theme." *In re Questcor Pharms., Inc. Sec. Litig.*, 2015 WL 12672130, at *1 (C.D. Cal. Jan. 21, 2015) (collecting cases); *see* Interrogatory Nos. 1 (Deel's contacts with Rippling employees); 2 (Rippling Originated Information used by Deel); 5 (persons at Deel who knew of O'Brien); 6 (documents provided by O'Brien to Deel); 7 (customers Deel contacted). Finally, the scope of Deel's theft likely creates "good cause" for more interrogatories. *Auris*, 2023 WL 5959427, at *6.

Deel's Position. "[W]here the subpart of an interrogatory 'introduce[s] a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it,' the subpart is generally counted as a separate interrogatory." *In re Soc. Media Adolescent Addiction/personal Inj. Prods. Liab. Litig.*, 2024 WL 5190206, at *2-5 (N.D. Cal. Dec. 20, 2024). Thus, Interrogatory 1 and 7 have three separate inquiries: (1) identification of Rippling employees/customers contacted by Deel; (2) how Deel obtained contact information; and (3) the substance of the communication. Ex. 1 at 9, 25. Interrogatory 2 asks Deel to "identify" each item of "Rippling Originated Information" and describe each item "with sufficient particularity to distinguish the item of Information from matters of general knowledge in the industry or of special knowledge of those Persons employed in the industry" and "identify the Person or entity to whom the information belongs (*e.g.*, Rippling or some other Person)." *Id.* at 8, 11-12. Not only does this Interrogatory impermissibly attempt to shift Rippling's burden to identify its trade secrets to Deel, it "would count as at least as many interrogatories as allegedly misappropriated trade secrets" (which cannot be calculated due to Rippling's refusal to identify). *Microvention, Inc. v. Balt USA, LLC*, 2021 WL 4840786, at *4 (C.D. Cal. Sept. 8, 2021); *Auris*, 2023 WL 5959427, at *6 ("[I]nterrogatories seeking information about 'each' of multiple things comprise discrete subparts for each of those things."). Likewise for Interrogatory 3 and 6. Ex. 1 at 14, 22. Apart from that, Interrogatory 2 also comprises four other separate inquiries: (1) how and when Deel accessed the Information; (2) Deel's purpose in accessing it; (3) the current location of the Information; and (4) how Deel used the Information and to whom it was disclosed. Interrogatory 3 also consists of four other separate inquiries: (1) Deel's direct and indirect efforts; (2) the name and company of each individual targeted in such efforts, (3) who at Deel was aware of each individual, and (4) the content of all information shared with Deel. Interrogatory 5 similarly comprises three separate inquiries—identities and two different "complete explanation[s]." *Id.* at 19. And Interrogatory 9 asks for (1) identification and (2) substance, in reference to two separate documents. *Id.* at 30.

4

Hon. Lisa J. Cisneros

**Issue #5—Interrogatory No. 1 (seeking Deel's contacts with Rippling's former employees)**

Rippling's Position. Deel objects that this Interrogatory "seeks information regarding recruiting without regard to Rippling's trade secrets." Ex. 1 at 10-11. But the FAC expressly alleges a nexus between recruiting and trade secret theft because the Enterprise targeted people from Rippling to obtain Rippling's trade secrets. *See*, *e.g.*, FAC ¶ 9 ("competitor hires were celebrated at Deel All-Hands meetings for the information they brought with them"); FAC ¶ 112 ("[F]ormer Deel employees have informed Rippling that it is widely-known at Deel that Deel deliberately recruits talent from competitors with the expectation that they bring confidential materials from their prior employers to Deel."); *see also* FAC ¶ 27-28, 166. The Interrogatory goes squarely to Rippling's allegation that Deel recruited from Rippling to ***unlawfully*** obtain Rippling's trade secrets.

Deel's Position. To be clear, Deel objects to all nine Interrogatories as overbroad and disproportionate to the needs of the case to the extent that they are not connected to "Rippling Originated Information." Interrogatory 1 is a prime example: Recruiting is not unlawful conduct. As Deel told Rippling on October 3, Deel would answer this Interrogatory if it was tethered to alleged use of "Rippling Originated Information," assuming Rippling could identify with particularity what trade secrets allegedly comprised that Information. Rippling refused.

**Issue #6—Interrogatory No. 3 (Deel's alleged theft from companies other than Rippling)**

Rippling's Position. Deel refuses to provide information about its targeting of companies other than Rippling. Ex. 1 at 16-17. This objection fails because as a RICO plaintiff, Rippling has "allege[d] predicate acts ***involving others*** to establish a pattern of racketeering activity," *Moses v. Martin*, 360 F. Supp. 2d 533, 549 (S.D.N.Y. 2004) (emphasis added); *Just Film, Inc. v. Merch. Servs., Inc.*, 2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012) (explaining that in proving a pattern, "a plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim") (quotation omitted); 18 U.S.C. § 1961(1) (defining trade secret theft as "racketeering activity"). Rippling is entitled to discovery into the alleged pattern.

As the FAC details, the Enterprise repeatedly deployed the same playbook: "deliberately recruit[] talent from competitors with the expectation that they bring confidential materials from their prior employers to Deel." FAC ¶112; *id.* ¶¶ 33-35, 160-68. Philippe Bouaziz bragged about having "spies at other companies." FAC ¶ 161. Competitor Papaya publicly alleged Alex Bouaziz personally attempted to steal their trade secrets. FAC ¶ 168; *see also id.* ¶ 9 (Papaya one of nine competitors that O'Brien searched for). The Enterprise similarly targeted a start-up accelerator, poaching employees and directing them to steal the accelerator's Customer Relationship Management ("CRM") file and bring it with them to Deel. FAC ¶ 166. It used LiquiFi to recruit a competitor's former general counsel in order to obtain its trade secrets. FAC ¶ 165. This pattern falls squarely within the scope of permissible RICO discovery. *Jones v. Deutsche Bank AG*, 2006 WL 648369, at *2 (N.D. Cal. Mar. 10, 2006) (in alleged RICO pattern of selling illegal tax shelters, ordering defendant to provide discovery into "other tax shelters alleged in the complaint" in addition to the tax shelter sold to plaintiff); *In re Outlaw Lab'ys, LP Litig.*, 2020 WL 1083403, at *10 (S.D. Cal. Mar. 5, 2020) (ordering discovery into predicate acts that were "a foundational part of the RICO claim because they are a common part of the pattern of conduct by" defendant).

Deel's Position. Interrogatory 3 is disproportionate to the needs of the case because "gain[ing]" undefined "Information" regarding other companies is not actionable. Even if it was, as a general matter, Rippling lacks standing to sue for alleged injuries it did not incur. The only basis Rippling asserts for seeking this information is its present status "as a RICO plaintiff." But, as explained in Deel's Motion to Dismiss, since Rippling has not alleged Deel proximately caused a RICO injury *to Rippling itself* (ECF 89 §I.A.; ECF 114 §I.A.), Rippling's cases are inapposite and Rippling has no basis seek discovery into RICO injuries allegedly suffered by non-parties. *See MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*, 2024 WL 3408221, at *14 (N.D. Cal. July 12, 2024) ("[RICO's] proximate cause requirements ensure only those directly injured by RICO violations can bring suit," and those "who are not directly injured are unable to bring RICO claims."). Because this merits issue is already fully briefed and pending before Judge Breyer, this Court should, at the very least, reject Rippling's request without prejudice at this time.

Hon. Lisa J. Cisneros

                                        Respectfully submitted,

| | |
|---|---|
| */s/ Jason D. Russell* | */s/ Joseph C. Sarles* |
| Jason D. Russell | Joseph C. Sarles |
| Attorneys for Defendant Deel | Attorneys for Plaintiff Rippling |

I hereby attest, pursuant to Local Rule 5-1(i)(3), that I obtained the concurrence in the filing of this document from the signatories indicated by the conformed signature (/s/).

*/s/ Joseph C. Sarles*
Joseph C. Sarles

Hon. Lisa J. Cisneros

Appendix A – Updated proposal provided by Rippling on September 8, 2025

"Rippling Originated Information" means the following information originating from Rippling obtained or used by Deel through improper means: (a) information wrongly obtained by Deel through its access as a Rippling customer while developing competing products (FAC ¶¶ 40-44), (b) the "pages of insights" on Rippling that Chris Lee claimed were gathered from Deel sales representatives posing as job applicants and other information obtained through Deel's "sustained and targeted" recruitment of Rippling personnel that served as "a mechanism for misappropriating trade secrets and confidential business information" (FAC ¶¶ 43-47, 166), (c) information taken by former Rippling employees recruited by Deel, including documents downloaded by Conspirator-1 before his termination by Rippling and PEO-related confidential documents retained by Conspirator-2 (FAC ¶¶ 27-28, 49-52, 162), (d) information from Rippling gathered by Deel employees falsely posing as legitimate customer prospects (FAC ¶¶ 52-53), (e) Rippling's product roadmaps, core initiatives, launch strategies, country-by-country pricing models, sales forecasts, customer lists, recruitment targets, go-to-market tactics, and information about Rippling's customers for particular products in particular countries (FAC ¶¶ 49, 69, 89, 91, 94-102, 105, 177), (f) Rippling's sales pipeline information, competitive intelligence cards, customer-specific information stolen by Keith O'Brien from Rippling's Slack channels and computer systems, and customer retention strategies (FAC ¶¶ 78-88, 103-104, 106-107), (g) information about Rippling's employees used by Deel to attempt to hire those employees away from Rippling (FAC ¶¶ 73, 108-112), and (h) information used by Deel to advance a false press attack against Rippling (FAC ¶¶ 113-117).