United States District Court
Northern District of California

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11

12

| PEOPLE CENTER, INC., | Case No.  25-cv-02576-CRB |
|---|---|
| Plaintiff, | |
| v. | **ORDER DENYING MOTIONS TO DISMISS IN PART AND GRANTING IN PART; DENYING MOTION TO STRIKE; DENYING MOTION FOR ATTORNEY FEES** |
| DEEL, INC., et al., | |
| Defendants. | |

13      People Center, Inc. d/b/a Rippling ("Rippling") brings its First Amended Complaint

14  against Deel, Inc. ("Deel"); Alexandre "Alex" Bouaziz, Philippe Bouaziz, and Daniel

15  "Dan" Westgarth (collectively the "Individual Defendants") for permanent injunctive relief

16  and compensatory, exemplary, punitive, and treble damages.  FAC (dkt. 54)  ¶¶ 64–65.

17  Rippling alleges that Defendants carried out a corporate espionage scheme by directing a

18  former Rippling employee to access and transmit confidential trade secrets and internal

19  documents.  Rippling brings six claims against the Defendants including a civil action

20  under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), conspiracy to

21  violate RICO, misappropriation of trade secrets, and other federal and state law claims.

22  Defendants move to dismiss Rippling's claims under the doctrine of <u>forum non</u>

23  <u>conveniens</u>, for a lack of personal jurisdiction, for insufficient service of process, and for a

24  failure to state a claim.  Deel also filed a special motion to strike Rippling's state law

25  claims as well as a motion for attorneys' fees based on its prior motion to strike.  The

26  Court **GRANTS** in part Deel's motion to dismiss for a failure to state a claim as to

27  Rippling's state law claims and **DENIES** the remaining motions.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# I.    BACKGROUND

## A.    Parties and Claims

Rippling is a Delaware corporation with its principal place of business in San Francisco, California.  Id. ¶ 13.  Founded in 2016, Rippling is a software company that offers a global workforce management system for businesses to manage internal workflows, including human resources ("HR"), IT, and finance.  Id.  Rippling has offices worldwide, including a subsidiary in Dublin, Ireland.  Id.

Deel is a Delaware corporation with its registered headquarters in San Francisco, California.  Id. ¶ 16.  Founded in 2019, Deel is a global workforce management software that connects employers in over 150 countries with remote workers through a platform that manages global human resources, payroll, and compliance.  Id.  Alex Bouaziz is the co-founder and Chief Executive Officer.  Id. ¶ 17.  Philippe Bouaziz is Alex's father and Deel's Chief Financial Officer, chairman, and purported whistleblowing contact.  Id. ¶ 18.  Dan Westgarth is the Chief Operating Officer.  Id. ¶ 19.

Rippling alleges the Defendants and others conspired to, and did conduct, a corporate espionage scheme to steal Rippling's trade secrets.  FAC ¶ 1.  In executing the alleged scheme, CEO Alex Bouaziz hired Keith O'Brien, a Rippling employee based in Ireland, to act as a corporate spy for Deel.  Id. ¶ 2.  In exchange for cryptocurrency payments, O'Brien allegedly followed Deel's direction to unlawfully obtain confidential information from Rippling's internal databases and sent this information directly to Deel.  Id.  Rippling brings six causes of action:

1) RICO, 18 U.S.C. § 1962: against Deel, Alex Bouaziz, and Philippe Bouaziz

2) Conspiracy to Violate RICO, 18 U.S.C. § 1962(d): against Deel, Alex Bouaziz, Philippe Bouaziz, Dan Westgarth

3) Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.: against Deel

4) Tortious Interference with Contract: against Deel

5) Aiding and Abetting Breach of Fiduciary Duty: against Deel

1    6)  <u>Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.</u>: against Deel

2    <u>Id.</u> ¶¶ 64–65.

3    Deel filed two separate motions to dismiss: one for <u>forum non conveniens</u> ("FNC")

4    and another for a failure to state a claim.  Deel FNC MTD (dkt. 88); Deel 12(b)(6) MTD

5    (dkt. 89).  Alex and Phillipe Bouaziz filed a motion to dismiss—joining Deel's arguments

6    on FNC and failure to state a claim and further asserting a lack of personal jurisdiction

7    under Rule 12(b)(2) and insufficient service of process under Rule 12(b)(5).  Bouaziz

8    MTD (dkt. 111).

9    Dan Westgarth also moved to dismiss, joining the other defendants' arguments on

10   FNC and failure to state a claim, as well as on the separate grounds of lack of personal

11   jurisdiction and insufficient service of process.  Westgarth MTD (dkt. 112).  Because the

12   arguments for FNC and failure to state a claim are common to all Defendants, the Court

13   addresses them together.  The issues of personal jurisdiction and service of process are

14   specific to the Individual Defendants and are discussed separately.

15   **B.    Jurisdictionally Relevant Facts**

16   **1.    Deel**

17   Deel is a Delaware corporation with its registered headquarters in San Francisco.

18   FAC ¶¶ 13, 18.  Deel concedes that its principal place of business is located in San

19   Francisco but argues that this location does not demonstrate a meaningful connection to

20   the forum.  Deel FNC MTD at 14.  Deel asserts that this address is merely a mailing

21   address; Deel does not run its company operations out of California, maintain any

22   documents there, and is in the process of changing the address to another state.  Deel FNC

23   MTD at 11.  Deel executives assert that Deel does not have any physical presence in

24   California, and its key executives and decision-making personnel do not reside or work in

25   San Francisco or California.  Shuo Wang Decl. (dkt. 48-2) ¶¶ 6–8.  Rather, they are

26   concentrated in countries in Europe and the Middle East and only travel to California for

27   trade conferences that "have nothing to do with this action."  <u>Id.</u>

28   Deel lists its San Francisco address in its SEC filings, Terms of Service, and

United States District Court
Northern District of California

Privacy Policy.  FAC ¶ 16 n.4.  Additionally, Rippling identifies two civil lawsuits in San Francisco County against foreign customers, where Deel cites the San Francisco forum and venue clauses in its customer agreements.  Opp'n Deel FNC MTD Ex. 1, Ex. 10 ¶ 3. Notably, Deel filed one of these lawsuits after Rippling brought the underlying claims in this Court.  Id.  Furthermore, Deel has many employees, directors, funders, and Board Members who work remotely from the Bay Area.  Id. Ex. 9.[1]

### 2.    Alex Bouaziz

Alex is a citizen of Israel and France and, since 2020, he has resided in Tel Aviv, Israel.  A. Bouaziz Decl. (dkt. 111-1) ¶¶ 2–3.  Alex has visited California four times since 2021 for short trips.  Id. ¶ 8.  Rippling points to his three-month stay in San Francisco in 2018 to show his connection to this forum, but that stay occurred before the alleged conduct and appears to have been a business trip.  Opp'n Individual Def. MTD at 17–18.

### 3.    Philippe Bouaziz

Philippe[2] is a citizen of Israel and France, and resided in Tel Aviv, Israel from 2012 to 2023.  P. Bouaziz Decl. (dkt. 111-2) ¶¶ 1–2.  Since 2023, Philippe moved to Dubai and has lived and worked there.  Id.  Philippe has visited California nine times since 2021 for short trips.  Id. ¶ 8.

### 4.    Dan Westgarth

Westgarth is a U.K. citizen who has lived in Dubai since June 2022.  Westgarth Decl. (dkt. 112-2) ¶¶ 2–3.  He owns property in New York and South Dakota but states that neither has ever been his primary residence.  Id. ¶ 3.  A June 2025 Deel event

---

[1] Deel and Rippling disagree on several jurisdictionally relevant facts, and related discovery disputes are currently pending before Judge Cisneros.  See Dkt. 148.  At this preliminary stage, and based on the available facts, the Court determines that Deel has substantial connections to this forum because it has availed itself of the benefits of this jurisdiction by listing San Francisco in its regulatory forms here, conducting substantial business here, and filing its own lawsuits in this forum.

[2] Rippling cites an exhibit (dkt. 129-13) to purportedly show that Philippe is associated with various addresses in the United States.  Opp'n Individual Def.'s MTD at 19.  Importantly, this exhibit appears to be a record of a different person with the same name.  The person listed in this exhibit is ten years younger than Philippe, has a Social Security number (while Philippe does not), and Philippe attested that he has no connection to the listed addresses.  Bouaziz Reply (dkt. 145) at 6; P. Bouaziz Supp. Decl. ¶¶ 1–3.

United States District Court
Northern District of California

described him as "now calling New York City home."  Opp'n Indv. Def.'s MTD (dkt. 129) Ex. 8.  He briefly visited California in 2022 to do "some limited work for Deel." Westgarth Decl. ¶ 4.

### C.    Factual Background

In 2022, Deel was a Rippling customer and developed similar HR software products.  Id. ¶ 42.  As Deel expanded, Rippling raised concerns about growing competitive interests and Deel's access to its intellectual property as a customer, so Rippling terminated the customer relationship with Deel in November 2022.  Id. ¶ 44. Following their split, Rippling alleges Deel attempted to gather confidential information from Rippling, like "positively encouraging" employees to bring information from prior employers to Deel and using misleading email accounts to impersonate potential customers. Id. ¶¶ 52, 55.  Rippling also alleges that two of its former employees, Conspirator-1 and Conspirator-2,[3] shared confidential information with Deel when they began working for Deel in early 2024.  Id.  ¶¶ 49–50.  Conspirator-1 served as Director of National Accounts at Rippling before becoming a Director of Partnerships at Deel in January 2024.  Id. ¶ 27.  Rippling alleges that Conspirator-1 downloaded sensitive trade secret documents before his termination from Rippling.  Id. ¶ 49.  When Rippling demanded Conspirator-1 return the documents, as required by his contract, Deel's attorneys hired a third-party forensic investigator to erase the records.  Id.

Conspirator-2 began working at Deel in February 2024.  Id. ¶¶ 28, 50.  According to Deel whistleblowers, he improperly retained confidential Rippling documents in anticipation of exchanging them for payment by the Individual Defendants.  Id. ¶ 50. When Conspirator-2 joined Deel, he shared stolen Rippling materials with Deel executives, including Alex Bouaziz, to benefit Deel at Rippling's expense.  Id. ¶¶ 50–51.

---

[3] Notably, these former employees are not parties to the action, but Rippling intends to call them as witnesses.  Opp'n Individual Def.'s MTD (dkt. 129) at 18.  Both Conspirator-1 and Conspirator-2 are residents of California.  FAC ¶ 21–22.

1          **1.**      **Alleged Corporate Espionage Scheme with O'Brien**

In March 2024, Alex Bouaziz connected with Keith O'Brien on LinkedIn, who was then a payroll compliance manager at Rippling. Id. ¶ 57. O'Brien applied for a similar role at Deel but was not offered the job and, after the application process, they exchanged messages about interview feedback. Id. They continued messaging, and a few months later, O'Brien told Alex he had started a new payroll consulting company called Global Payroll Geeks. Id. ¶ 58. Alex referred O'Brien to Dan Westgarth to explore a service provider arrangement. Id. ¶¶ 57–58. When O'Brien told Alex he was considering leaving Rippling to dedicate himself full-time to his payroll business, Alex suggested they speak by phone. Id. During this call, Alex allegedly recruited O'Brien to serve as a "spy" for Deel. Id. ¶ 59. When O'Brien agreed to the arrangement, Alex made a three-way phone call with O'Brien and his father, Philippe Bouaziz, to discuss the logistics of the alleged scheme. Id.

Alex allegedly instructed O'Brien to send him stolen Rippling information via Telegram, where messages cannot be forwarded and auto-delete after 24 hours. Id. ¶¶ 60–61. Payments would be made in a separate Telegram channel with Philippe and a third individual, the "Watchman." Id. O'Brien began receiving compensation for his spying activities when he received a $6,000 bank transfer from Westgarth's wife. Id. ¶ 64. Philippe informed O'Brien that all subsequent payments would be in cryptocurrency to make the financial transfers harder to trace. Id. ¶ 65. These payments continued until March 13, 2025. Id.

On a near-daily basis, Alex instructed O'Brien to access secure internal Rippling databases hosted by Salesforce, Slack, and Google, all of which are in the United States. Id. ¶ 67–68. O'Brien transmitted confidential information from Rippling, such as Slack searches and content within Salesforce and Google Drive repositories, directly to Alex via Telegram, for his use at Deel. Id. ¶ 68. Rippling alleges that vast amounts of trade secrets were stolen and used to give Deel an unfair competitive advantage in poaching Rippling customers and employees and misappropriating private product roadmaps. Id. ¶ 100.

United States District Court
Northern District of California

Once Deel gained access to Rippling's internal roadmaps, Deel gained "significant competitive advantages," and Rippling alleges none of this information would have been available to Deel "but-for its spying scheme." Id. ¶ 103.  Rippling alleges that access to its trade secrets "gave Deel an unlawful head start in launching or developing competing products" and "where Deel benefitted, so did Alex and Philippe personally via their investment vehicles." Id. ¶ 127.  This alleged scheme included "stolen product roadmaps, competitive battlecards, and over 6,000 queries through Rippling's Slack channels," all of which provided distinct customer or product information.  Id. ¶ 129.

For example, Rippling alleges O'Brien accessed or downloaded its customer list on more than 600 occasions between November 2024 and March 2025.  Id. ¶¶ 104–05.  Additionally, O'Brien allegedly acted on Alex's instructions and stole contact information for Rippling employees.  Id. ¶ 109.  Alex and Westgarth then used that information to contact at least 21 Rippling employees via LinkedIn and WhatsApp, and at least ten were offered jobs at Deel, often without a substantive interview.  Id. ¶¶ 110–12.

When O'Brien told Alex he wanted to leave Rippling to focus on Global Payroll Geeks, Alex also directed O'Brien to contact Dan Westgarth.  Id. ¶ 72.  Alex said Westgarth would "see to it that [his] consulting company Global Payroll Geeks[] would get money from Deel." Id.  In January 2025, Alex created a WhatsApp group with himself, Westgarth, and O'Brien called "Keith <> Dan." Id.  Alex also promised to make Global Payroll Geeks a preferred partner if the scheme continued.  Id.

In February 2025, Rippling became aware of a possible spy accessing its internal databases when a reporter contacted Rippling about its sanctions compliance program, citing internal Slack messages related to the reporter's assertions.  Id. ¶¶ 113–15.  Learning that the messages were in the possession of a non-employee, Rippling opened a security investigation.  Id. ¶ 115.  Rippling's forensic team identified O'Brien as the source of the shared messages that the reporter referenced.  Id.

To confirm O'Brien's involvement stemmed from Deel, on March 3, 2025, Rippling's General Counsel initiated a "honeypot operation" and sent a letter to three

7

individuals: Philippe Bouaziz, Deel's Head of U.S. Legal, and an employment attorney at Deel's outside law firm. Id. ¶ 119. The letter included a screenshot of a fake Slack channel named #d-defectors where former Deel employees, now employed by Rippling, shared negative information about Deel. Id. ¶ 120. This channel "was set up as part of a ruse to confirm that Deel was instructing O'Brien to search for specific information in Rippling's Slack." Id. ¶ 121. That same day, at Alex's instruction, O'Brien accessed the #d-defectors channel five times. Id. ¶¶ 123, 125.

### 2.    Alleged "Cover-Up" and Irish Proceedings

On March 12, 2025, Rippling sought and obtained an emergency form of relief to prevent O'Brien from destroying evidence after the honeypot operation. FAC ¶ 130. Rippling filed an ex parte motion for an Anton Piller order, an order from the High Court in Ireland requiring O'Brien to turn over his electronic devices to an independent third party for forensic imaging. Id. ¶ 2 n.2. "[N]on-compliance with the order has a likely risk of imprisonment in the Irish legal system." Id. This order began proceedings in Ireland ("the Irish Proceedings").

On March 14, 2025, a court-appointed, independent solicitor visited Rippling's Dublin office to serve O'Brien with the court order. Id. ¶ 131. O'Brien "hid in the bathroom to delete evidence" and fled the office when warned about the potential for imprisonment for violating the order. Id. Over the course of two weeks, O'Brien allegedly maintained daily contact with Deel attorneys, including Asif Malik, who said "Deel would move O'Brien and his family to Dubai," cover his legal costs, and "financially reward[]" O'Brien if he "kept quiet and stuck with the plan." Id. ¶ 134. O'Brien then destroyed his phone with an axe and flushed it down the drain of his mother-in-law's house. Id. ¶¶ 135–36. That evening, O'Brien's wife spoke with Malik for about an hour to discuss Deel's plan for O'Brien. Id. ¶ 137.

On March 17, Rippling filed its initial Complaint in this Court (the "U.S. Proceedings"), and Deel responded with a series of public statements. Id. ¶ 138. These statements included allegations that Rippling purportedly made payments to Russia that

8

violated government sanction policies, and that O'Brien reported these payments to the Central Bank of Ireland.[4] Id. ¶ 139. On March 19, O'Brien appeared in Irish court to hand over his devices, specifically his phone, in compliance with the Anton Piller Order. Id. ¶ 140. O'Brien informed the judge that he had previously destroyed his phone, and the court reprimanded him. Id. ¶ 141. Rippling's First Amended Complaint further details allegations of a complex "cover-up" by O'Brien, Deel, the Individual Defendants, Malik, and others that include deleting evidence, making false statements to media outlets, and obstructing justice—most of which are not relevant to the U.S. Proceedings and are being litigated in the Irish Proceedings.[5] Id. ¶¶ 142–59. On March 27, O'Brien agreed to cooperate, met with the court-appointed independent solicitor, handed over his personal devices for imaging, and swore an affidavit disclosing everything he knew about the scheme. Id. ¶ 149; see O'Brien Decl.

### a.    Procedural Posture of the Irish Proceedings

In Ireland, an Anton Piller order can only be issued within a substantive proceeding pending before the Irish courts. Justice Clarke Decl. (dkt. 102-1) ¶¶ 7–8. It cannot be obtained in a standalone motion, in aid of a substantive U.S. proceeding, or through letters rogatory. Id. ¶ 7. The plaintiff must identify and plead the underlying claim so the court can assess the requested relief, supervise the execution of the order, and enforce compliance through attachment for contempt if needed. Id. ¶ 8.

When Rippling brought the proceedings in the Irish High Court to obtain the Anton Piller Order, it listed O'Brien as the sole defendant and had claims related to violations of Trade Secret Regulations. Anton Piller Mot. (dkt. 102-13) ¶¶ 9–11. After O'Brien failed to comply with the order on March 14 by deleting evidence and refusing to hand over his

---

[4] In O'Brien's sworn declaration, he states that he knew these allegations were false when he made them, and only did so at Malik's instruction. O'Brien Decl. (dkt. 56-1) ¶ 34.

[5] The Amended Irish Complaint distinguishes the scope of the U.S. Proceedings and the Irish Proceedings: "As appears from the complaint in the U.S. Proceedings, [Rippling]'s claims against Deel in the U.S. Proceedings are confined to Deel's conduct prior to the time on 14 March 2025 when Deel learned that Rippling had discovered its wrongful conduct including civil racketeering and misappropriation of trade secrets." Amended Irish Compl. (dkt. 111-4) ¶ 15.

1    devices, Rippling applied to the High Court of Ireland for an order to enforce compliance.

2    FAC ¶ 131; Anton Piller Mot. ¶ 13–14.  While this application was before the High Court,

3    on March 27, Rippling, its Irish subsidiary, and O'Brien signed an agreement

4    ("Cooperation Agreement").  FAC ¶ 153 n.37.  The Cooperation Agreement stated

5    O'Brien would fully cooperate with and assist in the U.S. Proceedings and, on March 31,

6    Rippling would notify the Irish court that the Anton Piller order was no longer required

7    because O'Brien had remedied his breach of the order.  Justice Clarke Decl. ¶ 12;

8    Cooperation Agreement (dkt. 102-16 Ex. 14) § F.

9        On April 2, two days after the Anton Piller application against O'Brien was

10    resolved, Rippling added Deel, Alex Bouaziz, Mr. Mieli, and Asif Malik to the

11    proceedings. Id. ¶13.  Rippling subsequently filed a Statement of Claim focusing solely on

12    these parties ("Ireland Defendants") and their alleged involvement in O'Brien's breach of

13    the Anton Piller order after March 14, 2025.  Id. ¶¶ 14–15; see Amended Irish Compl. at

14    15 ¶¶ 62–68, at 16 ¶¶ 1–15.

15            **b.    Scope of the Irish Proceedings**

16        The pleadings establish that Rippling's claims in the Irish Proceedings against the

17    Ireland Defendants only concern their alleged conduct after March 14.[6]  Amended Irish

18    Compl. ¶ 16 ("The Plaintiffs' claims against the Deel Defendants in these proceedings is

19    confined to their unlawful conduct to frustrate the Order subsequent to the time on 14

20    March 2025 when Deel learned that Rippling had discovered its wrongful conduct and to

21    defamatory statements made by the Deel Defendants to that end.").  Facts alleged relating

22    to events before March 14 are listed for the limited purpose of providing background

23    evidence supporting Rippling's claim that the Ireland Defendants made defamatory

24    statements.  Id. ¶¶ 19–24.  The claims listed in the Amended Irish Complaint all relate to

25

26    _____

[6] The Irish Proceedings arise from the same core factual allegations and will require consideration
27    of much of the same evidence and testimony as this case.  The disputes are closely related, but the
claims and parties differ, and the Irish Proceedings concern a distinct period—the events after
28    March 14—whereas the U.S. Proceedings address conduct primarily before that date. For purposes
of the FNC analysis, they are more appropriately characterized as related proceedings, not
identical or dependent actions.

1    obstruction of justice, defamation, and damages arising from conduct after March 14.  Id.

2    ¶¶ 59–68, at 16 ¶¶ 1–15. No trade secrets claims are asserted in the Irish Proceedings.  Id.

3    Notably, Rippling's claims in the Irish Proceedings "can only succeed if and to the extent

4    that the Court becomes satisfied that the wrongdoing alleged to have occurred after March

5    14 is established and amounts to actionable wrong or wrongs."  Justice Clarke Decl. ¶ 17.

6    **II.    DISCUSSION**

7         First, the Court addresses the order in which the issues should be decided.  Second,

8    it turns to the Individual Defendants' motions to dismiss for lack of personal jurisdiction.

9    Third, the Court evaluates the Defendants' motions to dismiss for FNC.  Fourth, it

10   determines whether the Court's alternative service order was invalid, such that the claims

11   should be dismissed for improper service of process.  Fifth, the Court addresses

12   Defendants' 12(b)(6) motions to dismiss for failure to state a claim.  And last, the Court

13   analyzes Deel's special motion to strike and motion for attorneys' fees.

14        **A.    Order of Issues**

15        The Defendants all move to dismiss on FNC grounds, asserting that Ireland is the

16   more appropriate forum.  See Deel FNC MTD; Bouaziz MTD; Westgarth MTD.  They

17   argue the Court should address FNC before the other pending motions, describing this as a

18   "textbook case for immediate forum non conveniens dismissal."  Deel FNC MTD at 5

19   (quoting Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422 (2007)); see

20   Bouaziz MTD at 3; Westgarth MTD at 3.

21        Under Sinochem, a court may dismiss on FNC grounds without first resolving

22   jurisdictional issues because FNC is a non-merits basis for dismissal, and "jurisdiction is

23   vital only if the court proposes to issue a judgment on the merits."  Sinochem, 549 U.S. at

24   431–32.  However, that approach is appropriate only when the FNC determination does

25   not depend on disputed jurisdictional facts.  Id. at 435.  When facts central to personal

26   jurisdiction are disputed, a court should not assume their truth for purposes of resolving

27   FNC without first analyzing them under a personal jurisdiction framework.  Id. ("[W]here

28   subject-matter or personal jurisdiction is difficult to determine, and forum non conveniens

United States District Court
Northern District of California

11

considerations weigh heavily in favor of dismissal, the court properly takes the less

burdensome course.")

Here, Defendants dispute the location of the alleged wrongful conduct, contending

that the relevant acts occurred in Ireland, where O'Brien accessed Rippling's databases,

rather than in San Francisco, where Rippling alleges the harm was felt at its headquarters.

Deel FNC MTD at 11; Bouaziz MTD at 6; Westgarth MTD at 3.  The Individual

Defendants also challenge personal jurisdiction, asserting they lack the requisite forum

contacts, while Rippling argues that they purposefully directed their conduct in the alleged

espionage scheme at California.  Bouaziz MTD at 15–20; Westgarth MTD at 5–9; see Deel

FNC MTD at 11.  These disputes over the Defendants' forum contacts and the alleged

wrongdoings are jurisdictional in nature and overlap with the FNC analysis.

Because these overlapping facts must be resolved to determine whether dismissal is

appropriate, the Court, under the guidance from Sinochem, first decides the personal

jurisdiction motions to resolve the factual disputes.  Sinochem, 549 U.S. at 432.  It is only

after those issues are resolved that the Court considers dismissal on FNC grounds.

### B.    Personal Jurisdiction

Rippling argues that the Individual Defendants are subject to jurisdiction in

California for three reasons: (1) specific jurisdiction under purposeful direction of tortious

conduct at the forum; (2) jurisdiction under Federal Rule of Civil Procedure 4(k)(2); (3)

personal jurisdiction under the RICO statute, 18 U.S.C. § 1965(b).   Opp'n Indv. Def.'s

MTD at 6–16.  The Court concludes that the Individual Defendants are subject to specific

jurisdiction and does not reach the remaining bases for jurisdiction.

### 1.    Specific Jurisdiction

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move

to dismiss for lack of personal jurisdiction.  It is the plaintiff's burden to establish the

court's personal jurisdiction over a defendant.  Cubbage v. Merchent, 744 F.2d 665, 667

(9th Cir. 1984).  The court may consider evidence presented in affidavits or order

discovery on jurisdictional issues.  Data Disc, Inc. v. Sys. Tech. Assoc.'s, Inc., 557 F.2d

1280, 1285 (1977).  "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995) (internal citations omitted).  In this context, a prima facie showing is established if the plaintiff has produced admissible evidence which, if believed, would be sufficient to establish the existence of personal jurisdiction.

Rippling does not contend the Individual Defendants are subject to general jurisdiction.  Accordingly, the Court only retains jurisdiction if the Individual Defendants are subject to specific jurisdiction in California.  Specific jurisdiction depends on the relationship between "the defendant, the forum, and the litigation."  Walden v. Fiore, 571 U.S. 277, 284 (2014) (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 775 (1984)).  "Although a nonresident defendant's physical presence within the territorial jurisdiction of the court is not required," such a defendant must still have "minimum contacts" with the forum state, "such that the suit does not offend traditional notions of fair play and substantial justice."  Id. at 283 (citation omitted).  As a framework for applying these principles, the Ninth Circuit has "established a three-prong test for analyzing a claim of specific personal jurisdiction."  Schwarzenegger, 374 F.3d at 802.  In particular:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.
>
> Id. (citation omitted).

The Court finds that the Individual Defendants are subject to specific personal jurisdiction, since all elements of the Schwarzenegger test are met.

### a.    Purposeful Direction

For "suits sounding in tort," such as this one, the Ninth Circuit applies the "purposeful direction analysis." AMA Multimedia, LLC v. Wanat, 970 F.3d 1201, 1208 (9th Cir. 2020) (quotation omitted).  Purposeful direction, or the "effects test," requires that a defendant have "[1] committed an intentional act, [2] expressly aimed at the forum state, [3] causing harm that the defendant knows is likely to be suffered in the forum state." Schwarzenegger, 374 F.3d at 803 (citing Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002)).

### i.    Intentional Act

To satisfy the intentional act prong, "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting Schwarzenegger, 374 F.3d at 806).  "The threshold of what constitutes an intentional act is relatively low." AirWair Int'l Ltd. v. Schultz, 73 F. Supp. 3d 1225, 1233 (N.D. Cal. 2014).

Bouazizes: Rippling alleges Alex and Phillipe Bouaziz personally recruited O'Brien to steal Rippling's trade secrets and oversaw and directed the scheme.  FAC ¶¶ 59, 61–62.  Rippling also claims Alex directed O'Brien's actions and personally received the stolen trade secrets. Id. ¶ 56.  Furthermore, Rippling alleges that Philippe provided "critical direction for the scheme" by setting up the logistics of the arrangement and coordinating with "the Watchman" to send cryptocurrency payments to O'Brien. Id. ¶¶ 59, 60–62.

Westgarth: Rippling alleges Westgarth participated in the discussions with O'Brien to create the arrangement for the theft of trade secrets. Id. ¶¶ 57–59.  Further, Rippling alleges Westgarth personally called employees from Rippling and offered them specialized roles at Deel, "with the expectation that they bring confidential materials from their prior employers to Deel," and presented confidential sales strategy materials internally at Deel. Id. ¶¶ 111–12.

The Court finds that the facts described above are sufficient to be considered intentional acts by the Individual Defendants.

### ii.                                    Express Aim

The express aiming inquiry centers on whether the defendant specifically targeted the forum state.  See Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1143 (9th Cir. 2017).  The defendant's forum contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.'"  Ford Motor Co., 592 U.S. at 359, 141 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).  Accordingly, express aiming requires "something more" than a "foreign act with foreseeable effects in the forum state." Washington Shoe v. A-Z Sporting Goods, Inc., 704 F.3d 668, 675 (9th Cir. 2012), abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064 (9th Cir. 2017).

Moreover, a court's analysis "must focus on the defendant's contacts with the forum state, not the defendant's contacts with the resident of the forum." Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015).  A defendant does not purposefully direct its activities at the forum state when the only link to the forum is the unilateral activity of the plaintiff or a third party.  See Walden, 571 U.S. at 284–85.  Accordingly, "mere injury to a forum resident is not a sufficient connection to the forum" because an injury is "jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."  Id. at 290.  The proper question is "whether the defendant's conduct connects him to the forum in a meaningful way," not where the plaintiff felt the injury.  Id.

The First Amended Complaint alleges a coordinated scheme in which the Individual Defendants collectively directed O'Brien to access Rippling's internal databases and steal trade secrets, thereby interfering with Rippling's customer relationships and gaining an advantage in product development and market competition.  FAC ¶¶ 4–6.  Rippling primarily develops and maintains its trade secrets, proprietary technology, customer relationships, and strategic business information at Rippling's headquarters in San Francisco.  Opp'n to Deel FNC Mot. (dkt. 102) at 3.  The Individual Defendants are alleged to have played a role in planning, facilitating, and benefitting from the acquisition

of this information to help Deel compete with Rippling in the California marketplace.  Id.
at 9.

Notably, O'Brien was directed to obtain and share information about 31 Rippling
customers located in California, a majority of whom were located in San Francisco.
O'Brien Decl. ¶¶ 3–6; Nardinelli Decl. (dkt. 128-9) ¶¶ 13–43.  The identity of these
customers constituted valuable trade secrets and the Individual Defendants' alleged
misappropriation of this information caused Rippling to lose business in San Francisco.
FAC ¶ 107; O'Brien Decl. ¶¶ 3–6; Opp'n Individual Def.'s MTD at 9.  As Deel is a direct
competitor of Rippling, acquiring this information benefited Deel and its executives by
giving them an advantage in the California marketplace.  FAC ¶¶ 45, 47.

The Individual Defendants argue Rippling alleges no forum contacts other than
O'Brien's conduct, all of which occurred in Ireland, and that a defendant cannot be said to
purposefully direct activities at the forum when the only connection to the forum arises
through the actions of a third party.  Westgarth MTD at 6–7; Bouaziz MTD at 16–17.
While the Individual Defendants are correct in principle, Rippling alleges specific conduct
by each Individual Defendant that furthered the alleged conspiracy.  These acts establish
express aiming because they show a California-specific focus: the use of trade secrets to
interfere with Rippling's California-based customers.  Rather than basing the forum
contacts solely on the conduct of O'Brien, Rippling alleges actions by each Individual
Defendant relating to these customers, establishing their personal connection to California.
For example, Rippling alleges Alex directed O'Brien's search for these customers, Phillipe
coordinated the payment for this information, and Westgarth used this information to
poach customers and employees.  FAC ¶ 6.  These actions were allegedly in furtherance of
helping Deel compete with Rippling in California.  Opp'n Individual Def.'s MTD at 9;
Nardinelli Decl. ¶¶ 13–43.

Case law is in accord.  In Enertrode, Inc. v. Gen. Capacitor Co. Ltd., the court found
express aiming where defendants, knowing the company's principal place of business was
in California, allegedly downloaded and copied the company's trade secrets, used them in

direct competition, and disclosed the information to third parties. No. 16-cv-02458-HSG, 2016 WL 7475611, at *4 (N.D. Cal. Dec. 29, 2016). Similarly, in <u>Mee Indus. Inc. v. Adamson</u>, the court found express aiming where a former employee of a California-based company remotely downloaded trade secrets from the plaintiff's California-based computer network for a competitor's benefit. 2018 WL 6136813, at *4 (C.D. Cal. July 27, 2018). The court emphasized that even though the defendant was not located in California when he allegedly stole the trade secrets, "physical presence in the forum is not a prerequisite to jurisdiction." <u>Id.</u> (quoting <u>Walden</u>, 571 U.S. at 285). It was the defendant's act of accessing a California-based computer network and the use of that information to compete against the plaintiff that established conduct aimed at California. <u>Id.</u> In both cases, the courts emphasized the defendants' intentional decision to exploit California-based networks or compete directly in California markets, satisfying the requirement that the defendants' own actions create the forum contact.

Rippling's allegations are on all fours with this rationale. While O'Brien accessed information from Ireland and the Individual Defendants' physical acts occurred abroad, the Individual Defendants directed their conduct toward California. Opp'n Individual Def.'s MTD at 9. The Individual Defendants targeted Rippling and its California customers because they "knew their misconduct would injure Rippling at its principal place of business." <u>Id.</u> at 8–9.

There are sufficient facts to support the allegations that the Individual Defendants knew Rippling would likely suffer harm at its headquarters in San Francisco; that each Individual Defendant took actions to direct and facilitate the theft of confidential information that was developed and used in San Francisco; and that the Individual Defendants used this information to interfere with Rippling's California-based customers. Therefore, the Court finds that Rippling has sufficiently demonstrated that each of the Individual Defendants expressly aimed their conduct at California.

### iii.    Foreseeable Harm

The third part of the purposeful direction test is whether the defendants knew their

1    intentional act would cause harm in the forum.  See Schwarzenegger, 374 F.3d at 803.  The

2    focus of the inquiry "is not the magnitude of the harm, but rather its foreseeability."

3    Lindora, LLC v. Isagenix Int'l, LLC, 198 F.Supp.3d 1127, 1141 (S.D. Cal. 2016).  For

4    jurisdictional purposes, a corporation incurs economic loss in the forum of its principal

5    place of business.  See CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079

6    (9th Cir. 2011).  "If a jurisdictionally sufficient amount of harm is suffered in the forum

7    state, it does not matter that even more harm might have been suffered in another state."

8    Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th

9    Cir. 2006).

10        Here, Rippling alleges Defendants carried out a corporate espionage scheme to

11   obtain confidential trade secrets, thereby unfairly competing with Rippling and causing

12   damage to Rippling's relationships with customers and employees in California.  See FAC

13   ¶¶ 187-88.  Accordingly, it is foreseeable that the impact of the harm would also be felt at

14   its headquarters in California.  Id. ¶ 13.  Therefore, Rippling has made a sufficient showing

15   of foreseeable harm.

16                    **b.    Arises Out of or Relates To**

17        Claims "arise out of" the defendant's contacts with the forum state when there is a

18   causal connection between the contacts and the claims.  See Bristol-Myers Squibb Co. v.

19   Super. Ct. of Cal., San Francisco Cnty., 582 U.S. 255, 255 (2017).  Claims that do not

20   "arise out of" the defendant's contacts may nonetheless "relate to" those contacts.  Ford

21   Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 362 (2021).  "The 'arises out of or

22   relates to' standard requires a connection, relationship, or nexus between the plaintiff's

23   claims and the defendant's contacts with the forum."  X Corp. v. Center for Countering

24   Digital Hate Ltd., 724 F. Supp.3d 921, 943 (N.D. Cal. March 25, 2024) (quoting Bluestar

25   Genomics v. Song, No. 21-CV-04507-JST, 2024 WL 54701, at *7 (N.D. Cal. Jan 4,

26   2024)).  Further, the connection to the forum state must be "analyzed with regard to the

27   defendant's contacts with the forum itself, not with persons residing there."  See Walden,

28   571 U.S. at 277.

The Individual Defendants argue Rippling's claims arise out of conduct that occurred abroad, emphasizing that O'Brien's conduct "from Ireland" did not take place in California.  Bouaziz MTD at 17–18.  They rely on X Corp., where sharing login credentials between two European actors did not satisfy the "arises out of or relates to" requirement because the only link to the forum was the plaintiff's location in the forum state.  724 F.Supp.3d at 934; Bouaziz MTD at 17–18.  But X Corp. is distinguishable.  There, the foreign conduct had no connection to California operations or markets when the alleged conduct occurred.  X Corp., 724 F. Supp.3d at 943.  Whereas here, Rippling alleges that the Individual Defendants sought to obtain trade secrets in California specifically to target California customers, employees, and their competing market in the state.  See FAC ¶¶ 187-88.

Because Rippling's claims against the Individual Defendants derive from the above conduct, the claims necessarily arise out of the Individual Defendants' forum-related activities.

### c.    Reasonableness of Exercising Jurisdiction

Lastly, the Individual Defendants bear the burden of showing the exercise of jurisdiction would be unreasonable.  See Ayla, 11 F.4th at 983.  To carry this burden, the Individual Defendants must "present a 'compelling case' that the exercise of jurisdiction would be unreasonable and therefore violate due process."  See id. at 983–84 (citing Boschetto, 539 F.3d at 1016) (internal citations omitted).  Courts use seven factors to evaluate whether jurisdiction would be reasonable:

> [i] the extent of the [defendant's] purposeful interjection into the forum state; [ii] the burden on the defendant of defending in the forum; [iii] the extent of conflict with the sovereignty of the defendant's state; [iv] the forum state's interest in adjudicating the dispute; [v] the most efficient judicial resolution of the controversy; [vi] the importance of the forum to the plaintiff's interest in convenient and effective relief; and [vii] the existence of an alternative forum.

Paccar Intern., Inc. v. Commercial Bank of Kuwait, S.A.K., 757 F.2d 1058, 1065 (9th Cir. 1985).

### iv.    The Extent of Purposeful Interjection

Under the "purposeful interjection" factor, courts examine the extent and significance of the defendant's contacts in the forum state.  See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1132 (9th Cir. 2003).  This factor weighs in favor of a defendant when the defendant's contacts are attenuated.  See id.  The Individual Defendants argue Deel's involvement in the forum state—specifically, its principal place of business as San Francisco—cannot be imputed to them merely because they are corporate officers.  Bouaziz MTD at 18 (citing Corwin v. Swanson, No. 10-CV-769-PSG, 2010 WL 11598013, at *5 (C.D. Cal. Apr. 27, 2010)).  While that is correct as a general principle, as explained above, Rippling alleges individualized conduct by the Individual Defendants that connects them to California, independent of Deel's headquarters.

Because purposeful interjection evaluates the strength of the same contacts that satisfied the express aim prong, and because those contacts were directly targeted at California, this factor weighs in favor of jurisdiction.

### v.    Burden on the Defendant

Next, the Court considers the burden on the defendant of litigating in the forum state.  Courts have recognized that foreign defendants face a "unique [burden]" when they must defend themselves "in a foreign legal system" that should be given "significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  Shields v. Federation of Internationale de Natation, 419 F.Supp.3d 1188, 1211 (N.D. Cal. 2019) (citing Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal., 480 U.S. 102, 114 (1987)).  However, this factor does not tip the scales because "modern advances in communications and transportation have significantly reduced the burden of litigating in another forum."  Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 608 (9th Cir. 2018) (quoting Sinatra v. Nat'l Enquirer, Inc. 854 F.2d 1191, 1199 (9th Cir. 1988)).

The Individual Defendants argue that litigating in California would impose a substantial burden, citing travel distance, time differences, and the availability of Ireland as

United States District Court
Northern District of California

1    an adequate alternative forum.  Bouaziz MTD at 18–19; Westgarth MTD at 8.   However,

2    the availability of Ireland is a FNC consideration and does not alter the personal

3    jurisdiction analysis.  Nonetheless, the Individual Defendants do not reside in Ireland and

4    litigating there would also require long-distance travel and time-zone changes.

5        Although litigation in California is inconvenient for the Individual Defendants,

6    these burdens do not outweigh the contacts underlying Rippling's claims.  See Asahi, 480

7    U.S. at 114 ("When minimum contacts have been established, often the interests of the

8    plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens

9    placed on the [foreign] defendant.").  Considering the mitigating effect of modern

10   transportation and technology, this factor weighs in favor of the Individual Defendants,

11   albeit only slightly.

12                        **vi.    Conflict with Sovereignty of Foreign States**

13       Next, the Court assesses whether asserting personal jurisdiction would conflict with

14   the sovereignty of the Individual Defendants' foreign states.  See X Corp., 724 F.Supp.3d

15   at 921.  Because Rippling's claims arise under United States and California law, the

16   resolution of these claims is unlikely to undermine the sovereignty of Israel and the UAE.

17   Ayla, LLC v. Alya Skin Pty. Ltd., 11 F.4th 972, 984 (9th Cir. 2021) (holding Australian

18   sovereignty was unlikely to be undermined where Plaintiff sought enforcement of its rights

19   under United States trademark law and California unfair competition law); Sinatra, 854

20   F.2d at 1200 (because the foreign defendant served and benefited from the United States

21   market, the "sovereignty considerations weigh less heavily than if no United States-based

22   relationships were established.").  Therefore, this factor also favors exercising jurisdiction.

23                        **vii.    Forum State's Interest**

24       "The forum state has a substantial interest in adjudicating the dispute of one of its

25   residents who alleged injury due to the tortious conduct of another."  CE Distrib., LLC v.

26   New Sensor Corp., 380 F.3d 1107, 1112 (9th Cir. 2004).  The Individual Defendants argue

27   that California has little, if any, interest in resolving a dispute involving foreign parties

28   because the alleged misconduct occurred in Ireland.  Westgarth MTD at 8–9; Bouaziz

1    MTD at 19.  Here, Rippling, not its Irish subsidiary, brings the underlying claims against

2    the Individual Defendants.  If the allegations are taken as true, and the Individual

3    Defendants facilitated the theft of California-based trade secrets to compete with a

4    California company for California customers, then California has a strong interest in

5    adjudicating the dispute.  FAC ¶ 13; X Corp., 724 F.Supp.3d at 945.  This factor supports

6    jurisdiction.

### viii.    Most Efficient Judicial Resolution

8        The Individual Defendants argue "it would be more efficient to resolve the case in

9    the ongoing Irish proceedings that Plaintiff initiated, which . . . center on the same subject

10   matter and facts."  Westgarth MTD at 8–9.  But the most efficient judicial resolution

11   analysis is primarily based on the location of evidence and witnesses.  Freestream, 905

12   F.3d at 609 (internal quotations omitted).  Notably, this factor is "no longer weighed

13   heavily given the modern advances in communication and transportation."  Harris Rutsky,

14   328 F.3d at 1133 (quoting Panavision Int'l v. Toeppen, 141 F.3d 1316, 1323 (9th Cir.

15   1998)).

16       The primary witness to this action is Keith O'Brien and, while he is located in

17   Ireland, has agreed in a sworn declaration to testify in the United States.  O'Brien Decl.

18   (dkt. 102-16) § 1.3(d).  The physical evidence is largely made up of electronic evidence,

19   which has been forensically imaged for ease of access.  Vanessa Wu Decl. (dkt 48-4) ¶ 25.

20   Rippling intends to call witnesses who reside in California and Seattle including Rippling

21   employees who developed the trade secrets, the security team that identified O'Brien as the

22   spy, and the executives who will explain the harm to Rippling.  Opp'n Individual Def.'s

23   MTD at 18–19.  The Individual Defendants argue that many witnesses reside in Ireland,

24   focusing on witnesses who will testify about O'Brien's state of mind during and following

25   the alleged espionage scheme.  Bouaziz MTD at 7; Westgarth MTD at 3.  These witnesses

26   include O'Brien's friends and family, as well as collateral witnesses who may testify that

27   Rippling coerced O'Brien to testify by financing him and intimidating him to the point of a

28   mental breakdown.  Bouaziz MTD at 7; Deel FNC MTD at 2–3.  The Defendants admit,

United States District Court
Northern District of California

however, that this evidence is also available through emails, phone records, and other exhibits.  Deel FNC MTD at 2.  While the admissibility of this physical evidence may implicate issues of hearsay under the Federal Rules of Evidence, and live witness testimony is preferred, evidence of O'Brien's state of mind can be provided by O'Brien's own testimony.

Because the majority of witnesses testifying about central issues are in or near California, and most of the physical evidence is available electronically, at this preliminary stage, the Court finds that this factor weighs in favor of jurisdiction, as well.

### ix.    Plaintiff's Interest

The Ninth Circuit gives little weight to a plaintiff's interest in the forum.  See, e.g., Freestream, 905 F.3d at 609.  Although this factor weighs in favor of Rippling, the focus in asserting specific jurisdiction is on "the defendant, the forum, and the litigation" so it should not sway the analysis in any significant way.  Walden, 571 U.S. at 284 (quoting Keeton, 465 U.S. at 775).

### x.    Existence of an Alternative Forum

"[W]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable."  Ayla, 11 F.4th at 984 (quoting CollegeSource, Inc., 653 F.3d at 1066) (cleaned up).  As discussed above, the Individual Defendants have not shown that California would be an unreasonable forum.  Accordingly, any further analysis regarding Ireland as an alternative forum is reserved for the parties' FNC arguments.

On balance, the factors tip towards jurisdiction, and the Court finds that California is a reasonable forum.  Therefore, Rippling has made a sufficient showing that the Court has specific jurisdiction over the Individual Defendants.

The Court **DENIES** the Individual Defendants' motions to dismiss for lack of personal jurisdiction.

### C.    Forum Non-Conveniens

A party moving to dismiss based on FNC bears the burden of showing (1) there is an adequate alternative forum, and (2) the balance of private and public interest factors

23

favors dismissal.  See Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142–43 (9th Cir. 2001).

A domestic plaintiff's forum choice is entitled to considerable deference.   Ravelo

Monegro v. Rosa, 211 F.3d 509, 513 (9th Cir. 2000) (citing Piper Aircraft Co. v. Reyno,

454 U.S. 235, 256 (1981)).

    The threshold to overcome a plaintiff's chosen forum is high.  The choice will not

be disturbed unless the private and public interest factors strongly favor trial in the foreign

country.  See Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1334 (9th Cir. 1984).  "[T]he

standard to be applied is whether . . . defendants have made a clear showing of facts which

. . . establish such oppression and vexation of a defendant as to be out of proportion to

plaintiff's convenience, which may be shown to be slight or nonexistent."  Cheng v.

Boeing Co., 708 F.2d 1406, 1410 (9th Cir. 1983) (internal quotation marks and citation

omitted).

    "The doctrine of forum non conveniens is a drastic exercise of the court's 'inherent

power' because, unlike a mere transfer of venue, it results in the dismissal of a plaintiff's

case."  Carijano v. Occidental Petroleum Corp., 643 F. 3d 1216, 1224 (9th Cir. 2011).

Because dismissal denies the plaintiff access to a domestic forum, the Ninth Circuit has

emphasized that FNC is "an exceptional tool to be employed sparingly, and not a doctrine

that compels plaintiffs to choose the optimal forum for their claim."  Id. (quoting Dole, 303

F.3d at 1118 (9th Cir. 2002) (internal quotations omitted).  The doctrine's application,

therefore, must be limited to more compelling circumstances, and courts should not

dismiss cases merely because they involve foreign parties or events.  Id.  As the Ninth

Circuit explained, "[j]uries routinely address subjects that are totally foreign to them,

ranging from the foreign language of patent disputes to cases involving foreign companies,

foreign cultures and foreign languages."  Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d

1163, 1181–82 (9th Cir. 2006).

### 1.    Adequacy of the Alternative Forum

    "The defendant bears the burden of proving the existence of an adequate alternative

forum."  Lueck, 236 F.3d at 1143 (quoting Cheng v. Boeing Co., 708 F.2d 1406, 1411 (9th

United States District Court
Northern District of California

Cir.1983)).  This ordinarily requires that the defendant is "amenable to service of process in the foreign forum" and that plaintiff may receive a remedy in that forum.  Id. at 1143–45.

### a.    Amenable to Process

Deel: Deel has already shown it is amenable to service of process in Ireland.  It was served, and then consented to jurisdiction, in the Irish Proceedings.  O'Malley Decl. (dkt. 88-1) ¶ 8.  "[V]oluntary submission to service of process suffices to meet the first requirement for establishing an adequate alternative forum."  Carijano, 643 F. 3d at 1225 (internal quotations omitted).

Individual Defendants: The Individual Defendants have also shown they are amenable to service in Ireland.  Rippling disagrees.  It argues that because Alex Bouaziz is contesting jurisdiction in the Irish proceedings, this undermines Defendants' assertion that Ireland is an adequate alternative forum.  Opp'n to Deel FNC MTD at 7–8.  Further, Rippling argues that Philippe Bouaziz and Dan Westgarth are not named in the Irish proceedings, have no connection to Ireland, and there "is no suggestion that either Bouaziz or Westgarth 'could be compelled to appear in a court there.'"  Id.  Rippling cites Dole for the proposition that a non-resident defendant who contests personal jurisdiction cannot be compelled to appear in a foreign court.  Id. at 8 (citing 303 F.3d at 1118).  But Dole is distinguishable.  In Dole, only one defendant agreed to submit to personal jurisdiction in the foreign forum, and the defendant who did not consent could not be compelled to appear.  303 F.3d at 1118.

Here, in contrast, all Individual Defendants have submitted sworn declarations agreeing to appear in Ireland for this case if the FNC motion is granted.  A. Bouaziz Decl. ¶ 10; P. Bouaziz Decl. ¶ 10; Westgarth Decl. ¶ 8.  Courts routinely find that voluntary submission to jurisdiction in an alternative forum means defendants are amenable to service of process there for purposes of FNC.  See, e.g., Lueck, 236 F.3d at 1143 (foreign forum was available where all defendants agreed to submit to jurisdiction there).  Accordingly, the Court finds that the Individual Defendants have demonstrated that they

are amenable to service process in Ireland.

### b.    Satisfactory Remedy

The next issue is whether Ireland provides "some remedy" for the wrong suffered by Rippling. Carijano, 643 F.3d at 1225–26. A foreign country is not inadequate merely because its laws differ from American law or "offer the plaintiff a lesser remedy than he could expect to receive in the United States." Lueck, 236 F.3d at 1145. "[T]ypically, a forum will be inadequate only where the remedy provided is 'so clearly inadequate or unsatisfactory, that it is no remedy at all.'" Carijano, 643 F.3d at 1226 (quoting Tuazon, 433 F.3d at 1178).

Here, Rippling does not contest that Ireland offers a satisfactory remedy for the underlying claims. See Rippling Opp'n Deel FNC Mot. at 7–8; Rippling Opp'n Individual Def.'s MTD at 16. Moreover, Irish courts provide civil causes of action for tort damages similar to those available in the United States. See Flynn v. National Asset Management Agency, 42 F.Supp.3d 527, 537 (S.D.N.Y. 2014). Although Ireland lacks a direct equivalent to RICO, Irish law recognizes claims addressing fraud and misappropriation of trade secrets and allows recovery of damages under the European Union Trade Secrets Directive. Id.; Peter Bredin Decl. (dkt. 48-1) ¶ 22–23. Courts have consistently held that similar Irish causes of action constitute adequate substitutes for civil RICO and related tort claims. See, e.g., Flynn, 42 F.Supp.3d at 537 (holding Ireland was an adequate forum even though it lacked an identical analogue to civil RICO); Transunion Corp. v. PepsiCo. Inc., 811 F.2d 127, 129 (2d Cir. 1987) (holding that the foreign forum was adequate where plaintiffs could not bring a RICO civil claim or obtain treble damages); Princeton Football Partners LLC, v. Football Ass'n of Ireland, 2012 WL 2995199, at *5 (D.N.J. July 23, 2012) (holding that Irish fraud and tort claims were an adequate substitute to provide redress for plaintiff's civil RICO claims). Irish law also provides remedies for tortious interference with contracts, breach of fiduciary duty, and the other related claims. See, e.g., In re Banco Santander, 732 F.Supp.2d 1305, 1333 (S.D. Fla. 2010) (Ireland provided a remedy for common law claims of breach of fiduciary duty, gross negligence, and unjust

26

1    enrichment); In re Herald, Primeo, & Thema Securities Litigation, 2011 WL 5928952, at

2    *14 (S.D.N.Y. Nov. 29, 2011).

3        Because Ireland provides Rippling with a remedy for each of its claims and all the

4    Defendants are amenable to service of process in Ireland, the Court finds that Ireland is an

5    adequate alternative forum.

6                    **2.    Deference to Rippling's Choice of Forum**

7        "When a domestic plaintiff initiates litigation in its home forum, it is presumptively

8    convenient." Carijano, 643 F.3d at 1227. This presumption is "strong" and may be

9    overcome only "when the private and public interest factors clearly point towards trial in

10   the alternative forum." Piper, 454 U.S. at 255. The degree of deference depends on

11   whether the chosen forum has a genuine connection to the dispute rather than the plaintiff

12   selecting the forum for tactical advantages. Iragorri v. United Techs. Corp., 274 F.3d 65,

13   72–73 (2d. Cir. 2001). Courts have recognized that little deference is accorded to

14   situations where "plaintiff's choice of forum is the result of forum shopping." Williams,

15   157 F.Supp.2d at 1106.

16       Rippling is a U.S. corporation and alleges that it suffered injury primarily at its

17   principal place of business in San Francisco. FAC ¶¶ 13, 187-88. Its choice of a U.S.

18   forum is therefore presumptively convenient. Carijano, 643 F.3d at 1227. Rippling also

19   identifies several witnesses in the United States, and notes that Deel maintains a U.S.

20   headquarters. Opp'n FNC MTD at 6. These facts establish a substantial connection

21   between the forum and the alleged wrongdoing and support that Rippling selected this

22   forum for reasons of convenience. See Iragorri, 274 F.3d at 72–73 (reduced deference

23   where plaintiffs lacked meaningful U.S. ties); Vivendi SA v. T-Mobile USA Inc., 586,

24   F.3d 689, 690 (9th Cir. 2009) (little deference where a French plaintiff sued European

25   defendants over conduct occurring largely in Europe).

26       Defendants rely on Flynn, but that case is distinguishable. 42 F.Supp.3d at 537.

27   There, the plaintiffs' strongest ties were to Ireland, several plaintiffs were domiciled in

28   Ireland, and related litigation had already been initiated in Ireland. Id. Those facts

supported an inference that the plaintiffs selected a U.S. forum for tactical reasons. Id. Here, although the Individual Defendants reside outside the United States and Rippling sought emergency relief in Ireland, Rippling's connection to this forum is substantial as a U.S. corporation alleging injury in the U.S. and identifying relevant witnesses in the country.

Defendants further argue that Rippling's selection of a U.S. forum should be given little weight because it is motivated by forum shopping to obtain the benefits of civil RICO and treble damages. Deel FNC MTD at 4–5; Bouaziz MTD at 10. The record does not support Defendants' conclusion. As explained, Rippling's connection to this forum is substantial: it is headquartered here, alleges injury here, and identifies relevant witnesses here. Moreover, Rippling's related action in Ireland does not undermine its reliance on this forum. Additionally, Rippling initiated the Irish Proceedings to secure emergency relief concerning evidence located there, and they involve different claims based on different factual timelines. FAC ¶ 131; Anton Piller Mot. ¶ 13–14. The circumstances do not show that Rippling viewed Ireland as a more convenient forum for the underlying dispute; rather, the Irish Proceedings were responsive to immediate events and addressed a harm (the obstruction of the Anton Piller order) distinctly felt in Ireland. Id.

The Court finds that Rippling's choice of forum is entitled to meaningful deference. While that deference is not dispositive, it weighs against dismissal absent a strong showing that the balance of private and public interest factors favors litigation elsewhere.

### 3.    Private Interest Factors

The private interest factors include:

(1) the residence of the parties and witnesses;

(2) the forum's convenience to the litigants;

(3) access to physical evidence and other sources of proof;

(4) whether unwilling witnesses can be compelled to testify;

(5) the cost of bringing witnesses to trial;

(6) the enforceability of the judgment; and

(7) all other practical problems that make trial of a case easy, expeditious and inexpensive.

Lueck, 236 F.3d at 1145 (citations and internal quotation marks omitted).  As explained below, the private interest factors weigh against dismissal of Rippling's claims.

### a.    Residence of the Parties and Witnesses and Forum Convenience

The Court's focus "should not rest on the number of witnesses or quantity of evidence in each locale" but instead on "the materiality and importance of the anticipated evidence and witness' testimony and then determine their accessibility and convenience to the forum."  Lueck, 236 F.3d at 1146 (quoting Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1335–36 (9th Cir. 1984)) (internal quotations omitted).

The first private interest factor is the residence of the parties and witnesses.  Here, three out of five of the parties live internationally but, notably, none live in Ireland.  FAC ¶¶ 17–19.  The parties are scattered globally, neither Ireland nor the United States is naturally convenient for everyone, so this factor looks at which forum imposes less of an aggregate burden.  See generally Lueck, 236 F.3d at 1146.  The Individual Defendants do not reside in California: Alex Bouaziz lives in Israel, and Philippe Bouaziz and Dan Westgarth live in the UAE.  FAC ¶¶ 17–19.  Rippling is headquartered in San Francisco and Deel's registered headquarters are also in the city.  FAC ¶¶ 13, 18.  However, Deel asserts its address is merely a mailing address; it does not run its company operations out of California, maintain any documents there, and is actively changing the address to another state.  Deel FNC MTD at 11.  Deel executives assert that Deel does not have any physical presence in California, and its key executives and decision-making personnel do not reside or work in San Francisco or California.  Shuo Wang Decl. (dkt. 48-2) ¶¶ 6–8.  However, in California, a "corporate defendant's state of incorporation and principal place of business is presumptively a convenient forum."  Morris v. AGFA Corp., 144 Cal.App.4th 1452, 1465 (2006).  This presumption of convenience may be overcome by "evidence that the alternative jurisdiction is a more convenient place for trial of the

29

1    action." Id. (internal citation omitted).  As discussed, Deel has significant connections to

2    the forum state, including maintaining a San Francisco address for its regulatory and legal

3    filings.  At this stage, the Court finds it reasonable to conclude that Deel is a resident of

4    San Francisco.

5         The primary witness, Keith O'Brien, is located in Ireland but agreed in a sworn

6    declaration to testify in the United States.  O'Brien Decl. (dkt. 102-16) § 1.3(d).

7    And Defendants plan to call witnesses who will testify about O'Brien's mental health to

8    demonstrate that Rippling allegedly coerced his testimony.  Deel FNC MTD at 2–3.

9    Rippling intends to call witnesses who reside in California and Seattle, including Rippling

10   employees who developed the trade secrets, the security team that identified O'Brien as the

11   spy, and the executives who will explain the harm to Rippling.  Opp'n Individual Def.'s

12   MTD at 18–19.

13        The second private interest factor is the forum's convenience to the litigants.  As

14   discussed, while Rippling and Deel are headquartered in San Francisco, the Individual

15   Defendants live abroad.  However, courts often consider the burden of litigating in another

16   forum "significantly reduced" because of modern advances in transportation.  Freestream

17   Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 608 (9th Cir. 2018).

18        In sum, neither forum is clearly convenient, however, given that three of the five

19   litigants and the primary witness do not reside in this forum, the first two factors weigh

20   slightly in favor of dismissal.

21                   **b.    Evidentiary Considerations**

22        The third private interest factor is the ease of access to evidence.  The Defendants

23   assert that the key physical evidence is located in Ireland: O'Brien's mobile phone and

24   computer, his iCloud account, and Rippling's Irish subsidiary's office system.  Deel FNC

25   MTD at 10.  But as Rippling notes, O'Brien's mobile phone was destroyed, a computer

26   can easily be transported, and the electronic evidence has been forensically imaged and is

27   available electronically.  Opp'n Deel FNC MTD at 12–13; Vanessa Wu Decl. ¶ 25.

28        Deel further argues that obtaining electronic records from Deel or Rippling's Irish

entities for use in this Court could present challenges due to European and Irish data protection regulations.  Deel FNC MTD at 11.  But as the Ninth Circuit has recognized, evidence in the possession of the parties themselves "can be brought to court, no matter the forum."  Lueck, 236 F.3d at 1146.  Deel notes that Lueck observed that foreign documents and witnesses "are not so easily summoned to the United States," but the issue there was about evidence outside the parties' control.  Id.; Deel FNC MTD at 4.  Here, by contrast, the relevant materials are primarily in the parties' or their affiliates' possession and do not present the same obstacles.  Deel's Irish subsidiary follows a privacy compliance framework that permits it to transfer data to its U.S. parent.  See Deel Privacy Framework (dkt. 102-23) at 1 (showing EU-U.S. data privacy framework certification).  On the other end, Rippling stores its information on U.S. servers, so there are no compliance obstacles.  Opp'n Deel FNC MTD at 13; FAC ¶ 67.  Most evidence is purportedly electronically stored and accessible online, so the difficulty of obtaining it in either forum is minimal.

As discussed above, the Defendants plan to call witnesses who will testify about O'Brien's mental health to demonstrate that Rippling allegedly coerced his testimony.  Deel FNC MTD at 2–3.  However, this evidence is also available through O'Brien's testimony.  Deel FNC MTD at 2.  On the other side, Rippling's California and Washington-based witnesses plan to testify about their firsthand account of the underlying events and the harm Rippling allegedly suffered.  Opp'n Individual Def.'s MTD at 18–19.  At this preliminary stage, it appears that the U.S.-based witnesses and O'Brien, who has agreed to testify here, plan to provide testimony about the substantive underlying facts, which is more material than the testimony of Ireland-based witnesses testifying about O'Brien's state of mind.  Deel FNC MTD at 2.  Accordingly, the Court finds that this factor weighs against dismissal.

The fourth private interest factor is whether unwilling witnesses can be compelled to testify.  The Ninth Circuit emphasized that this factor is not about whether there are witnesses "beyond the reach of the compulsory process, but whether it has been alleged or shown that witnesses would be unwilling to testify."  Carijano, 643 F.3d at 1231 (holding

1  the defendant had not shown nor represented any witness unwilling to testify where it

2  merely listed witnesses outside of its control to call to testify).

3        Defendants argue that the outcome of the claims turns on O'Brien's credibility and

4  that his mental state is "central to this action."  Deel Reply MTD (dkt. 113) at 3–5.

5  Because he is accused of lying, Deel argues, there is no reason to think he would

6  voluntarily travel to this forum to testify.  Id.  Additionally, Defendants assert that

7  O'Brien's wife, whom they plan to call to testify as to O'Brien's state of mind, is an

8  unwilling witness.  Deel FNC MTD at 7.  But O'Brien has already signed an agreement to

9  testify in the United States and does not qualify as an "unwilling witness" who would need

10  to be compelled to testify.  At this stage, Defendants have not provided facts—beyond

11  speculation—demonstrating that any of the Irish witnesses, including O'Brien and his

12  wife, are unwilling to testify.  Deel FNC MTD at 8–12; Bouaziz MTD at 7; Westgarth

13  MTD at 3–4.  As Defendants fail to show any witness is unwilling to testify, this factor

14  weighs against dismissal.

15        The fifth private interest factor is the cost of bringing witnesses to trial.  Rippling

16  asserts that it plans to pay O'Brien's travel costs if the trial occurs in San Francisco.

17  Opp'n Deel FNC MTD at 13.  As discussed, most of the material witnesses are located in

18  or near California, and the cost of traveling to San Francisco would be less than traveling

19  to Ireland.  However, the Individual Defendants and several other witnesses will be

20  required to travel, presumably at a significant cost.  On balance, because Rippling assumes

21  the cost of the primary international witness, several witnesses are in California, but other

22  witnesses are located abroad, this factor is neutral

23                    **c.    Enforceability of the Judgment**

24        The sixth private interest factor considers the enforceability of the judgement

25  against Defendants.  "California generally enforces foreign judgments, as long as they are

26  issued by impartial tribunals that have afforded the litigants due process."  Carijano, 643

27  F.3d at 1231–32.  Deel asserts that it "can satisfy any judgment with its Irish assets, and if

28  those are insufficient, will agree to satisfy any judgment awarded."  Deel FNC MTD at 13.

United States District Court
Northern District of California

1    Rippling responds that, because the Individual Defendants are not parties to the ongoing

2    Irish Proceedings and "have not committed to satisfying an Irish judgment," they could

3    resist enforcing the judgment.  Opp'n Individual Def.'s MTD at 20.

4         Neither argument address the central inquiry: whether a judgment issued by Ireland

5    is enforceable against Defendants.  Rippling offers no evidence that an Irish judgment

6    would be unenforceable or that Ireland lacks adequate mechanisms for enforcement

7    against the Individual Defendants if they are joined.  Adding the Individual Defendants to

8    the Irish Proceedings is Rippling's choice, not a barrier to enforcement.  On this record,

9    there is no showing that an Irish judgment could not be enforced, and this factor weighs in

10   favor of dismissal.

### d.    Other Practical Problems

12       The last private interest factor considers all other practical problems that make the

13   trial of a case easy, expeditious, and inexpensive.  Rippling asserts that the underlying

14   claims involve misconduct that is allegedly criminal in nature and "should the U.S.

15   Attorney's Office pursue charges here against the Conspiring Executives, there will be

16   additional convenience to litigating both the civil and criminal cases in the United States."

17   Opp'n Individual Def.'s MTD at 20–21.  This argument lacks any credible facts suggesting

18   that it is likely to happen; for now, it is pure speculation.

19       Additionally, Defendants argue that the Irish Proceedings surround the same

20   overarching conspiracy and that the existence of a parallel action in a foreign forum

21   "weighs heavily in favor of dismissal."  Deel FNC MTD at 12–13; Bouaziz MTD at 8–10.

22   The Amended Irish Complaint, however, distinguishes the scope of the two actions: "As

23   appears from the complaint in the U.S. Proceedings, [Rippling]'s claims against Deel in

24   the U.S. Proceedings are confined to Deel's conduct prior to the time on 14 March 2025

25   when Deel learned that Rippling had discovered its wrongful conduct including civil

26   racketeering and misappropriation of trade secrets."  Amended Irish Compl. ¶ 15.

27       There is substantial overlap in the underlying facts, relevant evidence, and

28   witnesses in both actions, which lends some support to Defendants' argument that it would

1   be more efficient to litigate in a single forum.  But the cases involve different claims,

2   distinct time periods, and separate legal interests.  On this record, the existence of the Irish

3   Proceedings does not meaningfully tip the private interest factors in either direction.

4       The Court finds that the private interest factors weigh slightly against dismissal.

5   The first and second factors, concerning the residence and convenience of the parties and

6   witnesses, favor dismissal.  However, the third factor, the ease of access to sources of

7   proof, weighs against dismissal and is more significant because it focuses on the location

8   and materiality of key evidence and witnesses.  Defendants do not identify any unwilling

9   witnesses, and the cost of bringing witnesses to trial is neutral.  The enforceability of the

10  judgment factor favors dismissal, while the seventh factor, addressing other practical

11  problems, is neutral.  On balance, the private interest factors weigh slightly against

12  dismissal.

### 4.    Public Interest Factors

13  The public interest factors include:

14 (1) the local interest of the lawsuit;

15 (2) the court's familiarity with governing law;

16 (3) the burden on local courts and juries;

17 (4) congestion in the court; and

18 (5) the costs of resolving a dispute unrelated to this forum.

20  Lueck, 236 F.3d at 1147 (citations omitted).

### a.    Local Interest

21      The first public interest factor is the local interest in hearing the dispute.  It focuses

22  on whether "the forum in which the lawsuit was filed has its own identifiable interest in the

23  litigation which can justify proceeding in spite of these burdens."  Carijano, 643 F.3d at

24  1232.  California has such an interest here.  As discussed, California has a significant

25  interest in adjudicating this dispute because Rippling, a California resident, alleges that it

26  suffered injury at its principal place of business in California.  See Dole Food Co., 303

27  F.3d at 1119 (finding a California interest in protecting California-based corporation where

United States District Court
Northern District of California

the core claims alleged fraud and breach of fiduciary duty against Dole U.S.). Moreover, Deel is a corporate citizen of California, and California has a "significant interest in providing a forum for those harmed by the actions of its corporate citizens." Carijano, 643 F.3d at 1232. While the Individual Defendants are not California citizens, they directed their conduct at a California entity and caused local harm here. See FAC ¶¶ 13, 187–88. Because California has a meaningful interest in adjudicating claims involving injury to a resident corporation, and that interest applies to all defendants, the local interest factor weighs against dismissal.

### b.    Judicial Considerations

"The remaining factors all relate to the effects of hearing the case on the respective judicial systems." Carijano, 643 F.3d at 1234.

The second public interest factor is the effect of the governing law. Here, the claims are brought under federal law and California law, which the Court is familiar with. FAC ¶¶ 170–220. This factor weighs against dismissal.

The third public interest factor considers the burden on local courts and juries. Defendants cite Van Schijndel for the proposition that trying this case would impose an unfair burden on local jurors. Deel FNC MTD at 15. But there, the court made that observation where there was no meaningful connection to the forum. Van Schijndel, 434 F.Supp.2d at 782. But here, California does have a concrete interest in the dispute, so local courts and jurors are not unfairly burdened beyond the congestion already present in the courts. Furthermore, courts generally recognize a burden on jurors where specific circumstances—such as language barriers or other factors that complicate the presentation of evidence—would make the case unusually difficult to try. See Fabian v. LeMahieu, 2020 WL 3402800, at *13 (June 19, 2020) (burden on local courts and juries considered evidence that had to be translated from Italian into English). Because no specific circumstances suggest a burden on the court and jurors, this factor weighs against dismissal.

The fourth public interest factor considers the congestion in the courts. This factor

compares which forum—this Court or the alternative one—would result in a speedier trial. Summa Resource Holdings LLC v. Carbon Energy Ltd., No. 15-cv-05334-THE, 2015 WL 2593868, at *7 (N.D. Cal. May 5, 2016). As the Defendants note, the "Northern District is one of the busiest courts in the nation." Deel FNC MTD at 13. Comparatively, in the Irish Commercial Court in 2022 and 2023, 195 of the 232 cases admitted during that period were resolved. Id. (quoting Peter Bredin Decl. ¶ 34). Consequently, it is more likely that Ireland would be a speedier forum, and this factor weighs in favor of dismissal.

The fifth public interest factor looks at the costs of resolving a dispute unrelated to this forum. As explained, California has a significant interest in hearing this litigation and the dispute is related to this forum. As a forum-related dispute, this factor weighs against dismissal.

Because only one factor weighs in Defendants' favor, the Court finds that the public interest factors weigh against dismissal.

### 5. Weighing the Factors

Viewing the factors together, dismissal on FNC grounds is not warranted. Rippling's choice of forum is entitled to meaningful deference, and Defendants have not carried their burden to show that the balance of factors "strongly favors" trial in the alternative forum. Piper, 454 U.S. at 255. The private interest factors weigh slightly against dismissal and the public interest factors do so overwhelmingly.

Considering the deference entitled to Rippling's choice of forum, the Court **DENIES** Defendants' motions to dismiss for FNC.

### D. Individual Defendants' Challenge to the Alternative Service Order

The Individual Defendants move to dismiss under Rule 12(b)(5) because they argue this Court's alternative service order under Rule 4(f)(3) was predicated on factual misrepresentations, and that alternative service is unwarranted when these errors are remedied. Bouaziz MTD at 11–13; Westgarth MTD 10–11. The Court reaffirms the alternative service order because the facts and circumstances Rippling submitted support a finding that the alternative service order was warranted under the Court's discretionary

36

1    authority.  See Rio Props., Inc. v. Rio Intern. Interlink, 284 F.3d 1007, 1016 (9th Cir.

2    2002).  Therefore, service of process was sufficient, and the Court **DENIES** the Individual

3    Defendants' motion to dismiss under Rule 12(b)(5).

### 1. Procedural and Factual Background

5    Rippling filed a motion requesting to serve the summons and related papers on the

6    Individual Defendants through Deel's registered agent and via the email addresses of the

7    Individual Defendants.  Alternative Service Mot. (dkt. 68) at 4.  This Court granted

8    Rippling's motion and ordered that Rippling effect initial service on the Individual

9    Defendants by serving Deel's registered agent and by serving the Individual Defendants at

10   their email addresses.  Alternative Service Order (dkt. 70) at 2.  That same day, Rippling

11   effected service in accordance with the Court's order.  See Certificate of Service (dkt. 98).

### 2. Legal Standard

13   Under Federal Rule of Civil Procedure 12(b)(5), a party may move to dismiss for

14   insufficient service of process.  Fed. R. Civ. Proc. 12(b)(5).  A motion to dismiss under

15   12(b)(5) "is a challenge to the mode or method of service of the summons and complaint."

16   McZeal v. Solon House, LLC, No. 23-cv-00297-KAW, 2023 WL 5002209 at *1 (N.D.

17   Cal. Aug. 4, 2023).

18   Service of an individual in a foreign country is governed by Rule 4(f).  Juicero, Inc.

19   v. Itaste Co., No. 17-cv-1921-BLF, 2017 WL 3996196, at *2 (N.D. Cal. June 5, 2017).

20   "Under Rule 4(f)(3), courts can order service through a variety of methods, 'including

21   publication, ordinary mail, mail to the defendant's last known address, delivery to the

22   defendant's attorney, telex, and most recently, email,' provided that there is no

23   international agreement directly to the contrary."  Juicero, 2017 WL 3996196, at *2

24   (quoting Rio Props., 284 F.3d at 1016).  "[T]he method of service crafted by the district

25   court 'must be reasonably calculated, under all the circumstances, to apprise interested

26   parties of the pendency of the action and afford them an opportunity to present their

27   objections.'"  Rio Props., 284 F.3d at 1016–17 (quoting Mullane v. Cent. Hanover Bank &

28   Tr. Co., 339 U.S. 306, 314 (1950)).

37

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10

Importantly, "court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)"—it "is neither a last resort nor extraordinary relief." Id. at 1015 (internal quotation marks omitted).  A party seeking authorization to serve under Rule 4(f)(3) need not show that all feasible service alternatives have been exhausted, but instead, must "demonstrate that the facts and circumstances of the present case necessitate[] the district court's intervention." Id. at 1016; Trader Joe's Co. v. Desertcart Trading FZE, No. 23-cv-01148-CRB, 2023 WL 3959376 at *9.  "[T]he task of determining when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3)" is committed "to the sound discretion of the district court." Rio Props., 284 F.3d at 1016.

### 3.    Discussion

11
12
13
14
15
16

Dismissal for insufficient service under Rule 12(b)(5) is not warranted for three primary reasons.  First, dismissal under Rule 12(b)(5) is the improper vehicle to remedy the Individual Defendants' alleged harm.  Second, the Court's alternative service order was not prohibited by any relevant international agreement.  Third, the Court had a sufficient factual basis to order alternative service under Rule 4(f)(3).

#### a.    Rule 12(b)(5) and "Fraud on the Court"

17
18
19
20
21
22
23
24
25
26

The Individual Defendants misconstrue both the scope of Rule 12(b)(5) and the effect of their asserted factual error.  They do not contend they lacked notice of this action or that service was delayed, incomplete, or otherwise prejudicial to their ability to respond. Instead, the Individual Defendants argue Rippling "deceptively induced this Court to order alternative service through knowing falsehoods," and, as a result, failed to demonstrate the facts and circumstances justified the Court's alternative service order under Rule 4(f)(3). Bouaziz Mot. at 12.  Based on "fraud on the court," they request the Court to reconsider its alternative service order and dismiss the claims against them pursuant to Rule 12(b)(5). Id. at 13.

27
28

Rule 12(b)(5) allows a defendant to move to dismiss the action for failure to comply with the service requirements of Rule 4.  See Fed. R. Civ. P. 12(b)(5).  It does not follow

that the court must dismiss an action where the plaintiff complied with the court order governing service and the defendant has actual notice of the suit.  See Javier v. Kaiser Foundation Health Plan Inc., No. 20-cv-00725-JD, 2020 WL 5630020, at *1 ("Defects in service are generally excused when the defendant has actual notice of the suit and is not prejudiced by the defects, and the plaintiff has a justification for failing to effect proper service.")

The Individual Defendants rely on In re Levander, 180 F.3d 1114 (9th Cir. 1999), to argue "the Court is within its discretion to dismiss the case for insufficient service of process" because of Rippling's purported deception.  Westgarth Reply at 12–13; see Bouaziz Mot. at 13.  But Levander does not support dismissal under Rule 12(b)(5).  There, the Ninth Circuit held that when a judgment or order is "obtained through fraud on the court," a federal court may exercise its inherent power to amend or vacate that judgment. Levander, 180 F.3d at 1119 (holding that a bankruptcy court may use its inherent power and California Code of Civil Procedure § 187 to amend a judgment to add a judgment-debtor based on fraud on the court).  These concerns are addressed by seeking to amend or vacate the prior order through a motion for relief under Rule 60(b)(3), not by dismissing the underlying claims under Rule 12(b)(5).  See Levander, 180 F.3d at 1119.

Nonetheless, the alleged misrepresentation is that the Individual Defendants were not evading service because Rippling knew of their addresses before filing its motion for alternative service.  Bouaziz MTD at 11.  The Ninth Circuit describes "fraud on the court" as "an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  Abatti v. C.I.R., 859 F.2d 115, 118 (9th Cir. 1988) (quoting Toscano v. Commissioner, 441 F.2d 930, 934 (9th Cir. 1971) (Byrne J. dissenting)).

In its motion, Rippling alleged facts that demonstrated the Individual Defendants were evading service including: (1) Deel did not respond to Rippling's request to identify the Individual Defendants' counsel or provide their contact information; (2) an attempt to serve Alex Bouaziz at his disclosed Paris address was unsuccessful after a family member stated he was in Dubai; and (3) contrary to Deel's recent SEC filings, the Individual

1    Defendants now reside in in Israel and Dubai.  Alternative Service Mot. at 2.  The

2    Individual Defendants argue the prior service attempts on Alex Bouaziz in Paris are related

3    to the Irish Proceedings and the SEC filing addresses are irrelevant because Rippling knew

4    of their current addresses before filing its motion for alternative service.  Bouaziz Mot. at

5    11–12; Westgarth Mot. at 11.  But that information was properly considered, alongside

6    evidence Rippling was unsuccessful in contacting the Individual Defendants' counsel, as

7    part of the overall factual record demonstrating the difficulty of effectuating personal

8    service.  See Alternative Service Mot. (dkt. 68) at 6–8.  The Court considered all the

9    information in the papers filed in connection with the motion and found good cause to

10   authorize alternative service.  Alternative Service Order at 2.  The Court finds that these

11   facts are insufficient to demonstrate "fraud on the court" because they reasonably show

12   Rippling encountered difficulties in serving the Individual Defendants.

13                    **b.    Compliance with International Agreements**

14            Second, the alternative service ordered was not prohibited by international

15   agreement and complied with the Hague Convention procedures.  Alternative service

16   under Rule 4(f)(3) is "not an extraordinary form of relief" and all the Rule requires is that

17   service "must be (1) directed by the court; and (2) not prohibited by international

18   agreement.  No other limitations are evident from the text." Rio Props., 284 F.3d at 1014.

19   The Individual Defendants argue that Rippling sought to avoid the procedures required by

20   the Hague Convention because Israel, where Defendant Alex Bouaziz is located, is a

21   signatory.  Bouaziz Mot. at 12.

22            Phillipe Bouaziz and Dan Westgarth purportedly reside in the United Arab Emirates

23   ("UAE").  Initial Disclosures (dkt. 68-3) at 2–3.  The UAE is not a signatory to the Hague

24   Convention or any other international agreement with the United States regarding service

25   of process, and there are no international agreements prohibiting service by email to a

26   resident of the UAE.  See Facebook, Inc. v. Trabi, No. 20-CV-07348-SK, 2021 WL

27   4942678, at *1 (N.D. Cal. May 3, 2021) (holding that alternative service by email in the

28   UAE is not prohibited by international agreement).  Alex Bouaziz is purportedly a resident

United States District Court
Northern District of California

1   of Israel, a signatory to the Hague Convention.  Initial Disclosures at 2.  However,

2   "numerous courts have authorized effective alternative service under Rule 4(f)(3) even

3   where the Hague Convention applies."  Gen. Star Indem. Co. v. First Am. Title Ins. Co. of

4   Napa, No. 20-cv-03210-TSH, 2020 WL 8614189, at *3.  Notably, the court in Gen. Star

5   held that service through a defendant's U.S.-based counsel and by the defendant's email

6   was not prohibited by the Hague Convention.  Id., at *3–4.  The Court finds that the

7   alternative service order complied with international procedures because alternative

8   service by email is not prohibited in the UAE or Israel.

9               **c.    Basis of Rule 4(f)(3) Order for Alternative Service**

10          Next, Rippling provided sufficient facts and circumstances justifying the Court to

11  order alternative service under Rule 4(f)(3).  Nevertheless, the Individual Defendants

12  advance three arguments to explain why the Court did not have a basis to order alternative

13  service: (1) Rippling misrepresented to the Court that the Individual Defendants "fled" or

14  were "evading service;" (2) Rippling failed to attempt personal service, despite knowing

15  the Individual Defendants' addresses; and (3) Rippling sought alternative service to

16  "manufacture personal jurisdiction" by claiming it served the Individual Defendants in the

17  United States through personal service on Deel's authorized agent.  Bouaziz MTD at 11–

18  12.

19          First, whether the Individual Defendants actually "fled" or were "evading service"

20  does not invalidate the basis of the alternative service order.  Even without these

21  statements in Rippling's motion, the facts and circumstances of the case permitted the

22  Court to use its discretion to authorize alternative service under Rule 4(f)(3).  In its motion,

23  Rippling accurately asserted that because the Individual Defendants are "in locales half a

24  world away" and because no international agreement forecloses Rippling's proposed

25  means of service, "that is reason enough for the Court to grant the motion."  Alternative

26  Service Mot. at 1.

27          Second, Rippling was not required to attempt personal service by other means

28  before requesting alternative service.  Rule 4(f)(3) does not require a plaintiff to attempt

United States District Court
Northern District of California

personal service simply because a defendant's address is known.  As the Ninth Circuit explained, "Rule 4(f)(3) includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means."  <u>Rio Props.</u>, 284 F.3d at 1015.  A plaintiff moving for alternative service under Rule 4(f)(3) "is not required to show that it attempted service through the Hague Convention and did not succeed, or that [the defendant] has evaded or is likely to evade personal service."  <u>Gen. Star</u>, 2020 WL 8614189, at *5.

Third, as explained above, this Court has specific personal jurisdiction over the Individual Defendants.  Therefore, service on Deel's agent in the United States does not need to be the basis to "manufacture personal jurisdiction" upon the Individual Defendants.

The Court finds that the alternative service order was based on sufficient facts and circumstances and ordered methods reasonably calculated to provide notice consistent with Rule 4(f)(3).  Alternative Service Order at 2.  Because Rippling complied with the Court's alternative service order and the service was effective under Rule 4(f)(3), the Court denies the Individual Defendants' motion to dismiss for insufficient service of process under Rule 12(b)(5).

### E.    Failure to State a Claim

Deel argues there is a failure to state a claim for <u>all</u> of Rippling's causes of action.  <u>See</u> Deel 12(b)(6) MTD.  The Individual Defendants move to dismiss the RICO claims against them.  <u>See</u> Bouaziz MTD; Westgarth MTD.  The Court **GRANTS** Deel's motion in part and **DENIES** the remainder, including the Individual Defendants' motion.

### 1.    Legal Standard

Under Rule 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal citation omitted).  And a court must construe the alleged facts in the light most favorable to the plaintiff.  <u>See</u> <u>Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.</u>, 768 F.3d 938, 945 (9th Cir. 2014) (providing the court must "draw all reasonable inferences in favor of the nonmoving party" for a Rule 12(b)(6) motion). Courts, however, are not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>Khoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 1008 (9th Cir. 2018) (internal citation omitted).

In addition, a plausible RICO claim must satisfy Rule 9(b)'s heightened pleading standard and a variety of specific pleading allegations under the statute with respect to the alleged enterprise, predicate acts, injury, and causation.  <u>See</u> <u>Edwards v. Marin Park, Inc.</u>, 356 F.3d 1058, 1065–66 (9th Cir. 2004) ("Rule 9(b)'s requirement that 'in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity' applies to civil RICO fraud claims." (cleaned up)).

### 2.    Discussion

#### a.    RICO, 18 U.S.C. § 1962

To state a claim under Section 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 547 (9th Cir. 2007) (en banc).  "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985) (citing 18 U.S.C. § 1962(c)).

<u>Deel</u>:

Deel first takes aim at Rippling's alleged injury and asserts that it is insufficient, arguing that Rippling fails to even allege that it was proximately caused by the predicate racketeering acts.  <u>See</u> Deel 12(b)(6) MTD at 5–6.  But that is not true.  Rippling identifies at least two prospective customers that purportedly chose Deel instead due to stolen trade secrets.  FAC ¶ 85.  That is sufficient at this stage.

43

Deel then challenges the sufficiency of allegations that there was a RICO enterprise, as well as a pattern of racketeering. Deel 12(b)(6) MTD at 7–9. The test for an associated-in-fact enterprise does not have "a high threshold for pleading." Hamana v. Kholi, 2011 WL 5077614, at *2 (S.D. Cal. Oct. 25, 2011). Rippling sufficiently alleges that there was a coordinated enterprise including more than just Deel and its employees that had a common purpose among members to enrich themselves through racketeering conduct. For example, Rippling alleges that a member of the enterprise, LiquiFi, misappropriated trade secrets with Alex Bouaziz's participation. See FAC ¶ 33.

Rippling also demonstrates a pattern of racketeering. A "pattern" of racketeering activity requires at least two acts of racketeering activity, occurring within a 10-year period. 18 U.S.C. § 1961(5). Rippling plausibly asserts three predicate acts: obstruction of justice, wire fraud, and theft of trade secrets. On obstruction, Rippling sufficiently alleges conduct that, while mostly relating to the Irish Proceedings, also impacts the current litigation. See FAC ¶¶ 130–56; see also Pugin v. Garland, 599 U.S. 600, 608 (2023) (noting that Section 1503 and many other federal obstruction offenses "proscribe obstruction when an investigation or proceeding is not pending"). And despite Deel's argument to the contrary, it is of no consequence that the allegations of wire fraud are not directed at Deel specifically. See Odom v. Microsoft Corp., 486 F.3d 541, 552 (9th Cir. 2007) (not every member has to be involved in each predicate act). And as discussed below, the Court determines that Rippling has at least plausibly stated a claim for misappropriation of trade secrets.

Deel also takes issue with the continuity of the enterprise. Deel 12(b)(6) MTD at 9. But Rippling has adequately pleaded both open- and closed-ended continuity. Rippling has alleged a potential threat of continued criminal activity (open-ended continuity) by pointing to other victims of the purported enterprise. See FAC ¶¶ 33–35; see also Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 449 (9th Cir. 1991) (open-ended community can be established by an ongoing scheme, multiple victims, or the risk of continuing illegal activity). Rippling also alleges closed-ended continuity by showing that the enterprise

44

1    lasted at least a year.  See FAC ¶¶ 43, 49, 134; Grimmett v. Brown, 75 F.3d 506, 512 (9th

2    Cir. 1996) ("[C]ontinuity cannot usually be proven unless the scheme has been in existence

3    for at least one year.").

4        Bouaziz Defendants:

5        The Bouazizes argue that Rippling's RICO claim fails since Rippling is unable to

6    show that it applies extraterritorially for any of the predicate acts.  Bouaziz MTD at 21.

7        For wire fraud, they argue that Rippling's allegations regarding Slack queries to

8    Rippling's U.S. servers and payments through the U.S. banking system are not domestic

9    wires that make the alleged conduct the focus of the wire fraud statute.  Id. at 22.  But

10   Rippling adequately alleges that the Slack queries were used to receive trade secrets from

11   Rippling's U.S. servers and databases.  FAC ¶ 176.  And the Bouazizes' citation to

12   Daramola v. Oracle America, Inc. to show server access is insufficient for

13   extraterritoriality is inapposite, since the case had nothing to do with wire fraud.  92 F.4th

14   833 (9th Cir. 2024).  The "focus of the wire fraud statute [for extraterritoriality] is the use

15   of wires in furtherance of a scheme to defraud."  United States v. Hussain, 972 F.3d 1138,

16   1143 (9th Cir. 2020).  And Rippling has demonstrated a sufficient domestic nexus for these

17   queries.  Moreover, Rippling also alleges that the Bouazizes bribed O'Brien by transferring

18   money "through the United States banking system."  FAC ¶ 176.  That, too, is enough.

19       The Bouazizes also challenge the trade secrets predicate by arguing they did not

20   commit an act in furtherance of the trade secret offense in the U.S.  Bouaziz MTD at 23;

21   18 U.S.C.A. § 1837(2) (expressly permitting extraterritorial application if "an act in

22   furtherance of the offense was committed in the United States").  But the relevant

23   provision "does not require the defendant to have committed such act."  vPersonalize Inc.

24   v. Magnetize Consultants Ltd., 437 F. Supp. 3d 860, 878 (W.D. Wash. 2020) (emphasis in

25   original).  As explained, Rippling already alleges that Deel used Rippling's trade secrets to

26   target its customers and prospects.

27       The argument regarding obstruction similarly fails.  The Bouazizes raise the same

28   argument as Deel—that the alleged obstruction was related to the Irish Proceedings.

45

Bouaziz MTD at 23. And it fails for the same reasons the Court identified.

The Bouazizes again track Deel's argument regarding a proximate RICO injury. See id. at 23–25. But Rippling sufficiently alleges that at least two prospective customers were lost due to the theft of trade secrets. FAC ¶ 85. The Bouazizes fare no better than Deel.

### b.    Conspiracy to Violate RICO

Deel and the Bouaziz Defendants:

Both Deel and the Bouazizes rest their argument against conspiracy on their perceived failure for Rippling to allege a substantive RICO violation. Deel 12(b)(6) MTD at 9; Bouaziz MTD at 26. As the Court has covered, Rippling has successfully alleged a substantive RICO violation. Deel makes the additional argument that Rippling fails to allege a conspiracy "to commit a RICO violation itself." Deel 12(b)(6) MTD at 9–10. Not so. Rippling alleges that Defendants "violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C. § 1962(c) . . . by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering." FAC ¶ 187. "Allegations that the defendants knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise are sufficient to state a claim under Section 1962(d)." Smith v. Levine Leichtman Cap. Partners, Inc., 723 F. Supp. 2d 1205, 1216 (N.D. Cal. 2010).

Westgarth:

Westgarth mainly contends that Rippling does not sufficiently plead that he agreed to be part of the conspiracy and that he knew the nature and scope of the enterprise. Westgarth MTD at 11–13. He concedes that there are at least seven allegations that implicate his purported involvement, but argues that they do not demonstrate that he committed or agreed to commit multiple predicate acts. Id. at 12–13. But the allegation that Westgarth's wife, who is not employed by Deel, sent $6,000 to O'Brien raises the inference that Westgarth was aware of the promise to pay O'Brien €5,000 per month for his espionage and did so surreptitiously through his wife's account. See FAC ¶¶ 60, 64.

1    That would support Rippling's allegations that Westgarth agreed to commit wire fraud.

2    Similarly, Rippling alleges that Westgarth "worked to erase all digital traces of contact

3    with O'Brien," which Rippling claims is obstruction of justice.  FAC ¶ 142.  As to

4    Westgarth's knowledge, a "co-conspirator need not know of the existence or identity of

5    other members of the conspiracy or the full extent of the conspiracy."  In re High-Tech

6    Emp. Antitrust Litig., 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012).  Moreover, it is "clear

7    that a defendant need not participate in all parts of the conspiracy in order to be a part of

8    it."  United States v. Laykin, 886 F.2d 1534, 1540 n.8 (9th Cir. 1989).

9         Westgarth also briefly argues that Rippling has failed to allege a substantive RICO

10   violation.  Westgarth MTD at 14–15.  For the reasons discussed above, for Deel and the

11   Bouazizes, the Court disagrees.

### c.    Misappropriation of Trade Secrets, 18 U.S.C. § 1836

13        Deel seeks to dismiss Rippling's trade secret claim based on its view that Rippling

14   did not adequately take "reasonable measures to keep [Rippling's] information secret."

15   Deel 12(b)(6) MTD at 12–13 (quoting 18 U.S.C. § 1839(3)(A)).  But this is a fact question

16   that "should be answered with evidence at the summary judgment or trial phase, not now."

17   Mastronardi Int'l Ltd. v. SunSelect Produce (California), Inc., 2019 WL 3996608, at *9

18   (E.D. Cal. Aug. 23, 2019) (declining to resolve a question about reasonable measures on a

19   motion to dismiss).  Nevertheless, the Court notes that the complaint does include

20   descriptions of measures that, when viewed holistically, could be deemed reasonable.  See

21   FAC ¶¶ 67 n.25, 192 (identifying restrictions for authorized users, activity logs, multi-

22   factor authentication, biometrics, and confidentiality agreements).

### d.    State Law Claims

24        Deel argues that Rippling's three state law claims are preempted by the California

25   Uniform Trade Secrets Act ("CUTSA").  Deel 12(b)(6) MTD at 12–13.  The Court agrees.

26   CUTSA "preempt[s] claims based on the same nucleus of facts as trade secret

27   misappropriation."  See K.C. Multimedia, Inc. v. Bank of America Tech. & Operations,

28   Inc., 171 Cal. App. 4th 939, 962 (Cal. Ct. App. 2009).  That is the case here.  All three

1    state law claims are inextricably tied to the nucleus of facts of the trade secret theft

2    Rippling alleges.  FAC ¶¶ 200–20.  Accordingly, the claims are preempted.

3        **F.    Motion to Strike and Motion for Attorneys' Fees**

4        Deel also filed an anti-SLAPP motion to strike Rippling's state law claims as well

5    as a motion for attorneys' fees based on its pre-amendment anti-SLAPP motion.  See Dkts.

6    90, 91.  Deel argues that Rippling seeks to premise liability based on its protected activity

7    and free speech rights, requiring Rippling's state law claims to be stricken.  Dkt. 90 at 1.

8    For its fees motion, Deel asserts that it technically "prevailed" on its original anti-SLAPP

9    motion since Rippling removed its CUTSA claim in its amended complaint.  Dkt. 91 at 1.

10   Although the Court has already dismissed Rippling's state law claims, the Court briefly

11   addresses both motions.

12       Deel's anti-SLAPP motion falls short at the gate.  "[A] claim may be struck only if

13   the speech or petitioning activity <u>itself</u> is the wrong complained of, and not just evidence

14   of liability or a step leading to some different act for which liability is asserted."  <u>Park v.</u>

15   <u>Bd. of Trs. of Cal. State Univ.</u>, 393 P.3d 905, 907 (Cal. 2017) (emphasis original).  As

16   exhaustively discussed, Rippling's claims are plainly based on corporate espionage and

17   trade secret theft, not Deel's protected rights.  And Deel's fees motion fares no better

18   because fees are only warranted if Deel's original anti-SLAPP motion (which has the same

19   fatal flaw) would have been successful.  See <u>Evans Hotels, LLC v. Unite Here! Loc. 30</u>,

20   No. 23-55692, 2025 WL 17120, at *3 (9th Cir. Jan. 2, 2025) ("Where a plaintiff abandons

21   its claims after the defendant files an anti-SLAPP motion, the defendant is entitled to fees

22   and costs if it would have prevailed on the merits of its motion.").

23       Accordingly, the Court **DENIES** Deel's motion to strike and motion for attorneys'

24   fees.

25

26

27

28

III.    **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** in part Deel's motion to dismiss for a failure to state a claim and **DENIES** all other motions.

**IT IS SO ORDERED.**

Dated: February 23, 2026



CHARLES R. BREYER

United States District Judge