**RE: *People Center, Inc. d/b/a Rippling v. Deel, Inc. et al.,* Case No. 3:25-cv-02576-CRB**
**Letter Brief re Rippling's Interrogatories 7 and 8**

**Dear Judge Cisneros:** This letter addresses a dispute between the parties related to Rippling's Interrogatories 7 and 8. Fact discovery closes January 15, 2027; expert discovery closes April 30, 2027; dispositive motions are due May 28, 2027; and trial has not yet been set.

**Rippling's Position:** Deel's recent productions remove any doubt that Deel used stolen Rippling customer information received from Keith O'Brien to steal Rippling's customers and prevent their own customers from churning to Rippling. Luke Ferrel, Deel's Head of Customer Success, played a central role in these efforts and *admitted the scheme* in multiple records produced by Deel, including a message to a colleague on December 11, 2024, six weeks into the spying scheme, boasting: "███████████████████████████████████████████████████" Ex. M. Deel's limited productions reveal glaring examples of Deel using specific details about Rippling's customers and sales leads, at scale, to poach or retain accounts for Deel. Given that O'Brien sent Defendants up to six screen-recordings of his spying activity *per day*, for nearly five months—two of which survived Defendants' deletion efforts and contain confidential details about dozens of Rippling customers—this evidence is the tip of the iceberg. Deel received information about *thousands* of Rippling customers, among other stolen trade secrets. Deel shamelessly now claims that Rogs 7 and 8 are burdensome. But the Court already ordered Deel to respond, the parties already agreed to limit Deel's burden, and its own productions demonstrate Rippling's compelling need for complete responses. Deel should not be afforded any leniency for its senior executives' destruction of the most direct evidence of the scope of their misappropriation.

Rippling served Rogs 7 and 8 on May 30, 2025, to identify all companies that Deel contacted based on stolen Rippling information. In January 2026—after this Court ordered Deel to respond (ECF No. 148) and Judge Breyer denied Deel's appeal (ECF No. 162)—Deel agreed to the following:

> ***Rippling [will] provide Deel with a <u>list</u> of the Rippling customers that it claims O'Brien had access to. Upon receiving that list, we can then provide responsive information on those specific customer communications from October 31, 2024 onward[.]***

Ex. A. The information Deel agreed to provide is necessary to identify all customers whom Deel contacted based on stolen Rippling information, since Defendants destroyed the direct evidence. Deel reaffirmed it would respond as agreed *many times*, including in two signed stipulations. But on the June 8 deadline, Deel reneged, asserting ten pages of untimely, waived, and meritless objections, and running a cherry-picked set of .003% of Rippling's list against another cherry-picked subset of Deel's customers, thus rewriting Rog 7 to exclude smoking gun evidence.

The Court should forcefully reject these new objections. As a threshold matter, the Court already ordered Deel to respond. The parties' subsequent agreement on scope is binding, and Deel's belated objections are waived. Deel's position also fails on the merits. The reason that both sides must undertake burdensome discovery is because Defendants destroyed evidence. Rogs 7 and 8, as limited by the parties' agreement, would reduce the burden by identifying likely acts of misappropriation. Deel's refusal to respond—after *months* of saying it would—has prejudiced Rippling and violated the Court's Order. The Court should order Deel to respond as agreed.

**Background:** In February, Rippling warned that the customer list Deel requested would contain "tens of thousands" of customers, due to the scope and duration of the spying scheme. Deel never objected. Rippling then expended significant resources to compile the list. On March 25, Rippling identified ~58,500 companies and provided a detailed explanation for how it created the list. *See* ECF No. 237 at 1–2; Rothstein Decl. ¶¶ 10–15. Again, Deel did not object. But in late April, after six weeks of radio silence, Deel walked back its commitment, forcing Rippling to file a unilateral

6232469                                                              **FILED UNDER SEAL**

brief on May 8 (ECF No. 237). Deel quickly backed down and *stipulated* on May 15 that it would "make a good faith effort to run the full list of 58,500 customers and prospective customers, and provide responses to Interrogatories Nos. 7 and 8 by May 29, 2026" (ECF No. 255).

Deel reaffirmed that stipulation many times: on May 20, confirming it would use the "Rippling customer list" (i.e., the ~58,500 companies) and that Rippling's HC-AEO designation would not interfere, because Deel's employees did not need access to the list (Ex. D at 4); on May 27, stating it was "actively working with [its vendor] to generate the information necessary to respond to the interrogatories" (Ex. E at 2); again on May 27, stipulating to an extended June 8 deadline and telling the Court it was making a "good faith effort to provide responses" (ECF No. 262); and on June 5, re-confirming it would respond by June 8. Ex. D at 2. But on June 8, without warning or attempt to confer, Deel reneged. Instead of responding, Deel asserted nine new objections to Rippling's customer list (Ex. 1 at 16–19), including (for example) demands that "Deel's forensic expert" analyze it and that Rippling "identif[y] the date on which it claims O'Brien viewed [each individual] company name" (an obvious impossibility, since Defendants destroyed the recordings showing which specific messages O'Brien viewed on which dates). Deel also asserted eight objections to the interrogatories themselves (*id.* at 19–21), despite having already lost a motion to compel responses and then agreeing to respond. Deel now seeks to limit its response to the overlap between two improperly narrowed lists: (i) the "Search Term List" (Deel's defined term) of 204 companies that Deel cherry-picked from the Rippling customer list, and (ii) customers whom Deel contacted *for the first time* after October 31, 2024. *Id.* at 12. The result is a skewed list of nine matches (Ex. 2) that *omits* smoking gun evidence of contemporaneous links between stolen Rippling customer information and Deel's outreach to its existing customers.

**Argument:** As a threshold matter, Deel's new objections are untimely and waived. Deel already litigated Rogs 7 and 8, and the Court ordered responses. ECF No. 148. Judge Breyer *denied* Deel's appeal and ordered the parties to seek clarification regarding the scope of the responses. ECF No. 162. The parties met and conferred and, ultimately, agreed in writing to limit Deel's responses to customers O'Brien accessed as part of the spying scheme that Deel contacted after the spying scheme began. Deel's failure to respond as agreed is thus a violation of the Court's Order.

Deel's objections also fail on the merits, because they would conceal key evidence of Defendants' theft. ***First***, omitting all companies Deel contacted *before* October 31, 2024 ignores the evidence that Deel used stolen information to retain *existing* customers. "Customer A" in Rippling's FAC (▮▮▮▮▮) is a perfect example. In October 2024, ▮▮▮▮▮ moved some employees from Deel's service to Rippling's. FAC ¶ 84. On the ***same day*** that O'Brien accessed that information, Luke Ferrel emailed ▮▮▮▮: "*word on the street* is that you're looking at signing with one of our competitors." Deel's Search Term List of 204 customers *includes* ▮▮▮▮, but its limiting constraint omits it because it was an *existing* Deel customer.

As another example, on February 23, 2025, at 4:00 pm, a Rippling employee posted in Slack about a conversation with "▮▮▮" at a client called ▮▮▮▮, noting the company recently closed an "▮▮▮" funding round, was moving an employee in ▮▮▮▮ to Rippling's EOR product, and wanted to move "everyone from Deel to Rippling." Ex. F. At 6:33 pm, O'Brien previewed that channel. Deel's evidence shows that at 7:02 pm, Alex Bouaziz messaged Luke Ferrel and Chris Lee (Deel's Head of Sales) stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. G. Alex confirmed that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" to which Ferrel responded, "▮▮▮▮▮." *Id.* At 7:19 pm, Ferrel relayed the information to others, stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮

6232469

██████████████ " Ex. H. When asked how he knew this, Ferrel responded: "█████████████ ██████████ " *Id.* ████████ , like ████████ , is on Deel's list of 204 companies but omitted from Deel's response. Rippling describes a third example in the accompanying declaration, and to be clear, there are many more. Deel's last-minute refusal to respond to Rogs 7 & 8 is intended to bury this type of smoking gun evidence and shows that Deel—which is controlled by the Individual Defendants—still refuses to participate in discovery in good faith.

**_Second_**, by limiting the response to only 204 Rippling customers, Deel's responses are incomplete and exclude relevant evidence of the Defendants' theft. The list of 204 includes only the companies O'Brien recalled months after the scheme ended and companies he used as *keywords*. It does *not* include the thousands of other customers O'Brien viewed, screen-recorded, and sent to Deel CEO Alex Bouaziz *each day*. For example, O'Brien's *most*-previewed Slack channel during the scheme was #deal-desk-sales—an automated feed that posts ████████████████████ ██████████ (often hundreds of times *per day*). O'Brien searched #deal-desk-sales and channels like it daily. The only two surviving recordings of this searching activity contain confidential information about *dozens* of Rippling customers. At the rate described in O'Brien's sworn testimony—*six* video recordings *per day* for nearly *five months*—O'Brien would have sent information about thousands of Rippling customers to Deel. Deel's limited productions to date prove that Deel used that information. *See* Rothstein Decl. ¶¶ 13–16. To identify the full extent of Deel's misuse of Rippling customer information, Deel must identify the companies it contacted during or after the spying scheme whom Rippling has forensically confirmed were accessed by O'Brien. Deel represented to Rippling and the Court multiple times that it would do so; it cannot renege now that it has seen the list of overlap and does not like the results.

Finally, by concealing its intent to renege and repeatedly telling Rippling and the Court that it would respond in "good faith," Deel stalled the resolution of this dispute and forced Rippling to brief it twice. Rippling therefore also requests to submit a fee application for this second brief.

**Deel's position:**

Interrogatory ("Rog") No. 7 asks Deel to identify *every customer or potential customer that it has contacted over a 20 month period*—essentially the full scope of Deel's business and sales development activities over a nearly 2 year period. Rog No. 8 asks Deel to identify how it obtained that customer. (Declaration of Quyen Ta ("Ta Decl."), ¶ 3.). The Rogs are overbroad, disproportionate to the needs of this case and untethered to Keith O'Brien and the alleged "spying scheme." As the Court noted in its 11/7/25 Order (Dkt. No. 148), "discovery must be limited to those matters that the plaintiff truly contends are secret. Otherwise the discovery mechanism, and the litigation itself, could become a tool to force a defendant to reveal its own trade secrets in defense against unfounded or special claims." (Dkt. No. 148 (quoting *Social Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *2 (N.D. Cal. June 14, 2012).) Rippling seeks to obtain Deel's customer lists even though these interrogatories are not tethered to O'Brien's alleged *conduct*. The reasoning that this Court endorsed from *Social Apps* applies here—the customer list used to generate a response to this interrogatory must be a list that Rippling contends is secret, and it must be one that Rippling contends O'Brien misappropriated. In late March, Rippling provided Deel with an astounding list of **58,500 prospects and customer names** from over 300 slack channels that O'Brien may or *may not* have viewed over the course of a five month period. Since Deel's new team came onboard in late April after two of Skadden's lawyers departed, the team has been working diligently to reach resolution. (*See* Ta Decl. at ¶ 5.)There has been no stonewalling and no reneging on any commitments. Deel respectfully requests that the Court order the parties to focus on the 204 customers and/or prospects contained in what Deel explains below as either "the KOB List" or "the Search Term List."

6232469

**Background**: On January 5, 2026, Judge Breyer "refer[red] the parties back to Judge Cisneros for a determination on the scope of Interrogatories 7 and 8." (Dkt. No. 162.) Instead of going back to Judge Cisneros, the parties engaged in extensive efforts to try to resolve this dispute. There are no orders setting the proper scope of Rogs 7/8 and Deel has not violated any court orders by responding to these interrogatories subject to its objections. It is disingenuous for Rippling to repeatedly contend that Deel has violated a court order when no such court order exists. Deel does not object to providing discovery relating to any confidential information that O'Brien allegedly sent to Defendants about customers or prospects **so long as there is a reasonable nexus to O'Brien.** In fact, Deel already provided Rippling with vast amounts of discovery related to over 204 customers or prospects, each of which is included on the 58,500 list. This briefing exchange has highlighted the most reasonable solution here—Deel should respond to Rogs 7 and 8 based on the 204 company names. Deel is willing to accept Rippling's interpretation of the interrogatory, such that Deel's response is *not* limited to only those companies whose initial communication occurred after 10/31/24—i.e., Deel would provide information about the initial communication with any of these 204 companies from 10/31/2024 to the present.

Four months after Rippling served Rogs 7 and 8, O'Brien submitted a declaration in support of Rippling's September 19, 2025 opposition to Deel's motion to dismiss. (*See* Ta Decl., Ex. 1 (Dkt. No. 128-3 (contains HC-AEO material)).) Rippling purportedly showed O'Brien (1) records of his Slack channel previews and searches; (2) screenshots that O'Brien took from Rippling's computer systems; (3) screen recordings; (4) screenshots from Excel documents that O'Brien created showing lists of Rippling's customers in a particular country for specific products; and (5) a portion of O'Brien's browser history from his Rippling-issued work computer. (*See id.*) After reviewing the records of his Slack channel previews and searches, ***O'Brien declared that he "recall[ed] sharing information" with Alex Bouaziz about 21 companies.*** (*See id.* ¶ 3.) The Declaration, records, screenshots, and recordings include additional company names beyond those O'Brien recalled, ***for a total of 54 company names***. (Ta Decl. ¶ 11.) Deel refers to this list as **the "KOB List."** Then, on January 26, 2026, Rippling's counsel explained that the list of 200 company names it provided to Deel to use as search terms was "derived from the keyword searches that [Rippling allegedly knew] O'Brien used to search Rippling's internal systems." (**the "Search Term List"**) (Ta Decl. ¶ 6(b); Ex. A to Rothstein Decl. (1/26/26 Email from Rothstein to Lloyd).)

Deel has already provided discovery to Rippling based on the KOB List of 54 companies and the Search Term List of 200 companies. Due to some overlap, these two sources produced 204 customer names or prospects. [1] These 204 names yielded approximately 510,000 documents with hits. With family members, a total of 819,000 documents were reviewed and responsive non-privileged documents were produced by June 5, 2026. (*See* Ta Decl. ¶ 12.) This document review, which was a portion of the broader document review in this case, cost Deel millions of dollars in attorneys fees and costs. (*See* Ta Decl. ¶ 13.) Although Deel reserves all rights with regard to the KOB List/Search Term List, Deel agreed to conduct discovery on both of these lists. Rippling's counsel disagreed and represented that the list should consist of every single customer name or prospect that O'Brien *may* have previewed in 304 Slack channels over the course of 5+ months (*See* Ta Decl. ¶ 6(e); Rothstein Decl., 2/11/26 Email from Rothstein), even if he did not actually view the information or did nothing with it. On February 9, **Deel objected** to Rippling's representation that the list could consist of "tens of thousands, or even hundreds of thousands of Rippling's customers," and noted that such a list "seems implausible at best, and is significantly disproportionate to the approximately 200 company names included in Rippling's proposed search terms…" (Ta Decl. Ta Decl. ¶ 6(d); Rothstein Decl., Ex. A, 2/9/26 Email from Lloyd to Rothstein.) Rippling ignored Deel and generated a list of ~58,500 company names in late March.

---

[1] Contrary to Rippling's misstatement, Deel did not "hand-pick[]" these 204 companies. Rather, the list came directly from Rippling and its paid witness, Keith O'Brien.

6232469

It directed Deel to run this list against Deel's Salesforce database to generate a response to Rog 7. Deel disagreed, but continued to meet and confer throughout May. Deel agreed to engage a third-party vendor and ran the 58,500 names against its own CRM/Salesforce database, which was expensive and time consuming. From June 4-8, Deel's counsel analyzed results and determined that the results were unreliable for at least two reasons. First, Deel could not determine whether certain "matches" were an actual match due to slight discrepancies in company names. (*See* Ta Decl. ¶ 23.) Second, Deel could not validate the "first activity" data field because the results were inconsistent with documents in the review database. *Id.* For these and other reasons,[2] on June 8, 2026, Deel supplemented its responses to Rogs 7 and 8 using only the KOB/Search Term List. This matching exercise generated ***only nine company names*** as a potential match in Deel's Salesforce data with an initial contact after October 31, 2024, which were provided to Rippling in Exhibit A.[3] (Ta Decl. ¶ 25; Rothstein Decl. Exs. 1 and 2.)

**Argument:** Deel's willingness to engage in this exercise does not negate the irrelevance, unreasonableness, overbreadth, and lack of foundation objections to the 58,500+ List. There are a number of reasonable options short of forcing Deel to reveal information relating to thousands of companies Deel contacted over the course of 20 months that has nothing to do with O'Brien.

*First*, the parties should conduct discovery on the ***54 companies*** that were listed in the O'Brien Declaration and exhibits. (*See* Ta Decl., Ex. 1.) While Deel does not agree with numerous facts in the Declaration, it at least attempts to provide a factual basis from which to compile a list of Rippling customers and sales leads that O'Brien says he recalls providing to Deel.

*Second*, if the Court wishes to give Rippling the benefit of the doubt, the Court should order the parties to focus on the 54 customers/prospects above, *and* the 200 customers and prospects that Rippling's counsel represented O'Brien searched in Rippling's internal systems. The two lists overlap and total 204 companies, most of which are included in the 58,500+ Rippling List. Deel has already run these terms against the review population and produced documents as part of its productions made on or before June 5, 2026. Deel will still have to investigate whether O'Brien was accessing those companies as part of his official work duties, but at least this list is tethered to O'Brien's ***conduct***. Notably, all three examples provided in Rippling's portion of this letter are contained within the list of 204 companies. As Deel offered on June 15, 2026, Deel is willing to re-run the matching exercise using the 204 companies and respond with a list of all companies whom Deel has contacted since October 31, 2024, even if it is not the first contact, which should include the three examples Rippling cites above.

*Third,* to the extent the parties should consider the 58,500+ List, Rippling has executed a cooperation agreement with O'Brien and should have him review its list, narrowing it to companies that he recalls sharing with Defendants. This is critical because Rippling has not provided any evidence at this juncture that O'Brien actually viewed the names Rippling has culled from its Slack channels.[4] Discovery should not devolve into a fishing expedition of any company name that may *or may no*t have passed before O'Brien's eyes during a 5- month period. The Court should order the parties to first focus on the 204 companies, with the option of expanding based on the evidence.

---

[2] Deel's counsel was unable to consult with its own client to understand and validate the results generated by the matching exercise due to the HC-AEO designation and Rippling's counsel refused to downgrade the designation so Deel personnel could meaningfully participate and assist counsel.

[3] On June 11, 2026, Rippling challenged Deel's interpretation of the interrogatory as seeking the list of customers or prospects whom Deel has contacted for the first time after October 31, 2024. (*See* Ta Decl. Ex. 2.)

[4] This is especially important given the information provided for the first time in the Rothstein Declaration indicating that the 58,500+ List includes company names from "all posts from the ***year prior to the first 'preview' event***." (Rothstein Decl. ¶ 13(ii).)

6232469

| | |
|---|---|
| _/s/ Eric H. MacMichael_ | _/s/ Quyen L. Ta_ |
| Eric H. MacMichael | Quyen L. Ta |
| Attorney for Plaintiff Rippling | Attorney for Defendant Deel |

I hereby attest, pursuant to Local Rule 5-1(i)(3), that I obtained the concurrence in the filing of this document from the signatories indicated by the conformed signature (/s/).

_/s/ Eric H. MacMichael_
Eric H. MacMichael
Attorney for Plaintiff Rippling

6232469