KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
ERIC H. MACMICHAEL - # 231697
emacmichael@keker.com
ANDREW F. DAWSON - # 264421
adawson@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
BENJAMIN D. ROTHSTEIN - # 295720
brothstein@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Plaintiff PEOPLE CENTER, INC. D/B/A RIPPLING,
a Delaware corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DEEL, INC., a Delaware corporation, ALEXANDRE (“ALEX”) BOUAZIZ, an individual, PHILIPPE BOUAZIZ, an individual, DANIEL JOHN (“DAN”) WESTGARTH, an individual, and DOES 1 – 100,<br><br>Defendants. | Case No. 3:25-CV-2576-CRB<br><br>**OPPOSITION TO DEEL’S MOTION FOR EVIDENTIARY SANCTIONS**<br><br>Date: November 13, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Dept.: 6<br><br>Date Filed: March 17, 2025<br>Am. Compl Filed: June 5, 2025<br><br>Trial Date: None Set |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................................1

II. BACKGROUND ....................................................................................................2

A. Rippling identifies then-employee Keith O'Brien as a suspected spy for Deel. ....................................................................................................2

B. Rippling's GC designs and successfully executes a "honeypot" that proved O'Brien was working for Deel. ....................................................................................................3

C. After a "wasted" year of no discovery, additional damning evidence against Deel begins to mount. ....................................................................................................5

1. Defendants' Interrogatory Responses ....................................................................................................5

2. Deel's Document Productions ....................................................................................................6

3. Forensic Data From Alex Bouaziz's iPhone ....................................................................................................7

III. ARGUMENT ....................................................................................................9

A. The Court Should Deny Deel's Motion as Untimely ....................................................................................................9

B. California's Rules Permit the Lawful Covert Investigation at Issue Here ............10

C. Rippling's GC Used a Legitimate Investigative Prop—Not "Falsified Evidence" —to Elicit Evidence of Unlawful Wrongdoing ....................................................................................................13

D. Deel Fails to Show Bad Faith ....................................................................................................14

IV. CONCLUSION ....................................................................................................15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Apple Corps Ltd. v. Int'l Collectors Soc.*,
15 F. Supp. 2d 456 (D.N.J. 1998) ............ 11, 12, 13

*Broan-NuTone, LLC v. Conglom Hong Kong Ltd.*,
802 F. Supp. 3d 1085 (E.D. Wis. 2025) ............ 12, 13, 15

*CogniPower LLC v. Samsung Elecs. Co.*, No. 2:23-CV-00160-JRG, 2024 WL 128207 (E.D. Tex. Jan. 11, 2024) ............ 14

*In re Frantz*,
655 B.R. 594 (B.A.P. 9th Cir. 2023) ............ 15

*Impossible Foods Inc. v. Motif Foodworks, Inc.*,
675 F. Supp. 3d 448 (D. Del. 2023) ............ 13

*People v. Smith*,
40 Cal. 4th 483 (2007) ............ 14

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
115 F.3d 644 (9th Cir. 1997) ............ 15

*United States v. Carona*,660 F.3d 360 (9th Cir. 2011) ............ 1, 12

*Witt v. Ross*,
No. 5:25-CV-02776-BLF, 2025 WL 2968025 (N.D. Cal. Oct. 20, 2025) ............ 15

**Other Authorities**

California Rule of Professional Conduct 1.0(a) ............ 11

California Rule of Professional Conduct Rule 1.0(b)(1) ............ 15

California Rule of Professional Conduct Rule 4.1 ............ 10, 11, 12, 13

California Rule of Professional Conduct Rule 8.4 ............ 10, 12, 13

## I. INTRODUCTION

Deel asks this Court to punish Rippling for the sin of protecting itself; namely, outsmarting Deel's senior executives and catching them red-handed in the act of stealing Rippling's trade secrets, and bringing an end to Deel's spying scheme.

For five months until they were caught, Deel's seniormost executives—CEO Alex Bouaziz, CFO and Board Chair Philippe Bouaziz, and COO Daniel Westgarth—exfiltrated Rippling's trade secret information on a daily basis through a Rippling employee they corrupted in exchange for illicit crypto payments. They stole core product and business strategy trade secrets such as Rippling's product roadmap, global expansion plans, sales and marketing strategies, and customer information. Deel's recent productions confirm that Alex Bouaziz directed the spying scheme and weaponized the stolen trade secrets within hours of receiving them, instructing trusted lieutenants across the company to use information from Deel's [redacted] (Deel Head of Customer Success Luke Ferrell's words) for maximum gain. Deel's motion ignores this evidentiary record and asks the Court, nearly eighteen months after Rippling exposed the scheme, to blame Rippling.

But the complaints of crooks caught in a lawful sting should fall on deaf ears. Rippling's "honeypot" trap, executed by then-general counsel Vanessa Wu, used an approach that the California Rules of Professional Conduct expressly permit and that established caselaw condones: "lawful covert activity" for the purpose of catching "violations of civil or criminal law." Cal. R. of Pro. Conduct 8.4, Comment 5. Wu did exactly that, and nothing more. Deel's position is at odds with widely accepted investigative practice that prosecutors use every day to catch criminals.

There are numerous reasons Deel's motion fails. First, Deel unjustifiably delayed nearly eighteen months in bringing it, violating Local Rule 7-8(c). Deel has known the facts underlying its motion since Rippling disclosed them in its March 17, 2025, Complaint. The delay exposes this motion as a strategic ploy to exclude the mounting, highly inculpatory evidence against Defendants. The Court should deny it for that reason alone.

Second, there was no ethical violation. The plain text of the California Rules of Professional Conduct and applicable case law permits covert activity, like Wu's, in both "civil and criminal" matters in which attorneys use covert techniques to catch suspected wrongdoers in the act. Indeed,

allowing the "wrongdoer to immunize himself against such undercover operations" based on a purported violation of the Rules—as Deel asks this Court to do—would be "***antithetical to the administration of justice***[.]" *United States v. Carona*, 660 F.3d 360, 365–66 (9th Cir. 2011). And Deel's argument that Wu "falsified evidence" attempts to confuse the Court. Rippling disclosed the mechanics of the "ruse" in its first pleading in this case. *See* ECF 1 ¶¶ 95–100. If Wu's letter were "falsified evidence," then *every* undercover operation would be improper. That is not the law.

Third, even if there were a rules violation—there was not—Deel cannot receive sanctions because it cannot show Rippling acted in bad faith. Getting Deel's executives to expose their unlawful conduct was not bad faith, nor was publicizing the honeypot and its outcome—particularly after Deel and the individual Defendants categorically, loudly, and publicly denied Rippling's well-supported allegations. And given the mounting evidence that Deel's seniormost executives orchestrated a five-month corporate espionage scheme and coverup effort, Deel's argument that *Rippling* acted in "bad faith" is the height of hypocrisy.

Finally, there is the audacity of bringing this motion in the first place. Deel's trade secret stealing spree might well have continued without detection had Rippling's General Counsel not sent the "honeypot" letter. This was, fundamentally, a defensive act, done out of necessity by the *victim* of a criminal scheme. The notion that Rippling and its General Counsel should face sanctions and not be permitted to introduce clear evidence of Deel's unlawful acts turns the ethical rules on their head. The Court should reject this cynical manipulation of the ethical rules—in service of unethical ends—and deny Deel's motion.

## II. BACKGROUND

### A. Rippling identifies then-employee Keith O'Brien as a suspected spy for Deel.

Rippling became suspicious that an employee was leaking confidential information on February 18, 2025, when a reporter at *The Information* emailed Rippling about a forthcoming article concerning Deel's Russia-related sanctions activity. ECF 1 ("Complaint") ¶ 83. The reporter's email quoted confidential internal Rippling Slack messages from thirteen different sanctions-related channels. *Id.* ¶ 84. In response, Rippling gave the reporter the complete Slack discussions and explained that it has never transmitted a payment to a sanctioned country, individual, or entity.

The reporter's disclosure of Rippling's confidential internal Slack messages caused Rippling to open a security investigation immediately. *Id*. Rippling reviewed Slack activity logs and discovered that a single employee, Keith O'Brien, had searched for sanctions-related keywords in the days immediately before and after the reporter's email to Rippling. *Id*. ¶¶ 85–86. But O'Brien's searches related to sanctions compliance were just the tip of the iceberg. Rippling also learned that, beginning in November 2024, O'Brien's Slack activity showed a dramatic uptick in searching and previewing activity. Starting in November 2024, he began running dozens of keyword searches per day and previewing dozens of Slack channels unrelated to his job function. *Id*. His most common keyword was "***Deel***." *Id*. ¶ 65.

**B. Rippling's GC designs and successfully executes a "honeypot" that proved O'Brien was working for Deel.**

Based on this discovery and other evidence linking O'Brien to Deel, Rippling suspected Deel was directing his spying activity and decided to run a test (the "honeypot") to confirm its suspicions. *Id*. ¶ 93. Rippling designed the honeypot based on its belief that Deel might activate O'Brien if Deel perceived potential reputational damage (as it apparently did in connection with the article in *The Information*). Rippling therefore crafted a letter to Deel containing information that, if disclosed publicly, would cause negative press for Deel. *Id*. ¶¶ 93-95.

As a first step, Rippling Chief Revenue Officer Matt Plank authored a Slack message stating a true fact: Deel had canceled a former employee's vested equity because he joined Rippling. *Id*. ¶ 95. Mr. Plank's message stated that he saw the information "*in the #d-defectors [Slack] channel.*" Those four words were not accurate: Rippling did not learn the information *from that channel*. *Id*. ¶ 96. In reality, #d-defectors channel was a "ruse." It had only one member—Mr. Plank—and no content. No one at Rippling (apart from the investigations team) knew of or had ever viewed it, and the only way any other Rippling employee could find it would be searching for the channel's name (not "Deel" or any of the keywords O'Brien had used since November 2024). *Id*. ¶ 99. The channel "existed only as bait for Deel, and [O'Brien] could not have known [it] existed absent a connection between himself and Deel[.]" *Id*. ¶ 97. ***Rippling's Complaint disclosed all of these facts***.

On March 3, 2025, Rippling's then-General Counsel, Vanessa Wu emailed the letter to Deel's board chair and formerly self-identified General Counsel, Philippe Bouaziz, and Deel's

Head of U.S. Legal, Spiros Komis, and addressed it to Deel's outside employment counsel.[1] *Id*. at ¶ 94. Within mere hours of Wu sending the letter, O'Brien ran extensive searches in Rippling's Slack for the terms "d defector," "defector," and "Matt Plank," and viewed the channel five times, leaving no doubt that Deel and its senior leadership were directing his spying. *Id*. ¶¶ 97-100.[2]

On March 12, 2025, Rippling obtained an ex parte order from the Irish High Court requiring O'Brien to turn over his phone for preservation and inspection. An independent solicitor served the order on O'Brien at Rippling's Dublin office on March 14. O'Brien hid in a bathroom, wiped his phone, and then fled the building. Rippling filed its Complaint three days later.

On March 27, 2025, O'Brien retained counsel and began cooperating with Rippling. On April 1, 2025, he signed a detailed affidavit (ECF 57-1), testifying that Alex Bouaziz directed his spying activities daily on a Telegram channel set to 24-hour auto-delete, and that Alex and Philippe Bouaziz paid him roughly $6,000/month—first by routing the money through an account owned by the wife of Defendant Westgarth (Deel's COO), then via crypto payments administered by a third party known to O'Brien only as "A.D." (aka "the Watchman"). He testified that, after he fled Rippling's office on March 14, Alex Bouaziz put him in touch with two Deel lawyers, Asif Malik and David Mieli, who instructed him to "stick with the program," destroy evidence of the scheme (including his phone), procure a burner phone to receive further instructions, and make false statements to Irish regulators and Deel's Irish attorneys that Rippling was retaliating against him for reporting sanctions violations. O'Brien also detailed the extensive Rippling confidential information that Defendants directed him to steal, appending to his declaration the few examples he was able to recover from an iCloud backup of his destroyed phone.

Despite this detailed testimony and corroborating evidence (including payment records and preserved screen-recordings of stolen information), Deel and the individual Defendants have categorically denied the spying scheme.

---

[1] The email address entered for Deel's outside employment counsel contained an inadvertent typographical error.

[2] In a verified interrogatory response, Alex Bouaziz admits that, within hours of Wu sending the honeypot letter to Deel, he sent O'Brien a Telegram message (set to auto-delete) in which he "informed" O'Brien of "the existence of the channel." Ex. A at 9.

### C. After a "wasted" year of no discovery, additional damning evidence against Deel begins to mount.

For the first year of this lawsuit, Defendants refused to engage in discovery. The individual Defendants refused outright, invoking jurisdictional objections, and Deel refused to produce any documents or respond to any interrogatories until Judge Cisneros ordered it. Even then, Deel excluded from its Court-ordered responses all facts known to the individual Defendants—the three Deel employees with the most relevant knowledge by far—after which Rippling moved for sanctions (ECF 202), Judge Cisneros entered a tentative order granting Rippling's motion (ECF 247), and Deel agreed to pay more than $66,000 in Rippling's attorneys' fees (ECF 259). At the hearing, Judge Cisneros described 2025 as a "wasted" year in this litigation. Ex. B at 57:21.

After the Court denied Defendants' motions to dismiss (ECF 174) and Judge Cisneros granted several discovery motions in March 2026 (ECF 179), Defendants finally began producing discovery. Defendants' interrogatory responses, nascent document productions, and the forensic data produced thus far from Alex Bouaziz's iPhone are damning. They confirm O'Brien's account and reveal that Defendants destroyed critical evidence after Rippling caught them. The examples below show why Rippling's honeypot was essential.

#### 1. Defendants' Interrogatory Responses

In late March 2026, Defendants admitted dozens of incriminating facts from O'Brien's Affidavit. Deel admits:

- On November 4, 2024, Defendants paid $6,000 to O'Brien, whom they knew at the time to be employed by Rippling, and they routed the payment through Deel COO Daniel Westgarth's wife to conceal its origin (Ex. C at 9);
- Defendant Philippe Bouaziz introduced O'Brien to "A.D." (aka "the Watchman"), the individual who made monthly crypto payments to O'Brien from December 2024 through March 2025 (*id*. at 11);
- From October 2024 through March 2025, Alex Bouaziz corresponded with O'Brien on a Telegram chat set to auto-delete, in which O'Brien sent him information about "customers leaving Deel to go to Rippling" (*id*. at 12, 15);
- Alex Bouaziz asked O'Brien to tell him "whether Rippling had certain product capabilities relating to French payroll systems" (*id*. at 14);
- Alex Bouaziz was the one who told O'Brien about the "#d-defectors" channel in Wu's honeypot letter (*id*. at 17);
- Deel in-house attorneys David Mieli and Asif Malik were in frequent contact with

O'Brien between March 14 and March 25, 2025 (*id*. at 20–22); and

- Bouaziz and Westgarth were participants in a three-way WhatsApp chat with O'Brien until March 20, 2025—three days after Rippling filed its Complaint—when they exited the chat (*id*. at 27).

Despite these admissions, Defendants insist they did nothing wrong, offering "alternative explanations" that strain credulity. For example, they say they paid O'Brien—***a Rippling employee***—because he asked Alex Bouaziz, CEO of its competitor, for a no-strings-attached $6,000 "gift" to cover living expenses; Alex referred the request to CFO Philippe because Alex "does not handle the company's finances," and Philippe approved it. Ex. E at 7–8; Ex. F at 7. Defendants say O'Brien asked that the gift "not come from Deel" because Rippling might monitor his accounts, so Defendant Westgarth (Deel's COO) personally routed it through his own wife's account. Ex. F at 7; ECF 202-10 at 8. This makes no sense and becomes even less plausible in light of Deel's productions, discussed below, which confirm its receipt and use of stolen Rippling trade secrets, often immediately after O'Brien stole the information.

**2. Deel's Document Productions**

Slack messages recently produced by Deel confirm that Alex Bouaziz used O'Brien as a spy. Bouaziz shared specific Rippling-customer details mirroring information O'Brien viewed hours earlier. When [redacted], Deel executive Luke Ferrel said: "[redacted]" Ex. H. Ferrel similarly wrote: "[redacted]" Ex. I. He then added, "[redacted]"—evidence of consciousness of guilt and intent to destroy evidence. *Id*.

For example, on February 23, 2025, a Rippling employee posted a Slack message about a client conversation with "[redacted]" at [redacted] and said the company recently closed a funding round, was moving an employee in [redacted] to Rippling's EOR product, and wanted to move "[redacted]." Ex. J. O'Brien viewed the channel at 6:33 pm. At 7:02 pm, Bouaziz told Ferrel: "[redacted]." Ex. K. Bouaziz identified "[redacted]" as the client representative and said "[redacted]"; Ferrel responded, "[redacted]" *Id*. at 7:19 pm, Ferrel

wrote to others, "[redacted]" Ex. L. When asked how he knew, Ferrel replied: "[redacted]" *Id.*

Despite Defendants' incomplete productions, Rippling has identified other Deel Slack messages in which Bouaziz shared specific Rippling-customer details within hours of O'Brien accessing the same information. Rippling described these examples in recent motion practice before Judge Cisneros (ECF 286 at 1–3; ECF 286-3) and in interrogatory responses to Deel.

**3. Forensic Data From Alex Bouaziz's iPhone**

The forensic data on Alex's iPhone—which Alex only began producing in recent weeks after the Court denied his motion for relief from Judge Cisneros' order on July 20 (*see* ECF 324)—is perhaps most damning. Preliminary findings show that Deel and Alex lied about their communications with O'Brien, that Alex and Philippe were directly involved in the crypto payments, and that Alex destroyed other relevant communications.

*Alex's Communications with O'Brien.* It is now clear that Deel and Alex lied about Alex's communications with O'Brien, and that Alex destroyed evidence of them—including after legal proceedings commenced. First, Alex lied about and deleted messages he exchanged with O'Brien on the same day, and immediately after, the independent solicitor confronted O'Brien with an evidence-preservation order. O'Brien testified that, after fleeing Rippling's office on March 14, 2025 (at 10:38 UTC, per the Irish independent solicitor's report), he logged into LinkedIn through his phone's browser and messaged Alex, and Alex called him and then responded to him on LinkedIn. ECF 57-1 at 6–8. Deel and Alex deny in their interrogatory responses that Alex sent "any LinkedIn message to Mr. O'Brien" that day. Ex. C at 19; *see also* Ex. E at 9, 18. [redacted].

Second, [redacted] *all* of his LinkedIn messages with O'Brien, which he admits dated back to 2023. Ex. E at 6.

Third, Alex destroyed evidence of WhatsApp communications with O'Brien. [redacted]

[redacted].

Fourth, there are no preserved Telegram messages between Alex and O'Brien, consistent with the 24-hour auto-delete O'Brien describes. Alex did *not* use that setting universally: [redacted]

*"A.D." Crypto Payments.* O'Brien testified that Defendants placed him in a Telegram chat with Philippe and "A.D." (aka "the Watchman") to coordinate crypto payments for spying. ECF 57-1 at 3–4. Blockchain records show approximately $6,000 in monthly Ethereum transfers from an unregistered wallet (presumably A.D.'s). Alex and Philippe admit Philippe introduced O'Brien to A.D., but claim he is a second-hand luxury watch dealer and that they introduced O'Brien to him as a favor, so that O'Brien could earn fees referring luxury watch buying opportunities. Ex. F at 7. They deny further involvement. But Alex's forensic data shows:

[redacted]

*Destruction Of Evidence.* Alex appears to have deleted other relevant communications after litigation began. He represents that he produced all documents discussing communications between him/Deel and O'Brien. Presumably, that would include communications with Asif Malik, the Deel lawyer in daily contact with O'Brien from March 14 to March 27, 2025. It is clear that many such communications existed during that exact period: [redacted]

[redacted] But Alex has not produced or logged a single message with Malik.

Additional "Notifications" data from the week after Rippling filed its Complaint shows numerous active text chats presumptively related to the litigation, including [redacted] The total number of messages was greater because notifications omit outgoing messages and messages received while the phone was unlocked. Alex has neither produced nor logged *any* of these messages. This recent discovery—not facts first disclosed seventeen months ago—explains the timing of Deel's motion.

## III. ARGUMENT

Deel's motion should be denied. It is untimely because Deel waited seventeen months after learning of the challenged conduct, filing only after recent discovery confirmed the evidence Rippling pleaded, and it fails on the merits. California's Rules of Professional Conduct permitted Wu's lawful effort to investigate Defendants' alleged criminal enterprise, including signing the honeypot letter. Wu did not falsify evidence: The letter was an investigatory prop. It is not being offered for the truth of the matters it asserts; rather, it is evidence of what it elicited.

### A. The Court Should Deny Deel's Motion as Untimely.

The Court should deny Deel's motion—and need not reach the merits—because Deel violated Civil Local Rule 7-8(c), which requires a sanctions motion to "be made as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate[.]" Civ. L.R. 7-8(c). Deel knew those circumstances by ***March 17, 2025***, when Rippling alleged that Wu's letter was a "ruse designed to confirm that Deel was instructing [Deel's spy] to search for specific information in Rippling's Slack." (ECF 1 ¶ 96). Yet Deel waited nearly ***eighteen months***, filing only after damaging discovery confirmed it could not prevail on the merits.

Deel offers no plausible justification. It says "Rippling's recent discovery responses and [Rippling CEO Parker] Conrad's public statements describe the mechanics" (Deel's Mot. Sanctions "Mot.," ECF 395, at 3) and cites those sources rather than Rippling's Complaint. But the conduct it now challenges—a letter from Wu containing disinformation about a Slack channel designed to

test Deel's response—was plainly disclosed in Rippling's March 2025 Complaint. Those facts were more than sufficient to present the legal theory it advances now.

Courts in this District routinely deny sanctions motions under Local Rule 7-8(c) after unjustifiable delays of similar or shorter length. In *Zeleny v. Newsom*, the court rejected a motion filed approximately a year and a half after the movant learned of the conduct, holding that "[i]n no way did that timing comply with Local Rule 7-8(c)." 2020 WL 6585793, at *6 (N.D. Cal. Nov. 10, 2020). In *Siebert v. Gene Sec. Network, Inc.,* the court denied sanctions after an eight-month delay—less than half the time at issue here. 2014 WL 5808755, at *2 (N.D. Cal. Nov. 6, 2014).

The Court should reach the same result. Local Rule 7-8(c)'s "as soon as practicable" standard is not just a procedural formality; it reflects the substantive judgment that sanctions motions must be brought promptly to serve their deterrent purpose. Deel's unexplained delay belies any claim that it seeks to deter unethical conduct or protect the proceedings' integrity. Instead, it suggests a strategic effort to exclude mounting evidence of Deel's unlawful spying scheme. The motion should be denied on timeliness grounds alone.

### B. California's Rules Permit the Lawful Covert Investigation at Issue Here

Deel has not established a violation of California Rule of Professional Conduct 8.4(c), which prohibits dishonesty, fraud, deceit, or misrepresentation, or Rule 4.1, which prohibits false statements of material fact to third parties. As Deel concedes, Comment 5 to Rule 8.4 ("Comment 5") provides that Rule 8.4(c) "does not apply" when a lawyer "advises clients or others about, or supervises, ***lawful covert activity*** in the investigation of violations of civil or criminal law." Rule 4.1's commentary directs lawyers to Comment 5, and the State Bar's adoption materials confirm that the exception "appl[ies] equally" to false statements under Rule 4.1 and dishonest conduct under Rule 8.4(c). State Bar of California, Executive Summary for Proposed Rule 4.1 at 1–2.

Wu's conduct was quintessential lawful covert activity. Like an undercover officer expressing a desire to buy drugs, Wu used a prop to elicit a response from a suspected wrongdoer solely to confirm ongoing misconduct—and it worked. Deel concedes that Wu's advising and supervising the operation was permissible; it argues only that she crossed an ethical line by signing the letter. Mot. at 11–12. On that theory, Wu could devise the honeypot, draft the Slack message

and letter, select the recipients, and instruct someone else to transmit it—but signing the same letter would make the conduct unethical and the evidence inadmissible. That hair-splitting argument is the crux of Deel's motion, yet it fails for several reasons.

First, the plain text of the Rules extends the "lawful covert activity" exception to lawyers' "false statements." The commentary to Rule 4.1 (which prohibits lawyers from "mak[ing] a ***false statement*** of material fact or law to a third person") expressly cross-references Comment 5. Deel's reading would make that cross-reference meaningless by prohibiting every attorney's "false statement of material fact," including statements that otherwise constitute lawful covert activity. *Cf.* State Bar of California, Exec. Summary for Proposed Rule 4.1 at 1 (describing protected conduct as lawyer "***participat[ion]*** in lawful covert activity"); *Carona*, 660 F.3d at 365–66 (no ethical violation where prosecutors signed a false subpoena for a cooperating witness to use as a "prop" in conversations with a criminal defendant). Deel's reading contradicts the Rules' text.

Second, excluding statements like Wu's from the "lawful covert activity" exception would conflict with the Rules' purpose: to "protect the public, the courts, and the legal profession; protect the integrity of the legal system; and promote the administration of justice and confidence in the legal profession." Rule 1.0(a). Wu's conduct served those goals by detecting evidence that Deel and the individual Defendants were stealing Rippling's trade secrets. Her correspondence was integral to the design: Wu was the lawyer to whom Deel had recently written, so a response from her was the viable channel of communication. Mot. at 5. No other Rippling employee had a plausible reason to correspond with Deel executives as an outlet for the investigative attempt.

Third, the relevant cases support Rippling's position. In *Apple Corps Ltd. v. Int'l Collectors Soc.*, 15 F. Supp. 2d 456 (D.N.J. 1998)—the leading case on this issue, which Deel fails to cite or address—the court held that the professional rules did not prohibit outside counsel from contacting an investigation target, posing as a customer, and making a purchase to determine whether the target was violating a consent decree. *Id.* at 462–64, 474–76. New Jersey's rules lacked an express counterpart to Comment 5, but that did not affect the result. The court explained:

> ***The prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically proscribed, especially where it would***

***be difficult to discover the violations by other means.***

*Id*. The court further explained that Rule 8.4 should reach only misconduct grave enough to call the lawyer's fitness into question. *Id*. The lawyer's conduct in *Apple Corps* did not rise to that level, and Wu's conduct was even less deceptive: She used her real name, communicated through an existing channel, and sent the letter to Deel's senior in-house counsel and Board Chair. She did not pose as someone else, contact low-level employees, or ask Deel to take wrongful action. She merely provided a responsive prop to test whether Deel's senior leadership *was already engaging in wrongful action*.

*United States v. Carona* underscores the point. There, prosecutors supplied a cooperating witness with fake subpoena attachments to provoke a corruption suspect's response. 660 F.3d at 365–66. The Ninth Circuit called the documents investigative "props" and their use a permissible "stratagem," explaining that "[i]t would be antithetical to the administration of justice to allow a wrongdoer to immunize himself against such undercover operations[.]" *Id*. at 365–66. The defendant challenged the conduct under the no-contact rule rather than Rules 4.1 or 8.4(c), but that distinction reinforces the point: *Carona* treated this investigative technique as permissible. Deel's theory would turn the lawful "stratag[em]" approved in *Carona* into misconduct and give wrongdoers the very immunity that *Carona* rejected as "antithetical" to the administration of justice. And like Comment 5 to Rule 8.4(c), the court drew no distinction between criminal and civil investigations, and the fact that it was a criminal prosecutor played no part in the decision.

Deel identifies no contrary authority: Each of the three cases it relies on involved different ethical rules and materially different conduct. In *Broan-NuTone, LLC v. Conglom Hong Kong Ltd.*, 802 F. Supp. 3d 1085 (E.D. Wis. 2025), outside counsel made a false warranty claim to induce a foreign defendant to ship a replacement component into the United States, then relied on that shipment to ***create personal jurisdiction***. *Id*. at 1107–11. The court distinguished *Apple Corps* on the grounds that (a) the fake warranty claim "did *not* merely serve to detect an ongoing violation of law," it also served to "manufacture . . . personal jurisdiction over Defendant," and (b) the client falsely denied the lawyer's involvement in its answer to the defendant's counterclaims. *Id*. at 1111–13. Neither of those distinguishing factors are here. The *Broan-NuTone* court also emphasized

commentary in the Wisconsin rules warning that "[w]hen the lawyer personally participates in the deception, . . . serious questions arise." *Id.* at 1110. In contrast to Wisconsin's approach, California's State Bar describes Comment 5 as permitting a lawyer's "participation" in lawful covert investigations. Executive Summary for Proposed Rule 4.1 at 1.

*Dareltech, LLC v. Xiaomi Inc.*—discussed in the footnote Deel cites from *Impossible Foods Inc. v. Motif Foodworks, Inc.*, 675 F. Supp. 3d 448, 461 n.8 (D. Del. 2023)—is likewise inapposite. *Dareltech* involved an attorney who concealed his identity, questioned a ***represented*** litigation adversary ***after*** litigation began, and secretly recorded it. 2019 WL 10966202, at *1–5 (S.D.N.Y. Apr. 11, 2019). The decision applied the no-contact rule—which Deel neither cites nor relies on—not the rule against dishonest statements. Wu's letter does not implicate *Dareltech*'s rule of decision: it was a *pre-litigation* letter under her own name to Deel's *counsel*.

*United States ex rel. Leysock v. Forest Labs., Inc.* is even farther afield. 2017 WL 1591833 (D. Mass. Apr. 28, 2017). There, lawyers directed investigators to create a fake medical study to induce physicians to disclose confidential patient information. *Id.* at *7–11. *Leysock* did not address the issue raised by Deel's motion—whether "lawful covert activity" covers false statements by *attorneys*—because the investigators, not the lawyers, executed the deception. And the court held that the lawyers violated the ethics rules because the fake study targeted "***wholly innocent*** physicians who are neither accused nor suspected of participating in the alleged scheme" and knowingly intruded on the legally protected physician-patient relationship. *Id* at *9–11 (emphasis added). Wu did nothing of the sort: She caused wrongdoers to reveal their wrongdoing, in which they had no legally protected privacy interest. *Leysock* is wholly consistent with *Apple Corps* reasoning that Rule 8.4 should reach only misconduct sufficiently grave to call the lawyer's fitness into question; Deel's argument is not.

In sum, the plain text of Rules 4.1 and 8.4(c), their stated purpose, and applicable case law, foreclose Deel's argument, and Deel has not identified any cases—and there are none—finding unethical conduct in circumstances even remotely analogous to this case.

### C. Rippling's GC Used a Legitimate Investigative Prop—Not "Falsified Evidence" —to Elicit Evidence of Unlawful Wrongdoing

Deel's claim that Wu "falsif[ied] evidence" is meritless. Mot. at 12 (citing Cal. R. Pro.

Conduct 3.4). It conflates the investigative prop with the evidence it produced. Rippling does not offer the screenshot as proof that "#d-defectors" was real; its Complaint disclosed that the channel was a "ruse." ECF 1 ¶¶ 95–100. Rippling relies instead on genuine evidence of Defendants' ***response***: Deel's spy searched for "d-defectors" within hours of Deel receiving the letter, proving Deel directed an espionage scheme. *Carona* likewise approved fake subpoenas as investigative "props" used to elicit genuine evidence. 660 F.3d at 365–66. The background evidence shows why that covert method was necessary here: Defendants denied the scheme and destroyed communications that ordinary discovery cannot recover.[3]

Deel's reliance on *CogniPower, LLC v. Samsung Elecs. Co.* is misplaced. There, a lawyer altered a discovery document and used it as a deposition exhibit. 2025 WL 5148586, at *4–6 (E.D. Tex. Mar. 18, 2025), *report and recommendation adopted*, 2025 WL 5148477 (E.D. Tex. Mar. 31, 2025). Here, Rippling used a pre-litigation investigative prop to elicit genuine evidence of ongoing unlawful misconduct. Neither Rippling nor Wu altered the discovery record or presented a falsified document to the Court or a witness; Rippling disclosed the honeypot's nature in its first filing. The evidence it elicited of Defendants' unlawful conduct is 100% real. Indeed, it is because the evidence elicited from the honeypot letter is so real, so incriminating, and so indefensible that Deel has resorted to this meritless attack.

Deel's proposed rule would have extraordinary consequences: It would bar *any* evidence generated through a lawful investigative ruse designed to expose wrongdoing, in either a civil or criminal context. That is not the law: the Ninth Circuit and California Supreme Court have rejected any right of wrongdoers not to be "dece[ived]" into revealing criminal behavior. *Carona*, 660 F.3d at 366–67 (citing cases); *People v. Smith*, 40 Cal. 4th 483, 505 (2007) (rejecting suppression of evidence elicited through "sham test" and collecting cases).

### D. Deel Fails to Show Bad Faith

Deel's request also fails because it cannot establish the bad faith required for evidentiary sanctions. The question is not whether Rippling deliberately designed the honeypot to elicit a

[3] Deel's argument that Wu's letter "altered" a document "having potential evidentiary value" is equally meritless. Nothing was altered; Wu's letter and the Slack message from Plank that it screen-shotted were real documents, created as props to expose Deel's unlawful misconduct.

response; of course it did. The question is whether Wu *willfully* violated an ethical rule or otherwise abused the judicial process. *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997); *cf.* Rule 1.0(b)(1) (only a "willful violation" of the Rules "is a basis for discipline"). Wu did neither. Wu had a legal basis to conduct a lawful covert investigation into an ongoing trade-secret-misappropriation scheme, and Rippling fully disclosed the "ruse" in its very first pleading. Recent discovery has confirmed that its suspicions were well-founded. That record cannot support a finding of bad faith. *See, e.g., In re Frantz*, 655 B.R. 594, 604 (B.A.P. 9th Cir. 2023) (reversing sanctions finding because the attorney's position had a reasonable legal basis); *Witt v. Ross*, No. 5:25-CV-02776-BLF, 2025 WL 2968025, at *3 (N.D. Cal. Oct. 20, 2025) (rejecting sanctions where movant failed to show "improper purpose").

In any event, Deel identifies no prejudice that could justify the extraordinary exclusionary remedy it seeks. It does not contend that Wu obtained privileged information, invaded a protected attorney-client relationship, or misled the Court, a witness, or a jury into believing that "#d-defectors" was authentic. Nor could it: Rippling disclosed that it was an investigative "ruse" at the outset. The evidence Rippling relies on is not the fictitious Slack channel as proof of its contents. It is the smoking-gun evidence the operation elicited. Nor has Rippling used bad faith tactics in this case, unlike in *Broan-NuTone*, in which sanctions followed not merely from the investigation itself, but from the plaintiff's and its counsel's false denials, misrepresentations to the Court, and discovery obstructionism. 802 F. Supp. 3d at 1114–18.

Here, sanctions would not "rectify [an] improper effect" of attorney misconduct; it would create one. *U.S. v. Sierra Pac. Indus.*, 857 F. Supp. 2d 975, 984 (E.D. Cal. 2011). Suppressing the actual response to the honeypot would not restore any privileged communication, cure any unfairness, or prevent use of falsified evidence. It would instead insulate Defendants from highly probative evidence of their own conduct after receiving the letter—a result that the Ninth Circuit has described as "antithetical to the administration of justice." *Carona*, 660 F.3d at 365–66.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Deel's motion for evidentiary sanctions.

Dated: September 18, 2026

KEKER, VAN NEST & PETERS LLP

By: */s/ Eric H. MacMichael*
ELLIOT R. PETERS
ERIC H. MACMICHAEL
ANDREW F. DAWSON
NICHOLAS S. GOLDBERG
BENJAMIN D. ROTHSTEIN

Attorneys for Plaintiff PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation