LANCE A. ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
CAROLINE VAN NESS (SBN 281675)
caroline.vanness@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

ALLEN L. LANSTRA (SBN 251510)
allen.lanstra@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JORDAN FEIRMAN (*pro hac vice*)
jordan.feirman@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West, 395 9th Avenue
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

*Counsel for Defendant and Counterclaimant Deel, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DEEL, INC., a Delaware corporation, ALEXANDRE (“ALEX”) BOUAZIZ, an individual, PHILIPPE BOUAZIZ, an individual, DANIEL JOHN (“DAN”) WESTGARTH, an individual, and DOES 1-100,<br><br>Defendants. | Case No. 3:25-cv-02576-CRB<br><br>**DEEL’S REPLY IN SUPPORT OF MOTION FOR EVIDENTIARY SANCTIONS**<br><br>Compl. Filed: March 17, 2025<br>Am. Compl. Filed: June 5, 2025<br>Judge: Hon. Charles R. Breyer<br>Courtroom: 6<br>Hearing Date: November 13, 2026<br>Hearing Time: 10:00 a.m. |

DEEL, INC., a Delaware corporation,

Counterclaimant,

v.

PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation; PARKER ROUSE CONRAD, an individual; KEITH O'BRIEN, an individual; and DOES 1-100,

Counter-Defendants.

## SUMMARY OF ARGUMENT

Pursuant to the Court's General Standing Order, Deel provides the following Summary of Argument. Nothing in Rippling's Opposition (ECF No. 403, "Opp.") provides any basis to deny the relief requested by Deel in its Motion for Evidentiary Sanctions (ECF No. 395, "Mot.").

### 1. Rippling's General Counsel Violated the Ethical Rules

Rippling devotes a great deal of its Opposition to recounting heavily disputed allegations that are wholly irrelevant to the Motion, and which stem from other efforts to coerce testimony from its central (but highly compromised) witness, Keith O'Brien. This is just an unfortunate sideshow, and should not distract from the reality that all of the pertinent facts concerning the "honeypot" scheme, Sham Letter, and actions of Rippling's former General Counsel, Vanessa Wu, are *undisputed*.

Rippling concedes that (i) the Sham Letter included falsehoods, (ii) Wu knew of the falsity, and (iii) Wu signed and sent the Sham Letter as General Counsel, falsely styled as a response to Deel's outside counsel. As set forth in the Motion, those actions violate ethical rules—*e.g.,* the prohibitions in Rules 4.1 and 8.4 of the California Rules of Professional Conduct, respectively, that a lawyer "shall not knowingly . . . make a false statement of material fact or law to a third person," or "engage in conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation." Cal. R. Prof. Conduct §§ 4.1(a), 8.4(c). None of Rippling's attempts to sidestep the plain language of these Rules is credible.

#### a. Rippling's Strained Reading of a Comment to the Rules Has No Merit

Rippling first posits a tortured interpretation of a *comment* to the Rules that merely recognizes that ethical rules are not necessarily violated "where a lawyer advises clients or others about, or supervises, lawful covert activity . . . provided the lawyer's conduct is otherwise in compliance with these rules." *Id.* § 8.4, cmt. [5]. Yet as that language makes clear, this exception extends to "advis[ing]" and "supervis[ing]" others—*not* to attorneys themselves making misrepresentations, let alone doing so in their capacity as counsel and in communications with opposing counsel. Rippling suggests that a general cross-reference to this comment in the comments to Rule 4.1 creates an implication that the Rules intend that the "lawful covert activity" exception also covers attorney falsehoods, but there is no support for that strained reading. Nor does or can Rippling explain why, if the Rules sought to permit attorneys themselves to engage in falsehoods, the Rules do not simply and expressly provide for that exception.

In any event, Rippling's position has been squarely rejected by authorities, and even those cases relied on and quoted by Rippling only further confirm that the ethical rules do *not* permit Wu's conduct. *See, e.g., Apple Corps Ltd. v. Int'l Collectors Soc'y*, 15 F. Supp. 2d 456, 475 (D.N.J. 1998) (quoted at Opp. at 11-12 in connection with rules governing a lawyer's "use of an undercover investigator").

**b. Other Exceptions Implied by Rippling Have No Application Here**

The ethical rules impose "sweeping prohibitions" on lawyer dishonesty. *Leysock v. Forest Labs., Inc.*, 2017 WL 1591833, at *6 (D. Mass. Apr. 28, 2017). Rippling nevertheless raises arguments and cites authorities that concern two limited and narrow exceptions to that rule: (1) undercover operations for prosecutors or government attorneys, and (2) retention of investigators to pose as ordinary consumers. I*d.*

Neither exception applies to Wu's conduct. Rippling's self-righteous analogizing of its GC to an "undercover officer expressing a desire to buy drugs" (Opp. at 10) does not grant her any additional limited latitude that may be afforded to law enforcement in certain circumstances. Nor does Rippling's disputed contention that its scheme was ultimately fruitful serve to bless or excuse the ethical violation. The second exception cannot apply because Rippling's GC is neither an investigator nor were the Sham Letter and "honeypot" scheme related to discovering the experience of ordinary consumers or members of the public.

**c. Rippling's GC Improperly Used Doctored Evidence to Elicit a Response**

Rippling's GC also violated Rule 3.4, which forbids attorneys from "unlawfully alter[ing] . . . a document" or "falsify[ing] evidence." (Mot. at 12 (citing Cal. R. Prof. Conduct § 3.4(a), (c)).) This conclusion follows from *CogniPower, LLC v. Samsung Electronics Co.*, which found that these rules are violated when an attorney attempts to "elicit[] testimony based on an altered document." 2025 WL 5148586, at *1 (E.D. Tex. Mar. 18, 2025), *report and recommendation adopted*, 2025 WL 5148477 (E.D. Tex. Mar. 31, 2025). Rippling's only response is to reiterate an argument that the *CogniPower* court *rejected*—namely, that the fraudulent document was a "prop" disclosed as fake after the response was elicited, and was not itself intended to be used as evidence. (Opp. at 14.)

**2. <u>The Requested Relief Is Narrowly Tailored and Appropriate</u>**

Rippling pivots to arguing that, even if there is an ethical violation, Deel simply has no recourse. Each of Rippling's arguments to that end mischaracterizes both the facts and the law.

**a. Rippling's "Bad Faith" Argument Fails on Multiple Grounds**

Rippling is wrong to contend that "bad faith" is required for sanctions to be entered here; there is no such standard under the local and ethical rules. *See* Mot. at 8 (citing *Jackson v. Taylor*, 2022 WL 17477938, at *3 (N.D. Cal. Sep. 19, 2022) (sanctions imposed without consideration of bad faith)).

With respect to the independent ground for sanctions—the Court's inherent authority—Rippling misstates and elevates the applicable "bad faith" standard by demanding proof of "willfulness." (Opp. at 15.) The actual standard is satisfied where an attorney "knowingly or recklessly" engages in misconduct. *Primus Auto. Fin. Serv., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997). Either way, Rippling's GC's conduct amply meets the "bad faith" standard insofar as she knowingly and intentionally lied in a formal legal communication. That Rippling claims Wu (inaccurately) believed she "had a legal basis" to lie is no answer (Opp. at 15), and would create a dangerous and disconcerting precedent for the legal practice.

**b. Deel Seeks Appropriately Cabined Sanctions**

Contrary to Rippling's rhetoric, the relief requested by this Motion is neither "extraordinary" nor would it lead to any of the parade of horribles Rippling suggests. (Opp. at 15.) Deel asks only that Rippling be denied the fruits of its GC's misconduct by excluding from evidence the scheme, the Sham Letter, and communications responding to it. As explained in the Motion, this is entirely appropriate and the minimum remedy necessary to ensure Rippling does not benefit from its misconduct (and that others are not encouraged to take similar unethical action).

**c. The Motion Is Not "Untimely"**

Rippling seeks to persuade the Court to "not reach the merits" and deny the Motion "on timeliness grounds alone" (Opp. at 9-10), but Rippling is again wrong on the law and the facts. "[N]othing in Rule 7–8(c) requires that sanctions be denied solely because of any delay, extended or otherwise." *PersonalWeb Techs., LLC v. Google Inc.*, 2014 WL 5422933, at *2 (N.D. Cal. Oct. 24, 2014). Further, Deel appropriately did not rush into filing this weighty Motion; rather, the Motion was filed after Deel received discovery responses that confirmed key details of Rippling's scheme and its GC's role in it. This cautious and reasonable approach undercuts any notion that the Motion was unduly delayed. *See, e.g.*, *Tessera, Inc. v. Sony Corp.*, 2013 WL 5692109, at *2 (N.D. Cal. Oct. 18, 2013) (moving party's "decision to conduct a thorough investigation of the situation . . . before bringing the motion was a reasonable one").

**3. <u>Rippling's Lengthy "Background" Is Irrelevant and Misleading</u>**

As noted, and predictably, a large portion of the Opposition has nothing to do with the requested relief or the specific conduct of Rippling's GC warranting the tailored sanctions at issue. Instead, Rippling uses its briefing to present its preferred narrative about Deel in the hopes of (1) drawing focus away from the clear facts and law requiring the sanctions here, (2) turning the Motion into a PR opportunity, and (3) laying the groundwork for its wholly improper position that the ends justify the means—*i.e.*, that ethical violations should be ignored if Rippling's deceptive scheme was (in its view) successful. The Court should reject these cynical propositions, and not consider Rippling's litany of allegations that have no bearing on the determination of whether sanctions are appropriate.

Nevertheless, Deel cannot simply stay silent in the face of Rippling's inaccurate "background." Accordingly, in the limited space available to it, Deel addresses some of the facts and context that are critical for the Court to understand the realities of this case and why Rippling's tales cannot be taken at face value.

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..... i

TABLE OF AUTHORITIES ..... vi

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

I. Rippling's GC Violated the Ethical Rules When She Sent a Pretextual Legal Letter With a Fabricated Screenshot to a Civil Adversary in Formal Legal Correspondence ..... 3

A. The Scheme Was Not "Lawful Covert Activity" ..... 3

B. Rippling's GC Improperly Used Doctored Evidence to Elicit a Response ..... 9

II. The Requested Relief Is Narrowly Tailored and Appropriate ..... 10

A. Bad Faith Is Not Required, But Is Nevertheless Unambiguously Established Here ..... 10

B. Deel Seeks Only Narrow, Cabined Sanctions ..... 12

C. The Motion Is Not "Untimely" ..... 13

III. Rippling's Recitation of Its Allegedly Supporting Evidence Is Misleading ..... 14

CONCLUSION ..... 15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
69 F.3d 337 (9th Cir. 1995) ....................11

*Apple Corps Ltd. v. International Collectors Society*,
15 F. Supp. 2d 456 (D.N.J. 1998) ....................2, 7, 8

*Broan-NuTone, LLC v. Conglom Hong Kong Ltd.*,
802 F. Supp. 3d 1085 (E.D. Wis. 2025)....................5, 6, 15

*CogniPower, LLC v. Samsung Electronics Co.*,
No. 2:23-CV-00160, 2025 WL 5148586 (E.D. Tex. Mar. 18, 2025),
*report and recommendation adopted*, No. 2:23-CV-00160, 2025 WL 5148477
(E.D. Tex. Mar. 31, 2025)....................9, 10

*In re Frantz*,
655 B.R. 594 (B.A.P. 9th Cir. 2023)....................12

*Fuqua v. Thornell*,
No. CV-23-8621-PCT-KML, 2024 WL 6069148 (D. Ariz. Dec. 18, 2024) ....................7

*In re Grand Jury Investigation of Targets*,
918 F. Supp. 1374 (S.D. Cal. 1996)....................6

*Haeger v. Goodyear Tire & Rubber Co.*,
813 F.3d 1233 (9th Cir. 2016), *rev'd on other grounds,* 581 U.S. 101 (2017)....................11

*Harper v. Nevada Property 1, LLC*,
552 F. Supp. 3d 1033 (D. Nev. 2021) ....................11

*Impossible Foods Inc. v. Motif Foodworks, Inc.*,
675 F. Supp. 3d 448 (D. Del. 2023)....................5, 8, 9

*Jackson v. Taylor*,
No. 21-cv-03660-SK, 2022 WL 17477938 (N.D. Cal. Sep. 19, 2022)....................11

*Leysock v. Forest Laboratories, Inc.*,
No. 12-11354-FDS, 2017 WL 1591833 (D. Mass. Apr. 28, 2017) ....................6, 7, 8

*Meyer v. Kalanick*,
212 F. Supp. 3d 437 (S.D.N.Y. 2016)....................12

*North Philadelphia Trust Co. v. Smith*,
13 F.2d 585 (3d Cir. 1926)....................7

*Oracle America, Inc. v. Hewlett Packard Enterprise Co.*,
328 F.R.D. 543 (N.D. Cal. 2018)....................14

*People v. Smith*,
40 Cal. 4th 483 (2007) ....10

*PersonalWeb Technologies, LLC v. Google Inc.*,
No. 5:13-cv-01317 EJD, 2014 WL 5422933 (N.D. Cal. Oct. 24, 2014) ....13

*Primus Automotive Financial Services, Inc. v. Batarse*,
115 F.3d 644 (9th Cir. 1997) ....11

*Raydiant Oximetry, Inc. v. ALC Medical Holdings LLC*,
808 F. Supp. 3d 987 (N.D. Cal. 2025),
*appeal filed*, No. 26-1443 (Fed. Cir. Feb. 17, 2026),
*appeal filed*, No. 26-1444 (Fed. Cir. Feb. 17, 2026)....11

*Scranton Products, Inc. v. Bobrick Washroom Equipment, Inc.*,
190 F. Supp. 3d 419 (M.D. Pa. 2016) ....12

*Siebert v. Gene Security Network, Inc.*,
No. 11-cv-01987-JST, 2014 WL 5808755 (N.D. Cal. Nov. 6, 2014)....13

*Syed v. M-I, LLC*,
853 F.3d 492 (9th Cir. 2017) ....4

*Tessera, Inc. v. Sony Corp.*,
No. C 11-043 99 EJD, 2013 WL 5692109 (N.D. Cal. Oct. 18, 2013)....13

*United States v. Bucher*,
375 F.3d 929 (9th Cir. 2004) ....5

*United States v. Carona*,
660 F.3d 360 (9th Cir. 2011) ....2, 7

*United States v. Cedars-Sinai Medical Center*,
No. 2:20-cv-08439-WLH-PVC, 2025 WL 3034708 (C.D. Cal. Sep. 8, 2025)....12, 13

*Wayne v. Bureau of Private Investigators & Adjusters*,
201 Cal. App. 2d 427 (1962) ....6

*Witt v. Ross*,
No. 5:25-cv-02776-BLF, 2025 WL 2968025 (N.D. Cal. Oct. 20, 2025) ....12

*Zeleny v. Newsom*,
No. 17-cv-07357-RS, 2020 WL 6585793 (N.D. Cal. Nov. 10, 2020)....13

**STATUTES**

Cal. Business & Professions Code § 7538....6

**RULES**

Cal. Rules of Professional Conduct § 1.0 ....8, 11

Cal. Rules of Professional Conduct § 3.4 ....................1, 3, 9, 10

Cal. Rules of Professional Conduct § 4.1 ....................1, 3, 4, 5

Cal. Rules of Professional Conduct § 8.4 .................... 1, 3, 4, 5

**OTHER AUTHORITIES**

30 *Moore's Federal Practice* § 809.02 ....................5

California Supreme Court Administrative Order No. 2018-05-09 (May 10, 2018) ....................7

David B. Isbell & Lucantonio N. Salvi, *Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct*, 8 Geo. J. Legal Ethics 791 (1995)....................8

State Bar of California, Executive Summary for Proposed Rule 4.1....................5

## PRELIMINARY STATEMENT[1]

Deel's Motion seeks tailored relief based on Rippling's GC's violations of California's Rules of Professional Conduct. Unable to dispute the heart of the Motion, Rippling devotes the majority of its opposition to recounting disputed allegations that are wholly irrelevant to the Motion, and which stem from other deeply disconcerting efforts to coerce testimony from its key witness, Keith O'Brien. But these efforts to distract from Rippling's GC's conduct and exploit another opportunity to convey Rippling's preferred (but false) narrative to the press fall short.

Deel's Motion is straightforward; ***all of the pertinent facts are undisputed***. Rippling's General Counsel: engineered the Sham Letter with fake content to knowingly deceive its recipients; sent the letter in her role as "General Counsel;" falsely styled it as a good faith, attorney-to-attorney response to Deel's outside employment counsel's letter about an active legal dispute (which Rippling had intentionally ignored until that point); added two individuals at Deel to the correspondence; and subsequently promoted the scheme to the public while encouraging other companies and lawyers to follow suit. (*See* Mot. at 3-7.) That conduct violates the plain language of the California Rules of Professional Conduct, which prohibit attorneys from knowingly making false statements of material fact, engaging in dishonesty or deceit, and falsifying evidence. *See* Cal. R. Prof. Conduct §§ 3.4, 4.1, 8.4.

Rippling's response amounts to an assertion that the ends justify the means. Under Rippling's theory, unethical conduct is not only excused, but *encouraged,* so long as the alleged "crooks" are caught "red-handed." (Opp. at 1.) This approach—in addition to flagrantly mischaracterizing the facts here—turns the ethical rules on their head, and confirms that Rippling is doubling down on the very "normalization of the betrayal of trust between lawyers" that the Motion flagged as so destructive to the judicial system. (ECF No. 395 ("Mot.") at 14.)[2] If accepted, this rationale would give license to any attorney to fabricate evidence and deceive opposing counsel whenever, in her own estimation, the target of the deception deserved it. The sanctity of attorney communications involving every issue from

[1] Unless otherwise noted, all emphases are added, and all citations, brackets, original alterations, footnotes, and quotation marks are omitted from quotations for ease of reading. References to the "LE Decl." refer to the Declaration of Lance Etcheverry filed with Deel's motion. (ECF No. 395-1.) "Supp. LE Decl." refers to the Supplemental Declaration of Lance Etcheverry filed concurrently herewith.

[2] Deel had anticipated this unfortunate attempt to justify unethical conduct. (*See* Mot. at 14 ("Rippling may seek to defend Rippling's GC's conduct by claiming that 'it worked'").) But the Rules of Professional Conduct are neither advisory nor outcome-dependent.

discovery meet and confers to settlement communications would be upended. The law and ethical rules do not permit this result.

Turning to the Rules themselves, Rippling offers an unsupported interpretation that is flatly contradicted by their plain language. Its lead defense rests on a comment to the Professional Rules that acknowledges a narrow carve-out where a lawyer "advises" or "supervises" others in connection with "lawful covert activity," which Rippling asserts means not only that lawyers *themselves* can lie, but that they can do so in formal legal communications. That reading contravenes the plain language of the comment and lacks any supporting authority. Indeed, Rippling principally relies on: (1) an opinion about a ***criminal prosecution*** decided ***years before California adopted Rules 4.1 and 8.4***, and ***in which no lawyer directly lied to anyone***, *United States v. Carona*, 660 F.3d 360, 365-66 (9th Cir. 2011), and (2) an old District of New Jersey decision that, as the block quotation included in the Opposition clearly reflects, addressed a lawyer's "use of an undercover investigator" to investigate publicly available information. (Opp. at 11 (quoting *Apple Corps Ltd. v. Int'l Collectors Soc'y*, 15 F. Supp. 2d 456, 475 (D.N.J. 1998)).)

Tellingly, Rippling's other arguments make no effort to demonstrate that its General Counsel's conduct was ethical, and instead contend that there is simply no recourse for her ethical violations. But these arguments are equally meritless. Rippling insists that no sanctions can be awarded without proof of "bad faith," but ignores that the Local Rules forming one of the independent bases for Deel's request do not require this finding. Even with respect to sanctions under the Court's inherent authority, Rippling's claim that "willfulness" is required for bad faith misconstrues the law—yet ultimately is irrelevant, because the General Counsel's conduct would satisfy a "willfulness" standard as well.

Rippling also contends that it is simply too late for it to face any consequences from the unethical conduct because Deel supposedly waited too long to bring the Motion. That argument is both factually and legally deficient. Deel sought the relief after receiving discovery concerning the scheme and Sham Letter. Given the severity of the misconduct, Deel was appropriately judicious in developing a thorough record before bringing an issue of such magnitude to the Court's attention. Such diligence should be encouraged. In any event, Rippling does not identify any prejudice from the supposed delay. If anything, Rippling has benefited from the additional time it has leveraged to tout and promote its improper scheme.

Contrary to Rippling's suggestion, Deel's Motion seeks very tailored relief to redress the ethical

violations by Rippling's GC: Rippling should not be permitted to introduce evidence regarding the "honeypot" operation, the Sham Letter, or communications responding or related thereto. This is not an "extraordinary exclusionary remedy." (Opp. at 15.) In fact, it is the minimum remedy necessary to ensure that Rippling does not benefit from the ethical violations, and to ensure that members of the California Bar and this Court's Bar are deterred from similar misconduct.

## ARGUMENT

Deel's Motion turns solely on Rippling's GC's role participating in the scheme underpinning the Sham Letter. Rippling's litany of supposedly "damning evidence against Deel" (Opp. at 5) grossly mischaracterizes the facts and is only a sideshow. The Court should ignore these irrelevancies and instead focus on the only three arguments that Rippling put forward to oppose sanctions: (1) there was "no ethical violation," (2) even if Rippling's GC violated the Professional Rules, Deel cannot receive sanctions because "it cannot show Rippling acted in bad faith," and (3) the Motion is "untimely." (Opp. at 1-2.) None of these arguments has any merit.

### I. Rippling's GC Violated the Ethical Rules When She Sent a Pretextual Legal Letter With a Fabricated Screenshot to a Civil Adversary in Formal Legal Correspondence

As previously detailed (*see* Mot. at 9-12), Rules 4.1 and 8.4 of the California Rules of Professional Conduct prohibit an attorney from doing exactly what happened here. A lawyer "shall not knowingly . . . make a false statement of material fact or law to a third person." Cal. R. Prof. Conduct § 4.1(a). Nor may a lawyer "engage in conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation." *Id.* § 8.4(c). A lawyer also may not "falsify evidence." *Id.* § 3.4(c). These Rules are unambiguous and apply here: Rippling does not dispute that the Sham Letter included false statements, that its GC knew of the falsity, or that she signed and sent it in her role as General Counsel, falsely styled as a response to correspondence from Deel's outside counsel. That should be the end of the inquiry, and Rippling cannot demonstrate why the Rules should not be applied as written.

#### A. The Scheme Was Not "Lawful Covert Activity"

Relying entirely on a *comment* to Rule 8.4, Rippling suggests there is a sweeping exception to the ethical Rules that would permit attorneys to make false statements to third parties any time those falsehoods are made in the context of "lawful covert activity." (Opp. at 10-13.) This interpretation of the

comment, however, is convoluted and wrong. Even the quotations relied upon by Rippling confirm that the exception applicable to "lawful covert activity" does not apply to false statements by attorneys themselves. Moreover, if adopted, Rippling's proposed rule would lead to chaotic, if not dangerous, results: attorneys would be free to plant falsehoods in correspondence (including with adversaries) so long as the attorneys deem the falsehoods to be in furtherance of an investigation into wrongdoing. The Rules do not condone such an outcome.

1. Comment [5] to Rule 8.4 Does Not Bless Rippling's GC's Conduct

By its plain terms, Comment [5] to Rule 8.4 only permits a narrow exception to the prohibition on lawyers engaging in any conduct involving dishonesty, deceit, or misrepresentation. A lawyer's involvement is expressly limited to conduct "where a lawyer ***advises*** clients or others about, or ***supervises***, lawful covert activity . . . provided the lawyer's conduct is otherwise in compliance with these rules." Cal. R. Prof. Conduct § 8.4, cmt. [5]. The comment does not create an exception for attorneys making misrepresentations ***themselves***. The drafters chose those words deliberately. They did not write that Rule 8.4(c) "does not apply where a lawyer makes false statements in the course of an investigation." The fact that the comment specifically identified the acts of "advis[ing]" and "supervis[ing]" confirms that an attorney's direct communications are excluded. *See Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017) (explaining that when interpreting provisions with an explicit exception, "the familiar judicial maxim *expressio unius est exclusio alterius* counsels against finding additional, implied, exceptions"). Because Rippling's General Counsel did not merely advise or supervise her client's scheme, but instead perpetuated and made the false statements, Comment [5] does not apply.

Faced with the clear language of the Rules and Comment [5], Rippling advances another theory to shoehorn lies by attorneys into a "lawful covert activity" exception—this time by reference to a comment to Rule 4.1. Rippling notes that Comment [4] to Rule 4.1 states, "Regarding a lawyer's involvement in lawful covert activity in the investigation of violations of law, see Rule 8.4, Comment [5]" (Cal. R. Prof. Conduct § 4.1 cmt. [4]), and argues that this cross-reference would be "meaningless" if attorneys were not permitted to make false statements because Rule 4.1(a) provides that lawyers shall not knowingly "make a false statement of material fact or law to a third person." (Opp. at 11.) This argument completely misstates the purpose and effect of Comment [4].

Rule 4.1 categorically prohibits an attorney from knowingly making a false statement of material fact to a third person. Comment [4] does not create an exception that would permit lawyers to lie in the course of an investigation. Instead, the purpose of Comment [4] is to cross-reference the more specific guidance in Rule 8.4, Comment [5] as to whether and how an attorney can participate in lawful, covert activity—namely, by advising or supervising. Indeed, the California Bar's rulemaking materials explain that this comment was solely intended to "direct lawyers to Comment [5]," which addresses a "lawyer's participation in lawful covert activity in the investigation of violations of civil or criminal law . . . ."[3] State Bar of California, Executive Summary for Proposed Rule 4.1, at 1-2. Comment [4] does no more than cite to the relevant qualification and framework set forth in Comment [5] to Rule 8.4 for determining whether and how a lawyer's involvement in such covert activity is permissible.

To be clear, what Rippling is arguing is that an ***implicit*** reading of a ***summary*** of the Rules creates a sweeping exception to the Rules themselves, which unambiguously state that lawyers may not make false statements to third parties. That is absurd on its face and contravenes basic rules of statutory interpretation. If the drafters' intent was to permit attorneys to lie in service of investigations, the Rules would simply state so. *See United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004) (explaining that courts "presume the drafters said what they meant and meant what they said").

Regardless, Rippling's interpretation has been rejected by courts. In *Broan-NuTone, LLC v. Conglom Hong Kong Ltd.*, the court interpreted materially identical language attached to Rule 4.1, which permitted lawyers to engage in "advising or supervising others with respect to lawful investigative activities." 802 F. Supp. 3d 1085, 1110 (E.D. Wis. 2025) (citing WSCR 20:4.1(b)). Analyzing the applicable rules of professional conduct, a leading treatise, and the relevant case law, the court found that all sources "suggest that ***an attorney personally serving [in an] 'investigator' role violates his ethical duties.***" Id. at 1110-11 (citing 30 Moore's Federal Practice § 809.02; *Impossible Foods Inc. v. Motif Foodworks, Inc.*, 675 F. Supp. 3d 448, 454 (D. Del. 2023)). Rippling attempts to distinguish *Broan-NuTone* on the basis that there the unethical conduct was used to create personal jurisdiction. (Opp. at 12.) But that is a distinction without a material difference, and the court's analysis with respect to the

[3] Rippling's argument that the use of the word "participation" condones the making of a false statement in violation of Rule 4.1 falls short. Advising and supervising are forms of "participation," and the executive summary does not purport to contravene the plain text of the Rule.

purpose of the false statement and whether it was used to establish jurisdiction was independent from its conclusion that it was impermissible for the deception to be "undertaken by Plaintiff's counsel himself" instead of "through a third party." *Broan-NuTone*, 802 F. Supp. 3d at 1111.[4]

2. Limited Exceptions Recognized by Case Law Do Not Apply Here

Rippling contends that "the relevant cases support Rippling's position." (Opp. at 11.) Not so. Rippling appears to nod to certain judge-made exceptions to Rules 4.1 and 8.4, but those exceptions are not applicable to Rippling's GC's conduct or the Sham Letter.

Rules 4.1 and 8.4 impose "sweeping prohibitions" on dishonesty by attorneys. *Leysock v. Forest Labs., Inc.*, 2017 WL 1591833, at *6 (D. Mass. Apr. 28, 2017). Within these sweeping prohibitions, courts have only recognized two "narrowly defined exceptions." *Id.* One is for ***prosecutors or government attorneys conducting undercover operations***, and the other covers the ***retention of investigators to pose as ordinary consumers***. Rippling's GC's conduct falls within neither.

The first exception "permits prosecutors and other government attorneys to conduct undercover criminal investigations." *Id.* Without support, Rippling invokes this exception and/or equates its General Counsel's conduct to that of criminal prosecutors. (*See, e.g.,* Opp. at 1 (comparing the Sham Letter to a "widely accepted investigative practice that prosecutors use every day to catch criminals").) Indeed, Rippling even compares its GC to law enforcement, stating this is "[l]ike an undercover officer expressing a desire to buy drugs." (*Id.* at 10.) Though this simile highlights Rippling's reckless and vigilante approach, it is of course wrong. Rippling's GC is neither a prosecutor, nor a government attorney, nor a member of law enforcement. She thus cannot lay claim to any purported limited latitude and authority vested in them in connection with their specialized roles in upholding justice. *See In re Grand Jury Investigation of Targets*, 918 F. Supp. 1374, 1378 (S.D. Cal. 1996) ("[P]rosecutors [are] different from private attorneys, because the channeling of advocacy toward a just result as opposed to vindication of a

[4] It is worth noting that even if Rippling's GC *had* "advise[d]" or "supervise[d]" through a non-attorney, the Sham Letter still would not be "lawful." California has strict rules governing private investigators, and broadly prohibits dishonesty in the course of private investigations. Cal. Bus. & Prof. Code § 7538(a)(2) (prohibiting private investigators from undertaking "any act constituting dishonesty or fraud"); *see Wayne v. Bureau of Priv. Investigators & Adjusters*, 201 Cal. App. 2d 427, 436-37 (1962) (affirming license suspension where investigator concealed relevant information, because "a false impression may consist in a concealment of what is true as well as the assertion of what is false").

particular claim lessens the temptation to circumvent the disciplinary rules.").[5]

Rippling's repeated reliance on *United States v. Carona* to validate its GC's deception is thus misplaced. (*See* Opp. at 1-2, 11-12, 14-15.) That case concerned whether government prosecutors could provide an undercover informant with a fake subpoena attachment as part of a sting operation. *See* 660 F.3d 360, 365-66 (9th Cir. 2011). The Ninth Circuit found such conduct did not violate California's no-contact rule because "it has long been established that the government may use deception in its investigations in order to induce suspects into making incriminating statements." *Id.* at 365-66. The case did not bear on the rights of private attorneys to engage in falsehoods, let alone do so in formal, private civil legal communications. And even if *Carona* was analogous (which it is not), it has no application here because the decision was issued ***seven years*** before Rules 4.1 and 8.4(c) were enacted. *See* Cal. Sup. Ct. Admin. Order No. 2018-05-09 (May 10, 2018). And, decisions predating a rule's enactment are, of course, irrelevant to its interpretation. *See N. Philadelphia Tr. Co. v. Smith*, 13 F.2d 585, 586 (3d Cir. 1926) (decisions "rendered before the enactment" of a statute could not have "interpreted its provisions").

The only other judge-made exception to Rules 4.1 and 8.4 "permits civil attorneys to use investigators in certain circumstances to obtain information that would normally be available to any member of the public," such as retaining "individuals who pose as renters or purchasers with no intent to actually rent . . . in order to gather evidence of housing discrimination." *Leysock*, 2017 WL 1591833, at *6. These individuals are commonly called "testers," and the exception is limited to "mere concealment of identity and purpose" in order to obtain "information that would be readily available to any member of the public who was seeking the products or services in question." *Id.* at *9.

This "tester" exception, too, has no potential application to Rippling's GC for multiple reasons. First, Rippling's GC is not a tester, and she did not retain other individuals or investigators to facilitate the deception; rather, she did it herself. It is baffling, then, that Rippling block quotes the decision in *Apple Corps Ltd. v. International Collectors Society*, which explicitly addresses "a public or private lawyer's ***use of an undercover investigator*** to detect ongoing violations of the law," and does not speak to, let alone condone, deceptive conduct in legal communications. (Opp. at 11-12 (quoting 15 F. Supp.

[5] Unsurprisingly, prosecutors do not have wide leeway to lie. *See Fuqua v. Thornell*, 2024 WL 6069148, at *22 (D. Ariz. Dec. 18, 2024) (finding that a prosecutor's deception would violate Rule 4.1: "[W]hile police may be entitled to lie to a witness to gain testimony, a prosecutor cannot do so.").

2d at 475).) Second, Rippling's GC's deception extended well beyond "identity and purpose," and did not merely seek to obtain "information that would be readily available to any member of the public." *Leysock*, 2017 WL 1591833, at *9.[6] *Apple Corps*, which Rippling proclaims to be "the leading case on the issue" (Opp. at 11) shows how the "tester" exception actually applies. That court found that the use of fake names in calls to vendors was permissible because the misrepresentations were "solely as to identity or purpose," and none of the testers was "acting in the capacity of lawyers." *Apple Corps*, 15 F. Supp. 2d at 475-76. None of this is true here: Rippling's GC was explicitly acting in her capacity as a lawyer and intentionally lied about material facts, through the guise of attorney correspondence to opposing counsel addressing a live legal dispute, in order to manipulate a litigation opponent.

3. Prohibiting Attorneys From Deceiving Third Parties Is Necessary to Promote the Rules' Purpose, and Is Not "Hair-Splitting"

Rippling astonishingly suggests that it is "hair-splitting" to distinguish between attorneys advising clients about potential falsehoods in investigations and attorneys themselves making false and deceptive statements. (Opp. at 11.) In so arguing, Rippling betrays that it misunderstands the ethical and professional considerations at play.

As already explained in the Motion, there is good reason for treating lawyers' statements differently. (Mot. at 11-12.) Rule 4.1 "is intended to require 'a standard of candor and fairness that does not necessarily apply in the ordinary exchanges among persons who do not purport to own any professional credentials.'" *Impossible Foods*, 675 F. Supp. 3d at 454-55 (quoting David B. Isbell & Lucantonio N. Salvi, *Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct*, 8 Geo. J. Legal Ethics 791, 814-15 (1995)); *see also* Cal. R. Prof. Conduct § 1.0 cmt. [5] ("A lawyer, as a member of the legal profession, is . . . a public citizen ***having special***

[6] Rippling argues that *Leysock* somehow turned on whether the target was "wholly innocent." (Opp. at 13.) That is not what *Leysock* considered in the relevant passage. The court examined the "nature" of the targeted persons, and found it supported harsher sanctions because allowing attorneys to lie to physicians would "breed[] distrust and skepticism." 2017 WL 1591833, at *11. As Deel has explained, allowing attorneys to lie in legal communications to other attorneys about ongoing disputes would have precisely that effect, undermining the Rules' purpose of protecting "the integrity of the legal system" and "confidence in the legal profession." (Mot. at 14 (quoting Cal. R. Prof. Conduct § 1.0(a)).)

***responsibilities for the quality of justice*.").[7] Other attorneys, and the public, must feel confident that when they receive a legal communication from an attorney, it is made in good faith and not a "ruse." Permitting attorneys to lie to a litigation opponent in a legal response letter based on a subjective conclusion that the ends justify the means would eviscerate the purpose and effect of the Rules.

Rippling also declares that granting Deel's Motion would "bar *any* evidence generated through a lawful investigative ruse." (Opp. at 14.) Not so; enforcing the Rules consistent with the Motion's request would have no such effect. Awarding sanctions here would confirm the basic precept that attorneys and their clients cannot benefit from placing intentional falsehoods in formal legal communications written in an attorney's capacity as an officer of the Court. Because Rippling's GC's conduct does not fall within any of the limited exceptions under the Rules for "lawful covert activity," those exceptions and the permissions granted thereunder will not be disturbed.

In fact, it is ***Rippling's*** proposed rule—that its deception is allowed because it deems the "honeypot" scheme successful—that would have disastrous effects on the legal system. (Opp. at 11.) Nothing in the Rules suggests that unethical conduct is transformed into ethical conduct if it generates results, nor would that "ends justify the means" principle make any sense. And it is utterly backwards for Rippling to argue that "Wu's conduct" of deliberately lying to a litigation adversary in her capacity as General Counsel actually "served [the] goals" of "protect[ing] the integrity of the legal system" and "promot[ing] . . . confidence in the legal profession." (*Id.*) The Court should reject Rippling's untenable contention that dishonesty and breaking the rules are necessary to maintain the integrity of those rules.

**B. <u>Rippling's GC Improperly Used Doctored Evidence to Elicit a Response</u>**

As Deel explained in its Motion, Rippling's GC also violated Rule 3.4, which forbids attorneys from "unlawfully alter[ing] . . . a document" or "falsify[ing] evidence." (Mot. at 12 (citing Cal. R. Prof. Conduct § 3.4(a), (c)).) This conclusion follows naturally from *CogniPower, LLC v. Samsung Electronics Co.*, which clearly found that these rules are violated when an attorney attempts to "elicit[] testimony based on an altered document." 2025 WL 5148586, at *1 (E.D. Tex. Mar. 18, 2025), *report and recommendation adopted*, 2025 WL 5148477 (E.D. Tex. Mar. 31, 2025).

---

[7] As Deel explained, *Impossible Foods* recognized a clear distinction between permissible "tester" cases and cases in which "the attorney personally participated in the undercover operation." 675 F. Supp. 3d at 461 n.8. Rippling never engages with this reasoning. (Opp. at 13.)

Rippling defends this fraudulent conduct through the same arguments the *CogniPower* court already rejected. Rippling argues that the Sham Letter was only a "prop," and the actual evidence was the *response* (Opp. at 14), just as the *CogniPower* attorneys contended that the deception was immediately revealed, and they "never intended, in any way, to use [the altered document] as evidence in the case." *Id.* at *18. But as the court recognized, the disclosure was too late, because "[o]nly after [the attorney] had sought to elicit responses to these questions did he represent to [the deponent] that the Altered Document had been modified from its original version." *Id.* at *4. Here too, Rippling's GC clearly "sought to elicit responses" to the Sham Letter prior to revealing that she had doctored it.

Similarly, Rippling's argument that it was only seeking to rely on the "response" to the fabricated document is also precluded. (Opp. at 14.) The *CogniPower* court found that "[t]here is no reason why [the attorney] should have thought that eliciting testimony based on an altered document was appropriate." *Id.* at *1. The fact that the document itself was never marked as an exhibit was "immaterial." *Id.* at *4.[8] At the end of the day, the court found it to be a simple issue: counsel "sought to develop evidence based on the presentation of a falsified document," and "[s]uch conduct warrants appropriate sanctions." *Id.* at *4. This Court should find the same.[9]

## II. <u>The Requested Relief Is Narrowly Tailored and Appropriate</u>

Unable to show that its General Counsel's conduct was above-board, Rippling pivots to arguing that Deel simply has no recourse. But these arguments, too, are meritless and provide no basis for Rippling to escape the consequences of the serious ethical violations that occurred.

### A. <u>Bad Faith Is Not Required, But Is Nevertheless Unambiguously Established Here</u>

Rippling contends that "Deel fails to show bad faith" (Opp. at 14), but that argument is irrelevant

[8] Rippling's only other argument, that "Wu's letter and the Slack message . . . were real documents" is entirely circular. (Opp. at 14 n.3.) By that standard, *any* doctored evidence is a "real document," insofar as it literally exists after it has been fraudulently created.

[9] In support of its contrary reading, Rippling again cites *Carona*—a criminal case, decided years before the enactment of Rule 3.4 and that has no application here (*supra* Section I.A.2). *Carona* did not endorse the use of misrepresentations in pretextual attorney correspondence to trigger a response. Rippling's companion citation to *People v. Smith*, 40 Cal. 4th 483 (2007), fares no better. (Opp. at 14.) *Smith* addressed whether a fake gunshot-residue test administered by ***police detectives*** during a custodial interrogation violated the Fifth Amendment. *Smith*, 40 Cal. 4th at 505-06. No attorney participated in the deception, and the court's holding (that "[p]olice deception does not necessarily invalidate an incriminating statement") says nothing about an attorney's duty of candor. *Id.* at 505. Every authority the court collected likewise involved police deception of a suspect. *Id.* at 505-06. And, like *Carona*, *Smith* was decided years before California adopted Rules 4.1, 8.4, and 3.4.

to the sanctions sought under the Local Rules, which do not require a showing of "bad faith." *See* Mot. at 8 (citing *Jackson v. Taylor*, 2022 WL 17477938, at *3 (N.D. Cal. Sep. 19, 2022) (sanctions imposed without consideration of bad faith)). Rippling cites no authority to the contrary, and its *cf.* cite to Rule 1.0(b)(1) concerns attorney "discipline," not evidentiary sanctions imposed by a Court. (Opp. at 15.)

As to the separate, independent basis for sanctions under the Court's inherent authority, Rippling misstates the applicable standard by demanding proof of "willfulness." The decision on which Rippling relies confirms that the standard is whether conduct "constituted or was tantamount to bad faith," which is satisfied where an attorney "knowingly or recklessly" engages in misconduct. *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648-49 (9th Cir. 1997); *accord Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1245 (9th Cir. 2016) ("[R]eckless and knowing conduct [is] tantamount to bad faith and therefore sanctionable. . . ."), *rev'd on other grounds,* 581 U.S. 101 (2017). There is no dispute that Rippling's GC knowingly lied in a formal legal communication, amply satisfying this (or even a "willfulness") standard. *See Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (courts may use inherent authority to penalize a party that "has engaged deliberately in deceptive practices"); *Raydiant Oximetry, Inc. v. ALC Med. Holdings LLC*, 808 F. Supp. 3d 987, 1003-04 (N.D. Cal. 2025) (finding bad faith when attorneys deceptively modified a document, "even if it were unintentional").

Rippling argues that its GC did not act in bad faith because she "had a legal basis to conduct a lawful covert investigation." (Opp. at 15.) Rippling's GC lacked any such lawful basis (*supra* Section I). But regardless, an inaccurate belief that intentional conduct was lawful does not immunize it. *See Harper v. Nevada Prop. 1, LLC*, 552 F. Supp. 3d 1033, 1052 n.23 (D. Nev. 2021) (a party's "alleged belief in his positions would not render him immune from inherent authority sanctions"). Rippling further contends that bad faith is negated because it "fully disclosed the 'ruse' in its very first pleading" (Opp. at 15), but that is a non sequitur. The bad faith inquiry pertains to the state of mind at the time of the act—here, the knowing misrepresentation in the March 3, 2025 letter—not whether the misconduct was subsequently revealed. A party that commits litigation misconduct does not retroactively purge the bad faith by later admitting what it did. If anything, the disclosure confirms that Rippling's GC acted knowingly: Rippling concedes its GC understood the letter contained false statements when she sent it. Such "knowing" conduct is the very definition of bad faith under the applicable standard. *See Haeger*, 813 F.3d at 1245

(knowing conduct is "tantamount to bad faith").

Finally, Rippling's citations to the *Frantz* and *Witt* decisions are misplaced. Both addressed motions seeking sanctions for submitting frivolous arguments—***not*** intentional attorney factual misrepresentations. *See In re Frantz*, 655 B.R. 594, 604 (B.A.P. 9th Cir. 2023) (reversing sanctions where counsel advanced a "plausible, good faith argument" on an unsettled legal question); *Witt v. Ross*, 2025 WL 2968025, at *3 (N.D. Cal. Oct. 20, 2025) (denying sanctions where party advanced an "eminently reasonable" jurisdictional argument and movant failed to show "improper purpose"). Nor do these decisions stand for the proposition that there can be no "bad faith" any time an attorney's "suspicions were well-founded." (Opp. at 15.) That framing misses the point. The inquiry does not turn on the attorney's ultimate, subjective goals. If that were the case, every attorney would have carte blanche to fabricate evidence, make false statements, and deceive opposing parties and tribunals so long as they suspect wrongdoing.

### B. <u>Deel Seeks Only Narrow, Cabined Sanctions</u>

Rippling contends that the remedy sought here would be "extraordinary" but does not and cannot explain why. (Opp. at 15.) That is because Deel asks only that Rippling be denied the fruits of its GC's misconduct by excluding from evidence the scheme, the Sham Letter, and communications responding to it. This is a standard and appropriate remedy, as reflected in caselaw that Rippling flatly ignores; indeed, "[c]ourts routinely preclude use of evidence obtained in violation of the ethical rules in order to appropriately remedy that violation." *Scranton Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 190 F. Supp. 3d 419, 434 (M.D. Pa. 2016); *see also United States v. Cedars-Sinai Med. Ctr.*, 2025 WL 3034708, at *4 (C.D. Cal. Sep. 8, 2025) (striking improperly obtained evidence "ensures that [the offender] does not benefit from the use of . . . information acquired through bad faith conduct"); *Meyer v. Kalanick*, 212 F. Supp. 3d 437, 449-50 (S.D.N.Y. 2016) (explaining the rule serves the basic purpose of "enjoining [the offending party] from making use of the fruits of their own troubling conduct"). Deel does not seek dismissal of claims, monetary awards, adverse inferences, or fee-shifting. Nor would the requested remedy impact Rippling's attempt to introduce non-"honeypot" evidence—*e.g.*, much of the supposed evidence Rippling (irrelevantly and misleadingly) calls out in its opposition.

Rippling's contention that the Court should not exclude evidence arising from the Sham Letter

because it is "highly probative" fares no better. (Opp. at 15.) "[T]he governing case law makes clear that the Court is not required to tolerate the use of evidence obtained through litigation misconduct, even where that evidence may be probative or relevant." *Cedars-Sinai Med. Ctr.*, 2025 WL 3034708, at *4.

**C. The Motion Is Not "Untimely"**

Rippling also seeks to persuade the Court to "not reach the merits" and deny the Motion "on timeliness grounds alone," pointing to the language in Local Rule 7-8(c) that litigants should file sanctions motions "as soon as practicable." (Opp. at 9-10.) As an initial matter, Rippling is wrong about the law. "[N]othing in Rule 7–8(c) requires that sanctions be denied solely because of any delay, extended or otherwise." *PersonalWeb Techs., LLC v. Google Inc.*, 2014 WL 5422933, at *2 (N.D. Cal. Oct. 24, 2014) ("This is unsurprising because such a requirement would unduly restrict the discretionary nature of a sanctions decision."). The cases to which Rippling cites are not to the contrary. *See Zeleny v. Newsom*, 2020 WL 6585793, at *6 (N.D. Cal. Nov. 10, 2020) (declining to grant sanctions where moving party lost the majority of the underlying motion); *Siebert v. Gene Sec. Network, Inc.*, 2014 WL 5808755, at *2 (N.D. Cal. Nov. 6, 2014) (denying motion for sanctions on the merits and stating only in dicta that the motion's "deficiencies are compounded by Plaintiff's delay").

Regardless, the notion that Deel's motion is "untimely" is based on a mischaracterization of the relevant facts and the unreasonable assumption that Deel should have taken the weighty step of accusing Rippling's General Counsel of ethical misconduct without thoroughly investigating that issue.

This Motion was filed after Deel received written discovery responses from Rippling that: (1) confirmed key details of the Sham Letter scheme; (2) revealed the damning detail that its GC had input the wrong email address for Deel's outside employment counsel, ensuring that the only people who received the Sham Letter were two individuals at Deel; (3) admitted the extensive involvement of Rippling's in-house legal team in the planning and execution of the scheme; and (4) critically, did *not* turn up any exculpatory information showing that Rippling's GC had not violated her ethical duties. (LE Decl. Ex. A.) Filing the Motion upon completion of this investigation was entirely reasonable, and ensured that the Motion would be based on a very strong and defensible foundation. *See, e.g., Tessera, Inc. v. Sony Corp.*, 2013 WL 5692109, at *2 (N.D. Cal. Oct. 18, 2013) (finding delay reasonable because the moving party's "decision to conduct a thorough investigation of the situation . . . before bringing the motion was

a reasonable one"); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 548 (N.D. Cal. 2018) (rejecting argument that sanctions motion was untimely because the relevant issues were identified nearly a year prior, and concluding that the relevant date to consider was when the moving party last obtained information relevant to the motion).

Furthermore, Rippling identifies no prejudice resulting from the purported delay. In its own words, little happened in the case in the intervening period. (Opp. at 5.) If anything, the time spent gathering facts relevant to the motion was to Rippling's benefit, as it used that time to continue peddling its concocted narrative, focused on the Sham Letter, to try to steal Deel's customers. (*See* Deel's First Amended Counterclaims, ECF No. 263 ("FACC"), ¶¶ 376-78.)

## III. <u>Rippling's Recitation of Its Allegedly Supporting Evidence Is Misleading</u>

While the vast majority of Rippling's "background" section is irrelevant to the "honeypot" scheme and has no bearing on the Motion (or the relief that it seeks), Deel is constrained to point out that Rippling's presentation is deeply misleading. A point-by-point rebuttal is not appropriate for this Reply, but neither can Deel permit the "record" fabricated by Rippling in its filing to go unaddressed.

Accordingly, Deel must flag that the willingness—if not outright eagerness—to cross ethical boundaries that Rippling and its GC displayed in sending the Sham Letter also extended to every aspect of its purported "security investigation." Outside of the Sham Letter, Rippling primarily relies on the testimony of Keith O'Brien. But Rippling glosses over the events leading up to O'Brien's bought-and-paid-for testimony, merely stating that in the weeks thereafter "O'Brien retained counsel and began cooperating with Rippling." (Opp. at 4.) In reality, Rippling took a series of steps to coerce O'Brien into providing a false narrative to harm Deel. It used both financial inducements (the carrot) and threat of legal action (the stick) to coax O'Brien into telling a new story that neatly fit Rippling's narrative. O'Brien's own contemporaneous statements speak for themselves: In a March 21, 2025 email to Deel's Irish counsel, O'Brien reported that Rippling representatives had called his home multiple times and were "trying their utmost to mentally destroy [him] and its [sic] working." (FACC ¶ 228.) The same day, O'Brien stated he was "being coerced into saying stuff that is not true to damage Deel." (*Id.*)

After Rippling's harassment campaign, O'Brien and his counsel agreed to meet with a court-appointed Irish solicitor, a host of Rippling's Irish lawyers, and IT professionals on March 26, 2025. Supp.

LE Decl. Ex. A ¶ 5.10. Despite the meeting nominally being called as an official proceeding, the majority of the time was spent in meetings just between O'Brien and Rippling's lawyers, which the Irish court-appointed solicitor described as "outside the scope of my role as Supervising Solicitor." *Id.* The court reporter, despite being present, went off the record for over ***eight hours***, only briefly going back on at 12:30 a.m. to note that the meetings would continue. *Id.* Ex. B. These off-the-record meetings did not end until 2:00 a.m. *Id.* Ex. A ¶ 5.11.

These off-the-record conversations resulted in two agreements with O'Brien, both signed by Rippling's GC in the early hours of March 27. In them, Rippling agreed to confer significant benefits on O'Brien—its former employee whom it had publicly claimed misappropriated trade secrets—including full indemnity from all liability in any related action and payment for legal representation moving forward. Supp. LE Decl. Ex. C. These benefits also came with conditions that enable Rippling to control his testimony: O'Brien is prohibited from "contact[ing] or assist[ing] Deel," "provid[ing] any information to anyone" about Deel, or making "any statement which directly or indirectly disparages or damages the reputation or standing" of Rippling. *Id.* ¶¶ 1.2, 1.7. A breach by O'Brien would allow Rippling to immediately enter judgment against him in Ireland and require him to pay Rippling €150,000. *Id.* ¶ 3.1(b). In exchange, O'Brien reversed his position and, for the first time, provided a binding "precis" consistent with Rippling's account of a "spying conspiracy," attached to the Cooperation Agreement. *Id.* ¶ 1.4.

It is clear that O'Brien's change in story following a series of Rippling-orchestrated events—from Rippling's Sham Letter, to off-the-record meetings between Rippling's and O'Brien's counsel, to the two agreements paying O'Brien for his testimony—is entirely a product of Rippling's influence. Deel vigorously disputes the validity of O'Brien's testimony, a dispute that will be resolved in due course.

## CONCLUSION

For the foregoing reasons, Deel respectfully requests that the Motion be granted. Excluding the Sham Letter is critical to preserve the principles of honesty and fair play that allow for disputes—even contentious ones—to be fairly adjudicated. Allowing Rippling to use its GC's misconduct "for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Broan-NuTone*, 802 F. Supp. 3d at 1112.

DATED: September 25, 2026

By: *\/s\/ Lance A. Etcheverry*
Lance A. Etcheverry
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Counsel for Defendant and Counterclaimant Deel, Inc.*