*[counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DEEL, INC., a Delaware corporation, ALEXANDRE ("ALEX") BOUAZIZ, an individual, PHILIPPE BOUAZIZ, an individual, DANIEL JOHN ("DAN") WESTGARTH, an individual, and DOES 1 – 100,<br><br>Defendants. | Case No. 3:25-CV-2576-CRB<br><br>JOINT CASE MANAGEMENT CONFERENCE STATEMENT<br><br>Date Filed: March 17, 2025<br>Am. Compl. Filed: June 5, 2025<br>Judge: Hon. Charles R. Breyer<br>Courtroom: 6<br><br>Trial Date: None set |

Pursuant to Civil Local Rule 16-10, Plaintiff People Center, Inc. d/b/a Rippling ("Rippling") and Defendants Deel, Inc. ("Deel"), Alex Bouaziz ("Alex"), Philippe Bouaziz ("Philippe"), and Dan Westgarth ("Dan," and collectively with Deel, Alex, and Philippe, "Defendants") jointly submit the following joint case management statement. Deel, Alex, Philippe, and/or Dan may address some of the issues separately below; otherwise all Defendants' positions are set forth in the sections entitled "Defendants' Position." Where not otherwise stated, the positions set forth below are the joint position of Rippling and Defendants (collectively, the "Parties").

## I. RIPPLING'S STATEMENT

After more than a year of Defendants ignoring or otherwise avoiding discovery, the evidence developed over the past six months establishes without any doubt that the Defendants—Deel and its senior-most executives—engaged in a wide-ranging and shocking racketeering conspiracy to steal Rippling's confidential information and trade secrets. Why? To curb mounting fears that Rippling's more comprehensive offerings presented an existential threat to Deel.

Defendants' campaign of competitive theft began with systematic efforts to steal Rippling's confidential information through targeted hiring of former Rippling engineers and product leaders pressured to reveal key details about Rippling's proprietary offerings. It then culminated in Deel's CEO directing a Rippling payroll manager in Dublin, Keith O'Brien, to target and steal reams of Rippling's trade secrets in exchange for cash and secret crypto payments arranged by Deel's CFO and board chair. For more than a year, Defendants have brazenly resisted producing clearly relevant and proportional evidence and forced Rippling to bring a series of discovery motions. Recent productions ordered by Magistrate Judge Cisneros, such as forensic data obtained from Alex Bouaziz's phone, have revealed damning evidence of the espionage scheme, as well as Defendants' extensive efforts to destroy incriminating evidence—including after the Complaint was filed.

But there is much more to do. As detailed below, Defendants' efforts at obstruction are ongoing, and critical evidence remains unproduced. Rippling requests a modest 120-day extension of the current case schedule in order to close critical gaps in the evidentiary record. Given the posture of the various disputes detailed below, Rippling believes that this extension is no more than what is necessary to enable adequate development of the evidentiary record.

### A. Summary of the Evidence Produced to Date

#### 1. *Overview of Defendants' Misconduct*

Rippling filed suit on March 17, 2025, with computer logs showing O'Brien's spying activity and its subject-matter relationship to Deel, and a successful honeypot test proving that Deel's executives directed that activity. *See* ECF 1 at ¶¶ 2, 75. At the time, O'Brien was evading an Irish High Court evidence preservation order. Weeks later, he flipped on Deel and signed an April 1, 2025 Affidavit (ECF 57-1, "O'Brien Aff.") that filled in the gaps.

O'Brien testified that, for nearly five months, Defendant Alex Bouaziz—Deel's CEO—directed his spying through a one-to-one, auto-deleting Telegram chat. O'Brien Aff. at ¶ 11. Alex told him what information to look for and what keywords to search, and O'Brien sent Alex photos and video recordings of what he found as attachments to self-destroying messages. *Id.* at ¶ 19. Deel paid him monthly—first through a $6,000 transfer funneled through the account of Deel COO Dan Westgarth's wife, then through crypto payments from a third party known to O'Brien only as "A.D." (aka "the Watchman"). *Id.* at ¶¶ 12, 14–16. And Deel in-house lawyer Asif Malik communicated with him daily over Telegram from March 14, 2025, when he began evading the Irish order, to March 25, when he decided to comply. *Id.* at ¶ 33. The Affidavit attached supporting evidence, including records of Deel's payments, phone records of Malik's outreach, and a handful of recordings of Rippling customer information sent to Alex that survived only because they were inadvertently backed up to O'Brien's iCloud account. *Id.* at ¶ 19.

Deel and the Individual Defendants have, in verified interrogatory responses, denied any wrongdoing and insist that there is an innocent explanation for all of this. But Defendants' actions in this case belie their sworn denials. They have obstructed discovery at every turn, even refusing to provide evidence Judge Cisneros has ordered them to produce. The evidence they have produced—most notably, forensic data from Alex's iPhone—has shown that their denials are false and that the espionage through O'Brien is just the tip of the iceberg.

#### 2. *Deel Misappropriated Trade Secrets and Used Them*

Deel swears that "Alex did not communicate with Mr. O'Brien on a near daily basis, much less multiple times a day." Deel's Mar. 18, 2026 Amended Response to Rippling's Interrogatory

No. 12 ("Rog 12 Resp.") at 15. It admits O'Brien sent Alex Telegram messages but claims they were "unsolicited," that the information "was not . . . at all useful to him or Deel," and that "Alex ignored or did not even see most of Mr. O'Brien's messages." *Id.* at 7, 12. Alex's iPhone data and Deel's productions disprove all of this.

Alex's Court-ordered forensic data shows that he received at least [redacted] from O'Brien between [redacted]—just the final two months of the scheme—and that Alex sent O'Brien at least [redacted] in the same period. That is roughly [redacted] from O'Brien and [redacted] from Alex. If Alex "did not read" these "unsolicited" messages and asked for Rippling information only once, why would the CEO of a multi-billion-dollar company respond to a competitor's mid-level payroll manager [redacted] in two months?

Deel's productions show that Alex shared O'Brien's information with a core group of Deel employees, including Head of Customer Success Luke Ferrel. Deel initially refused to make Ferrel a custodian. After Judge Cisneros ordered his addition, Deel produced Slack messages in which Ferrel contemporaneously wrote: [redacted]." *See* DEEL-00605835 at 2. On another occasion, Ferrel wrote that "[redacted]"—and added, "[redacted]." *See* DEEL-00603442 at 1–2. Ferrel knew Deel's CEO had a spy inside Rippling—and that the evidence had to disappear.

Deel's documents also reveal how Defendants weaponized specific customer information stolen by O'Brien from Rippling's internal systems and passed to Alex, who deployed it to Deel's sales force—sometimes within minutes. For example, on February 24, 2025, a Rippling employee posted in Slack that [redacted] at a customer called [redacted] had said the company had just closed a funding round, was moving a [redacted] employee onto Rippling's EOR product, and wanted to move "[redacted]" *See* RIPPLING-DEEL-00329721. O'Brien viewed that channel at 6:33 p.m. (All times herein are in UTC, which is also local time in Dublin.) At 7:02 p.m., Alex messaged Ferrel: "[redacted]." *See* DEEL-00019746 at 1–2. Alex identified [redacted] as the contact and told Ferrel [redacted] Ferrel replied, [redacted] *Id.* at 5. At 7:19 p.m., Ferrel told

colleagues, [redacted] *See* DEEL-00614302 at 1. Asked how he knew, he answered: [redacted] *Id.* at 3.

[redacted] is not an outlier. From the scheme's first month, the pattern repeats: Rippling's logs show O'Brien searching a keyword—often "Deel," which he searched 23 times a day on average—then previewing a channel with a matching recent post, often about Rippling trying to win a Deel customer. Within hours or even minutes, Deel's production shows Alex messaging senior Deel sales leaders like Ferrel with granular customer details matching the Rippling post and urging them to [redacted] or [redacted] If O'Brien's information was not "at all useful to [Alex] or Deel," why would Alex immediately forward it with those instructions?

3. *The O'Brien Payment Scheme*

Alex and Defendant Philippe Bouaziz, Deel's CFO and board chair, told O'Brien they would pay him approximately €5,000 per month, around the 6th of each month. O'Brien Aff. ¶ 8. The first payment was a $6,000 transfer on November 4, 2024, from the Revolut account of Westgarth's wife, Alba Basha. *Id.* ¶ 12. Revolut records show that Basha's account received $6,000 from Deel minutes before sending it to O'Brien. Deel admits this but claims it paid O'Brien because he was a potential referral source who asked for the money to cover his "living expenses" while he was "leaving Rippling." Rog 12 Resp. at 6. Deel claims it routed the money through Westgarth's wife's personal account because O'Brien "asked that the payment not come from Deel" on account of Rippling "monitoring his communications." *Id.* at 9. This is Deel's sworn testimony.

Deel's story makes no sense. No normal company pays a competitor's employee $6,000 for nothing in exchange, or funnels payments to potential referral sources through an executive's wife's personal account. And O'Brien did not "le[ave] Rippling." He stayed more than four months, with full system access, searching "deel" two dozen times a day and sending the results to Alex. *Id.* at 17. Most tellingly, Deel's own account statement lists Basha—not O'Brien—as the recipient. If Deel hid the payment's source only because O'Brien feared Rippling was "monitoring his communications," there would have been no need to omit O'Brien's name in Deel's own internal records. The only plausible explanation is that Deel omitted his name intentionally.

O'Brien testified that the remaining monthly payments were crypto transfers from A.D.

Philippe concocted coded terminology, instructing O'Brien to request payment by sending a watch photo to a Telegram chat with Philippe and A.D., which Philippe would approve by saying "send that watch to London." O'Brien Aff. ¶ 15. Records attached to the Affidavit show Ethereum worth approximately $6,000 a month going to O'Brien from an unregistered wallet, beginning December 4, 2024 (exactly one month after the $6,000 Revolut payment funneled through Basha's account) and ending March 12, 2025 (two days before he was caught).

Defendants admit the transfers and that Philippe introduced O'Brien to A.D., but they implausibly swear they had nothing to do with the payments. They claim O'Brien wanted more money after the initial $6,000 payment, so Philippe introduced him to A.D., a purported second-hand luxury watch dealer, to earn referral fees. Rog 12 Resp. at 10. Deel swears the arrangement was "[u]nbeknownst to, and without any assistance by Deel, Alex, or Philippe"; that Philippe "had no further involvement"; and that "Alex never had any communications with Mr. O'Brien concerning this subject." *Id.* at 10, 12. Their cover story—built around Philippe's codewords for the payments—beggars belief. Was it just a coincidence that A.D. paid O'Brien approximately $6,000/month in cryptocurrency, in four monthly installments, beginning the month after the initial $6,000 from Deel and ending exactly when Rippling caught and confronted O'Brien? And why would A.D. do that if, as Deel admits, A.D. never bought a single watch[1] that O'Brien "referred"?

Alex's iPhone data confirms the obvious answer: the transfers were bribes for stolen information. Rippling's experts have found only *one* Telegram message between Alex and O'Brien that survived Alex's deletions—a message from O'Brien, preserved in an obscure database of [redacted] received when Alex's home screen was locked, saying: [redacted] That message, dated [redacted], fits perfectly with O'Brien's testimony that he "was supposed to be paid around the 6th of each month" and "would tell Alex if my payment was late, and he would tell me to 'ping Watchman' or that he would 'sort it'" (O'Brien Aff. ¶ 16) and eviscerates Deel's sworn claim that "Alex never had any communications with Mr. O'Brien concerning" A.D. or the crypto payments. Rog 12 Resp. at 10, 12. A.D. refuses to accept service of a subpoena, and Deel has moved to seal his name from the public docket.

[1] Notably, the first "luxury watch" picture O'Brien sent A.D. was his own used Casio G-Shock.

4. *The Cover-Up*

It is now beyond dispute that the two Deel employees most discussed in O'Brien's Affidavit—Alex and Malik—spoliated evidence of their communications with and about O'Brien after this suit was filed on March 17, 2025.

***Alex Bouaziz.*** On March 20, 2025, three days after the Complaint, Alex renamed and exited a three-way group chat with O'Brien and Westgarth. No messages from that chat survive on Alex's phone. From there, the deletions accelerated. On March 21, Alex began deleting records of [redacted] from March 12–21, including [redacted] exchanged with A.D. on March 12 (the day of A.D.'s penultimate payment to O'Brien) and [redacted] exchanged with A.D. on March 20, 2025 (three days after the Complaint). On March 23, Alex acquired a new phone and migrated his accounts to it. The old phone's data shows that disappearing messages were in general use right up to that point: [redacted]. Beginning on March 23, 2025—when Malik (on behalf of Deel) remained in daily contact with O'Brien, and O'Brien was still evading the Irish High Court's order—Alex used the new phone to receive daily messages from Malik about O'Brien's status, all of which are now destroyed. But Alex refuses to turn over the image of that phone for inspection. On November 6, 2026, Judge Cisneros ordered the inspection. Alex has promised to appeal.

***Asif Malik.*** Malik's October 29, 2026 deposition—the first of a Deel witness—confirms the destruction was intentional and coordinated. On March 14, 2025, the day O'Brien began evading the Irish order, [redacted]. *Id.* at pp. 88, 94–98. [redacted] *Id.* at pp. 58–60. [redacted]. *Id.* at pp. 42–43, 46–47. Then, on March 31, 2025—days after O'Brien began cooperating and stopped communicating with him—[redacted]

[redacted] *Id.* at pp. 143–146. [redacted] *Id.* at pp. 146–152. Today, the entirety of Malik's written correspondence with O'Brien is destroyed, and only three out of more than 100 Telegram messages with Alex have been recovered (again, solely as preserved "notifications" on Alex's phone).

Deel blocked inquiry into [redacted]. On November 4, 2026, Rippling filed an administrative motion with Judge Cisneros seeking leave to challenge the privilege objections under the crime-fraud exception and compel testimony. *See* ECF 474.

5. *Deel's Broad Campaign to Steal Rippling's Confidential Information*

O'Brien was not Deel's only source. Discovery shows that Deel systematically recruited Rippling employees—often with above-market compensation (sometimes twice as much as other Deel employees in identical roles)—and then mined them, and their former colleagues still at Rippling, for Rippling's confidential information.

***U.S. Payroll.*** Deel hired former Rippling engineers and, through them, misappropriated confidential Rippling product development information to build a competing U.S. Payroll product—a critical product for both companies. By the second half of 2023, Deel realized that Rippling had a head start of [redacted] in developing U.S. Payroll software, that [redacted] that [redacted] and that [redacted] DEEL-00310967; DEEL-00585765 at 2, 6. So Alex recruited three senior Rippling payroll engineers—Shubham Choudhary, Ming Li, and Namit Nangia—with unusually [redacted] compensation and personally supervised their work. DEEL-00002194. When Choudhary told Alex [redacted] more engineers [redacted] Alex responded: [redacted] DEEL-00001144 at 18. Li advised that their [redacted] and offered to replicate the U.S. payroll tax engine he [redacted] DEEL-00002054 at 10; DEEL-00004305 at 2. Nangia promised to hire

[redacted] DEEL-00017051 at 3.

Based on this evidence, Judge Cisneros ordered Deel to produce documents showing the three former Rippling engineers' work on Deel's U.S. Payroll product by November 1. Rippling's initial review of that production shows that the former Rippling engineers shared numerous specific, valuable details about Rippling's superior software architecture and product design. *See* DEEL-01143638; DEEL-01143529.[2] The documents imply that Ming Li was at the center of these efforts. Not coincidentally, Alex's phone data shows that [redacted] on March 20, 2025—three days after the Complaint.

***Project Pokémon.*** The U.S. Payroll engineers were part of a much broader campaign at Deel to poach Rippling employees. In August 2023, Deel launched [redacted]—subtitled [redacted]—an organized campaign to poach competitors' employees, complete with a [redacted] of targets that included Rippling. DEEL-00150817; DEEL-00227568. Although nominally aimed at several competitors, Deel singled out Rippling. Its recruiters reported that [redacted] DEEL-00658802, and justified an above-band offer to Rippling's Phillip Alvarado because Deel was [redacted] and [redacted] DEEL-00658790. Deel then [redacted] to recruit still more Rippling employees. DEEL-00103987. Deel's production reflects more than three dozen former Rippling employees now at Deel, many of them members of a dedicated [redacted] Slack channel. DEEL-00651409.

***Disclosures by Other Former Rippling Employees.*** Rippling's complaint identified two former employees whom Deel hired as part of this scheme: Phillip Alvarado and Don Floss. FAC ¶¶ 48–51. Discovery confirms that Alvarado put his Rippling knowledge to work at Deel. He

---

[2] *See also* DEEL-01144415 (Li to Alex: [redacted]; DEEL-01149413 [redacted]; DEEL-01143693 ( [redacted]; DEEL-0114519 [redacted]

invoked Rippling's internal underwriting practices, DEEL-00682899; marshaled Rippling customers' plan and per-employee pricing details to undercut Rippling across multiple deals, e.g., DEEL-00264512; DEEL-00271266; and pushed for [redacted] DEEL-00277157. And Floss took a highly confidential Rippling product roadmap with him to Deel. Former Rippling employees also reached back into Rippling for current information. For example, Malik—the Deel lawyer who communicated daily with O'Brien, and whom Rippling previously fired in 2024—repeatedly messaged a former Rippling colleague to learn [redacted] Deel_Malik_00000001; Deel_Malik_00000027; Deel_Malik_00000044. That answer told Deel when to expect Rippling to launch competing e-money products in the U.K.

***Status of Discovery on Non-O'Brien Misappropriation.*** Deel refused to answer Rippling's June 2025 RFPs or interrogatory about the three former Rippling engineers' work on Deel's U.S. Payroll product, forcing motion practice. Judge Cisneros recently ordered Deel to respond by November 1. *See* ECF 435 at 1. Similarly, Deel refused for months to provide any discovery into Rippling's allegations that Deel stole information from other competitors, despite this Court denying Deel's motion to dismiss Rippling's RICO claim based in part on those allegations. Again, Judge Cisneros ordered Deel to produce the discovery by November 1. *See id.* at 2. Consequently, Rippling received much of the discovery it needs to continue investigating the full scope of Deel's misconduct less than a week ago. And it appears that Deel's Court-ordered November 1 productions are substantially incomplete, likely requiring further motion practice.

### B. Deel's Efforts to Obstruct Discovery

Recognizing the damning nature of the evidence, Defendants have engaged in a sweeping campaign to obstruct and delay discovery in this case, despite Judge Cisneros's admonishment to Deel in March 2026 to "start getting this discovery on a fast track." Mar. 4, 2026 Hr'g Tr. at 59. In May, two months after the last case management conference, Judge Cisneros reprimanded Deel for "gamesmanship" in trying to delay discovery and observed that "most of 2025 . . . was wasted" in terms of discovery. May 12, 2026 Hr'g Tr. at 34, 57; *see also* Oct. 29, 2026 Hr'g Tr. at 34 (Cisneros,

MJ.: "[Deel] wanted to pretend like the case didn't exist for a long time … even though I issued an order that said there was no stay of discovery."). After the May hearing, she issued a tentative order finding that Deel's failure to comply with a Court-ordered deadline to respond to interrogatories was "sanctionable misconduct" (ECF 247 at 2), after which Deel paid more than $66,000 in Rippling's attorneys' fees to avoid a final ruling (ECF 259). And less than a month ago, Judge Cisneros concluded that this case "should be much further along on discovery than we are[,]" because Defendants have "used just about every procedural mechanism available to minimize their exposure to these allegations" and delay this case. Oct. 8, 2026 Hr'g Tr. at 45–46.

Just a few examples demonstrate the delays that Defendants have succeeded in generating, and that make completion of discovery on the current schedule impossible.

***Forensics.*** Alex Bouaziz delayed the forensic inspection of his phone for more than seven months, by forcing a motion, bringing a meritless appeal (which this Court denied in July), and then slow-rolling his Court-ordered production. Defendants are now deploying the same playbook to delay further inspections. After data produced by Alex in August and September revealed false statements in Alex's discovery responses and a shocking amount of evidence destruction, Rippling requested inspection of Alex's successor phone (which he began using on March 23, 2025) and Philippe's phone. They refused. On October 8, Judge Cisneros found "it makes sense to allow forensic discovery … of Alex and Philippe's devices" and noted that continued resistance from the Bouazizes would look "not substantially justified" under Rule 37. Oct. 8 Hr'g Tr. at 8–9. The Bouazizes demanded a written order and have stated they will—again—appeal it before turning over the requested data, even though the evidence justifying inspection is now overwhelming.

***Documents.*** Defendants' document productions remain woefully incomplete. Judge Cisneros recently ordered Deel to respond to 29 RFPs that Rippling served in May and June. ECF 435. Deel's production, received on November 1, contains significant gaps, and Rippling will need to seek further relief. Rippling has also detailed numerous other deficiencies in Defendants' productions, which the parties are addressing during their weekly status conferences with Judge Cisneros. Given the number of outstanding issues, Rippling is unlikely to get a complete document production any time soon. And Defendants continue to object across the board to Rippling's most

recent sets of RFPs, which will perpetuate this cycle of delay.

***Depositions.*** Defendants have also obstructed the orderly progression of depositions. First, Alex has filed yet another Rule 72 appeal to this Court, challenging Judge Cisneros's order that he be deposed in San Francisco—despite his own counsel's concession on the record that Judge Cisneros has "discretion" in setting the location of depositions and her order is not "legal error," Oct. 22 Hr'g Tr. at 7. This appeal is frivolous and sanctionable. *See Maisonville v. F2 Am., Inc.*, 902 F.2d 746, 747–48 & n.2 (9th Cir. 1990) (noting that a magistrate judge's order on a nondispositive matter should be overturned only if "clearly erroneous or contrary to law"). Second, at Malik's October 29 deposition (the only deposition so far), Deel improperly instructed Malik not to answer questions based on meritless privilege objections, forcing Rippling to pursue further motion practice to complete the deposition. Then, Defendants refused even to stipulate to a briefing schedule, forcing Rippling to file an administrative motion just to obtain one. *See* ECF 474. Third, Defendants refuse to offer deposition dates. On October 13, Rippling requested deposition dates for four Deel executives and has yet to receive any. Rippling also requested dates for Philippe and Defendant Westgarth, and a confirmation that they will appear in San Francisco. Both refuse to be deposed in San Francisco, and neither has offered a date.

***Third-Party Discovery from Deel's Senior Executives.*** The evidence shows that Deel often instructed its executives to use WhatsApp, instead of Deel's corporate email and Slack, including for portions of the spying scheme. For example, when a former Rippling employee told Alex he was [redacted] (i.e., to develop Deel's competing U.S. Payroll product), Alex replied: [redacted] *See* DEEL-00132849. Malik now admits that [redacted] Malik Dep. Tr. at 76:23–24. Forensic discovery from Alex's phone alone shows thousands of text messages with Deel's executives during the spying scheme, many of which he apparently deleted. Text messages from its executives' mobile devices are therefore critical to discovery. And Deel is making it as burdensome and time-consuming as possible for Rippling to get them.

In December 2025, Deel agreed to collect from its custodians' mobile devices, but never did. ECF 337 at 1. In July, Deel reversed course, refused outright for seven executives, and told

Rippling to subpoena those materials from the executives directly. Rippling served subpoenas in early August. Since then, each of the seven executives and their lawyers (paid for by Deel) has stonewalled. After lengthy delays in responding to letters and emails from Rippling, they have refused to run Rippling's search terms, provide hit counts, or commit to any timeline for production. To date, Rippling has received a total of only three documents, produced by one of the executives. Even worse, all seven refuse to consent to this Court's jurisdiction for Rippling's motions to compel. Rippling is therefore preparing to move to compel in each witness's home district and then move to transfer—a process that will take months—just to get Deel-work-related documents from Deel's current executives that were created at Deel's CEO's direction. This obstruction alone makes completing fact discovery by January 15 impossible.

**C. Damages**

Defendants' position statement below asserts that Rippling's damages will be low. That argument strains credulity. Rippling and Deel are two leading competitors in a market worth more than $100 billion per year. Defendants' premature attempt to limit Rippling's damages to *currently identified* lost customers tries to take advantage of their sweeping destruction of evidence, and Deel continues to withhold discovery that would allow Rippling to identify more lost customers—which is just one category of damages Rippling will pursue in this case. Defendants neglect to even mention entire categories of other trade secrets, such as Rippling's product roadmap and its then-current global expansion plans, for which Deel withheld discovery until November 1 and which are likely to generate substantial additional damages. Defendants also ignore that the DTSA allows Rippling to recover unjust enrichment in addition to damages (e.g., Rippling's cost to develop the stolen information, even if Defendants failed to weaponize it successfully). And Defendants grossly mischaracterize the strength of the evidence that they stole Rippling's U.S. Payroll trade secrets, though they implicitly concede that U.S. Payroll is a cornerstone product. Evidence showing that Deel received a head start in developing a strong U.S. Payroll offering by using Rippling's trade secrets will compound Rippling's damages significantly.

But above all, the "low damages" argument requires taking a big step back: If the stolen information was worth as little as Defendants contend, then why did the CEO, CFO, and COO of

a seventeen-billion-dollar software giant personally bribe an employee at their biggest competitor to steal it? Why would they risk criminal liability to do that? And why would they go to such lengths to destroy evidence of what they did? The answer is obvious.

### D. Discovery Is Not on Schedule Due to Defendants' Obstruction and Delay

Due to the delays catalogued above, the current discovery schedule is no longer feasible. Defendants are plainly seeking to run out the clock on discovery in order to avoid producing more inculpatory evidence. Rippling therefore requests a necessary extension to obtain the discovery to which it is entitled. Rippling proposes an approximately 120-day extension to the remaining deadlines previously set by this Court at ECF 199. The following chart sets forth the resulting schedule, accounting for weekends and holidays.

| **Event** | **Current Date** | **Proposed Date** |
|---|---|---|
| Close of fact discovery | January 15, 2027 | May 14, 2027 |
| Last day to file motions to compel | January 29, 2027 | May 28, 2027 |
| Exchange of opening expert reports | February 26, 2027 | June 25, 2027 |
| Exchange of rebuttal expert reports | March 26, 2027 | July 23, 2027 |
| Close of expert discovery | April 30, 2027 | August 27, 2027 |
| Deadline to file dispositive motions and *Daubert* motions | May 28, 2027 | September 24, 2027 |
| Deadline to file oppositions to dispositive motions and *Daubert* motions | July 2, 2027 | October 29, 2027 |
| Deadline to file replies to dispositive motions and *Daubert* motions | July 30, 2027 | December 3, 2027 |
| Hearing on dispositive motions and *Daubert* motions | August 13, 2027 | December 17, 2027 |

### E. State of the Pleadings

Rippling's operative complaint is the First Amended Complaint, filed on June 5, 2025. ECF 57. This Court dismissed or stayed most of Deel's First Amended Counterclaims on September 25, 2026. ECF 411. On November 4—nearly six weeks later—Deel filed its Second Amended

Counterclaims, which seek to re-plead various theories of Lanham Act liability that this Court previously dismissed. ECF 472.

### F. Discovery Limits

This case includes a sprawling corporate espionage scheme involving the three individual Defendants, Deel itself, other Deel employees, and a number of third parties, in addition to a civil RICO conspiracy with multiple corporate victims. Given the complexity of this case, the scope of Defendants' wrongdoing, and Defendants' known efforts to destroy evidence, Rippling proposes the following discovery limits:

- Each party must respond to up to 50 interrogatories;
- 200 hours of fact depositions per side.

On November 5, 2026, the night before the parties submitted this Joint Statement, Defendants stated they would not agree to calendar any more depositions until Rippling agreed to Rule 30's default limit of ten depositions per side—despite the evidence of a sprawling corporate espionage scheme involving numerous Rippling employees, numerous unrelated categories of stolen trade secrets, and a racketeering conspiracy. On the facts of this case, Defendants' position is absurd. The FAC alone identifies more than 25 potential witnesses, discovery produced thus far has identified scores more, and the proven spoliation of extensive documentary evidence leaves additional depositions as the only available tool to develop the evidentiary record.[3] Defendants' insistence on a ten-deposition cap is yet another attempt to prevent Rippling from uncovering the true scale of their misconduct. And their refusal to offer any deposition dates until Rippling agrees to that limit is another example of their efforts to delay the discovery process.

### G. Pending and Anticipated Motions

In addition to various discovery motions currently pending before Magistrate Judge Cisneros, Deel's Motion for Evidentiary Sanctions, which is set for a hearing on December 18, 2026, is currently pending before this Court. ECF 395. Various administrative motions to seal are

---

[3] *See Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2007 WL 3306496 (N.D. Cal. Nov. 6, 2007) (default limit is not warranted where "breadth and complexity" of the case require additional depositions); *FMC Techs., Inc. v. Edwards*, 2006 WL 8454813 (W.D. Wash. Mar. 20, 2006) (finding good cause to exceed default limit of depositions in trade secrets case given the "numerous witnesses" and "the course and complexity of discovery").

pending before this Court as well. ECF 311, 333, 349, 396, 397, 401, 402, 414.

Defendant Alex Bouaziz also recently filed a Rule 72 appeal from Judge Cisneros's order that he be deposed in San Francisco (ECF 476), despite his own counsel conceding on the record that Judge Cisneros's order was not "legal error." The appeal is not only meritless, but also sanctionable. *See Maisonville*, 902 F.2d at 747–48 & n.2. The appeal should be denied promptly.

Rippling also anticipates being forced to bring a motion to compel further deposition testimony from Asif Malik, and an Administrative Motion seeking a briefing schedule is currently pending before Judge Cisneros. ECF 474. During Mr. Malik's recent deposition, Deel instructed him not to answer many of Rippling's questions based on spurious privilege objections. Rippling will move to compel answers to those questions. Rippling will also seek a finding that the crime-fraud exception vitiates any attorney-client privilege over Malik's Telegram communications with Alex and Deel between March 14–31, 2025 (the period in which Malik was communicating with O'Brien) and an order permitting further questioning about those communications.

Finally, the shocking evidence of spoliation that Rippling has uncovered to date—including Malik's deletion of *every single message* with and about Keith O'Brien occurring after Rippling filed suit—all but ensures that Rippling will move for sanctions under Rule 37. The requested relief may include fees and costs associated with Rippling's forensic inspection and associated motion practice, evidence preclusion, an adverse inference against Defendants, and/or issue sanctions.

Defendants have indicated that they plan to file additional motions as well. On October 27, Rippling received a grand jury subpoena from the United States Attorney's Office for all party discovery records, with the return date set for November 10. Compliance is permitted under the Protective Order, and black-letter law holds that a grand jury subpoena takes precedence over a civil protective order. *See In re Grand Jury Subpoena*, 62 F.3d 1222, 1227 (9th Cir. 1995). Defendants have stated that they "object" to the subpoena and "may pursue a protective order." Defendants have not explained the basis for their objection or motion.

**H. Settlement and ADR**

Rippling does not believe this case is amenable to alternative dispute resolution at this time.

## II. DEFENDANTS' STATEMENT

Defendants supplement and update their positions in the parties' March 20, 2026 Joint Case Management Statement (Dkt. 196) as follows. Except as stated below, Defendants' positions in that statement are unchanged.

### A. Rippling Seeks To Extend The Case Schedule Because This Case Is About Perpetuation of The Litigation, Not The Adjudication Of The Claims

Rippling's portion of this case management statement is lengthy, inflammatory, and replete with disputed facts. For all of its overblown rhetoric and unproven accusations of wrongdoing, Rippling cannot escape the fact that discovery thus far has revealed that Rippling has suffered no damages. Tellingly, Rippling is unable to articulate any meaningful measure of damages or harm it suffered.[4] The payroll industry in which the parties operate is a low-margin, high-volume business, meaning Deel and Rippling have hundreds of thousands of customers, each of which pays them relatively small amounts of money. Based on discovery to date, Rippling ***did not lose a single customer*** as a result of the alleged acts at issue here. Rippling, itself, ***claims*** that Deel *contacted* only a handful of its customers. None of those alleged contacts resulted in any loses. And, even if they had, the damages would be meager.

Yet, Rippling unquestionably has spent at least tens of millions of dollars litigating this case. Why would a company spend that much to recover, at best, a few thousand dollars? The answer is that this case exists to serve Rippling's separate commercial and public relations purposes. Rippling coerced, Keith O'Brien, a mentally-unstable admitted liar, into signing an uncorroborated affidavit to support its outlandish civil claims.[5] Rippling then manufactured a criminal investigation related to its allegations and promptly leaked the fact of that investigation to the Wall Street Journal. Rippling contacted Deel's customers to falsely tell them that, if a customer continued doing business with Deel, the customer's funds could be frozen as part of the

---

[4] After seeing Deel's section of this statement in the parties' exchange, Rippling inserted an eleventh hour section on the purported damages it suffered. Notably, that section is vague and Rippling is unable to claim any damages that would stand up to scrutiny.

[5] Notably, shortly before he signed this affidavit, Keith O'Brien pleaded desperately for help and stated that "Rippling is coercing me to say untruths about Deel," *See* Dkt. 203 at 95. He also noted that "I have been harassed by Rippling legal team," and that "they are trying to break me for whatever reason…" *Id.* at 94.

Government's investigation.[6] Rippling's CEO and General Counsel frequently post about the case on Rippling's blog and on social media in an effort to commercially weaponize the allegations. Even as recently as this week, Rippling insisted on gratuitously including in a publicly filed joint status report to Magistrate Judge Cisneros the fact that it had received another grand jury subpoena. Within 12 hours, the grand jury subpoena had been reported by Rippling-friendly media. Just this morning, Rippling CEO Parker Conrad then appeared on a Rippling-friendly podcast to discuss the grand jury subpoena and the case more generally.

Rippling's media campaign has not slowed; instead, it has intensified as discovery has failed to bear out Rippling's claims. Rippling's litigation and its public relations strategy now operate as one. Rippling times its filings for maximum press effect, places inflammatory characterizations of sealed and confidential discovery material into public court filings, and then amplifies those filings within hours through its executives' social media accounts and sympathetic media outlets. Rippling's portion of this very statement continues the pattern: it devotes many pages to inflammatory narrative about disputed evidence that is the subject of pending motions and sealing requests and again gratuitously describes a grand jury subpoena that has nothing to do with case management.

Knowing it cannot show any meaningful harm, Rippling aggressively has sought discovery into other irrelevant areas in a futile effort to manufacture a damages theory. Rippling even has baselessly suggested that Deel might have copied Rippling's U.S. Payroll product—a claim to which Deel has responded by offering to cut to the chase and compare source code, yet Rippling has not responded to that proposal. All of this is to say that, while the allegations in this case concerning liability are both serious and vigorously disputed, the damages are, at best, grossly disproportionate to the level at which this case is being litigated. Despite the delays caused by Rippling's fishing expeditions, Deel is committed to completing fact discovery by January 15, 2027 and unlike Rippling which has blown through Court deadlines for discovery—has met the Court's substantial completion deadline for document production.

[6] This customer forwarded the communication to Deel, which is how Deel obtained it. Despite the obvious relevance of these communications to Rippling's motive in bringing this lawsuit, Rippling has refused to produce communications with its customers about the lawsuit.

Rippling insists that it cannot complete fact discovery by January 15, 2027, and requests an additional four months. Rippling recites stale gripes to support its assertions that Defendants are obstructing discovery, when it has been Rippling that has failed to meet its own sought-for discovery deadlines. Since March, Deel has worked at breakneck pace to meet the Court's deadlines, deploying over 70 contract reviewers and over 100 Skadden timekeepers to stay on pace to meet the Court's January 2027 fact discovery cutoff date. This stands in stark contrast to Rippling's snail's pace of production, where it admits it has deployed only 20 reviewers to review the 11 million documents it has collected. Not surprisingly, Rippling will not complete production until November 20, 2026, at earliest, over two months after the Court's substantial completion deadline. Deel has produced over 100,000 documents related to its 16 custodians, which dwarfs Rippling's current production set of 10,000 documents for over 17 custodians. As ordered by Judge Cisneros on October 8, Deel has also produced documents related to its U.S. Payroll Product and other sensitive business documents, despite the lack of any link to allegations in Rippling's First Amended Complaint. Rippling has not identified any actual deficiencies in Deel's productions, but baldly claims it needs additional time when Rippling has been the party slow-rolling its production—even refusing to produce forensics related to Keith O'Brien's devices, when it has had this information for over a year.

At bottom, Rippling has two goals: (1) to prolong this case past deadlines it has previously fought for and agreed to—in order to use public discussion of the litigation to inflict the greatest possible commercial pain on Deel and Defendants, and (2) to search for other damages theories through broad swaths of irrelevant discovery because its pleaded case has yielded so little in terms of actual harm or damages.

### B. Discovery Update: Rippling Has Not Been Harmed; Its Discovery Fishing Expeditions Are Intended To Find New Facts And To Jeopardize The Fact Discovery Deadline

Since the March 20, 2026 statement, discovery has confirmed what Defendants said then: Rippling has not been harmed. Neither of Rippling's two principal damages theories—lost customers or U.S. Payroll—is bearing out, and Rippling has responded by expanding discovery in search of a theory of harm that might pan out. Recently, Rippling has pivoted its focus to vague

and unsupported RICO claims to justify its massive expansion of discovery, which Magistrate Judge Cisneros has largely granted. The fact that Rippling is actively searching for some basis on which to claim it was harmed speaks volumes about the true nature of this litigation.

1. <u>The Customer Theory</u>

Lost customers are the core of Rippling's theory of harm. Yet when asked to identify the customers it allegedly lost because of Defendants' conduct, Rippling identified only a handful, each of which was already a Deel customer that stayed with Deel, or a prospective or current Rippling customer that Rippling does not allege chose Deel over Rippling. Based on a Rippling-supplied list of company names O'Brien purportedly searched, Deel identified the customers with which it had any contact since the alleged spying scheme, and described those contacts.[7] Although more than two months have passed since Deel served those discovery responses, Rippling has not identified any of those customers as "lost." Nor has Rippling produced any document quantifying a lost customer, lost value, lost profit, or showing ***any*** benefit Deel obtained from any claimed Rippling trade secret.

Rippling's sole customer example in this statement proves the point. Rippling points to [redacted] as the paradigm case: a customer about which O'Brien allegedly viewed information that Rippling says was passed to Alex. But [redacted] did not leave Rippling. It remained a Rippling customer throughout, purchased additional Rippling products, and in March 2026 renewed its Rippling contract for two more years. Nor did Deel retain that customer: in 2025,

[7] Because Rippling must pump up the number of potential customers at issue given the lack of damages it is able to prove, its recent theory is that every time O'Brien searched "Deel," any references to a potential customer would be automatically deemed one that Rippling lost to Deel. But that theory is flawed as Rippling has no evidence that any such information was actually <u>transmitted</u> to "Deel." In an Appendix A Rippling served on Deel listing 1,432 Customers Rippling allegedly "lost," hundreds of references are simply nonsensical, mistranscriptions, or fail to prove damages at all. For example, there are numerous references to mistranscriptions of "deel." See, e.g., RIPPLING-DEEL-00112132, RIPPLING-DEEL-00140196; RIPPLING-DEEL-00140276; RIPPLING-DEEL-00140247. Within this Appendix, there were also scores of references to instances where Rippling was able to win deals over Deel (and yet they claim damages based on these examples?). See, e.g, RIPPLING-DEEL-00274541;RIPPLING-DEEL-00274590; RIPPLING-DEEL-00237725;RIPPLING-DEEL-00195106. These hundreds of flawed "examples" of "lost customers" in Exhibit A reflect that Rippling is quick to accuse in order to manufacture damages, but slow to verify its overblown allegations.

[redacted] moved its international employees off Deel and onto Remote, a third-party competitor. Nor is [redacted] among the companies O'Brien recalls sharing information with Alex. Even taking Rippling's account at face value, then, its own paradigmatic example shows that where O'Brien allegedly transmitted information about a customer, Rippling lost nothing. [redacted] is not an outlier. Rippling's "lost customer" examples reflect that Rippling suffered no harm.

- Customer A from the FAC, [redacted] moved from Deel to Rippling and remained a Rippling customer. This cannot support damages.
- Prospect A from the FAC, [redacted] did not consolidate to Rippling because Rippling could not offer the products it needed and Rippling kept changing its fees. *See* [redacted]; RIPPLING-DEEL-00629766; RIPPLING-DEEL-00629744; [redacted].
- Prospect B from the FAC, [redacted], is an example of a customer Rippling tried and failed to poach in the fall of 2024. Deel's records indicate Deel was focused on maintaining this customer's business long before any allegations related to O'Brien. That Deel's sales representatives did their best to retain this customer's business shows nothing to support Rippling's claims.

All of these examples support Deel's conclusion that Rippling cannot win in the marketplace so it has taken the fight to the PR arena, and has weaponized litigation in order to do so.[8]

2. <u>The U.S. Payroll Theory</u>

Facing the absence of cognizable damages, Rippling has tried to expand its case to an entirely new product—Deel's U.S. Payroll product ("USP"). As Magistrate Judge Cisneros observed after reviewing the pleadings, "the FAC does not contain[] allegations that secrets related to Rippling's native U.S. Payroll system were stolen." Dkt. 384 at 2. Rippling's verified response

[8] Additional examples abound. Prospect C was considering both Deel and Rippling but had concerns about Rippling based on its reputation for jacking up prices. *See* [redacted]; DEEL-00696431; DEEL-00575972; RIPPLING-DEEL-00000312. Ultimately, Prospect C chose Deel because it was impressed by Deel's responsiveness. [redacted] (likely Customer B) was a Deel and Rippling customer that was having problems with Rippling and discussed consolidating its business with Deel months before the alleged spying scheme. Another split Deel/Rippling customer decided to consolidate with Rippling, had a bad experience, and then moved all of its business back to Deel after efforts by Deel to win the business back.

to Interrogatory No. 9 likewise identifies no USP trade secret. Despite these omissions, Magistrate Judge Cisneros permitted Rippling to pursue broad USP discovery, under the guise of potential "pattern" evidence for Rippling's RICO claim. *Id.* Rippling's theory rests on nothing more than Deel's hiring of three former Rippling engineers. Recruiting experienced payroll engineers is not misappropriation, it is protected commercial activity under California law.

At the October 8 discovery conference, Deel explained that Rippling could not furnish any evidence of misappropriation by Deel as to its USP.[9] Despite the absence of USP allegations, the lack of USP in Rippling's interrogatory response, and the dearth of misappropriation, Magistrate Judge Cisneros ordered Deel to produce broad swaths of documents from the three engineers related to USP. Deel complied with the order and, in less than three weeks, produced the court-ordered USP discovery. To resolve Rippling's theory efficiently, Deel proposed on November 3 that the parties' experts directly compare the source code and technical design of the two companies' U.S. payroll products under a new "HIGHLY CONFIDENTIAL—SOURCE CODE" protective order tier modeled on this District's form. Deel further explained that the only code the two products could possibly share is code from common libraries and open-source modules that belongs to neither party. Deel also asked Rippling to identify each component it contends Deel copied or used (RFP No. 251), to produce any technical comparison it has already performed (RFP No. 116), and to respond on a shortened schedule to Deel's October 21 source-code requests (RFP Nos. 232–233, 247, 251–252; RFI Nos. 1–2) given the Court's January 15 fact discovery cut off date. Rippling has failed to respond. If Rippling will not test its new theory against readily available evidence, Deel will ask the Court to issue an order requiring Rippling to produce its source code on an expedited time frame so the parties can complete source code review by the middle of December given the mid-January fact discovery deadline.

3. Refusal to Identify Trade Secrets

[9] Rippling furnished Deel with 188 pages of slack messages from Deel's employees. *See* Dkt. 366-1 Those slack messages showed Deel denigrating Rippling's product, seeking to build its own, and also showed that Deel was careful in its recruitment of employees from competitors, with its teammates stating that Deel would review restrictive covenants. *Id.*

The crux of Rippling's claims is that Defendants misappropriated trade secrets from Rippling. Yet nearly 20 months after filing suit, Rippling still has not identified the trade secrets Defendants allegedly misappropriated. Rippling persistently claims it cannot identify its own allegedly misappropriated trade secrets until it obtains further discovery from Defendants. But it neglects to identify what exactly it needs from Defendants. The prejudice to Defendants cannot be overstated. The identification of the claimed secrets defines the case. A plaintiff "may not simply rely upon 'catchall' phrases or identify categories of trade secrets." It must describe each secret with "sufficient particularity to separate it from matters of general knowledge in the trade." *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020). Without that identification, a defendant cannot test whether any claimed secret is generally known, was reasonably protected, or was ever used. For that reason the identification should come "by the outset of merits discovery," 22 Sedona Conf. J. 223, 246 (2021), and the Court may limit trade secret discovery until the plaintiff sufficiently identifies the claimed trade secrets. *Quintara*, 149 F.4th at 1091.

Rippling refuses to identify what confidential information it claims Defendants actually obtained, notwithstanding its unrestricted access to its forensic records and to O'Brien. Instead, Rippling has identified everything O'Brien ***might have seen*****,** whether or not Rippling has any reason to believe that O'Brien ***actually*** saw it, let alone transmitted it to any Defendant. By way of example, Rippling identified the entire contents of 268 Slack channels—250,000 pages of documents, a stack of paper more than 8 stories tall when printed—as misappropriated trade secrets. But Rippling does not claim O'Brien actually read all that information or that he transmitted it to Defendants. Where O'Brien "previewed" a channel even once, Rippling claims every message posted in that channel over more than a year was misappropriated. Dkt. 367 at 1-2. Rippling's position has no basis in fact or law. The sheer breadth of Rippling's "identification" deprives Defendants of the ability to fairly defend themselves.

Rippling also refuses to distinguish which documents embody the allegedly misappropriated trade secrets. It refuses to identify the confidential information within those

documents and to distinguish them from everyday chatter about Halloween costumes and cafes that fills the channels it claims as trade secrets. And Rippling refuses to answer related interrogatories going to the basic elements of trade secret status, such as whether the claimed "secret" has been disclosed to third parties. Its stated reason is telling. Rippling calls its own identification "extraordinarily broad" and says that breadth makes answering too burdensome.

After three months of unsuccessful meet-and-confers, Defendants sought relief from Magistrate Judge Cisneros in an August 13 joint letter, which also asked for full briefing. Dkt. 367. That relief has not come. Deel raised the issue at successive discovery conferences on October 8, October 22, and October 29. On October 29, Magistrate Judge Cisneros observed that, "to the extent there are known transmissions, in distinguishing those known transmissions from just alleged access," it seemed "appropriate" to order identification, but she declined to order such relief without O'Brien's counsel present—for some reason conditioning Deel's right to party discovery against Rippling on the presence of a non-cooperative third party. Dkt. 463. On November 5, she ordered Rippling to serve a verified supplement due January 4, 2027, eleven days before fact discovery closes. The order sets no limit on later amendment and does not require Rippling to fix the defects Deel identified. Defendants intend to move for relief under Civil Local Rule 72-2 and will ask that Rippling be required to identify its trade secrets now, and be held to that identification, so that the remaining discovery is tied to the claims actually in the case.

4. <u>Deel's Recruiting Practices and Allegations Related to Former Employees</u>

Rippling makes much of "Project Pokémon," but these allegations describe lawful competition. Project Pokémon was a recruiting initiative to identify and hire strong go-to-market talent across the industry; its targets included ADP, Multiplier, Remote, Oyster, Omnipresent, Papaya, and Cloud Pay, not just Rippling. Deel's production also makes clear that Deel proceeded with caution in hiring employees from its competitors, noting that it would follow and take into account candidates' restrictive covenants. *See* DEEL-00150818. Recruiting experienced employees from competitors is protected commercial activity, particularly in an industry where talent comes from a handful of companies and many employees have worked at several competitors. It is not evidence of *any* wrongdoing, and certainly not an expansive RICO

conspiracy. Rippling itself recruited aggressively from Deel, and Rippling cannot complain when its own employees leave to work for one of its competitors.

5. Rippling's Competitor "Pattern" Discovery

Although Rippling's RICO allegations are not a model of clarity, its RICO claims appear to rest solely on the O'Brien scheme. The Court found three plausible predicates—obstruction of justice, wire fraud, and trade secret theft—and every alleged co-conspirator relates to Rippling. Dkt. 174 at 44. Rippling has nonetheless used its RICO claims to pursue discovery into Deel's dealings with eleven other competitors on the basis of an unsupported "network of spies" allegation. Rippling claims no injury to any of those competitors and has not explained how they were involved in, or victimized by, the alleged enterprise. Lawful competitive hiring is not a predicate act. Deel has complied with Magistrate Judge Cisneros's October 8 order (ECF 435) while reserving its objections.

6. Forensic Data

Rippling dedicates much of its position statement to conclusions it draws from its forensic analysis of Alex's phone. But that forensic analysis is wholly consistent with Alex's interrogatory responses. The number and pattern of messaging is consistent with Alex's statements that: (1) O'Brien sent multiple unsolicited messages to Alex via Telegram, (2) Alex did not read or look at most of the messages, and (3) Alex only occasionally responded to these messages. That is borne out by the 7:1 ratio of messages received versus sent. And by Rippling's count, even short successive messages such as "Hi" and "How are you?" would count as multiple messages. Moreover, the implication that it was unusual for Alex to be corresponding with someone at O'Brien's level is rebutted by Alex's well-known reputation in the tech industry as a hands-on executive who is highly approachable on social media. In sum, this is another instance of Rippling attempting to gin up controversy where none exists to distract from Rippling's inability to prove actual damages.

**C. Deel Has Substantially Completed its Productions and Is Committed to the January 15, 2027 Deadline; Rippling Has Repeatedly Failed to Meet Its Deadlines and Now Seeks an Additional Four Months**

The central discovery update since the last statement is simple: Deel has met the substantial completion deadline, and Rippling has not.

Deel reviewed over 1.1 million documents, produced over 100,000 documents across 16 custodians, and served a privilege log. In November, Deel deployed 70 reviewers and made a further 15,000-document production in response to the Court's October 8 expansion on the scope of discovery. Deel is committed to the January 15, 2027 close of fact discovery and the remaining deadlines in the case schedule, and Deel is on track to meet them. Rippling, by contrast, has produced little, and has requested to push out the schedule by months. It failed to meet the September 16 substantial completion deadline that it fought to set, Dkt. 196 at 20–21, and seven weeks later it still has not substantially completed its production. Rippling now says it will substantially complete its custodial productions by November 20, 2026 and it only recently expanded its review team to 20 contract attorneys for a collection of more than eleven million documents. Dkt. 457 at 2–3. That "substantial completion" date does not cure the problem; it compounds it.

1. <u>Subpoenas for Deel Employees' Personal Devices</u>

The Court has already ruled on this issue, now twice. *See* Dkts. 375; 479. Rippling seeks information from the *personal* devices of Deel's employees. As Deel has explained, these personal devices are not within Deel's possession, custody, or control. Deel was actively seeking cooperation from these employees when Rippling aggressively served subpoenas on those employees. Not surprisingly, Deel's employees now wish to work through their individual lawyers regarding any production. The Court has since confirmed that "[r]egarding Deel employees' personal devices and subpoena compliance, the Court will not compel these individuals to produce this information without a proper subpoena and proceedings. Deel represented that it has collected the corporate sources." Dkt. 479.

**D. Deel's Second Amended Counterclaims**

On November 4, 2026, Deel filed its Second Amended Counterclaims against Rippling, Parker Conrad, and Keith O'Brien. Dkt. 472. The Second Amended Counterclaims assert claims for (1) violation of RICO, 18 U.S.C. § 1962(c); (2) RICO conspiracy, 18 U.S.C. § 1962(d); (3)

violation of the CFAA, 18 U.S.C. § 1030; (4) violation of the CDAFA, Cal. Penal Code § 502; and (5) false advertising under the Lanham Act, 15 U.S.C. § 1125(a). Deel's Second Amended Counterclaims re-pleads claims to address the specific deficiencies identified by the Court. (Compare FACC ¶ 320, with SACC ¶¶ 265-66 (amending to allege that the statement is still on Rippling's website and that Deel has offered native global payroll since at least 2020); compare FACC ¶ 322, with SACC ¶¶ 267-68 (amending to allege that the ad has run since at least October 30, 2025, and that Continuous Compliance has been available since no later than January 2024); compare FACC ¶¶ 350, 354, with SACC ¶ 298 (amending to allege that report builder has been offered since no later than early 2025 and adding details on how it works across modules).) Deel has not yet commenced arbitration of the claims compelled to arbitration in the Court's September 25, 2026 order. Counter-Defendants' response is due November 18, 2026.

### E. Defendants' Proposed Schedule

As noted above, Defendants are committed to meeting the Court's January 15, 2027 fact discovery cut-off date. What jeopardizes the parties being able to meet the fact discovery deadline is Rippling's slow-rolling productions and its failure to meet the Court deadlines, even as the parties are in the midst of depositions. Rippling also refuses to narrow its trade secrets case and continues to hatch new theories of liability because its current customer-driven trade secrets case has turned up empty and yields, at best, minimal damages.

Rippling's request for a 120-day extension should be denied. This is Rippling's latest attempt to grossly expand the scope of discovery in this case, as described above. Having failed to find evidence of harm under either of its two principal damages theories, Rippling now seeks four more months to look for a new theory in its *250,000 pages* of alleged trade secrets. Rippling controlled the sequencing of its own discovery. It chose which witnesses to depose and when, and it is choosing to use its deposition slots on peripheral witnesses with little connection to the claims or (nonexistent) damages at issue. Rippling cannot now claim that it needs additional time and additional depositions to examine Philippe Bouaziz and Dan Westgarth, named Defendants it could have deposed first. The only delay in this case is of Rippling's own making: Rippling fought for a September 16 substantial completion deadline, will miss it by two months, and now does not expect

to substantially complete its custodial productions until November 20, 2026. Rippling's failure to meet its own deadlines is not good cause to extend the case schedule. Defendants remain committed to the January 15, 2027 close of fact discovery and the remaining deadlines set at ECF No. 199, and they ask the Court to keep that schedule in place. Defendants are willing and ready to meet the Court's discovery deadline, which Judge Cisneros made clear she would enforce. Dkt. 384 at 1-2.

**F. Discovery Limits**

Defendants' position is unchanged from the parties' March 20, 2026 Joint Case Management Statement: the Court should enforce the default limits of Federal Rules of Civil Procedure 30 and 33, with the ability to seek leave for additional discovery on a showing of good cause. Dkt. 196 at 17. The case schedule the Court adopted rests on those default limits. *Id.* at 19. At the time, Rippling insisted it needed 50 interrogatories and 200 hours of deposition time per side, and it dismissed any concern about the schedule on the ground that the roughly 100 working days between substantial completion and the discovery cutoff would be "more than enough time" to complete that testimony. *Id.* at 16.

The Court should deny Rippling's request for "200 hours" of deposition time per side. That request equates to roughly 30 depositions per side, three times Rule 30's default limit of 10. A party seeking to exceed that limit must make a "particularized showing of the need to depose" each witness, including those it took in exhausting the default limit. *Manly v. MGM Resorts Int'l*, 2025 WL 3459709, at *5 (D. Nev. Dec. 1, 2025). This ensures that a party cannot "circumvent the cap on depositions by exhausting the maximum allotted number to take those that she could not justify under the Rule 26(b)(2) standards, and then seeking leave to exceed the limit in order to take depositions that he could substantiate." *Id.* (citation omitted). Rippling cannot make that showing. To date, Rippling has taken ***one deposition***. The assertion, then, that Rippling has shown a need for what equates to 30 depositions when it has only taken one deposition so far lacks all credibility and certainly does not satisfy the "particularity" standard required to justify each witness. In fact, Rippling has not even named a single witness to justify its request. Even for the 12 depositions it has requested to date, Rippling cannot establish the necessary particularized showing for each. For example, Rippling intends to depose Elisabeth Diana, a former Deel PR employee whose role was

limited to communicating with a publication called *The Information* about a story on sanctions compliance. Likewise, Rippling seeks to depose Shuo Wang, a Deel co-founder who has ***no involvement whatsoever*** in any of Rippling's allegations. Nowhere has Rippling made the particularized showing required to justify the need to depose these witnesses (or others). And in a case where there are zero damages at stake, the burden of engaging in 200 hours of depositions per side is hardly justified. Moreover, contrary to Rippling's claims, Defendants have not refused to produce Philippe Bouaziz or Dan Westgarth for deposition; rather, Defendants have asked which two of the 12 requested depositions Plaintiffs will withdraw to bring them within the 10-deposition limit.

### G. Pending and Anticipated Motions

**Motion for Relief From Judge Cisneros's Order (ECF No. 449)**. On November 5, 2026, Alex Bouaziz, Philippe Bouaziz, and Daniel Westgarth filed a Motion for Relief from a Nondispositive Pretrial Order regarding the Court's order at ECF No. 449 under seal. ECF No. 481. That motion is currently pending before the Court. Pursuant to Civil L.R. 72-2(d), the Court may allow Rippling to file an opposition by November 19, 2026, after which it may set a hearing for oral argument. Counsel nonetheless will be prepared to argue this motion at the upcoming conference but request that any such argument be held in a sealed hearing due to the requirements imposed by the underlying order

**Alex Bouaziz's Deposition Location.** On November 5, 2026, Alex Bouaziz filed a Motion for Relief from a Nondispositive Pretrial Order regarding Magistrate Judge Cisneros's order that Mr. Bouaziz be deposed in San Francisco. ECF No. 476. That motion is currently pending before the Court. Pursuant to Civil L.R. 72-2(d), the Court may allow Rippling to file a motion in opposition by November 19, 2026, after which it may set a hearing for oral argument. Counsel will nonetheless be prepared to argue this motion at the upcoming conference. The basis for Mr. Bouaziz's motion is that he is entitled to the presumption that he be deposed at or near where he resides. Mr. Bouaziz has offered to appear for deposition in Israel, where he lives with his young family, in his native France, or remotely. Rippling has presented no exceptional circumstances to overcome this presumption.

**Deel's Motion for Discovery Sanctions.** Deel has filed a motion for evidentiary sanctions seeking to prevent Rippling from benefiting from the unethical conduct underlying its so-called "honey pot" scheme. As Rippling has openly admitted, that scheme revolved around its General Counsel's decision to knowingly include lies in a legal communication to a litigation adversary, and any alleged fruits of that scheme should be excluded. A hearing on Deel's motion is scheduled for December 18, 2026.

The Defendants may also be filing a motion to require Rippling to narrow its trade secrets as it is impossible to prepare witnesses and to conduct discovery when Rippling has designated over 250,000 pages as its alleged trade secrets. Defendants reserve all rights to file other dispositive motions after the end of fact discovery in January.

### H. Settlement and ADR

As stated in the parties' March 20, 2026 Joint Case Management Statement, the parties have met and conferred as required by ADR L.R. 3-5 and agree that private mediation is the most appropriate form of ADR for this matter. Dkt. 196 at 19. Deel continues to believe that private mediation is the appropriate ADR process, but that mediation would not be productive at this time. Rippling has not substantially completed its document production, has not identified with particularity the trade secrets it contends were misappropriated or what O'Brien actually transmitted to any Defendant, and has not identified any customer it lost or any quantification of its claimed harm. Until those gaps are closed, and Rippling produces its documents and Defendants complete depositions of Rippling's witnesses, the parties lack a common factual basis on which to evaluate the case. Deel will continue to evaluate the timing of a mediation as discovery proceeds and is prepared to revisit the issue with Rippling following the close of fact discovery.

Dated: November 6, 2026

By: */s/ Eric H. MacMichael*
ELLIOT R. PETERS (SBN 158708)
epeters@keker.com
ERIC H. MACMICHAEL (231697)
emacmichael@keker.com
ANDREW F. DAWSON (264421)
adawson@keker.com
NICHOLAS S. GOLDBERG (273614)
ngoldberg@keker.com
BENJAMIN D. ROTHSTEIN (295720)
brothstein@keker.com
MAYA P. JAMES (318554)
mjames@keker.com
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5499
Facsimile: (415) 397-7188

Attorneys for Plaintiff PEOPLE CENTER, INC. D/B/A RIPPLING, a Delaware corporation

By: */s/ David R. Eberhart*
DAVID R. EBERHART (SBN 195474)
deberhart@omm.com
CHRIS B. PHILLIPS (SBN 330256)
cphillips@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
Telephone: +1 415 984 8700

STUART M. SARNOFF (*pro hac vice*)
ssarnoff@omm.com
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas
17th Floor
New York, New York 10019
Telephone: +1 212 326 2000

Attorneys for Defendant DANIEL JOHN WESTGARTH

By: */s/ Lance Etcheverry*
LANCE ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
QUYEN L. TA (SBN 229956)
quyen.ta@skadden.com
JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

ALLEN L. LANSTRA (SBN 251510)
allen.lanstra@skadden.com
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

Attorneys for Defendant DEEL, INC.

By: */s/ Kenneth Brown*
Joseph G. Petrosinelli (*pro hac vice*)
jpetrosinelli@wc.com
Kenneth Brown (*pro hac vice*)
kbrown@wc.com
Danielle J. Barondess (*pro hac vice*)
dbarondess@wc.com
Lydia A. Weiant (*pro hac vice*)
lweiant@wc.com
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

William Frentzen (Bar No. 343918)
WFrentzen@mofo.com
**MORRISON FOERSTER LLP**
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Defendants ALEXANDRE and PHILIPPE BOUAZIZ

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the other party signatories. I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 6, 2026

*/s/ Eric H. MacMichael*
Eric H. MacMichael