UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE CENTER, INC., Plaintiff, v. DEEL, INC., et al., Defendants. | Case No. 25-cv-02576-CRB (LJC)<br>**ORDER RESOLVING DISCOVERY DISPUTE**<br>Re: Dkt. No. 338 |

This action involves two competitors that offer payroll and human resource management software. Plaintiff People Center, Inc. d/b/a Rippling (Rippling) has accused Defendant Deel, Inc. (Deel), along with individual Defendants Alexandre "Alex" Bouaziz and Phillipe Bouaziz, of engaging in a corporate espionage scheme in which Rippling employee Keith O'Brien was recruited to funnel Rippling's confidential trade secret information to Deel. Rippling and Deel have filed a Joint Discovery Letter (ECF No. 338) in which Deel seeks to discover communications between O'Brien's and Rippling's separate counsel. Rippling is resisting discovery of its outside counsel's communications with O'Brien's counsel, arguing that they are protected by the common interest doctrine. In general, attorney-client communications are privileged, and thus, shielded from discovery, but the privilege is waived if the communication is disclosed to a third party. The doctrine of common interest, however, excuses that waiver, preserving the attorney-client privilege and thereby safeguarding those communications from being revealed through discovery. The parties dispute the application of the common interest doctrine and disagree as to whether federal common law or Irish privilege law should apply to the communications at issue.

The parties have briefed the dispute, and presented a factual record that includes, among

other things, the Cooperation Agreement that O'Brien entered into with Rippling. Dkt. No. 338 (Joint Discovery Letter); Dkt. No. 338-20 (Cooperation Agreement or "CA"). The Court held a hearing, in which Rippling's, Deel's, and O'Brien's counsel participated. Dkt. No. 399. Having considered the parties' briefing, the factual record, oral argument, and the applicable authorities, the Court **GRANTS IN PART and DENIES IN PART** Deel's request to compel this discovery.

## I. BACKGROUND

### A. Rippling's First Amended Complaint

Founded in 2016, Rippling is a software company that offers a global workforce management system for businesses to manage internal workflows, including human resources, IT, and finance. Dkt. No. 57 (First Amended Complaint) (FAC) ¶ 13. Rippling's worldwide customers are business enterprises ranging from small businesses to larger, enterprise-level customers. *Id.* Deel represents that it was founded in 2019.[1] *Id.* ¶ 16. Rippling and Deel compete head-to-head for customers looking for global workforce management solutions. *Id.* ¶ 45.

Rippling initiated this action (the U.S. Proceeding) on March 17, 2025, naming Deel and Doe defendants 1-100. Dkt. No. 1. The operative FAC brings claims against Deel for violations of the federal RICO statute, conspiracy to violate the RICO statute, and violations of the federal Defend Trade Secrets Act, as well as state law. FAC ¶ 10. As part of the RICO claim, Rippling also names as defendant Deel's Chief Executive Officer, Alex Bouaziz, and its Chief Financial Officer, Phillipe Bouaziz (Alex's father). Rippling alleges that Alex personally recruited Keith O'Brien as a corporate spy, directing "the near-daily theft of trade secrets and confidential information" from Rippling. *Id.* ¶ 2. Rippling alleges that this "top-down, centrally orchestrated" operation led by Alex and Phillipe involved several senior Deel executives, and was only discovered after O'Brien, a then-Rippling employee, confessed in a sworn affidavit. *Id.* Rippling also named a third individual defendant, Deel's Chief Operating Officer, as a defendant in connection with its RICO conspiracy claim.

[1] In its Motion to Dismiss, Deel describes itself as a global workforce management software that connects employers in over 150 countries with remote workers through a platform that manages global human resources, payroll, and compliance. Dkt. No. 89 at 11–12.

O'Brien is a resident of Dublin, Ireland, and was the Global Payroll Compliance Manager for Rippling Ireland Ltd., Rippling's Irish subsidiary. FAC ¶ 24. Rippling alleges that Alex began recruiting O'Brien in or around March 2024 by commenting on a LinkedIn post by O'Brien. *Id.* ¶ 57. Rippling alleges that O'Brien began receiving compensation for his spying in November 2024. *Id.* ¶ 64. After conducting a "controlled honeypot test" and submitting "extensive forensic evidence," Rippling obtained an emergency preservation order from the High Court of Ireland on March 12, 2025, requiring "the spy" to turn over his devices to an independent solicitor for forensic imaging. *Id.* ¶ 2, n.2. The order carried a risk of imprisonment in the Irish legal system. *Id.* Rippling alleges that Deel continued making payments to O'Brien until March 13, 2025, the day before Rippling obtained an order from the Irish High Court requiring O'Brien to turn over his personal devices for imaging and preservation. *Id.* ¶ 65.

Rippling alleges that, on March 25, 2025, O'Brien contacted the Irish law firm Fenecas Law, and confessed about Deel's alleged spying scheme. *Id.* ¶ 148. O'Brien allegedly met with the independent solicitor, alongside counsel from Fenecas Law, on March 26, 2025 to attempt compliance with the High Court Order and provide his personal devices. *Id.* Rippling contends that O'Brien "voluntarily came forward to confess while represented by his own legal counsel." *Id.* ¶ 153, n.37.

On April 1, 2025, O'Brien signed a sworn affidavit that tracked in detail many of Rippling's allegations, including those set forth above. Rippling attached O'Brien's affidavit to its FAC. Dkt. No. 57-1 (O'Brien Aff.). O'Brien's affidavit has been described in another discovery order, but for the sake of brevity, the details of his statements are not repeated here. *See* Dkt No. 482 at 3-4.

**B. Rippling and O'Brien's Cooperation Agreement**

Rippling and O'Brien entered into the Cooperation Agreement on March 27, 2026. The Cooperation Agreement sets forth certain preliminary information. CA ¶¶ A-F. The Agreement refers to O'Brien as "Defendant" throughout and explains that, on March 12, 2025, "Plaintiffs", specifically Rippling, the Delaware incorporated entity, and Rippling Ireland LTD, a company incorporated under Irish law, initiated the "Irish Proceedings" against O'Brien, seeking damages



United States District Court
Northern District of California

based on his conduct "whereby he unlawfully accessed and provide [Rippling's] trade secret and confidential information to Deel." CA ¶ C. The Cooperation Agreement goes on to acknowledge the action before this Court as the "US Proceeding," filed against Deel "arising out of" the same role that O'Brien played "whereby he provided Deel with the Plaintiff's trade secrets and confidential information." CA ¶ D. The Plaintiffs in the Irish Proceeding secured an "Anton Piller Order" and filed a "Contempt Motion." CA ¶ E. The final paragraph of the Cooperation Agreement's preliminary statement describes the purpose of the agreement:

> In advance of the hearing of the Interlocutory Notice of Motion in the Irish Proceedings (which was first returnable to 24 March 2025 but currently stands adjourned to 31 March 2025) and the said Contempt Motion, the Parties have agreed to resolve these proceedings and all disputes between them on the terms set out in this Agreement.

CA ¶ F.

After the preliminary statement, the Cooperation Agreement covers nine sections: (1) Cooperation; (2) Section 19 of the Criminal Justice Act, 2011; (3) Breach by the Defendant; (4) Expert Determination; (5) Independent legal advice; (6) Confidentiality; (7) Entire Agreement; (8) Severability; and (9) Variation. The section labeled "Cooperation" states,

> The Defendant agrees to cooperate fully with the Plaintiffs and their affiliates in relation to the US Proceedings, and any similar proceedings by or involving the Plaintiffs in relation to the subject matter of these proceedings. The Defendant agrees to provide full, truthful and accurate information with respect to the same.

CA ¶ 1.1.

The Agreement details the cooperation required of Defendant O'Brien, including "providing documents," "participating in privileged interviews," "giving evidence," "attending all meetings, judicial proceedings, depositions, and any other places" that Rippling requests his presence, and giving notice to Rippling prior to "discussing the conduct at issue in the Irish Proceedings and / or the US proceedings with anyone other than [Rippling]." CA ¶¶ 1.3(a)-(g).

In return for Defendant's cooperation, Plaintiffs in the Irish Proceedings promised to pay him sums, including reimbursement for reasonable travel expenses and out of pocket costs, including costs associated with independent legal advice, a €80,000 plus VAT at 23% contribution towards his legal costs; and €10,000 plus VAT at 23% in contribution towards BDO Ireland's



United States District Court
Northern District of California

fees, and his employee restricted stock units vested. CA ¶ 1.6(a)-(c), (j). Plaintiffs also promised to indemnify "the Defendant in respect all and any liability for damages and costs that might be awarded against him in the US proceedings," and "in respect of all and any liability for damages and/or costs that might arise in respect of any litigation to which [O'Brien] is joined as defendant, notice party, or for any other reason in relation to the circumstances of the Irish and US Proceedings or any other such proceedings that may arise in the future." CA ¶¶ 1.6(g)-(h).

Notably, the Cooperation Agreement provided that:

> Within 28 days of this agreement, the Plaintiffs will strike out the proceedings with no order including no order as to costs subject to the Defendant being able to comply with his obligations to, being available to, and cooperating with the Plaintiffs. All undertakings given by the Plaintiffs will be discharged. Any costs or other orders made in the proceedings to date will be vacated

CA ¶ 1.6(d).[2] Moreover, the Cooperation Agreement further provided that:

> In the event of any material breach by the Defendant of the provisions of this Agreement the Plaintiff will be entitled, at its election to: (a) (b) re-enter the proceedings in which case the Plaintiffs will be entitled to retain any cooperation given under this agreement and the Defendant will be entitled to credit for same; or to immediately enter final judgment against the Defendant for the sum of€150,000.

CA ¶ 3.1.

**C. Deel's Counterclaims**

On March 25, 2026, soon after the first anniversary of this action's commencement, Deel filed its answer and counterclaims against Rippling, O'Brien, and Rippling's founder and Chief Executive Officer Parker Conrad. Dkt. No. 203 (Answer). After Deel amended its counterclaims, Rippling moved to compel arbitration and to dismiss the counterclaims. Dkt. Nos. 263, 268. Deel asserted eight counterclaims: (1) RICO violation, (2) RICO conspiracy, (3) violation of the Computer Fraud and Abuse Act (CFAA), (4) violation of California's Comprehensive Computer Data Access and Fraud Act (CDAFA), (5) cybersquatting, (6) trademark infringement, (7) false designation of origin and unfair competition, and (8) false advertising. Answer. On September

[2] Deel represented, and Rippling has not disputed, that Rippling withdrew its claim against O'Brien in the Irish Proceedings on August 1, 2025. Dkt. No. 338 at 1.

United States District Court
Northern District of California

25, 2026, the Court compelled arbitration of the CFAA and CDAFA counterclaims, and the RICO counterclaim arising from alleged unauthorized access to Deel's platform; these counterclaims were stayed pending arbitration. Dkt. No. 411 at 17–19. In addition, the Court dismissed the remaining counterclaims, except for Deel's false advertising counterclaim, which it narrowed to certain allegedly false or misleading statements concerning Deel's products and services. *Id.* at 24–32. Deel has since filed its Second Amended Counterclaims. Dkt. No. 472. The substance of Deel's racketeering counterclaims against Rippling involve allegations that Rippling intimidated and harassed O'Brien to coerce him into spreading lies about Deel and bribed O'Brien to influence him to provide false testimony about Deel to deflect from Rippling's own allegedly unlawful conduct in making payments in Russia in violation of sanctions.

## II. LEGAL STANDARD

Discovery is properly directed toward "any nonprivileged matter that is relevant" and "proportional to the needs of the case"; such discovery "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26.

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020). The privilege extends to a client's confidential disclosures to an attorney to obtain legal advice, as well as an attorney's advice in response to such disclosures. *See United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). In the Ninth Circuit, whether information is protected by the attorney-client privilege is determined using an eight-part test:

> Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Sanmina*, 968 F.3d at 1116. "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Ruehle*, 583 F.3d at 607 (citations and quotations omitted). The party claiming the privilege has the burden to establish that it applies. *See United States v. Martin*, 278 F.3d 988, 999–1000 (9th Cir. 2002).

United States District Court
Northern District of California

A party asserting privilege or work product protection must "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii); *see also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1148 (9th Cir. 2005). The party asserting the privilege must provide "sufficient information for the Court to determine whether the privilege or protection applies in the first instance to a particular communication." *Howington v. Taiwan Semiconductor Mfg. Co.*, No. 24-CV-05684-VKD, 2025 WL 2597403, at *3 (N.D. Cal. Sept. 8, 2025).

"A party challenging application of the attorney-client privilege or work product protection may request in camera review, but only if the party establishes that such review is warranted." *Howington*, 2025 WL 2597403, at *2 (citing *In re Grand Jury Investigation*, 974 F.2d at 1074. "To empower the district court to review the disputed materials in camera, the party opposing the privilege need only show a factual basis sufficient to support a reasonable, good faith belief that in camera inspection may reveal evidence that information in the materials is not privileged." *In re Grand Jury Investigation*, 974 F.2d at 1075.

## III. DISCUSSION

### A. Common Interest Exception to Waiver of Attorney-Client Privilege

Given the parties' dispute, the Court first reviews the law concerning the common interest doctrine.

It is a "settled rule that *any* voluntary disclosure of information to a third party waives the attorney-client privilege, regardless of whether such disclosure later turns out to be harmful." *Ruehle*, 583 F.3d at 612 (emphasis in original). The common interest doctrine provides "an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). The common interest exception is inapplicable where documents are "not covered by attorney-client privilege because they do not represent communications between a lawyer and his client for the purpose of obtaining legal advice." *Id.*

The "'common interest' privilege or doctrine" and "joint defense privilege" refer to the

same principle which "has not been limited to criminal defense situations [or civil cases] or even situations in which litigation has commenced." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012).

> Whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

*Id.* (quoting *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990).

However, "even if there were a common legal interest, the common interest exception requires that the communication at issue be 'designed to further *that* [legal] effort.'" *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007) (quoting *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *see also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir.1986) (stating that joint defense privilege requires that "the statements were designed to further the [joint defense] effort"); *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 572 (E.D. Cal. 2002) (noting that "doctrine only protects communication when they are part of an ongoing and joint effort to set up a common defense strategy"); *accord United States ex rel., Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 685 (S.D. Cal. 1996).

### 1. *In re Pacific Pictures*

In *In re Pacific Pictures*, the Ninth Circuit addressed "whether a party waives attorney-client privilege forever by voluntarily disclosing privileged documents to the federal government," and in doing so, the court considered whether the common interest exception applied. 679 F.3d 1121, 1124 (9th Cir. 2012). The dispute arose from litigation over rights to Superman. *Id.* Marc Toberoff, an attorney representing parties asserting rights to Superman, alleged that a former employee had taken documents from his files and delivered them to D.C. Comics, an opposing litigant. *Id.* at 1124–25. Toberoff subsequently asked federal prosecutors to investigate the alleged theft. *Id.* at 1125. In response, the U.S. Attorney's Office issued a grand jury subpoena and provided a letter concerning the confidentiality of the materials. *Id.* Toberoff voluntarily produced the documents without redaction, and D.C. Comics sought their production on the

grounds that he had waived any attorney-client privilege. *Id.* The petitioners advanced two bases for preserving the privilege notwithstanding the disclosure: selective waiver, based on the disclosure's having been made to the government rather than a civil litigant, and the common interest doctrine, based on Toberoff's position as the alleged victim of the conduct under investigation. *Id.* at 1127–29.

In rejecting selective waiver, the Ninth Circuit first recognized that because the attorney-client privilege "contravenes the fundamental principle that the public has a right to every man's evidence, we construe it narrowly to serve its purposes." *Id.* at 1126 (cleaned up). The court held that adopting the selective waiver theory would "unmoor a privilege from its underlying justification," and "fail[] to construe the privilege narrowly." *Id.* at 1128. The rationale for this holding was that "selective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose." *Id.* at 1127.

The court next considered whether the disclosure was nonetheless protected by the common interest doctrine because Toberoff was the alleged victim of the crime being investigated. *Id.* at 1129–30. Consistent with principle that an exception to the third-party disclosure rule must be moored to the policy justification for the attorney-client privilege, the Ninth Circuit determined that the common interest exception did not apply because, among other reasons, the victim's disclosures to the government were not "intended to facilitate representation of either Toberoff or the government." *Id.* at 1129-30 (citing *Hunydee v. USA*, 355 F.d 183, 184-85 (9th Cir. 1965) (common interest doctrine protected communications at a conference in which separately represented husband and wife, and their attorneys, had discussions to facilitate representation in possible subsequent proceedings, though their interests were not entirely aligned)). The victim of a crime and the government did share a common legal interest.

The common interest argument also raised the distinct question of whether Toberoff and the government had undertaken a joint legal strategy, rather than merely sharing an interest in the prosecution of his former employee. *Id.* The court held that "a shared desire to see the same

outcome in a legal matter is insufficient to bring a communication between two parties within this exception." *Id.* at 1129. "Instead, the parties must make the communication ***in pursuit of a joint strategy*** in accordance with some form of agreement." *Id.* (emphasis added).

**2. *U.S. v. Gonzalez***

In *United States v. Gonzalez*, the Ninth Circuit recognized that the common interest doctrine is also referred to as the joint defense privilege, and addressed the extent to which an alignment of interests is necessary to support such a privilege, whether the joint defense agreement must be in writing and whether and when it may terminate. There, a husband and wife were prosecuted for insurance fraud involving the wife's car and for the use of fire to commit a felony. *Gonzalez,* 669 F.3d at 976. The spouses both separately confessed to the fraud. *Id.* With respect to the use of fire charge, the husband initially told federal agents that he burned the car but his wife knew nothing about it. *Id.* The trial court severed the spouses' trials when the husband announced that he would testify at his wife's trial regarding the use of fire count. *Id.* However, the husband changed his mind shortly before his own trial, and indicated that he would defend against the crime, and he lied about his involvement to protect his wife. *Id.* The husband asserted that he remained consistently committed to his wife's defense on the use-of-fire count (which carried a ten-year minimum sentence)—that she was guilty of fraud but had no knowledge that the car would be burned. *Id.* at 976, 981. The husband was later convicted of three fraud counts, but acquitted of the use of fire count. *Id.* at 976. The wife was convicted on all counts. *Id.*

After their convictions, the wife sought relief under 28 U.S.C. § 2255, alleging that her attorney had provided ineffective assistance by failing to call her husband as a witness. *Id.* The government sought discovery of communications between their attorneys concerning the husband's proposed testimony, and the husband asserted the joint-defense privilege to prevent disclosure. *Id.* at 976–77.

The Ninth Circuit explained that the common-interest doctrine extends attorney-client privilege to communications exchanged between separately represented parties pursuing a "joint defense effort or strategy." *Id.* at 978. Although the parties need not possess "identical interests," and "may even have some adverse motives," their attorneys must, at minimum, be "engaged in

maintaining substantially the same cause." *Id.* at 980 (quoting *Cont'l Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964)). The protection extends to communications "to the extent that they concern common issues and are intended to facilitate representation." *Id.* (quoting *Hunydee*, 355 F.2d at 185). The Ninth Circuit further explained that "no written agreement is required," and that a joint-defense agreement "may be implied from conduct and situation." *Id.* at 979. The Ninth Circuit found sufficient evidence of an initial joint-defense agreement based on the attorneys' declarations and testimony that they had agreed to coordinate their defenses, share confidential information, and proceed pursuant to a mutual understanding of confidentiality. *Id.* at 979–80.

The more difficult question was whether the parties continued pursuing a common legal strategy *after* the husband's interests diverged. First, the court rejected the government's contention that severance necessarily defeated common-interest protection, reasoning that "parties in separate actions might nonetheless have reasons to work together toward a common objective." *Id.* at 980. Indeed, the trials had initially been severed so that the husband could testify in his wife's defense, and the attorneys continued discussing their cases afterward. *Id.* Second, the court recognized that the husband's subsequent decision to blame his wife potentially terminated their common legal interests. *Id.* at 981. The timing was significant because the wife's attorney testified that she learned of the husband's intention to blame his wife only "shortly before trial." *Id.* at 980. The court therefore considered whether the change in defense strategy had terminated the original joint-defense arrangement, notwithstanding the attorneys' earlier cooperation. *Id.* at 980–81. Nonetheless, the parties arguably continued pursuing a narrower joint strategy concerning whether the wife knew that the vehicle would be destroyed by fire. *Id.* at 981. Thus, their conflicting positions on the broader fraud allegations did not necessarily eliminate their common legal interest in that particular issue. *Id.* at 980–81.

The court explained that a joint-defense agreement "is not necessarily an all-or-nothing proposition" and may be established or terminated through conduct. *Id.* at 981. Without deciding which was correct, the court identified two possible conclusions: the parties' original agreement terminated when the husband adopted an antagonistic defense, or their agreement was limited to the fire-related charge and survived their broader disagreement. *Id.* Because the record did not



United States District Court
Northern District of California

establish precise scope and duration of the joint-defense agreement, the Ninth Circuit remanded for an evidentiary hearing to determine "(1) if the JDA implicitly ended at some point, (2) if so, when, and (3) when the relevant communication here (the ultimate representation regarding what Gonzalez would testify to at Paiz's trial) was made." *Id.* at 981. The court also distinguished between communications made during an operative joint-defense agreement and communications made after the agreement had ended, recognizing that earlier privileged communications would remain protected even if subsequent communications did not qualify. *Id.* at 981.

### 3. ***Waymo v. Uber***

In *Waymo LLC v. Uber Techs., Inc.*, following *in camera* review, neither the attorney-client privilege nor the common interest doctrine applied to protect from discovery a forensic report and its exhibits, and the court granted Waymo's motion to compel. No. 17-CV-00939-WHA (JSC), 2017 WL 2485382, at *1 (N.D. Cal. June 8, 2017). The *Waymo* case arose from Uber's proposed acquisition of Ottomotto (Otto), a self-driving vehicle company founded by former Waymo employee Anthony Levandowski. *Id.* at *1. Uber and Otto, each separately represented, executed a Term Sheet that created a process for Uber's acquisition of Otto through the execution of a Put Call Agreement. *Id.* at *1-2. The Term Sheet did not obligate Uber to acquire Otto, i.e. execute the Put Call Agreement or close on the transaction, but it required a forensic investigation of certain Otto employees, including Levandowski, to identify activities, events and such reasonably related to certain defined "Bad Acts" by the diligenced employees, and required Uber to indemnify Otto and/or any diligenced employee, including Levandowski, for any claim brought by Waymo. *Id.*

First, Judge Corley addressed Levandowski's and Uber's separate contentions that the forensic report and its exhibits were protected from discovery based on the attorney-client privilege. Judge Corley determined that Levandowski's attorney-client privilege did not extend to the report and its exhibits as the forensic investigator had been engaged by Otto and Uber through their respective law firms, rather than Levandowski or his own personal attorney, and Levandowski was interviewed by the investigator outside the presence of his personal attorney. *Id.* at *4-6. Likewise, Uber failed to establish a protectable attorney-client privilege in the report

or any of its exhibits, given that the memoranda concerning the investigator's interviews with Levandowski and another individual were conducted in their individual capacities and Levandowski was not a client of the law firms involved in directing the preparation of the report. *Id.* at *6-7. Furthermore, Levandowski and Uber's shared interest with Otto in preparing for potential litigation against Waymo did not create a common interest that protected Levandowski's communications with Uber's and Otto's respective counsel, or more particularly, his communications with the investigator, acting as an agent for both firms, because the common interest doctrine itself does not make a document or communication privileged. *Id.* at *7-8. Finally, Levandowski's attorney's input into the protocol that the investigator implemented did not create an attorney-client relationship between Levandowski and the two law firms that were representing Uber and Otto. *Id.* at *8.

Second, Uber argued that attorney work-product protection applied to protect the forensic report and its exhibits from discovery. *Id.* at *8. The court assumed that the report qualified as Uber's attorney-work product and focused its question on whether Uber waived any privilege by disclosing the work product to Otto. *Id.* The two law firms working for Uber and Otto engaged the forensic investigator to conduct the due diligence report, but Uber alone paid for it. *Id.* The law firms directed the investigator to jointly and simultaneously share its factual findings with both law firms. *Id.*

The court found that the common interest doctrine did not apply to excuse the waiver of attorney work product protection. The court rejected Uber's contention that, at the time of the signing of the Term Sheet, it and Otto had a common legal interest and therefore did not waive the attorney work-product privilege, reasoning that, at that time, "Otto and Uber were on opposite sides of a proposed transaction with no obligation to consummate the transaction." *Id.* at *9. Furthermore, even if Uber and Otto shared a common legal interest, waiver is only prevented under the doctrine "if the communications at issue were 'designed to further *that* [legal] effort.'" *Id.* (quoting *Nidec*, 249 F.R.D. at 579). The court reasoned that the Term Sheet itself was the best evidence of the purpose of the forensic investigation, and the Term Sheet made clear that it was intended to allow Uber to discover facts relevant to the acquisition and to create a record to control

whether Uber would be entitled to reimbursement of its indemnification expenses. *Id.* at *9. Judge Corley's review of the Term Sheet, the investigative report and its exhibits, which set the parameters and a protocol for the investigation, confirmed that Uber and Otto's interests were not aligned. *Id.* at *10. Accordingly, the report was not in furtherance of Uber's common interest with Otto to defend against potential litigation against Waymo or "part of an on-going and joint effort" to advance a common strategy. *Id.* The court similarly rejected Uber's engagement letter sent to the forensic investigator and its written joint defense agreement with Otto as evidence that Uber and Otto share a common legal interest in securing the forensic report, or that the report was in furtherance of a common legal strategy. *Id.* at *11-12.

Judge Corley nevertheless recognized that "[t]he outcome might be different ***after*** the signing of the Put Call Agreement." *Id.* at *10, n.2 (emphasis added). The court explained that the subsequent Put Call Agreement created an indemnification obligation and gave the parties conditional rights to compel completion of the transaction. *Id.* As Uber had only argued that the common legal interest was established upon the signing of the Term Sheet, the court did not determine whether the Put Call Agreement established a common legal interest.

#### 4. Summary of the Decisions

These decisions include key takeaways that guide the application of the common interest doctrine. The common interest exception must be applied in a manner tethered to the very policy justification for the attorney-client privilege—it must serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance. *In re Pacific Pictures*, 679 F.3d at 1127. A shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within the common interest exception, and the parties must "make the communication ***in pursuit of a joint strategy*** in accordance with some form of agreement." *Id.* at 1129 (emphasis in original). Though the common interest agreement need not be written, *Gonzalez*, 669 F.3d at 979, the existence of a written agreement between the parties to the communication will not necessarily establish that a common legal interest exists; the agreement must be scrutinized to discern its purpose. *See Waymo*, 2017 WL 2485382, at *9. Nor must the agreement be supported by an alignment of identical interests; some adversarial motives

may be permitted, though the agreement may be terminated by conduct. *Gonzalez,* 669 F.3d at 980-981. The extent of the parties' common interest matters; a party's changing defense theory will not necessarily eliminate their common legal interest that pertains to a narrow issue. *Id.* A legally significant change in the parties' relationship may give rise to a common legal interest that did not previously exist. *See Waymo*, 2017 WL 2485382 at *10 n.2.

**B. The Present Dispute**

**1. The Common Interest Exception**

**a. The Existence of a Common Legal Interest**

Rippling and O'Brien argue that from March 27, 2025 forward, Rippling and O'Brien shared common legal interests, as established by their Cooperation Agreement. Dkt. No. 338 at 3. Rippling contends that, as of that date, O'Brien "resolved Rippling's claims against him in Ireland," and agreed to cooperate with Rippling and participate in "privileged interviews" with Rippling's legal representatives. Rippling and O'Brien's asserted common legal interests include: "establishing that Deel recruited and directed O'Brien to spy on Rippling, preserving and adducing evidence for civil and criminal proceedings; advancing DOJ's investigation into Deel's criminal conduct; and defending against Deel's efforts to attack O'Brien's credibility and falsely accuse both O'Brien and Rippling." *Id.*

Deel, on the other hand, argues that O'Brien and Rippling did not share a common legal interest until Deel filed the counterclaims. *Id.* at 1. Insofar as Deel takes this position, Rippling argues that Deel attacked O'Brien and Rippling as joint adversaries long before the counterclaims were filed and the timing of when Deel filed its counterclaims should not be control when the common legal interest commenced between Rippling and O'Brien because the filing date was driven in part by Deel's delay tactics. *Id.* at 4.

Addressing Rippling and O'Brien's first argument, the Cooperation Agreement did not establish a common legal interest between the two. The provisions in the Cooperation Agreement are geared towards settling the Irish proceedings in return for O'Brien's cooperation. CA ¶ F ("Whereas . . . the Parties have agreed to resolve these proceedings and all disputes between them on the terms set out in this Agreement."). However, Rippling and O'Brien remained adversaries

even upon the signing of the Agreement. The Cooperation Agreement did not unconditionally require Rippling to dismiss the Irish proceeding against O'Brien. *See Waymo*, 2017 WL 2485382, at *9 ("no acquisition obligation existed until the subsequent execution of the Put Call Agreement," and thus "Uber and Otto did not share a common legal interest."). Rather, the agreement provided that within 28 days of its signing, Rippling "will strike out the [Irish] proceedings . . . ***subject to*** [O'Brien] being able to comply with his obligations to, being available to, ***and cooperating with the Plaintiffs***." CA 1.6(d) (emphasis added). Under these terms, Rippling's Irish case against O'Brien continued subject to O'Brien cooperating to Rippling's satisfaction. Though O'Brien's cooperation pursuant to the agreement afforded him an opportunity to settle the dispute with Rippling, the execution of the Cooperating Agreement itself on March 27, 2025 did not guarantee or end the Irish proceeding against him. In fact, the Irish proceeding was not dismissed until August 1, 2025, 127 days after the date the agreement was signed.

In the Cooperation Agreement Rippling agreed to indemnify O'Brien for damages and/or costs in any litigation in which O'Brien is named as a defendant for any reasons related to the circumstances involved in the Irish and US Proceedings. CA ¶ 1.6(h). That provision arguably contemplates the possibility that Deel might pursue claims against O'Brien, but nothing else in the Cooperation Agreement addressed O'Brien and Rippling's preparation of a joint defense to those potential counterclaims. The purpose of the agreement was to set terms for the settlement of Rippling's Irish claims against O'Brien.

After the agreement was signed and during the time in which Rippling's Irish Proceeding against O'Brien was not yet dismissed, Rippling and O'Brien remained on opposite sides of a settlement agreement that was not yet consummated. In this respect, their relationship was still substantially adversarial. However, after Rippling dismissed the Irish Proceeding, the adversarial nature of the relationship meaningfully diminished, such that a common legal interest could exist. Though Rippling could reinstate its claim against O'Brien and enter a monetary judgment under the terms of the Cooperation Agreement, a common legal interest may still exist where there is some measure of adversity between the parties. *See Gonzalez*, 669 F.3d at 980-981.



United States District Court
Northern District of California

The possibility of being codefendants or "vulnerable to related claims" supports a common legal interest shared by those facing possible legal exposure. *Id.* at 979. Rippling and O'Brien were not sufficiently aligned in facing a common threat in Deel at the time the Cooperation Agreement was signed on March 27, 2025 because Rippling still had an outstanding legal case against O'Brien. Days later when O'Brien signed a sworn affidavit, pointing a finger at Deel for instigating corporate spying, he began to face a mounting possibility of a legal counterattack by Deel. Rippling became a target for Deel as well, with respect to its cooperation with O'Brien, which would have been evident when it filed its First Amended Complaint on June 5, 2026. Yet Rippling had not yet dismissed the Irish Proceeding against O'Brien. This vulnerability shared by O'Brien and Rippling crystalized once Rippling dismissed the Irish action against O'Brien, making it clear that O'Brien had demonstrated a level of cooperation acceptable to Rippling in support of its claims against Deel in the U.S. Proceeding. On August 1, 2025 it became clear that O'Brien and Rippling were on the same side. O'Brien and Rippling moved from being foremost adversaries while the Irish proceeding was pending, to sharing a common legal interest in preparing to defend against possible counterclaims by Deel. Though Deel began attacking both O'Brien and Rippling even before August 1, 2025, that alone would not have been sufficient to create a common legal interest between O'Brien and Rippling while Rippling's claims against O'Brien were still pending in the Irish court system. Because the existence of litigation is not required to establish a common interest between parties, the common legal interest may arise before Deel filed its counterclaims. *Id.* at 978.

Deel cites *Citizens Development Corporation, Inc. v. County of San Diego*, 2019 WL 172469, at *12 (S.D. Cal. Jan. 11, 2019) to support its contention that Rippling and O'Brien could not have a "true common goal" when it would involve O'Brien imposing liability on himself. In one important respect this case is different from *Citizens*, where the court considered whether the plaintiff and defendant public agencies could have shared a common interest during a mediation process. There, the plaintiff and defendant public agencies were parties on opposite sides of pending civil litigation that was the subject of the mediation process. In contrast, as of August 1, 2025, the Irish proceeding against O'Brien had ended. From that point forward, facing the

United States District Court
Northern District of California

prospect of counterclaims by Deel, the ability of O'Brien's and Rippling's counsel to communicate with one another without waiving attorney-client privilege would facilitate their representation in joint defense against those claims. *See In re Pacific Pictures*, 679 F.3d at 1129-30. Before the August 1, 2025 dismissal, communications between O'Brien and Rippling's counsel involved in facilitating O'Brien's cooperation are for the purpose of consummating the settlement terms set forth in the Cooperation Agreement and terminating the Irish Proceeding in which O'Brien and Rippling are adversaries. Adversaries' shared interest in completing a settlement agreement is different from a common legal interest where parties need their counsel to communicate with one another to advance a joint legal strategy with respect to a set of claims or defenses.

**b. Furtherance of a Joint Strategy**

"[F]or the non-waiver of a privilege to apply, the parties must have a common legal interest and the communication sought to be shielded from discovery must have been in furtherance of a joint strategy in support of that legal interest." *Waymo*, 2017 WL 2485382 at *9. Having established the existence of a common legal interest that could apply to a given communication, the next step in the analysis is to determine whether the communication advanced a joint legal strategy in service of that common interest. Rippling has argued that it and O'Brien embarked on a shared legal strategy that involved substantiating O'Brien's credibility.

An individualized evaluation will be necessary to determine whether a given communication or document was made to further a joint legal strategy in support of O'Brien and Rippling's common legal interest. A privilege log provided by Rippling will facilitate Deel's review of information concerning the communications and documents that Rippling contends may be withheld from discovery pursuant to the attorney-client privilege and the common interest exception to third-party disclosure. Rippling flagged Section 8 of the parties' Stipulated ESI Protocol as the basis for not logging communications involving trial counsel that post-date the filing of the original complaint in this action on March 17, 2025. *See* Dkt. No. 73. However, the party asserting a privilege bears the burden of establishing that the privilege applies. Therefore, where Rippling asserts that a communication or document made after the August 1, 2026

dismissal of the Irish Proceeding is subject to attorney-client privilege or attorney work product protection and that it is further protected from the ordinary waiver rule pursuant to the common interest doctrine, Rippling must provide an entry in a privilege log to substantiate its position.[3]

**2. Irish Privilege**

Beginning on March 26, 2025, there were communications between counsel for Rippling and counsel for O'Brien conducted in Ireland, by Irish attorneys, concerning O'Brien. Deel has expressed particular interest in discovering documents and communications from the period of time spanning approximately twelve hours between March 26 and March 27, 2026 while Rippling and O'Brien, through their counsel, negotiated the Cooperation Agreement. Dkt. No. 399 (Tr. 4:22-5:20). The parties agree that the common interest doctrine is inapplicable to communications between O'Brien's and Rippling's respective lawyers while they were actively litigating against each other prior to the Cooperation Agreement. Rippling, however, argues that a subset of documents that Deel seeks are communications between Rippling and O'Brien's Irish counsel in connection with the Irish Proceedings, and Irish privilege law independently protects these communications from disclosure. Both parties cite to *Cadence Pharmaceuticals, Inc. v. Fresenius Kabi USA, Inc.*, a patent action, to address whether Irish or U.S. law governs. 996 F. Supp. 2d 1015, 1019 (S.D. 2014).

In *Cadence*, certain basics are recited. Rule 501 of the Federal Rules of Evidence states that "questions of privilege in a federal question case are governed by the principles of common law." "Most courts apply the 'touch base' analysis in deciding choice of law issues in cases where the alleged privileged communications occurred in a foreign country or involved foreign attorneys or proceedings." *Id.* at 1019. "Courts engaging in the 'touch base' analysis defer to the law of the

[3] Rippling has asserted that the resolution of privilege disputes requires a communication-by-communication determination. Insofar as Rippling argues only that from March 27, 2025, when the Cooperation Agreement was entered into, O'Brien and Rippling shared common legal interests, and the Court has rejected that argument, Rippling has not identified any other cognizable common legal interest before the August 1, 2025 dismissal of the Irish Proceeding. Therefore, any further disputes that relate to the common interest doctrine will involve communications and records made after the August 1, 2025 dismissal, and a privilege log and individualized determinations before communication and documents before that date are unnecessary.

United States District Court
Northern District of California

country that has the 'predominant' or 'the most direct and compelling interest' in whether the challenged communications should remain confidential, unless the foreign law is contrary to the public policy of the forum." *Id.* (citing *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 2080 F.R.D. 92, 98 (S.D.N.Y. 2002). The party invoking a foreign privilege has the burden of proving the applicability of the foreign law and must establish that the foreign law protects the communication from discovery. *Id.* The burden then shifts to the opponent of the privilege to present evidence to contest the existence of the privilege. *Id.*

The U.S. has the predominant and most direct and compelling interest in whether the attorney-to-attorney communications and records from March 26 to March 27, 2025, and through dismissal of the Irish Proceeding on August 1, 2025, should remain confidential. During this period Rippling was negotiating and advancing the consummation of the settlement agreement to end the Irish case against O'Brien in return for his cooperation to advance the U.S. Proceeding. This action, the U.S. Proceeding, was not merely incidental, but rather it was the higher priority for Rippling relative to the Irish Proceeding against O'Brien, which ultimately was dismissed. Thus, under the "touch base" test, the Court will apply U.S. privilege law to the communications at issue. Rippling has not advanced any basis under U.S. privilege law for withholding the communications between O'Brien's Irish counsel and Rippling's Irish counsel before the execution of the Cooperating Agreement; accordingly they must be produced.

## IV. CONCLUSION

In light of the Court's ruling that the record does not establish a common legal interest between O'Brien and Rippling before the point that the Irish Proceeding was dismissed on August 1, 2025, Rippling is **ORDERED** to produce by November 16, 2026, all responsive documents and communications made before dismissal of the Irish Proceeding that have been withheld solely on the basis of the common interest doctrine, for which no other privilege or protection from discovery applies.

Rippling shall produce a privilege log of all documents and communications between Rippling's counsel and O'Brien's counsel for which Rippling seeks to assert an attorney-client and/or attorney work product protection, and a common interest exception to the usual waiver rule

based on voluntary disclosure. Given the Court's ruling that the record establishes a common legal interest between O'Brien and Rippling at the point that the Irish Proceeding was dismissed on August 1, 2025, Rippling shall log the documents and communications from that point forward that it seeks to withhold from discovery on the basis of the common interest doctrine. This privilege log shall be served on Deel by November 16, 2026. Rippling's privilege log shall provide in each entry for the communication or document withheld:

> (1) the Bates number,
> (2) the date and timestamp,
> (2) all authors,
> (3) all recipients,
> (3) the basis for privilege (e.g., attorney client privilege, work product, etc),
> (4) Rippling's asserted common interest,
> (5) a high-level description of the legal strategy furthered by the communication or document withheld (e.g., "Email from John Doe to Jane Doe requesting legal advice regarding strategy for ***defending*** against potential counterclaims").

After Rippling has produced its privilege log, the parties shall promptly meet and confer regarding any disputed entries. If the parties are unable to resolve the dispute, the parties shall file an updated discovery dispute letter and attach the privilege log as an exhibit. No page limit applies to the length of the privilege log. At the parties' request, the Court will conduct an *in camera* review of the contested documents, and the parties shall stipulate to the set of documents they will provide to the Court.

At the next discovery status conference the parties shall address whether and when they anticipate further discovery disputes concerning the common interest exception and the parties shall update the Court regarding the status of any privilege log that pertains to common interest exceptions that Deel may be invoking to withhold communications or records.

**IT IS SO ORDERED.**

Dated: November 7, 2026

LISA J. CISNEROS
United States Magistrate Judge