**Dear Judge Cisneros:** This letter addresses Rippling's motion to compel responses to RFP Nos. 185-190, which seek documents related to customers listed on Appendix A to Rippling's supplemental response to Deel's Rog 7.

**<u>Rippling's Position</u>**

Rippling asks the Court to order Deel to produce documents responsive to RFPs 185–190 for every company in Appendix A to Rippling's verified supplemental response to Deel's Rog 7 ("Appendix A"), for October 1, 2024 through June 30, 2025. Deel has limited its responses to 204 companies and a narrower date range. But Rippling built Appendix A exactly as the Court's June 18, 2026 Order on Rippling's Rogs 7 and 8 (ECF 287) invited, the Court has already found the narrowing thoughtful and proportional, and RFPs 185–190 target the systems most likely to evidence Deel's misuse of stolen Rippling customer information. Deel should be ordered to respond.

***Background.*** ECF 287 ordered Deel to respond to Rippling's Rogs 7 and 8 for 204 companies. It also permitted Rippling to identify additional companies for which it has "specific evidence tending to show that misappropriation occurred," and directed Deel to supplement for those companies. Over the next two months, Rippling built that list.

Rippling began with the term O'Brien used most often to search Rippling's Slack during the spying scheme: "Deel." On July 13, Rippling served an initial list of about 1,200 companies drawn from Slack posts containing "Deel" in channels O'Brien belonged to or previewed, listing the channel and date for each post at Deel's request. On July 23, Deel complained that sampled entries reflected Gong transcriptions of "deal" as "Deel" and raised other questions. On July 29, Rippling responded point by point and agreed to remove the misspellings. On August 25, it served a revised list of 1,538 companies that removed 78 Slack-derived names and the misspellings, and added 390 companies from customer lists O'Brien photographed for Alex Bouaziz and the two preserved screen recordings. Deel next objected that some posts predated O'Brien's views of the channel. On September 1, Rippling sent a further revision that removed customers posted after O'Brien's last preview of the relevant channel.

Rippling also quality-checked the final list. An attorney or contract attorney reviewed every "Deel" search-term hit; the list was deduplicated and stripped of competitor names; and each Slack-derived entry was confirmed against the trade secrets identified in Rippling's Rog 9 response. Rippling also produced its logs of O'Brien's Slack searches and previews so that Deel could check each entry. The final list contains 1,432 names—about 2.5% of the 58,500 companies on which Rippling previously moved to compel—and identifies each entry's source (Slack channel, O'Brien search, channel preview, New Hire Report, or screen recording) and the date of O'Brien's access. Deel nonetheless refused to supplement its responses to Rippling's Rogs 7 or 8, citing burden.

To address that objection, Rippling served RFPs instead. On September 30, it appended the list to a verified supplemental response to Deel's Rog 7 (seeking information about stolen customer information), and on October 12, it served RFPs 185–190, targeting the systems and communications most likely to reflect Deel's misuse of that information. The following week, Deel argued in a joint discovery report that Rippling was trying to "circumvent" ECF 287.

At the November 5 hearing, Rippling's counsel addressed Deel's argument. Rippling explained that the list reflected "hundreds of hours of work . . . by our attorneys and our contract attorneys," and that Rippling "iterated [the list] three times over the course of two months" in response to Deel's feedback. ECF 490 (Nov. 5 H'rg Tr.) 28:20–23, 29:17–22, 30:17–18. The Court found that Rippling's process was "thoughtful and substantive," and that "Deel simply just doesn't want to engage in discovery along this issue." *Id*. 29:20–25. The Court explained that Rippling does not "need to prove the claims in order to get the discovery" and observed that the information may have been used by "any number of other employees" at Deel beyond Alex Bouaziz. *Id*. 30:5–20. The Court concluded that "there's been an adequate amount" of narrowing "as far as proportionality is concerned under Rule 26 to justify this discovery as not being overbroad or unduly burdensome." *Id*. 30:21–24.

Deel's counsel admitted that Rippling had engaged in "a thoughtful process," but baselessly asserted that about 400 entries were "nonsensical" and asked for more narrowing. *Id.* 31:7–8, 31:17–24. The Court declined: "January is not that far off. So just plow forward and provide the discovery," adding that anything nonsensical is "more that . . . Rippling has to dig through." *Id.* 32:4–9. Deel's counsel answered, "We'll obviously respond." *Id.* 32:10–16.

A week later, Deel did the opposite. Its November 12 responses limit RFPs 185, 186, 188, 189, and 190 to the 204 companies and a period ending April 30, 2025, and assert that no Vitally records exist. On November 19, Deel sent a letter raising new complaints about entries on the list Rippling served nearly three months earlier; those complaints now form the basis for its opposition.

***Argument.*** Each of the RFPs that reference Appendix A is relevant and proportional, and Rippling requires documents responsive to each RFP to identify additional instances in which Deel disclosed and used Rippling's stolen customer information.

[redacted]—a company that well illustrates Deel's misuse of stolen Rippling information (*see, e.g.*, ECF 286 at 2-3)—also shows how the misappropriation moved through the systems subject to RFPs 185–190. On February 24, in an internal Deel Slack channel titled "[redacted]" Deel executive Luke Ferrel asked when [redacted] Rippling contract ended and answered his own question: "[redacted]." His colleagues responded, "[redacted]" and "[redacted]." DEEL-00699004. Deel then contacted [redacted] and held a call with [redacted] on February 27. DEEL-00614669. That one episode appears in Slack (RFP 190), in a Gong-recorded call that *still* has not been produced (RFP 186), and in communications with the customer (RFP 185). Deel's internal notes and analysis of those interactions (which Deel has not produced thus far) will necessarily be in Deel's CRM and customer-success records (RFPs 187, 188).

<u>RFP 185: Communications with Appendix A Companies.</u> Contact with a company after O'Brien viewed that company's information is the most direct evidence of use. Deel already accepted this logic for the 204 companies; the same logic applies to the rest of Appendix A. These are custodial communications Deel already collected.

<u>RFP 186: Gong Transcripts.</u> Deel records and transcribes its sales calls in Gong, and it has described using AI to analyze the transcript of every prospective-client call. Transcripts show what Deel's representatives told Rippling's customers, including whether they raised contract terms, pricing, or service problems they had no legitimate way to know. Gong data is organized by account and is easily searched.

<u>RFP 187: Vitally Records.</u> Vitally is a customer-success platform. Account teams use it to record notes, tasks, and account-health updates for each customer—including notes regarding why a customer is at risk and what the team plans to do about it—and it pulls in data from other systems. Deel used Vitally extensively: Its production includes more than ***500*** documents with links to Deel's Vitally platform (URLs beginning "***deel.vitally.io***"). *See, e.g.*, DEEL-00002088 ([redacted]."). But Deel's November 12 objections asserted that Vitally "is not used in the ordinary course of [its] business." At a November 20 meet and confer, Deel had no explanation for the ubiquity of Vitally links in its production. Then, ***for the first time on the evening of this filing***, Deel disclosed that it stopped using Vitally by October 2024. It appears that, on or about that time, Deel began using a different customer-success platform called Gainsight and transferred its Vitally records to Gainsight. *See* DEEL-01268176. The Court should order Deel to produce records for the Appendix A customers from the relevant time period (October 1, 2024 – June 30, 2025) from whichever customer-success platform—Vitally or Gainsight—contains them.

<u>RFP 188: Salesforce Records.</u> Salesforce shows when Deel opened or advanced an opportunity relative to O'Brien's access, and how much revenue was at stake: stage, close date, "closed won" status, ARR, lead source, and field history. That data goes to misappropriation and damages alike.

<u>RFPs 189–190: Executive Drive Files and Communications.</u> These requests are limited to ten

named custodians, including Alex Bouaziz, O'Brien's alleged handler, and Luke Ferrel, who wrote that Alex "[redacted]." They capture how information was directed and spread inside Deel: target lists, account plans, and the instructions behind outreach.

<u>Deel's Burden Objection.</u> The Court already rejected Deel's burden argument and told Deel to "plow forward and provide the discovery." Deel provides no reason to reconsider. Rippling's requests will not require review of "7 million hits." Deel extrapolates that number from a prior search involving more than double the custodians, a date range that was six times as long, and customer names that overlapped with common words. And the burden argument relates only to RFPs 185 and 190, which seek communications; RFPs 186–189 seek structured records from specific applications (Gong, Vitally, Salesforce, and Google) that will be easy to collect and produce. Deel had ample opportunity to propose narrowing parameters; Deel chose instead to object categorically. The Court should reject its belated attempt to narrow the requests through briefing, either to Salesforce records only (as those records will not contain the full scope of Deel's communications and internal notes about the customers) or to a subset of customers that O'Brien specifically remembers searching, as his memory of the thousands of customers' information he gathered over a five-month spying scheme occurring two years ago will be far from complete.

<u>Deel's New Complaints About Appendix A.</u> Rippling materially revised Appendix A twice in response to Deel's feedback in July–September. After September 1, Deel stopped engaging. Only *after* Deel disregarded the Court's admonition that it should produce the requested documents did Deel raise new complaints about the list. The Court should not require further narrowing. Rippling has worked diligently and in good faith to narrow it, and, as the Court explained, Rippling need not prove its case to receive discovery.

***Requested Relief.*** The Court should order Deel to (1) produce documents responsive to RFPs 185–190 for every Appendix A company for October 1, 2024 through June 30, 2025; (2) collect and produce responsive records from Vitally, including any archived Vitally data, or, alternatively, serve a sworn declaration as described above; and (3) complete production by December 18, 2026.

**<u>Deel's Position</u>:** On October 12, Rippling served its Fifth Set of RFPs, including Nos. 185-190 seeking broad discovery related to a list of 1,432 companies.[1] These RFPs are overbroad for two distinct reasons: (1) they seek nearly every document and communication with a customer or prospect regardless of the subject matter; and (2) the requests refer to a list of companies in App. A, a list that is unreliable, full of errors, and lacks a sufficient nexus to Keith O'Brien.

**<u>The RFPs Are Overbroad and Disproportionate to the Needs to the Case .</u>** RFPs 185–190 seek, in substance, the discovery the Court already declined to order in Dkt. 287, and more. The requests (1) ignore the Court's order, (2) are disproportionate under Rule 26(b)(1), and (3) rest on a list that remains materially flawed. The Court refused to make Deel run 58,500 names against its CRM/Salesforce database because the list lacked "a sufficiently strong nexus with O'Brien's conduct." (Dkt. 287.) **RFP 188** asks for all Salesforce records for 1,432 companies. **RFPs 185, 186, 187, 189 and 190** go further still, seeking all communications, Gong transcripts, Vitally

---

[1] **RFP 185:** All communications between Deel and any company listed in Appendix A from October 1, 2024 through June 30, 2025; **RFP 186:** All Gong transcripts of calls or meetings between Deel and any company listed in Appendix A hereto from October 1, 2024 through June 30, 2025; **RFP 187:** All Vitally Records associated with any company identified in Appendix A, from October 1, 2024 through June 30, 2025; **RFP 188:** All Salesforce Records associated with any company identified in Appendix A, from October 1, 2024 through June 30, 2025; **RFP 189:** All Google Drive Records concerning any company identified in Appendix A that Alex Bouaziz, Dan Westgarth, Philippe Bouaziz, Shuo Wang, Chris Lee, Luke Ferrel, Chelsea Taylor Seifarth, John Crosson, Mike Gallardo, or Phillip Alvarado created or edited from October 1, 2024 through June 30, 2025; **RFP 190:** All communications discussing or referring to any of the companies listed in Appendix A hereto that were sent by Alex Bouaziz, Dan Westgarth, Philippe Bouaziz, Shuo Wang, Chris Lee, Luke Ferrel, Chelsea Taylor Seifarth, John Crosson, Mike Gallardo, or Phillip Alvarado from October 1, 2024 through June 30, 2025.

records and Google Drive files.[2] These RFPs would capture communications and documents far beyond the prospecting and onboarding phase (the commercial components of any relationship) and would reach into the operational servicing of these customers. Such operational communications and documents are untethered to allegations related to O'Brien. The Court already denied a narrower request, and these RFPs ask for much more. Even with approximately 200 companies, which Deel ran against the custodial documents, Deel reviewed **over 1 million hits.** Review costs alone totaled **several million dollars, at least**. With 1,432 companies, based on Deel's last review rate, Deel would have to review approximately **7 million hits**, which would cost Deel upwards of **$3-5 million** dollars in potential review costs. Such discovery is disproportionate since Rippling cannot establish a "sufficiently strong nexus with O'Brien's conduct." (Dkt. 287.)

**The RFPs Do Not Comply With The Court's Order On ROGs 7 and 8.** Rippling admitted that it served these RFPs to "avoid re-litigating Rogs 7 & 8 a third time." (Dkt. 441.) But Rippling cannot just serve additional discovery as an end-run around the Court's order addressing Interrogatories 7 and 8. In that order, the Court "decline[d] to order Deel to run the Rippling-provided list of approximately 58,500 company names against Deel's CRM/Salesforce database" because "[s]uch discovery would be disproportionate to the needs of the case, as the list was created without a sufficiently strong nexus with O'Brien's conduct." (Dkt. 287.) Judge Cisneros ordered Deel to "respond to Interrogatories 7 and 8 with respect to the 204 companies identified as having been listed as customers or prospects in O'Brien's Declaration and exhibits or having been searched by O'Brien in Rippling's internal systems." (*Id.*) Judge Cisneros recognized the potential to supplement and allowed Rippling to "provide a list of companies for which it has specific evidence tending to show that misappropriation occurred and/or companies about which O'Brien, having reviewed the list of 58,500+ companies, recalls sharing information with Deel."

Over the course of the following two months, the parties met and conferred over various iterations of Rippling's Supplemental Customer List. Despite the meet and confers, Rippling has still failed to fix the issues that Deel identified. Deel pointed out a number of flaws with Rippling's list, including the references to Deel either (1) do not exist; (2) are misspellings of "deal"; or (3) contain information that Deel would not want or need but would expose Deel to further expensive and resource-heavy discovery. Rippling represented that it took the following steps to "address the overbreadth concerns": (1) Reviewed the Slack posts to ensure that each named customer appears in a message containing one or more of the compilations of trade-secret information identified in Rippling's response to Interrogatory No. 9; and (2) Removed customers whose names appeared because of misspellings or mistranscriptions of the word "deal." Deel later wrote to identify additional issues, including (a) Slack channel "sources" without a close in time O'Brien view according to the logs; (b) Slack channel "sources" where the company name appeared after O'Brien's last view of that channel; (c) Slack channel "sources" where the company name appeared weeks or months before O'Brien's first view of that channel; and (d) Slack channel "sources" that lack logs indicating any previews by O'Brien. Rippling once again reverted with a further revised supplemental customer list, including purportedly "remov[ing] all customer names derived from posts that appeared in a channel after O'Brien's last preview of that channel." This further revised supplemental list dropped from 1,538 names to 1,384. Then, on October 12, Rippling served its Fifth Set of RFPs, with Nos. 185-190 premised on App. A, apparently abandoning the meet and confer process over its Supplemental Customer List for Rogs 7 and 8. App. A has 1,432 names, 48 more names than the last iteration of the supplemental customer list.[3]

**App. A Remains Defective.** App. A does not comply with the Court's order requiring any list to

---

[2] Deel decommissioned Vitally prior to October 1, 2024. Based on counsel's investigation to-date, produced documents that link to Deel's Vitally platform were generated by automated plugins and do not link to live materials.

[3] Rippling offers Hightouch as an example to show why it should be entitled to this discovery. But Rippling misses the point. Hightouch was included in the original list of 204 and Deel has agreed to produce in response to RFP Nos. 185-190 for this list.

be based on "a sufficiently strong nexus with O'Brien's conduct." (Dkt. 287.) Approximately 1,000 of the 1,432 names fall into category 1 in the description of App. A: "Competitively sensitive information about [the customer] appeared in the context of a Slack thread that also contains the keyword 'Deel' . . . and for which O'Brien either was a member of the channel or he 'previewed it' after the post[.]" (Rippling's Response to Rog 7.) But the Court's Order permits supplementation only with companies (1) for which Rippling has "specific evidence tending to show that misappropriation occurred," or (2) that O'Brien recalls sharing. Category 1 Names were derived based on what O'Brien ***may*** have viewed and Rippling cannot say that O'Brien actually recalls sharing these customer names with Deel. Rippling has added names where O'Brien had **channel access,** but this is not evidence of misappropriation. In addition, the following numerous issues remain with the list of companies in App. A. Deel met and conferred with Rippling as late as November 20, but Rippling refuses to remove the customer names falling into these categories:

1. **No Customer Reference In Source.** For several of the customers, the Slack channel referenced in App. A does not include the customer name. In some instances, it appears this could be due to redacted information. Rippling must first produce a privilege log including these redacted documents before Deel will include these names in any search for responsive documents. But even then, Rippling should remove redactions from the claimed customer name if Rippling wants Deel to accept its assertion that the name is included in the referenced source. Deel must be able to test Rippling's assertion that the customer names exist in the cited source before providing any discovery related to that customer.

2. **Deal Mistranscriptions.** As with previous lists, several names appear as a result of mistranscriptions of "deal" as "Deel," including at least 60 customer names that appear to be included solely based on automated transcriptions misidentifying "Deel." Rippling previously represented that it "[r]emoved customers whose names appeared because of misspellings or mistranscriptions of the word 'deal.'" Rippling has not done so.

3. **Lack of Competitively Actionable Information.** Many of the purported "Deel" hits are references that are not competitively useful. For example, many include historical references to Deel or concern closed deals won by Rippling over Deel (and other competitors). Others contain only passing or non-substantive references to Deel.

4. **Duplicate Customers.** Several customers appear to be identified multiple times under different names, including several instances of entities listed under both their legal names and their DBA names. Rippling must deduplicate its own list.

**Deel's Proposal.** Given the numerous deficiencies contained in App. A, Deel proposes three possible paths forward. *First*, Rippling can remove the names identified in the enumerated list above and confirm that it has re-screened App. A for similar defects and identify, for each remaining company, the specific evidence that it contends shows misappropriation involving that company as required by the Court's June 2026 Order. *Second*, Deel can respond to RFP Nos. 185-190 based on Deel's Appendix A to Interrogatory No. 7. Rippling has repeatedly stated that Rogs 7/8 provided "gating" discovery that was necessary before pursuing additional discovery, but then abandoned that approach in favor of these far-reaching RFPs. *Third*, the most efficient course would be to reconsider these RFPs and the appropriate scope of Deel's response *after* the deposition of Mr. O'Brien, so he can shed light on the issues identified above. To address the overbreadth of the requests, Deel proposes a phased approach wherein it first responds to RFP 188, with All Salesforce Records for the appropriate list of prospects and customers. As Rippling has acknowledged, that data is structured in a way that minimizes the burden for Deel. If that production reveals information justifying further discovery, then Rippling can pursue its remaining requests (RFPs 185, 186, 187, 189, and 190) for that subset of companies for which it can identify a "sufficiently strong nexus with O'Brien's conduct."[4]

[4]The Court's comment that the parties should "plow forward" predates the 4-month extension of the case schedule.